JODI LINKER
Federal Public Defender
Northern District of California
ANGELA CHUANG
TODD M. BORDEN
Assistant Federal Public Defenders
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:       Angela_Chuang@fd.org

Counsel for Defendant DePape

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 22–00426 JSC |
| Plaintiff, | **DECLARATION OF BRYAN EDELMAN IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER VENUE** |
| v. | |
| DAVID WAYNE DEPAPE, | |
| Defendant. | |

## DECLARATION OF BRYAN EDELMAN, Ph.D.

I, Bryan Edelman, solemnly, sincerely, and truly declare and affirm as follows:

## I.    INTRODUCTION

I am the co-founder of Trial Innovations, Inc., a national full-service jury research firm. I have worked as a trial consultant for 20 years and have conducted pretrial and post-trial research on both criminal and civil cases across the country. I have been retained as an expert in over 70 high profile cases to assess the impact of pretrial publicity on the fairness of the trial

proceedings including the *State of Colorado v. James Holmes*, *United States v. Robert Bowers*, *State of Florida v. Nikolas Cruz*, and the Flint water crisis.

Counsel for the defendant in *United States v. David DePape* retained me to research and evaluate: (1) whether there was extensive and prejudicial pretrial publicity regarding the assault of Paul Pelosi and attempted kidnapping of Nancy Pelosi; (2) determine if the media coverage has impacted the defendant's ability to obtain a fair and impartial jury in the San Francisco Division of the Northern District of California; and (3) based on the findings, recommend appropriate remedial measures—for example, a change of venue or intra-district transfer—to protect the DePape's ability to be tried by a fair and impartial jury. As part of my analysis, I evaluated relevant newsprint, television, and social media coverage surrounding these events and conducted a community attitude survey in the San Francisco, San Jose, and Eureka Divisions of the Northern District of California. A third comparison survey was conducted in the Phoenix Division of the District of Arizona. These surveys were designed to assess case recognition, familiarity with prejudicial media content, and bias.

Based on my analysis, it is my opinion that the San Francisco Division jury pool has been exposed to inflammatory and prejudicial pretrial publicity surrounding David DePape, his conspiratorial beliefs, alleged political motivations, the assault of Paul Pelosi, the attempted kidnapping of Nancy Pelosi, and misinformation spread by Elon Musk and other influential public figures.

The pretrial publicity to date is overwhelmingly negative in how it depicts the defendant and his motivations for breaking into the Pelosi's home. He is portrayed as a conspiracy theorist and proponent of right-wing hate. The media closely detailed the break-in and assault on Paul Pelosi. This coverage offered a chronology of events including DePape's plan to not only torture Nancy Pelosi but use her to lure other public figures on his list. The pretrial publicity also reported on prejudicial details from the preliminary hearing. The media saturated the jury pool with detailed descriptions of the defendant's statements to investigators and made recordings of the break-in, 911 call, assault of Paul Pelosi, and a confession to KTVU News widely available to the public. The media also detailed an 18 minute jailhouse interview with investigators where DePape told police that he planned to hold Nancy Pelosi hostage because of her leadership of the Democratic Party in the House of Representatives and falsely accused

her of a "record-breaking crime spree." Overall, the coverage to date has been highly prejudicial and creates a strong presumption of guilt.

A community attitude survey[1] was conducted to assess the impact of the media coverage on the San Francisco Division jury pool. Approximately **77%** of the survey respondents were familiar with the case, which increased to **93%** for those who regularly watch the news and read the newspaper. In addition, community members have more than just a passing familiarity with the case. Approximately **55%** of survey respondents recognized at least four of six media items tested in the survey. [2] Thirty-eight percent (**38%**) of those familiar with the case had seen video of David DePape breaking into the Pelosis' home or footage of him striking Paul Pelosi in the head with a hammer. Another **25%** had read, seen, or heard the media describe the video of the assault.

The survey data indicate that the media coverage has shifted the burden of proof to the defendant. Many community members in the San Francisco Division hold a "presumption of guilt" in this case. Seventy-seven percent (**77%**) of survey respondents who recognized the case reported that David DePape is guilty of assaulting Paul Pelosi, with **48%** indicating that he is "definitely guilty." The number who believed the defendant is guilty of assault increased to **87%** for those who recognized four or more media items. In addition, **68%** of survey respondents familiar with the case reported that DePape would have a difficult time convincing them that he is <u>not</u> guilty. Once again, bias was significantly related to exposure to pretrial publicity. Eighty percent (**80%**) of prospective jurors who knew four or more of the specific media items tested in the survey indicated that the defendant would have a difficult time changing their opinion.

With regards to the attempting kidnapping charge, **54%** of community members who recognized the case reported that David DePape is guilty. This number increased to **65%** for those who recognized four or more media items. In addition, **46%** of these survey respondents reported that he would have a difficult time convincing them that he is <u>not</u> guilty of attempted kidnapping. That number increased to **57%** for those prospective jurors who recognized four or more media items.

---

[1] A community attitude survey is telephone survey which uses a random digit dialing methodology to evaluate case recognition, familiarity with widely reported news content, and prejudgment. Respondents are screened to ensure that they are jury eligible and representative of the jury pool.

[2] These media items are specific pieces of content which were widely reported in the news coverage.

Case recognition and prejudgment were also high in the comparison venues. However, there were nuanced differences. For example, only **39%** of the Eureka Division survey respondents reported that the defendant was guilty of attempting to kidnap Nancy Pelosi, and **38%** indicated that he would have a difficult time convincing them otherwise. In addition, prospective jurors in the Eureka Division were less familiar with specific items reported by the media. Just **37%** recognized four or more media items, 18 percentage points lower than their counterparts in the San Francisco Division.

In conclusion, given the nature of the pretrial publicity—and its negative impact on the San Francisco Division jury pool—it is my opinion that the presumption of innocence has been undermined. As such, remedial measures are necessary to protect the defendant's right to a fair and impartial jury. An intra-district transfer to the Eureka Division or a change of venue to an alternate district less connected to these events would be an appropriate and efficient measure for ensuring a fair and impartial jury.

## II.    QUALIFICATIONS

**Education and Experience**: A copy of my curriculum vitae can be found in **Appendix A** to this declaration. Upon completion of my undergraduate education, I received an MA and Ph.D. in Social Psychology from the University of Nevada, Reno, and an LL.M. from the University of Kent in the United Kingdom.  My graduate studies have provided me with a broad foundation in both qualitative and quantitative research methodologies as well as statistics

The Social Psychology Program at the University of Nevada is unique in that it is one of the few in the country that has an emphasis on the application of social psychological theory to the legal arena.  During my studies I specialized in jury related issues and examined how attitudes, race, stereotypes, pretrial publicity, and other factors influence juror and jury decision-making.  In this regard, I took coursework addressing topics associated with change of venue motions, the impact of pretrial publicity on jurors' ability to be fair and impartial, and the steps necessary to conduct a change of venue analysis.  The University's association with the National Judicial College and other government agencies also afforded me the opportunity to

conduct research with the Public Defender, District Attorney, Court Services, the judiciary, and others institutions in Washoe County, Nevada.

**Research Experience**: While at the University of Nevada, Reno I worked as a Research Assistant and Project Manager at the Grant Sawyer Center for Justice Studies where I assisted with several national surveys, including one that examined the judiciary's understanding and application of the Daubert standard.  I also explored how jurors "minimize" what they have read, seen, or heard about high profile cases during voir dire.  In addition, I oversaw a study of the Washoe County's pretrial release program and assisted with the development of training programs for foreign justices, court administrators, prosecutors, and defense attorneys who were brought to the United States by the Department of State.

Further, I have conducted and published research on the impact of illegitimate factors on juror decision-making.  This research included developing and testing a model that attempted to explain how factors such as race and empathy influence pre- and post-deliberation sentencing decisions in capital cases.  My research on juror decision-making in capital cases was later published as a book.  Since completing my studies I have also published on the impact of graphic images on jurors, and on methodological issues associated with online survey research.

**Jury Research Experience**: I began working as a trial consultant in 1998 and cofounded Trial Innovations in 2010.  Over the years I have worked on hundreds of criminal and civil cases across the country.  As a trial consultant I have conducted mock trials, focus groups, surveys, post-trial interviews, and other research exercises.  I have consulted in the courtroom and assisted with jury selection on more than 100 cases.  I have also served as a presenter at local bar associations, law firms, national meetings, and conferences.  In addition, I have been invited to conduct MCLE courses related to jury selection by the Public Defender, Alternate Defender, and District Attorney in California, Nevada, and New Mexico.  I have also served as a guest lecturer at the University of Santa Cruz, Saint Mary's College, and Stanford Law School.

**Venue Experience**: As a graduate student, I was trained by Dr. Ronald Dillehay and Dr. Edward Bronson, two of the leading experts in the country on venue and pretrial publicity.

Over the years I have had the opportunity to work with Dr. Bronson on a number of change of venue studies.

I have worked on change of venue issues in several different capacities. As a researcher I have coded trial transcripts in high profile cases to evaluate how jurors "minimize" their bias and exposure to pretrial publicity during voir dire, and the challenges this phenomenon poses for judges and attorneys. In addition, I examined the impact of television pretrial publicity on prejudgment of guilt. I have also presented as a panelist on change of venue issues at the American Society of Trial Consultants' annual conference and been a co-author on the chapter in the "California Criminal Law Procedure and Practice" on change of venue since 2011.

I have conducted content analyses of media coverage on a host of topics and have designed more than 50 community attitude surveys over the years. I have been retained as an expert to conduct and evaluate change of venue studies, and also to recommend remedial measures for addressing exposure to pretrial publicity outside of a change of venue.

