1   ISMAIL J. RAMSEY (CABN 189820)
    United States Attorney
2
    KATHERINE L. WAWRZYNIAK (CABN 252751)
3   Chief, Criminal Division

4   HELEN L. GILBERT (NYBN 4736336)
    LAURA VARTAIN HORN (CABN 258485)
5   KYLE F. WALDINGER (CABN 298752)
    Assistant United States Attorneys
6
        450 Golden Gate Ave, 10th Floor
7       San Francisco, CA 94102
        Telephone: (415) 436-7200
8       Fax: (415) 436-7234
        Email: Helen.Gilbert@usdoj.gov
9              Laura.Vartain@usdoj.gov
               Kyle.Waldinger@usdoj.gov
10
11  Attorneys for the United States of America

12              UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14              SAN FRANCISCO DIVISION

15  UNITED STATES OF AMERICA,              )   CASE NO. 3:22-CR-426-JSC
                                           )
16          Plaintiff,                     )   UNITED STATES' OPPOSITION TO
                                           )   DEFENDANT'S MOTION TO CHANGE VENUE
17      v.                                 )
                                           )   Trial Date:     November 6, 2023
18  DAVID WAYNE DEPAPE,                    )   Hearing Date:   July 19, 2023
                                           )   Hearing Time:   10:00 a.m.
19          Defendant.                     )
                                           )   Judge:          Hon. Jacqueline Scott Corley
20  ─────────────────────────────────────

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ...................................................................................................... 1

II.  RELEVANT BACKGROUND .................................................................................. 2

    A.   Factual Background ........................................................................................ 2

    B.   State Criminal Case and Defendant Contact with Media ............................... 2

    C.   Federal Criminal Case .................................................................................... 3

    D.   Defendant's Community Attitude Survey and Media Coverage Analysis ....... 3

        1.   Edelman Community Attitude Survey .................................................. 4

        2.   Edelman Media Coverage Analysis ..................................................... 6

    E.   National Media Coverage ............................................................................... 7

III. ARGUMENT ........................................................................................................... 8

    A.   Legal Standards .............................................................................................. 8

        1.   The Standards Governing Change of Venue are Extremely High ......... 8

        2.   The Standards Governing Intradistrict Transfer ................................. 11

    B.   This Case Does Not Present the "Rare" and "Extreme" Situation of a Jury
        Pool Presumptively Prejudiced by Inflammatory and Prejudicial Media
        Coverage ....................................................................................................... 12

        1.   Media coverage has been primarily factual in nature and not
            prejudicial or inflammatory ............................................................... 13

        2.   The release of the defendant's post-arrest interview is not uniquely
            prejudicial ......................................................................................... 19

        3.   Any potential for prejudice is mitigated by the large, diverse pool of
            potential jurors in the San Francisco-Oakland Jury Division ............. 20

        4.   Media interest in this case has diminished over time .......................... 21

        5.   Congresswoman Nancy Pelosi's prominence does not necessitate
            changing venue ................................................................................. 22

    C.   Intradistrict Transfer is Unwarranted .......................................................... 23

    D.   The Court Can Ensure A Fair and Impartial Trial Through Robust Jury
        Selection ....................................................................................................... 24

IV.  CONCLUSION ....................................................................................................... 25

1

## <u>**TABLE OF AUTHORITIES**</u>

2

### **CASES**

3    *Ainsworth v. Calderon*, 138 F.3d 787 (9th Cir. 1998) ............................................................. 9

4    *Casey v. Moore*, 386 F.3d 896 (9th Cir. 2004) ...................................................................... 21

5    *Dobbert v. Florida*, 432 U.S. 282 (1977) ............................................................................... 9

6    *Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991) ............................................................. 20

7    *Harris v. Pulley*, 885 F.2d 1354 (9th Cir. 1989).......................................................... passim

8    *Hayes v. Ayers*, 632 F.3d 500 (9th Cir. 2011).......................................................... 1, 8, 16

9    *In re Murchison*, 349 U.S. 133 (1955)................................................................................... 8

10   *Leahy v. Farmon*, 177 F. Supp. 2d 985 (N.D. Cal. 2001)............................................ 10, 18

11   *Miranda v. Arizona*, 384 U.S. 436 (1966) ...................................................................... 2, 16

12   *Mu'Min v. Virginia*, 500 U.S. 415 (1991).................................................................... 20, 24

13   *Murphy v. Florida*, 421 U.S. 794, 799 (1975) ....................................................................... 9

14   *Patton v. Yount*, 467 U.S. 1025 (1984) ....................................................................... passim

15   *Platt v. Minnesota Min. & Mfg. Co.*, 376 U.S. 240 (1964) ................................................. 12

16   *Randolph v. California*, 380 F.3d 1133 (9th Cir. 2004) ............................................ 9, 13, 16

17   *Randolph*, 380 F. 3d at 1142 ............................................................................................... 15

18   *Reynolds v. United States*, 98 U.S. 145 (1879) .................................................................... 10

19   *Rideau v. Louisiana*, 373 U.S. 723 (1963)........................................................................... 19

20   *Sheppard v. Maxwell*, 384 U.S. 333 (1966) ......................................................................... 10

21   *Skilling v. United States*, 561 U.S. 358 (2010) ............................................................ passim

22   *United States v. Abdulmutallab*, 2011 WL 4343851
         (E.D. Mich. Sept. 14, 2011).......................................................................................... 18
23
     *United States v. Alvarado*, 647 F.2d 537 (5th Cir. 1981) .................................................... 11
24
     *United States v. Balistrieri*, 778 F.2d 1226 (7th Cir. 1985)................................................. 11
25
     *United States v. Campa*, 459 F.3d 1121 (11th Cir. 2006) ................................................... 25
26
     *United States v. Chitolie*, 2010 WL 2384550 (D.V.I. June 8, 2010) ................................... 12
27
     *United States v. Cloud*, No. 1:19-CR-02032-SMJ-1, 2021 WL 9406685
28       (E.D. Wash. Dec. 14, 2021)........................................................................................... 23

*United States v. Croft*, 124 F.3d 1109 (9th Cir. 1997) ........................................... 9, 13, 22

*United States v. Dreitzler*, 577 F.2d 539 (9th Cir. 1978),
   *cert. denied*, 440 U.S. 921 (1979) ........................................................................... 23

*United States v. Erwin*, 155 F.3d 818 (6th Cir. 1998) ................................................. 11

*United States v. Flores-Elias*, 650 F.2d 1149 (9th Cir. 1981) ................................... 11

*United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976) .................................... 22, 25

*United States v. Hearst*, 466 F. Supp. 1068 (N.D. Cal. 1978),
   *aff'd in part*, 638 F.2d 1190 (9th Cir. 1980) ............................................................ 18

*United States v. Joyce*, 2008 WL 2367307 (W.D. Pa. June 10, 2008) .................. 12, 23

*United States v. Lehder-Rivas*, 955 F.2d 1510 (11th Cir. 1992) .......................... 18, 21

*United States v. Lindh*, 212 F. Supp. 2d 541 (E.D.Va. 2002) ................................... 18

*United States v. Lipscomb*, 299 F.3d 303 (5th Cir. 2002) ...................................... 11, 23

*United States v. Malmay*, 671 F.2d 869 (5th Cir. 1982) ............................................ 25

*United States v. Philpot*, 733 F.3d 734 (7th Cir. 2013) ............................................. 21

*United States v. Poludniak*, 657 F.2d 948 (8th Cir. 1981) ........................................ 23

*United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009) ........................................ 25

*United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999) ........................................... 11, 23

*United States v. Thomas*, 2019 WL 3307043 (D.V.I. July 23, 2019) .................... 12, 23

*United States v. Tsarnaev*, 2014 WL 4823882 (D. Mass. Sept. 24, 2014) ............... 18

*United States v. Yousef*, 1997 WL 411596 (S.D.N.Y. July 18, 1997),
   *aff'd*, 327 F.3d 56 (2d Cir. 2003) ............................................................................. 18

**CONSTITUTION, STATUTES, AND RULES**

U.S. Const. art. III, § 2, cl. 3 ............................................................................ 1, 11, 15

U.S. Const. amend. VI ....................................................................................... 1, 11, 15

28 U.S.C. § 82 ....................................................................................................... 5

28 U.S.C. § 84 ....................................................................................................... 5

28 U.S.C. § 1869 ................................................................................................... 5

Federal Rule of Criminal Procedure 18 .......................................................... 1, 15

Federal Rule of Criminal Procedure 21 .......................................................... 1, 11

Northern District of California General Order No. 6 .......................................... 5, 26

1

**MISCELLANEOUS**

2

Amber Lee, *Depape in bizarre phone call to KTVU says he should have*
*been 'more prepared,'* KTVU Fox 2 (Jan. 27, 2023), available at
3      https://www.ktvu.com/news/depape-in-bizarre-phone-call-to-ktvu-
       says-he-should-have-been-more-prepared ................................................................. 3

