JODI LINKER
Federal Public Defender
Northern District of California
ANGELA CHUANG
TODD M. BORDEN
Assistant Federal Public Defenders
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:  (415) 436-7700
Facsimile:   (415) 436-7706
Email:        Angela_Chuang@fd.org

Counsel for Defendant DePape

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br> v. <br> DAVID WAYNE DEPAPE, <br> Defendant. | **Case No.:** CR 22–426 JSC <br><br> **REPLY IN SUPPORT OF MOTION TO CHANGE VENUE** <br><br> **Court:**  Courtroom 8, 19th Floor <br> **Hearing Date:**  July 19, 2023 <br> **Hearing Time:**  10:00 a.m. |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................................ii

INTRODUCTION ...............................................................................................................................1

ARGUMENT........................................................................................................................................1

    I.      The government overstates the onerousness of the legal standard that applies to venue-change motions, especially for intra-district transfers. .....................................................1

    II.     Extensive pretrial publicity in the Bay Area requires transferring venue to protect Mr. DePape's right to a fair trial. ...............................................................................................3

          A.     The media coverage of this case has been extensive, prejudicial, and often inflammatory. ..........................................................................................................3

          B.     The release and broadcast of Mr. DePape's police interrogation supports transferring venue. ..................................................................................................6

          C.     Insufficient time has passed to mitigate the prejudice from the inflammatory publicity in this case, which will only increase as this trial approaches...............7

          D.     Nancy Pelosi's unique prominence in San Francisco supports transferring the venue. ......................................................................................................................9

    III.    At the very least, an intra-district transfer to the Eureka Division of this Court is required. ................................................................................................................................11

CONCLUSION..................................................................................................................................13

# TABLE OF AUTHORITIES

**Federal Cases**

*Casey v. Moore*,
    386 F.3d 896 (9th Cir. 2004) .................................................................................................. 8-9

*Harris v. Pulley*,
    885 F.2d 1354 (9th Cir. 1988) ..................................................................................................... 9

*Parker v. Randolph*,
    442 U.S. 62, 72 (1979) ............................................................................................................ 6-7

*Patton v. Yount*,
    467 U.S. 1025 (1984) .................................................................................................................. 8

*Rideau v. Louisiana*,
    373 U.S. 723 (1963) .................................................................................................................... 7

*Skilling v. United States*,
    561 U.S. 358 (2010) ........................................................................................................ 6-7, 7, 8

*Smith v. United States*,
    143 S. Ct. 1594 (2023) ................................................................................................................ 2

*United States v. Casellas-Toro*,
    807 F.3d 380 (1st Cir. 2015) ....................................................................................................... 5

*United States v. Cervantes*,
    No. 21-cr00358-YGR, Dkt. 153 (N.D. Cal. Nov. 15, 2021) .................................................... 12

*United States v. Cloud*,
    2021 WL 9406685 (E.D. Wash. Dec. 14, 2021) ..................................................................... 2, 6

*United States v. Cortez*,
    251 F.R.D. 237 (E.D. Tex. 2007) ................................................................................................ 3

*United States v. Croft*,
    124 F.3d 1109 (9th Cir. 1997) .............................................................................................. 9, 10

*United States v. Dickie*,
    775 F.2d 607 (5th Cir. 1985) ..................................................................................................... 11

*United States v. Diehl-Armstrong*,
    739 F. Supp. 2d 786 (W.D. Pa. 2010) ......................................................................................... 4

*United States v. Ebens*,
    654 F. Supp. 144 (E.D. Mich. 1987) ........................................................................................... 8

*United States v. Faulkner*,
    17 F.3d 745 (5th Cir. 1994) .................................................................................... 6

*United States v. Flores-Elias*,
    650 F.2d 1149 (9th Cir. 1981) ................................................................................ 2

*United States v. Hearst*,
    466 F. Supp. 1068 (N.D. Cal. 1978) ...................................................................... 5

*United States v. Henrikson*,
    14-CR-0124-SMJ, 2015 U.S. Dist. LEXIS 170829 (E.D. Wash. Dec. 22, 2015) ............................. 6

*United States v. Joyce*,
    2008 WL 2367307 (W.D. Pa. June 10, 2008) ........................................................... 3

*United States v. Maad*,
    75 F. App'x 599 (9th Cir. 2003) ............................................................................ 5

*United States v. Mase*,
    556 F.2d 671 (2d Cir. 1977) ................................................................................. 13

*United States v. Moody*,
    762 F. Supp. 1485 (N.D. Ga. 1991) ..................................................................... 10

*United States v. Poludniak*,
    657 F.2d 948 (8th Cir. 1981) ............................................................................... 11

*United States v. Sablan*,
    No. 1:08-CR-00259-PMP, 2014 WL 7335210 (E.D. Cal. Dec. 19, 2014) .................. 6

*United States v. Saya*,
    980 F. Supp. 1157 (D. Haw. 1997) ........................................................................ 6

*United States v. Tokars*,
    839 F. Supp. 1578 (N.D. Ga. 1993) ....................................................................... 6

