1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney
2
   THOMAS A. COLTHURST (CABN 99493)
3  Chief, Criminal Division

4  HELEN L. GILBERT (NYBN 4736336)
   LAURA VARTAIN HORN (CABN 258485)
5  Assistant United States Attorneys

6       450 Golden Gate Ave
        San Francisco, CA 94102
7       Telephone: (415) 436-7200
        Fax: (415) 436-7234
8       Email: Helen.Gilbert@usdoj.gov
               Laura.Vartain@usdoj.gov
9
   Attorneys for the United States of America

10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) CASE NO. 3:22-CR-426-JSC |
|---|---|
| Plaintiff, | ) |
| | ) **UNITED STATES' OPPOSITION TO** |
| | ) **DEFENDANT'S MOTIONS IN LIMINE 4, 6-9** |
| v. | ) **AND NON-OPPOSITION TO MOTIONS IN** |
| | ) **LIMINE 1-3, 5** |
| DAVID WAYNE DEPAPE, | ) |
| | ) Trial Date:     November 6, 2023 |
| Defendant. | ) Hearing Date:  October 26, 2023 |
| | ) Hearing Time:  11:00 a.m. |
| | ) |
| | Judge:  Hon. Jacqueline Scott Corley |

# TABLE OF CONTENTS

I. THE COURT CAN GRANT MOTIONS *IN LIMINE* 1-3, 5 AS UNOPPOSED. ...........................1

II. THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE 4 TO DESIGNATE ALL GOVERNMENT WITNESSES UNDER DEFENSE SUBPOENA AS OVERLY BROAD. ........................................................................................1

III. THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE 6 TO EXCLUDE PORTIONS OF THE BODY-WORN CAMERA AND TO EXCLUDE PHOTOGRAPHS OF MR. PELOSI'S HEAD INJURY ..................................................3

   A. The Evidence at Issue ..................................................................................3

   B. The Evidence is Relevant, Probative and Not Unfairly Prejudicial....................3

IV. THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE 7 TO EXCLUDE THE TESTIMONY OF ALL THREE PHYSICIAN WITNESSES BECAUSE THE GOVERNMENT INTENDS TO PROVIDE TESTIMONY OF ONLY ONE. ..............................................................................................................7

V. THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE 8 TO PERMIT COUNSEL TO INQUIRE DURING VOIR DIRE ABOUT JURORS' POLITICAL AFFILIATIONS AND WHETHER THEY VOTED FOR NANCY PELOSI ABSENT A MORE SPECIFIC BASIS TO CONDUCT SUCH INQUIRY. ...................7

VI. THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE 9 TO INCREASE THE NUMBER OF PEREMPTORY CHALLNEGES TO DOUBLE THE STANDARD NUMBER AS UNSUPPORTED AND UNWARRANTED. ..........................9

# TABLE OF AUTHORITIES

Page(s)

Cases

*Batchelor v. Cupp,*
    693 F.2d 859 (9th Cir. 1982) .................................................................................................. 5
*Burson v. Freeman*,
    504 U.S. 191 (1992) ................................................................................................................ 9
*Ferrier v. Duckworth*,
    902 F.2d 545 (7th Cir. 1990) .................................................................................................. 6
*Maxwell v. United States,*
    368 F.2d 735 (9th Cir. 1966) .................................................................................................. 5
*McIntyre v. Ohio Elections Com'n*,
    514 U.S. 334 (1995) ................................................................................................................ 9
*Old Chief v. United States*,
    519 U.S. 172 (1997) ............................................................................................................ 3, 4
*Skilling v. United States*,
    561 U.S. 358 (2010) ........................................................................................................ 8, 11
*United States v. Blom*,
    242 F.3d 799 (8th Cir. 2001) ................................................................................................ 10
*United States v. Boise*,
    916 F.2d 497 (9th Cir. 1990) .................................................................................................. 5
*United States v. Bonanno*,
    177 F. Supp. 106 (S.D.N.Y 1959) ........................................................................................ 11
*United States v. Ganoe*,
    538 F.3d 1117 (9th Cir. 2008) ................................................................................................ 5
*United States v. Golund*,
    959 F.2d 1449 (1992) .............................................................................................................. 8
*United States v. Jewell*,
    2008 WL 400938 (E.D. Ark. Feb. 8, 2008) ........................................................................... 9
*United States v. Miguel*,
    87 F. App'x 67 (9th Cir. 2004) ............................................................................................... 4
*United States v. Moussaoui*, No CR 01-455-A,
    2002 WL 1987955 (E.D. Va. August 16, 2022) ................................................................. 10
*United States v. Salim*,
    189 F. Supp. 2d 93 (S.D.N.Y 2002) ................................................................................... 5, 6
*United States v. Serafini*,
    57 F. Supp. 2d 108 (M.D. Pa. 1999) ...................................................................................... 8
*United States v. Walsh*,
    796 F. App'x 337 (9th Cir. 2019) ........................................................................................... 5
*Weber*,
    599 F. Supp. 3d .................................................................................................................... 6

