Pages 1 - 93

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
UNITED STATES OF AMERICA,      )
                               )
           Plaintiff,          )
                               )
   VS.                         )   NO. CR 22-00426-JSC
                               )
DAVID WAYNE DEPAPE,            )
                               )
           Defendant.          )
_____)
```

San Francisco, California
Thursday, October 26, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          ISMAIL J. RAMSEY
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                   BY:  **LAURA E. VARTAIN**
                        **HELEN L. GILBERT**
                        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:          JODI H. LINKER
                        Federal Public Defender
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                   BY:  **JODI H. LINKER**
                        **ANGELA CHUANG**
                        **TODD M. BORDEN**
                        **ASSISTANT FEDERAL PUBLIC DEFENDERS**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

1   **APPEARANCES**:   **(CONTINUED)**

2   For Interested Party "Target 1":
                                SWANSON & MCNAMARA
3                               300 Montgomery Street - Suite 1100
                                San Francisco, California  94104
4                   BY:   **EDWARD W. SWANSON, ATTORNEY AT LAW**
                          **CARLY BITTMAN, ATTORNEY AT LAW**
5
    Also present:       Maddi Wachs, Government Paralegal
6                       Sheree Cruz-Laucirica, Defense Paralegal

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
 1   Thursday - October 27, 2023                         1:01 p.m.

 2                       P R O C E E D I N G S

 3                           ---o0o---

 4        THE CLERK:  All rise.

 5        This Court is now in session the Honorable Jacqueline

 6   Scott Corley presiding.

 7        Please be seated.

 8        Calling Criminal Action CR-22-0426, U.S.A. versus David

 9   Wayne DePape.

10        Come on up, please.

11        MS. VARTAIN:  Good afternoon, Your Honor.  Laura

12   Vartain and Helen Gilbert for the United States.

13        THE COURT:  She's right there.  Good afternoon.

14        MS. CHUANG:  Good afternoon, Your Honor.  Angela

15   Chuang, and Jodi Linker, and Todd Borden at the table on behalf

16   of Mr. DePape.  He is present and in custody.

17        THE COURT:  Good afternoon.

18        Good afternoon, Mr. DePape.

19        Okay.  Now is the time for the pretrial conference.  Let

20   me tell you my agenda.  Then, of course, I'll discuss whatever

21   the parties would like to discuss.

22        I'd first like to start with the protective order covering

23   stuff that's already been made public and whether we can get

24   rid of that so we can clear that up for the rest of the

25   conference.  Then we'll go through the Government's motions in
```

1    limine, skipping Number 1 for the moment; Defense's; and then

2    come back to Number 1, which corresponds with -- and I see

3    Mr. Swanson is here -- corresponds with a motion to quash.

4         I believe we can do that in open court and still maintain

5    the Defense's confidence.  And then, if it turns out we can't,

6    we can stop and move on to other things.  We can talk about

7    questionnaire logistics, and then some trial logistics, and

8    whatever else the parties want to discuss.

9         Does that sort of order sound good?

10        Okay.  All right.

11        So, first, my understanding is that the police interview

12   of Mr. DePape, the 9-1-1 call, and his call to the TV station

13   were all made public by the state court, and so I'm not so sure

14   why they're covered by the -- parts are covered by the

15   protective order here.

16        **MS. GILBERT:**  Your Honor, I think that what -- the

17   protective order originally covered, the whole excerpt --

18   excuse me, the whole interview of the defendant because it

19   included things like the victim's address.  But I believe that

20   the excerpts that we are debating do not include that

21   information, and so I don't think that we need to continue to

22   keep, at least those excerpts, under protective order.

23        **THE COURT:**  Okay.  I think the Defense did actually

24   redact some things that did involve that in an abundance of

25   caution.

1           MS. CHUANG:  Right.

2           THE COURT:  I don't think they agree.

3       Can we just say addresses, of course, and Target Number 1,

4    we'll keep their --

5           MS. CHUANG:  Yes, that's fine.

6           THE COURT:  -- name sealed, but everything else is

7    open, so we have that understanding.

8           MS. GILBERT:  And, Your Honor, is that in regards to

9    today's hearing and going forward or is that -- I think we have

10   specifically have some concerns about redacting PII in exhibits

11   for other individuals.

12       Is that something to take up later or would you like to

13   talk about that now as well?

14          THE COURT:  Oh, I think we can agree that PII would be

15   redacted from exhibits.  But mostly I wanted to, for purposes

16   of today -- and going forward, so we understand for trial --

17   that those things will be presented in open court.

18          MS. CHUANG:  Right.  And in terms of the trial itself,

19   I think we would request that the protective orders just

20   wouldn't apply at trial.

21       I understand the Government's position in the pretrial

22   conference statement was that the protective order should still

23   apply to anything that is not an exhibit at trial.  But

24   testimony, questioning, that may draw from protected

25   information, and that would have to be aired publicly at trial;

 1    it is a public proceeding.

 2         **THE COURT:**  I think that's right.  I can't think of

 3    anything, for example -- well -- and we'll get to -- a name and

 4    address.  That should not be revealed publicly.  It may need to

 5    be revealed, maybe, to the jury.  But that should not be

 6    revealed publicly.  But I think we can work with -- we can work

 7    with that.

 8         But other than that, it's just an open, public trial.  I

 9    think we're in agreement.

10         **MS. GILBERT:**  Yes, Your Honor.  We agree with that.

11         And I think the one thing I'll just note right now is that

12    I think there is a -- a relatively new local rule requiring us

13    to file both admitted and exhibits that we sought to admit that

14    weren't admitted after trial.  And it looks like we -- the

15    Government may have some views about things that should

16    potentially be sealed for the same reasons that they were

17    covered by the protective order.

18         **THE COURT:**  Yeah, of course.  I mean, it is a criminal

19    case still, and we do have concerns about invading privacy of

20    people who had nothing to do with the case, so -- okay.

21         All right.  Great.

22         And during trial, we'll get here before the trial starts,

23    and to the extent there are issues we need to bring up, if

24    there's uncertainty about redactions and things, we can address

25    it then, before the jury comes in.

**PROCEEDINGS**

1          Okay.  Now, with respect to the motions in limine.  Thank

2     you for your presentation.  And number -- the Government's

3     Number 2 is granted as unopposed.

4          Number 3, granted as unopposed, as to law enforcement

5     witnesses.  They've withdrawn their request with respect to

6     civilians.

7          So, Number 4, I would grant.  I'm not going to allow the

8     entire statement to the police to come in.  I don't think the

9     rule of completeness requires it at all.

10          To the extent you believe there are particular statements

11     that are non-hearsay -- I won't make you bring them up now, but

12     I will note one thing that was mentioned in your opposition

13     was, well, it might go to state of mind or motive.  That's an

14     exception to other bad acts.  That's not a hearsay objection.

15     So that wouldn't get it in.

16          **MS. CHUANG:**  Well --

17          **THE COURT:**  Offering -- the statements you identified

18     would have been offered for the truth, and so they're hearsay.

19          **MS. CHUANG:**  Well, I mean, we don't have to go into

20     specific statements now, but there is an exception for an

21     expression of motive, intent, or plan, as a then-existing

22     mental condition.  So that's what I was referring to.

23          And if I could just be heard on the matter.  Our position

24     is that this is -- the interview in total is a little under an

25     hour; right?  It's not particularly extensive, like some

1   interrogations that last hours and hours.  It could be.

2       It is a holistic interview.  There is -- there are --

3   within the interview, they jump back and forth between topics.

4   They sometimes circle back to topics that have previously been

5   discussed, so it has to be taken as a whole.  And I think the

6   way that the Government has chopped it up completely removes

7   that context.

8       For example, the -- between the first two excerpts that

9   the Government proposes, there is about two transcript page's

10  worth of conversation where Mr. DePape is clearly just

11  elaborating on an answer to the police officer's initial

12  question.  She's not actually asking follow-up questions for

13  nearly all of it.  She's just saying like things like, "yeah,"

14  "right," as he is essentially giving a narrative answer.  So

15  they've chopped up an answer to a singular question and

16  completely removed it out of context, which is misleading.

17      **THE COURT:**  You haven't shown that it's misleading.

18      I guess what I'm saying, is if you want to -- but the

19  showing hasn't been made, that anything is misleading based on

20  what's been admitted.

21      **MS. CHUANG:**  Well, with respect to that specific

22  missing chunk, it's generally just talking about motivations

23  and intentions.  And then they remove a section of it that is

24  explaining exactly that, motivations and intentions for some of

25  Mr. DePape's conduct.

1      **THE COURT:**  Well, there were a couple of things you

2    mentioned, but they were elsewhere in the Government's excerpt,

3    I believe.

4      **MS. CHUANG:**  So what I'm looking at is pages -- and

5    I'm looking at the transcript pages, not the Bates numbers.

6      So their first excerpt is on -- or their second excerpt, I

7    believe, is -- starts on page 8.  Their first excerpt ends on

8    page 6.  So if you look at page 5 of the transcript, the

9    question that Mr. DePape is answering is on page -- it really

10   starts at -- on line 7, but a more specific question is posed

11   to him at line 18, and then he begins to answer.

12     From there on, Sergeant Hurley's pieces of this transcript

13   are things like, "okay," "right," "of course."  And he's

14   essentially giving one long answer to that question.  So

15   they've cut off, essentially, the middle of what is a longer

16   answer to the question she posed.

17     **THE COURT:**  Why is it misleading?

18     **MS. CHUANG:**  Because it doesn't -- it doesn't show the

19   full extent of his explanation of what his intentions and

20   motivations were.

21     **THE COURT:**  How is that, what's admitted, any

22   different from what -- what is included in the Government's

23   excerpts?  I don't see it.

24     **MS. CHUANG:**  It's further clarification of the origins

25   of the motivations and intentions.

1      **THE COURT:**  But it seems similar.  I mean, I don't

2  know.  I actually read it and wondered why the Government

3  didn't include it.  But that's okay.

4      **MS. CHUANG:**  I mean, it is on the same topic which is

5  why we think it needs to be included in order to be complete.

6  Some of the later excerpts -- and I'll point the Court to

7  page -- I think it's 35.

8      So on page 36, begins another Government excerpt at

9  line 5.  That is just an answer.  The corresponding question is

10  not included in the Government's excerpt at all.  So it's an

11  answer with no question before it.

12      What exactly is he talking about -- right? -- I think that

13  would be confusing to the jury.

14      **THE COURT:**  Where is the question?

15      **MS. CHUANG:**  The question is -- it ends on line 1.

16  Right?  It actually starts on the previous page, page 35,

17  line 25.  That's the question he was answering.

18      **THE COURT:**  It doesn't answer the question.

19      **MS. CHUANG:**  Well, it was in response to that

20  question.  So if this is -- if this just starts with him

21  answering something that's not even there, that's not made

22  available to the jury, it will be confusing.

23      **THE COURT:**  But it would be confusing anyway because

24  it doesn't answer the question.

25      **MS. CHUANG:**  But it's not -- but as it is right now,

 1  the excerpt is -- he's giving an answer that -- with no context

 2  about what it's in response to or what immediately preceded it.

 3         **THE COURT:**  Ms. Vartain?

 4         **MS. VARTAIN:**  Well, on that one, I think we plan to

 5  elicit the question.  So from -- from Sergeant -- now

 6  Lieutenant -- Hurley.  I'm happy to extend it so that the

 7  question is in here.  It's sort of irrelevant to the

 8  Government.

 9         **THE COURT:**  So that's a good point.  And one -- maybe

10  you can meet with the Government and -- because one of their

11  concerns was they haven't -- you just asked to put the whole

12  thing in.  I'm not going to put the whole thing in.