**Expert Witness Experience**: I have been retained as an expert witness on matters including freedom of religion in China (political asylum hearing), eyewitness identification, and change of venue. I have testified as an expert witness in person or by declaration in California, Idaho, Colorado, Texas, Michigan, Florida, Massachusetts, Nevada, Pennsylvania, Tennessee, West Virginia, and Washington in state and federal court. In the majority of cases I have been retained to conduct a change of venue study,[3] I have recommended against a change of venue.

### III.    THE INFLUENCE OF ATTITUDES ON COGNITION[4]

There is a substantial body of literature documenting the impact of attitudes on information processing. Attitudes have been shown to have an impact on selective attention, the evaluation of new information, memory recall, and behavior. This research provides insight into how media coverage may lead to juror bias.

---

[3] These exclude instances where I have been hired to review a change of venue survey, assist with addressing media coverage during voir dire, or review trial transcripts and pretrial publicity as part of a post-conviction appeal.

[4] Cognition is a term referring to the mental processes involved in gaining knowledge and comprehension, including thinking, knowing, remembering, judging and problem solving.

Pretrial publicity can have a prejudicial effect on jurors through its impact on the formation of attitudes and beliefs that they bring into the courtroom. Attitudes are not isolated entities but are often linked to other memories, experiences, attitudes, and beliefs. These links can create large networks of attitudes, which are resistant to change. The links between attitudes strengthen with repeated activation. As these links strengthen, the probability increases that the attitudes and underlying beliefs will be consistent with one another and brought to awareness simultaneously. Attitudes that are strongly linked to one another are more easily accessible in memory and more likely to be automatically activated with exposure to the attitude object. Attitudes can be activated automatically without any conscious, intentional processing. This is more likely to occur when an attitude has been repeatedly activated in the past.[5]

When media coverage surrounding a case is broad, extensive, and redundant, strong links between relevant attitudes and beliefs begin to form. If the pretrial publicity creates links between case details, attitudes, and beliefs over the course of a trial, these attitudes are likely to be automatically activated at a subconscious level. As described below, this network of linked attitudes can have an impact on a juror's attention to and evaluation of the evidence and arguments presented in court.

As the network of linked attitudes grows and strengthens, specific attitudes become resistant to change because change requires revisions to other attitudes and beliefs within the network. Resistance to revising well-established attitudes has been shown to lead to biased information processing. When attitudes are strong, there is a tendency to favor arguments and information in support of those attitudes over arguments that may disprove them. The acceptance of a counterargument can create cognitive dissonance.[6] In an effort to avoid cognitive dissonance, information that supports attitudes may be selectively attended to and

---

[5] Eagley, A.H., & Chaiken, S. (1993). *The psychology of attitudes.* Florida: Harcourt Brace College Publishers.

[6] Cognitive dissonance is an uncomfortable feeling caused by holding two contradictory ideas simultaneously. People have a motivational drive to reduce dissonance by changing their attitudes, beliefs, and behaviors or by justifying or rationalizing them.

counterarguments may be distorted or dismissed.[7]

Attitudes can also have an impact on attention and recall. Research has shown that information that supports a preexisting attitude is easier to learn, more accurately retained and easier to recall. The links formed between attitudinally supporting information and preexisting attitudes are stronger than those formed between counterarguments and preexisting attitudes. As a result, the latter is more difficult to retrieve from memory. Further, there is a tendency to produce new beliefs, which support preexisting attitudes and suppress those that run counter to such attitudes.

In sum, when a venue is exposed to prejudicial media coverage surrounding a crime, there is a risk that potential jurors will develop a large network of linked attitudes and beliefs relating to the victim, the defendant, and the crime. These linked attitudes include opinions about the guilt of the defendant, appropriate sentence and evaluations of the evidence presented through the media. When the links between attitudes are strong, they can be activated at a subconscious level and have an impact on jurors' evaluation of the evidence and arguments presented at trial.

Attitudinally supporting arguments will be more closely attended to, evaluated as persuasive, integrated into the existing network of attitudes and beliefs and made easily accessible during deliberations. In contrast, counterarguments and evidence conflicting with well-established attitudes may create cognitive dissonance. As a result, jurors will either ignore this evidence or make cognitive efforts to refute it. This evidence will not establish strong links to preexisting attitudes and will not be easily accessible during deliberations. When a venue has been saturated with pretrial publicity, these psychological processes can put the defendant at a significant disadvantage, undermine the presumption of innocence, and diminish the prosecution's burden of proof.

The prejudicial impact of preexisting attitudes is accentuated by the fact that the media

---

[7] For example, people list more counterarguments for information that refutes preexisting attitudes than information that supports them.

coverage underlying them is often biased in favor of the prosecution. Furthermore, news content is encoded under very different circumstances from those found in the courtroom, because the rules of evidence that are strictly enforced at trial do not apply. As such, the persuasive impact of information presented through the news media becomes more significant and engrained in the juror's mind than the evidence presented at trial.

## IV.    THE PREJUDICIAL IMPACT OF PRETRIAL PUBLICITY

There is a body of research within the social sciences that attempts to address the impact of pretrial publicity on decision-making in the courtroom. This literature suggests that pretrial publicity influences evaluations of the defendant, perceptions of criminality, sympathy toward the defendant, pretrial judgments regarding guilt, and final verdicts.[8]

Daftary-Kapur, Penrod, O'Connor, and Wallace (2014) conducted a field study that incorporated real time evidence into the methodology.[9] Participants included jury-eligible community members who were naturally exposed to pretrial publicity over a 14-month period leading up to the trial. Trial summaries were presented online during six sessions over the course of ten weeks.

The researchers reported a pretrial publicity effect that persisted throughout the actual trial. Despite the admonitions to set-aside prejudicial pretrial publicity, participants were biased by the content of the pretrial publicity. Specifically, those exposed to prosecution-oriented

---

[8] *See* Constantini, E., & King, J. (1980-1981). The partial juror: Correlates and causes of prejudgment. *Law and Society review, 15,* 9-40; DeLuca, A.J. (1979). *Tipping the scales of justice. The effects of pretrial publicity.* Unpublished master's thesis, Iowa State University, Ames; Hvistendahl, J.K. (1979). The effect of placement of biasing information. *Journalism Quarterly, 56,* 863-865; Kline, F.G., & Jess, P.H. (1966). Prejudicial publicity: Its effects on law school mock juries. *Journalism Quarterly, 43,* 113-116; Moran, G. & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology, 21,* 345-367; Otto, A.L., Penrod, S., & Dexter, H. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior, 18,* 453-470; Padawer-Singer, A. & Barton A.H. (1975). The impact of pretrial publicity on jurors' verdicts. In R.J. Simon (Ed.) *The jury system in America: A critical overview* (pp. 123-139). Beverly Hills, CA: Sage; Simon, R.J., Eimermann, T. (1971). The jury finds not guilty: Another look at media influence on the jury. *Journalism Quarterly, 48,* 343-344; Sue, S., Smith, R.E., & Gilbert, R. (1974). Biasing effect of pretrial publicity on judicial decisions. *Journal of Criminal Justice, 2,* 163-171;Tans, M., & Chaffee, S. (1966). Pretrial publicity and juror prejudice. *Journalism Quarterly, 43,* 647-654.

[9] Daftary-Kapur, T., Penrod, S.D., O'Connor, M. & Wallace, B. (2014). Examining pretrial publicity in a shadow jury paradigm: Issues of slant, quantity, persistence, and generalizability. *Law and Human Behavior,* 38(5), 462-477.

articles were more punitive in their guilty ratings across all six sessions compared to those exposed to pro-defense pretrial publicity. The amount of the pretrial publicity participants were exposed to also had a significant effect. In addition, the biasing effect of pretrial publicity did not disappear over time. Thus, neither delay nor trial evidence eliminated the pretrial publicity effect on judgments of guilt.⌞SEP⌟

Steblay, et al. (1999) conducted a meta-analysis[10] encompassing 44 research studies on pretrial publicity. The authors reported a statistically significant relationship between pretrial publicity and verdicts.[11] Media coverage addressing the defendant's prior record, the existence of confessions, the heinousness of the crime, and negative character of the defendant have all been shown to have an effect on perceptions of guilt and final verdicts. Furthermore, deliberations may not reduce the biasing impact of pretrial publicity.[12] In fact, Kramer, Kerr, and Carroll (1990), found that deliberations actually accentuated the effects of pretrial publicity on final verdicts.[13]

Dexter, Cutler, and Moran (1992) also reported a significant relationship between pretrial publicity and views toward guilt. Participants were given pretrial publicity a week before the study began. Negative pretrial publicity increased conviction rates, even for subjects who underwent extensive voir dire addressing pretrial publicity.[14]

As demonstrated by Ruva and McEvoy (2007) exposure to pretrial publicity can influence verdicts by affecting perceptions of defendant credibility, ratings of the prosecuting and defense attorneys, and source attribution errors (i.e., misattributing information learned from the media as evidence presented as trial evidence).[15]

---

[10] A meta-analysis is a statistical analysis of several separate but similar experiments or studies in order to test the pooled data for statistical significance.

[11] Steblay, Jasmina Besirevic, Solomon M. Fulero, Belia Jimenez-Lorente. "The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytic Review", Law and Human Behavior, vol.23, no.2, pp. 219-235, 1999.

[12] Otto, A.L., Penrod, S. & Dexter, H.R. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior*, 18(4), 452-469.

[13] Kramer, G.P., Kerr, N.L., & Carroll, J.S. (1990). Pretrial publicity, judicial remedies, and jury bias. *Law and Human Behavior,* 14(5), 409-438.

[14] Dexter, H., Cutler, B.L., & Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology*, 22, 819-832.