4

Berkeley IGS Poll, *Tabulations from a February 2023 Poll of California*
5      *Registered Voters about Prominent California Politicians, Governor*
       *Newsom and the State Budget Deficit* (Mar. 1, 2023),
6      https://escholarship.org/uc/item/60p8c1nr ............................................................. 22

7      *California DMW Statistics*, Cal. Dep't of Motor Vehicles,
       https://www.dmv.ca.gov/portal/file/california-dmv-statistics-pdf/ ...................... 21

8
       *California*, U.S. Census Bureau Quickfacts,
9      https://www.census.gov/quickfacts/CA ................................................................. 21

10     *Jury*, United States District Court Northern District of California,
       https://www.cand.uscourts.gov/jury/ ..................................................................... 21

11

Lydia Saad, *Pelosi Best Known, Least Liked of Congressional Leaders*,
12     GALLUP (Apr. 24, 2013),
       https://news.gallup.com/poll/162029/pelosi-best-known-least-liked-
13     congressional-leaders.aspx .................................................................................. 22

14     Marcus White, *Why reactions to Bob Lee killing followed a uniquely*
       *American pattern*, San Francisco Examiner (Apr. 18, 2023),
15     https://www.sfexaminer.com/news/crime/why-bob-lee-killing-
       reactions-followed-unending-pattern/article_aef230a4-de07-11ed-
16     b36e-7b12a5ee0390.html ....................................................................................... 7

17     Press Release, San Francisco District Attorney, District Attorney Brooke
       Jenkins Announces Felony Charges Against David DePape for Attack
18     on Speaker Pelosi's Home (Nov. 2, 2022),
       https://sfdistrictattorney.org/press-release/district-attorney-brooke-
19     jenkins-announces-felony-charges-against-david-depape-for-attack-on-
       speaker-pelosis-home/ ............................................................................................. 2

20
       Shirley N. Weber, Cal. Sec'y of State, Report of Registration: Odd-
21     Numbered Year Report (2023), https://elections.cdn.sos.ca.gov/ror/ror-
       odd-year-2023/complete-ror.pdf .......................................................................... 21

22

23

24

25

26

27

28

# I.      INTRODUCTION

Defendant David DePape is charged with attempting to kidnap Congresswoman Nancy Pelosi and assaulting her husband Paul Pelosi.  This conduct occurred in the Pelosis' San Francisco home.  The case is properly assigned to the San Francisco courthouse of this District, and the Court should deny the defendant's motions to move the case outside this courthouse under Rules 21 and 18.

The defendant's motion falls far short of establishing the "rarely applicable" and "extreme" presumption of prejudice required to transfer districts.  *Hayes v. Ayers*, 632 F.3d 500, 507-10 (9th Cir. 2011).  The Constitution prescribes that criminal trials are to be held in the state and district where the crime was committed.  U.S. Const. art. III, § 2, cl. 3; amend. VI.  Transferring trial to a different district is permitted only when the original district is so saturated with prejudicial, inflammatory publicity that it would be impossible to seat an impartial jury.  *Skilling v. United States*, 561 U.S. 358, 378-79 (2010); *Hayes*, 632 F.3d at 507-10.

This Court is capable of empaneling an impartial jury from the San Francisco-Oakland jury pool. Contrary to the defendant's claims, local media coverage of this case and the defendant has focused primarily on the admissible facts of this case, has not been prejudicial or inflammatory, and peaked more than eight months ago.  The defense team's own community attitude survey demonstrated no meaningful difference in both familiarity with this case and prejudgment about the charged crimes between the San Francisco-Oakland jury pool and the other jury pools in this District and the Phoenix jury pool of the District of Arizona.  The public stature of victim Congresswoman Nancy Pelosi does not alter this analysis.  And any potential prejudice is mitigated by the large, diverse San Francisco-Oakland jury pool.

Transferring this trial to the Eureka courthouse is unwarranted for similar reasons.  There is no basis to transfer based on pretrial publicity; the defendant, victims, and witnesses are in San Francisco; and no other venue considerations weigh in favor of transfer.

A rigorous jury selection process is fully capable of identifying 12 jurors in the San Francisco-Oakland jury pool.  The defendant's motion should be denied.

//

//

## II. RELEVANT BACKGROUND

### A. Factual Background

On October 28, 2022, the defendant broke into Congresswoman Nancy Pelosi's and her husband Paul Pelosi's San Francisco home ("Pelosi Residence").  United States Capitol Police surveillance video captured the defendant breaking into the Pelosi Residence.  Congresswoman Pelosi was not home at the time.  Mr. Pelosi was home and called 9-1-1 upon encountering the defendant.  The 9-1-1 call was recorded.  San Francisco Police Department ("SFPD") officers responded to the Pelosi Residence and saw the defendant strike Mr. Pelosi with a hammer.  The assault was captured by the officers' body-worn cameras.  The officers arrested the defendant.  SFPD officers then interviewed the defendant after confirming the defendant's understanding of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The interview was recorded.

### B. State Criminal Case and Defendant Contact with Media

On November 2, 2022, the San Francisco District Attorney announced that her office had charged the defendant with attempted murder, assault with a deadly weapon, elder abuse, residential burglary, false imprisonment, and threatening the life of or serious bodily harm to a public official.  *See* Press Release, San Francisco District Attorney, District Attorney Brooke Jenkins Announces Felony Charges Against David DePape for Attack on Speaker Pelosi's Home (Nov. 2, 2022), https://sfdistrictattorney.org/press-release/district-attorney-brooke-jenkins-announces-felony-charges-against-david-depape-for-attack-on-speaker-pelosis-home/.

On December 14, 2022, a preliminary hearing was held in the defendant's state criminal case. During that hearing, the District Attorney's Office admitted into evidence and played in open court, among other things, Mr. Pelosi's 9-1-1 call; portions of SFPD body camera footage; portions of the audio recording of SFPD's interview of the defendant; and portions of surveillance camera footage.

On January 10, 2023, twelve media entities—CBS Broadcasting Inc., The Associated Press, New York Times Co., WP Company LLC (d.b.a. The Washington Post), Cable News Network, Inc., Fox News Network LLC, NBCUniversal Media, LLC, ABC, Inc., KQED Inc., Hearst Communications, Inc., Sonoma Media Investments, LLC (d.b.a. The Press Democrat), and Los Angeles Times Communications LLC (collectively the "Media Coalition")—moved the state court to release the

1    evidence submitted by the District Attorney's Office in the preliminary hearing.

2         On January 25, 2023, the state court granted the Media Coalition's motion and released the audio

3    recordings of Mr. Pelosi's 9-1-1- call and SFPD's interview of the defendant, as well as portions of the

4    body-worn camera and surveillance video footage.

5         On January 27, 2023, after media organizations published the audio and video evidence of the

6    conduct charged here that they had obtained in the state criminal case, the defendant called local Fox

7    network station KTVU.  *See* Amber Lee, *Depape in bizarre phone call to KTVU says he should have*

8    *been 'more prepared,'* KTVU Fox 2 (Jan. 27, 2023), available at https://www.ktvu.com/news/depape-

9    in-bizarre-phone-call-to-ktvu-says-he-should-have-been-more-prepared.  The defendant gave statements

10   to a reporter, who recorded the interview with his consent.  KTVU published a portion of this recording

11   the same day.  *Id.*

12        **C.    Federal Criminal Case**

13        On October 31, 2022, the defendant was charged by criminal complaint with attempting to

14   kidnap a federal official and assaulting the immediate family member of a federal official.  Dkt. 1.  On

15   November 9, 2022, a grand jury sitting in San Francisco returned an indictment charging the defendant

16   with these two crimes.  Dkt. 3.  Both the complaint and the indictment indicated that the conduct

17   occurred in San Francisco and that the case should be assigned to the San Francisco courthouse, which it

18   was.  On June 14, 2023, the defendant filed the instant motion to change venue.  Dkt. 41.

19        **D.    Defendant's Community Attitude Survey and Media Coverage Analysis**

20        The defendant submitted a Declaration from Dr. Bryan Edelman, who is characterized by the

21   defendant as an "expert on the impact of pretrial publicity on juries," in support of his Motion to Change

22   Venue.  Def. Mtn. at 6:12-14.  Dr. Edelman declared that he conducted a media analysis "to assess the

23   extent of coverage surrounding this case and the defendant" as well as a "community attitude survey"

24   about the impact of the media coverage of this case.  Decl. of Bryan Edelman ("Edelman Decl.") at 2:9-

25   14, 11:6-9.

26        The government requested additional information about Dr. Edelman's survey not included in

27   his Declaration, which defense counsel provided in a Supplemental Declaration of Bryan Edelman that

28   the government submits with this filing.  *See* Suppl. Decl. of Bryan Edelman ("Supp. Edelman Decl.").