**Federal Statutes and Rules**

28 U.S.C. § 2254 ............................................................................................................ 8-9

28 U.S.C. § 2255 .............................................................................................................. 5

Fed. R. Crim. P. 18 ................................................................................................. *passim*

Fed. R. Crim. P. 21 ................................................................................................. *passim*

**State Case**

*Salas v. Hi-Tech Erectors*,
    230 P.3d 583 (Wash. 2010) ................................................................................... 4

## Other Authorities

CBS Bay Area, *Federal Immigration officials say Pelosi attacker DePape may be in U.S. illegally*, Nov. 3, 2022, *available at* https://www.cbsnews.com/sanfrancisco/news/fed-immigration-officials-say-pelosi-attacker-depape-was-in-u-s-illegally/ (last accessed July 12, 2023) .............................................. 3

Jay Barmann, *Accused Pelosi Attacker David DePape Enters Plea In Federal Court; LA Times Tries to Explain His Radicalization*, SFist (Nov. 15, 2022), *available at* https://sfist.com/2022/11/15/accused-pelosi-attacker-david-depape-enters-plea-in-federal-court-la-times-tries-to-explain-his-radicalization/ (last accessed July 11, 2023).................................................................................................... 4

Jonah Owen Lamb, *San Francisco Too Liberal To Give Paul Pelosi's Alleged Attacker Fair Trial, Lawyers Say*, S.F. Standard (Jun. 15, 2023), *available at* https://sfstandard.com/2023/06/15/san-francisco-too-liberal-to-give-paul-pelosis-alleged-attacker-fair-trial-lawyers-say/ (last accessed July 11, 2023) .................................................................................................................................. 8

Lisa Fernandez, *David DePape, alleged Pelosi attacker, was in country illegally, feds say*, KTVU Fox 2, Nov. 3, 2022, *available at* https://www.ktvu.com/news/ice-seeks-to-deport-david-depape-alleged-pelosi-attacker-to-canada (last accessed July 12, 2023) ....................................... 3-4

Luz Pena & Lena Howland, *Paul Pelosi attack: Immigration officials say suspect was in US illegally*, ABC 7 News, Nov. 3, 2022, *available at* https://abc7news.com/paul-pelosi-attack-suspect-david-depape-in-us-illegally-deportation-charges/12412765/ (last accessed July 12, 2023) ............................ 3

Maria Sacchetti, *Immigration officials confirm alleged Pelosi attacker was in the U.S. illegally*, Wash. Post, Nov. 3, 2022, *available at* https://www.washingtonpost.com/national-security/2022/11/03/pelosi-attacker-david-depape/ (last accessed July 12, 2023) ........................................................................ 4

Mary Kay Linge, *'PELOSI' WACKO A 'SEX ABUSER' Stepdaughter's accusation*, N.Y. Post, Oct. 30, 2022.................................................................................................................................................. 4-5

NBC Bay Area, *Suspect in Paul Pelosi Beating Is in the U.S. Illegally, DHS Confirms*, Nov. 3, 2022, *available at* https://www.nbcbayarea.com/news/local/san-francisco/suspect-in-paul-pelosi-beating-is-in-the-u-s-illegally-dhs-confirms/3067366/ (last accessed July 12, 2023) ............................................ 8

Rachel Swan, *ICE wants to deport Pelosi attack suspect to Canada. D.A. Brooke Jenkins says S.F. won't turn him over*, S.F. Chron., Nov. 3, 2022, *available at* https://www.sfchronicle.com/bayarea/article/paul-pelosi-attack-suspect-david-depape-could-be-17556136.php (last accessed July 12, 2023)................................................................................................ 3

**INTRODUCTION**

Defendant David DePape moved to transfer venue based on the pervasive prejudicial pretrial publicity concerning this case in the San Francisco Bay Area, seeking to move the venue either out of this District under Federal Rule of Criminal Procedure 21, or at the very least to move this case out of the Bay Area to the Eureka Division under Federal Rule of Criminal Procedure 18.  *See* Dkt. 41.  The government opposes this motion, primarily arguing that the legal standard under Rule 21 is extremely high and citing sundry high-profile cases where district courts have not exercised their discretion to transfer venue out of district.  *See* Dkt. 44.  But contrary to the government's contentions, the publicity surrounding Mr. DePape and the incident at the Pelosi residence has been particularly inflammatory, and not focused merely on admissible factual evidence, but also delving into inadmissible topics such as his immigration status, and especially inflammatory (and false) allegations that he sexually abused his stepchildren.  Further, the release of a recording of a police interrogation of Mr. DePape in which he made incriminating statements, the relatively short span between the events in question and trial, and unique public stature of Nancy Pelosi in San Francisco all further support transferring venue.