**I.    THE COURT CAN GRANT MOTIONS *IN LIMINE* 1-3, 5 AS UNOPPOSED.**

Defendant's motion *in Limine* 1: The government does not object to excluding witnesses from all trial proceedings, with the exception of the government's case agent and, as defense requests at *motion in limine* 2, the defense investigator. The Court should therefore grant the motion but exclude the government's case agent and defense investigator Catherine Goulet from the scope of the order.

Defendant's motion *in Limine* 2: The government has designated only one case agent as the government's representative. The Court should grant this motion as unopposed.

Defendant's motion *in Limine* 3: The government does not object to exempting the defense investigator Catherine Goulet from witness exclusion orders. The Court should grant this motion as unopposed.

Defense motion *in Limine* 5: The government does not intend to introduce the evidence at issue in this motion in its case-in-chief. The Court should grant this motion as unopposed.

**II.    THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE 4 TO DESIGNATE ALL GOVERNMENT WITNESSES UNDER DEFENSE SUBPOENA AS OVERLY BROAD.**

Defendant's fourth motion *in limine* requests that the Court designate all government witnesses under defense subpoena for the duration of the trial. The Court should deny this motion, which is overly broad and not supported by any authority. Defendant should subpoena those witnesses that he intends to call so that each witness has an idea of what to expect for the duration of trial. This is particularly the case with the primarily local but also very busy professionals at issue in this case. Alternatively, if the Court is inclined to grant the motion, the government respectfully proposes a more workable approach; specifically, Defendant should inform the government and the Court which witnesses he requests remain under subpoena, and the government will let Defendant know (1) whether the witness has in fact been subpoenaed; (2) whether the government expects to call that witness; and (3) whether the government intends to release that witness from the subpoena in advance of trial.

Defendant's request to put all government witnesses under defense subpoena is not supported by the Federal Rules or precedent. Neither Federal Rule of Criminal Procedure 17(b) nor the cases that Defendant cites speak to the precise relief requested here. Instead, Federal Rule of Criminal Procedure

17(b) speaks to when a defendant can make an *ex parte* request for a subpoena and how to pay witness fees. The cases stand for the notion that the Court can subpoena witnesses on behalf of indigent defendants.

As a practical matter, Defendant's request is further undermined by the fact that none of the government's witnesses are on Defendant's witness list. *Compare* Docket 91 (Defense list) with Docket 87 (USA list). Imposing uncertainty on witnesses that Defendant does not even intend to call is unjustified. Moreover, Defendant has already served a trial subpoena upon a witness in another state, demonstrating that service is not overly burdensome. (In fact, the government facilitated service of this witness.) Most of the witnesses on the government's witness list are local, so service should be even less of a burden.

Additionally, Defendant's request to treat all government witnesses as under defense subpoena is not workable. The government has not and does not intend to subpoena or call all the witnesses on its witness list, which is overinclusive and designed to give notice of all reasonably foreseeable witnesses, not just necessary ones. *See* Docket 87. Accordingly, Defendant should not expect that each of the witnesses listed at Docket 87 is under subpoena, or, for the few that live outside San Francisco, that they will be in San Francisco for testimony. Further, for those that are under subpoena, the government is attempting to narrow those that it will call at trial and to inform those witnesses accordingly that they will not need to testify. Because most of the witnesses are busy professionals, the government is working expeditiously to provide them with some certainty about the need for their testimony.[1] If Defendant truly wants to call them as witnesses, he should subpoena them himself or alternatively, provide a more specific request to the government over which the parties can meet and confer.

//

//

//

---

[1] The government's possible witnesses include attending physicians at Zuckerberg San Francisco General Hospital, in addition to San Francisco Police Department officers. Those officers will likely be working literally around the clock during trial in light of the Asian Pacific Economic Cooperation summit, which San Francisco is hosting from November 11 through November 17, and which is expected to draw thousands of visitors and foreign dignitaries to the city.