13      So if there are particular -- just like you identified

14  here today -- things like that, ask the Government.  They may

15  very well put it in, because, like I said, maybe some of it

16  they would want in anyway.

17         **MS. CHUANG:**  Okay.  Yes.  And we can certainly do

18  that.

19      I do just want to talk about the last -- the Government's

20  last excerpt, which is on page 53 of the transcript.  So it's a

21  very short one.

22      This exchange, taken out of context, would seemingly come

23  out of nowhere.  And I think it's -- these questions that

24  Sergeant -- now Lieutenant -- Hurley is asking Mr. DePape in

25  this excerpt are clearly prompted by everything they've

**PROCEEDINGS**

1    discussed before.  And that, I think, is one of the reasons why

2    it is important to have the entire interview for that larger

3    context.

4            **THE COURT:**  I don't understand that.

5            **MS. CHUANG:**  Right.  These are not routine questions

6    that are asked in every interview of a suspect.  Right?  So

7    it's clearly prompted by her interpretations and what he has

8    said to her during the preceding 52 pages -- these are

9    transcript pages -- of this interview that prompted her to ask

10   these questions of him.  And the jury will be asked to assess

11   the circumstances of the interview in judging these

12   statements --

13           **THE COURT:**  So what?  I don't understand the inference

14   then.  You -- I don't understand.  (as read):

15               "Can I ask you where do you take any medication

16       or anything?"

17           **MS. CHUANG:**  Right.  These specific -- no, these

18   specific questions about his -- whether he's of sound mind or

19   whether he takes medications or anything, those are not

20   necessarily routine questions that are asked of every person

21   who is taken into custody.  So our position is they are clearly

22   prompted by what he has said to her on the previous pages and

23   all the rest of the preceding interview.

24           **THE COURT:**  But what the Government's excerpts are

25   could explain the question in and of themselves even though it

 1  doesn't include the entire transcript.  So what -- leaving the

 2  rest out makes it misleading?

 3       **MS. CHUANG:**  I think without that full information

 4  about what prompted those questions, it seems to come out of

 5  nowhere.  The excerpts -- the Government's excerpts are a tiny

 6  portion of this entire interview.

 7       **THE COURT:**  How is that unfair?

 8       **MS. CHUANG:**  Because the jury won't have the full

 9  information -- the full context of this entire discussion that

10  they've been having on topics relevant to the case.

11       **THE COURT:**  Well, then -- then can you give me a case

12  in which they say you always have to admit the entire

13  interview?

14       **MS. CHUANG:**  No.  I think it's case-specific.  It's

15  depending on the statement and the context, and what's being

16  discussed.  But in this interview itself, they circle back to

17  the same topics over and over, and the Government has chosen

18  only particular pieces of it, but not others that would

19  actually -- that actually complete the discussion about what --

20  the topics that are being gone over.

21       **THE COURT:**  Okay.  I don't think it comes out of

22  nowhere, though, when you read the other -- the excerpts that

23  the Government is showing -- right? -- is choosing to show.

24       But, again, Ms. Vartain, do you have a response?

25       **MS. VARTAIN:**  I think -- I mean, I certainly agree

**PROCEEDINGS**

1   with the Court that I don't think that this is out of the blue.

2         To the extent that the Defense wants to ask Lieutenant

3   Hurley why she asked this question, I think they could do so.

4   But it would be redundant and long for the jury to hear the

5   whole thing.

6         It would be, as the Court has already noted -- it's not

7   consistent with the rules, and it would certainly be

8   inconsistent with the notion that if the defendant wants to

9   testify, he can't do so by simply putting in the whole

10  statement.

11        And so I'm happy to look at other portions, and meet and

12  confer on those.  But, as it concerns this segment, I don't

13  think it warrants putting in the entire statement.

14        **THE COURT:**  Okay.  Why don't you meet and then,

15  though, there may be particular statements in there, for

16  example, you said that are non-hearsay that, I guess, you would

17  elicit with Sergeant Hurley that would be -- so before she

18  testifies, I would suggest you raise it, you know, before me,

19  like at 8:00 a.m. that day, so that we can resolve it.

20        **MS. CHUANG:**  Sure.

21        **THE COURT:**  Does that work?

22        **MS. CHUANG:**  That works, Your Honor.

23        **THE COURT:**  Okay.  Okay.

24        I think that takes care of the Government's motions in

25  limine; is that right, Ms. Vartain?

PROCEEDINGS

1          MS. VARTAIN:  Yes, Your Honor.

2          THE COURT:  All right.  With respect to the

3    Defendant's 1, 2, and 3, that's granted.  All witnesses will be

4    excluded, except for the case agent and the Defense

5    investigator.

6       So let me ask you about Number 4, designating all

7    witnesses as under Defense subpoena.  Just process what you're

8    anticipating there.

9          MS. CHUANG:  Right.  So what we are asking is that,

10   essentially, the Government witnesses that have been noticed

11   and listed on the witness list be considered under Defense

12   subpoena, so that if the Government, at the last second,

13   chooses not to call them, that they would still be available

14   for us to potentially call.

15         THE COURT:  So, yeah, that brings up a good question.

16      When do you think you can provide a -- or can you provide,

17   now that we're getting closer to trial, a narrowed witness

18   list?

19         MS. VARTAIN:  Yes, we provided a narrowed witness list

20   yesterday?  Yesterday.

21         THE COURT:  Did I get that too?

22         MS. VARTAIN:  No, but we could do that, Your Honor.

23         THE COURT:  That would be great.

24      Okay.  All right.  And then --

25         MS. VARTAIN:  I take it, the Court would like us to

**PROCEEDINGS**

1   file a revised witness list?

2          **THE COURT:**  Yes.

3          **MS. VARTAIN:**  Yes.

4          **THE COURT:**  And so then --

5          **MS. CHUANG:**  And that's certainly helpful, Your Honor,

6   the narrowing they have done.  If there's any further changes,

7   we would want them -- the Government -- to be ordered to

8   immediately notify us, in case we do have to make preparations

9   to call those witnesses.  But I just do believe it is within

10  the Court's power to deem the Government's witness list as

11  under Defense subpoena just in general.

12         **THE COURT:**  Is there any objection to that?

13         **MS. VARTAIN:**  For the witnesses that are currently on

14  the list?

15         **THE COURT:**  The current, the narrowed list.

16         **MS. VARTAIN:**  I think there are two or so witnesses

17  who are on a "maybe" list, and they -- at least one of them is

18  out of town.  I don't know yet whether we're going to call or

19  bring them.  So -- but for in-town witnesses, I don't think we

20  have any objection.

21         **THE COURT:**  Sure.  If you could just let them know who

22  the out-of-town person is that's a maybe.

23         **MS. VARTAIN:**  Yes.  The only thing I would ask, Your

24  Honor, is that I think, as the Court knows, especially for the

25  law enforcement officers -- of which that's most of the case --

**PROCEEDINGS**

1  they are on around-the-clock duty for APEC.  So if the Defense

2  wants to be sure that they're here, I think they might want to

3  give them some advance notice.

4      MS. CHUANG:  Sure.  I mean, presumably, they're

5  already planning to be available if the Government has put them

6  on their witness list.  But if that -- I think that buttresses

7  the request for, if any of that changes, so that we can

8  immediately be notified.  And if we can release them so they

9  can attend to those other duties, because we don't want to call

10  them, then we would.

11      MS. VARTAIN:  I think I'm saying something a little

12  bit different, which is only that they're planning to be here

13  on the day the Government -- right? -- they arranged in their

14  schedules to be here on the day.  And that, I will just say,

15  has been complicated, for them to be released to be present in

16  court.  And so it does create a little more complications if

17  there's another date that they need to be -- need to be here.

18  They are all local, so I think this is all doable.

19      THE COURT:  Well, are you more concerned that they end

20  up not calling them and you wanted to be their witness?

21      MS. CHUANG:  Right, exactly.

22      MS. VARTAIN:  Oh.

23      THE COURT:  I think you could let the Defense know

24  what is the day that they're planning on being here and that

25  you're planning on calling them.  And if, at the last minute,

PROCEEDINGS

 1  you decide -- you decide not to call them, let the Defense know

 2  so the Defense can say, well, we want to talk to them anyway.

 3         MS. CHUANG:  Right.

 4         THE COURT:  We can take them out of order, if we need

 5  be.

 6         MS. VARTAIN:  That's fine.  We can do that, Your

 7  Honor.

 8         THE COURT:  If it ends up being --

 9         MS. CHUANG:  If it ends up being an issue.

10         THE COURT:  It may not be an issue.  Okay.  So we're

11  in agreement how to proceed there?

12         MS. VARTAIN:  Yes.

13         MS. CHUANG:  Yes.

14         THE COURT:  Again, and I'm sure you would do this

15  anyway, as soon as you know -- well, let me say this:  When --

16  for example, we're picking the jury on the 6th.

17         MS. VARTAIN:  Yes.

18         THE COURT:  When -- or maybe you already have -- told

19  the Defense who you'll be calling on the 9th.

20         MS. VARTAIN:  We agreed to do that on -- by noon on

21  the 8th.

22         THE COURT:  Okay.  All right.  I just want to --

23         MS. CHUANG:  Yes.  And then the other part of the

24  agreement that we just came to in terms of that, so it would be

25  on noon on the 8th for witnesses on the 9th for the first day

1    of trial.  Every subsequent day, it would be by 5:00 p.m. the

2    previous court day, they would tell us who is going on the next

3    trial day.  So on the 9th, they would let us know, by

4    5:00 p.m., the witnesses in order of call for Monday the 13th,

5    the next court day.

6           **THE COURT:**  Got it.  Okay.  All right.

7        Defense Number 5 is granted as unopposed.

8        Now, Number 6.  Okay.  That is to exclude.  Now, as I

9    understand it, a lot of exhibits that were on the exhibit list

10   the Government isn't seeking to offer any.  So first we have --

11          **MS. CHUANG:**  And, I think, before the Court starts

12   going down the list, just to alert the Court, we took a look

13   again at Exhibits 315 -- that's the time stamps of Officer

14   Najarro's body cam footage from 8:51 to 9:19, and we're

15   withdrawing our request as to that exhibit because it doesn't

16   show --

17          **THE COURT:**  Right, I think I you weren't --

18          **MS. CHUANG:**  Right.

19          **THE COURT:**  -- sure what part they were admitting.

20   But the part they're admitting is just the --

21          **MS. CHUANG:**  Exactly.

22          **THE COURT:**  Great.  Then I don't have to overrule your

23   objection.

24       Okay.  So on Exhibit -- I guess it's D, that's

25   Trial Exhibit 2, as I understand it, you're objecting from one

**PROCEEDINGS**

 1  minute 25 to three minutes 49.

 2          **MS. CHUANG:**  Yes.

 3          **THE COURT:**  And the Government starts at 38 seconds,

 4  and you're not objecting to up to minute 25, you recognize

 5  the --

 6          **MS. CHUANG:**  Yes, so --

 7          **THE COURT:**  -- relevance of that.

 8          **MS. CHUANG:**  Yes.  From 38 seconds up to minute 25, we

 9  have no objection to.

10          **THE COURT:**  All right.  Ms. Vartain, do you want to

11  explain why the Government is moving that?