[15] Ruva, C.L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision-making. *Journal of Experimental Psychology: Applied,* 14(3), 226-235.

Consistent with the experimental literature on attitudes described above, Hope, Memon, and McGeorge (2004) found that jurors exposed to negative pretrial publicity evaluate pro-prosecution evidence more favorably than its actual probative value, a phenomenon coined "pre-decisional distortion."[16] Thus, attitudes developed from exposure to pretrial publicity serve as a filter through which later trial evidence is evaluated.

## V.    MEDIA ANALYSIS

A careful effort was made to collect the articles published in newspapers with circulation in the San Francisco Division of the Northern District of California to assess the extent of coverage surrounding this case and the defendant. A search of the *San Francisco Chronicle, San Francisco Examiner,* and *San Francisco Foghorn* uncovered **93** articles which reference these events between October 28, 2022, and April 12, 2023. This case shocked the public and generated significant additional coverage at the state and national level. Attached as **Appendix C** is a compilation of those 93 articles.

The nature of the coverage is an important factor to consider when weighing the need for a change of venue. The pretrial publicity to date is overwhelmingly negative in how it depicts the defendant and his motivations for breaking into the Pelosi's home. He is portrayed as a conspiracy theorist and proponent of right-wing hate:

- DePape had a history of promoting **far-right conspiracy theories**, which have increasingly focused on Nancy Pelosi.

- Websites bearing his name, although never mentioning Pelosi, also included posts **invoking QAnon and a number of far-right conspiracies**.

- Websites bearing his name, although never mentioning Nancy Pelosi, also included posts **invoking QAnon** and a **number of far-right conspiracies**.

- But social media **screeds** DePape apparently wrote in the months and days leading up to the attack paint a **portrait of a man who had latched onto various right-wing conspiracy theories** including **QAnon**

---

[16] Hope, L., Memon, A. & McGeorge, P. (2004). Understanding pretrial publicity: Predecisional distortion of evidence by mock jurors. *Journal of Experimental Psychology: Applied,* 10, 111-119.

- The blog, which has now been removed, also included **bigoted commentary** directed **at people of color, women, Jewish people, Muslims, members of the LGBTQ community and immigrants**.

- Blog posts in his name declared that COVID vaccines are harmful and that the 2020 election was stolen

- More and more, he had become **consumed with far-right politics** and **conspiracy theories**, and he posted **bigoted rants** on personal websites that appeared to have no audience.

- The suspect in the attack, David DePape, m**aintained several blogs that were consumed with extreme right-wing conspiracy theories** -- about **"satanic pedophile" communists, the Holocaust and the destruction of white society by an elite government cabal led by antifa and progressives**.

- Ciccarelli has known DePape for six years and said that his involvement with **extremist groups** was "a gradual process," and that DePape spoke about **"Hillary Clinton, Pizzagate, MAGA, the election was stolen — all of it."**

- DePape ran a now-deleted  blog with **right-wing conspiracy theories and slander targeting Black people and Jews**.

- **Motivated** by his apparent **revulsion** with national **politics**, DePape had spent the past few years writing **bizarre and rambling blog posts that seemed to have no audience.**

- Multiple websites bearing DePape's name shared far-right conspiracy theories and memes, including m**ultiple invocations of defamatory claims that high-ranking Democratic politicians**.

- …inspired by right**-wing conspiracy theories about Nancy Pelosi**.

- His blogs were filled with **references to far-right conspiracy theories**, **QAnon insanity and racist and anti-LGBTQ ramblings**. Weeks before the attack, he created posts with headlines like "**Communist Voodoo science," "Feminist gets owned" and "The woke are Racists with a guilty conscience**."

- …railed against Democrats and referenced **QAnon**, the baseless conspiracy theory

claiming that the Democratic Party — and other institutions and or**ganized the theory's adherents believe oppose former President Donald Trump — is comprised of Satanic, cannibalistic pedophiles who traffic children for sex**.

- DePape had filled websites with these theories along with **bigoted screeds directed at people of color, women, Jewish people and others**.

- DePape appears to be part of the **conspiracy theorists' internet tribe**. On Facebook, he has posted **links to multiple videos produced by Mike Lindell, Trump's Big Lie amplifier and My Pillow CEO**.

The political nature of this crime created a firestorm of misinformation promoted and spread by national figures including Elon Musk and former president Donald Trump. These prominent individuals gave credence to false claims that the defendant and Paul Pelosi knew each other and were having a sexual relationship:

- **Musk on Sunday tweeted a homophobic conspiracy theory** about the relationship between **Pelosi and David DePape**, the man facing federal and state charges in the attack.

- Within it, many **prominent conservatives have spread and continue to spread misinformation** and disinformation about the attack on Pelosi, from which the 82-year-old required extensive surgery.

- **Donald Trump Jr.,** Louisiana Rep. **Clay Higgins and far-right filmmaker Dinesh D'Souza all shared tweets referencing the homophobic conspiracy theory**, which relied upon a retracted detail from a KTVU report about what DePape was wearing.

- Others, including **D'Souza and Georgia Rep. Marjorie Taylor Greene**, **falsely claimed that DePape was Pelosi's** friend**,** after an excerpt of the 911 dispatch shared on Twitter said Pelosi called DePape "a friend."

- The case over the last few days took **another dark turn as bizarre**, **largely anti-LGBTQ conspiracy theories** about the attack were amplified by some of the nation's most visible public figures, including **Elon Musk and Donald Trump**.

- **Musk on Sunday tweeted a homophobic conspiracy theory** about the **relationship**

**between Pelosi and David DePape**, the man facing federal and state charges in the attack.

- **Former President Donald Trump** claimed that the house invasion **"wasn't a break-in, it was a break-out," saying, falsely, that the glass door had been smashed from the inside**.

- **His son Donald Trump Jr.** shared a social media post saying, **"Got my Paul Pelosi Halloween costume ready"** and showing pictures of a hammer and a pair **of underwear,** an apparent reference to the **bogus allegation that Paul Pelosi was having an affair with DePape**.

- **President Donald Trump, have responded by promoting additional conspiracy theories** about what happened in the Pelosi's home.

- Pelosi attributed the attack to a **"flame that was fueled by misinformation."** She "absolutely" agreed with President Joe Biden's tying the attack to the Jan. 6 insurrection.

- When **asked about conspiracy theories** about the attack spread by former President Donald Trump and Elon Musk, Pelosi said, "It's really sad for the country that people (who) have that high visibility would separate themselves from the facts and the truth in such a blatant way."

- **Multiple conspiracy theories about the attack have circulated**, such as the theory that **Pelosi and DePape knew each other** before the attack and were **involved in a romantic relationship**, or that **DePape was a male prostitute who Pelosi was soliciting**.

- Accounts of the incident **became so riven with misinformation** on social media.

- **Misinformation and disinformation** about the Paul Pelosi attack **spread on Twitter**.

- **Trump supporters, and Trump himself, shared unfounded conspiracy theories** about the attack on Paul Pelosi, further exposing the deep divisions that rend the nation.

1   • Many on the right responded by **spreading even more conspiracy theories** about the

2   attack itself.

3   • **Former President Donald Trump; Tesla and Twitter CEO Elon Musk; Sen. Ted**

4   **Cruz, R-Texas; and Rep. Marjorie Taylor Greene, R-Ga., spread conspiracy**

5   **theories** claiming DePape was **attempting to break out of rather than into the**

6   **Pelosi home**.

7   • Paul Pelosi was **drunk and in a fight with a male escort**.

8   • Meanwhile, the images set off a new round of unfounded speculation from some

9   right-wing media figures.

10  • They said the foot**age raised more questions and implied it was unusual that Paul**

11  **Pelosi was holding a drinking glass** when he opened the door.

12  • **Seized on the glass a**nd claimed that Paul Pelosi was an alcoholic whose disease

13  invited the situation.

14  • They also laid bare the **viciousness of moves by right-wing activists** and media

15  outlets to **spread false and often homophobic claims** about what happened -- a tack

16  that continued Friday, despite the evidence in the recordings, including the stark

17  image of Pelosi losing his grip on an assailant's hammer.

18  • He also argued that the r**elease of the recordings would fuel more unfounded**

19  **conspiracy theories** about the attack, which have **proliferated on social media and**

20  **conservative news outlets**.

21  • They are **swallowing the same disinformation** that many spread online about Paul

22  Pelosi's attack.

23  • **It was spread by everyone from Trump to Twitter CEO and Tesla founder Elon**

24  **Musk,** who shared an **anti-LGBTQ conspiracy theory** about the attack.

25  • It is the kind of **misinformation that feeds people like DePape**. And what pushed

26  him into that frame with Paul Pelosi.

27  • Many accused her of lying or covering up the circumstances surrounding the attack,

28  often citing **unsupported conspiracy theories that DePape knew Paul Pelosi**.

Many contained **links to far-right websites** that promoted inaccurate information about the assault.

- The release of the footage last month, however, **sparked a new round of unfounded speculation from some right-wing media figures**, underscoring the extent to which **misinformation** around the case has been almost impossible to quash.

- The **promotion** of **false information** by people like Carlson with a platform on a major network like Fox News has **allowed unfounded theories to go mainstream**.

- Musk **amplified a baseless anti-LGBTQ conspiracy theory** about the attack.

The timing of the attempted Pelosi kidnaping coincided with the midterm elections, which generated additional political commentary from candidates and discussion around escalating violence against elected officials:

- "It makes me so angry because this is a **direct result of the right-wing conspiracy theory demonization campaign against Speaker Pelosi** and against so many other progressive leaders," Wiener said. "There **has to be accountability** for this kind of extreme right-wing rhetoric that directly incites violence and undermines democracy."