### 1.   Edelman Community Attitude Survey

Dr. Edelman declares that he conducted a telephone survey about this case "to assess case recognition, familiarity with prejudicial media content, and bias." Edelman Decl. at 2:13-14. This survey was conducted in the "San Francisco, San Jose, and Eureka Division of the Northern District of California," as well as in the "Phoenix Division of the District of Arizona."[1] *Id.* at 2:11-13. Dr. Edelman characterized his findings as falling into two categories: "case recognition" or "case knowledge" and "presumption of guilt" or "prejudgment." *Id.* at 29:7-23, 39:3.

In his initial declaration, Dr. Edelman stated that "[t]he differences between case recognition and prejudgment in the comparison surveys compared to the San Francisco Division were not statistically significant" but claimed that "there were nuanced differences" in the other polled jury divisions. *Id.* at 4:1-2, 29:22-23. That declaration, however, only included detailed survey results for the San Francisco-Oakland and the Eureka jury divisions. *See, e.g., id.* at 3:3-4:7, 28-32. In response to the government's request for additional information about survey results from all four jury divisions, defense counsel provided Dr. Edelman's Supplemental Declaration.

Dr. Edelman's Supplemental Declaration showed no meaningful difference in case recognition and prejudgment between the four surveyed jury divisions. For example:

- 77.1% of San Francisco respondents; 73.5% of San Jose respondents; 75.7% of Eureka respondents; and 83% of Phoenix respondents were familiar with this case. Supp. Edelman Decl. at 2:3-7.

Only the respondents who recognized the case were then asked more detailed information about specific facts and about their views of the defendant's guilt. Edelman Decl., App. B, at 4 (directing surveyors to skip fact-specific questions if the surveyed individual was not familiar with the case), 5 (survey states that only those who answered "yes" to familiarity with the case should be asked certain fact-specific

---

[1] There are no separate divisions in the Northern District of California or the District of Arizona. *See* 28 U.S.C. §§ 82, 84(a). Rather, Congress has merely provided that "[c]ourt for the Northern District shall be held at Eureka, Oakland, San Francisco, and San Jose." *See* 28 U.S.C. § 84(a); *compare id.* § 84(c) (providing for division of Central District into three "Divisions"). Pursuant to 28 U.S.C. § 1869(e), Northern District of California General Order No. 6 divides this District into three "jury divisions" for jury selection purposes: San Francisco-Oakland jury division, San Jose jury division, and Eureka jury division. *Id.* § II. We assume for the sake of argument that Dr. Edelman conducted his survey in the different jury divisions established by Northern District of California General Order No. 6.

questions).  The responses to these fact specific questions showed similar recognition across the four surveyed areas.  For example:

- When the subset of respondents already familiar with the case were asked, "Have you read, seen, or heard if David DePape hit Paul Pelosi in the head with a hammer?" the following percentages of respondents said they had: 80.5% of San Francisco respondents; 85.7% of San Jose respondents; 78.1% of Eureka respondents; and 69.4% of Phoenix respondents.  Supp. Edelman Decl. at 7:8-17.

- When the subset of respondents already familiar with the case asked, "Have you read the transcript or heard the 911 call Paul Pelosi made to police?" the following percentages of respondents said they had: 34.7% of San Francisco respondents; 23.3% of San Jose respondents; 30.3% of Eureka respondents; and 29.4% of Phoenix respondents.  *Id.* at 9:26-10:7.

Dr. Edelman's Supplemental Declaration also showed similar rates of what he described as "prejudgment," Edelman Decl. at 4:1, among all of the respondents surveyed.  For example:

- When asked, "Based on what you have read, seen, or heard, do you believe David DePape is definitely guilty; probably guilty; probably not guilty; or definitely not guilty of attempting to kidnap Nancy Pelosi?" among the total sample in each surveyed area, 42.3% of San Francisco respondents; 30.5% of San Jose respondents; 29.3% of Eureka respondents; and 43.9% of Phoenix respondents answered "definitely guilty" or "probably guilty."  Supp. Edelman Decl. at 5:15-6:4.

- When asked, "Based on what you have read, seen, or heard, do you believe David DePape is definitely guilty; probably guilty; probably not guilty; or definitely not guilty of assaulting Paul Pelosi?" among the total sample in each surveyed area, 59.6% of San Francisco respondents; 57% of San Jose respondents; 59% of Eureka respondents; and 57.6% of Phoenix respondents answered "definitely guilty" or "probably guilty."  *Id.* at 3:21-4:11.

//

//

USA'S OPPOSITION TO MOTION TO CHANGE VENUE
3:22-CR-426-JSC                                    5

### 2.    Edelman Media Coverage Analysis

Dr. Edelman states that he "evaluated relevant newsprint, television, and social media coverage" about the case, Edelman Decl. at 2:9-11, although he appears to focus the analysis in his Declaration primarily on local news articles.[2]  According to his Declaration, Dr. Edelman reviewed media coverage from October 28, 2022, to April 12, 2023.  *Id.* at 2:9-11.

Dr. Edelman declares that "[a] search of the San Francisco Chronicle, San Francisco Examiner, and San Francisco Foghorn uncovered 93 articles" about this case and the defendant from October 28, 2022 (the date of the conduct at issue here) to April 12, 2023.  *Id.*  These 93 articles are attached as Appendix C to his Declaration.[3]  Half of the articles in Appendix C date to within two weeks of the defendant's crimes, from October 28, 2022, to November 11, 2022.  *See, e.g.*, App. C at 17-19 (investigation into the defendant's personal history); *id.* at 32-35 (column canvassing political leaders' reaction to incident ahead of 2022 midterm election); *id.* at 147-49 (report about effects of tech CEO's tweeting patterns on his automobile business).  During this timeframe, mainstream local media mentioned the defendant's motives as suggested bigotry and vulnerability to far-right conspiracy theories, although such details, or "bias" according to the Edelman Declaration, were rarely the focus of any article.

According to Dr. Edelman's compilation, as more information about the defendant's arrest emerged from court filings and police records, the *Chronicle*'s reports focused primarily on factual details from those public documents.  For instance, the *Chronicle* published an article on November 1, 2022, entitled "Feds release chilling new details," which primarily relayed factual allegations from federal charging documents filed the previous day.  *See id.* at 80-82.

---

[2]  Section V of Dr. Edelman's Declaration includes 18 pages of bullet points that appear to be quotes or summaries of the media reviewed by Dr. Edelman.  *See* Edelman Decl. at 11-28.  There is no attribution for any of these bullet points, the vast majority of which are not identified as direct quotes.  It appears, from a search of Appendix C, that these bullet points may all be direct quotes from the newspaper articles included in that Appendix.  Therefore, the government focuses its analysis on the media coverage cited in Appendix C (particularly the *San Francisco Chronicle* and *San Francisco Examiner*, which likely have broader readerships than the San Francisco Foghorn, the University of San Francisco student newspaper) and otherwise included in the Defendant's Motion.  *See, e.g.*, Def. Mtn. at 7:21-8:16.

[3]  Appendix C also includes three articles from *Mission Local*, a neighborhood newspaper covering San Francisco's Mission District.  *See* App. C at 40-43; *id.* at 237-40; *id.* at 258-61.

Dr. Edelman's compilation of print media shows that local coverage of the case briefly revived in late January as the court in the defendant's state criminal case ordered the release of video and audio recordings of the incident.  *See id.* at 212-61.  Local print coverage of the defendant's call to KTVU on January 27, 2023, according to Dr. Edelman's compilation, was minimal.  *See id.* at 267, 278.

Local media coverage of this case has been limited in the five months since late January 2023. *See id.* at 255-90.  Dr. Edelman's review shows that only six articles were published in the final two months of the article search set, from February 12, 2023, to April 7, 2023.  *See id.* at 269-90.  Of those six articles, a review of Appendix C shows that four did not even mention the defendant by name, and each of those four referenced the conduct charged here in passing just once.  *See id.* at 269-71 (Feb. 12, 2023) (article about threats of political violence to women of color); *id.* at 279-81 (Feb. 27, 2023) (article about tech and automobile CEO's defense of the creator of a popular cartoon series); *id.* at 282-84 (Mar. 21, 2023) (article about popular comedian Adam Sandler's receipt of a lifetime achievement award); *id.* at 285-90 (Apr. 7, 2023) (article profiling local state politician that included a two-sentence paragraph describing the attack and characterizing the defendant as an "intruder").

As of this filing, the last article published in the *Chronicle* even mentioning the terms "Paul Pelosi" or "DePape" is the April 7, 2023 story included in Appendix C.  *See id.* at 285-90.  The *San Francisco Examiner* last published an article mentioning the defendant's attack nearly three months ago, in an April 18, 2023 story about the killing of a tech executive in San Francisco.  *See* Marcus White, *Why reactions to Bob Lee killing followed a uniquely American pattern*, San Francisco Examiner (Apr. 18, 2023), https://www.sfexaminer.com/news/crime/why-bob-lee-killing-reactions-followed-unending-pattern/article_aef230a4-de07-11ed-b36e-7b12a5ee0390.html.