At the very least, an intradistrict transfer under Rule 18 to the Eureka Division of this Court is required to mitigate the effect of prejudicial pretrial publicity in the Bay Area.  The legal showing Mr. DePape is required to make under Rule 18 is much lower, and Dr. Edelman's survey data confirm that Bay Area (and especially San Francisco Division) prospective jurors have been exposed to more prejudicial publicity and have more detailed knowledge about this case than Eureka Division prospective jurors.  And the government's alternative proposal to transfer this case to the San Jose Division both fails to address Mr. DePape's core concern about prejudicial pretrial publicity in the Bay Area, and also would entail moving this case to this District's busiest rather than least busy courthouse.  Accordingly, the Court should grant Mr. DePape's motion to transfer venue.

**ARGUMENT**

**I.   The government overstates the onerousness of the legal standard that applies to venue-change motions, especially for intra-district transfers.**

The government argues that the legal standard to transfer venue under Rule 21 based on

prejudicial pretrial publicity is extremely high, and that such motions are rarely granted. *See* Dkt. 44 at 8–11. Mr. DePape does not dispute that a substantial showing is required to transfer venue under Rule 21, but the legal standard is not as insurmountable as the government suggests. Indeed, district courts have wide discretion to grant such motions, and as argued below, numerous of the relevant factors identified by the Supreme Court and other courts support granting a venue transfer here. *See, e.g., United States v. Flores-Elias*, 650 F.2d 1149, 1150 (9th Cir. 1981) (abuse-of-discretion review on appeal). Indeed, while much of the appellate case law necessarily involves instances where a convicted defendant appeals from the denial of a motion to change venue, such motions are routinely granted in cases with extensive pretrial publicity such as this one, including in matters much less publicized than this one. *See* Section II.A below (collecting cases).

While the government spills much ink on the standard that applies to Rule 21 transfers, it is notably terser in its discussion of the standard for Rule 18 transfers within a judicial district. *See* Dkt. 44 at 11–12. The standard that governs intradistrict transfers of venue is much lower than the standard that applies to interdistrict transfers because there is no competing constitutional interest rooted in the Sixth Amendment's Vicinage Clause or Article III's Venue Clause entailed in moving a case from one courthouse to another within the same judicial district. *See* Dkt. 41 at 3–5; U.S. Const., Art. III, § 2, cl. 3; amend. VI; *see also Smith v. United States*, 143 S. Ct. 1594, 1604–05 (2023) (explaining Vicinage and Venue Clauses). Whether the government agrees or disagrees with this proposition is unclear. In a discursive footnote, the government suggests that Mr. DePape relies only on a single case from then-District Judge Mendoza from the Eastern District of Washington for this proposition, but does not articulate a clear alternative view. *See* Dkt. 44 at 23 n.12. Judge Mendoza's opinion, however, is well-reasoned and is rooted in the fact that intradistrict transfers do not implicate the constitution's requirement that a defendant be tried in a particular judicial district, unlike a motion for an interdistrict transfer. *See United States v. Cloud*, 2021 WL 9406685, at *1–*2 (E.D. Wash. Dec. 14, 2021). The government does not dispute this reasoning. *See* Dkt. 44 at 11–12.

Further, contrary to the government's suggestion, many other courts agree with Judge Mendoza that the standard for an intradistrict transfer is lower than for an interdistrict transfer, having denied defendants' motions for interdistrict transfers based on pretrial publicity under the Rule 21 standard,

but granting intradistrict transfers under Rule 18. *See, e.g., United States v. Joyce*, 2008 WL 2367307, at *2–*4 (W.D. Pa. June 10, 2008) (collecting cases where district courts denied interdistrict transfers under the Rule 21 standard but granted intradistrict transfers under the Rule 18 standard); *see also United States v. Cortez*, 251 F.R.D. 237, 237–38 (E.D. Tex. 2007). Obviously, if the legal standard were the same for both types of transfers, these courts would not have denied an interdistrict transfer based on prejudicial pretrial publicity while granting an intradistrict transfer on the same basis. *See Joyce*, 2008 WL 2367307, at *3 ("Several courts have denied Rule 21(a) motions for transfer outside of the district, while allowing a transfer within the district to a different division.").

## II. Extensive pretrial publicity in the Bay Area requires transferring venue to protect Mr. DePape's right to a fair trial.

### A. The media coverage of this case has been extensive, prejudicial, and often inflammatory.

The government also argues that Mr. DePape will not be prejudiced because it characterizes the media coverage of this matter as primarily factual and not prejudicial. *See* Dkt. 44 at 13–16. Not so. In addition to the media coverage characterizing Mr. DePape as a bigot, there has also been media coverage highlighting other prejudicial information about Mr. DePape that would not be admissible at trial. For example, many local media outlets, including the *Chronicle* and all four major broadcast networks, have reported that Mr. DePape is illegally residing in the United States. *See, e.g.,* Rachel Swan, *ICE wants to deport Pelosi attack suspect to Canada. D.A. Brooke Jenkins says S.F. won't turn him over*, S.F. Chron., Nov. 3, 2022, *available at* https://www.sfchronicle.com/bayarea/article/paul-pelosi-attack-suspect-david-depape-could-be-17556136.php (last accessed July 12, 2023); Luz Pena & Lena Howland, *Paul Pelosi attack: Immigration officials say suspect was in US illegally*, ABC 7 News, Nov. 3, 2022, *available at* https://abc7news.com/paul-pelosi-attack-suspect-david-depape-in-us-illegally-deportation-charges/12412765/ (last accessed July 12, 2023); *Federal Immigration officials say Pelosi attacker DePape may be in U.S. illegally*, CBS Bay Area, Nov. 3, 2022, *available at* https://www.cbsnews.com/sanfrancisco/news/fed-immigration-officials-say-pelosi-attacker-depape-was-in-u-s-illegally/ (last accessed July 12, 2023); Lisa Fernandez, *David DePape, alleged Pelosi attacker, was in country illegally, feds say*, KTVU Fox 2, Nov. 3, 2022,