**III.    THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE 6 TO EXCLUDE PORTIONS OF THE BODY-WORN CAMERA AND TO EXCLUDE PHOTOGRAPHS OF MR. PELOSI'S INJURIES.**

The government does not intend to accept Defendant's stipulation, which presumably is conditioned upon the government not introducing the evidence to which Defendant objects. At bottom, Defendant wants the government to end its case the moment that the police officers tackle Defendant as he attacked Mr. Pelosi. There is no precedent for cutting off the government's case, and doing so is inconsistent with the Supreme Court's "accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away." *Old Chief v. United States*, 519 U.S. 172, 189 (1997).

**A.    The Evidence at Issue**

The government intends to put in limited photographs of Mr. Pelosi's injuries and limited body-worn camera (BWC) footage capturing the blood after the assault. Defendant objects to all evidence after the moment of the assault as being unnecessary because he has offered to stipulate to sentencing enhancements. At Exhibit A, the government lists the evidence to which Defendant objects, and those portions that the government intends to offer. As the Court will see, the government has narrowed the evidence to the moments of the assault and immediately after it, even ending the BWC footage when Defendant is removed from the scene, thus omitting much of the footage of Mr. Pelosi's blood pooling around him. In addition, the government intends to offer four photographs taken at the hospital of Mr. Pelosi's injuries. Two of these are of his post-operative head wounds, one of his hand and arm pre-treatment, and another post-treatment of his elbow.

**B.    The Evidence is Relevant, Probative and Not Unfairly Prejudicial**

The evidence of the injuries that Mr. Pelosi sustained when Defendant assaulted him is relevant specifically to intent, which will undoubtedly be at issue in this case on both charges. It is also relevant to the specific finding the jury will be asked to make that the hammer was a dangerous weapon. Finally, the limited visual evidence of Mr. Pelosi immediately after the assault goes to the full story of Defendant's assault, as well as his plan to kidnap Congresswoman Pelosi and his unwillingness to be deterred from that plan.

Rule 403 states:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

In *Old Chief v. United States,* 519 U.S. 172, 190 (1997), the Supreme Court held that evidence of the name and nature of defendant's conviction was not admissible to show prior felony conviction element on a felon-in-possession trial. In reaching this conclusion, the Supreme Court distinguished the precise issue before it—the legal status of the defendant as an element of the felon-in-possession—from other circumstances, setting out the general rule that the prosecution is not obligated to accept a stipulation of fact:

> In sum, the accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away rests on good sense. A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it. People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard. A convincing tale can be told with economy, but when economy becomes a break in the natural sequences of narrative evidence, an assurance that the missing link is really there is never more than second best.

*Id.* at 189. The Court then continued:

> This recognition that the prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story has, however, virtually no application when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him.

*Id.* at 190.  In short, *Old Chief* stands for the rule that the prosecution can prove its case without accepting defense stipulations aside from those wholly independent from the events of the case, like the predicate status of the felony conviction on a felon-in-possession case.

The Ninth Circuit has permitted admission of photographs that were prejudicial, finding that they were not unfairly so. *See United States v. Miguel*, 87 F. App'x 67, 69 (9th Cir. 2004) (photographs of the victim's corpse were relevant to the cause and manner of death and were not "of such a gruesome and horrifying nature that [their] probative value was outweighed by the danger of inflaming the jury."); *United States v. Boise*, 916 F.2d 497, 504 (9th Cir. 1990) (no abuse of discretion in

admitting single autopsy photo of child victim); *Batchelor v. Cupp,* 693 F.2d 859, 865 (9th Cir. 1982) (admissibility of photographs of homicide victims was not unfairly prejudicial), *cert. denied,* 463 U.S. 1212, 103 S.Ct. 3547, 77 L.Ed.2d 1395 (1983); *Maxwell v. United States,* 368 F.2d 735, 740 (9th Cir. 1966).

The cases that Defendant cites do not support its argument that the images at issue are not admissible. First, Defendant cites *United States v. Merino-Balderrrama*, which was a child pornography case in which the Ninth Circuit overturned the conviction based on the government's introduction into evidence of the child pornography at trial, after it rejected the defendant's stipulation that the films at issue were child pornography and had travelled in interstate commerce. 146 F.3d 758, 762 (9th Cir. 1998). In that case, the Court found that the child pornography films did not themselves go to scienter because the government could not establish that the defendant had knowledge of the films. (These were films inside of cases, and it was only clear that defendant had seen the cases.) Because there was no proof that defendant saw the contents, the contents were unfairly prejudicial. *Id.* at 763.