12          **MS. VARTAIN:**  Yeah.  So the entire Exhibit 2, for the

13  portion that the Government is seeking to admit, is -- includes

14  key evidence, both relevant to intent, but also to the physical

15  evidence.  And let me start there.

16      The video shows the officers pulling Mr. Pelosi's phone

17  out of the defendant's pocket, his other forms of

18  identification.  They ask him his name.  He identifies himself.

19  He volunteers that his backpacks are outside.  And this is all

20  evidence that the jury should hear because it's relevant to the

21  proof.

22      The -- it also -- setting aside the specific items of

23  evidence that are apparent from the video, the assault is

24  understood in the story and the context, which is that there is

25  and aftermath to it.  And the aftermath to it is that

 1   Mr. Pelosi is on the floor in his own blood, and the defendant

 2   is essentially -- he and the defendant have to be separated.

 3        The jury will hear the hammer be thrown away from the

 4   defendant.  And that's, of course, the hammer that hit Mr. --

 5   the defendant used to hit Mr. Pelosi in the head.

 6        And so I think the Government has endeavored to provide a

 7   streamlined and as limited blood -- bloody portion of the

 8   evidence as possible.  But the intent in this case, as well as

 9   the hammer being a dangerous weapon is, obviously, the intent

10   is core to the case.  And we do have to prove that the hammer

11   is a dangerous weapon.  So I think the Government is entitled

12   to the presentation that it is seeking here.

13        **THE COURT:**  Exhibit 314, how is that different from

14   Exhibit 2?

15        So it's the other officers, but it appears to be some of

16   the same.  I mean they're different, but what is the additional

17   evidence that the Government is offering there?

18        **MS. VARTAIN:**  So it shows -- it shows a different

19   angle.  I think you hear more of the defendant's -- I'm

20   sorry -- of the -- Mr. Pelosi's breathing, which is --

21        **THE COURT:**  Difficult.

22        **MS. VARTAIN:**  Difficult, yes.

23        And sort of you're seeing them start to try to stop the

24   blood flow.  So I think, given where the officers were and the

25   different angles, it shows a different set of presentation.

1      THE COURT:  Okay.

2      MS. CHUANG:  All right.  Your Honor, all of those --

3  the evidentiary issues that the Government brings up about

4  where certain things were, that Mr. DePape gave his name and

5  told the police officers that his backpack was outside, none of

6  that is going to be in dispute.  That can easily come in

7  through officer testimony.  And presumably, they will be

8  testifying about their recollection of what happened there.

9      We're also planning to enter a chain of custody

10  stipulation to much of the physical evidence, so that is not

11  going to be at issue in this trial.

12      So in terms of the link to intent, as we put in our

13  briefing, I just don't see the link there.  The elements here

14  for assault, aside from the sentencing enhancements,

15  essentially, are intentional physical contact.  And that's

16  completed as --

17      THE COURT:  But you're ignoring the most important

18  instruction with respect to the assault:  With the intent to

19  impede, intimidate, or interfere with a federal official while

20  engaged in the performance of her official duties or intent to

21  retaliate against the federal official on account of the

22  performance of her official duties.

23      MS. CHUANG:  Right.

24      THE COURT:  The force used, the amount of force when

25  used, all that is relevant to it.  And to see -- the jury to

1    see it.  And whether it also -- also relevant to the

2    substantial step that the Government has to prove beyond a

3    reasonable doubt, that unequivocally -- because -- thank you --

4    these instructions are stipulated to -- unequivocally

5    demonstrate that the crime will take place unless interrupted

6    by independent circumstances.

7         So some evidence -- not too much, but some evidence

8    showing the force, the effect of the force, what it did, the

9    amount, just to say it doesn't paint the picture of the amount

10   of force that was used.  And that all goes to what's in

11   someone's head and what their intent and what they maybe would

12   have done if they had not been interrupted, or what the purpose

13   of it was, and the police being there, and doing it all in

14   front of it, I think it goes -- goes directly to it.

15        **MS. CHUANG:**  Right.  And that may be where we just

16   disagree, Your Honor.  I don't think the extent of an injury

17   sheds any light, really, on the motivations for any conduct, in

18   this circumstance.

19        With respect to the intent requirement for the intent to

20   intimidate, impede, or obstruct while engaged in official

21   duties or on account of the performance of official duties, how

22   bad an injury is, I don't -- I don't see how that is probative.

23        **THE COURT:**  So the force used is probative and the

24   result of the force gives the jury an indication of the amount

25   of the force.  If you just had a scratch, not so much force.

1   But when you see what it -- then you get a sense of the force

2   that was used.  And the force that was used goes to what your

3   intent is.

4        Would you have -- I mean, they have to prove -- this is a

5   pretty heavy burden for the Government -- unequivocally

6   demonstrate that the crime will take place unless interrupted

7   by independent circumstances.

8        What someone does right when the police are standing right

9   in front of you, and the force used, and where used, and how

10  used, that shows what -- would that person have kept going?

11  What would they have done if they hadn't been interrupted?

12       Maybe not.  True.  You can make an argument.  But I think

13  an argument can be made the other way as well, that it's not.

14  So under -- I wouldn't -- and I don't think -- it is

15  prejudicial.  I mean, it is.

16       But it's -- A, it's true.  It's true.  There's nothing

17  misleading about it.  It happened.  And, B, I think it's

18  relevant.

19       And they're talking about three minutes.  Well -- about

20  three minutes total.

21       MS. CHUANG:  Well, so I anticipate -- and, you know, I

22  don't want to put words in the Government's mouth -- but I

23  anticipate that they'll be arguing that going to the house

24  itself is enough of a substantial step --

25       THE COURT:  I'm sorry.  Yeah.  I'm sure that they

1    will.  And you're not going to concede it; right?  I mean,

2    otherwise, why are we having the trial?

3        So they're entitled to put in all their evidence, not

4    just -- like "maybe that would be enough, maybe not."  But I

5    don't cut that off, you know.

6        **MS. CHUANG:**  So even if there's some probative value

7    to it, it's heavily outweighed by how prejudicial it is.

8        **THE COURT:**  I disagree.  I just disagree.

9        I think it's, actually, pretty critical evidence.  I

10   think, they've cabined it to three minutes.

11       And it is prejudicial.  There isn't any question about

12   that.  That's the nature of what happened.  It's just the

13   nature of what happened.

14       **MS. CHUANG:**  Right.  But there's ample evidence that

15   the Government can put on in the form of witness testimony.

16   And I think they are going to have witnesses talk about what

17   they saw and observed, and Mr. Pelosi talk about what he felt

18   and experienced, and all of that.  That is far less prejudicial

19   than the actual, visceral, graphic images and footage --

20       **THE COURT:**  Also far less probative.

21       **MS. CHUANG:**  -- and reaches the same goal.

22       **THE COURT:**  No, it doesn't.  A picture is worth a

23   thousands words.  It's just not the same.  Just not the same at

24   all.  I understand.

25       Your objection is noted and preserved for the record but

**PROCEEDINGS**

1    I'm going to allow those three minutes of video.

2         **MS. CHUANG:**  Well, the three minutes from

3    Officer Willmes, but what about Exhibit 314?  I know the

4    Government says it shows different angles, but we agree with

5    the Court that it basically shows the same sequence of events.

6         So if the point is -- is to show force or the resulting

7    injury in the immediate aftermath, there's no reason to put two

8    different officers' body cam footage of that same thing in at

9    trial.

10        **THE COURT:**  The three minutes was -- added them

11   together, unless my math was wrong.

12        **MS. VARTAIN:**  I think we also took care on Exhibit 314

13   to make sure that we didn't add any extra sections of the

14   aftermath -- sort of additional sort of bloody footage.  So I

15   think that that's clipped to be very tight for precisely that

16   reason.

17        **MS. CHUANG:**  It's actually four minutes total, between

18   the two.  The --

19        **THE COURT:**  I'm looking at the part that you objected

20   to.

21        **MS. CHUANG:**  Okay.

22        **THE COURT:**  I guess you're right.  I'm looking at what

23   was objected to.

24        **MS. CHUANG:**  I think that would just be -- if

25   the Court is allowing in the Officer Willmes excerpt, which is

PROCEEDINGS

1    Exhibit 2, that Exhibit 314 doesn't offer anything additional.

2    It's just additional prejudice and cumulative at that point.

3              THE COURT:   All right.   Okay.   Objection overruled.

4         Okay.   And then are you objecting to all the photos

5    that -- are these the only photos that you're offering,

6    Ms. Vartain, the ones -- so it's Exhibit 30, 31, 75, 76, 77,

7    84, 298, 305, 310, and 312?

8              MS. CHUANG:   It's 313.   312 was a typo on our part.

9              MS. VARTAIN:   Your Honor is looking at Exhibit A, I

10   think -- sorry -- to the Government's motion?

11             THE COURT:   I'm looking at something that someone

12   prepared for me.

13             MS. VARTAIN:   Okay.   Never mind.

14        Yes, Your Honor.   Yes, Your Honor.

15             THE COURT:   So you're not -- this is the universe of

16   what you are offering?

17             MS. VARTAIN:   As it concerns this topic, of course,

18   yes.

19             THE COURT:   Yes.   Noted.

20        All right.   So the argument is the same?

21             MS. CHUANG:   Right.   Especially in light of the

22   Court's ruling on the body cam footage, these still photographs

23   of the same thing are just overkill.   It doesn't add anything

24   beyond what the footage that the Court is allowing in already

25   would show, you know, at least as to the photos taken at the

1    house.

2        The photos taken at the hospital -- again, if the Court is

3    saying that it's probative as to the full force and intent --

4    right? -- what it looks like at the hospital doesn't

5    necessarily add anything to that beyond what is already in the

6    body cam that the Court is allowing in.

7        **THE COURT:**  So, for example, let's look at Exhibit 30.

8        What is the reason that's being offered in addition to the

9    video?

10       **MS. VARTAIN:**  Yeah.  So -- Exhibit -- if Your Honor

11   will just give me a second.

12       Some of the exhibits show some of the -- where the

13   evidence was found, for example, the cup that was in

14   Mr. Pelosi's hand.  And so because of how we spliced the

15   body cam to be brief, some of that doesn't come in.

16       Exhibit 30, though, I'm looking at, Your Honor, doesn't --

17   doesn't have that, but it does show -- it's one of the shots

18   that shows Mr. Pelosi most clearly because the body cam is so

19   abridged.  And so I think this is actually the best depiction

20   of what Mr. Pelosi felt, which is that he woke up in a pool of

21   his own blood.

22       **THE COURT:**  Why 20 and 21?  Because both -- I mean 30,

23   and 31?

24       **MS. VARTAIN:**  I think we just -- so that was just 30,

25   if I'm -- that I was answering.  And 31, shows that even after

1  they pulled the defendant off of him, he's still, essentially,

2  right there.  But I don't -- I think we could do without 31.

3          **THE COURT:**  Maybe I'm looking at -- I thought 31 was

4  ECF 92-6 at 20, and 30 was ECF 92-6 at 21.  Or, I should say,

5  Bates numbers 735 and 736.

6     Do I have that correct?

7          **MS. VARTAIN:**  Yes.

8          **THE COURT:**  Those do seem -- why do you need them

9  both?

10         **MS. VARTAIN:**  I think, just Bates numbered with the

11 ending 35 is accurate, or we don't need the second one.

12         **THE COURT:**  Okay.

13         **MS. CHUANG:**  So they will not be seeking to enter 31?