- Rep. **Marjorie Taylor Greene**, R-Ga., **said the attack was an example of crime "rampant in Joe Biden's America**."

- **Republican National Chair Ronna McDaniel** told Fox News that "if this weren't Paul Pelosi, **this criminal would probably be out on the street tomorrow because of "Democrat policies**."

- The attack on Paul Pelosi **prompted a flood of vitriolic emails to San Francisco officials**, many from people **influenced by conspiracy theories** who accused the district attorney of lying and corruption, records obtained by The Chronicle show.

- The emails, some laden with **racial slurs and expletives**, help illustrate the **extent to which misinformation that circulated online and was shared** by prominent people including former **President Donald Trump and Twitter CEO Elon Musk** shaped the story of the attack.

- **Gov. Gavin Newsom** has done it -- **criticizing Republicans who have made light of the incident**, in which an attacker broke into House Speaker Nancy Pelosi's home and fractured her husband's skull with a hammer.
- In one **close congressional race** in Southern California, **Democrat Christy Smith has accused her opponent of bearing responsibility for the attack because he has called Nancy Pelosi "evil."**
- In Northern California, **congressional candidate Dr. Kermit Jones talked about the event** with supporters over the weekend, saying it **underscores that civility and American democracy are at stake in this election.**
- Two days later, Jones brought Pelosi up on his own during an event with campaign volunteers. **Jones described the attack on Pelosi's husband as a symbol of the hyper-partisan politics** he says he's **running to fight, which drew sympathetic groans** from his audience of supporters.
- **"We're in a political environment where one side seems to think the truth is malleable and political violence is OK,"** he said.
- A **week out from the election, Jones is using the attack as part of his effort** to present himself as an **antidote to partisan rancor**.
- **Newsom has been blasting Republicans** who have **made flippant comments about Pelosi**, including Arizona **gubernatorial candidate Kari Lake and Virginia Gov. Glenn Youngkin**.
- He's also **criticized Texas Sen. Ted Cruz, who tweeted screenshots from a conservative commentator suggesting "none of us will ever know for sure" what motivated the attack**.
- **Multiple law enforcement agencies have said the attack was politically motivated** against Nancy Pelosi.
- **"Mocking an (82-year-old) in the ICU with a fractured skull takes a special kind of talent**," Newsom tweeted in response to a video of **Lake's comments. "Youngkin, Cruz, Lake... the character of the @GOP is on full display for us all to see."**

- **"Radicalization and violence from extremists** is the direct result of people like my **opponent @RepMikeGarcia,"** she wrote on Twitter. "Mr. Pelosi and the family are owed an apology from you Mike."

- **Some Republican candidates also joked about the attack on the campaign trail**, and Pelosi said those jokes are "traumatizing."

- She has said **that the brutal attack on husband** Paul Pelosi in their San Francisco home last month **shaped her decision. "I will not seek re-election to Democratic leadership** in the next Congress," Pelosi said to a packed chamber.

- **"She's losing the gavel, but finding the hammer,"** Rep. Andy Biggs of Arizona said **with a smile** in one clip, referencing Nancy Pelosi's intent to step down from House leadership in January.

- **"Apparently her house doesn't have a lot of protection,"** Kari Lake, who lost the race for Arizona governor, **joked in another**.

- **"We're going to send her back to go be with him in California, that's what we're going to do,"** Virginia Gov. Glenn Youngkin quipped in a third.

- His alleged attack on **Paul Pelosi came days before a hotly contested midterm election, jolting a nation and hardening political divisions**.

- **Just hours after the release of the audio and videos**, Republican National Committee Chairwoman R**onna McDaniel said, "Why are we in California? Because I just wanted to rub Nancy Pelosi's face in it one more time**."

- And they **illustrate how political violence in America is escalating every day**.

- **Some expressed glee over the violence**. "I **personally would like to give him a medal," one emailer wrote about DePape**. "That **disgusting Nancy is finally getting the karm**a that should've come her way years ago."

The media closely detailed the break-in and assault of Paul Pelosi. This coverage offered a chronology of events including David DePape's plan to not only torture Nancy Pelosi but use her to lure other public figures on his list. The pretrial publicity also reported on prejudicial

details from the preliminary hearing:

- DePape using a **hammer to bash through a glass rear entryway** to the Pelosi home.

- David DePape, 42, of Richmond had u**sed a hammer to break the glass backdoor and enter the Pelosi home**.

- He **carried a backpack**, which he left just outside the backdoor, filled with **zip ties, a roll of tape, a rope and gloves**.

- He **walked inside with the hammer**, made his way upstairs to the Pelosi bedroom and **awoke the man sleeping on the bed**: Paul Pelosi, the 82-year-old husband of Nancy Pelosi.

- Paul Pelosi **told the man his wife was not home** and the man responded that he **would sit and wait for her**. Even when Paul Pelosi told the man his wife wouldn't be home for several days, the man **insisted he would wait**.

- **DePape told Paul Pelosi he would tie him up so that he could get some sleep** while he waited, because he had grown tired from carrying the backpack to the Pelosi home.

- **Attacked Paul Pelosi with a hammer** in **front of the responding officers.**

- Startled awake, **Paul Pelosi managed to slip into a bathroom and surreptitiously call 911**.

- When police arrived, they **saw the two men struggling over a hammer**, which **DePape wrested from Paul Pelosi** and used **to strike the elderly man unconscious, fracturing his skull**.

- **Fracturing his skull with a hammer** at their home in San Francisco

- He would **hold Nancy Pelosi hostage and talk to her**. If she told the "truth," he would free her; if she lied -- which is what he expected -- **he would break her kneecaps**. He figured, she **would then have to be wheeled into Congress -- and other representatives would learn there were consequences to actions,** the affidavit said.

- He **believed he could use her to lure another individual**, who was not named, according to the investigator's account.
- Paul Pelosi **managed to slip into a bathroom and call 911**.
- Although DePape heard the 911 call and knew police were coming, **he stayed put, because, "much like the American founding fathers with the British, he was fighting against tyranny without the option to surrender,"** Minor said in the affidavit, citing DePape's interview with officers after his arrest.
- **At 2:31 a.m., a police squad car rolled up** to the brick house and Officers Kolby Wilmes and Kyle Cagney **knocked on the door**, by which point the two men had moved downstairs to the entryway. **Paul Pelosi "ran over and opened" the door, and the two men began struggling over the hammer**.
- **Wilmes and Cagney saw the two men grappling and commanded them to drop the tool**, but **DePape wrested the hammer from Pelosi and in a split second struck him on the head**. Paul Pelosi collapsed, apparently unconscious.
- At that point the **officers rushed in, restrained DePape, took his hammer away**.
- **In his bag, investigators said they found the rope, tape and gloves**.
- Comparing himself to an American founding father fighting British tyranny, **DePape said repeatedly that he could not give up**. He **would go "through" Paul Pelosi rather than surrender**, the affidavit said, **making the 82-year-old man endure a "punishment" that was intended for his wife, he later told investigators**.
- Federal prosecutors on Monday **revealed chilling new details** about the attack, including the suspect's alleged plot to hold Speaker Nancy **Pelosi hostage** and **potentially break "her kneecaps."**
- Police at the scene dis**covered multiple tools that could have been used to carry out a kidnapping**, including "a roll of tape, white rope, a **second hammer, a pair of rubber and cloth gloves and zip ties from the crime scene**.

- When DePape came into the bedroom, **he told Paul Pelosi that he wanted to talk to "Nancy**."
- **Paul Pelosi was taken to a hospital and underwent surgery** to **repair a skull fracture** and serious injuries to his right harm and hands
- When they arrived, police said they saw the two men struggle over a **hammer that was used** to strike Paul Pelosi at least once.
- **"Are you Paul Pelosi?" DePape asked, gripping a large hammer in his right hand and white plastic zip ties in his left. "Where's Nancy? Where's Nancy?"**
- **"OK," DePape said. "Well, I'm going to tie you up**."
- Pelosi recalled later that **he stood up and tried to escape,** trying to bolt into the home's elevator off the bedroom. **DePape allegedly used an arm to hold the door**.
- **DePape explained that they were "all" corrupt, and that "we've got to take them all out."**
- DePape, prosecutors said, responded that this was the **"end of the road" for Pelosi**.
- Fearing what the intruder would do, **Paul Pelosi soon asked if he could go to the bathroom**.
- **Pelosi grabbed the phone, turned it on and called 911** on speaker. **DePape stood about 3 feet away, still holding his hammer and zip ties**.
- Paul Pelosi told the dispatcher he didn't need police, fire or medical assistance. **Yet he continued to speak in coded language**, attempting to **relay the urgency of the situation** to authorities without upsetting the stranger in his home.
- "No, no, no," he said, "**this gentleman just uh, came into the house** uh, and he wants to wait for my wife to come home."**.
- **"No, he wants me to get the hell off the phone**," Pelosi said -- and the call

ended.