### E.   National Media Coverage

There has been a significant amount of national media coverage about this case.  As of the date of this filing, a search for news media that included the terms "DePape" and "Pelosi" generated 2,404 articles in Westlaw and 6,514 results in Lexis.[4]

//

---

[4]  This search was conducted using additional possible spellings of the defendant's name, including "depape," "pape," and "de pape."

III.     **ARGUMENT**

      A.     **Legal Standards**

            1.     **The Standards Governing Change of Venue are Extremely High**

      The standards governing venue transfer under the Constitution and Federal Rule of Criminal Procedure 21 are derived from the Sixth Amendment, which secures a defendant's right to trial by "an impartial jury." *Skilling v. United States*, 561 U.S. 358, 377 (2010).  The Sixth Amendment also prescribes that the trial be held before a "jury of the state and district wherein the crime shall have been committed."  U.S. Const. amend. VI; *see also* U.S. Const. art. III, § 2, cl. 3 (criminal trials "shall be held in the State where the said Crimes shall have been committed").  The Supreme Court has long recognized that the Constitution's place-of-trial prescriptions do not prohibit transfer of criminal proceedings to a different district "if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'"  *Skilling*, 561 U.S. at 378 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

      Federal Rule of Criminal Procedure 21 governs venue transfers in federal court.  Under that rule, if the court finds that "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there," then the court "must transfer the proceeding . . . to another district."  Fed. R. Crim. P. 21(a).

      Two different types of prejudice – actual prejudice and presumed prejudice – may support venue transfer.  *See Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (internal quotations omitted).  Actual prejudice exists only when voir dire reveals that the jury pool harbors "actual partiality or hostility [against the defendant] that [cannot] be laid aside."  *Harris v. Pulley*, 885 F.2d 1354, 1363 (9th Cir. 1989).  Prejudice may be presumed, on the other hand, in "only the extreme case" – that is, where "the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime."  *Hayes*, 632 F.3d at 508; *see also Skilling*, 561 U.S. at 381; *Harris*, 885 F.2d at 1361.  Screening questionnaires and voir dire, however, are normally sufficient to "detect and defuse juror bias" and ensure a fair trial.  *Skilling*, 561 U.S. at 385.

      In a case such as this one, where jury selection has not begun, it is impossible to determine whether an unacceptably high percentage of jurors in the venire or on the panel are actually partial or

hostile to the defendant such that they could not judge the guilt of the defendant impartially. *See, e.g.*, *Harris*, 885 F.2d at 1363-64. Accordingly, where, as here, the absence of voir dire precludes a finding of actual prejudice, the Court need only consider whether the defendant's right to a fair trial is presumptively prejudiced.

The courts have set the bar extremely high for such a presumption, which is "rarely applicable" and reserved only for an "extreme situation." *Id.* at 1361 (citations omitted). The Supreme Court has adopted a "totality of the circumstances" analysis. *See, e.g.*, *Murphy v. Florida*, 421 U.S. 794, 799 (1975); *Patton v. Yount*, 467 U.S. 1025, 1031 (1984). In *Skilling*, the Court identified three key factors to evaluate claims of presumed prejudice: (1) "the size and characteristics of the community in which the crime occurred"; (2) whether news coverage contained a confession or "blatantly prejudicial information"; and (3) whether "trial swiftly followed a widely reported crime." 561 U.S. at 382-83.[5] Prior to *Skilling*, the Ninth Circuit summarized its analysis of the latter two factors as the consideration of

> whether there was a "barrage of inflammatory publicity immediately prior to trial amounting to a huge . . . wave of public passion," whether the media accounts were primarily factual or editorial in nature, and whether the media accounts "contained inflammatory, prejudicial information that was not admissible at trial."

*Randolph v. California*, 380 F.3d 1133, 1142 (9th Cir. 2004) (quoting *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998)). The adverse publicity must rise to such a pervasive and inflammatory level "that jurors cannot be believed when they assert that they can be impartial." *United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997). A court may presume prejudice only when the "trial atmosphere [is] utterly corrupted by press coverage," *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (citing *Murphy*, 421 U.S. at 798), or when "a wave of public passion . . . ma[kes] a fair trial unlikely by the jury," *Yount*, 467 U.S. at 1040 (internal quotation marks omitted). *See also United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996) ("Prejudice is rarely presumed because 'saturation' defines conditions found only in extreme situations.") (citation and internal quotation marks omitted).

---

[5] A fourth factor identified by the Supreme Court in *Skilling*, whether the jury's verdict "undermined in any way the supposition of juror bias," is not applicable here, where the defendant's motion is brought before trial. 561 U.S. at 383-84.

Moreover, the Supreme Court has explained that extensive media coverage of important criminal cases is to be expected and welcomed. *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966) ("A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. . . . The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism."). The Court has further held that "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961); *see also Reynolds v. United States*, 98 U.S. 145, 155-56 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."). The Supreme Court stated:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 723. As the Supreme Court recently stated, "[p]rominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Skilling*, 516 U.S. at 381 (emphasis in original).

Accordingly, courts in the Ninth Circuit have routinely found no presumed or actual prejudice even in cases with extremely high jury pool awareness and assumed guilt rates. *See, e.g.*, *Sherwood*, 98 F.3d at 410 (no presumed or actual prejudice where 96% of the jurors admitted that they were aware of the case and 60% mentioned that the victim, the daughter of Mirage Resorts CEO Steven Wynn, was kidnapped); *Leahy v. Farmon*, 177 F. Supp. 2d 985, 1004 (N.D. Cal. 2001) (no presumed prejudice despite survey results showing that 78% of the jury pool had heard about the case and 49.1% thought that the defendants were definitely or probably guilty); *see also Yount*, 467 U.S. at 1029 (upholding no presumed or actual prejudice where all but 2 of the 163 members of the venire panel had heard of the case and where 126 venire members—77% of the panel—admitted that they would carry an opinion into

1   the jury box).  The Ninth Circuit has stated, "Although a defendant is entitled to an impartial jury, he is

2   not entitled to a jury completely ignorant of the facts."  *Sherwood*, 98 F.3d at 410.

3           Furthermore, the Ninth Circuit has been unequivocal that a district court has "broad discretion"

4   in ruling on a motion for change in venue and may be reversed only upon a showing of abuse of

5   discretion.  *United States v. Flores-Elias*, 650 F.2d 1149, 1150 (9th Cir. 1981); *see also, e.g.*, *Skilling*,

6   561 U.S. at 378 n.11 ("[D]istrict-court calls on the necessity of transfer are granted a healthy measure of

7   appellate-court respect.").

8                       **2.       The Standards Governing Intradistrict Transfer**

9           There is no constitutional right to a trial within a particular division of, or courthouse in, a

10  federal judicial district.  *See, e.g.*, *United States v. Erwin*, 155 F.3d 818, 824 (6th Cir. 1998); *United*

11  *States v. Betancourt*, 734 F.2d 750, 756 (11th Cir. 1984).  Rather, the Sixth Amendment's Vicinage

12  Clause provides only that an accused be tried in "the State and district wherein the crime shall have been

13  committed."  U.S. Const. amend. VI; *see also* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes . . .

14  shall be held in the State where the said Crimes shall have been committed"); *see also Betancourt*, 734

15  F.2d at 756 ("A division of a federal judicial district is not a unit of venue in criminal cases.").  District

16  courts therefore have been given broad discretion to determine whether an intradistrict transfer of venue

17  pursuant to Federal Rule of Criminal Procedure 18 is warranted, as such transfers do not pit the Vicinage

18  Clause against Due Process guarantees.  *See United States v. Balistrieri*, 778 F.2d 1226, 1229 (7th Cir.

19  1985); *United States v. Alvarado*, 647 F.2d 537, 539 (5th Cir. 1981); *cf. also Flores-Elias*, 650 F.2d at

20  1150 ("A trial judge is granted broad discretion in ruling on a change of venue motion [under Rule

21  21].").  The Ninth Circuit reviews denials of motions for change of venue pursuant to Rule 18 for abuse

22  of discretion by the district court.  *See United States v. Scholl*, 166 F.3d 964, 969 (9th Cir. 1999).

23          Rule 18 provides, in relevant part: "The court shall fix the place of trial within the district with

24  due regard to the convenience of the defendant and the witnesses and the prompt administration of

25  justice."  Fed. R. Crim. P. 18.  The Fifth Circuit has held that, "[a]lthough the text of Rule 18 refers only

26  to convenience and prompt administration, the district court may consider other factors."  *United States*

27  *v. Lipscomb*, 299 F.3d 303, 340 (5th Cir. 2002).  Such factors "commonly include, but are not

28  necessarily limited to, docket management, courthouse space and security, and . . . pretrial publicity."