*available at* https://www.ktvu.com/news/ice-seeks-to-deport-david-depape-alleged-pelosi-attacker-to-canada (last accessed July 12, 2023); *Suspect in Paul Pelosi Beating Is in the U.S. Illegally, DHS Confirms*, NBC Bay Area, Nov. 3, 2022, *available at* https://www.nbcbayarea.com/news/local/san-francisco/suspect-in-paul-pelosi-beating-is-in-the-u-s-illegally-dhs-confirms/3067366/ (last accessed July 12, 2023); Declaration of Angela Chuang (Chuang Decl.) Exs. A–E.

Further, according to these media reports, this prejudicial information about Mr. DePape's immigration status was intentionally released to the public by the federal government, i.e., by a Department of Homeland Security official spokesperson. *See, e.g.,* Maria Sacchetti, *Immigration officials confirm alleged Pelosi attacker was in the U.S. illegally*, Wash. Post, Nov. 3, 2022, *available at* https://www.washingtonpost.com/national-security/2022/11/03/pelosi-attacker-david-depape/ (last accessed July 12, 2023) ("'U.S. Immigration and Customs Enforcement (ICE) lodged an immigration detainer on Canadian national David DePape with San Francisco County Jail, Nov. 1, following his Oct. 28 arrest,' DHS officials said in an email."); Chuang Decl. Ex. F; *see also* Chuang Decl. Ex. E ("The man suspected of attacking Speaker Nancy Pelosi's husband in their San Francisco home last week is in the United States illegally, a Department of Homeland Security spokesperson confirmed Thursday."). When the government is responsible for the dissemination of prejudicial information, courts weigh this factor in favor of granting a change of venue. *See, e.g., United States v. Diehl-Armstrong*, 739 F. Supp. 2d 786, 798 (W.D. Pa. 2010) (collecting cases). Mr. DePape's immigration status has no conceivable relevance at trial, and is highly prejudicial. *See, e.g., Salas v. Hi-Tech Erectors*, 230 P.3d 583, 586 (Wash. 2010) (collecting cases).

Even more concerning, there have also been extremely prejudicial (and false) media reports that Mr. DePape sexually abused his stepchildren, which have been reported in Bay Area media. *See, e.g.,* Jay Barmann, *Accused Pelosi Attacker David DePape Enters Plea In Federal Court; LA Times Tries to Explain His Radicalization*, SFist (Nov. 15, 2022), *available at* https://sfist.com/2022/11/15/accused-pelosi-attacker-david-depape-enters-plea-in-federal-court-la-times-tries-to-explain-his-radicalization/ (last accessed July 11, 2023) (stating that Mr. DePape's alleged "obsession" with Jeffry Epstein "seems ironic given what [DePape's] stepdaughter . . . wrote about DePape in the days after his arrest, on her Facebook page," i.e., that Mr. DePape was "physically and sexually abusing

REPLY IN SUPPORT OF MOTION TO CHANGE VENUE
*DEPAPE*, CR 22–426 JSC
4

me and my brothers, which started when we were very young and continued until around 2008"); *see also* Mary Kay Linge, *'PELOSI' WACKO A 'SEX ABUSER' Stepdaughter's accusation*, N.Y. Post, Oct. 30, 2022, at 9 ("The loon accused of attacking Paul Pelosi with a hammer was a 'monster' who sexually abused his kids, his stepdaughter alleged Saturday."); Chuang Decl. Exs. G & H. Needless to say, false and unsubstantiated allegations of child sexual abuse and incest are highly inflammatory and not at all probative to the charged offense here. Thus, contrary to the government's contention, the Bay Area media coverage of this case has been far from limited to admissible evidence, creating a substantial risk of prejudice and warranting a transfer of venue.

The government also suggests that because Mr. DePape is "a previously low-profile defendant" that he would encounter a better chance at a fair trial than a laundry list of high-profile defendants whose motions to change venue were denied.[1] *See* Dkt. 44 at 18. First, while Mr. DePape was not previously a public figure, he surely is one now, which is the relevant inquiry. (Also, most of the defendants mentioned in the government's brief were also not well known until charged with serious crimes.) Second, Mr. DePape's case is different and dissimilar to those cited by the government because of the unique stature of his alleged victims, especially Nancy Pelosi. Third, all of the cases cited by the government involved only Rule 21 motions for interdistrict transfers, not intradistrict transfers, which are subject to a more lenient legal standard.