Since *Merino-Balderrama*, the Ninth Circuit has upheld convictions in child pornography cases where the government has showed the images after refusing to stipulate. *United States v. Weber*, 599. F. Supp. 3d 1025, 1038-39 (9th Cir. 2022) ("[N]umerous Courts, including the Ninth Circuit, have rejected the interpretation of *Old* Chief Mr. Weber offers, especially when, as is the case here, the proffered stipulation does not reach other elements such as knowledge"); *United States v. Walsh*, 796 F. App'x 337, 338 (9th Cir. 2019) (rejecting appeal based on Rule 403 argument after trial court permitted jury to view photographs depicting child pornography despite defense's offer to stipulate to same); *United States v. Ganoe*, 538 F.3d 1117, 1119 (9th Cir. 2008) (holding district court acted within its discretion in rejecting a defense offer to stipulate and "allowing the jury to briefly view a carefully limited number of [child pornography] images that were the subjects of the charged offenses.").

Defendant also relies on the out of district case *United States v. Salim*, 189 F. Supp. 2d 93, 98 (S.D.N.Y 2002), citing it as an example of a case in which 403 warrants exclusion. But *Salim*, as defendant notes, collected many cases in which graphic and disturbing images were acceptable, and

then concluded that the precise photo at issue was not probative of any issue because it was taken post-operation:

> The government is correct in its assessment that the depiction of the nature and extent of a victim's injuries can certainly be relevant and probative of intent, particularly where the Defendant places intent in dispute at trial…Had this close-up photograph of Mr. Pepe's face been taken after the attack but before the invasive surgical procedure at Belleview, this Court would agree that such a photograph could have been probative of intent. The difficulty arises where the photograph is post-operative and does not necessarily reflect the state of Mr. Peps' face after the attack.

*Id*. at 99. Many of the images that Defendant asks the Court to exclude in his trial are precisely the type that the *Salim* Court would have permitted—that is, the pre-operation photographs taken after an attack.

Finally, Defendant again reaches beyond the Ninth Circuit and points the Court to *Ferrier v. Duckworth*, 902 F.2d 545 (7th Cir. 1990), for the proposition that bloody photographs should be excluded under Rule 403. The Seventh Circuit found that bloody photographs of the floor of a bar after a murder should not have been admitted where the issue was whether the defendant had been drunk or insane when he committed the murder. *Id*. at 548. The Court found that the blood did not illuminate whether the defendant had been drunk or insane. *Id*. Implicit in the Seventh Circuit's decision is the converse point, which is that where the photographs are evidence that could go to intent, they are not unfairly prejudicial.

Here, the limited photographic evidence and BWC footage are taken in the immediate aftermath of the assault. The BWC captures the assault and the moments right after, and the photographs were taken during that same time. The government must prove intent on both counts, and that Defendant used a dangerous weapon to assault Mr. Pelosi. On these issues, the result of the hammer hitting Mr. Pelosi's head—the immediate aftermath of the assault including limited photographs of Mr. Pelosi's injuries as taken in the hospital— is relevant and probative and not unfairly prejudicial. *See Weber*, 599 F. Supp. 3d at 1038-39. Defendant's offer to stipulate to the fact of a dangerous weapon being used and serious bodily injury resulting does not change the government's burden to prove his intent to commit the charged crimes, and the Court should permit the government to put in the immediate aftermath of the assault, and the four photographs taken at the hospital, as set out at Exhibit A.

**IV.  THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE 7 TO EXCLUDE THE TESTIMONY OF ALL THREE PHYSICIAN WITNESSES BECAUSE THE GOVERNMENT INTENDS TO PROVIDE TESTIMONY OF ONLY ONE.**

The government does not intend to accept Defendant's proffered stipulation, for the reasons discussed above as relevant to Defendant's motion *in limine* 6.

The government expects to call one physician witness at trial to testify about the extent of injury to Mr. Pelosi. At present, the government expects that the neurosurgeon who conducted the brain surgery on Mr. Pelosi on October 28, 2022 in the immediate aftermath of the attack will be the physician witness, but the government's assessment is ongoing. Because the government intends to present only one physician's testimony, there is no risk of cumulative evidence. As discussed in the government's opposition to motion *in limine* 6, the extent of injury goes to intent on both counts, and well as to the sentencing element.

Accordingly, the Court should deny motion *in limine* 7.