14         **THE COURT:**  31 has been withdrawn.

15         **MS. CHUANG:**  Okay.  It has been withdrawn.

16    And we still object to Exhibit 30.  If that's the best

17 depiction, why have the footage in the first place?  The

18 Government shouldn't be able to pile on the same prejudicial

19 images once they've already gotten it in.

20         **THE COURT:**  Okay.  I think it's a little bit different

21 because what the video doesn't show is actually the police

22 caring for Mr. Pelosi, and what they had to do while they were

23 waiting for the ambulance to arrive.  So I don't think they

24 need them both.  So I'll allow 30.

25    And then let's see.  Were you objecting to 75?  This is --

1     **MS. CHUANG:**  Yes.  So 75, 76, and 77, as well as

2  Exhibit 84.  Those are four photos of very similar things, of

3  the blood and clothes taken at the house.  So we object on the

4  same grounds.

5     And, certainly, I don't think the Government needs four

6  photos of essentially the same items of evidence, particularly

7  since we're not contesting any chain of custody or where

8  anything was found in the house.

9     **MS. VARTAIN:**  I think it's a different thing to not

10  contest chain of custody and for the jury to see, for example,

11  where the cup Mr. Pelosi was holding when the defendant

12  assaulted him fell, which is what Exhibit 76 shows.

13     So I mean, frankly, on the -- on the graphic nature, these

14  are not particularly graphic, but they do show and help the

15  recovering SFPD officers say where they found key evidence.

16     There are zip-ties strewn all over the floor.  Those are

17  obviously what Mr. -- what the defendant was carrying, and what

18  he threatened Mr. Pelosi with when he said he was going to tie

19  him up.

20     **THE COURT:**  Okay.  So that's so 76.

21     What about, then, 75?  Is that a different -- that's a

22  different -- 75 is Bates Number 406.

23     **MS. CHUANG:**  From our point of view, 75 is the least

24  prejudicial of this set, but they -- all four of these show

25  very similar things.

1      **THE COURT:**  That's a different view, 75.  It's a

2  different view, given what's happening.  So I'll allow that.

3      And 77?

4      **MS. VARTAIN:**  It has both the cup and the zip ties,

5  Your Honor.

6      **THE COURT:**  Those were in --

7      **MS. VARTAIN:**  It also --

8      **THE COURT:**  Also in -- oh.

9      **MS. VARTAIN:**  It also has Mr. Pelosi's phone, which

10  the defendant had taken from him.

11      **MS. CHUANG:**  I think both of those show it, actually.

12  I think 76 actually shows more than 77.  77 is a more limited

13  view of what the Government is speaking about.

14      **MS. VARTAIN:**  I don't have a problem just admitting

15  the -- let me make sure I get my number right.

16      76 and not 77.

17      **THE COURT:**  All right.  The Government has withdrawn

18  77.

19      And then 84?

20      That's just what was in -- just more Clipper cards and the

21  like.  There's -- I mean, that's not prejudicial, I think.

22      **MS. CHUANG:**  84?  84 is the same thing as -- basically

23  the same thing as 77, but with evidence markers -- is what I'm

24  looking at.  This is Bates stamp 666.

25      **THE COURT:**  I'm looking at -- sorry.

**PROCEEDINGS**

1      Oh, I was looking at the wrong one.

2      Oh, yeah.  What's that one offered for?

3      **MS. VARTAIN:**  I mean, it shows the process they went

4  through to mark up -- to mark up the evidence.

5      On the one hand, I don't feel strongly about it.  On the

6  other hand, I think the Court can trust that the Government is

7  going to be streamlined.  And if we find that there's not

8  utility for some of these, we're not going to put them in.  But

9  the marginal value as between these two, I'd sort of like to

10  take a moment and decide which one we want to --

11      **THE COURT:**  I don't think there's any, in the

12  marginal, prejudice.  And admitting it, I think, is --

13      **MS. VARTAIN:**  Right.

14      **THE COURT:**  -- minimal.  So I won't exclude it.

15      So now we move on, I think, to -- let's see --

16  Exhibit 298, which is the photo of the hand injury.

17      **MS. CHUANG:**  Yes.

18      **THE COURT:**  I mean, what other exhibit does the jury

19  have that shows what the Government proffers is the hand

20  injury?

21      **MS. CHUANG:**  The specifics of the injury, I think,

22  have less probative value to the Court's finding that the force

23  that -- that force -- the level of force and the resulting

24  injury has some relationship to intent.  I think, once we start

25  getting into the specific injuries that are not the main

1   injury, the probative value really diminishes significantly.

2   And this is a graphic photo.

3        MS. VARTAIN:  It -- Mr. Pelosi sustained significant

4   injuries.  This is the only photograph -- or maybe there's one

5   other of the hand and arm.  And so I think it's fair.

6        The head injury was, of course, the most captured on the

7   police camera because that's where we see the hammer -- the

8   hammer hit.  But this is part of the injury, and I think a

9   limited presentation to the jury is fair and will support

10  Mr. Pelosi's testimony about the injury he sustained.

11       THE COURT:  And the proffer is that it occurred during

12  that 15 seconds -- right? -- when the police; right?

13       MS. VARTAIN:  Oh, yes, that's right.

14       THE COURT:  That he also, in addition to the head

15  injury, suffered the hand and the elbow injury.

16       MS. VARTAIN:  Correct, Your Honor.

17       THE COURT:  I don't think they're particularly

18  prejudicial, and I think they showed the extent of what

19  happened.  So I'll allow those.

20       MS. CHUANG:  That was Exhibit 298 and is it --

21       THE COURT:  305.

22       MS. CHUANG:  305.

23       THE COURT:  And then we have 310 and 313.  I don't --

24  can you tell me what the ECF number was?  I wasn't sure.  They

25  didn't have Bates numbers -- the ECF -- so I didn't know which

```
 1   ones they were.

 2            MS. CHUANG:  I have the -- I have the Bates numbers

 3   if -- does the Court's copy have Bates numbers?

 4            THE COURT:  No, it doesn't.  That's the --

 5            MS. CHUANG:  Oh.  Okay.  Let me -- let's see.

 6            THE COURT:  I know it's ECF 92-8.  Just tell me which

 7   one -- you guys probably don't have the ECF one.

 8            MS. VARTAIN:  I don't have the ECF, unfortunately,

 9   Your Honor.

10            MS. CHUANG:  I have a copy of that.  Oh, I don't have

11   the Bates -- the ECF stamped one.  I could hand up --

12            THE COURT:  Yeah.  Just give me another -- like, clue

13   and I'll figure out which one it is.

14            MS. CHUANG:  I could hand up the ones I have printed

15   up.

16            MS. LINKER:  Your Honor, what ECF number did you say?

17            THE COURT:  It's 92-8.

18            MS. CHUANG:  It's under seal.

19            THE COURT:  Okay.  And are you handing me up -- which

20   exhibit number?  Those are --

21            MS. CHUANG:  So the ones I handed you, at the bottom,

22   they should have the trial exhibit number with the stamp.

23            THE COURT:  Got it.  Okay.  All right.

24        All right.  Ms. Vartain, why is the Government offering

25   these?
```

PROCEEDINGS

1          **MS. VARTAIN:**  So I'm looking at Trial Exhibit 311.  Is

2    that what the Court is looking at as well?

3          **THE COURT:**  No.  I'm looking at 310 and 313.

4          **MS. VARTAIN:**  I'm sorry.  310.  Okay.

5      So what is somewhat apparent from the body camera is that

6    there's more that -- that the defendant swung the hammer more

7    than once.  And what we see here are -- and by "here" I mean,

8    Exhibit 310 -- we see, and what the surgeon will explain, is

9    that there are, in fact, three impacts of the hammer to the

10   head, and that was apparent to him when he went to perform the

11   surgery on Mr. Pelosi.  And so I think when the neurosurgeon is

12   testifying about three head wounds, the photos actually help

13   him explain where those head wounds are.

14         **THE COURT:**  Okay.

15         **MS. CHUANG:**  And we object on the same grounds.  He

16   can testify about what he did, what -- how many impact points

17   he saw.  He can describe where they are, certainly.  But we

18   just think that the photo itself is too prejudicial.

19         **THE COURT:**  Okay.  Overruled.  I'll allow those.

20         **MS. VARTAIN:**  Thank you.

21         **MS. CHUANG:**  And 313 well?

22         **THE COURT:**  Both of them.  They're two different views

23   of two different --

24         **MS. CHUANG:**  Right.  Well -- is it the Government's

25   position that 313 also shows an impact point?

**PROCEEDINGS**

 1          I'm just trying to be -- to understand.  Because, to me,

 2     that looks like a surgical suture.

 3          **MS. VARTAIN:**  Yeah.  It's the surgical -- it's the

 4     post-surgery that the neurosurgeon will explain how they

 5     repaired the impact.

 6          **THE COURT:**  So the proffer is that, with these two

 7     photos, the surgeon will testify and show to where there were

 8     three -- three separate areas of impact?

 9          **MS. VARTAIN:**  Yes.

10          **MS. CHUANG:**  But do they really need both photos to

11     show that?  Wouldn't 310 suffice for that?

12          **THE COURT:**  Well, probably not 310, but maybe 313.

13          **MS. VARTAIN:**  I think that's fine, Your Honor.

14          AUSA Gilbert has corrected me that, I think, the testimony

15     is going to be that he saw the two -- that the neurosurgeon saw

16     the two points of impact depicted at 3- -- Exhibit 310.

17          **THE COURT:**  Okay.  We'll exclude 310 and use 313 then;

18     right?

19          **MS. VARTAIN:**  No, I think --

20          **MS. CHUANG:**  310 would show the impact points.  313

21     does not.

22          **THE COURT:**  Okay.  That's why I'm not a surgeon.

23          **MS. CHUANG:**  Right.

24          **THE COURT:**  All right.  So we'll use 310 and not 313.

25          **MS. VARTAIN:**  Your Honor, I think there --

 1          THE COURT:  You've got to talk into the microphone.

 2          MS. VARTAIN:  There might be two things that the

 3  defendant raised that we did not cover, which are Exhibits 33

 4  and 305.

 5          THE COURT:  Okay.  What are they?

 6          MS. VARTAIN:  Okay.  So when you say "what are they,"

 7  would you like the proffer, Your Honor?

 8          THE COURT:  Yes.  Do you have a Bates Number that I

 9  can --

10          MS. VARTAIN:  Yes, Exhibit 305 is Bates Number ending

11  3069.

12          MS. CHUANG:  I think the Court had said it was

13  allowed.

14          MS. VARTAIN:  Okay.  Oh.

15          MS. CHUANG:  Right.  Exhibits 298 and 305 the Court

16  had allowed.

17          THE COURT:  Right.  The elbow and the hand pics come

18  in.

19          MS. VARTAIN:  Okay.  Thank you.

20          THE COURT:  So now, I think we move to Motion in

21  Limine Number 1.  And so Mr. Swanson may want to come forward

22  because it also involves Target 1.

23      And I will say -- what I will say is I understand -- I

24  cannot say that it's irrelevant, completely irrelevant,

25  frivolous such that I would exclude it.  Okay.

1        I'll just tell you what my thought process was.  I hear

2   Target Number 1's concern about not wanting to become a

3   spectacle, and safety concerns, and the like.  I do think the

4   facts that the Defense is asking for or would need or have

5   shown some relevance to, are minimal, innocuous, and

6   undisputed, I would guess; and I would also think,

7   particularly, wouldn't want Target 1 on the stand necessarily.