- Chief Scott said Grives was suspicious enough about what she heard from Paul Pelosi that she **boosted the priority** from a "well-being check" to a **Code 3 emergency**.
- The two **descended the stairs, with DePape following Pelosi with the zip ties and hammer.**
- **"I can take you out,"** he allegedly said, moving to Pelosi's right and **gripping the hammer upright**. Fearing the intruder would strike, Pelosi put his hand on the hammer's handle.
- Officers Wilmes and Cagney walked to the front of the home and rang the doorbell. Inside, investigators said, **DePape ordered Pelosi not to open the door, but he did anyway**, leading to **a pivotal confrontation in a dimly lit foyer.**
- After an **officer turned on his flashlight**, DePape could be seen **holding the bottom of the hammer with one hand and Pelosi's right arm with the oth**er. Pelosi gripped the same hammer, near the top of the handle.
- "**Drop the hammer!**" one officer shouted.
- Pelosi lost his grip on the hammer. **DePape stepped back and swung the tool, striking Pelosi in the head**. He was unconscious as the **officers rushed into the house**, tackled DePape and took away the hammer.
- "Mr. Pelosi remained **unresponsive for about three minutes**," prosecutors wrote, "waking up in a pool of his own blood."
- He arrived to the house with a hammer and zip ties, "**slammed his body through the window to gain entry**," and **later confessed to he hostage plot.**
- Investigators later said they **found two hammers, a pair of rubber gloves and a sword** on the premises after the attack.
- "The **only reasonable interpretation of his statements is that he intended to kill Paul Pelosi** when Mr. Pelosi got in his way," **San Francisco Superior**

1     **Court Judge Stephen Murphy** said during his ruling.

2     • Lipson also **referenced statements DePape had made about the fact that**

3        **Nancy Pelosi was his target, not Paul** -- and that he **intended to break her**

4        **kneecaps "if she lied,"** rather than kill her.

5     • After the alleged bludgeoning, **Cagney described tackling DePape after he ran**

6        **out of the house**. The ensuing struggle caused DePape to drop the hammer,

7        Cagney said.

8     • The **video then showed the attack and the tussle that ensued**, with one of the

9        officers recorded saying **"Give me your f-- hand!"** multiple times and calling

10       for backup. A sound that appeared to be Pelosi's snoring, **after he was struck**

11       **by the hammer**, was heard loudly at the end of the video.

12     • **Cagney said Pelosi did not regain consciousness** while officers were at the

13       scene.

14     • Prosecutors then **played portions of an interview between San Francisco**

15       **Police Sgt. Carla Hurley and DePape**, who was questioned about **five hours**

16       **after the attack**, while recovering in the hospital.

17     • In the recorded interview, **DePape admitted to breaking into the Pelosi home** -

18       - which took several tries and ended with him body-slamming the window open -

19       - and **told Hurley he intended to take Nancy Pelosi hostage and hurt her if**

20       **she lied**.

21     • DePape told the investigator that he **told Paul Pelosi he was not going to be**

22       **stopped, and that he was not going to surrender**.

23     • **"I had threatened him a couple of times but for the most part it was pretty**

24       **amicable,"** DePape said on the recording, before describing when **he decided to**

25       **lunge at him, which he described as "at full force."**

26     • allegedly told investigators he had **contrived to take Nancy Pelosi hostage**

27       **while eyeing other high-profile targets,** including a **"local professor" and**

28       **several state and federal politicians**.

- The other notable figures allegedly included **Hunter Biden, actor Tom Hanks, California Gov. Gavin Newsom and feminist anthropologist Gayle Rubin**.

Some of the most prejudicial coverage in this case surrounds statements made by the defendant to investigators and KTVU News. The media detailed an 18 minute jailhouse interview with investigators where DePape told police that he planned to hold Nancy Pelosi hostage because of her leadership of the Democratic Party in the House of Representatives and falsely accused her of a "record-breaking crime spree." Media coverage addressing the existence of confessions has been found in the social science literature to impact perceptions of guilt and final verdicts. In *Rideau v. Louisiana,* the Supreme Court recognized the prejudicial nature of this type of pretrial publicity and the threat it posed to due process:

For anyone who has ever watched television the conclusion cannot be avoided that this **spectacle**, to the **tens of thousands of people** who saw and heard it, in a verry real sense **was Rideau's trial**—at which he pleaded guilty to murder. **Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality**.[17]

In this case, not only has the media saturated the jury pool with detailed descriptions of the defendant's statements to investigators, but also made video and audio recordings widely available to the public. The recording of the 911 call, surveillance video of the break-in, body cam footage of the assault, and a prejudicial phone recording of the defendant by KTVU news received hundreds of thousands of views online. This coverage is highly prejudicial and creates a strong presumption of guilt:

- During a nearly **18-minute interrogation** with a San Francisco police sergeant, **DePape said he intended to try to force Nancy Pelosi to recant what he called her lie**s -- and harm her if she refused.
- During his interrogation, DePape **spouted a host of unfounded conspiracy theories**.
- He said he **wandered through the Pelosi's spacious residence until he found Paul Pelosi** asleep in bed upstairs.
- DePape allegedly **told police** there was **"evil in Washington" and that he targeted**

---

[17] *Rideau v. Louisiana*, 297 U.S. 373, 726.

**Nancy Pelosi** because of her leadership of the Democratic Party.

- DePape allegedly **confessed** to officers that he **broke into the Pelosis' San Francisco home in order to get to Nancy Pelosi,** who was in Washington, D.C. at the time of the attack.

- DePape a**llegedly explained to investigators that if Nancy Pelosi's kneecaps were broken, she would have to be "wheeled into Congress, which would show other Members of Congress there were consequences to actions,**" court records state.

- In his own **interview with police**, DePape allegedly **said he told Paul Pelosi that he wanted to tie him up so that he could go to sleep** "as he was tired from having had to carry a backpack to the Pelosi residence."

- "**DePape explained that he did not leave after Pelosi's call to 911 because, much like the American founding fathers with the British, he was fighting against tyranny without the option of surrender**," federal officials said.

- In his **police interview**, DePape said at this point he "**did not plan to surrender and that he would go 'through' (Paul) Pelosi.**"

- **DePape told police that he swung the hammer toward Paul Pelosi, explaining that his actions resulted in Paul Pelosi "taking the punishment instead."**

- …**told police in an interview** published in a federal affidavit on Monday that he us**ed a hammer to break into a back door of the Pelosis' home**, and that he **planned to break Nancy Pelosi's "kneecaps" unless she told the "truth."**

- DePape allegedly **told police officers**…that he was on a "**suicide mission**."

- DePape also **allegedly told police** he also **planned to target an unnamed "local professor" and other federal and state politicians**, along with their **relatives**.

- After his Friday arrest, DePape **allegedly confessed** to officers that he broke into the Pelosis' San Francisco home in **order to get to Nancy Pelosi**.

- "DePape stated that he **was going to hold Nancy hostage and talk to her**."

- **DePape allegedly explained to investigators** that if Nancy Pelosi's **kneecaps were broken, she would have to be "wheeled into Congress, which would show other**

**Members of Congress there were consequences to actions.**"

- "I'm sick of the insane f-- level of lies coming out of Washington, D.C.," **DePape told officers and medics**, though none had asked him questions. "**I came here to have a little chat with his wife.**"

- "**I didn't really want to hurt him, but you know this was a suicide mission**," DePape continued. "**I'm not going to stand here and do nothing even if it cost me my life**. Hurting him was not my goal. **I told him before I attacked him, that he's escalating things, and I will go through him if I have to.**"

- According to prosecutors, **DePape went on to make a full confession**.

- He **reportedly told investigators he intended to take Nancy Pelosi hostage and talk to her**. If she told the truth, DePape said, he would let her go. **If she lied, he would break her kneecaps**. And DePape said he **didn't expect Pelosi to tell the truth**.

- "DePape also explained generally that he **wanted to use Nancy to lure another individual to DePape**."

- He said he did, that his **targets included a local professor and other prominent state and national politicians, as well as their spouses**.

- "When asked if he had any other plans, (the) **defendant named several targets**," Macbeth wrote, "**including a local professor, several prominent state and federal politicians, and relatives of those state and federal politicians**."

- **DePape disclosed that after breaking Nancy's knees, he wanted to wheel her into Congress** to show other members of Congress what the consequences of their actions were.

- Own **recorded statements** in which DePape said, "**If I have to go through him, I will,**" referring to Paul Pelosi.

- **Told police** shortly after his arrest that U.S. Rep Nancy Pelosi's **husband "took the punishment instead"** after trying to stop him "from coming after evil."

- An **audio recording of DePape speaking to police** after the attack reveals he **intended to try to force Nancy Pelosi to recant what he called her lies -- and harm her if she**

1   **refused**.

2   • **"If she told the truth, I would let her go scot-free," DePape said. "If she f-- lied, I**

3   **was going to break her calves**."

4   • Yeah, I mean, I'm not, like, trying to get away with it, so. **You know, I know exactly**

5   **what I did**.

6   • Um, well, **I was gonna basically hold her hostage, and I was gonna talk to her and**

7   **basically explain to her while I do** — And talk to her. **If she told the truth, I would let**

8   **her go scot-free. If she f--king lied, I was gonna break her kneecaps**.

9   • **I knew, beyond a doubt, she would f--king lie**.

10  • And **I start taking out, like, the twist ties from my pocket so that I can restrain him**

11  so that I don't have to worry about what he's doing.

12  • **So, a couple of times I kind of started to threaten him** a little bit like, "Dude." Like —

13  **he's pushing me into a corner where I have to do something**.

14  • … It's like, **I plan on doing something, and I have other targets, and I can't be**

15  **stopped by him. If I have to go through him, I will**.

16  • Yeah, it's like you're setting this up in the position where, like, you're going to stop me,

17  and **I will not be stopped here**.

18  • ...**And when I left my house, I left to go fight tyranny. I did not leave to go**

19  **surrender**.

20  • And it's like, These recorded statements were released to the public and made widely

21  available..

22  • And **so I basically yanked it away from him and hit him**.

23  • Oh, I told him. I'm not gonna surrender. **I'm here for the fight. And it's like, if you stop**

24  **me — it's like, if you stop me from coming after evil**, you **will take the punishment**

25  **instead**."

26  • So, I basically **yanked it away from him and hit him**," DePape said. "**It was not a tap.**

27  **It was full force**."