*Id.* at 342.

Several other courts have likewise applied the factors relevant to Rule 21 motions for interdistrict transfers to guide their consideration of Rule 18 motions for intradistrict transfers. *See, e.g.*, *United States v. Joyce*, 2008 WL 2367307, at *2 (W.D. Pa. June 10, 2008) ("[G]enerally the same principles involved in deciding whether to transfer a case to another district are relevant to the decision of where within the district to set the trial."); *see also United States v. Chitolie*, 2010 WL 2384550, at *4-6 (D.V.I. June 8, 2010) (listing cases). The Supreme Court has established ten factors relevant to the Rule 21(b) analysis for transfers "in the interest of justice":

> [1] location of the defendant; [2] location of possible witnesses; [3] location of events likely to be in issue; [4] location of documents and records likely to be involved; [5] disruption of defendant's business if case not transferred; [6] expenses of the parties; [7] location of counsel; [8] relative accessibility of place of trial; [9] docket conditions of each potential district; and [10] any other special elements which might affect the transfer.

*Platt v. Minnesota Min. & Mfg. Co.*, 376 U.S. 240, 244 (1964). Using this framework allows courts to fix the place of trial within a district based on a consideration of multiple factors, not just on whether there may be slight inconveniences to the parties and witnesses. *See United States v. Thomas*, 2019 WL 3307043, at *4-6 (D.V.I. July 23, 2019) (applying and weighing multiple *Platt* factors in granting government's motion for transfer of venue for sentencing hearing).

### B.    This Case Does Not Present the "Rare" and "Extreme" Situation of a Jury Pool Presumptively Prejudiced by Inflammatory and Prejudicial Media Coverage

This Court is more than capable of empaneling an impartial jury from the San Francisco-Oakland jury pool. As explained below, media coverage of the case peaked more than eight months ago, has focused primarily on the admissible facts of the case, and has not been prejudicial or inflammatory. The defendant's own survey fails to show any meaningful difference of case recognition and prejudgment between the San Francisco-Oakland jury pool and the other surveyed jury pools (in San Jose, Eureka, and Phoenix, Arizona). The public stature of victim Congresswoman Nancy Pelosi does not change this analysis. Moreover, the San Francisco-Oakland jury division's large, diverse pool of potential jurors mitigates any potential for prejudice.

1

2

   **1.  Media coverage has been primarily factual in nature and not prejudicial or inflammatory**

3    Defendant fails to establish that this is the "rare" and "extreme" situation where media coverage

4 is so inflammatory as to presumptively prejudice the entire jury pool.  The defendant cannot meet the

5 standard because the media's primary focus has been on the admissible facts of this case.  Further, the

6 reporting of any additional information that could even arguably be deemed prejudicial has diminished

7 over time and cannot be said to have so saturated the prospective jury pool "that jurors cannot be

8 believed when they assert that they can be impartial."  *Croft*, 124 F.3d at 1115.  Against this backdrop,

9 each of the defendant's arguments regarding media coverage fails to establish a "rare" and "extreme"

10 situation warranting transfer.

11    First, defendant inaccurately conflates the magnitude and tone of the local media coverage of this

12 case with presumptive prejudice.  Def. Mtn. at 6:9-13 ("Prospective Bay Area jurors have been

13 inundated with media coverage of this case"), 6:19-21 ("San Francisco media have provided an

14 'overwhelming negative' depiction of Mr. DePape and his motives"), 9:25-28 ("the extremely high level

15 of exposure to prejudicial media coverage of this case in the Bay Area supports transferring the venue

16 out of the San Francisco Division of this Court.").  The defendant fails to cite a single case supporting

17 change of venue on the basis of negative coverage.  Def. Mtn. at 6-9.  Indeed, the Supreme Court firmly

18 rejected this standard in *Skilling*, overturning the lower court's finding of presumptive prejudice that had

19 been based "primarily on the magnitude and negative tone of media attention."  561 U.S. at 384.

20 Instead, the Court held that "pretrial publicity—even pervasive, adverse publicity—does not inevitably

21 lead to an unfair trial."  *Id.*  The adverse publicity must rise to such a pervasive and inflammatory level

22 "that jurors cannot be believed when they assert that they can be impartial."  *Croft*, 124 F.3d at 1115.

23 That is not the record here, where instead, media coverage has been primarily factual in nature and has

24 generally not included "inflammatory, prejudicial information that [will] not [be] admissible at trial."

25 *Randolph*, 380 F.3d at 1142 (quotation omitted).

26    Defendant's main examples of negative and overwhelming coverage are simply reports of the

27 admissible evidence in this case.  He points to local media coverage and video footage of defendant

28 breaking into the Pelosi Residence and assaulting Paul Pelosi, as well as the publication of audio

1   recordings of defendant's interview by SFPD and Paul Pelosi's 9-1-1 call.  Def. Mtn. at 6:16-19, 7:11-

2   8:16.  To the extent that any of this media coverage is adverse to the defendant, that state of affairs is

3   due to the nature of the facts and not to prejudicial, inflammatory reporting.

4         Second, although defendant argues that the coverage is presumptively prejudicial because the

5   local media have portrayed him "as a bigot, who holds racist, antisemitic, misogynistic, Islamophobic,

6   and homophobic beliefs," his representations of the scope of such coverage are exaggerated.  *See* Def.

7   Mtn. at 7:1-2; *see also id.* at 6:20-21 ("San Francisco media have provided an 'overwhelming negative'

8   depiction of Mr. DePape and his motives, in particular portraying him as a 'proponent of right-wing

9   hate.'") (quoting Edelman Decl. at 11).  Assuming for the sake of argument that Dr. Edelman's

10  compilation of Bay Area print media coverage is a fair and accurate representation of local media

11  coverage, this local media coverage of the defendant's personal beliefs peaked in the first two weeks

12  after the conduct at issue here, which occurred on October 28, 2022, and then quickly dissipated, with

13  no mention of the defendant's alleged history of bigotry since January 28, 2023.

14        Just two of the four *San Francisco Chronicle* articles published between October 28 and October

15  30, 2022, and included in Appendix C to Dr. Edelman's Declaration, describe the defendant's "racist"

16  and "bigoted" blog posts in any measure of detail.  App. C at 17-19 (Oct. 29, 2022); *id.* at 24-29 (Oct.

17  29, 2022).  A third article only briefly mentions defendant's conduct and does not refer to his

18  background or alleged bigotry at all.  *See id.* at 15 (Oct. 29, 2022).  The fourth article mentions the

19  defendant's far-right beliefs and vulnerability to conspiracy theories in one sentence of a 700-word

20  article about a general uptick in threats to lawmakers.  *See id.* at 21 (Oct. 29, 2022).

21        By October 30, 2022, most *Chronicle* articles about the incident mention the defendant's alleged

22  bigotry only in passing—summed up in just a paragraph or two—or not at all.  *See, e.g.*, App. C at 30-31

23  (Oct. 30, 2022 letter to the editor that does not mention defendant by name and uses incident as

24  springboard to broader discussion); *id.* at 150-52 (Nov. 13, 2022 column about corporate governance of

25  a social media company that does not mention defendant by name and refers only once to the conduct at

26  issue here); *id.* at 147-50 (Nov. 11, 2022 article exploring how aforementioned social media CEO's

27  behavior has affected his other businesses, that does not mention defendant by name and refers only

28  once to the conduct at issue here).  As more information about the defendant's arrest emerged from court

USA'S OPPOSITION TO MOTION TO CHANGE VENUE
3:22-CR-426-JSC                              14

filings and police records, the *Chronicle*'s reports focused primarily on factual details from those public documents. *See, e.g.*, *id.* at 80-82 (Nov. 1, 2022) (article primarily discussing factual allegations in affidavit in support of criminal complaint).

By November 29, 2022, most references to the defendant's background in the *Chronicle* were fleeting and, at most, described him as a right-wing "blogger" and "conspiracy theorist." *See, e.g.*, *id.* at 170 (Nov. 29, 2022). Many do not even mention the defendant by name. *See, e.g.*, *id.* at 184 (Dec. 16, 2022); *id.* at 285 (Ap. 7, 2023) (one mention of the attack that neither names defendant nor says anything about his alleged bigotry).