Fourth, Mr. DePape can likewise point to numerous federal cases where motions to change venue were granted, in obscure cases far less high-profile than this one:

- False-statements case where defendant was subject to media coverage related to his separate conviction for murder in another matter. *See United States v. Casellas-Toro*, 807 F.3d 380, 382–85, 390 (1st Cir. 2015) (reversing denial of interdistrict transfer).

- Bank fraud case involving Arab-American print-shop owner who damaged his own business and falsely claimed to be the victim of a hate crime. *See United States v. Maad*, 75 F. App'x 599, 600 (9th Cir. 2003) (reversing denial of intradistrict transfer).

---

[1] The Patty Hearst case cited by the government is inapposite. The issue of prejudicial pretrial publicity arose only in the context of her 28 U.S.C. § 2255 motion, and she had never filed any pretrial motion to transfer venue. The court thus found the prejudicial-publicity issue waived and did not reach the merits. *See United States v. Hearst*, 466 F. Supp. 1068, 1074 (N.D. Cal. 1978), *aff'd in part, vacated in part*, 638 F.2d 1190 (9th Cir. 1980) ("It is unnecessary for the Court to consider the merits of petitioner's arguments [concerning prejudicial pretrial publicity], for her failure to raise them prior to trial or on appeal precludes relitigation here.").

- Fraud case arising out of collapse of several savings and loan institutions. *See United States v. Faulkner*, 17 F.3d 745, 754–55 (5th Cir. 1994) (interdistrict transfer was granted).

- Homicide on Yakima Nation Reservation in rural Eastern Washington. *See United States v. Cloud*, No. 1:19-CR-02032-SMJ-1, 2021 WL 9406685, at *1 (E.D. Wash. Dec. 14, 2021) (granting intradistrict transfer).

- North Dakota oil patch worker involved in murder for hire of Spokane businessman. *See United States v. Henrikson*, 2:14-CR-0124-SMJ, 2015 U.S. Dist. LEXIS 170829, at *18–*21 (E.D. Wash. Dec. 22, 2015) (granting intradistrict transfer).

- A federal inmate charged with killing a prison guard at USP Atwater. *See United States v. Sablan*, No. 1:08-CR-00259-PMP, 2014 WL 7335210, at *1 (E.D. Cal. Dec. 19, 2014) (granting interdistrict transfer).

- Methamphetamine distribution case with recent publicity about defendant's violent background. *See United States v. Saya*, 980 F. Supp. 1157, 1158–60 (D. Haw. 1997) (granting interdistrict transfer).

- Racketeering, money laundering, and drug conspiracy case involving a defense lawyer and former prosecutor who worked for a criminal enterprise. *United States v. Tokars*, 839 F. Supp. 1578, 1579–80 (N.D. Ga. 1993), *aff'd*, 95 F.3d 1520 (11th Cir. 1996) (granting interdistrict transfer).

The government further suggests that because no one died or suffered financial ruin, a venue change is not warranted. *See* Dkt. 44 at 18. The distinction the government draws here is not significant. While thankfully no one died in this case, the offense Mr. DePape is charged with is still a very serious and violent offense, and certainly one that arouses the public's passion to a similar or greater degree as those cited above and by the government, especially because this case involves a prominent political figure and strongly held political beliefs.

      **B.    The release and broadcast of Mr. DePape's police interrogation supports transferring venue.**

The government concedes, as it must, that the Supreme Court has consistently held that the release of a recording of a defendant's police interrogation in which the defendant makes incriminating statements is a factor supporting transfer of venue. *See* Dtk. 44 at 19; *see also, e.g., Skilling v. United States*, 561 U.S. 358, 383 (2010) (""The defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.") (cleaned up) (quoting

REPLY IN SUPPORT OF MOTION TO CHANGE VENUE
*DEPAPE*, CR 22–426 JSC

1  *Parker v. Randolph*, 442 U.S. 62, 72 (1979) (plurality opinion)).  And the government does not
2  dispute that the local media widely reported on and broadcast Mr. DePape's post-arrest interrogation
3  by San Francisco police officers.  Instead, the government draws a series of factual distinctions
4  between Mr. DePape's statement here and the statement that was broadcast in *Rideau v. Louisiana*,
5  373 U.S. 723 (1963).  *See* Dkt. 44 at 19–20.  But many of the distinctions cited by the government,
6  like the relative size of the jury pool or the passage of time between the publicity and trial, simply
7  amount to the government pointing to separate factors in the analysis.  *See Skilling*, 561 at 382–83
8  (analyzing separately the prejudicial nature of a confession from the size of the jury pool and the
9  passage of time).  And while San Francisco in the early 2020s is certainly a very different place than
10 the Deep South in the early 1960s, the Supreme Court has continued to reiterate in the intervening
11 decades that media reporting on a defendant's confession alone is uniquely incriminating and weighs
12 in favor of a venue change.  *See id*.