**V.  THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE 8 TO PERMIT COUNSEL TO INQUIRE DURING VOIR DIRE ABOUT JURORS' POLITICAL AFFILIATIONS AND WHETHER THEY VOTED FOR NANCY PELOSI, ABSENT A MORE SPECIFIC BASIS TO CONDUCT SUCH INQUIRY.**

The juror questionnaire that will be distributed to the potential venire is the beginning of an extensive *voir dire* process in this case, which will continue on November 6, 2023. During this process, there are many ways to assess impartiality without asking questions about party affiliation and whether the potential jurors voted for Congresswoman Pelosi. Indeed, Defendant's motion *in limine* fails to explain how the issue will assist in securing fair jurors. When the topic came up during the juror questionnaire stage, Defendant similarly could not explain the necessity of those questions. In light of the far more detailed questionnaire with questions targeted at assessing the more probative questions about involvement or views any potential jurors have about Congresswoman Pelosi or the political system, Defendant is unlikely to be able to establish that political affiliation or voting are better proxies for bias. Additionally, asking potential jurors about votes they cast flies in the face of this country's long support of the right to cast a secret ballot in a public election. Accordingly, the Court should deny the motion without prejudice but consider whether any events during *voir dire* warrant revisiting the issue.

In cases in which pretrial publicity is at issue, robust jury selection like that contemplated in this

case is particularly appropriate. *See Skilling v. United States*, 561 U.S. 358, 386 (2010) (when pretrial publicity is at issue in jury selection, primary reliance on the judgment of the trial court makes good sense; noting that there "no hard-and-fast formula dictates the necessary depth or breadth of *voir dire*."). With this in mind, the juror questionnaire asks questions that are much more targeted to assessing bias and fair-mindedness than general questions asked in public about party affiliation or whether anyone in the venire voted for Congresswoman Pelosi. The questionnaire, for example, asks each potential juror whether he/she has had any prior personal or professional experience with Congresswoman Pelosi, and whether the potential juror has ever worked or volunteered for other politicians or public figures. *See* Dkt. 95-1 at 17. Similarly, the questionnaire asks: "During the course of the trial in this case, you will hear testimony regarding Congresswoman Nancy Pelosi, who represents parts of San Francisco. Does Congresswoman Pelosi currently represent you in Congress or has she ever represented you in Congress?" Dkt. 95-1 (question 9). Then, the follow up, "if you answered Yes to the question above, would the fact that Nancy Pelosi has represented or currently represents you affect your impartiality in a case where she and her husband are alleged victims of a crime?" *Id.* at Question 10. These questions are tailored to get at potential bias far more than a blanket, public polling of voting history or party affiliation.

Further, asking blanket questions to the venire is not likely to be as effective at encouraging discussion that will assess the potential for fair-mindedness. For example, a question such as: "Raise your hand if you are a Democrat?" will not move the needle in any direction. To the extent Defendant wants to ask the entire venire a broad question such as: "raise your hand if you voted for Congresswoman Pelosi," this likewise does not get at anything probative of impartiality. In fact, in *United States v. Golund*, 959 F.2d 1449 (1992), the Ninth Circuit upheld the district court's decision not to ask about these precise questions of party affiliation and for which candidate the potential juror voted. *Id.* at 1454.

Against the backdrop of the robust questionnaire, the intrusive level of public questioning about party affiliation or voting weighs in favor of not allowing it. *See United States v. Serafini*, 57 F. Supp. 2d 108, 113 (M.D. Pa. 1999) ("Whether a juror is registered to vote, his or her political party affiliation, and political philosophy . . . have no pertinence to a juror's qualification to be fair and impartial in this case.

The ability to be fair has no direct linkage to political party affiliation or active participation in the political process."); *see also United States v. Jewell*, 2008 WL 400938, at *4 (E.D. Ark. Feb. 8, 2008) (rejecting proposed question for juror questionnaire "asking about jurors' political opinions").

Permitting public questions about who potential jurors voted for would also undermine the secret ballot. The Supreme Court has described the secret ballot as "the hard-won right to vote one's conscience without fear of retaliation." *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 343 (1995); *see also Burson v. Freeman*, 504 U.S. 191, 214 (1992) (Scalia, J., concurring) (describing the secret ballot as a "venerable [ ] part of the American tradition"). In upholding a Tennessee statute that prohibited political candidates from campaigning within 100 feet of a polling place entrance, the Supreme Court stated:

> [A]n examination of the history of election regulation in this country reveals a persistent battle against two evils: voter intimidation and election fraud. After an unsuccessful experiment with an unofficial ballot system, all 50 States, together with numerous other Western democracies, settled on the same solution: a secret ballot secured in part by a restricted zone around the voting compartments. We find that this widespread and time-tested consensus demonstrates that some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud.