8        So what I was thinking of, why not just work out a

9   stipulation with Mr. Swanson?

10        **MS. CHUANG:**  Well, there's just generally the

11   preference for live testimony during a trial.  And I think,

12   you know, for the same reason why the Government wants to

13   present their prosecution a certain way --

14        **THE COURT:**  Well, let me stop you for a minute.

15        Target 1 is not a percipient witness, has no connection

16   whatsoever to anything, other than nothing; right?

17        So tell me -- I understand generally a preference --

18   actually, I don't understand in this particular case, because I

19   can't control what Target 1 is going to say, and Target 1 may

20   start talking about why Target 1 didn't even want to be here to

21   begin with, which is not going to be so particularly great.

22        Now, there were limited facts that I could see that might

23   be relevant.  And what I don't know is why -- I can't

24   imagine -- and maybe we'll need to go ex parte because it's not

25   obvious to me why those would, at all, need to be done live.

**PROCEEDINGS**

1    Can't see it.  Can't see it.

2         MS. CHUANG:  Well, part of the reason why we would

3    want to bring her in to question her -- or to question them is

4    because to lay out in a declaration or a stipulation ahead of

5    time exactly what we would ask them -- right? -- even if the

6    answers are likely not going to be disputed, would just reveal

7    ahead of time what we're going for.

8         THE COURT:  Okay.  Totally understand.

9         So what my thinking was:  You work it out with Mr. Swanson

10   in advance.  He doesn't share it with the Government; and it's

11   Mr. Swanson, so you don't have to worry about that.

12        And, then, whether -- I don't know when it's going to come

13   up, we'll see what your opening -- if you do an opening.  If

14   not, then, when the Government closes -- at whatever that point

15   is -- right? -- that it's -- no longer can be hidden, the --

16   the stip is then shared with the Government.

17        I'm confident, if it was worked out, that they won't

18   object to it because it's going to be true.  And then it comes

19   in.

20        So I am mindful that you don't want to disclose, and I

21   think there's a process that you don't have to disclose to the

22   Government.  So -- yeah.

23        MS. CHUANG:  And we would just request that Target 1

24   be ordered to testify because there's more of an impact from

25   live testimony, in front of a jury, than there would be from

**PROCEEDINGS**

1   just reading off a paper.  So there's a reason why we present

2   evidence like this in a court of law.  And some stipulations,

3   like admissibility, certainly -- right? -- that is read off a

4   piece of --

5           **THE COURT:**  So let me ask you this:  Can I think

6   about, in making this decision, the evidence that was offered

7   with respect to the concerns and the safety concerns of

8   Target 1?  Can I think about that when I'm weighing?

9           So I get that you would like that, I'm weighing that.  And

10  don't I have to think about, while Mr. DePape is absolutely

11  entitled to a fair trial, and I want to make sure he has a fair

12  trial, absolutely, but I also want to make sure the trial

13  doesn't unnecessarily inflict additional and more harm on

14  people who have -- totally had nothing to do with it, and did

15  nothing, are not percipient witnesses.

16          Don't I have to weigh that?

17          **MS. CHUANG:**  I think that does play into the Court's

18  consideration.  That is not our intention.  We are not doing

19  this to inflict any type of unnecessary harm, or to do

20  something gratuitous to Target 1 at all.

21          I do want to note that a lot of things that are laid out

22  in terms of how Target 1 has adjusted their life, accordingly,

23  the damage was done not by anyone on our side.  Right?

24          The damage was done because of choices made during state

25  court proceedings that --

1      **THE COURT:**  We can go into that.  There is a place

2    where it all started, which was -- right?  So I wouldn't go

3    that far if I were you.  Okay.  But I hear what you're saying

4    and I can hear from Mr. Swanson on that.

5         It's also public.  It's also been made public by the DA.

6           **MS. CHUANG:**  Right.

7           **THE COURT:**  But we're talking about not exacerbating.

8    That's all.  That's all that we're talking about.

9           **MS. CHUANG:**  And --

10          **THE COURT:**  I guess what I haven't heard is why,

11   because I don't know.  And so maybe what I need to do is see

12   ex parte.  Because what you submitted to me -- I don't see it

13   at all.  And the only thing I can see is that it simply is done

14   to cause a burden or inflict.  And I know that's not your

15   intention.  So that's why, maybe, I need to --

16          **MS. CHUANG:**  Right.

17          **THE COURT:**  -- do it.

18        Because I don't see it.  Because the facts -- the only

19   facts I see that are potentially relevant, you wouldn't need

20   live testimony for.

21        Because this witness knows nothing, is my understanding;

22   does not know Mr. DePape; does not know Mr. Pelosi; does not

23   know Speaker Pelosi; none of those things.  Doesn't know

24   anything.  Doesn't know anything at all.

25          **MS. CHUANG:**  Then I am happy to proffer more specifics

1    ex parte.

2            THE COURT:  Okay.  All right.

3        But let me hear from Mr. Swanson.

4        MR. SWANSON:  Your Honor, I am more than willing to

5    meet with the Defense to work out a stipulation.  I do not see

6    any testimony that could possibly be relevant.  I can conceive

7    of facts that possibly could be and we would be willing to

8    stipulate to those.

9        I would commit to the Court, we would not share any of

10   that information with the Government, at any point, until it

11   was made public in court.

12       And I think there is, when a motion to quash is brought, a

13   balancing that the Court is to consider of whether it is

14   oppressive; whether it is material; whether its cumulative.  I

15   think all of these things can be addressed exactly the way

16   the Court has proposed.

17       And we're happy to work with the Government to get --

18   sorry -- with the Defense to get them the information that they

19   want in the form of a stipulation -- factual, accurate

20   stipulation without having my client have to appear in court,

21   and everything that we have already laid out be exacerbated as

22   a result.

23           THE COURT:  Okay.  All right.

24       So I think I need to hear from the Defense ex parte.  And

25   then I'll issue a ruling, which may be that you should work

 1   with the Defense.

 2        But let me hear from Ms. -- did you want --

 3        **MR. SWANSON:**  I was just going to say, Your Honor, if

 4   the Defense is going to make a presentation ex parte, I would

 5   ask to be able to be present for that so that we could weigh in

 6   on the question that is before the Court of whether this is

 7   oppressive and unreasonable in light of whatever relevance it

 8   has; not with the Government present, but with us present since

 9   we really are the counter-party for that motion and would not

10   be revealing -- they would not be revealing any strategy that

11   we would, then, communicate to anyone.

12        **THE COURT:**  Well, I don't know that necessarily you

13   have actually -- well.  No, I don't think -- yeah, I don't

14   think so.  I think I'm perfectly capable of evaluation -- I

15   think -- I hope --

16        **MR. SWANSON:**  You are.

17        **THE COURT:**  -- of evaluating the relevance.  And I

18   understand the concerns.  I understand the concerns.  And I

19   just need to hear -- because, based on my understanding, I

20   agree that the facts can simply be stipulated to, or even

21   brought out from a different witness perhaps, like a law

22   enforcement witness or something and -- because I honestly

23   don't see the value, other than harm, of bringing that witness

24   here.

25        But I will see -- but I'll keep an open mind and hear the

1    Defense.

2         And why don't you, after court today, stick around

3    outside, because I'll meet with them ex parte on the record.

4         **MR. SWANSON:**  I'll do that, Your Honor.

5         And I just would point out, the Defense did argue in

6    connection with an earlier motion that a stipulation, where

7    facts are not in dispute, and can easily come in through an

8    officer's testimony, is a way to approach a problem like this.

9         So that might be a suggestion in this case as well.

10        **MS. VARTAIN:**  Your Honor, before you take it up

11   ex parte, I know the Court knows this and I am very sensitive

12   to Target 1's -- maintaining Target 1's privacy, but I would

13   need to think and see, of course, a stipulation before the

14   Government would agree to enter -- I think the Government would

15   have to be a party to the stipulation, of course.

16        **THE COURT:**  Oh.  So, right.

17        So my idea was, you would see it, and, of course, you

18   would have to stipulate to it, and then you might, in fact, get

19   additional facts.

20        **MS. VARTAIN:**  Yeah.

21        **THE COURT:**  Or something.  I don't know.

22        **MS. VARTAIN:**  Yeah, okay.

23        **THE COURT:**  But, I --

24        **MS. VARTAIN:**  Yes.

25        **THE COURT:**  I'm assuming that the Government -- the

1   reason you even brought In Limine 1 -- because, quite honestly,

2   that evidence could be helpful to the Government --

3          MS. VARTAIN:  Yes.

4          THE COURT:  -- is because you were concerned about

5   not -- the trial not causing additional harm.

6          MS. VARTAIN:  Yes.  And it, I think -- but the other

7   reason is that it is truly irrelevant -- from what the

8   Government knows, and I hear the Court that there are other

9   considerations.  And so I would say that having the witness

10  live would be better for the Government potentially, because I

11  think it will be harmful to the defendant.

12      So I will need to -- so the Government will need to

13  consider, but it's -- consider what the stipulation looks like

14  and also whether questions could be posed of other witness --

15  for example, the case agents -- without our objecting to it.

16  Those are things we will consider.

17      I just can't agree, of course, that we, without seeing it,

18  that we would agree to a stipulation.

19          THE COURT:  No, I understand.

20          MS. VARTAIN:  Okay.

21          THE COURT:  But, I mean, again, on the relevance, as

22  the Defense points out, it was in the indictment.

23          MS. VARTAIN:  Sure.  But, I mean, we plead background

24  facts to tell a story all of the time that isn't directly

25  relevant.  And I think if we had tried to bring it up in a

**PROCEEDINGS**

1    different circumstance, a different defendant might have

2    claimed it was 404(b).

3              THE COURT:  True.  That's actually -- and maybe

4    successfully.

5              MS. VARTAIN:  Correct, Your Honor.

6              THE COURT:  And maybe successfully.

7         But, the point is, it is part of the story of what

8    happened, and to carve it out and say the defendant can't raise

9    it, seems to me hard to swallow in this context.

10        All right.  After the proceeding, I'll see the Government

11   ex parte, and so you both should hang on outside.

12             MS. VARTAIN:  Yes.

13             MS. LINKER:  The Defense.

14             THE COURT:  The Defense ex parte.  Yes, exactly.

15        Okay.  So I think that takes care of our -- well, so let's

16   also, though, there was the additional thing about the target

17   list -- right? -- that the Government had moved to exclude.

18   The Defense's opposition focused on Target 1.

19        There isn't a list, per se, as I understand it; right?

20             MS. CHUANG:  Right.  I mean -- so Target 1 is very

21   linked to this, and is specifically mentioned in the

22   indictment.  And we can explore this more ex parte as well.

23        But I did submit an ex parte declaration about -- talking

24   about the other names on the list and how they fit into the

25   case; how they are relevant; and how they fit into the theory

PROCEEDINGS

 1 | of defense.

 2 |      **THE COURT:**  I guess my question is:  How would it come

 3 | in?

 4 |    How would it -- like, what would be the evidence that we

 5 | would get it in, that it's not inadmissible hearsay?

 6 |      **MS. CHUANG:**  We can talk about that ex parte.

 7 |      **THE COURT:**  Okay.

 8 |      **MS. CHUANG:**  Right.

 9 |      **THE COURT:**  Okay.

10 |      **MS. CHUANG:**  I think -- I don't know if the Court had

11 | gotten to our motion in limine about the physician witnesses?