28  • When the investigator asked DePape if he **regretted attacking Pelosi**, he responded,

**"No, it needed to be done**."

- Last month, **DePape called the KTVU television newsroom** from San Francisco County Jail and **told a reporter that he attacked Pelosi because "people's individual liberties are under attack,"** the outlet reported.

- He also **apologized for "not going further" and said he "should have come better prepared."**

- **DePape told KTVU** last month that he was "**so sorry I didn't get more of them**" **before he was arrested**.

- "Now that you all have seen the bodycam footage, **I have an important message for everyone in America: You're welcome**," DePape said.

- In almost a call to arms, DePape says the, "people killing it have names and addresses, **so I got their names and addresses, so I could pay them a little visit…have a heart-to-heart chat about their bad behavior**."

- "**I want to apologize to everyone. I messed up. What I did was really bad. I'm so sorry I didn't get more of them**. It's my own fault. **No one else is to blame. I should have come better prepared**," he says.

The survey data indicate that the media coverage has negatively impacted the jury pool. For example, **67%** of the San Francisco Division survey respondents who recognized the case had read, seen, or heard that David DePape's plan to harm Nancy Pelosi was politically motivated. The survey data also suggest that the coverage has undermined the "presumption of innocence." A large percentage of prospective jurors have strong opinions which appear to be resistant to change. Eighty percent (**80%**) of San Francisco Division survey respondents familiar with the case believe that the defendant is guilty of one of the two charges, and **72%** reported that he would have a difficult time convincing them otherwise.

## VI.   TELEPHONE SURVEY

A telephone survey was conducted in the San Francisco Division of the Northern District of California. Comparison surveys were completed in the San Jose and Eureka Division. A third comparison survey was conducted in the Phoenix Division of the District of Arizona.

Standard methodological practices related to the development of the instrument, interviewer training, sampling, and callbacks were closely followed. All recognition questions were designed to describe the case using the language found in the media coverage. The survey was in the field between May 2nd and May 30th of 2023.[18] Ultimately, 400 jury-eligible residents in the San Francisco Division, 200 from the San Jose Division, 205 from the Eureka Division, and 205 from the Phoenix Division completed the survey.

Case Recognition

It is my opinion that the results of the telephone survey indicate that there is bias in the San Francisco Division jury pool against the defendant stemming from exposure to pretrial publicity. Despite the size of the venue, **77%** of jury eligible respondents were familiar with the case. The recognition rate increased to **93%** for those who regularly follow local news.

Presumption of Guilt

The survey data also indicate that the "presumption of innocence" has been shifted to a "presumption of guilt." Approximately **77%** of prospective jurors in the San Francisco Division who were familiar with the case believe that David DePape is guilty of assaulting Paul Pelosi, with **48%** falling into the "definitely" guilty category.  Furthermore, **68%** of those who have been exposed to media coverage reported that the defendant would have a difficult time convincing them that he is <u>not</u> guilty. In addition, **55%** of prospective jurors from the San Francisco Division reported that the defendant is guilty of attempting to kidnap Nancy Pelosi and **46%** indicated that he would have a difficult time changing their minds

Comparison Venues

The differences between case recognition and prejudgment in the comparison surveys compared to the San Francisco Division were not statistically significant. However, there were important differences which indicate that bias may be less widespread and entrenched in alternative venues. For example, only **39%** of the Eureka Division survey respondents reported that the defendant was guilty of attempting to kidnap Nancy Pelosi, approximately 16 percentage points lower than their counterparts in the San Francisco Division.  In addition,

---

[18] The survey instrument can be found in **Appendix B**.

attitudes were less resistant to change. Thirty-eight percent (**38%**) indicated that David DePape would have a difficult time convincing them that he is not guilty of attempted kidnapping.

Case Knowledge

Members of the San Francisco Division jury pool recognized some of the more prejudicial details widely reported in the media coverage. Seventy-one percent (**71%**) of respondents were familiar with at least three of the six media items incorporated into the survey, and **55%** recognized four or more media items. Prospective jurors in the Eureka Division were less familiar with specific items reported by the media. Just **37%** recognized four or more media items, 18 percentage points lower than survey respondents in the San Francisco Division.

Consistent with the social science literature, case knowledge was significantly related to prejudgment. For example, **87%** of San Francisco Division survey respondents who were familiar with four or more media items reported that David DePape is guilty of assault, and **80%** indicated that he would have a difficult time convincing them otherwise. A similar trend was found regarding the attempting kidnapping charge where the prejudgment rate increased to **65%** for those who were familiar with four or more media items. In addition, the percentage reporting that the defendant would have a difficult time convincing them that he is not guilty increased from **46%** to **57%**.

Several of the media items widely reported in the media and tested in the survey were significantly related to prejudgment. These media items are reported in the table below. Approximately **85%** of prospective jurors who knew the plan to harm Nancy Pelosi was politically motivated believed the defendant is guilty, and **75%** reported that he would have a difficult time convincing them otherwise. In addition, **89%** of those who had heard David DePape told investigators that he planned to hold Nancy Pelosi hostage and break her kneecaps if she did not tell him the truth maintained that he was guilty, and **81%** held a fixed opinion.

| Have you read, seen, or heard if… | Believe DePape is guilty of assault | DePape would have difficult time convincing not guilty |
|---|---|---|
| David DePape told investigators that he planned to hold Nancy Pelosi hostage and break her kneecaps if she did not tell him the truth? | 89% | 81% |
| David DePape's plan to harm Nancy Pelosi was politically motivated? | 85% | 75% |
| David DePape hit Paul Pelosi in the head with a hammer? | 82% | 74% |
| Police officers saw David DePape hit Paul Pelosi in the head after a brief struggle over the hammer? | 83% | 79% |

**NOTE: The relationships between the media items and measures of prejudgment in the table are statistically significant.**

Negative Impressions of the Defendant in the Jury Pool

Much of the media coverage paints David DePape in a negative light. He is often portrayed as an embodiment of the far right and its efforts to inject conspiracy theories into the political debate. Survey respondents were asked for their opinions about David DePape and the assault of Paul Pelosi. Their responses demonstrate the impact the media coverage has had on prospective jurors in the San Francisco Division:

This coverage has had a significant impact on prospective jurors' impressions of the defendant

- I'm not sure of all the details, but he believed some right wing conspiracy theories that Nancy might have been behind the "stolen election" and he possibly has some mental health issues.
- He was radicalized by the far right and probably unstable.
- I guess it's more on the extreme political views, strong polarization of our political

system, it's become a religion to some people. On the Republican side, they just want to take revenge. That's only my opinions. That's it, it's all about the extreme politics.

- He is dangerous and is guilty and needs to be put away.
- He seemed deranged.
- I feel like it's troubling due to the fact I feel like it's a political attack and the Republican politicians seem to motivate these attacks.
- Just that I'm pretty sick of this stuff and I think it is out of hand all over the place. It's kind of like the people who attacked the capitol. Everyone is out of control and this is another example of it being right in our faces.
- I believe he is guilty and he should be sucker punched.
- I think he is a very sick man, I mean to do what he did and it is all on video. He had no place to do that and he caused some serious harm.
- I'm automatically disgusted with it and he is a racist pig.
- He sounds like a criminal and a jerk. It is a pretty serious crime that he broke in and said he was there to harm someone. He sounds like a crack pot.
- Political violence is not okay. It was politically motivated.
- He is a very bad person and a violent person.
- I feel that he is an ignorant Trumper and he is following a deranged man. I think with the way our political environment is they need to take this and make an example out of him, that it's not okay for them to get away with this.
- I think he is a horrible person and I feel sorry for her husband. I think David should go to jail forever. He should be executed.

## VII.   ABILITY TO SELECT A FAIR AND IMPARTIAL JURY IN VENUES SATURATED WITH MEDIA COVERAGE

When a jury pool has been inundated to media coverage, the trial court and parties are faced with unique challenges, which are not present in most cases. In high profile cases, many prospective jurors enter the courtroom with extensive knowledge and attitudes about the case, defendant, and victims. However, it is often difficult for prospective jurors to predict how case-

specific knowledge and opinions may affect them over the course of a trial. Prospective jurors may also unintentionally omit exposure to specific media items during voir dire when asked what they recall hearing about the case. These items, however, may become salient and recalled from memory once witness testimony begins. The research also shows that information learned from media exposure can be misattributed as evidence presented at trial.[19]

Given these factors, it is important to ferret out during voir dire the full extent of exposure to pretrial publicity, case-specific attitudes, impressions of the defendant, and potential motivations to serve. However, the prejudicial effects of preexisting attitudes can occur at both a conscious and subconscious level, meaning jurors who profess impartiality may not be fully aware of their bias or how it may affect them as the trial unfolds. This can make it difficult to identify potential prejudice during the jury selection process. The Supreme Court has recognized the limitations of the voir dire process as a remedy where potentially prejudicial pretrial publicity is an issue. In *Irvin v. Dowd*, the Court concluded:

> No doubt, each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see." With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.[20]

State appellate courts have also expressed concerns about notions that voir *dire* can rebalance the scales once they have been unfairly tipped by improper influence:

> By this logic, it would be permissible to improperly influence a jury panel so long as we have a competent set of attorneys and a diligent trial judge willing to parse through the venire and eliminate any potential bias injected in the jury by that improper influence. **That is not the way or judicial system works. Litigants should enter the courtroom on an equal basis, not one made equal by the hard work of conducting voir dire on a bias panel** [Emphasis added].[21]

---

[19] Ruva, C.L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision-making. *Journal of Experimental Psychology: Applied,* 14(3), 226-35.

[20] *Irvin v. Dowd,* 366 U.S. 717, 727-28 (1960).