From January 29, 2023 onward, no article in Appendix C, from the *Chronicle* or otherwise, mentions the defendant's alleged history of bigotry. Altogether, references to the defendant's history of bigoted blog posts and vulnerability to conspiracy theories are fleeting and comprise just a fraction of the *Chronicle*'s coverage, which overwhelmingly focuses on the facts of the case gleaned from court documents.[6]

The passage of time between any reporting on the defendant's personal beliefs and the trial is significant, as the Supreme Court and the Ninth Circuit have consistently held that "time helps mitigate any bias the media coverage might have created." *Randolph*, 380 F. 3d at 1142; *see also Yount*, 467 U.S. at 1034 ("That time soothes and erases [possible prejudice] is a perfectly natural phenomenon, familiar to all."). The record here is similar to that in *Harris v. Pulley*, 885 F.2d 1354 (9th Cir. 1988), where the court found that the "vast majority of the media accounts" were "largely factual in nature" and that media accounts that included potentially prejudicial information "were published within the two weeks immediately following" the charged crimes. *Id.* at 1362. The Ninth Circuit concluded that there was no presumed prejudiced based on the fact that "[t]he number of news reports regarding [petitioner's] case had dissipated considerably by the time of jury selection four months later." *Id.* Here, the last mention of defendant's alleged history of bigotry was in late January 2023, more than

_____

[6] Moreover, defendant's state-court counsel set off a brief round of media publicity by commenting to the press in November 2022 about DePape's "vulnerability to misinformation." *See* App. C at 103 (Nov. 3, 2022). Having had his lawyer fuel media coverage about his "vulnerability to misinformation," it is now hard for the defendant to argue that such media coverage warrants a change of venue in his federal case.

ninth months prior to the November 6, 2023, trial date.

Furthermore, the reporting of defendant's alleged history of bigotry and any media reports that characterize the defendant as a "proponent of right-wing hate," Def. Mtn. at 6:20 (quoting Edelman Decl. at 11), pale in comparison to media coverage of inadmissible, prejudicial information that the Supreme Court and Ninth Circuit have found still did not create a presumption of prejudice.  Indeed, the defendant offers no authority supporting his argument that media coverage of his personal beliefs necessitates a change in venue, Def. Mtn. at 7, likely because courts have dismissed much more unfavorable publicity as insufficient to meet the extremely high bar required to show prejudice so infused that no impartial jury can be impaneled.  For example, in *Patton v. Yount*, 467 U.S. 1025 (1984), Yount, a high school math teacher, was tried and convicted of first-degree murder and rape for killing one of his 18-year-old high school students.  *Id*. at 1026-27.  That conviction was overturned based on the use of Yount's confession, which the state supreme court found was taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Press coverage reported on Yount's prior confession, his plea of temporary insanity in the first trial, and his conviction in the first trial, none of which were admissible in his second trial.  *Id.* at 1029.  The Supreme Court still held that this publicity did not foreclose a fair trial.  *Id*. at 1035.

Similarly, in *Hayes v. Ayers*, 632 F.3d 500 (9th Cir. 2011), Hayes was convicted of two counts of first-degree murder in Santa Cruz County.  *Id.* at 506.  Prior to his trial, local media coverage had included, among other things, Hayes's criminal history in two other states, including that he had been twice acquitted of murder, once by reason of insanity; that Hayes had been committed to and escaped from a mental hospital; Hayes's jailhouse marriage to a former nun; two witnesses' description of how Hayes shot the two victims and removed their heads and hands; and the fact that one witness had passed a polygraph test.  *Id*. at 507.  The Ninth Circuit held that even though the media coverage was "unflattering and in some instances included inadmissible evidence," none of the coverage included "the kind of vivid, unforgettable information" requiring a change of venue.  *Id.* at 509.  *See also Randolph*, 380 F.3d at 1143 (finding no presumed prejudice where "media coverage contained prejudicial information that would not have been admissible at trial, such as [petitioner's] previous conviction for an unrelated crime"); *Harris*, 885 F.3d at 1360 (holding no presumed prejudice in trial for murder

1   convictions where pretrial publicity included the petitioner's televised capture for bank robbery, that he

2   and his brother had confessed to the crimes, his prior manslaughter conviction, and that he had violated

3   his parole).

4          Third, neither the applicable legal standards nor Dr. Edelman's community attitude survey[7]

5   supports the defendant's argument that "bias" in this District necessitates moving this case outside the

6   District in which it was properly indicted.  Def. Mtn. at 8:17-9:28.  The defendant claims that "there is

7   bias in the San Francisco Division jury pool, and that bias stems from exposure to pretrial publicity."  *Id*.

8   at 8:25-9:1 (citing Edelman Decl. at 29).  The standard is not whether there is potential bias in the jury

9   pool, but rather, whether the entire jury pool has been saturated by inflammatory media coverage.

10   *Skilling*, 561 U.S. at 381.  Weeding out potential jurors who may be biased is the normal, proper role of

11   a robust jury selection process.  Applying this standard to Dr. Edelman's survey demonstrates that no

12   transfer of venue is appropriate.

13          The defendant asks this Court to move the case to Eureka, if not outside the District, because

14   "[t]he Eureka Division of this Court—which is not part of the Bay Area media market—is much less

15   exposed to the overwhelming publicity concerning this case."  Def. Mtn. at 12:13-14.  But Dr. Edelman

16   expressly notes the opposite, declaring "[t]he differences between case recognition and prejudgment in

17   the comparison surveys compared to the San Francisco Division *were not statistically significant*."

18   Edelman Decl. at 29:22-23 (emphasis added).  Dr. Edelman's initial Declaration included only specific

19   survey results for the San Francisco-Oakland and Eureka jury divisions.  *See, e.g.*, *id*. at 3:3-4:7, 28-32.

20   The government then requested the same information for all four surveyed jury divisions, which defense

21   counsel provided in Dr. Edelman's Supplemental Declaration.  This Supplemental Declaration shows

22   similar rates of survey respondents' familiarity with this case and its facts across all four surveyed areas.

23   *See, e.g.*, Supp. Edelman Decl. at 2:3-7 (percentage of respondents who were familiar with the case); *id.*

24

25        [7] The voluntary responses to the community attitude survey made by those respondents who
were willing and available to participate present a stark contrast to the jury selection process, where

26   responses to the jury questionnaire and in voir dire will be made under penalty of perjury.  Additionally,
the Court can query venire members' views during voir dire.  Other differences between the defendant's

27   survey and jury selection make it difficult to assume that the survey's findings will apply to prospective
jurors.  For example, the survey questions shifted the burden of doubt onto the defendant, *see, e.g.*, App.

28   B, at 4 ("[W]ould David DePape have a difficult time convincing you that he is not . . . guilty of
assaulting Paul Pelosi?").

at 6:16-25 (percentage of respondents familiar with the case who had read, seen, or heard that the defendant used a hammer to break into the Pelosi Residence); *id.* at 7:8-17 (percentage of respondents familiar with the case who had read, seen, or heard that the defendant hit Mr. Pelosi in the head with a hammer).

Dr. Edelman's survey provides no support for the claim that the San Francisco-Oakland jury pool is uniquely situated compared to other possible venues. Instead, assuming for the sake of argument that the survey is sound, it shows that there is a high level of recognition about this case in all surveyed areas, and a percentage of respondents in each surveyed area who may have formed opinions about this case in response to the survey questions. None of this establishes a presumption of prejudice in this District or elsewhere. *See, e.g.*, *Sherwood*, 98 F.3d at 410 (no presumed or actual prejudice where 96% of jurors were aware of the case and 60% mentioned that the victim was kidnapped); *Farmon*, 177 F. Supp. 2d at 1004 (no presumed prejudice despite survey showing that 78% of jury pool had heard of the case and 49.1% thought defendants were definitely or probably guilty).

In short, a previously low-profile defendant such as DePape whose crimes, while serious, did not result in any victim's death or financial ruin stands a far better chance of encountering an impartial jury than all of the following defendants, whose motions to transfer venue were also denied:

- The CEO who presided over Enron's propping up of stock prices before its collapse into bankruptcy. *See Skilling*, 561 U.S. at 385;

- The "Boston Marathon Bomber." *See United States v. Tsarnaev*, 2014 WL 4823882, at *1-4 (D. Mass. Sept. 24, 2014);

- The "Underwear Bomber." *See United States v. Abdulmutallab*, 2011 WL 4343851, at *1 (E.D. Mich. Sept. 14, 2011);

- The six conspirators to the 1993 World Trade Center bombing. *See United States v. Yousef*, 1997 WL 411596, at *3 (S.D.N.Y. July 18, 1997), *aff'd*, 327 F.3d 56 (2d Cir. 2003);

- John Walker Lindh, referred to in the press as the "American Taliban." *See United States v. Lindh*, 212 F. Supp. 2d 541, 549-51 (E.D.Va. 2002);

- A notorious Columbian drug lord. *See United States v. Lehder-Rivas*, 955 F.2d 1510, 1525 (11th Cir. 1992); and

- An American heiress turned bank robber. *See United States v. Hearst*, 466 F. Supp. 1068, 1076 (N.D. Cal. 1978), *aff'd in part*, 638 F.2d 1190 (9th Cir. 1980).