        **C.**    **Insufficient time has passed to mitigate the prejudice from the inflammatory publicity in this case, which will only increase as this trial approaches.**

15 The government argues that sufficient time will have elapsed between the media coverage
16 highlighted in Mr. DePape's moving papers—which was generally concentrated right after the events
17 in question in October and November of 2022, and after the state court preliminary hearing and
18 subsequent release of the video and audio recordings of the break-in, alleged assault, 911 call, and
19 Mr. DePape's interrogation in January of this year—to dissipate any prejudice from that coverage.
20 *See* Dkt. 44 at 21–22.  First, the government's argument rests on a faulty premise, i.e., that the
21 relative decline in media coverage of this case over the last few months will continue as the trial
22 nears.  Of course, the initial local media coverage was especially high in the days and weeks after the
23 incident at the Pelosi residence.  But the subsequent greatest period of local media coverage was
24 following the state court preliminary hearing, and the release of audio and video recordings that were
25 played at that hearing.  *See, e.g.,* Edelman Decl. Ex. C.
26 Although Mr. DePape's public legal proceedings have been in a relative lull over the past few
27 months, this will of course change as the trial approaches, and prejudicial local media coverage will
28 surely increase as pretrial motions are litigated, hearings are held, etc.  Indeed, even the filing of the

instant motion—a dry bit of legal prose—triggered local media coverage. *See, e.g.,* Jonah Owen Lamb, *San Francisco Too Liberal To Give Paul Pelosi's Alleged Attacker Fair Trial, Lawyers Say*,[2] S.F. Standard (Jun. 15, 2023), *available at* https://sfstandard.com/2023/06/15/san-francisco-too-liberal-to-give-paul-pelosis-alleged-attacker-fair-trial-lawyers-say/ (last accessed July 11, 2023). Thus, as the case nears trial, the level of prejudicial local media coverage will only increase. And courts have granted venue changes based on ongoing prejudicial pretrial publicity, including coverage of the legal twists and turns of cases lasting as long as five years. *See, e.g., United States v. Ebens*, 654 F. Supp. 144, 144 (E.D. Mich. 1987) (granting interdistrict transfer based on "the saturation publicity which has surrounded this case for five years and continues" for the second trial in a case where the first conviction had been reversed on appeal).

Second, even accepting the government's faulty premise that prejudicial publicity will not continue or increase as this case approaches trial, the case law on venue changes and prejudicial pretrial publicity, including cases cited by the government itself, does not support the government's contention that the interval between the prior period with the highest concentration of media coverage in this case so far—from October 2022 to January 2023—and the November 2023 trial date is sufficiently long to have attenuated the pervasive prejudice to the local venire. The leading Supreme Court cases that have cited the passage of time as a relevant factor in reducing the levels of prejudice all involved multi-year intervals between the prejudicial media coverage and the trial. *See, e.g., Skilling v. United States*, 561 U.S. 358, 383 (2010) (4-year period between Enron's collapse and Skilling's trial); *Patton v. Yount*, 467 U.S. 1025, 1027 (1984) (4-year interval between publicity at first trial and second trial). While a handful of Ninth Circuit cases cited by the government have involved relatively short intervals, some of those cases involved the Ninth Circuit reviewing the decisions of state courts in collateral habeas corpus proceedings, under the highly deferential standard under the Antiterrorism and Effective Death Penalty Act (AEDPA) or its predecessor statutes. *See* 28 U.S.C. § 2254(d); *Casey v. Moore*, 386 F.3d 896, 909 (9th Cir. 2004) (affirming denial of habeas petition because state court's ruling on change of venue "was not unreasonable or contrary to clearly

---

[2] This headline inaccurately characterizes the argument contained in Mr. DePape's motion.

established federal law" under ADEPA); *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988) (affirming denial of § 2254 habeas petition under pre-AEDPA standard, which entailed presuming all factual determinations by the state court were correct). Such Ninth Circuit decisions refusing to overturn state court decisions on collateral review provide minimal guidance for this Court.

### D. Nancy Pelosi's unique prominence in San Francisco supports transferring the venue.

The government argues that Nancy Pelosi's prominence in San Francisco is irrelevant to whether to transfer venue. *See* Dkt. 44 at 22–23. The government primarily relies on *United States v. Croft*, where the Ninth Circuit found no abuse of discretion when a district court denied a motion to change venue, in a case involving followers of the religious leader Bhagwan Shree Rajneesh attempting to kill Oregon's United States Attorney in the 1980s. *See* 124 F.3d 1109, 1115–16 (9th Cir. 1997). The government vastly overstates the similarities to this case. First, the public opinion polling in that case indicated only that 90% of Oregonians had heard of "Rajneeshpuram," i.e., the religious community in rural Oregon where followers of Rajneesh gathered, not that 90% of Oregonians had heard of the two specific defendants who appealed the denial of the venue motion in *Croft*. *See id.* at 1115. Further, the opinion poll's questions about whether Oregonians thought the indicted conspirators were guilty asked only about all the indicted conspirators generally, not about the two specific conspirators challenging the venue motion, a fact the Ninth Circuit relied on in discounting the salience of the poll. *See id.* More importantly, most of the media attention in that case focused on the more culpable defendants like Rajneesh himself and his chief lieutenant Ma Anand Sheela, not the two less culpable (and less prominent) codefendants who went to trial in *Croft*.[3] *See id.* The government omits this important context; in contrast to that case, here Mr. DePape is the only person charged in this matter, all media attention has been focused on him alone as the sole alleged perpetrator of the offense, and Dr. Edelman's polling asked specifically about Mr. DePape.