Publicly requiring all members of the venire to state whether they voted for Congresswoman Pelosi would undermine this key tenant of American democracy.

The juror questionnaire is designed to identify those who are involved in the political process in ways that may warrant additional inquiry during *voir dire*. Blanket questions about political affiliation do not accomplish that. Should the Defendant be able to proffer any reason to inquire as to a specific person about party affiliation or voting for or against Congresswoman Pelosi, that would be a different story, and the Court could take it up closer to November 6 if specific circumstances warrant further consideration.

VI. **THE COURT SHOULD DENY DEFENDANT'S MOTION IN LIMINE 9 TO INCREASE THE NUMBER OF PEREMPTORY CHALLNEGES TO DOUBLE THE STANDARD NUMBER AS UNSUPPORTED AND UNWARRANTED.**

Defendant wants 10 additional peremptory challenges, which would leave Defendant with 20 challenges and the government with six. The Court should deny this and Defendant's alternative request to double both parties' peremptory challenges. Both sets of numbers are arbitrary and extreme in light of

the well-considered jury selection process. To the extent any additional peremptory challenges may be warranted in light of pretrial publicity, the Court can take that up closer to trial and perhaps after the jury questionnaires are submitted. At that time, there will be more facts available to inform whether any additional challenges are necessary, and if so, how many.

The Court has established a robust jury selection process. The process includes a detailed questionnaire and an extra-large jury pool. Upon review of the completed jury questionnaires, the parties will meet and confer regarding strikes for hardship and cause, and then the Court will conduct a hearing on November 3, 2023. After that process, there will be in person *voir dire* conducted by the parties and overseen by the Court, beginning on November 6, 2023.  The Court has stated that a second pool of potential jurors will be available to be called in if necessary on November 7, 2023. This robust selection process should ensure a fair and impartial jury.

The cases that Defendant cites do not support the proposition that a single defendant should get double the number of peremptory challenges.  Defendant cites *United States v. Blom*, 242 F.3d 799 (8th Cir. 2001) for the notion that additional peremptory challenges are warranted.  In *Blom*, the district court granted additional peremptory challenges, but it is not clear how many additional challenges. *See id.* at 804-05. In *United States v. Moussaoui*, No CR 01-455-A, 2002 WL 1987955, at *1 (E.D. Va. August 16, 2022), the Court gave both sides a total of 25 peremptory strikes, which could be used as to either regular or alternate jurors. *Id.* at note 3. Because this was a capital case of one of the 9/11 conspirators, each side was entitled to 20 peremptory challenges pursuant to Rule 24. Further, because the Court was selecting a jury of 18, meaning that there would be 6 alternatives, three additional peremptory challenges were warranted under Rule 24. Accordingly, the Court appears to have given only two additional peremptory challenges in that case. This was the trial of one of the September 11 conspirators, and accordingly on the far extreme of pretrial publicity and the potential for victims within the potential jury pool and yet the Court limited peremptory challenges to two additional and gave those to both sides. Finally, in *United States v. Bonanno*, 177 F. Supp. 106, 123 (S.D.N.Y 1959), the Court granted the 23 defendants a total of 42 peremptory challenges, while limiting the government to the statutory six. *Bonanno* is not like this case because there were 22 more defendants.

A better barometer is found in *Skilling*, where Court granted two additional peremptory

USA's OPP TO MIL
3:22-CR-426-JSC                                    10

challenges to the defendants. *See* 561 U.S. 358 at 373 (allowing 14 peremptory challenges for two defendants, which was "2 more than the standard number prescribed by Federal Rule of Criminal Procedure 24(b)(2) and (c)(4)(B)"). This case has some similarities to *Skilling* in that there is certainly pretrial publicity, though in *Skilling*, the Court confronted the challenge that defendants' conduct could have impacted persons in the jury pool directly. That is not the case here, where there are two victims.

Thus far, the jury selection process already in place will ensure that the Court empanels a fair and impartial jury. To the extent that any additional peremptory challenges might further that effort—a determination the government recommends be taken up after receiving the jury questionnaires—10 is far too many, and two is likely to be sufficient and should be provided to both parties.

DATED: October 11, 2023

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

　　　/s/
HELEN L. GILBERT
LAURA VARTAIN HORN
Assistant United States Attorneys