12 | It's very linked to the prejudice, the general prejudicial --

13 |      **THE COURT:**  I think they said they're only going to

14 | call one.  I think they're probably waiting to figure out which

15 | one is available.

16 |      **MS. VARTAIN:**  We intend -- and I thought we were

17 | fairly clear on this.  We intend to call the neurosurgeon who

18 | did the surgery.  That's Dr. Wong.  And to the extent we

19 | weren't entirely sure, it's because we hadn't talked to

20 | everyone yet.  But that's where we are.

21 |      **MS. CHUANG:**  Okay.  Yeah.  I just want to make sure I

22 | have a clear notation.  We had objected to any physician

23 | testimony for the same reasons as in our other motion in

24 | limines arguing that the extent of the injury and the details

25 | about the injury are not probative enough to be introduced in

1    the case.  With the Government saying they're only calling one

2    physician, the cumulativeness is not an issue.

3           **THE COURT:**  Okay.  All right.  But your objection to

4    calling any neurosurgeon is --

5           **MS. CHUANG:**  Yes.

6           **THE COURT:**  -- preserved for the record.

7           **MS. CHUANG:**  Yes.  Thank you.

8        And then I think we had a couple of other motions in

9    limine about voir dire and peremptory challenges.

10          **THE COURT:**  Ah, yes.  How could I forget?

11       Okay.  I'm not going to allow you to ask about political

12   affiliation or whether the juror voted for Speaker Pelosi.  We

13   have a question on the written questionnaire whether someone

14   has, or even a family member or friend, worked for

15   Speaker Pelosi or gone above that.

16       I think it would be invasive.  And I don't think it would

17   really tell you anything.

18       What you want to do is explore, you know, would the fact

19   if someone expressed views or hatred to the Democratic Party,

20   would that affect your ability to be fair or impartial.  That's

21   what the question is.  How someone is registered to vote

22   doesn't really tell you anything.  So that's part of it.

23       But the other part of it is, I think it would be

24   incredibly harmful to the administration of justice going

25   forward -- and, frankly, to our democracy.

**PROCEEDINGS**

1     What we're then going to see is the newspapers -- it's bad

2   enough the newspapers say "a jury of ten women and two men," as

3   if that matters.  It's completely irrelevant; right?  Now they

4   would report "a jury of eight Republicans, two Democrats, two

5   decline to state, and one Green Party," as if it mattered;

6   right?

7     And that would reduce our belief in the whole jury system.

8   And I think it would be very harmful.  So I'm just not going to

9   allow it.  I think it would be destructive to the

10  administration of justice, and it's not just not probative.

11  Just not probative.  It's invading privacy as well.

12    But your objection is preserved.

13          **MS. CHUANG:**  Thank you.

14          **THE COURT:**  With respect to the peremptories, I'm

15  going to deny without prejudice.

16    Let's look at our questionnaires and let's see what

17  happens on the 6th with our pool.  And maybe, you know, looking

18  at it, maybe I'll decide.  I do think I have to give the

19  Government more if I give the Defense more.

20    But let's see what our pool looks like first.

21          **MS. CHUANG:**  Okay.  Understood.

22          **THE COURT:**  Okay.  All right.

23    So the questionnaires, you're going to get them,

24  hopefully, that's our plan, on Wednesday.  And we are meeting

25  at 10:00 a.m. on Friday; is that right?  10:00 a.m. on Friday.

 1        If, in advance, you agree on people that you agree to

 2   exclude, then, when we meet on Friday -- you can either let me

 3   know in advance, or let me know on Friday.  I may or may not

 4   exclude them.  If I figure out some in advance, we will let you

 5   know as well who they are, so you can look at them and see if

 6   you agree.

 7        So, generally, my practice has been, for hardship -- I

 8   mean, I prefer to get agreement of the parties, but I don't

 9   necessarily need it if I think there's a hardship issue.

10        If it's a bias issue, if there's agreement, I may agree.

11   But if there's not agreement, then I'll bring the person in,

12   because I think we should be allowed to voir dire them before

13   they're excused.

14        **MS. CHUANG:**  Does the Court know when on Wednesday we

15   will get the questionnaires?  I think both parties are

16   interested, because we do plan to meet and confer on the 2nd,

17   before the hearing on the 3rd.  So we just want to know if

18   we'll have the whole day on Wednesday or if it might be later

19   in the day.

20        **THE COURT:**  We don't know.  We can ask.

21        **MS. CHUANG:**  Okay.  As early as possible as the jury

22   office is able to do would be preferable.

23        **THE COURT:**  Yeah.  We're like trying cases like crazy,

24   so we're busy; but we will ask.

25        **MS. CHUANG:**  Thank you.

1    **THE COURT:**  Okay.  So the other thing, so we will pick

2  our jury, hopefully, on the 6th.  We'll talk more on the 3rd

3  about -- we'll have an idea, how many people return the

4  surveys, what they look like.  We can talk about how many to --

5  come in.

6       I like to be mindful of not bringing people in who we

7  don't need to bring in, but we'll just see; right?  Maybe we'll

8  do some in the morning, some in the afternoon.  Some -- I don't

9  know.  Let's just see.  We have our own special pool, so let's

10  just see what it looks like on Friday.

11       Then we will start, on the 9th, with openings, and then

12  witnesses.  And I think I said before, generally, I like to go

13  8:30 to around 3:00, with a morning break, a 45-minute lunch,

14  and an afternoon break.

15       Does that schedule work?

16       **MS. VARTAIN:**  Yes, Your Honor.

17       **THE COURT:**  And I ask you to be here at 8:00 a.m. so

18  we can resolve any outside-the-presence-of-the-jury issues that

19  we can.

20       **MS. GILBERT:**  Yes, Your Honor.

21       **MS. CHUANG:**  That works.

22       **THE COURT:**  Anything else?

23       **MS. GILBERT:**  Your Honor, we have a short list of more

24  logistical issues for trial that we met and conferred with

25  Defense counsel about prior to today's hearing.  So I think,

1   hopefully, we -- most of these are things that are not

2   contested.

3        We wanted to just put on -- note for the courtroom deputy

4   and the Court, we have a lot of physical evidence in this case.

5   And, as we've discussed, the parties have agreed to stipulate

6   to a chain of custody already.

7        We're trying to streamline that presentation, but we need

8   to make sure that we develop a procedure that recognizes that

9   another forum actually has much of the evidence and we need to

10  preserve it for what could be a future trial.  So we're working

11  on that, the Government is.

12       But we wanted to put on notice that you -- typically, our

13  understanding is that when an exhibit, a physical exhibit is

14  introduced and admitted at trial, it then goes into the custody

15  of the clerk during the course of trial.  And you might need a

16  couple of carts.  But if the Court wants to do something

17  different in terms of who holds custody during trial, we can --

18  we're happy to discuss that.  But we wanted to put that on your

19  radar.

20       And the other piece of it is that one of the items of

21  physical evidence is about $9,000 in cash.  And so the Court

22  may wish to handle that slightly differently, but --

23            **THE COURT:**  I don't want it anywhere near me.

24            **MS. GILBERT:**  Or not want it anywhere.

25       We can perhaps discuss that later, but we thought that

1    would be good, to put you on notice of that.

2         THE COURT:  I haven't done a trial, I think, with --

3    no, did I do that one trial with physical evidence.  And,

4    actually, they just kind of left it sitting there next to the

5    witness stand.

6         Normally, you would say, like, at the end of the court

7    day, the clerk would take it?

8         MS. GILBERT:  The rule says clerk.  Our understanding

9    is, usually the courtroom deputy takes it and keeps it in

10   custody while -- during the course of the trial and then, when

11   the trial is done -- the rules are clear about how the

12   Government then has a duty to maintain it.  And we discuss that

13   all at the end of the trial, given the other -- San Francisco

14   Police Department's interest and, essentially, custody over the

15   evidence, but --

16        THE COURT:  Does the Defense have a view?  Would they

17   prefer for the Court, as opposed to the Government to take it

18   at the end of the day?

19        MS. CHUANG:  We have no preference.

20        And we are working with the Government to see how they can

21   streamline entering the physical evidence, instead of having

22   someone take out each and every piece on the stand.  So we're

23   trying to figure out a way to expedite that and, maybe, bundle

24   items.  But we have no preference about, you know, the Court

25   taking custody or the Government maintaining it.

**PROCEEDINGS**

1      **THE COURT:**  I would think that Ms. Means would prefer

2  for the Government to take it at the end of the day; especially

3  if it needs to be preserved for the State, and we have no

4  contact with them whatsoever and you do.

5      So maybe that would be better.

6      **MS. GILBERT:**  The Government is fine with that, as

7  long as the Defense doesn't object.

8      **MS. CHUANG:**  That's fine.

9      **THE COURT:**  Okay.

10      **MS. GILBERT:**  I think we -- it sounds like our

11  understanding is Exhibit 1 on our exhibit list is the 9-1-1

12  call that Mr. Pelosi made during the course of the events.  We

13  were planning to introduce that without a witness at the

14  beginning of our case.  And we understand that we have both a

15  stipulation regarding that from Defense, and our understanding

16  is that the Defense does not object to the admissibility of

17  that exhibit.

18      **MS. CHUANG:**  Yes, that's correct.

19      **THE COURT:**  Okay.  Thank you.

20      **MS. GILBERT:**  Your Honor, we plan to introduce two

21  exhibits under Federal Rule of Evidence 1006, which are summary

22  exhibits of voluminous videos.  And we understand that the

23  Defense does not object to this.

24      One exhibit is regarding the BART and Muni footage of the

25  defendant traveling to the area near where -- the Pelosi

1   residence.  And the other exhibit will be a summary of the

2   cameras that -- the U.S. Capitol Police cameras outside of the

3   Pelosi residence that captured the defendant on October 28th.

4          MS. CHUANG:  Right.  And we are not objecting to

5   those.

6          THE COURT:  Thank you.

7          MS. GILBERT:  The Government has -- as the Court has

8   seen, we have a number of video and audio recordings that are

9   marked as exhibits in our case.  We have discussed this with

10  Defense.  We understand there's no objection.

11         What our plan is, we have transcripts of all of those

12  recordings.  We are planning to publish them to the jury with a

13  transcript running along the bottom.  We have provided those to

14  Defense.  And that -- but that the exhibit that will go back

15  and admitted to the jury will not include the transcript.  And

16  that is our -- that is our plan for trial, absent any change

17  from the Court or Defense.

18         THE COURT:  Correct.  Right.  It goes back without the

19  transcript.

20         MS. GILBERT:  We -- the parties -- I think we saw

21  the Court's notice regarding dailies and realtime

22  transcription.  The Government, and we understand the Defense,

23  will not be seeking dailies and realtime, just so the Court is

24  aware.

25         MS. CHUANG:  That's correct.

**PROCEEDINGS**

1        **MS. GILBERT:**  We would request a time, and maybe we

2   can talk to Ms. Means about doing an audio/visual run-through

3   given the amount of video and audio evidence.  And we can set

4   that up with her.  And we're happy to have the Defense here or

5   do it separately.  The Government has no view on that.

6        **MS. CHUANG:**  I think just doing it at the same time

7   probably makes the most sense, and it may be the easiest to do.

8        **THE COURT:**  Agreed.

9        **THE CLERK:**  When do you guys want to come?

10        **MS. GILBERT:**  We will -- can coordinate with your

11   courtroom deputy.

12        Your Honor, we're wondering whether the Court has thought

13   about setting up an overflow courtroom.