[21] Recent decision from the Court of Appeals Seventh District of Texas: William A. Brewer III v. Lennox Hearth Products, LLC et al. (2018) No. 07-16-00121-CV

Research on voir dire shows that these concerns are justified. Jurors are often reluctant to disclose relevant experiences, relationships or opinions that may lead to bias, even when pretrial publicity is not an issue. One study found that while 71% of jurors had a fixed opinion regarding guilt, only 15% admitted so during the voir dire.[22] Marshall obtained questionnaires from 277 former jurors in two counties and found that 18% of those jurors admitted to withholding information during voir dire.[23] Seltzer reported that approximately 39% of jurors who were interviewed after trial should have come forward in response to questions regarding crime victimization or knowledge of police officers during jury selection, but failed to do so.[24]

Many aspects of the large group voir dire format deter juror candor. Federal Court Judge Gregory Mize published his findings after experimenting with an expanded voir dire procedure in 30 federal criminal trials over a nine-month period, which included individual interviews with every venire member who failed to respond to his general opening questions. Judge Mize reported that approximately 28% of members of each panel failed to respond to the dozens of questions posed in open court, an average of about 16 people per trial. However, when questioned in private, one in five of these silent jurors disclosed personal information that was relevant to the case. In 90% of the trials, between one and four of these silent jurors expressed bias that led to their removal for cause.[25]

A search of appellate opinions shows that juror disclosure has led to several mistrials by undermining a defendant's fair trial rights. For example, in *U.S. v. Colombo*, 869 F.2d 149 (2d Cir. 1989), a juror failed to disclose when asked during voir dire that her brother-in-law was a lawyer for the government. She did not mention this fact because she wanted to sit on the jury for the case. In *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998), a juror answered "no" when the panel was asked if anyone had ever been the victim of a crime. After the guilt phase, the defense learned that her brother had been shot and killed six years earlier. When questioned,

---

[22] Fahringer, H.P. (1980). In the valley of the blind: A primer on jury selection in a criminal case. *Law and Contemporary Problems,* 43, 116-36.

[23] Marshall, L.L. (1983). Juror, judge, and counsel perceptions of voir dire. Ph.D. dissertation, Boston University.

[24] Seltzer, R. (1991). Juror honesty during the voir dire. *Journal of Criminal justice*, 19, 451.462.

[25] Mize, G.E. (1999). On better jury selection: Spotting UFO jurors before they enter the jury room, *Connecticut Review Spring,* 33.

she told the judge that she answered "no" because she, "thought the shooting was an accident, not a crime." Her brother had been pistol-whipped four times and shot in the back of the head.

Problems such as these have also been reported in high profile cases. For example, in the 2012 murder trial of Matthew Stebbins, who had been charged in a shooting death at a homeless shelter, a mistrial was declared after a juror announced during deliberations that she had a previous issue with violent crime. One of her children had been shot in the head. She failed to raise her hand during jury selection when asked if anyone had been a victim of a violent crime. According to her, "she did not think it was going to be an issue."[26]

A $6.5M judgment was overturned in the high profile police corruption lawsuit against the Public Defender surrounding the Rampart Division in Los Angeles County.  It was uncovered after the verdict that one of the jurors—Jennifer Salinas—had concealed knowledge of the scandal during jury selection.  She did not raise her hand when asked if anyone had some knowledge of events surrounding the Rampart Division. Later it was discovered that Salinas had played a prominent role in a movie titled "Gang Warz" that was based on the Rampart Division. Other jurors on the panel corroborated that she was very familiar with the scandal and discussed aspects that were not in the evidence.[27]

Prospective jurors in cases with extensive media coverage enter the courtroom with case-specific knowledge gleaned from the media, social media, and discussions with friends, family members, and co-workers. Uncovering the full extent of jurors' case-specific knowledge and opinions in high profile cases can be extremely difficult. Jury selection as a judicial remedy to address such bias relies on two factors: 1) that jurors can access their source of bias and 2) are willing to report it. In one study where researchers tested the effectiveness of extended voir dire, participants in the experimental condition were exposed to pretrial publicity a week before the experiment.[28] Prior to viewing a trial, they were subjected to minimal or extended voir dire.

[26] Villarreal, M. (2012, March 12). Judge declares mistrial in Corpus Christi murder case. *Corpus Christi Caller Times*. Retrieved February 10, 2015, from http://www.caller.com/news/local-news/crime/judge-declares-mistrial-in-corpus-christi-murder.

[27] Ellis, S.M. (2008, January 22). Appeals court orders new trial in suit against public defender. *Metropolitan News-Enterprise*. Retrieved February 12, 2015, from http://www.metnews.com/articles/2008/ovan012208.htm.

[28] Dexter, H. R., Cutler, B. L., & Moran, G. (1992). A test of voir dire as a remedy for the

The attorney in the extended voir dire condition explained how pretrial publicity may inappropriately impact decision-making, asked jurors to hold each other accountable for not discussing pretrial publicity, obtained public commitments to base their verdict solely on the evidence presented in court, and to ensure that fellow jurors did the same. The researchers ultimately found that educating jurors on the potential impact of pretrial publicity did not eliminate the effects of pretrial publicity.

High profile cases also create a unique challenge during jury selection known as the "minimization effect."[29] This concept refers to prospective jurors' attempts to minimize the full extent of their exposure to pretrial publicity. During voir dire, prospective jurors try to downplay their knowledge of the case using qualifiers such as, "just," "nothing other than," "only," "a little bit," and "that's all." In an archival study that analyzed the jury selection transcripts from five high profile cases, 69% of prospective jurors used minimization language when questioned by the judge or attorneys.[30]

Another challenge in cases with significant media coverage surrounds the difficulty jurors have during voir dire to recall every detail they have read, seen, or heard about a case. These types of open-ended "recall" questions require significant cognitive effort and often result in incomplete recollection. This phenomenon is an inherent limitation in how memory works. For example, if someone is asked to recall everything they know about the movie *Star Wars,* their description would likely miss important details they are familiar with. Memory is much more accurate when answering "recognition" questions: *Have you read, seen, or heard if Darth Vader was Luke Skywalker's father?*

This concern is not mere speculation. In a 2017 change of venue hearing in Texas, community residents exposed to detailed pretrial publicity over several years were called as

prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology*, 22, 819-32.
[29] Bronson, E. (1989). The effectiveness of *voir dire* in Discovering Prejudice in High Publicity Cases: An archival Study of The Minimization Effect.
[30] Edelman, B., Dahir, V.B., & Dillehay, R. (2011). Paper presented at the meeting of the American Society of Trial Consultants.

witnesses.[31] During the hearing they were asked to recall everything they knew about the case. Following the "recall" question, they were asked a number of "recognition" questions about specific prejudicial and potentially inadmissible media items they failed to mention. The hearing demonstrated the limitations in memory [Emphasis added]:

Q. Can you tell the Court the facts that you know about the State of Texas versus John Feit as it relates to Irene Garza?

A.  [Description of basic facts]

Q. Is that it?

A.  **Let's see. I believe so.**

Q. Now, Ms. Perez, have you read, seen, or heard about John Feit **giving a confession to a priest**?

A. **Yes.**

Q. **And you didn't mention that a few minutes ago?**

A. I'm sorry.  **There were two that I remember.  They mentioned that there were two confessions that he made to two priests.**

Q. Okay.  Have you read, seen, or heard about whether or not Ms. Irene Garza **was alleged to have been raped?**

A. **I read, yes.**

Q. Now having refreshed your memory a few minutes ago, **are there any other facts that you have read, seen, or heard that you haven't told the Court about**?

A. **I don't believe so.**

Q.  Okay.  Have your read, seen, or heard that **John Feit was transferred to a monastery after this**?

A. **I did read that, yes.**

This limitation in memory recall has been demonstrated in a number of high profile cases around the country. For example, in a change of venue survey in Sonora, California, 95% of survey respondents recognized at least one additional detail reported in the media from the

---

[31] *State of Texas v. John Feit*, CR-0464-16-A (2017).

closed-ended recognition questions that they failed to mention in the open-ended recall question. A near identical trend (96%) was found in another high profile case in Nashville, Tennessee.[32] For example, when asked, "What have you read, seen, or heard about the case," one respondent answered, "Bits and pieces on the news. They were just talking about the case." However, he later recognized several media items including that: 1) the shooting was captured on video by surveillance cameras in the area and played on the television news and internet; and 2) the public approved a ballot measure in the last election to create a community oversight board to monitor the Metro Nashville Police Department. Both were prejudicial items widely reported in the media.

A similar pattern was found in this case. For example, **67%** of San Francisco survey respondents remembered learning that the defendant's actions were politically motivated when asked the "recognition" question: *Have you read, seen, or heard if David DePape's plan to harm Nancy Pelosi was politically motivated?* However, only **36%** of prospective jurors mentioned this detail when first asked the common "recall" question posed during voir dire: *What have you read, seen, or heard about this case?* On average, less than one (.**82**) case detail was recalled from memory and reported in response to this question. In contrast, survey respondents recognized an average of **3.2** additional media items when later asked a battery of recognition questions. Ultimately, **95%** of survey respondents recognized at least one additional media item they failed to mention in their open-ended answer. Many San Francisco Division survey respondents also used "minimization language" or incomplete responses when asked what they knew about the case. Most of these prospective jurors later recognized items widely reported in the media (see table below).