1

2

## 2. The release of the defendant's post-arrest interview is not uniquely prejudicial

3      The cases do not support the defendant's argument that the "release and broadcast" of the audio

4  recording of his post-arrest interview is so prejudicial as to require a change in venue.  Def. Mtn. at

5  11:2-4.  The Supreme Court has considered the release of a defendant's confession to the public as a

6  factor in assessing the prejudicial nature of pretrial publicity.  However, the Supreme Court and Courts

7  of Appeals have distinguished cases where pretrial publicity of a defendant's incriminating statements

8  did not warrant a change of venue because the pretrial publicity caused little prejudice, the passage of

9  time dampened any prejudicial effect, and/or the size and characteristics of the communities where the

10  trials were held mitigated prejudicial concerns.

11      The defendant relies on only one Supreme Court case, *Rideau v. Louisiana*, 373 U.S. 723 (1963),

12  where the Court presumed prejudice in the jury pool partly because the defendant's confessions had

13  been released to the public before trial.[8]  Def. Mtn. at 10:25-11:2.  However, that case differs

14  significantly from the scenario presented here.

15      In *Rideau*, Rideau robbed a bank, kidnapped three of the bank's employees, and killed one of

16  them.  *Id.* at 723-24.  Rideau was arrested the same day and, the next day, admitted to the crimes during

17  a videorecorded in-custody interview.  *Id.* at 724.  This video confession was broadcast later the same

18  day, and again over the second and third day after Rideau's arrest, to 24,000, 53,000, and 20,000 people,

19  respectively, in a parish numbering just 150,000 inhabitants.  *Id.*  The defendant's trial, described by the

20  Supreme Court as "kangaroo court proceedings," occurred less than two months later.  *Id.* at 726; *id.* at

21  728 (Clark, J., dissenting).  The Supreme Court later characterized the confession in *Rideau* as

22  "dramatically staged" and "likely imprinted indelibly in the mind of anyone who watched it."  *See*

23  *Skilling*, 561 U.S. at 382-83.

24      This contrasts greatly with this case.  The San Francisco-Oakland jury pool is vastly larger than

25  the jury pool at issue in *Rideau*.  *See infra* III.B.3.  There is no basis to believe that the publication of the

26

27

28

[8]  The defendant also cites *Irvin v. Dowd*, 366 U.S. 717 (1961).  Def. Mtn. at 10:25-11:2.
However, *Irvin* is about actual prejudice in the empaneled jury and is inapposite to the present case.  *Id.*
at 727-28.

1  defendant's audio recorded interview has reached as large of a percentage of this community, and the

2  audio recording is significantly different in presentation and manner from the "staged" video confession

3  in *Rideau*.  Finally, the greater passage of time between publication of the defendant's interview and

4  trial in this case mitigates any potential bias.

5      Since *Rideau*, the Supreme Court has distinguished cases where confessions were reported in the

6  media but the Court still found no presumption of prejudice.  In *Yount*, the defendant had been convicted

7  but was ordered a new trial.  467 U.S. at 1027.  His confession, his plea of temporary insanity at the first

8  trial, and his initial conviction were all reported in the media before his second trial, and none of these

9  facts and evidence was admissible at the second trial.  *Id.* at 1029.  Affirming the denial of the

10 defendant's motion to change venue in his second trial, the Supreme Court emphasized that the

11 determination of whether to change venue was based on the totality of the circumstances and found that

12 the length of time, four years, between the first and second trial had been sufficient to soften public

13 sentiment.  *Id.* at 1031-34; *see also Mu'Min v. Virginia*, 500 U.S. 415, 417 (1991) (finding no actual

14 prejudice even where the defendant's confession had been reported in the media).

15

16              **3.      Any potential for prejudice is mitigated by the large, diverse pool of potential**
                       **jurors in the San Francisco-Oakland Jury Division**

17      The Supreme Court has repeatedly emphasized that potential prejudice in a jury pool can be

18 mitigated by more populous, diverse communities.  *See Skilling*, 561 U.S. at 382 (holding that "the

19 suggestion that 12 impartial individuals could not be empaneled is hard to sustain" for a trial in Houston

20 with more than 4.5 million people eligible for jury duty); *Mu'Min*, 500 U.S. at 429 (finding the potential

21 for prejudice in Washington, D.C., mitigated by the "population of over 3 million" and the "hundreds of

22 murders [that] are committed each year" in the area); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044

23 (1991) (plurality opinion) (stating that there was less likelihood of prejudice where jury pool exceeded

24 600,000 individuals).  This Court's jury pool comprises a similarly large, diverse population, which will

25 mitigate any likelihood of prejudice.

26      Jurors in the Northern District of California are randomly drawn from voter registration lists

27 provided by the Secretary of State of California and from lists of driver's license and identification cards

28 provided by the California Department of Motor Vehicles.  *Jury*, United States District Court Northern

USA'S OPPOSITION TO MOTION TO CHANGE VENUE
3:22-CR-426-JSC                              20

District of California, https://www.cand.uscourts.gov/jury/ (last visited June 23, 2023); *see also*

Northern District of California General Order No. 6 § V.  Jurors from the following seven counties

within this District report to the San Francisco Courthouse: Sonoma, Napa, Marin, San Francisco,

Contra Costa, San Mateo, and Alameda.  *See* Northern District of California General Order No. 6 § II.

There are 3,120,195 registered voters in these seven counties.  Shirley N. Weber, Cal. Sec'y of State,

Report of Registration: Odd-Numbered Year Report (2023), https://elections.cdn.sos.ca.gov/ror/ror-odd-

year-2023/complete-ror.pdf.  Given the relative population size of the seven counties in the San

Francisco-Oakland jury division as compared to the population of California, there are approximately

4,086,428 people with either driver's licenses or identification cards in these seven counties.[9]  *See*

*California*, U.S. Census Bureau Quickfacts, https://www.census.gov/quickfacts/CA (last visited June 23,

2023); *California DMW Statistics*, Cal. Dep't of Motor Vehicles,

https://www.dmv.ca.gov/portal/file/california-dmv-statistics-pdf/ (last visited June 23, 2023).

Therefore, the jury pool for the San Francisco-Oakland jury division includes at least 3 million, and

likely more than 4 million, people – roughly on par with the Houston jury pool in *Skilling* and the D.C.

jury pool in *Mu'Min*.

### 4.    Media interest in this case has diminished over time

The local media's diminishing interest in this case also militates against granting the defendant's

motion to change venue.  *See supra* II.D.2.  The Supreme Court, Ninth Circuit, and other courts have

consistently held that the passage of time from peak media coverage of an alleged crime dampens

possible prejudice.  *See Yount*, 467 U.S. at 1033 (finding that time between publicity and trial had "a

profound effect" on the jury "in softening or effacing opinion"); *Casey v. Moore*, 386 F.3d 896, 909 (9th

Cir. 2004) (motion to transfer venue denied where coverage was four to eight months before trial);

*Harris*, 885 F.2d at 1363 (same, where peak coverage was four months before trial); *United States v.*

*Philpot*, 733 F.3d 734, 741 (7th Cir. 2013) (same, where most of the media coverage was one year prior

to trial in a "fairly large" community); *Lehder-Rivas*, 955 F.2d at 1524-25 (same, where peak coverage

---

[9]  This approximation was calculated by taking the percentage of the population of California that resides in the seven counties in the San Francisco-Oakland jury division (13.3%) and multiplying that percentage by the number of people with either a driver's license or identification card in the state of California.

1  was five months before trial).  As these cases demonstrate, courts have found that the passage of months

2  between media coverage and trial is sufficient to mitigate any potential prejudice.

3

4        **5.     Congresswoman Nancy Pelosi's prominence does not necessitate changing venue**

5        Congresswoman Nancy Pelosi, as two-time Speaker of the House, is a national rather than local

6  figure, but if she is more prominent in the counties comprising the San Francisco-Oakland jury division

7  than elsewhere, there is no precedent to support a change of venue on that basis.  A national Gallup poll

8  from 2013 found that Nancy Pelosi was the most well-known congressional leader at the time with 79%

9  of Americans having some opinion of her.  Lydia Saad, *Pelosi Best Known, Least Liked of*

10  *Congressional Leaders*, GALLUP (Apr. 24, 2013), https://news.gallup.com/poll/162029/pelosi-best-

11  known-least-liked-congressional-leaders.aspx.  The defendant argues that despite Pelosi's status as a

12  national figure, her ties to San Francisco in particular make her "uniquely prominent" in this area.  Def.

13  Mtn. at 5:12-6:8.  Supporting this argument, the defendant cites Pelosi's election results and a study by

14  the University of California, Berkeley showing Pelosi's popularity among San Francisco Bay Area

15  residents.  *Id.*  However, these sources likely indicate the political leanings of the area,[10] which is not a

16  proper basis on which to change venue.  *See United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir.

17  1976) (noting that the court could not find support for claim that "a community's voting patterns are at

18  all pertinent to venue").