Second, contrary to the government's legal contention, *Croft*, although it happened to involve a

---

[3] The prejudicial news stories were also over 10 years old by the time of trial, a far longer interval than the mere months that have elapsed here. *See Croft*, 124 F.3d at 1115.

REPLY IN SUPPORT OF MOTION TO CHANGE VENUE
*DEPAPE*, CR 22–426 JSC

United States Attorney as the victim, does not stand for the general proposition that the prominence of the victim in a case should not be considered in a venue-change motion. *See id.* at 1115–16. To the contrary, courts will consider the public stature of the victim in determining whether to transfer venue. For example, in a tragic case involving the murder of a sitting Eleventh Circuit judge and a Savannah, Georgia alderman in 1989, the district court granted the defendant's motion to transfer venue out of the Northern District of Georgia and to the District of Minnesota. *See United States v. Moody*, 762 F. Supp. 1485, 1486–90 (N.D. Ga. 1991). In granting the motion to transfer venue based on prejudicial pretrial publicity in Atlanta, the court focused extensively on the unique nature of a case involving victims who were high-profile public figures, in particular a federal judge, and also noting that all the judges in the Northern District of Georgia had recused themselves.[4] *See id.* Here, much like in *Moody*, Mr. DePape has been the subject of such extensive media attention precisely because he is charged with violent offenses against a prominent federal official and her husband. *See id.* If Mr. DePape were charged with attempting to kidnap Nancy Doe, and with assaulting her husband Paul Doe, we would not be in this situation. Nancy Pelosi's prominence—as the former Speaker of the House and a long-serving San Francisco Congressperson—is arguably greater than that of a federal judge or a local alderman who were the victims in *Moody*, or a United States Attorney, as in *Croft*. *See id.*; *Croft*, 124 F.3d at 1113.

Third, holding the trial in San Francisco also presents the unique problem that a substantial portion of the jury pool will themselves be personally represented by Nancy Pelosi in Congress, with any long-time San Francisco residents having been represented by her for decades. This creates yet another unique reason to presume prejudice here.[5] Indeed, when jurors are represented in Congress by the alleged victim of a crime, it is unrealistic to ask them to set aside their views about their own

---

[4] The judge originally assigned to this case likewise summarily recused himself, presumably because of some personal connection to the Pelosis. *See* Dkt. 6.

[5] The government states that Mr. DePape did not raise this argument, *see* Dkt. 44 at 23 n.11, but he wishes to clarify that he is indeed raising the argument that Pelosi's representing a substantial portion of the San Francisco jury pool in Congress amounts to another form of presumed prejudice. The government has already addressed this issue in its briefing (stating that an intradistrict transfer to San Jose would cure this problem), *see id.*, but Mr. DePape would not object to the government's filing a surreply on this issue should it wish to address it further.

REPLY IN SUPPORT OF MOTION TO CHANGE VENUE
*DEPAPE*, CR 22–426 JSC

Congressperson, particularly a long-serving Congressperson routinely reelected by wide margins, when called to serve as jurors. *See United States v. Poludniak*, 657 F.2d 948, 960 (8th Cir. 1981) (Lay, J., dissenting) ("Senator Tom Eagleton represented all the potential jurors drawn from the general electorate in the State of Missouri. . . . Each of the potential jurors belonging to the general electorate had undoubtedly formed before the trial a personal impression of Senator Eagleton based upon the Senator's many years of service to Missouri. In my judgment it was clear error for the trial court to assume that potential jurors could fully set aside these impressions in a trial where the Senator was a central figure. Such an assumption is totally unrealistic.").

### III. At the very least, an intra-district transfer to the Eureka Division of this Court is required.

The government also argues that an intradistrict transfer is unwarranted because Mr. DePape, the victims and witnesses, counsel for both parties, and the Court are located in San Francisco. *See* Dkt. 44 at 23–24. Of course, Mr. DePape's location is of no moment: he is incarcerated and the United States Marshals will ensure his presence at trial no matter where it is held. The government's concern about the convenience of defense counsel is misplaced as the defense is in fact seeking a venue change and will not be inconvenienced by one. Nor is consideration of the convenience of the government a valid factor to consider under Rule 18. *See United States v. Dickie*, 775 F.2d 607, 610 (5th Cir. 1985) ("The convenience of the prosecution, however, is not a factor to consider in changing venue."). While moving the trial to Eureka would entail some degree of inconvenience to the Court and witnesses, the inconvenience would not be substantial. The Eureka courthouse is only a five-hour drive from San Francisco, and the trial itself is unlikely to be lengthy, involving only two charges and fairly straightforward allegations.