14        **THE COURT:**  Yes.  The media room in the lobby of the

15   building will be set up.  We'll do it initially, and then we'll

16   see if it -- if we continue to need it.  But we will, for jury

17   selection and the first couple of days of trial, see if we

18   continue to need it, but we will set that up.

19        **MS. GILBERT:**  The Government has been thinking about

20   ways to streamline the trial, and also discussing that with

21   Defense.  One suggestion we have, that we wanted to just put on

22   the Court's radar, is -- especially if we're planning to meet

23   at 8:00 each day, before the jury comes at 8:30 -- potentially

24   preadmitting the exhibits that the Government would seek to

25   introduce that day, and so we could, if there were any

1    objections or issues, those can be litigated ahead of time.

2    And if there are none, then it will make the process of

3    publishing those exhibits to the jury much more efficient.

4        And, as part of that, I think maybe this is a two-prong

5    piece.  We have seven stipulations with the Defense that we've

6    already finalized.  A number of them regard simply

7    admissibility issues like authenticity and relevance.  And I

8    think the parties are in agreement that we could read those on

9    the record, but before -- not before the jury.  So before the

10   jury comes in.  And then there are other stipulations of fact

11   that we would plan to read before the jury.

12       But I think the question is whether we could potentially

13   streamline the admission of exhibits at the beginning of the

14   day.  It's something I've done in other trials and it's been

15   effective, but we just wanted to see if that's a way we could

16   speed things up.

17       **THE COURT:**  If there's agreement and if the exhibit is

18   actually going to be used with a witness -- so I don't want to

19   admit any exhibits, then, that are never used with a witness --

20   right? -- and then they just go back to the jury, and the jury

21   has never seen them or heard of it.

22       **MS. GILBERT:**  I can say I think the Government -- the

23   only exhibit the Government plans to introduce without a

24   witness is the 9-1-1 call, Exhibit 1.

25       **THE COURT:**  But you're going to refer to it.  What I

1   mean is -- and it's mostly in civil cases, where there'll give

2   you a stack of exhibits and they'll just move them in and

3   they'll never refer to them ever.

4          **MS. GILBERT:**  That is definitely not our intention.

5          **MS. CHUANG:**  And we're fine with that, with

6   the Court's caveat.

7          **THE COURT:**  Okay.

8          **MS. GILBERT:**  I think our final question is the -- we

9   have witness binders -- sorry.

10       We have exhibit binders for the Court, and we're wondering

11  when you would like those, and whether you would also like, for

12  the Court's use, exhibit binders for each witness.

13         **THE COURT:**  Well, do you create the binders for the

14  witness?

15         **MS. GILBERT:**  We typically do.  We're actually

16  wondering in this case, because so much of the evidence is

17  photographs and audio/video, whether we might not do that here,

18  because there's very few documents or pieces of evidence.  So

19  we're still discussing that.  But if the Court has a

20  preference, we're, of course, willing --

21         **THE COURT:**  Well, just as -- right.  Just as you said,

22  there just isn't very much non-video evidence, so I think one

23  binder would probably be okay, especially because you got them

24  to withdraw some today.

25         **MS. GILBERT:**  Okay.  That's fine, Your Honor.  So

1  we'll produce one binder for the Court of all the exhibits.

2  Excellent.

3       MS. CHUANG:  So I think I have a couple of items in

4  addition.

5       We spoke with the Government about this Proposed

6  Instruction Number 16, about the transcripts of the recordings,

7  and that the -- what the jury hears is controlling and they

8  won't have the transcripts of the recordings in the jury room.

9       We would just ask the Court to read that instruction

10  again, right before the recording -- the recording is played,

11  so that the jury is reminded of that again.

12       THE COURT:  Certainly.  And please remind me if I

13  don't.

14       MS. CHUANG:  Okay.  Great.  Thank you.

15       And then, to go back to voir dire for a moment, I think

16  the Government and I, we're both interested to know how much

17  attorney voir dire will be allowed.

18       THE COURT:  I thought I told you -- and I couldn't

19  remember -- one hour.  That is what I thought.

20       MS. CHUANG:  Okay.  One hour.

21       And then, we just want to make a record that we have

22  discussed with the Government some discovery requests for

23  communications between the witnesses or the Pelosi family,

24  including communications with their attorneys as their agents.

25  I understand that is a pending request.

1    We have also received recently some screen shots of text

2  messages from one of the law enforcement witnesses.  It's --

3  we've only received such texts from one officer.  So we would

4  request that any texts or e-mails similar to that from other

5  law enforcement witnesses who may have communicated about the

6  case or the subject of the testimony be turned over immediately

7  as well.

8         **MS. VARTAIN:**  We're turning them over as we interview

9  witnesses and get them, so that's what we'll keep doing.

10        **THE COURT:**  I'm glad you brought up voir dire.  You're

11  going to get a list of the potential jurors in advance to do

12  whatever research you do.  I just want to make sure -- and I

13  know you wouldn't do this -- but that no one, no juror,

14  potential juror is contacted at all; and that includes not

15  liking them or anything that can be -- but whatever is public

16  is public.  So I'm not prohibiting that.  I just want to make

17  sure that no contact in any way by anyone or anyone working for

18  you is made.

19        **MS. GILBERT:**  Absolutely, Your Honor.

20        **MS. CHUANG:**  Understood.

21    I think that's it in terms of our items.

22        **THE COURT:**  Okay.  All right.  So I have to -- I have

23  a 2:00 video calendar.  I'm going to do that.

24    So why don't we empty the courtroom, and I will see the

25  Defense.

**PROCEEDINGS**

1      If the Government and Mr. Swanson can stay available

2 outside -- hopefully, I'll be about 15 minutes and then I'll be

3 back.

4          **MS. GILBERT:**  Thank you, Your Honor.

5          **MS. CHUANG:**  Thank you.

6               (Proceedings adjourned at 2:19 p.m.)

7      (All counsel but Defense counsel leaves the courtroom.)

8 (The following proceedings, pages 62 through 79,  were heard ex

9               parte and are bound separately.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

1    <u>**Thursday - October 27, 2023**</u>                              <u>**3:18 p.m.**</u>

2         (Government counsel and Mr. Swanson enter the courtroom.)

3         (The following proceedings were heard in open court:)

4         **THE COURT:**  We're back on the record in open court, no

5    longer under -- yeah.  You can unlock it.

6         We're not going to talk about anything other than to say,

7    Mr. Swanson, the Defense did persuade me that I should not

8    quash the subpoena.

9         They are willing -- they represented it will be as short

10   as possible.  We can work around day, time.  I'm open to any

11   accommodations.

12        I will note that your client -- it's already public;

13   right?  It was brought out in public in December 2022.  I even

14   wondered about continuing to call her "Target Number 1" because

15   it is public.  But I understand trying not to exacerbate

16   things.  I don't know.  And I'll take your word for it that --

17   keeping it that way.

18        And I think we could -- that may even be a way to do it,

19   not use a name.  I don't know.

20        I mean, I would ask the Defense to talk to you about that,

21   but --

22        **MS. CHUANG:**  Right.  And we would be fine with that,

23   any type of moniker, pseudonym, anonymous identifier.

24        And as we had stated in the briefing, we are willing to

25   seal the courtroom if the Court decides that it's appropriate

1  that --

2       **THE COURT:**  I don't know if I can do that.  But

3  there's no -- it's not broadcast, this trial.  It's not

4  broadcast.  There's no photographs, any of that, allowed.  And

5  I am certainly fine with not using her name -- their name.

6       **MR. SWANSON:**  Well, Your Honor, let me say for the

7  record that I know I'm not a party here, but having to fight

8  against a relevance showing that we cannot know anything about

9  makes it very difficult for me to argue how the countervailing

10  concerns of the burden that this places on my client when there

11  are, it seems to me, many other means to achieve any legitimate

12  end here are available to the Defense.

13       I can't argue it because I don't know what they are, and I

14  appreciate that.

15       **THE COURT:**  Well, Mr. Swanson, have you cited me a

16  case that says I can just do that, force them to agree to a

17  stipulation -- when, by the way, it's not as if -- it's not an

18  anonymous witness.  It's a witness who was referred to in the

19  indictment; and who was referred to not anonymously in a

20  preliminary hearing where the DA, at least, thought it was

21  relevant enough to bring it out there.

22       I mean, that's sort of where I think it would be error,

23  and reversible error, which is not something I want to do.

24       Believe me, I'm very mindful of your client's concerns.

25  And I'm sorry about that.  I am deeply sorry about that, and I

1   wish there was a way to do that, because I hear that.  But, as

2   we all know, as we sit here today, there is a ton of incredible

3   unfairness in the world, and hurt, and harm.  And so my goal is

4   just to mitigate it as much as possible while giving Mr. DePape

5   a fair trial and trying not to create a reversible error.

6        And I just -- I know -- I've listened to it.  I'm

7   confident in -- I'm pretty confident that to exclude that

8   evidence altogether would be very problematic for the trial in

9   terms of on review.

10        **MR. SWANSON:**  And, I think -- I think given this

11   defendant's willingness to call out to the press to essentially

12   make, what was described in the press, as a "call to arms,"

13   apologizing to everyone for not having -- not having finished,

14   not having gotten more of them.  And then having my client, who

15   will come here -- if this is what's going to happen -- and

16   obviously be identifiable, and obviously be written about, and

17   there being media out there that have already forced

18   fundamental changes in my client's life, and her family's life

19   and her professional life.

20        And now, being brought back front and center in this case,

21   even if it's under seal, people will see who it is coming in.

22   People will see who it is leaving.  It will be reported on.

23   And there is a group of people out there who are particularly

24   worrisome to my client and to her employer.  And they've gone

25   to great lengths to try to do everything possible to make sure

1   that my client is safe.  This will make my client less safe.

2        And to the extent -- what the Court can do, I believe,

3   when faced with a motion to quash is to consider whether it

4   would be oppressive and unreasonable to quash it; whether it is

5   not just relevant, but also material; whether it would be

6   cumulative of other information, those are all considerations

7   that courts have considered in the face of motions to quash

8   trial subpoenas.  And what we're saying is that there are other

9   means to get in this evidence.  It could be that the Defense

10  can get in this evidence.

11       My client's testimony -- I can understand there might be

12  something about who my client is, a fact, that could be

13  relevant to the Defense, I don't know, but possibly.  My client

14  knows nothing about what this defendant did or what this

15  defendant was thinking or who this defendant is -- literally

16  has nothing to offer on any material element to the Defense.

17       My client has a certain -- has characteristics, I guess,

18  that may be relevant.  Those are not necessary to be brought in

19  through testimony.  The Defense can get everything that is

20  relevant and material in through other means other than

21  compelling my client to go through this process and suffer the

22  consequences for it.  That's what we're objecting to.

23            THE COURT:  I understand.  And I explored that in

24  great depth.  And my initial inclination was to agree with you,

25  but I -- again, do you have a case that I can -- when I find

1  that some evidence is relevant, that I can force them to agree

2  to a stipulation?  Which, by the way, the Government has said

3  that they may not agree to.  I think it may be more complicated

4  that I had than I thought.

5      I think the testimony will be short.  We can call your

6  client "Target Number 1".  We can do it whatever day we think

7  would be the least paying attention -- I mean, I understand

8  that.

9      But, Mr. Swanson, there's a lot of people -- don't you

10 think those people testifying in those January 6th trials, all

11 of them -- right? -- they all get threats.  I mean, I have to

12 tell you, you get threats just being a judge in a video game

13 case.  I mean, it's a crazy, terrible world out there.