---

[32] *State of Tennessee v. Andrew Delke*, Case No. 2019-A-26 and *People of the State of California v. Diane Anderson*, Case No.: CRF53011.

| What have you read, seen, or heard about these events? [recognize the case] | Number of media items recognized |
|---|---|
| Just what I saw on TV. | 6 of 6 |
| Read what is online or in the Chronical only. | 6 of 6 |
| He broke in and assaulted the husband. | 6 of 6 |
| I know he had a hammer. | 6 of 6 |
| The man did break into his home. | 6 of 6 |
| David assaulted Paul. | 5 of 6 |
| Don't really know about it and do not know why he attacked Paul. | 5 of 6 |
| Just what has been in the daily news. | 5 of 6 |
| Just what the news has said. Honestly, so the basics of the case really. | 5 of 6 |
| Not much recently.  I heard a few things on the news when it first came out in the news.  I try to avoid the news. | 5 of 6 |
| He attacked him and broke into his home. | 5 of 6 |
| Heard a lot of coverage. | 5 of 6 |
| Heard a lot, it's hard to put into concise words. | 5 of 6 |
| I saw it on the news when it happened. | 5 of 6 |
| I've read the news reports. | 5 of 6 |
| New articles-news video actions. | 5 of 6 |
| What's been on the news. | 5 of 6 |
| A man was arrested for assaulting Paul and injured them. | 5 of 6 |
| He hit her husband with a hammer . | 4 of 6 |
| A lot of news reports. | 4 of 6 |
| Just what I saw in the news. | 4 of 6 |
| Just what I saw on the news, something is not right about this. | 4 of 6 |
| Just what was on the news and read in newspapers. | 4 of 6 |
| Not much more than someone broke in and assaulted her husband. | 4 of 6 |
| Not much, just that he broke into the home. | 4 of 6 |
| Not much. I just saw headlines on social media. | 4 of 6 |

| | |
|---|---|
| Saw video, have not heard anything else. | 4 of 6 |
| What I just saw on the news. | 4 of 6 |
| Not much, just that he broke into the home.  I saw clips of it on the news. | 3 of 6 |
| Other than him assaulting the husband and that's all I heard about it. | 3 of 6 |
| Read some articles and saw whatever the news said. | 3 of 6 |
| The basics, videos, news reports and 911 call. | 3 of 6 |
| I just heard the basics of the case on the radio | 2 of 6 |

The inability to provide a full account of everything a juror knows about a case puts the defendant in an untenable position. Counsel must choose to either rely on an open-ended question—known to generate incomplete recall—or ask media specific recognition questions, which are more diagnostic but risk exposing prospective jurors to extrajudicial information they may not be familiar with.

Prospective jurors' inability to recall the full extent of their exposure to pretrial publicity can undermine the value of voir dire as a corrective measure for identifying and ferreting out bias in high profile cases. If jurors are unable to fully recall from memory their detailed knowledge about a case when asked an open-ended question, it makes it difficult for counsel to effectively exercise challenges. This problem is exacerbated when there is extensive reporting around inadmissible content or disputed facts. Incomplete recall also poses a problem for the trial court when exercising its discretion to weigh prospective jurors' self-reports about their ability to be fair and impartial and rule on cause challenges.

This predicament is compounded by research, which suggests that professions of impartiality should not always be taken at face value. Part of the challenge media coverage presents surrounds jurors' efforts to guess how exposure to pretrial publicity may affect their evaluations of the evidence. Given the difficulties that such a guess poses, it is not surprising that claims of impartiality in high profile cases have been shown to be unreliable. A study on the prejudicial impact of pretrial publicity found that 62% of jury-eligible residents said they could be fair and impartial and decide the case solely on the basis of the evidence presented.

However, only 39% said they could put knowledge of the media out of his or her mind.[33]

Another obstacle is the well-documented tendency for individuals to respond in a manner that will be viewed favorably by others, which has been coined the "social desirability" effect. This phenomenon has been researched and found in a multitude of disciplinary settings, including the courtroom. Socially desirable responses are more likely to occur when individuals become focused on the public aspects of themselves. Public awareness of oneself can become particularly salient in a courtroom setting where prospective jurors are asked questions by an authority figure in front of a public audience. Jones, for example, reported that participants appeared to alter their answers to reflect what they thought a judge wanted to hear rather than what they actually thought.[34] When potential jurors learn through the jury selection process that the law requires them to be fair and impartial, there is a risk that they will overstate their ability to set aside their knowledge and beliefs in order to create a favorable public impression.

Also referred to as response bias and demand characteristics, the effect causes the juror (interviewee) to pick up the subtle and overt clues as to what a lawyer or judge (interviewer) wants to hear. During voir dire a clear, strong message is often sent to prospective jurors: good jurors are not supposed to have prejudicial information or biases about the case. If they do, then they should set them aside and decide the case solely on the law and the evidence presented in court.[35] When this is established, many prospective jurors will adjust their public statements to meet to these courtroom norms.

The social desirability effect is found even in instances when the jury pool has been

[33] Moran, C., & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology*, 21(5), 345-67.

[34] Jones, S. (1987). Judge versus attorney conducted voir dire: An empirical investigation of juror candor. *Law and Human Behavior,* 11(2), 131-46. Responses were inconsistent with what had been reported earlier in a questionnaire.

[35] The same "good citizen" impulse leads a number of respondents in telephone surveys to claim that they are registered to vote when in fact they are not. Silver, B., et al., "Who Overreports Voting?" 80 <u>American Political Science Review</u> 613 (1986). Book publishers have long said that if survey respondents had actually read all the books they reported having read recently when they are surveyed, the book publishing business would be the most profitable business in the country. These effects, in response to an anonymous telephone pollster, are amplified in the presence of real authority figures in the courtroom and makes it difficult to assess problematic attitudes in prospective jurors.

exposed to extreme forms of prejudicial media coverage. In *Rideau*, the jury pool was exposed to a taped 20-minute interview in the jail between the defendant and Sheriff.[36] In the interrogation, the defendant confessed to the murder of three people during a bank robbery. A soundtrack was added to the recording and the interview aired three times on television within a few months leading up to trial. Three of the 12 seated jurors had seen the televised interrogation. Despite the highly prejudicial nature of such a sensational televised confession, all three jurors told the court during voir dire that they could "lay aside any opinion, give the defendant the presumption of innocence as provided by law, base their decision solely upon the evidence, and apply the law as given by the court."[37]

Accordingly, a juror's professed ability to be fair and impartial should not be taken at face value in cases where there is substantial prejudicial pretrial publicity. This is less of an issue when dealing with the tangential experiences, limited case knowledge, and general attitudes jurors typically bring with them into the courtroom. There is little evidence, however, to suggest that individuals can forget or dissociate themselves from specific attitudes, emotions, and beliefs about the defendant and case developed from exposure to media coverage.

## VII.   CONCLUSION

The San Francisco Division jury pool has been exposed to prejudicial pretrial publicity and social media content surrounding the break-in and assault of Paul Pelosi. The survey data indicate that this pretrial publicity has had an impact on the jury pool. Approximately **77%** of prospective jurors are familiar with the case. Case recognition increased to **93%** for those who regularly watch the news and read the newspaper.

San Francisco District residents have also retained extensive case knowledge from exposure to pretrial publicity. Fifty-five percent (**55%**) of survey respondents were familiar with at least four of six media items tested in the survey. Thirty-eight percent (**38%**) of those familiar with the case had seen video of David DePape breaking into the Pelosis' home or footage of him hitting Paul Pelosi with a hammer. Another **25%** had read, seen, or heard the

---

[36] *Rideau v. Louisiana*, 373 U.S. 723 (1963).
[37] *Id*. at 732.

EDELMAN DECL.
*DEPAPE*, CR 22–00426 JSC

media describe the video of the assault.

Prospective jurors who recognized the case exhibited strong bias and a "presumption of guilt." Seventy-seven percent (**77%**) reported that David DePape is guilty of assault, with **48%** indicating that he is "definitely guilty." The number who maintained that DePape is guilty of assault increased to **87%** for those who recognized four or more media items. In addition, **68%** of survey respondents familiar with the case reported that DePape would have a difficult time convincing them that he is <u>not</u> guilty.

With regards to the attempted kidnapping charge, **54%** of community members who recognized the case reported that the defendant is guilty, which increased to **65%** for those who recognized four or more media items. In addition, **46%** of these survey respondents reported that he would have a difficult time convincing them that he is <u>not</u> guilty.

Overall, these findings are particularly concerning given the limitations of voir dire as a tool for assessing the full extent of prospective jurors' case knowledge in high profile cases. Consistent with the research literature, survey respondents offered incomplete recall when asked the common open-ended question, "What have you read, seen, or heard about the case?" Most survey respondents (**95%**) later recognized at least one additional media item they failed to report in their open-ended answer and averaged **3.2** additional media items. [38] For example, only **36%** percent of survey respondents mentioned that David DePape's actions were politically motivated. However, **67%** remembered hearing about this detail when asked a closed-ended recognition question later in the survey.[39]

Jurors' inability to fully recall what they know about a high profile case undermines the value of voir dire as a tool for ferreting out bias. If jurors are unable to fully disclose what they have read, seen, or heard then neither the Court nor defense counsel can properly weigh self-professions of impartiality and exercise challenges.

In conclusion, given the nature of the pretrial publicity, social media content, and the

---

[38] Participants were first asked the open-ended recall question (what have you read, seen, or heard about this case?) and were later asked closed-ended recognition questions.

[39] Have you read, seen, or heard if David DePape's plan to harm Nancy Pelosi was politically motivated?

availability of prejudicial videos online—and its negative impact on the jury pool—I believe the "presumption of innocence" in the case against David DePape has been threatened. As such, remedial measures are necessary to protect the defendant's Constitutional rights to a fair and impartial trial. It is my opinion that a change of venue or intra-district transfer would be an appropriate prophylactic measure to mitigate the prejudicial impact of pretrial publicity.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing facts are true and correct, except as to facts stated upon information and belief, which facts I believe to be true.

Executed on June 14, 2023

_Bryan Edelman_
_____
Bryan Edelman