19        Even if the Court were to disregard the political leanings of the area, Nancy Pelosi's prominence

20  would still not create a basis for changing venue.  In *United States v. Croft*, 124 F.3d 1109 (9th Cir.

21  1997), the defendants moved for a change of venue when they went to trial for conspiracy to murder the

22

23      [10] The Berkeley IGS Poll asked registered voters for their opinions of Senator Alex Padilla,
24  Governor Gavin Newsom, Senator Dianne Feinstein, Vice President Kamala Harris, and Speaker Kevin
   McCarthy.  Berkeley IGS Poll, *Tabulations from a February 2023 Poll of California Registered Voters*
25  *about Prominent California Politicians, Governor Newsom and the State Budget Deficit* (Mar. 1, 2023),
   https://escholarship.org/uc/item/60p8c1nr.  Of the five Democratic politicians included in the poll, the
26  San Francisco Bay Area reported the highest rate of approval of the nine areas polled for four of the
   politicians.  *Id.*  The area still reported the third highest rate of approval for the fifth Democratic
27  politician.  *Id.*  As for the one Republican politician included in the poll, the San Francisco Bay Area
   reported the lowest approval rating of all areas polled.  *Id.*  This poll in conjunction with results from the
28  general election lead to the simple conclusion that the San Francisco Bay Area tends to be relatively
   Democratic.

U.S. Attorney for the district where they would be tried. The Ninth Circuit relied on the passage of time between the height of the publicity and the trial, and the lack of prejudicial information in the media when affirming the denial of the motion, despite the fact that 90% of people in the district had heard of one of the defendants and 40% believed the defendants were guilty, according to opinion polls. *Id.* at 1115.

Similarly, the defendants in *United States v. Poludniak*, 657 F.2d 948 (8th Cir. 1981) were denied a change of venue when they were tried for extortion two weeks before an election, and a U.S. Senator from the state where they were tried was one of their victims. *Id.* at 955. The Eighth Circuit affirmed the denial of the motion, emphasizing the sufficiency of voir dire to identify biased jurors. *Id.*

Likewise, voir dire is sufficient in this case to identify jurors who have particular ties to the Pelosis or whose views of Congresswoman Pelosi might impair their ability to serve on a fair and impartial jury. *See infra* III.D.[11]

### C.    Intradistrict Transfer is Unwarranted

The defendant requests that, if the Court does not grant his Rule 21 motion to change venue to another judicial district, the Court should nevertheless transfer the case to the "Eureka Division."[12] No intradistrict venue transfer consideration weighs in favor of the defendant's motion, and the Court

---

[11] To the extent that the Court determines that the San Francisco-Oakland jury division is presumed prejudiced because Congresswoman Nancy Pelosi represents a portion of this jury pool in the U.S. Congress, an argument not raised by the defendant, this case could be transferred to the San Jose jury division for trial while remaining convenient to the defendant, victims, witnesses, and counsel.

[12] The defendant claims that Rule 18 intradistrict venue transfer is subject to a "much lower legal standard," Def. Mtn. at 3, than Rule 21 interdistrict transfer. This characterization apparently traces to language from a single trial court order granting a transfer within the Eastern District of Washington, which, itself, cites no higher authority for its determination that the standard for intradistrict transfer is "less burdensome." *United States v. Cloud*, No. 1:19-CR-02032-SMJ-1, 2021 WL 9406685, at *1 (E.D. Wash. Dec. 14, 2021). Defendant correctly notes that intradistrict transfer requests are distinct from interdistrict requests in that they do not implicate the Sixth Amendment's Vicinage Clause. But courts still consider a range of factors supplemental to those enumerated in the text of Rule 18 for intradistrict transfers, including factors relevant to Rule 21 interdistrict transfers. *See Lipscomb*, 299 F.3d at 340; *Thomas*, 2019 WL 3307043, at *4-6. Defendant's own motion cites to a case holding that "generally the same principles" guide court decisions on both types of venue transfers. *See Joyce*, 2008 WL 2367307, at *2. Moreover, district courts have broad discretion in ruling on both Rule 21 (interdistrict) and Rule 18 (intradistrict) change of venue motions, each of which is reviewed for abuse of discretion. *See United States v. Dreitzler*, 577 F.2d 539, 552 (9th Cir. 1978), *cert. denied*, 440 U.S. 921 (1979) ("[W]e cannot conclude that the trial court clearly abused its discretion in denying the [Rule 21] motion to change venue."); *see also Scholl*, 166 F.3d at 969 ("The denial of a motion for transfer should be overruled only if the district court abused its discretion.").

USA'S OPPOSITION TO MOTION TO CHANGE VENUE
3:22-CR-426-JSC                                    23

1  should deny it.  The defendant is in San Francisco, the victims and witnesses are in San Francisco,

2  counsel for both defendant and the government are based in San Francisco, the judge presiding over the

3  case is seated in San Francisco, and the crime took place in San Francisco.  Furthermore, the San

4  Francisco courthouse is more capable of handling the logistics and security for what will likely be a

5  high-profile trial.

6      To the extent that the Court determines that an intradistrict transfer is warranted, the San Jose

7  courthouse is a more appropriate location given its proximity to San Francisco (and therefore, the

8  defendant, victims, witnesses, and counsel) and its capacity to handle a trial of this nature.

9      **D.      The Court Can Ensure A Fair and Impartial Trial Through Robust Jury Selection**

10      Assuming for the sake of argument that Dr. Edelman's survey and media analysis are sound,

11  they show that potential members of the jury pool are likely to be familiar with this case in addition to

12  misinformation about the case.  *See, e.g.*, Supp. Edelman Decl. at 7:18-28 (reporting percentage of

13  respondents in each jury division who reported having read, seen, or heard "several prominent

14  conservative public figures and elected officials spread misinformation about the assault on Paul

15  Pelosi").  Ensuring a fair and impartial trial is crucial especially given these dynamics.  Contrary to the

16  defendant's argument that voir dire is insufficient, Def. Mtn. at 12, the Supreme Court and the Ninth

17  Circuit have been clear that relying on voir dire to ensure the impartiality of jurors in the face of

18  significant pretrial publicity is proper and have repeatedly affirmed the Courts' confidence in the ability

19  of the voir dire process to root out bias.  *See, e.g.*, *Skilling*, 561 U.S. at 386; *Yount*, 467 U.S. at 1038;

20  *Harris*, 885 F.2d at 1364.

21      In *Skilling*, the Supreme Court explained that relying on the trial court's judgment is appropriate

22  because the judge "sits in the locale where the publicity is said to have had its effect" and, therefore, can

23  assess jurors based on her understanding of the pretrial publicity and its effect on the community.  561

24  U.S. at 396 (quoting *Mu'Min*, 500 U.S. at 427).  Furthermore, during voir dire, the judge can observe a

25  "juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty," all factors

26  weighing into her evaluation of impartiality.  *Id.*; *see also Yount*, 467 U.S. at 1038 ("It is fair to assume

27  that the method we have relied on since the beginning [, *i.e.*, voir dire,] usually identifies bias. . . . [T]he

28  determination is essentially one of credibility, and therefore largely one of demeanor.") (citation

USA'S OPPOSITION TO MOTION TO CHANGE VENUE
3:22-CR-426-JSC                    24

omitted).

The defendant suggests that the questions asked during Dr. Edelman's survey produced more accurate responses than can be expected in voir dire due to the "minimization effect." Def. Mtn. at 12:18-13:11. Yet the jury selection process has greater safeguards to ensure that the seated jury is fair and impartial compared to a telephone survey. Responses to the survey were entirely voluntary. The jury questionnaires distributed in this District are signed by potential venire members under penalty of perjury. Members of the venire are put under oath during voir dire. And the Court can question potential jurors about any potential bias. Other courts have, for similar reasons, refused to rely on the results of public opinion polls when reviewing denials of motions to change venue on appeal in favor of relying on voir dire. *See United States v. Rodriguez*, 581 F.3d 775, 786 (8th Cir. 2009) (explaining that "special voir dire protocols would screen out prejudiced jurors" when a poll showed that 42% of respondents strongly held an opinion of the defendant's guilt); *United States v. Campa*, 459 F.3d 1121, 1145-46 (11th Cir. 2006) (en banc); *United States v. Malmay*, 671 F.2d 869, 875-76 (5th Cir. 1982); *Haldeman*, 559 F.2d at 64 n.43 ("[T]he trial court did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel.").

## IV.   CONCLUSION

For the reasons stated above, the Court should deny the defendant's Motion to Change Venue. This Court should hold the trial in the San Francisco courthouse, with a jury venire formed in conformance with the District jury plan.

DATED:  July 5, 2023                                        Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

s/*Helen L. Gilbert*
HELEN L. GILBERT
LAURA VARTAIN HORN
KYLE F. WALDINGER
Assistant United States Attorneys