More importantly, any inconvenience to the witnesses or the Court is outweighed by the danger posed by the San Francisco jury pool's exposure to greater prejudicial pretrial publicity, particularly given the relatively lenient "interest of justice" standard that applies to Rule 18 motions to transfer. *See* Dkt. 41 at 11–14. Indeed, Dr. Edelman's survey showed, and the government does not dispute, that prospective jurors in Eureka have much lower level of detailed familiarity with this case than San Francisco jurors, with 55% of San Francisco jurors recognizing four or more details about this case,

and only 37% of Eureka jurors having the same level of knowledge. See Edelman Decl. at 30.

The government suggests that any intradistrict transfer should be to the San Jose Division rather than the Eureka Division. See Dkt. 44 at 24. But it hardly makes sense to transfer this case to the San Jose Division, which is by far the busiest division in this District. Indeed, this Court has recently reassigned numerous criminal cases—including a massive, multi-defendant racketeering prosecution—out of the San Jose Division to the Oakland Division because of the onerous caseloads in that location; and the Court also recently reassigned one active judgeship from San Francisco to San Jose due to high caseloads in the San Jose Division. *See, e.g., United States v. Cervantes*, No. 21-cr00358-YGR, Dkt. 153 (N.D. Cal. Nov. 15, 2021).

The Eureka Division, by contrast, is by far the least busy division within this Court. Indeed, based on review of the upcoming calendar of the sole magistrate judge based in Eureka, hearings are held in the Eureka Division only one or two days a week, the majority of which are held telephonically. See Chuang Decl. Ex. I; *see also* Calendar for: Magistrate Judge Robert M. Illman, *available at* https://apps.cand.uscourts.gov/CEO/cfd.aspx?71Bx (last accessed July 12, 2023). Thus, a heavy caseload in Eureka would not preclude holding Mr. DePape's trial there. The government also suggests that the San Francisco courthouse would be more capable of handling "the logistics and security for what will likely be a high-profile trial." See Dkt. 44 at 24. The government's security concerns are unwarranted. The Eureka Division courthouse, like all federal courthouses, is ably protected by the United States Marshals Service. And by moving the trial away from San Francisco (or San Jose), the degree of public focus on the trial, and the potential circus-like atmosphere that Mr. DePape fears will surround it, will be mitigated by leaving the Bay Area. Additionally, while voir dire in this case will certainly be longer than usual, the trial itself is unlikely to be lengthy, lasting only a few days and almost certainly under a week, further mitigating any inconvenience to the Court posed by an intradistrict transfer to Eureka.

More importantly, transfer to the San Jose Division does not address Mr. DePape's serious concerns about pervasive prejudicial pretrial publicity in the Bay Area media market, as San Jose and San Francisco are part of the same media market, unlike Eureka. Further, substantially lower numbers of eligible jurors surveyed in the Eureka Division had been exposed to detailed media

coverage about Mr. DePape and the incident at the Pelosi residence than in the Bay Area. For example, 38% of those surveyed in the San Francisco Division had actually seen the video footage of Mr. DePape entering the Pelosi home or of the hammer strike, while only 28.4% of potential jurors in Eureka had seen the footage. *See* Edelman Supp. Decl. ¶ 25. While the number of jurors in San Jose who had seen this footage was also lower in San Jose at 29.9%, substantially higher numbers of prospective jurors in both San Jose and San Francisco had read or heard media descriptions of these videos. Specifically, 50% of prospective San Francisco jurors had read or heard about the footage of Mr. DePape breaking into the Pelosi residence with a hammer, with that number being 49% in San Jose, and only 37.4% in Eureka. *See id.* ¶ 27. Likewise, 51.6% of prospective San Francisco jurors had read or heard about the footage of the Paul Pelosi being struck in the head with a hammer, with that number being 50.3% in San Jose, and only 39.4% in Eureka. *See id.* at ¶ 28.

Further, higher percentages of jurors in the Bay Area are familiar with details surrounding the charges in Count 1, the alleged attempted kidnapping of Nancy Pelosi. Specifically, when asked if they had read, seen, or hear if Mr. DePape told investigators that he planned to hold Nancy Pelosi hostage and break her kneecaps if she did not tell him the truth, 45.8% of prospective San Francisco jurors were familiar with this detail, while 38.1% of San Jose jurors were, and 34.2% of Eureka jurors were. *See* Edelman Supp. Decl. ¶ 23. In sum, under the more liberal "interest of justice" standard under Rule 18 and Local Rule 18-1, the Court should at the very least transfer venue to the Eurka Division based on pervasive prejudicial pretrial publicity in the Bay Area. *See, e.g., United States v. Mase*, 556 F.2d 671, 675–76 (2d Cir. 1977) ("We think that transferring the second trial to Hartford was an appropriate way to accommodate the public's right to a speedy and public trial with the defendant's right to a fair trial.").

## CONCLUSION

The Court should grant Mr. DePape's motion to transfer venue.

Dated: July 12, 2023

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

             /S
ANGELA CHUANG
TODD M. BORDEN
Assistant Federal Public Defenders