14     And I hear you, and I pushed the Defense really hard

15 because I do not want to put your client in that position at

16 all.  I don't.  I don't.  But I feel constrained by the

17 Sixth Amendment and Mr. DePape's right to put on his defense to

18 do it.  And I -- and I do.  And I --

19          MR. SWANSON:  Here's what different, Your Honor:  This

20 is a case with a defendant who has actually, from jail, called

21 the press and said:  I apologize.  I didn't get more of them.

22 I got names and addresses.

23     This is not sort of a vague sense of "I'm being oppressed

24 by someone."  This is someone who has called the press to say

25 "I apologize I didn't get more of them."  And that echos in

1    this world that he is allegedly part of and that my client is

2    seeing the blowback from.

3        And to now have to then show up and be a witness, be named

4    in the press -- because that will happen -- and have that --

5    that one initial disclosure be times ten, times a thousand, is

6    going to have consequences, that, to me --

7             **THE COURT:**  I don't know if it's times a thousand.  I

8    mean, it was disclosed in December.

9             **MR. SWANSON:**  And there have been consequences in my

10   client's life.

11            **THE COURT:**  No, I understand.

12            **MR. SWANSON:**  And, I guess, what I'm saying,

13   Your Honor is, I do think that the Court -- I'm not saying that

14   the Court necessarily can compel the Defense to enter into what

15   seems to me an utterly reasonable stipulation.  If they don't

16   want to do that they don't have to do that.

17       But the Court can say that, in the situation where it

18   would be unreasonable and oppressive to compel a witness to

19   testify and that testimony would be cumulative or not material,

20   that you can quash a subpoena, and they can put in that same

21   evidence, whatever they need, through other means.  But you can

22   say that this is oppressive, and it's not compelling, it's not

23   irrelevant and material, not her testimony.

24            **THE COURT:**  I don't know what the other means is other

25   than your client.  That's the problem.

The other means was a stipulation, but as you just -- I appreciate it -- candidly said, I can't force them to agree to that.  That is what I explored.  That is -- and I'm sorry.  I am sorry because I understand your client is going to be -- and her family -- in distress from now until that day, and after.  And I am sorry about that.  That's why I thought -- I am.

I -- and if I didn't feel like I needed to do it, I wouldn't.  But that is -- that is part of our system.  That is part of our system of justice.  It is what makes us have fair trials -- is we reluctantly bring people here who don't want to be here.

Now, if there was a -- and I understand the general threat; right?  But it's -- and I understand what Mr. DePape did before -- and, actually, we didn't even talk about it, but it's coming into evidence, it wasn't excluded.

And certainly, if something were to happen between now and then to change -- if something else, I could always reconsider; right?  But, at the moment, it's sort of the generalized concern.

**MR. SWANSON:**  I, again, have no way of understanding why her testimony is necessary, because we don't know what the possible basis for that is.  We might feel differently if we knew anything about it.

But, given where things stand, given her utter ignorance of anything about this defendant's guilt or innocence, it is

1    shocking to me that she is going to have to go through this

2    process and the Defense will not agree to something that would

3    spare her that.

4        So I will talk to the parties about ways to minimize the

5    harm that will be occasioned by this.

6        **THE COURT:**  Okay.  All right.  And we -- and then also

7    when to do it.  And -- but I think we're all in agreement,

8    we'll refer to her as "Target 1," or something else; whatever

9    you come up with.

10       **MS. CHUANG:**  That's fine with us.  If they want to

11   present another way to refer to her, we are -- like we've said

12   from the beginning, willing to make all reasonable

13   accommodations to try to minimize --

14       **THE COURT:**  I did another trial with an undercover

15   agent and we just -- they made up a name, and we just even used

16   a different name.  That might even be better, you know,

17   something like that.

18       And to the extent -- well, what I suggested to them is

19   maybe to ease or make it easier, they could talk to you at

20   least, maybe even -- and your client, just to try to shortcut

21   it or ways to get in what they want as quickly as possible.

22       **MR. SWANSON:**  I have suggested that.  I have asked to

23   have a conversation, but we've not had that conversation.  I

24   remain open to it.

25       **MS. CHUANG:**  We would be open to it if there was an

1  understanding that none of this would be relayed to the

2  Government.  So we can discuss amongst ourselves.

3          THE COURT:  I am sure Mr. Swanson would agree to that.

4          MR. SWANSON:  Of course.

5          THE COURT:  So whatever you can do.

6      All right.  So what a privilege to have all of you arguing

7  in front of me today.

8          MS. VARTAIN:  Your Honor, I think that possibly,

9  though, does not end that motion in limine, because the motion

10 was broader than simply Target 1.  And I would like to know

11 what the scope of the Court's ruling is on that motion.

12     For example, if the Defense asks the case agent for, you

13 know, evidence in the case related to Target 1, and the

14 Government objects based off of relevance, do I understand

15 the Court's ruling to be that Target 1 is, in fact, relevant?

16         THE COURT:  So I think -- well, there's a question of

17 relevance, there's a question of hearsay; right?  So in terms

18 of relevance, in terms of my understanding, there was a piece

19 of paper -- right? -- stop me if I shouldn't be saying

20 something.

21         MS. CHUANG:  There is a piece of paper.

22         THE COURT:  I mean, I think we have to --

23         MS. LINKER:  There's a piece of paper.

24         MS. CHUANG:  There's a piece of paper with addresses.

25         THE COURT:  With addresses.  I think, that that should

1    be under seal, of course, the actual addresses, but I do think

2    it's relevant.

3            **MS. VARTAIN:**  Okay.  I suppose we'll also explore some

4    of this, just on the fly, like the questioning of the case

5    agent as to who Target 1 is, their identity, those types of

6    questions.  If the Government objects based off of relevance --

7    well, on relevance grounds, it sounds like -- I'm trying to

8    assess whether the Court has deemed Target 1's identity --

9            **THE COURT:**  I don't know how much I can say here in

10   terms of what they've said.

11       I would say this, that the interview -- right? -- I denied

12   the Defense's motion to put statements in there that are

13   hearsay; right?

14       So I don't think that if a statement is asked of the

15   witness and the answer would be hearsay, it would be offered

16   for the truth, I think that would be a valid objection.

17           **MS. VARTAIN:**  Okay.

18           **THE COURT:**  That's what I would say.

19           **MS. VARTAIN:**  Okay.

20           **THE COURT:**  It may not be relevance.  It may be

21   hearsay.

22           **MS. VARTAIN:**  Okay.

23       The -- there are others, as the Court knows, on the --

24   you know, quote/unquote, target list.

25       Is the Court making a ruling as to -- I think, the

1   defendant was not very clear with the Court as to what the

2   scope of that evidence is.  I'm happy to shed some light on

3   that.

4           **THE COURT:**  Well, I think the question there would be,

5   first:  What is the admissible evidence?

6           **MS. VARTAIN:**  Yes.  I'm -- so the Government has

7   redacted, out of all of our exhibits, mention of other

8   individuals, including Target 1 and the others on the

9   defendant's list.

10          **THE COURT:**  So there was an actual written list?

11          **MS. VARTAIN:**  No.

12          **THE COURT:**  No, there isn't.  That's right.  So

13  there's a list or a plan that was discussed in the interview.

14          **MS. VARTAIN:**  That's --

15          **THE COURT:**  That's hearsay.

16          **MS. VARTAIN:**  That's one source of evidence.

17          **THE COURT:**  Right.

18          **MS. VARTAIN:**  Let me give you another source.

19          **THE COURT:**  Right.

20          **MS. VARTAIN:**  Defendant queried, and the forensic

21  evidence details his queries as to the other targets.  The

22  Government's view is that those other targets are irrelevant,

23  and we have redacted their information -- the queries

24  accordingly.

25          **THE COURT:**  I think they're not irrelevant, but any

**PROCEEDINGS**

1  personal, you know, identifying information, addresses, should

2  be under seal and not -- right?

3       But the jury can know about that, that there were other

4  people that were searched for.

5            **MS. VARTAIN:**  Okay.  Thank you.

6            **MS. CHUANG:**  That's it from us.

7            **MS. VARTAIN:**  One other item.

8       Mr. Swanson referred to the call to the press.  That's the

9  KTVU call.  I think Your Honor just said something relevant to

10  that call, if I heard, Your Honor, correctly, it's that the

11  call is admissible?

12            **THE COURT:**  Yes.

13            **MS. VARTAIN:**  Thank you, Your Honor.

14            **THE COURT:**  Yeah, we didn't discuss it --

15            **MS. CHUANG:**  That was within one of the motions of the

16  Government's that you granted; right?

17            **THE COURT:**  Yeah.

18            **MS. VARTAIN:**  And --

19            **THE COURT:**  It's prejudicial, just not unduly.

20            **MS. VARTAIN:**  I'm sorry?

21            **THE COURT:**  It's not unduly prejudicial.

22            **MS. VARTAIN:**  Thank you.  I understand that the

23  parties should meet and confer about any statements from

24  additional parts of the defendant's statements that the Defense

25  would like to introduce.  I would anticipate that we may need a

 1  hearing in advance of trial to cover those to the extent that

 2  there's dispute.

 3      Should we reach out if there is dispute and schedule that,

 4  or should we schedule one now?

 5          THE COURT:  Well, we have one for November 3rd at

 6  10:00 a.m.  It's a further pretrial to talk about whatever we

 7  need to talk about.

 8          MS. VARTAIN:  Your Honor, the syncing process is

 9  extremely burdensome, and I think, to the extent we could

10  schedule before then, it would be enormously helpful to the

11  Government.

12          MS. CHUANG:  When would you like to --

13          MS. VARTAIN:  Well, if we met and conferred, today,

14  tomorrow, and had something earlier next week -- I'm sorry.

15  Let me just pull up the calendar.

16      I have an actual hard copy calendar.

17      I think just the 3rd is too soon?  Even, like, the 31st

18  would be better.

19          THE COURT:  Would the 1st work?

20          MS. VARTAIN:  Yes.  Thank you, Your Honor.  That would

21  be much better for the Government.

22          MS. CHUANG:  That works.  We could do it early in the

23  morning, so that if we do get the questionnaires in, it

24  doesn't -- we can start reviewing them immediately.

25          THE COURT:  We have a regular calendar at 10.  Do you

**PROCEEDINGS**

1   want to do it at -- I don't know what time they can bring --

2   Mr. DePape gets here.

3          **MS. CHUANG:**  Maybe 9:30.

4          **THE COURT:**  Ms. Means, does that work, 9:30 on the

5   1st?

6          **MS. VARTAIN:**  Yes, that's fine.  Thank you, Your

7   Honor.

8          **MR. SWANSON:**  Thank you, Your Honor.

9      Just one other thought, in light of what Ms. Vartain said.

10     I just want to alert the Court to the possibility that,

11  should evidence come in during the Government's case that

12  changes the balance here, we may want to revisit this issue

13  before the Defense case.

14         **THE COURT:**  Absolutely.  Everything that we've

15  discussed today can be revisited.  Everything.

16         **MR. SWANSON:**  Thank you.

17         **THE COURT:**  Okay.  Thank you.

18         **MS. VARTAIN:**  Thank you.

19         **MS. CHUANG:**  Thank you.

20             (Proceedings adjourned at 3:36 p.m.)

21                     ---o0o---

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Sunday, October 29, 2023

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court