**Volume 2**

**Pages 201 - 421**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|             Plaintiff,    ) | |
|   VS.                   ) | **NO. CR 22-00426-JSC** |
| DAVID WAYNE DEPAPE,        ) | |
|             Defendant.    ) | |
| _____ ) | |

San Francisco, California
Thursday, November 9, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                          ISMAIL J. RAMSEY
                          United States Attorney
                          450 Golden Gate Avenue
                          San Francisco, California 94102
           BY:  **LAURA E. VARTAIN**
                  **HELEN L. GILBERT**
                  **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

                          JODI H. LINKER
                          Federal Public Defender
                          450 Golden Gate Avenue
                          San Francisco, California 94102
           BY:  **JODI H. LINKER**
                  **ANGELA CHUANG**
                  **TODD M. BORDEN**
                  **ASSISTANT FEDERAL PUBLIC DEFENDERS**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
               Official Reporter, CSR No. 12219

```
 1   APPEARANCES:   (CONTINUED)

 2   Also present:        Maddi Wachs, Paralegal
                          Special Agent Stephanie Minor
 3                        Sheree Cruz-Laucirica, Paralegal
                          Catherine Goulet, Defense Investigator
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# I N D E X

Thursday, November 9, 2023 - Volume 2

|  | **PAGE** | **VOL.** |
|---|---|---|
| Preliminary Jury Instructions | 223 | 2 |
| Opening Statement by Ms. Vartain | 232 | 2 |
| Opening Statement by Ms. Linker | 239 | 2 |

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|

**WILLMES, KOLBY**

| (SWORN) | 252 | 2 |
|---|---|---|
| Direct Examination by Ms. Vartain | 252 | 2 |
| Cross-Examination by Ms. Chuang | 269 | 2 |

**CAGNEY, KYLE**

| (SWORN) | 282 | 2 |
|---|---|---|
| Direct Examination by Ms. Vartain | 283 | 2 |
| Cross-Examination by Ms. Linker | 286 | 2 |

**NAJARRO, ALEJANDRO**

| (SWORN) | 297 | 2 |
|---|---|---|
| Direct Examination by Ms. Gilbert | 297 | 2 |
| Cross-Examination by Ms. Chuang | 310 | 2 |

**HURLEY, CARLA**

| (SWORN) | 321 | 2 |
|---|---|---|
| Direct Examination by Ms. Gilbert | 322 | 2 |
| Cross-Examination by Ms. Chuang | 353 | 2 |

**DEMKOWSKI, TRACY**

| (SWORN) | 371 | 2 |
|---|---|---|
| Direct Examination by Ms. Gilbert | 371 | 2 |
| Cross-Examination by Ms. Chuang | 396 | 2 |

**O'CONNOR, LYN**

| (SWORN) | 401 | 2 |
|---|---|---|
| Direct Examination by Ms. Vartain | 402 | 2 |
| Cross-Examination by Ms. Linker | 415 | 2 |

| | **E X H I B I T S** | | | |
|---|---|---|---|---|
| **TRIAL EXHIBITS** | | **IDEN** | **EVID** | **VOL.** |
| 1 | | | 212 | 2 |
| 2 | | | 212 | 2 |
| 3 | | | 212 | 2 |
| 4 | | | 212 | 2 |
| 5 | | | 212 | 2 |
| 6 | | | 212 | 2 |
| 7 | | | 212 | 2 |
| 8 | | | 212 | 2 |
| 26 | | | 212 | 2 |
| 27 | | | 212 | 2 |
| 28 | | | 212 | 2 |
| 30 | | | 212 | 2 |
| 33 | | | 212 | 2 |
| 38 | | | 212 | 2 |
| 42 | | | 212 | 2 |
| 43 | | | 212 | 2 |
| 59 | | | 212 | 2 |
| 61 | | | 212 | 2 |
| 75 | | | 212 | 2 |
| 76 | | | 212 | 2 |
| 78 | | | 212 | 2 |
| 79 | | | 212 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 84 | | 212 | 2 |
| 89 | | 212 | 2 |
| 90 | | 212 | 2 |
| 95 | | 212 | 2 |
| 96 | | 212 | 2 |
| 104 | | 212 | 2 |
| 106 | | 212 | 2 |
| 107 | | 212 | 2 |
| 109 | | 212 | 2 |
| 110 | | 212 | 2 |
| 115 | | 212 | 2 |
| 117 | | 212 | 2 |
| 118 | | 212 | 2 |
| 123 | | 212 | 2 |
| 124 | | 212 | 2 |
| 125 | | 212 | 2 |
| 126 | | 212 | 2 |
| 127 | | 212 | 2 |
| 132 | | 212 | 2 |
| 135 | | 212 | 2 |
| 160 | | 212 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 161 | | 212 | 2 |
| 162 | | 212 | 2 |
| 163 | | 212 | 2 |
| 164 | | 212 | 2 |
| 165 | | 212 | 2 |
| 166 | | 212 | 2 |
| 167 | | 212 | 2 |
| 168 | | 212 | 2 |
| 169 | | 212 | 2 |
| 170 | | 212 | 2 |
| 171 | | 212 | 2 |
| 172 | | 212 | 2 |
| 173 | | 212 | 2 |
| 174 | | 212 | 2 |
| 175 | | 212 | 2 |
| 176 | | 212 | 2 |
| 177 | | 212 | 2 |
| 178 | | 212 | 2 |
| 179 | | 212 | 2 |
| 180 | | 212 | 2 |
| 181 | | 212 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 182 | | 212 | 2 |
| 183 | | 212 | 2 |
| 184 | | 212 | 2 |
| 185 | | 212 | 2 |
| 186 | | 212 | 2 |
| 187 | | 212 | 2 |
| 188 | | 212 | 2 |
| 189 | | 212 | 2 |
| 190 | | 212 | 2 |
| 191 | | 212 | 2 |
| 192 | | 212 | 2 |
| 193 | | 212 | 2 |
| 194 | | 212 | 2 |
| 195 | | 212 | 2 |
| 196 | | 212 | 2 |
| 197 | | 212 | 2 |
| 198 | | 212 | 2 |
| 199 | | 212 | 2 |
| 200 | | 212 | 2 |
| 201 | | 212 | 2 |
| 202 | | 212 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 203 | | 212 | 2 |
| 204 | | 212 | 2 |
| 205 | | 212 | 2 |
| 206 | | 212 | 2 |
| 207 | | 212 | 2 |
| 208 | | 212 | 2 |
| 209 | | 212 | 2 |
| 210 | | 212 | 2 |
| 211 | | 212 | 2 |
| 212 | | 212 | 2 |
| 213 | | 212 | 2 |
| 214 | | 212 | 2 |
| 215 | | 212 | 2 |
| 216 | | 212 | 2 |
| 217 | | 212 | 2 |
| 218 | | 212 | 2 |
| 219 | | 212 | 2 |
| 220 | | 212 | 2 |
| 221 | | 212 | 2 |
| 222 | | 212 | 2 |
| 223 | | 212 | 2 |

**<u>I N D E X</u>**

**<u>E X H I B I T S</u>**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 224 | | 212 | 2 |
| 225 | | 212 | 2 |
| 226 | | 212 | 2 |
| 227 | | 212 | 2 |
| 314 | | 212 | 2 |
| 315 | | 212 | 2 |
| 316 | | 212 | 2 |
| 320 | | 212 | 2 |
| 569 | | 400 | 2 |

<u>**Thursday - November 9, 2023**</u>                                    <u>**8:17 a.m.**</u>

P R O C E E D I N G S

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE CLERK:** All rise.  This Court is now this session,
the Honorable Jacqueline Scott Corley presiding.

**THE COURT:** Good morning.  You may be seated.

I just wanted to check if there was anything we need to do
before we begin this morning.

**MS. VARTAIN:** Yes, Your Honor.  A few items.  A couple
housekeeping items first.  We had talked with the Court about
preadmitting exhibits, and we were hoping to do that now.

**MS. CHUANG:** And that's fine with us.  We are
objecting to one exhibit.  We can take that up after.

**THE COURT:** All right.  So why don't you list all the
exhibits to which there is no objection.

**MS. GILBERT:** And, Your Honor, there are
two stipulations the parties entered regard the authenticity of
the exhibits we'd like to move to admit, and I'd like to read
those into the record at this time.

**THE COURT:** Please do.

**MS. GILBERT:** The first is at Docket 152.  It's a
stipulation regarding San Francisco Department of Emergency
Management Records.  And it states (as read):

"It is hereby stipulated and agreed between

**PROCEEDINGS**

1          plaintiff, the United States of America, by its

2          undersigned counsel and Defendant David DePape by his

3          undersigned counsel on follows:

4               "The following trial exhibits are relevant as

5          determined by Federal Rule of Evidence 401 and

6          authentic as determined by Federal Rule of

7          Evidence 901(a).  The parties preserve other possible

8          objections to the admissibility of the underlying

9          contents of these exhibits including objections under

10         Rule 403, 801, and 802.  The two exhibits are

11         Exhibit 1 and Exhibit 316.  It is so stipulated and

12         agreed."

13              The second stipulation is at Docket 148.  It's a

14    stipulation regarding chain of custody of physical evidence (as

15    read):

16              "It is hereby stipulated and agreed between

17         plaintiff and the United States of America by its

18         undersigned counsel and Defendant David DePape but

19         his undersign counsel as follows:

20              "The exhibits noted in the stipulation are

21         relevant as determined by Federal Rule of

22         Evidence 401 and authentic as determined by Federal

23         Rule of Evidence 901(a).  The Defendant does not

24         contest the chain of custody for any of the exhibits

25         noted herein."

PROCEEDINGS

1          This includes Exhibit 170, Exhibit 268, and then a

2   long list of exhibits from 160 through 237 and also

3   Exhibit 320.

4      At this time the Government moves to admit the following

5   exhibits:  1, 3 -- excuse me.

6      1, 2, 3, 4, 5, 6, 7, 8, 26, 27, 28, 30, 33, 38, 42, 43,

7   59, 61, 75, 76, 78, 79, 84, 89, 90, 95, 96, 104, 106, 107, 109,

8   110, 115, 117, 118, 119, 123, 124, 125, 126, 127, 132, 135, 160

9   through 227, 314, 315, 316, 318, and 320.

10          THE COURT:  Okay.  And to those, the Defense has no

11   objection.

12          MS. CHUANG:  Except as to 318.  So every other exhibit

13   we have no objection.  318 is the one we're objecting to.

14          THE COURT:  So all except 318 admitted.

15      (Trial Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 26, 27, 28, 30,

16   33, 38, 42, 43, 59, 61, 75, 76, 78, 79, 84, 89, 90, 95, 96,

17   104, 106, 107, 109, 110, 115, 117, 118, 119, 123, 124, 125,

18   126, 127, 132, 135, 160 through 227, 314, 315, 316, and 320.

19   received in evidence.)

20          THE COURT:  The first time you -- and my

21   understanding, as we discussed pretrial, is the Government will

22   be using all of these exhibits.

23          MS. GILBERT:  That's correct, Your Honor.

24      But 318 is in our opening, so we'd like to take that up

25   right now.

1    **THE COURT:**  Okay.  So we'll do that.  And the first

2    time you use one, I will tell the jury that the parties, to

3    save time, have worked together and admitted a number of

4    exhibits in advance.  Okay.

5        So 318 is a slow version of body-worn camera.

6        **MS. GILBERT:**  Yes, Your Honor.  318 is 2 seconds

7    slowed down from Exhibit 3, which the Defense does not object

8    to admitting.  It is a slowed-down version of the assault on

9    Mr. Pelosi.  Instead of playing it slow, in order to facilitate

10   the audiovisual capacity of all of us, we made it into a

11   separate exhibit.  But the content the Defense does not object

12   to, and there's no sound in 318.  It's silent.

13       **THE COURT:**  Okay.

14       **MS. CHUANG:**  But we object to it.  It is an altered

15   video.  Slowing it down is a form of enhancing a video.  The

16   sponsoring witness I expect the Government will call to try to

17   authenticate it will be Officer Cagney whose body cam it was.

18       He can only authenticate regular speed video because

19   that's what he perceived.  So unless he perceived it in slow

20   motion as it happened, he actually can't authenticate a

21   slowed-down version of body cam footage.

22       So we received the slowed-down video extremely late.  We

23   got it two-and-a-half days before the pretrial conference,

24   which was months after the discovery cut-off date of August

25   15th --

PROCEEDINGS

1        **THE COURT:**  But it's the same evidence.  It's just

2   slowed down.  But you got it long before today.

3        **MS. CHUANG:**  Well, Your Honor, the problem is that

4   they will not have a witness that can properly authenticate

5   that the slowed -- what process was used to slow it down and to

6   testify about how that would alter the actual contents.

7        And there are several circuits who have ruled that in

8   situations where the Government is trying to introduce enhanced

9   video like this -- right? -- it has to be properly

10  authenticated generally by the analyst who did the slow-down

11  process, who can testify about the process and whether it was

12  reliable or not.

13       That's not evident here.  We don't have any information

14  about who did it, how it was done, when it was done.

15       Sorry.  There's a bug.

16       And certainly, it doesn't appear -- we've gotten no expert

17  disclosure about any type of video or audiovisual expert who

18  would be able to testify to that.

19       **THE COURT:**  I don't know that you need an expert, but

20  do you have a witness who would testify as to how it was done?

21       **MS. GILBERT:**  Your Honor, I think our case agent is

22  very familiar with it and has played the video at that slow

23  speed and can testify this is the same as the other video,

24  but --

25       **THE COURT:**  Who slowed it down?

**PROCEEDINGS**

1      **MS. GILBERT:**  It was a member of our staff, but I

2    think it's -- it's not -- I think, first, the Defense has had

3    this video for a month and a half and has not raised a single

4    objection until now.

5       We have done -- we have -- we gave it to them early in the

6    process, and I think it's -- I think, at this point, it's --

7    we've given them our exhibit list with the sponsoring witnesses

8    months ago, and I think that they could have raised this much

9    earlier.

10       **THE COURT:**  When did you tell them that it was going

11    to be in your opening?

12       **MS. CHUANG:**  Just now.

13       **MS. GILBERT:**  Just now.

14       But, Your Honor, I think we can -- we can adjust for the

15    opening.

16       **THE COURT:**  Sure.  Can you not use it in the opening

17    and then I can address it when -- look at the case law and the

18    like?

19       **MS. GILBERT:**  I think that's fine, Your Honor.

20       **THE COURT:**  Okay.  Why don't we do that.  So let's not

21    use it in the opening.  I won't admit it yet, and we'll take it

22    up later.

23       **MS. CHUANG:**  I do have some citations for when the

24    Court looks at the case law about it.

25       **THE COURT:**  Okay.

1          **MS. CHUANG:**  So I can just read those now for you.

2      So *Roberts* is a Sixth Circuit case from this year.  It's

3  awaiting an "F.4th" citation, but right the Westlaw citation is

4  2023WL6814956.  And then -- it's either "Sy-fert" or

5  "Sef-fert," S-E-I-F-E-R-T.  This is an Eighth Circuit case from

6  2006, 445 F.3d 1043.

7      And then *Carbone*, C-A-R-B-O-N-E, a First Circuit case from

8  1986, 798 F.2d 21.

9      And then a district court case from -- a couple district

10  court cases.  One is *Gomez v. Fachko*, F-A-C-H-K-O,

11  2021WL5630623.  This is a -- from our district, actually, in

12  2001 with Judge Koh.

13      *Hernandez v. City of LA*, 2022WL16551705.  That's CD Cal

14  2022.

15      Then one final district court case.  *Snyder v. Tiller*,

16  2010WL3522580.  This is from the Northern District of Indiana

17  in 2010 and speaks, actually, directly to the issue with a

18  slowed-down video.

19          **THE COURT:**  Okay.  Now, you have those, your brain

20  trust can work on it during the day; and at the end of the day,

21  just let me know how you want to address it and when.

22          **MS. GILBERT:**  Thank you, Your Honor.  We have one more

23  thing that Ms. Vartain will address.

24          **MS. VARTAIN:**  As the Court will recall, we had taken

25  up the topics of Defendant's prior statements in a continued

1   pretrial conference.  At the time, or before that, the

2   Government had asked that we take up any statements that the

3   Defendant wanted to include from his statement.  We didn't do

4   that at that time, I don't think.

5       The witness who will be offering that recorded interview

6   will testify today.  And if my recollection serves me

7   correctly, the Court had asked that we take up this morning --

8   the morning that that witness was going to testify any portions

9   of the defendant's own statement that he would like to admit

10  through this witness.

11          **THE COURT:**  I thought we already did that

12  subsequently, that they -- we had another conference and they

13  raised certain statements, some of which I allowed and some of

14  which I did not.

15          **MS. CHUANG:**  Those are the statements under the rule

16  of completeness.  We also indicated in our filing prior to that

17  hearing that we may also seek to admit additional statements

18  that he made for non-hearsay purposes, so that was not

19  addressed.

20          **THE COURT:**  I see.  Okay.  All right.  So let me pull

21  it up.

22      Can you give me the docket number of the statement?

23          **MS. CHUANG:**  Yes.  I think it was originally filed

24  under seal at 99-1 -- is the transcript of the interview that

25  we'll be talking about.

PROCEEDINGS

1          **MS. VARTAIN:**  Your Honor, while you're finding it, I

2     will add that we did meet and confer about it a while ago.  I

3     don't know, standing here now, whether the statements we met

4     and conferred about are the statements that the defendant is

5     going to want to offer or if there are others.

6          **THE COURT:**  Okay.

7          **MS. CHUANG:**  I can go through them right now.

8          **THE COURT:**  All right.

9          **MS. CHUANG:**  So, I don't anticipate actually putting

10    in additional recorded portions of the interview, but during

11    cross-examination, eliciting from the officer who interviewed

12    him, additional statements that he said to her.

13    So the first --

14          **MS. VARTAIN:**  I'm sorry.  Can I just ask:  What is the

15    difference between putting them in and eliciting?

16    What I'm trying to -- what I want to understand is, is the

17    jury -- is the effort to have the jury have portions of his own

18    words from the statement or simply to ask the lieutenant

19    whether she heard him say something?

20          **THE COURT:**  I think it's the latter.

21          **MS. CHUANG:**  Right.  It's the latter.

22          **THE COURT:**  Okay.

23          **MS. CHUANG:**  So the first -- but I can point to the

24    portions of the transcripts that these statements are coming

25    from.

 1          So the first would be from page 24.

 2          THE COURT:  Is that ECF 24 or transcript 24?

 3          MS. CHUANG:  Transcript 24.

 4          THE COURT:  Okay.

 5          MS. CHUANG:  And these statements are made between

 6  lines 12 and 17.  But we would not be offering these statements

 7  for the truth of what's actually being asserted here, but

 8  merely to show what Mr. DePape's beliefs were and his

 9  motivation.  So we're not trying to prove the truth of any of

10  these statements.

11          MS. VARTAIN:  Your Honor, first of all, I'd like to

12  know the basis that -- I mean, is this a non-hearsay just

13  simply because it's not for the truth?  I think --

14          THE COURT:  That would make it non-hearsay.

15          MS. VARTAIN:  It sounds to me like this is his state

16  of mind, frankly.  This is more 8033 than non-hearsay.

17          THE COURT:  But it's not hearsay if it's not being

18  offered for the truth; right?  So what would be the objection

19  then to asking the witness if that's -- if that was said?  In

20  other words --

21          MS. VARTAIN:  I think it's for the truth that he

22  believed it, Your Honor.

23          MS. CHUANG:  That's not what's asserted.

24          THE COURT:  That's not the truth, though.  It's

25  definitely not being offered for the truth -- right? -- that

 1   what he said was true.

 2           MS. VARTAIN:  I'm sorry.  I'm just trying to read the

 3   section in context for a moment so I can see where we're at.

 4                   (Pause in proceedings.)

 5           MS. VARTAIN:  Okay.

 6           THE COURT:  Okay.  All right.

 7           MS. VARTAIN:  But only lines 12 through 17 is what I

 8   understand; is that correct?

 9           MS. CHUANG:  Oh, of this.  That's the first part.

10           MS. VARTAIN:  I understand.

11           MS. CHUANG:  Right.

12      And then, transcript page 5510.

13           THE COURT:  One second.

14      Ms. Means, is the jury all here yet?

15           THE CLERK:  Yes.

16           THE COURT:  They are all here.

17           MS. CHUANG:  We could take this up at a different

18   time, too.

19           THE COURT:  Can we do it at the break?  She won't be

20   on cross, do you think, before 10:00 a.m.?

21           MS. VARTAIN:  No, she would not.

22           THE COURT:  So why don't -- and maybe if you have a

23   chance, you can hand -- someone on your team can hand a piece

24   of paper to the Government while we're going, what they are, so

25   they can look at it, and then at the break, we'll be ready to

**PROCEEDINGS**

1    go like that.

2              MS. VARTAIN:  Thank you, Your Honor.

3              MS. CHUANG:  Okay.  Yeah.  I have one final thing to

4    bring up.  I don't know if we'll break before the first witness

5    which is why I think I should bring this up now.

6         So we anticipate that three of the officers testifying

7    today -- they were three of the responding officers on the

8    scene -- are going to -- that the Government will try to elicit

9    from them that the breathing noises they heard was something

10   called agonal breathing.

11        That is a technical medical term.  None of these officers

12   are medical experts, and they haven't been noticed as any type

13   of medical expert.  So we would move to preclude them from

14   using such a technical medical term that they're not qualified

15   to offer an opinion on.  They're not experts, and it's outside

16   a normal layperson's knowledge about what exactly this is.

17        Certainly, they could testify what it sounded like in less

18   technical terms, but to call it agonal breathing, I think,

19   would require more of a foundation and expert testimony.

20             MS. VARTAIN:  We will lay the foundation they are all

21   trained and each one of them recognized it precisely as agonal

22   breathing.

23             THE COURT:  I'll allow it.  I don't see why that

24   wouldn't fall necessarily into their expertise.

25             MS. CHUANG:  Well, because they're not noticed as

**PROCEEDINGS**

 1  experts.  We have no idea --

 2       THE COURT:  No.  As a lay witness.  Lay witnesses can

 3  testify as to what they know, if that's what they know because

 4  that's what they have been trained to -- to testify.  I mean,

 5  then they can testify to it.  She'll have to lay the foundation

 6  with it.

 7       MS. CHUANG:  Right.  And we don't have full

 8  information about what -- their supposed qualifications for

 9  this.

10       THE COURT:  She'll have to lay the foundation for it.

11       MS. CHUANG:  Right.  And we object to that.  They're

12  simply not qualified to give that type of testimony.

13       THE COURT:  I don't know because I haven't seen the

14  foundation.  We'll see.  She'll have to lay the foundation, but

15  I don't know necessarily why a police officer couldn't be

16  trained to recognize something.  And in the training, it's

17  called a name.

18       Anyway, okay.

19       All right.  So -- but if you don't think they've laid the

20  foundation, then you can object.

21       MS. VARTAIN:  Your Honor, just a quick reminder that

22  after openings, the Government will enter a stipulation and

23  then play Exhibit 1, which is the 9-1-1 call, prior to any

24  witness testimony.

25       THE COURT:  Okay.

PRELIMINARY JURY INSTRUCTIONS

```
 1              MS. VARTAIN:  Thank you.

 2              THE COURT:  All right.  Thank you.  We'll go get

 3    the -- yes, Ms. Linker.

 4         Into the microphone.

 5              MS. LINKER:  Your Honor, it's my understanding in

 6    between -- after the Government's opening, we're going to need

 7    a moment to readjust the podium.  They don't want it adjusted,

 8    and we'll just need a moment in between.

 9              THE COURT:  Of course.

10              MS. LINKER:  Thank you.  All right.

11              MS. VARTAIN:  Thank you.

12              THE COURT:  The jury is on their way.

13         I think there's still some room in the courtroom, if you

14    want to let them in.

15              THE CLERK:  All rise for the jury, please.

16                   (The jury enters the courtroom.)

17    (Proceedings were heard in the presence of the jury.)

18              PRELIMINARY JURY INSTRUCTIONS

19              THE COURT:  You may be seated.

20         Good morning, members of the jury.  Welcome back.  Thank

21    you for being so prompt.

22         As I told you on Monday, you are now the jurors in this

23    case, and I'm going to take a few minutes before I begin to

24    tell you a few things about your duties as jurors and give you

25    some preliminary instructions.
```

**PRELIMINARY JURY INSTRUCTIONS**

1    At the end of the trial, I'm going to give you some more

2 detailed, written instructions, and you'll have those

3 instructions with you for your deliberations.

4    But before I do that, as I emphasized on Monday, it's

5 important for you to decide the case solely on the evidence

6 that you receive here in the courtroom.  And so you must not

7 learn any additional information about the case from sources

8 outside the courtroom.

9    If you think, in the past two days, that you might have

10 heard some outside information since you left the courtroom,

11 even inadvertently, could you please raise your hand.

12                    (No response.)

13    **THE COURT:**  Great.  You're all on a news blackout.

14 Terrific.

15    If at any time there's something you'd wish to talk

16 privately with me, just let Ms. Means know, and we can do that

17 as well.

18    Now, let's get back to your duties.  When you deliberate,

19 it'll be your duty to weigh and evaluate all of the evidence

20 received in the case and, in that process, to decide the facts.

21 To the facts as you find them, you will apply the law as I give

22 it to you, whether you agree with the law or not.

23    You must decide the case solely on the evidence and the

24 law before you.

25    Perform these duties fairly and impartially.  You should

**PRELIMINARY JURY INSTRUCTIONS**

1  not be influenced by any person's race, color, religious

2  beliefs, national ancestry, sexual orientation, gender

3  identity, gender or economic circumstances.

4       Also, do not allow yourself to be influenced by personal

5  likes or dislikes, sympathy, prejudice, fear, public opinion,

6  or biases, including unconscious biases.  Unconscious biases

7  are stereotypes, attitudes, or preferences that people may

8  consciously reject but may be expressed without conscious

9  awareness, control, or intention.  Like conscious bias,

10  unconscious bias can affect how we evaluate information and

11  make decisions.

12       This is a criminal case brought by the United States

13  Government.  The Government charges the defendant with

14  attempting to kidnap Congresswoman Nancy Pelosi in violation of

15  federal law, Title 18, United States Code Section 1201(d), and

16  with assaulting Paul Pelosi with a dangerous weapon in

17  violation of federal law, Title 18, United States Code

18  Section 115(a)(1)(A).

19       The charges against the defendant are in what we call an

20  indictment.  The indictment simply describes the charges the

21  Government brings against the defendant.

22       The indictment is not evidence and does not prove

23  anything.  Mr. DePape, the defendant, has pleaded not guilty to

24  the charges and is presumed innocent unless and until the

25  Government proves Mr. DePape guilty beyond a reasonable doubt.

**PRELIMINARY JURY INSTRUCTIONS**

1    In addition, the defendant has the right to remain silent
2  and never has to prove innocence or present any evidence.

3    To help you follow the evidence, I will now give you a
4  brief summary of the elements of the crimes the Government must
5  prove to make its case.

6    The elements of the crime of attempting to kidnap
7  Congresswoman Nancy Pelosi are:  First, the defendant intended
8  to seize, confine, kidnap, abduct, or carry away and hold a
9  federal officer against her will, on account of or during the
10  performance of her official duties; and, second, the defendant
11  did something that was a substantial step toward committing the
12  crime.

13    The elements of the crime of assaulting Paul Pelosi are:
14  First, the defendant forcibly assaulted a member of the
15  immediate family of a United States official; second, the
16  defendant did so with intent to impede, intimidate, interfere
17  with, or retaliate against the federal official while she was
18  engaged in or on account of the performance of her official
19  duties; and, third, the defendant used a dangerous weapon.

20    The evidence you are to consider in deciding what the
21  facts are consists of, first, the sworn testimony of any
22  witness; second, the exhibits that are received in evidence;
23  and third, any facts to which the parties agree.

24    The following things are not evidence, and you must not
25  consider them as evidence in deciding the facts of this case:

**PRELIMINARY JURY INSTRUCTIONS**

1    First, statements and arguments of the attorneys; second,

2   questions and objections of the attorneys; third, testimony

3   that I instruct you to disregard; and fourth, anything you may

4   see or hear when the court is not in session, even if what you

5   see or hear is done or said by one of the parties or one of the

6   witnesses.

7    Evidence may be direct or circumstantial.  Direct evidence

8   is direct proof of a fact, such as testimony by a witness about

9   what that witness personally saw or heard or did.

10    Circumstantial evidence is indirect evidence that is,

11   proof of one or more facts from which one can find another

12   fact.

13    You are to consider both direct and circumstantial

14   evidence.  Either can be used to prove any fact.  The law makes

15   no distinction between the weight to be given to either direct

16   or circumstantial evidence.  It is for you to decide how much

17   weight to give to any evidence.

18    There are rules of evidence that control what can be

19   received into evidence.  When a lawyer asks a question or

20   offers an exhibit in evidence and a lawyer on the other side

21   thinks that it is not permitted by the rules of evidence, that

22   lawyer may object.

23    If I overrule the objection, the question may be answered

24   or the exhibit received.  If I sustain the objection, the

25   question cannot be answered or the exhibit cannot be received.

**PRELIMINARY JURY INSTRUCTIONS**

1   Whenever I sustain an objection to a question, you must ignore

2   the question and not guess what the answer would have been.

3      Sometimes I may order that evidence be stricken from the

4   record and that you disregard or ignore the evidence.  That

5   means, when you are deciding the case, you must not consider

6   the evidence that I told you to disregard.

7      In deciding the facts in this case, you may have to decide

8   which testimony to believe and which testimony not to believe.

9      You may believe everything a witness says, or part of it,

10  or none of it.

11     In considering the testimony of any witness, you may take

12  into account:  First, the witness's opportunity and ability to

13  see or hear or know the things testified to; second, the

14  witness's memory; third, the witness's manner while testifying;

15  fourth, the witness's interest in the outcome of the case, if

16  any; fifth, the witness's bias or prejudice, if any; sixth,

17  whether other evidence contradicted the witness's testimony;

18  seventh, the reasonableness of the witness's testimony in light

19  of all the evidence; and eighth, any other factors that bear on

20  believability.

21     You must avoid bias, conscious or unconscious, based on a

22  witness's race, color, religious beliefs, national ancestry,

23  sexual orientation, gender identity, gender, or economic

24  circumstances in your determination of credibility.

25     The weight of the evidence as to a fact does not

1  necessarily depend on the number of witnesses who testify about

2  it.  What is important is how believable the witnesses are and

3  how much weight you think the testimony deserves.

4       I will now, again, say a few words about your conduct as

5  jurors.  First, it is important you keep an open mind

6  throughout the trial and do not decide what the verdict should

7  be until you and your fellow jurors have completed your

8  deliberations at the end of the case.

9       Second, because you must decide this case based only on

10  the evidence received in the case and on my instructions as to

11  the law that applies, you must not be exposed to any other

12  information about the case or the issues it involves during the

13  course of your jury duty.  Thus, until the end of the case,

14  unless I tell you otherwise, do not communicate with anyone in

15  any way, and do not let anyone else communicate with you in any

16  way about the merits of the case or anything to do with it.

17       This restriction includes discussing the case in person,

18  in writing, by old-fashioned telephone, by computer, by text,

19  or app.

20       This restriction also applies to communicating with your

21  fellow jurors during the case.  So on your breaks, do not

22  discuss this case with your fellow jurors until -- at the end

23  of the case, when I order you to do so for your deliberations.

24       This restriction, of course, applies to communicating with

25  everyone else including your family members, your employer, the

**PRELIMINARY JURY INSTRUCTIONS**

 1  media, the people involved in the trial.  If you are asked or

 2  approached in any way about your jury service or anything about

 3  the case before you have been excused as a juror, you must

 4  respond that you have been ordered not to discuss the matter.

 5  In addition, you must report the contact to the Court.

 6      And as I emphasized on Monday, do not do any research such

 7  as consulting dictionaries, searching the Internet, or using

 8  other reference materials, and do not make any investigation or

 9  in any other way try to learn about the case on your own.  And

10  this includes any research involving the parties and the

11  witnesses involved.

12      These rules protect each party's right to have this case

13  decided only on evidence that has been presented here in court.

14      Witnesses here in court take an oath to tell the truth,

15  and the accuracy of their testimony is tested through the trial

16  process.  If you do any research or investigation outside the

17  courtroom or gain any information through improper

18  communications, your verdict may be influenced by inaccurate,

19  incomplete, or misleading information that has not been tested

20  by the trial process.

21      Each of the parties is entitled to a fair trial by an

22  impartial jury and if you decide the case based on information

23  not presented in court, you will have denied the parties a fair

24  trial.

25      And remember, you have taken an oath to follow the rules,

1  and it is very important that you follow these rules.

2      Any juror who violates these restrictions jeopardizes the

3  fairness of these proceedings and a mistrial could result that

4  would require the entire trial to start over.  If any juror is

5  exposed to any outside information, please notify the Court

6  immediately.

7      At the end of the trial, you will have to make your

8  decision based on what you recall of the evidence.  You will

9  not have a written transcript of the trial so I urge you to pay

10  close attention to the testimony as it is given.

11      Now, if you wish, you may take notes to help you remember

12  the evidence.  If you do take notes, please keep them to

13  yourself until you and your fellow jurors go to the jury room

14  to decide the case.

15      Do not let note-taking distract you from being attentive.

16  When you leave the Court for recesses and for the day, your

17  notes should be left in the jury room.  No one will read your

18  notes.

19      Whether or not you take notes, you should rely on your own

20  memory of the evidence.  Notes are only to assist your memory.

21  You should not be overly influenced by your notes or those of

22  your fellow jurors.

23      Only the lawyers and I are allowed to ask questions of the

24  witnesses.  A juror is not permitted to ask questions of

25  witnesses.  If, however, you are unable to hear a witness or a

1    lawyer or to see an exhibit on the screens in front of you,

2    please raise your hand and let us know.

3        The next phase of the trial will now begin.  First, each

4    side may make an opening statement.  An opening statement is

5    not evidence, it is simply on outline to help you understand

6    what the party expects the evidence will show.  A party is not

7    required to make an opening statement.

8        The Government will then present evidence and counsel for

9    the defendant may cross-examine.  Then, if the defendant

10   chooses to offer evidence, counsel for the Government may

11   cross-examine.

12       After all the evidence has been presented, I will instruct

13   you on the law that applies to the case and the attorneys will

14   make closing arguments; and after that, you will go to the jury

15   room to deliver -- deliberate on your verdict.

16       All right.  Thank you.

17       And we'll begin with the Government's opening statement.

18       **MS. VARTAIN:**  Thank you, Your Honor.  If the Court

19   could give me one moment to get set up, please.

20       **THE COURT:**  Of course.

21       **MS. VARTAIN:**  Thank you.

22                   (Pause in proceedings.)

23                   **OPENING STATEMENT**

24       **MS. VARTAIN:**  Defendant David DePape broke into the

25   Speaker of the House of Representatives' home, Nancy Pelosi's

1   home, where she lived with her husband Paul, using this hammer

2   to shatter glass.

3        You will hear that the defendant from -- in his own words,

4   that the defendant considered Nancy Pelosi evil, a liar, and

5   leader of the pack.

6        When the defendant broke into the Speaker's home, he had a

7   plan.  It was a violent plan.  He planned to kidnap Nancy

8   Pelosi, to hold her hostage, to break her kneecaps, to teach

9   her a lesson.

10       The speaker was not home; her husband, Paul, was home.

11  Also not home were the Capitol Police officers who protect the

12  Speaker 24/7, 365 days a year, because of her job.

13       But, as I said, Paul was home.

14       At the time, Mr. Pelosi was 82 years old.  He was asleep

15  in his bedroom on the third floor, alone.

16       You will hear that when the defendant found his way to the

17  bedroom, he threatened defendant -- he threatened Mr. Pelosi.

18  You will hear various threats that he made, including this one

19  (as read):

20            "If you stop me from going after evil, you will

21       take the punishment instead."

22            Mr. Pelosi did take the punishment.  He took the

23  punishment from defendant in the form of multiple hits with

24  this hammer over Mr. Pelosi's head, leaving him in the middle

25  of the night, on his own floor, in his own blood, with a

1    fractured skull.

2          That is David DePape.

3          Let me take a step back in time.  I'm going to take us

4    back to August of 2022.  And just a quick fact:  The speaker at

5    the time, of course, was Nancy Pelosi.  She was and is

6    San Francisco's congresswoman in the House of Representatives.

7          In August of 2022, the defendant, you will hear through

8    FBI testimony and evidence, began collecting the items that he

9    would need for the plan that I just described to you, including

10   the large backpack that he would carry with him when he left

11   his home on October 27th and made his way to the Pelosis' home

12   on October -- arriving there on October 28th.

13        About a week before the attack, you will hear, the

14   defendant started collecting information about Speaker Pelosi,

15   personal information about her.  You will hear that he began

16   searching online, he started querying for Nancy Pelosi, her

17   address.  And he even purchased a subscription to a service

18   that would allow him to find information about the Speaker and

19   other people that would be more comprehensive, perhaps, than

20   what he could find online.

21        What's on your screen is a document that the FBI found on

22   the defendant's home computer.  As you can see from the

23   document, it has the Speaker's name, her maiden name, and most

24   importantly for the defendant's plan, her home address.  It, as

25   you can see, also lists who her husband is, who some of her

1   children and grandchildren are.

2       The document that was just up on the screen was saved in a

3   folder on the defendant's computer titled "Favorite

4   Politicians."  There were other people, including politicians,

5   but also private figures, that the defendant was collecting

6   information about.

7       Armed with this information, on October 27th, you will see

8   footage from the defendant arriving at a BART Station -- Bay

9   Area Rapid Transit -- in the East Bay.  You will see that he

10  had the big backpack on that he had purchased back in August,

11  and you will hear evidence that it was filled with this hammer,

12  a sledge hammer, duct tape, rope, zip ties, electronic items,

13  and other items.

14      You will watch defendant on BART and then transfer to the

15  bus, and you will watch him on the bus in San Francisco.

16      And then, at about 1:40 in the morning, you will see him

17  arrive at the Pelosis' home.  You will see that because the

18  US Capitol Police, in addition to providing protection to the

19  speaker wherever the speaker is, also had cameras on the

20  Pelosis' home.

21      What I have up on the screen now is -- if you will look at

22  the bottom portion, there's an aerial of the Pelosis' home with

23  six triangles.  The triangle that we are most interested in for

24  right now is Triangle 1, with the sort of light shining on the

25  red dot.

1    From all of the cameras, though, you will see the

2  defendant casing the Pelosis' home before he settles on the

3  porch where Camera 1 is focused on.

4    Let's watch what he does.  This, as you can see, is at

5  about 2:12 -- in fact, at 2:12 in the morning, on October 28th,

6  2022.

7              (Video played but not reported.)

8        **MS. VARTAIN:**  Once inside the Pelosis' home, the

9  defendant roamed.  How do we know?  Again, we know that from

10  recorded voluntary statements that the defendant has given and

11  that you will hear in this case.

12    He roamed the house until he found Mr. Pelosi, home alone,

13  on the third floor.  The defendant, of course, as you will

14  hear, had been looking for Nancy; and as I said, she was not

15  home.

16    But Paul was home, asleep.  And you will hear from the

17  defendant, and also, I expect, from Mr. Pelosi, that Mr. Pelosi

18  woke up with the defendant standing over him in his bedroom,

19  holding that hammer, and carrying zip ties.

20    The defendant threatened to tie him up.  He made other

21  threats.  "You will take the punishment instead," being one of

22  them.

23    Mr. Pelosi, despite having been woken up in the bed that's

24  on your screen now -- and you can see it just as it was, he --

25  Mr. Pelosi was asleep on the side that, of course, the bedding

1   is down.

2        Mr. Pelosi, despite waking up in this situation and being

3   in peril, found a way to walk around the bedroom, around the

4   bed, to the open door that you see.  And you'll see that it

5   opens to a closet.

6        To the left is this bathroom, the Pelosis' bathroom, where

7   Mr. Pelosi kept his phone.  That's the bathroom where the

8   defendant -- where Mr. Pelosi was standing when he made the

9   call to 9-1-1 that you will hear just a little bit later this

10   morning.

11        In the call, you will hear Mr. Pelosi attempting to

12   explain to the operator the peril he's in without disclosing

13   anything that would upset the defendant who was standing in the

14   doorway to the bathroom, still with that hammer.

15        Having called 9-1-1, you will hear that the defendant and

16   Mr. Pelosi eventually went downstairs.  They went down two

17   flights of stairs, Mr. Pelosi walking in front and the

18   defendant on stairs behind him still holding the hammer.

19        Once downstairs, they were near where the front door of

20   the Pelosis' home is.  And that, of course, is where the two

21   police officers who responded to the 9-1-1 call were when they

22   knocked on the door and Mr. Pelosi answered it.

23        You will see exactly what those officers saw because they

24   were wearing their body-worn cameras at the time and they were

25   activated.  So, as Mr. Pelosi opened the door, you will see

1    just a little bit later this morning that the officers saw

2    Mr. Pelosi and the defendant both holding this hammer.

3         And then you will watch the assault.  You will watch it

4    from the angles of both body-worn cameras which captured the

5    assault from different angles.  You will see the defendant hit

6    Mr. Pelosi over the head with the hammer multiple times.

7         And then you will see that Mr. Pelosi woke up -- I'm

8    sorry.  That Mr. Pelosi -- this photo was taken of Mr. Pelosi

9    on the floor moments after the assault.

10        Why?

11        "You will take the punishment instead."

12        The defendant arrived at the Pelosis' home with a plan.

13   When his plan was thwarted and with the police at the door and

14   the gig was up, the defendant unleashed his plan of violence on

15   the next closest thing to the speaker, her husband, Paul.

16        In the defendant's words, "Paul became one of them."  Here

17   it is, in defendant's own words, in a call he made voluntarily

18   to a reporter, months after the assault.

19                    (Audio played but not reported.)

20        **MS. VARTAIN:**  The evidence in this case is going to

21   prove to you beyond a reasonable doubt that when defendant used

22   this hammer to break into the Pelosis' home, he intended to

23   kidnap and hold Nancy Pelosi hostage.

24        That's Count 1, attempted kidnapping.

25        The evidence is also going to prove to you beyond a

1 reasonable doubt that, when the defendant used this hammer to

2 hit Mr. Pelosi over the head, he intended to impede and to

3 retaliate against the Speaker because of her job.

4      That's Count 2, assault on a family member of a federal

5 official.

6      At the end of the Government's case -- at the end of the

7 case, the Government will ask you to convict the defendant on

8 both counts.

9      Thank you.

10      **THE COURT:**  Thank you.

11 Does the Defense wish to make an opening?

12      **MS. LINKER:**  Yes, Your Honor.  If I could have just

13 one moment, Your Honor.

14      **THE COURT:**  Yes.

15                    **OPENING STATEMENT**

16      **MS. LINKER:**  Tom Hanks, the actor, raped a 13-year-old

17 girl.  He raped a 13-year-old girl, and the only person that

18 had evidence to stop the cabal of Hollywood elites who are

19 prostituting children and harming children, a man named Isaac

20 Kappy, committed suicide in circumstances that make it

21 abundantly clear that he was murdered.

22      George Soros.  George Soros is a hedge fund manager with

23 unimaginable wealth, unimaginable wealth that he uses as part

24 of the ruling class to spread lies in the media.

25      Hunter Biden is so blatantly corrupt, there is simply no

1  end to what he will do.  He launders his father's influence

2  peddling and he uses his access to his father -- to the

3  president of the United States -- to spread lies and engage in

4  corruption.

5       Gavin Newsom.  Gavin Newsom, the governor of California,

6  is trampling all of our constitutional rights.  The

7  Second Amendment is clear, the right to bear arms shall not be

8  infringed.  And what does Gavin Newsom do?  He infringes those

9  rights.  He signs laws to violate our constitutional rights.

10      Adam Schiff abuses children.  He abuses children, and he

11  posts pictures of himself in front of Asian orphanages that

12  everyone knows are fronts for child prostitution and

13  trafficking.  And the elite ruling class, they know about what

14  Adam Schiff is engaged in, and they use that as leverage to get

15  him to spread lies about the 2016 election.

16      Target 1.  Target 1, a college professor, a college

17  professor who wants to turn our schools into pedophilia

18  factories, who wants to break the will of children in our

19  schools so that they could be abused and harmed.

20      Nancy Pelosi.  Nancy Pelosi is a cultural warrior, the

21  leader, the face of the Democratic party.  Her army is the

22  Democratic National Committee, and her weapon is the mainstream

23  media.  She is part of the elite ruling class, pulling the

24  strings and using their wealth and their power to manipulate

25  the country to spread lies and to steal votes from Donald

OPENING STATEMENT / LINKER

Trump.

That is tyranny.  That is corruption.  That is killing the tree of liberty.

Members of the jury, many of us do not believe any of that.  We think it's bogus.  You may think it is all lies.  You may think it's harmful lies, harmful lies that are, in fact, destroying the country.  That's what you may believe.

But the evidence in this trial will show that Mr. DePape believes these things.  He believes them with every ounce of his being.

He believes them firmly and completely.  And it is these beliefs, beliefs wholly unrelated to Nancy Pelosi's official duties as a member of Congress, that propelled him to act that night.

Mr. DePape's beliefs, beliefs that he developed with hours and hours playing video games, listening to podcast after podcast and YouTube video after YouTube video as it was fed to him, and then doing his own research, prompted him to act.  Prompted him to act to stop the wealthy elite, to protect children, and to end the lies and reveal the truth.

And in this court, on these two charges, these beliefs matter.  They matter because both charges require that the Government prove beyond a reasonable doubt that Mr. DePape acted because of Nancy Pelosi's performance of her official duties as a member of Congress.

 1          That's simply not why he did it.

 2          You each took an oath, an oath to follow the law.  And

 3     part of that means putting aside your personal beliefs.  So

 4     whether you believe these things or not, the evidence will show

 5     that Mr. DePape certainly does.  And that's what matters.  And

 6     those beliefs are what brought him to take the extreme measure

 7     of breaking into the Pelosi home on October 28th so that he

 8     could talk to Nancy Pelosi and use her to lure out Target 1 and

 9     then continue on his plan to the others on his list.

10          In this trial, in this courtroom, under the instructions

11     that the Court will give you, based on that oath that you took,

12     your belief is not at issue, nor is the logic of Mr. DePape's

13     beliefs.

14          What you will be evaluating is what brought Mr. DePape to

15     the Pelosi home on October 28th, what brought David to that

16     house, what David believed, and what he intended.

17          This is not a "whodunit."  Mr. DePape will not be

18     contesting much of the Government's evidence.  The recordings,

19     the awful, horrific video, the photograph you just saw, and the

20     tragic harm that Mr. DePape inflicted on Mr. Pelosi by hitting

21     him in the head with that hammer, there is no disputing that,

22     and we will not be disputing that.

23          But what the Government fails to acknowledge is the

24     "whydunit."  And the "why" matters.  The why is what makes this

25     a federal case.  They fail to appreciate that this was a larger

1  plan to stop the wealthy elite, to protect children, and to

2  stop the lies and reveal the truth.

3      If this case were as simple as the videos and the audio

4  recordings, there really would be no need for this trial.  It

5  would be an open and shut case.

6      And that's what the Government wants you to believe.  But

7  that's not the full story.  That's not the full picture.  And

8  that's not what the judge will instruct you about the law.

9      The evidence will show unequivocally that Mr. DePape's

10  plan was not about Nancy Pelosi and her official duties as a

11  member of Congress.

12      The evidence will show that he had a much larger plan, and

13  his stop at the Pelosis was only the first step of that plan.

14  He had a plan to rule out the corruption of the ruling class.

15  He had a plan to stop the molestation of children.  He had a

16  plan to end corruption and get to the truth.

17      He had names.  He had addresses, and he was going to go

18  across the country with a backpack full of supplies.  The first

19  stop was to talk to Nancy Pelosi.  To see if she would tell the

20  truth.

21      The other thing she's good for?  With her prominence, with

22  her notoriety, she could lure out others.  She could call

23  Target 1, regardless of whether they knew each other, and lure

24  Target 1 out.  Then he would continue to Tom Hanks, Hunter

25  Biden, George Soros, and on.

1    You will also learn that this was not a very

2  well-thought-out plan.  Mr. DePape had not even contemplated

3  that Nancy Pelosi would not be home; that he wanted to go to

4  sleep when he realized that she wasn't there so he could figure

5  out what to do, how to pivot, what comes next.

6    When he went to that home, he had absolutely no intention

7  of harming Mr. Pelosi, and you will hear that, for the first

8  20 minutes that he was in that house, he did not harm him.

9    Mr. Pelosi showed an incredibly calm, thoughtful, and

10  strategic demeanor.  It's remarkable, frankly, how he was able

11  to navigate the terrifying event of waking up and finding

12  someone in your bedroom.  He was able to call 9-1-1 and,

13  without raising the alarm, get some attention.

14    The responding officers, who you will hear from, were told

15  that the reporting person, Mr. Pelosi, sounded confused, and

16  that there was a "friend in his house named David."

17    So, after confirming they were at the right address, the

18  officers walked up to the door and knocked.  And when

19  Mr. Pelosi opened the door, there the officers saw two people

20  who both officers will describe as "nonchalant."

21    Officers did not sense any urgency when they opened that

22  door; no one was struggling or yelling.  And at that point, the

23  officers did not know if Mr. DePape was Mr. Pelosi's son or a

24  friend or who.

25    And Mr. Pelosi's incredible calmness also left Mr. DePape

1   with the impression that things were okay, that he could go

2   downstairs and take a nap, that he had some time to pivot, to

3   come up with a new plan, to collect himself and figure out what

4   to do.

5        But that all changed the moment the police arrived.  The

6   door opened.  Mr. Pelosi grabbed the hammer, and the police

7   ordered them to drop the hammer.  That was the shift.  That was

8   the trigger.

9        In the heat of that moment, Mr. DePape did something

10  horrific, something horrific that he will have to live with the

11  rest of his life.  It did not matter who was standing there.

12  It did not matter that it was Paul Pelosi.  It did not matter

13  who it was.

14       In that moment, when Paul Pelosi grabs the hammer, the

15  door opens, and he's ordered to drop the hammer, that moment of

16  despair when he realizes that his plan -- his plan to save the

17  country, his plan to protect children, his plan to stop the

18  lies, that it all had been completely stopped, thwarted -- in

19  that moment, he reacted impulsively, and he yanked the hammer

20  out of Mr. Pelosi's hand, and he hit him.

21       He hit him because he was the one standing there in that

22  moment.  You will hear that before that moment, that was not

23  what Mr. DePape had thought about doing.  It was not what he

24  had planned.  And it was not part of his larger plan when he

25  went to the house; but he did it, he hit Mr. Pelosi in the head

1  with that hammer.

2      And it is so hard to watch that video and know of the harm

3  and suffering that Mr. DePape caused to Mr. Pelosi.

4      Thank goodness Mr. Pelosi is doing better -- and he will

5  be here to testify -- because the evidence will certainly show

6  that it could have been a lot worse.  Thank goodness it was

7  not.

8      During jury selection we spent a lot of time discussing

9  that video and how disturbing it would be, and you each were

10  selected as fair and impartial jurors of this trial because of

11  your ability, your promise to not allow any natural, visceral

12  reaction distract you from the issues in this case.

13      The night of Mr. DePape's arrest, he talked to several

14  officers.  He told them several things.  He told them he was

15  there to talk to Nancy Pelosi.  He told them he was sick of the

16  lies.

17      He told them he did not go there with any desire or harm

18  or plan -- excuse me -- or -- to harm or hurt Mr. Pelosi, and

19  that he had a larger plan, a plan involving Tom Hanks and Adam

20  Schiff and Hunter Biden and, importantly, Target 1.  And that

21  larger plan was about stopping the ruling class conspiracy to

22  engage in lies, tyranny, and corruption, and that larger plan

23  was about protecting children.

24      When the officers emptied Mr. DePape's pockets the night

25  of the incident, they found one handwritten piece of paper with

1    three things on it:  The Pelosi address; Target 1's address;

2    and Target 1's phone number.

3        That's it.

4        Target 1, you will learn, was higher up on Mr. DePape's

5    list and that he had researched Target 1 and determined that

6    her house was like a fortress, impenetrable, and therefore, he

7    was going to Nancy Pelosi, given her notoriety, given her

8    celebrity, to lure Target 1 to him.

9        So who is Target 1, this person who was higher up on

10   Mr. DePape's list?  She is an associate professor of

11   Anthropology and Women's and Queer Studies at the University of

12   Michigan.  She is considered one of the pioneer voices of

13   next-wave feminism and queer studies.

14       She has written on a number of topics including gender

15   roles, pornography, and feminism, sex education, and age of

16   consent laws.  Her writings have prompted debate among

17   academics, feminists, LGBTQ activists, and members of the

18   public.

19       So what does a college professor, an academic, on these

20   topics have to do with this case?  Everything.

21       As you will hear, Mr. DePape went to the Pelosi house to

22   lure Target 1.  Why?  Because of her writings, because of her

23   areas of studies, because he believes she is promoting child

24   molestation, so-called groomer schools; that she is an advocate

25   of what academics call "cross-generational relationships,"

1   relationships between adults and children.  She is what

2   Mr. DePape calls a "pedoactivist," a supporter of pedophilia.

3   And she is at the root of harm to children.

4        You are going to hear from Target 1, and she may tell you

5   that this is all completely false, that she believes no such

6   things.  But David believes it.

7        Does this all sounds bizarre?  A lot of what you're going

8   to hear the next few days may sound very bizarre.  But this is

9   what the evidence will show.

10       Make no make mistake.  Mr. DePape committed a crime that

11  night.  He broke into the Pelosi home, and he assaulted Paul

12  Pelosi.  And that's what makes it so hard to ask you to follow

13  that oath that you took.  He committed a horrible and shocking

14  act of violence against someone just because he was there.

15       He did something wrong, something horrible; but he did not

16  commit these two federal charges.  Asking you to maintain that

17  oath when you know someone has done something so wrong is a big

18  ask, and it's unnatural; but you can do it.

19       You were chosen for this jury because of that, because you

20  will follow your oath and the Court's instructions and consider

21  Mr. DePape's purpose in acting, even if you disagree with that

22  purpose; maybe especially if you disagree with that purpose.

23       At the end of this trial, you will know that the reason he

24  acted had nothing to do with Nancy Pelosi's official duties as

25  a member of Congress.  The reason, the why of all of this, had

1  everything to do with the ruling class engaged in corruption,

2  the media spreading lies, and protecting children.

3      He went to the Pelosi home to effectuate his plan, as

4  bizarre, misguided, and unthoughtful as it was; and when the

5  police showed up and he realized he would not be able to

6  continue with his plan to lure out Target 1, to confront Tom

7  Hanks, the others, he did something awful.  But, as you will

8  hear, it was not on account of Nancy Pelosi's official duties

9  as a member of Congress.  That's for sure.

10      This is not the trial for just an assault on Mr. Pelosi.

11  This isn't a burglary case or even a breaking and entering case

12  or a trial about whether you believe the same things that

13  Mr. DePape believes, find them illogical, or even harmful.

14      This case here, here in federal court, is a narrow one.

15  This case here is about the why.  The why matters.  The why

16  matters in this court and in this case.  This case is about

17  whether David acted because of, on account of Nancy Pelosi's

18  duties as a member of Congress.

19      He didn't.

20      At the end of this trial, you will know.  You will know

21  that Mr. DePape went to Nancy Pelosi's house to talk with her

22  about wealth, power, corruption, and the preservation of truth,

23  things that he was concerned about with every ounce of his

24  being, things unrelated to her official duties; and he only

25  struck Paul Pelosi in a quick moment of despair because the

1    police arrived and his larger plan was thwarted.

2        Because of that, because of the whydunit, at the end of

3    this case, I have no doubt that you will find Mr. DePape

4    innocent of these charges.  He's just not guilty.

5        **THE COURT:**  All right.  Is the Government -- you need

6    to move things around, and then ready to start with your

7    evidence.

8        **MS. GILBERT:**  At this time, Your Honor, the Government

9    would like to enter into evidence a stipulation agreed to by

10   the parties.

11       I will read that stipulation now.  (As read):

12       "On October 28th of 2022, at 2:23 a.m., Paul

13       Pelosi called 9-1-1.  That call was recorded and is

14       marked as Exhibit 1."

15       And, Ms. Wachs, could you please pull up Exhibit 1.

16       And, Your Honor, I'd ask that you perhaps instruct

17   the jury with Instruction Number 16.

18       **THE COURT:**  All right.  So first, a stipulation, so

19   you know, is an agreement of the parties as to certain facts,

20   and so those facts are now conclusively established because

21   they have agreed to them.

22       And now you're about to hear a recording that has already

23   been received into evidence.  So this morning, before you came

24   out, the parties -- we admitted certain exhibits to which

25   there's no objection.  They do that to help smooth and

 1   facilitate the trial.

 2       So you're going to hear a recording.  And please, listen

 3   to it very carefully.  A transcript of the recording will be

 4   provided on the screen as you listen to help you identify

 5   speakers and as a guide to help you listen to the recording.

 6       However, bear in mind that it is the recording that is the

 7   evidence, not the transcript.  If you hear something different

 8   from what appears in the transcript, what you hear is

 9   controlling.  The transcript will not be provided to you for

10   your review during deliberations, just the recording, because

11   that is the evidence.

12       **MS. GILBERT:**  Thank you, Your Honor.

13       Ms. Wachs, could you please play Exhibit 1 which has been

14   admitted.

15       **THE COURT:**  Yes.

16              (Audio played but not reported.)

17       **MS. GILBERT:**  Can you please stop the recording.  I

18   don't think the transcript is visible.

19              (Audio played but not reported.)

20       **THE COURT:**  Is the Government prepared to call your

21   first witness?

22       **MS. VARTAIN:**  We are, Your Honor.  The Government

23   calls Kolby Willmes.

24       (Kolby Willmes steps forward to be sworn.).

25       **THE COURT:**  Stop right there.  Ms. Means will swear

 1   you.

 2                        **KOLBY WILLMES**,

 3   called as a witness for the Government, having been duly sworn,

 4   testified as follows:

 5             **THE WITNESS:**  I do.

 6             **THE CLERK:**  Will you please say your name and spell it

 7   for the record.

 8             **THE WITNESS:**  Sorry about that.

 9        It's Officer Kolby Willmes.  It's K-O-L-B-Y,

10   W-I-L-L-M-E-S.

11             **THE COURT:**  Good morning.

12             **THE WITNESS:**  Good morning.

13             **THE COURT:**  You may proceed.

14                     **DIRECT EXAMINATION**

15   BY MS. VARTAIN:

16   **Q.**   Good morning, Officer Willmes.

17   **A.**   Good morning.

18   **Q.**   Who do you work for?

19   **A.**   San Francisco Police Department.

20   **Q.**   How long have you worked for the San Francisco Police

21   Department?

22   **A.**   Since March 2016.

23   **Q.**   And I take it, if I say "SFPD," you'll understand that I

24   mean San Francisco Police Department?

25   **A.**   I will.

1  Q.   So you've worked for the San Francisco Police Department

2  for about eight years; is that correct?

3  A.   That's correct.

4  Q.   And what training did SFPD provide you to become a police

5  officer?

6  A.   A 34-week academy.

7  Q.   Is there a term for that academy?

8  A.   Yeah.  It's the POST Academy.  It's police officer

9  standards and training.

10  Q.   What kinds of training do you receive in the POST

11  training?

12  A.   Everything from codes, legal, scenarios as a --

13  Q.   Do you receive any training in emergency response from a

14  medical perspective?

15  A.   Yes, we do.

16  Q.   And can you briefly describe that?

17  A.   It's just basic life support training.

18  Q.   Do you also periodically receive training after the

19  initial course?

20  A.   Yes, we do.

21  Q.   And can you briefly describe what types of training you

22  receive on a periodic basis?

23  A.   Yes.  Every other year we go to advance officer training.

24  And that includes a refresher in medical and any legal updates,

25  policy updates, and so forth.

**WILLMES - DIRECT / VARTAIN**

1  **Q.**  After your training, did you receive an assignment?

2  **A.**  Yes.

3  **Q.**  What was that assignment?

4  **A.**  It's field training at Bayview Station.

5  **Q.**  What is your current assignment?

6  **A.**  Northern Police Station patrol.

7  **Q.**  I'm going to break that into two parts.

8      You say Northern Police Station.  Does the Northern

9  Station cover specific parts of the city?

10  **A.**  It does.

11  **Q.**  And just generally, can you describe some of those parts?

12  **A.**  Yeah.  Hayes Valley, Western Addition, Upper Polk,

13  Lower Polk, Marina, Pacific Heights.

14  **Q.**  And what are the basic duties of a patrol officer?

15  **A.**  Responding to calls for service, self-initiated activity,

16  enforcing the law.

17  **Q.**  And what do you mean by "calls for service"?

18  **A.**  Just 9-1-1 callers, the citizens in our district that are

19  calling for help.

20  **Q.**  And then how do you learn about the 9-1-1 calls for help?

21  **A.**  We get the calls through our radios from dispatch.

22  **Q.**  You have regular hours of duty?

23  **A.**  I do.

24  **Q.**  What are those?

25  **A.**  9:00 p.m. to 7:00 a.m.

**WILLMES - DIRECT / VARTAIN**

1   **Q.**   Is that called the midnight shift?

2   **A.**   That is called the midnight shift.

3   **Q.**   As of October 2022, did you primarily work with the same

4   officer during your shifts?

5   **A.**   I did.

6   **Q.**   Who was that officer?

7   **A.**   Officer Kyle Cagney.

8   **Q.**   Can you briefly describe how staffing works on the night

9   shift out of the Northern Station?

10  **A.**   Yeah.  At Northern Station, it's split up into six

11  sectors.  So if we're fully staffed, there's a partnership in

12  each of those six sector cars.  And whatever assignment that

13  you have for that night, you are the primary unit for the calls

14  in that area.

15  **Q.**   Okay.  So would I be understanding you correctly if I said

16  that, when you're on patrol in a given sector, if a call for

17  service comes in in that sector, are you primarily responsible

18  for responding to that call for service?

19  **A.**   That's correct.

20  **Q.**   Were you working the night shift beginning at 9:00 p.m. on

21  October 27th, 2022?

22  **A.**   I was.

23  **Q.**   And were you working with Officer Cagney at that time?

24  **A.**   Yes, I was.

25  **Q.**   Were you assigned to a specific sector?

**WILLMES - DIRECT / VARTAIN**

1   A.   Yes, I was.

2   Q.   What sector was that?

3   A.   It's called the four-car in the Northern District.

4   Q.   And does that include any neighborhoods?

5   A.   Yeah.  Pacific Heights.

6   Q.   You were patrolling in a marked police vehicle; is that

7   correct?

8   A.   I was.

9   Q.   And on October 28th, 2022, did you respond to the Pelosi

10  residence?

11  A.   I did.

12  Q.   Why is that?

13  A.   We received a call for service from dispatch.

14  Q.   Does that mean you received it on the radio, as you

15  described earlier?

16  A.   Yes, I did.

17  Q.   Do you remember where you were when the call came in?

18  A.   Yeah.  I was on Divisadero Street in the area of, like,

19  Divisadero and California.

20  Q.   Who was driving?

21  A.   My partner.

22  Q.   And were you sitting in the passenger seat then?

23  A.   I was.

24       **MS. VARTAIN:**  Okay.  I'd like to play admitted

25  Exhibit 316, and what I'd like to do is ask --Ms. Wachs, if you

**WILLMES - DIRECT / VARTAIN**

1   can play it once all the way through.

2   BY MS. VARTAIN:

3   Q.   And then I'm going to ask you some questions about it.

4   Okay?

5   A.   Okay.

6   Q.   Thank you.

7                  (Audio played but not reported.)

8   BY MS. VARTAIN:

9   Q.   This is the radio dispatch call that led you to go to the

10  Pelosi residence; is that correct?

11  A.   That's correct.

12           **MS. VARTAIN:**   Ms. Wachs, if I could please ask you to

13  play to Second 5.

14                  (Audio played but not reported.)

15  BY MS. VARTAIN:

16  Q.   Whose voices are we listening to?

17  A.   That is dispatch.

18  Q.   When you heard this, what did you understand this to mean?

19  A.   A well-being check.

20  Q.   What do you mean by well-being check?

21  A.   That's what the code "910" refers to; it's a well-being

22  check.

23  Q.   And what is a well-being check?

24  A.   I mean, it could be a bunch of different things, but

25  usually, it's checking if someone is okay.

1   Q.   Okay.  And what is "A priority"?

2   A.   "A priority" is how urgent the call is and how fast you

3   have to respond.

4   Q.   Is "A" within well-being checks the top priority?

5   A.   Is A priority, the top priority?  Yes, it is.

6          MS. VARTAIN:  Okay.  Ms. Wachs, if you would please

7   play to Second 10.

8                  (Audio played but not reported.)

9   BY MS. VARTAIN:

10  Q.   Whose voice was that?

11  A.   That was my voice.

12  Q.   What does "14 Edward" mean?

13  A.   That is our call sign, because we are the four-car in the

14  Northern District at that time.

15  Q.   When you say "our," who do you mean?

16  A.   Northern District.  Oh, our call sign is me and

17  Officer Cagney.

18          MS. VARTAIN:  Okay.  Ms. Wachs, to Second 22, please.

19                  (Audio played but not reported.)

20  BY MS. VARTAIN:

21  Q.   Whose voice was just speaking?

22  A.   Dispatch.

23  Q.   And what does "Edward 14 Edward copy" mean?

24  A.   It means we're acknowledging dispatch.

25  Q.   What does "RP" mean?

**WILLMES - DIRECT / VARTAIN**

1   **A.**   It's the reporting party.

2           **MS. VARTAIN:**   Ms. Wachs, would you please play until

3   the end.

4                   (Audio played but not reported.)

5   **BY MS. VARTAIN:**

6   **Q.**   What just happened?

7   **A.**   Another partnership responded as backup to us.

8   **Q.**   And what does it mean to respond as backup?

9   **A.**   It just means to also go on the call.  We're still the

10  primary unit, but it's kind of like just being there in case we

11  need help, just as support.

12  **Q.**   In addition to the call for service that we just -- or the

13  call from dispatch that we just listened to, did you receive

14  information about responding to the address in any other

15  format?

16  **A.**   Yeah.  In our patrol vehicles, we also have a computer.

17  **Q.**   And is there a term for that computer?

18  **A.**   It's called an MDT, a mobile data terminal.

19  **Q.**   Just generally, what type of information did you receive

20  on that that was relevant to your response to the Pelosi

21  residence?

22  **A.**   It shows us the call on our computer.  Essentially, what

23  dispatch says to us is on that.  And then it just says the

24  location, the code -- which is the 910 -- the priority, and who

25  called in.

1  Q.   Do you recall approximately how long it took you to get to

2  the Pelosis' home from where you were?

3  A.   I would say approximately one minute.

4  Q.   So fair to say you were close by?

5  A.   Yes, we were.

6  Q.   Once you arrived at the address, what did you do?

7  A.   We asked -- or I asked dispatch to do a callback.

8  Q.   And what does that mean?

9  A.   It just means dispatch reaches back out to the person that

10  called in and just lets them know we're here and to come meet

11  us.

12  Q.   Okay.  And did you go make your way to the home at some

13  point?

14  A.   Yes.  Simultaneously.

15  Q.   Did you activate your body-worn camera at some point?

16  A.   I did, upon arrival.

17  Q.   When I say "body-worn camera," what do you understand that

18  to mean?

19  A.   It's the camera that we wear on our uniform.

20  Q.   And does it have recording capabilities?

21  A.   It does.

22  Q.   How so?

23  A.   When you -- well, it records continuously, and then once

24  you tap it two times, then it begins also recording audio.

25  Q.   So fair to say it records both audio and visual; is that

1  correct?

2  A.   Yes.

3  Q.   Okay.  I'd like to show you Exhibit 2 -- which is

4  admitted, which is just over three minutes from your body cam.

5        And what I'm going to ask Ms. Wachs to do, once again, is

6  play it all the way through, and then we'll go back and I will

7  ask you some questions as we play it again.  Okay?

8  A.   Sounds good.

9                (Video played but not reported.)

10        MS. VARTAIN:  Okay.  Ms. Wachs, would you please play

11  to Second 24.

12                (Video played but not reported.)

13  BY MS. VARTAIN:

14  Q.   What's going on here?

15  A.   I knocked at the door, and my partner is asking me if

16  we're at the right location.

17  Q.   And are we listening to your and your partner's voices

18  here?

19  A.   That is correct.

20  Q.   Are you the one who knocked on the door?

21  A.   That is correct.

22  Q.   When you arrive for a well-being check, is it your

23  practice to arrive and knock?

24  A.   Yeah.  It's more of a casual approach.

25  Q.   Based on the events we just watched, if you had known

1    someone had broken into the Pelosis' home, would you have,

2    based on your practice, arrived in a different manner?

3    **A.**    Yes, we would have.

4    **Q.**    How so?

5    **A.**    We would have waited for more units, and it would have

6    been a more tactical approach.

7    **Q.**    What do you mean by "tactical"?

8    **A.**    Well, for one thing for sure, we would have arrived and

9    had our guns out, probably, at low ready.

10   **Q.**    What is "low ready"?

11   **A.**    It's out of our holster, but not pointed up at anything;

12   it's just pointed at the ground.

13           **MS. VARTAIN:**   Ms. Wachs, would you please play to

14   Minute 1:02.

15                (Video played but not reported.)

16   **BY MS. VARTAIN:**

17   **Q.**    Did you see the hammer hit Mr. Pelosi when it happened?

18   **A.**    Yes.  The first strike.

19   **Q.**    And was there a noise that you recall hearing at that time

20   that is not captured on the body cam footage?

21   **A.**    Yes.

22   **Q.**    What is that?

23   **A.**    It was a very loud, distinct noise that just sounded like

24   iron hitting a skull.

25   **Q.**    Do you recognize the defendant in the courtroom today?

WILLMES - DIRECT / VARTAIN

```
1    A.    I do.

2    Q.    And can you point him out for the jury, please.

3    A.    (Indicating.)

4    Q.    How would you describe how the manner -- the manner in

5    which you and Officer Cagney responded to the assault?

6    A.    We tackled him.

7    Q.    And I think we saw "Edward Backup Code 3."

8          What is that?

9    A.    Yes.  I said, "Edward 14 Edward, can I get backup,

10   Code 3," and it meant I needed all the units that were also

11   responding to come as quickly as possible.

12             MS. VARTAIN:  Ms. Wachs, to 1:39, please.

13                  (Video played but not reported.)

14   BY MS. VARTAIN:

15   Q.    Whose hands are we looking at in the video we just

16   watched?

17   A.    My hands.

18   Q.    And what are you trying to do?

19   A.    Place the assailant into handcuffs.

20   Q.    Can you describe the defendant's position at this time

21   relative to Mr. Pelosi?

22   A.    His lower body was still on top of Mr. Pelosi.

23   Q.    At the time, did you recognize the noise that we're

24   hearing in this portion of the video?

25   A.    Yes.
```

1    Q.    And how did you recognize it?

2    A.    From the videos that we see in our basic life support

3    training, it would -- resembled agonal breathing.

4         MS. CHUANG:  Objection.  Lack of foundation.

5         THE COURT:  Sustained.

6         I think you need to lay a foundation for that.

7         Disregard that answer.

8         MS. CHUANG:  Your Honor, move to strike.

9         THE COURT:  Yeah, but -- stricken.

10   BY MS. VARTAIN:

11   Q.    The videos that you're talking about, what course did you

12   take those in?

13   A.    It was in the academy and the basic -- the advanced

14   officer training, where we take the basic life support.

15   Q.    Okay.  And in the basic life support training, what was

16   your training as it concerned recognizing breathing, if any

17   such training?

18   A.    Yeah.  They just showed a bunch of traumatic videos and

19   injuries; and in some of those videos, they describe the

20   breathing in some of these videos as agonal breathing.

21   Q.    What you saw in those videos that you're talking about in

22   your training, did you recognize that, based on sound, to be

23   the same breathing that you heard in the video we just watched?

24        MS. CHUANG:  Objection, leading; and objection, lack

25   of foundation.

1           THE COURT:  I think it is leading, but I think the

2   foundation is there.

3       So if you could rephrase the question.

4           MS. VARTAIN:  Sure.

5   BY MS. VARTAIN:

6   Q.   The videos that you watched in your training, I think you

7   testified that you heard a type of breathing in those trainings

8   that you knew to be called agonal breathing; is that correct?

9           MS. CHUANG:  Objection.  Leading.

10          THE COURT:  Overruled.

11          THE WITNESS:  That's correct.

12  BY MS. VARTAIN:

13  Q.   Okay.  How did you apply that knowledge to your assessment

14  of the scene here?

15  A.   It was the same sound in some of those videos as I heard

16  coming from Mr. Pelosi.

17  Q.   Okay.  And it's not your testimony today that it was, in

18  fact, agonal breathing, but that's what you believed it to be

19  at the time; is that correct?

20  A.   That is correct.

21          MS. CHUANG:  Objection.  Leading.

22          THE COURT:  Overruled.

23  BY MS. VARTAIN:

24  Q.   And based off of your training, what do you

25  understand agonal breathing to be?

1   **A.**   It's your body's, essentially, fighting for its like --

2   it's fighting for its last -- it's trying to push oxygen to the

3   brain.  It's last kind of chance to keep you alive.

4          **MS. VARTAIN:**  I'd like to play, Ms. Wachs, to

5   Minute 2:18, please.

6                (Video played but not reported.)

7   **BY MS. VARTAIN:**

8   **Q.**   You now have the defendant cuffed?

9   **A.**   Yes, we do.

10  **Q.**   And what does "two 408s Code 3" mean?

11  **A.**   Two ambulances.

12         **MS. VARTAIN:**  Ms. Wachs, would you please play until

13  2:32.

14                (Video played but not reported.)

15  **BY MS. VARTAIN:**

16  **Q.**   What are you doing here?

17  **A.**   Trying to find identification and searching for, possibly,

18  more weapons.

19  **Q.**   And how are you doing that?

20  **A.**   By pulling things out of his pocket.

21  **Q.**   What are you pulling out of his pocket here?

22  **A.**   Phone.  There's some money that came out.  I know a

23  Clipper Card came out.

24         **MS. VARTAIN:**  Ms. Wachs, to the end of the exhibit,

25  please.

```
1              (Video played but not reported.)
```

2   **BY MS. VARTAIN:**

3   **Q.**   During the video we just watched, were you personally

4   providing any medical care to Mr. Pelosi?

5   **A.**   I was not.

6   **Q.**   Why not?

7   **A.**   It was my job to make sure the scene was safe.

8   **Q.**   We heard the defendant say that he might have ID in his

9   backpack on the porch.  Did you hear that?

10  **A.**   I did.

11  **Q.**   And at some point, did you identify whether the defendant

12  had a backpack outside?

13  **A.**   I did.

14  **Q.**   How did you do that?

15  **A.**   When I escorted the assailant out of the residence.

16  **Q.**   And when you escorted him out, did you see the backpack?

17         How did you come to know there was, in fact, a backpack?

18  **A.**   I did.  We walked out of the back door, and on the back

19  patio there was -- there was black bags.

20  **Q.**   I'm showing you Exhibit 38, which is admitted.

21         What are we looking at here, Officer?

22  **A.**   What I saw the night of the attack.

23  **Q.**   Okay.  And could you identify the bags in the photograph,

24  please?

25  **A.**   Yeah.  It's the black backpacks that you see to the left

**PROCEEDINGS**

1    of, like, all the paint, tarps, and paint supplies.

2            **MS. VARTAIN:**  Ms. Wachs, if you would, please take

3    that down.

4    **BY MS. VARTAIN:**

5    **Q.**   How long were you at the Pelosi residence, approximately,

6    after the portion of your body camera that we just watched?

7    **A.**   I would say approximately 20 to 30 minutes.

8    **Q.**   And at the time you left, had you identified whether there

9    were suspects remaining in the house?

10   **A.**   Yes.

11   **Q.**   What had you learned?

12   **A.**   That there was not any further suspects or victims in the

13   house.

14           **MS. VARTAIN:**  Thank you.

15       I have no further questions.

16           **MS. CHUANG:**  Your Honor, would this be a good time --

17           **THE COURT:**  Yeah, I was going to say do you want to

18   take our break?  Yeah.  Okay.

19       Members of the jury, around 10:00 or so, depending on

20   where we are with the witness, we take breaks.  So we'll take a

21   15-minute morning break.

22       As always, please do not discuss the case with each other

23   or anyone else, and we'll resume around 10:20.  Thank you.

24                   (The jury leaves the courtroom.)

25       (Proceedings were heard out of the presence of the jury.)

```
 1                (Recess taken at 10:04 a.m.)

 2              (Proceedings resumed at 10:20 a.m.)

 3          THE COURT:  We need the defendant.  The jury is

 4   coming.

 5                      (Pause in proceedings.)

 6          THE COURT:  All rise.

 7                 (The jury enters the courtroom.)

 8       (Proceedings were heard in the presence of the jury.)

 9          THE COURT:  Thank you.  You may be seated.

10      Any cross-examination?

11          MS. CHUANG:  Yes, Your Honor.

12                      CROSS-EXAMINATION

13          THE COURT:  You may begin.

14   BY MS. CHUANG:

15   Q.   Good morning.

16   A.   Good morning.

17   Q.   Okay.  So, Officer, let's talk about when you first got to

18   the house.  So you and your partner were standing outside the

19   front door for a little bit; is that right?

20   A.   That's correct.

21   Q.   And while you were standing outside the door, you didn't

22   hear any yelling or screaming coming from inside; correct?

23   A.   That's correct.

24   Q.   You didn't hear anything coming from inside; right?

25   A.   That's correct.
```

1  Q.   And then, when you -- and then you knocked on the door; is

2  that right?

3  A.   Yes.  I knocked on the door first.

4  Q.   After you knocked and you waited a little bit, then

5  Mr. Pelosi opened the door?

6  A.   I'm not sure who opened the door.

7  Q.   It was almost like they both answered the door?

8  A.   Yes.  That's correct.

9  Q.   At that moment, when that door was opened, they didn't

10  seem like they were fighting?

11  A.   They didn't seem like they were fighting initially.

12  Q.   And at that moment, both men appeared to be smiling?

13  A.   That is true.

14  Q.   They were both holding the hammer with one hand?

15  A.   That's correct.

16  Q.   And Mr. Pelosi had a cup with liquid in it in his other

17  hand?

18  A.   That's correct.

19  Q.   At that moment, both men appeared nonchalant?

20  A.   Yes.

21  Q.   And they weren't really struggling over the hammer with

22  each other?

23  A.   Initially.

24  Q.   Right.  When the door opened, they weren't struggling over

25  the hammer?

**WILLMES - CROSS / CHUANG**

1   **A.**   That's correct.

2   **Q.**   All right.  And you would agree that it was weird how it

3   wasn't combative?

4   **A.**   I would agree that it's weird that it isn't combative?  I

5   would say it just was a very -- sorry.

6        Rephrase that.  Sorry about that.

7   **Q.**   Would you agree that it was weird how it wasn't combative?

8   **A.**   I don't know if it was -- "weird," would be the right

9   word, but it didn't seem like a very escalated situation.

10  **Q.**   But you were confused by how they were acting?

11  **A.**   I wasn't confused by their acting.  I was just trying to

12  figure out what was going on.

13  **Q.**   All right.  So you spoke with an FBI agent and the

14  U.S. attorneys earlier in October; correct?

15  **A.**   Yes.

16  **Q.**   And that was to prepare you for your testimony?

17  **A.**   That's correct.

18  **Q.**   And you went over what you were going to testify about?

19  **A.**   That is correct.

20  **Q.**   That included talking about your reaction when you got to

21  the house; correct?

22  **A.**   That is correct.

23  **Q.**   All right.  And during that interview, you knew that you

24  should be truthful about what you should -- what you were

25  telling them?

**WILLMES - CROSS / CHUANG**

1   **A.**   Yes.

2   **Q.**   And that it was important that everything be accurate,

3   what you were telling them?

4   **A.**   Of course.

5   **Q.**   So you did your best to tell the truth?

6   **A.**   Always.

7   **Q.**   And you knew that they were taking notes during this

8   interview?

9   **A.**   Yes.

10   **Q.**   During that interview, you told the FBI agents and the

11   U.S. Attorney's Office that you were confused by how Mr. DePape

12   and Mr. Pelosi were acting?

13          **MS. VARTAIN:**  Objection.  Objection.  She's trying to

14   impeach the witness with a statement that he doesn't have.

15          **MS. CHUANG:**  Your Honor --

16          **THE COURT:**  Do you remember saying that?

17          **THE WITNESS:**  I don't recall exactly saying that in

18   the interview with the ADA.

19   BY MS. CHUANG:

20   **Q.**   You would agree, though, that it wasn't -- when the door

21   opened, it wasn't a heated moment?

22   **A.**   Yes.

23   **Q.**   That Mr. Pelosi didn't call out for help immediately or

24   anything like that?

25   **A.**   That's correct.

1  Q.   And when you got the call to go to the house originally,

2  through dispatch, it came in as a well-being check; correct?

3  A.   That's correct.

4  Q.   And then you also mentioned it was A priority?

5  A.   Yes.

6  Q.   Well-being checks are not normally A priority; correct?

7  A.   They're usually a B priority.

8  Q.   And that's a lower level of priority; right?

9  A.   Yes.  But there are circumstances where it is A priority.

10 Q.   Like this one?

11 A.   Like this one.

12 Q.   But usually they're B?

13 A.   More commonly B.

14 Q.   And you said a well-being check could be a number of

15 different things; right?

16 A.   That's correct.

17 Q.   So, for example, it could be something like someone --

18 responding to someone having a mental health crisis?

19 A.   That's correct.

20 Q.   Or someone who might be overly intoxicated?

21 A.   Correct.

22 Q.   And the information that you got from dispatch was that

23 there was a man in the house who was a friend named David.

24 That's what you were told; right?

25 A.   I don't know if those were the exact words, but in

1    general.

2    Q.    Well, you just listened to the audio on direct; correct?

3    A.    Yes.

4    Q.    Right.  And the audio -- in that audio, you were told that

5    there was -- the reporting party said there was a man in the

6    house, a friend named David; correct?

7    A.    I don't know if the audio said -- that the RP said he was

8    a friend.

9    Q.    The audio did say that RP sounded somewhat confused;

10   right?

11   A.    That's correct.

12   Q.    So as far as you knew, this was just a well-being check

13   and nothing violent was going on; correct?

14   A.    Yes.

15   Q.    Okay.  And a call for a well-being check, you would

16   respond differently than if you did know something violent was

17   happening; right?

18   A.    That's correct.

19   Q.    I think you said on direct that a well-being check, you

20   would take a casual approach?

21   A.    Yeah.  It's more of a casual approach to make sure just

22   everybody's okay.

23   Q.    And that's what you and Officer Cagney did that night, the

24   casual approach?

25   A.    That is how we approached the call, yes.

1   Q.   So if you had gotten a call of an assault in progress, you

2   would have responded differently; right?

3   A.   Yeah, that or a burglary.

4   Q.   Right.  If you had been told that there was a burglary,

5   you would have responded differently?

6   A.   That's correct.

7   Q.   But as far as you knew from the information you had --

8   right? -- you had no reason to believe anything violent was

9   happening in that house?

10  A.   That's correct.

11  Q.   All right.  And if you had, you would have responded with

12  guns drawn, like you said?

13  A.   Yes.

14  Q.   At the low ready; correct?

15  A.   Yes.

16  Q.   And while you were standing outside that house before the

17  door opened, nothing changed to make you think there was

18  anything violent happening in the house; correct?

19  A.   That's correct.

20  Q.   Because if it had, then you would have pulled out your gun

21  at that point; right?

22  A.   That's correct.

23  Q.   But you didn't --

24  A.   That's correct.

25  Q.   -- correct?

1          And if you had known that something more was happening in

2    the house, would you have gone straight to the front door or

3    looked around first?

4    **A.**   We would have looked around first.

5    **Q.**   You would have tried to maybe go around the side to see

6    what was going on inside?

7    **A.**   I don't know exactly how I would have approached it, but

8    it would have been different.

9    **Q.**   You wouldn't have just gone up and knocked casually?

10   **A.**   That's correct.

11   **Q.**   Officer, so you said that you heard what sounded like

12   agonal breathing to you, on direct; correct?

13   **A.**   Potentially agonal breathing, that's correct.

14   **Q.**   That breathing in the video that we watched, that also

15   sounds like snoring, doesn't it?

16   **A.**   Yes.  That is a way that agonal breathing can sound as

17   well.

18   **Q.**   Okay.  Now, you're saying today that, from your

19   recollection, you're describing it as sounding like agonal

20   breathing instead of snoring; right?

21   **A.**   That's correct.  That's what we believed at the time.

22   **Q.**   So when you went to the academy, you were trained in how

23   to write police reports, weren't you?

24   **A.**   That's correct.

25   **Q.**   And that's important because these reports help the police

1  department keep track of different incidents; isn't that right?

2  A.   That's correct.

3  Q.   And they're often used in courts of law like this one?

4  A.   Yes, they are.

5  Q.   So it's really important that be accurate?

6  A.   That's right.

7  Q.   And you certainly tried to make your reports as accurate

8  as possible --

9  A.   Yes, I do.

10 Q.   -- correct?

11      You wrote a report in this case, didn't you?

12 A.   Yes.  I was the author of this report.

13 Q.   Okay.  And you wrote that report the same day as you

14 responded to the house, October 28th, 2022; correct?

15 A.   That's correct.

16 Q.   So it was fresh in your mind, everything you had just

17 experienced?

18 A.   Yes.

19 Q.   And that was before you had spoken to any prosecutors for

20 the case; correct?

21 A.   That's correct.

22      **MS. CHUANG:**  Now, if we could pull up, just for the

23 witness and the Court and the parties, Exhibit 516.

24      **THE WITNESS:**  It's not showing anything right now.

25      There we go.

WILLMES - CROSS / CHUANG

1          **MS. CHUANG:**  I do have paper copies.

2          **THE COURT:**  It's there now.

3          **MS. CHUANG:**  The analog version.

4      May I approach, Your Honor?

5          **THE COURT:**  Please.

6              (Counsel approaches witness.)

7  **BY MS. CHUANG:**

8  **Q.**   Officer, what I just handed you, that's a copy of the

9  police report you wrote in this case; correct?

10  **A.**   That's correct.

11  **Q.**   So I'm going to direct your attention to the third page.

12  You'll see a number at the bottom ending 16400.

13      And towards the bottom, do you see a paragraph that

14  says -- that starts just with "I observed"?

15  **A.**   Yes, I do.

16  **Q.**   In this report, you wrote that --

17          **MS. VARTAIN:**  Objection.  The report is not evidence.

18  She can refresh him with it, but until she contradicts him,

19  it's not an --

20          **THE COURT:**  Well, I think she is contradicting him.

21          **MS. VARTAIN:**  Yes.  But she's not even showing that

22  there's a contradiction, and by reading it to the jury, this is

23  not in evidence.

24          **THE COURT:**  I see the line that she's pointing to, so

25  I'm going to allow her do it.  Okay.

**WILLMES - CROSS / CHUANG**

1  BY MS. CHUANG:

2  Q.   You wrote in your report (as read):

3         "Mr. Pelosi appeared unconscious.  He was

4  snoring and unresponsive."

5         correct?

6  A.   That's correct.

7  Q.   You did not write anywhere in this report the term "agonal

8  breathing"; correct?

9  A.   That's -- well, I'd have to read the whole report.

10  Q.   Go ahead.

11  A.   (Witness examines document.)

12      Yeah.  I did not mention agonal breathing.

13  Q.   So it was "snoring" when you wrote your report, and

14  it's "agonal breathing" today?

15  A.   Agonal breathing can be snoring.

16  Q.   So that's a "yes," it was snoring when you wrote your

17  report, but it's agonal breathing today?

18  A.   Agonal breathing can be snoring.

19  Q.   So that's a "yes"; right?  You wrote snoring in your

20  report, and now you're saying agonal breathing; correct?

21  A.   I wrote snoring in my report, and it's potentially agonal

22  breathing.

23  Q.   You didn't write that in your report, "potentially agonal

24  breathing," did you?

25  A.   No, I did not.

1   Q.   So you're aware -- I'll take that back, actually.

2   A.   Okay.  Here you go, ma'am.

3   Q.   Officer, you're also aware that, in the house, Mr. Pelosi

4   regained consciousness within minutes; correct?

5   A.   No.  I'm not aware of that.

6   Q.   You didn't see him being helped to a stretcher?

7   A.   No.  I was with the assailant.

8   Q.   Okay.  Let's talk about after Mr. DePape was arrested.

9        As the officer who wrote the report in this case, you are

10  responsible for booking him into jail; correct?

11  A.   No, that's not true.

12  Q.   Okay.  You are aware that he was booked into jail?

13  A.   Yes.

14  Q.   Right.

15       Booked on a number of different charges?

16  A.   That's correct.

17  Q.   Before he was booked into jail, he went to the hospital;

18  right?

19  A.   That's correct.

20  Q.   He needed treatment for a dislocated shoulder?

21  A.   That's correct.

22  Q.   He also needed stitches on his left arm?

23  A.   That's correct.

24  Q.   And while at the hospital, you're aware that he was placed

25  on what's called a 5150 hold?

1          **MS. VARTAIN:**  Objection.  Lacks foundation.  Also

2    contradicts the motion in limine.

3          **THE COURT:**  Sustained.

4          **MS. CHUANG:**  Your Honor, this is -- he is testifying

5    that he's aware on it.  We're also not offering any expert --

6          **THE COURT:**  Well, I don't know its relevance.

7    **BY MS. CHUANG:**

8    **Q.**  He was examined at the hospital; correct?

9    **A.**  That's correct.

10   **Q.**  Okay.  All right.  So let's go back to when you're at the

11   house.

12        Once he was in -- once he was in cuffs, you spoke to a

13   potential witness; correct?

14   **A.**  Outside of the house?

15   **Q.**  Outside of the house.

16   **A.**  That's correct.

17   **Q.**  And that person was -- what you understood that person to

18   be was a private security guard who worked in the neighborhood;

19   right?

20   **A.**  That's correct.

21   **Q.**  And he was working that night on the same street?

22   **A.**  No.

23   **Q.**  He was working in the neighborhood; right?

24   **A.**  Yes.

25   **Q.**  And you asked him if he had heard or seen anything;

1  correct?

2  **A.**   Yes.

3  **Q.**   All right.  And as far as you know -- right? -- the

4  private security guard hadn't tried to intervene in -- with

5  anything that was going on at the Pelosi house that night;

6  correct?

7          **MS. VARTAIN:**  Objection.  Calls for hearsay.

8          **THE COURT:**  Overruled.

9          **THE WITNESS:**  Yes, the security did not intervene.

10          **MS. CHUANG:**  Thank you.  No further questions.

11          **THE COURT:**  Anything further?

12          **MS. VARTAIN:**  No.  Thank you, Your Honor.

13          **THE COURT:**  Thank you, Officer.  You may step down.

14          **THE WITNESS:**  Thank you, Your Honor.

15                    (Witness excused.)

16          **THE COURT:**  Is the Government prepared to call your

17  next witness?

18          **MS. VARTAIN:**  We are, Your Honor.  The Government

19  calls Kyle Cagney.

20      (Kyle Cagney steps forward to be sworn.)

21          **THE COURT:**  Step right in the box.  Thank you.

22                    **<u>KYLE CAGNEY</u>**,

23  called as a witness for the Government, having been duly sworn,

24  testified as follows:

25          **THE WITNESS:**  I do.

CAGNEY - DIRECT / VARTAIN

```
 1              THE CLERK:  Can you please state your name and spell
 2    it for the record.
 3              THE WITNESS:  Can I sit down?
 4              THE CLERK:  Please.
 5              THE COURT:  Yes.
 6              THE WITNESS:  Kyle Cagney.  K-Y-L-E, C-A-G-N-E-Y.
 7              THE COURT:  Good morning.
 8              THE WITNESS:  Good morning.
 9              THE COURT:  You may go ahead.
10              MS. VARTAIN:  Thank you.
11                        DIRECT EXAMINATION
12    BY MS. VARTAIN:
13    Q.   Officer Cagney, who do you work for?
14    A.   The San Francisco Police Department.
15    Q.   How long have you worked for the San Francisco Police
16    Department?
17    A.   Since 2016.
18    Q.   That's about eight years?
19    A.   Yes, ma'am.
20    Q.   And did you receive the standard POST training when you
21    became an officer?
22    A.   Yes.
23    Q.   What is your current assignment?
24    A.   I work midnight patrol at Northern Station.
25    Q.   What are the hours of midnight patrol?
```

**CAGNEY - DIRECT / VARTAIN**

1  A.   9:00 p.m. until 7:00 a.m.

2  Q.   And who is your partner?

3  A.   Officer Kolby Willmes.

4  Q.   Were you working the night shift beginning at 9:00 p.m. on

5  October 27th, 2022?

6  A.   Yes, ma'am.

7  Q.   And on October 28th, 2022, did you respond to the Pelosi

8  home together with Officer Willmes?

9  A.   Yes, I did.

10  Q.   Did you activate your body-worn camera at some point

11  before responding to the Pelosis' home?

12  A.   Yes, as I arrived.

13  Q.   And I'd like to ask Ms. Wachs to hit play on your body

14  camera, but before I do that, I'd like to ask you:  Is there a

15  difference in when the video and the audio start when you

16  record on your body cam?

17  A.   Yes, there is.  There's a 30-second buffer prior to me

18  activating that shows the previous 30 seconds.  So once I

19  double-click and turn it on, it shows the previous 30 seconds

20  before audio starts.

21  Q.   So in the video we're about to look at, will the first

22  30 seconds be silent as a result of the buffering that you just

23  described?

24  A.   Yes.

25          MS. VARTAIN:  Ms. Wachs, would you please play

**CAGNEY - DIRECT / VARTAIN**

1    Exhibit 3.

2                    (Video played but not reported.)

3    **BY MS. VARTAIN:**

4    **Q.**   Mr. Cagney, why does the screen go dark?

5    **A.**   My camera fell off my body.

6    **Q.**   How did your camera fall off your body?

7    **A.**   It was magnetized to my jacket, and when I made contact

8    tackling the suspect, my camera fell off.

9    **Q.**   And were you able at some point in the video we just

10   described did you see the -- the video we just looked at, did

11   you see the hammer that the defendant used to assault

12   Mr. Pelosi?

13   **A.**   I did.

14   **Q.**   And did you see the hammer again in the course of your

15   time on scene?

16   **A.**   I did.

17   **Q.**   How was that?

18   **A.**   After I tackled the suspect, while we were attempting to

19   place him in handcuffs, the hammer was by his head, I grabbed

20   the hammer with my off hand and threw it in the living room and

21   enabled -- so the suspect wouldn't be able to gain -- regain

22   control of it.

23   **Q.**   We've just watched about two minutes of your time at the

24   Pelosis' home; is that right?

25   **A.**   Yes, ma'am.

CAGNEY - CROSS / LINKER

1   Q.   And how long were you there for?

2   A.   Approximately two hours.

3   Q.   During those two hours, did you take any other

4   investigative steps?

5   A.   I positively ID'd the suspect.

6   Q.   What do you mean by that?

7   A.   The suspect wrote out his name.  I went back to my vehicle

8   and then ran his name out doing a records check, and positively

9   ID'd him.

10          MS. VARTAIN:  No more questions.  Thank you.

11          THE COURT:  Cross-examination.

12                  **CROSS-EXAMINATION**

13  BY MS. LINKER:

14  Q.   Good morning, Officer.  My name is Jodi Linker.  I

15  represent David DePape.

16  A.   Good morning.

17  Q.   Officer, a lot of crazy stuff happens as a police officer;

18  is that fair to say?

19  A.   Yes, ma'am.

20  Q.   And this situation was up there?

21  A.   Yes.

22  Q.   This didn't make a lot of sense, did it?

23  A.   No.

24  Q.   You got the call originally at 2:23 a.m., about a

25  B priority well check; isn't that correct?

CAGNEY - CROSS / LINKER

1  **A.**    It was upgraded to an A priority.

2  **Q.**    It was later upgraded to an A priority?

3  **A.**    It was upgraded when they dispatched it to us.

4  **Q.**    When it went out -- there are two things.   There's a radio

5  broadcast; correct?

6  **A.**    Yes.

7  **Q.**    And then there's something in your vehicle that's a

8  computer-aided dispatch; is that correct?

9  **A.**    Yes, ma'am.

10 **Q.**    And so the computer-aided dispatch originally came through

11 at 2:23 a.m., with a B priority well-check; correct?

12 **A.**    Yes.   But it was broadcasted to us as an A.

13 **Q.**    As an A, at 2:27 a.m.?

14 **A.**    Yeah.   They never announced the B.   It was probably just

15 in writing, and then it was announced to us as an A.

16 **Q.**    So by "announced to us," you mean the verbal that you

17 heard over the radio was announced at 2:27?

18 **A.**    Yes, ma'am.

19 **Q.**    And at 2:23, though, it came through your computer in your

20 patrol car?

21 **A.**    Not necessarily, no.   It doesn't -- it goes -- the

22 dispatchers type that out.   And then once we get put on the

23 call is when we get it.   So we don't get it -- like, it doesn't

24 just pop up on our screen like that.

25 **Q.**    Understood.

1         And you didn't get the 9-1-1 call directly?

2    A.   We did not.

3    Q.   You get the broadcast from the dispatcher?

4    A.   Yes, ma'am.

5    Q.   You were informed that it was A priority because of whose

6    house it was; correct?

7    A.   Yes, ma'am.

8    Q.   And it didn't make sense to you to have an A priority well

9    check; is that fair to say?

10   A.   No.  We get A priority well-being checks.

11   Q.   Who determined that it was A priority?

12   A.   Dispatchers.

13   Q.   When doing well checks, you expect someone suffering from

14   a mental health crisis; is that fair?

15   A.   No, not necessarily.

16   Q.   You expect someone who's intoxicated?

17   A.   That's potentially an option, yeah.

18   Q.   What are some of the other options?

19   A.   It could be a person sleeping on the sidewalk that is not

20   responsive.  It could be someone drunk.  It could be someone

21   that is sitting by themselves in an odd area, anything like

22   that; just a well-being check to check if someone is okay.

23   Q.   All nonviolent situations?

24   A.   Not necessarily, again.

25   Q.   The common things you see in well-being checks are those

**CAGNEY - CROSS / LINKER**

1    that you listed; is that fair to say?

2    **A.**    Yes, ma'am.

3    **Q.**    You thought that the call might be someone who was drunk

4    and went into the wrong house since dispatch said it was a

5    friend and his name was David; is that fair to say?

6    **A.**    Correct.

7    **Q.**    You were not told there was any burglary?

8    **A.**    I was not.

9    **Q.**    Not alerted to any danger in the home?

10   **A.**    I was not, not prior.

11   **Q.**    You didn't have your guard up?

12   **A.**    Correct.

13   **Q.**    Had you been alerted that it was a burglary, you would

14   have arrived at the scene differently; is that fair to say?

15   **A.**    Yes, ma'am.

16   **Q.**    Maybe you would have gone around the back to look in?

17   **A.**    Potentially.

18   **Q.**    Had your weapons drawn?

19   **A.**    Potentially.

20   **Q.**    You could have tried to assess the situation before just

21   approaching the door?

22   **A.**    Yes.

23   **Q.**    But you didn't know what was going on, so you just went

24   straight to the door?

25   **A.**    Yes, ma'am.

CAGNEY - CROSS / LINKER

1    Q.   All right.  So let's go back to when you get that call.

2         It's an A priority call, so you went right away?

3    A.   Yes, ma'am.

4    Q.   And you knew that it was the Pelosi home?

5    A.   Yes, ma'am.

6    Q.   You were told that the reporting party seemed confused?

7    A.   Yes, ma'am.

8    Q.   And the reporting party was Mr. Pelosi; correct?

9    A.   Yes, ma'am.  But I did not know that personally because I

10   only heard it through the radio; and I did not read the

11   computer because I was the one driving, so I did not know that

12   at the time.

13   Q.   You knew the reporting party seemed confused, but you

14   didn't know who the reporting party was?

15   A.   Yes, personally, yes.

16   Q.   And you knew that you were going to the Pelosi home?

17   A.   I did not know that initially either, until I arrived on

18   scene because I knew it was the house.

19   Q.   Thank you for the clarification.

20   A.   Sorry.  Thank you.

21   Q.   And you arrived at the house quickly after receiving the

22   call?

23   A.   Yes, ma'am.

24   Q.   And you went directly to the front door?

25   A.   Yes, ma'am.

CAGNEY - CROSS / LINKER

1  Q.   The lights were on in the house when you approached; is

2  that correct?

3  A.   I do not recall.  I don't remember.

4  Q.   You didn't hear anything inside, did you?

5  A.   I did not.

6  Q.   Your partner, Officer Willmes, he's the one who knocked on

7  the door?

8  A.   Yes, ma'am.

9  Q.   And Mr. Pelosi opened the door?

10  A.   We believe so.  We don't -- I don't know who opened it.

11  Q.   But that's your belief is that Mr. Pelosi opened the door?

12  A.   Yes, ma'am.

13  Q.   Mr. Pelosi did not appear in distress when he opened the

14  door, did he?

15  A.   Not to -- not to my opinion.

16  Q.   He didn't appear to have any injuries on him when he first

17  opened the door?

18  A.   Not that I observed.

19  Q.   Both Mr. DePape and Mr. Pelosi seemed nonchalant?

20  A.   In my opinion, yes.

21  Q.   Mr. Pelosi had a drink in his left hand?

22  A.   I didn't notice that -- well, in the moment.

23  Q.   And you've reviewed the body-worn camera since this time;

24  right?

25  A.   I did.

CAGNEY - CROSS / LINKER

1   **Q.**   And you saw the drink in his left hand?

2   **A.**   Yes, I did.

3   **Q.**   You didn't know when he opened the door if that was a

4   friend or a son or what; is that fair to say?

5   **A.**   Correct, yes.

6   **Q.**   You didn't know if someone had just gone crazy; correct?

7   **A.**   Correct.

8   **Q.**   First thing Mr. Pelosi said to you was, "Hey, guys."

9        Is that fair?

10  **A.**   Yes, ma'am.

11  **Q.**   In a relatively nonchalant way?

12  **A.**   In my opinion, yes.

13  **Q.**   He asked you, "How are you?"

14  **A.**   Yes, ma'am.

15  **Q.**   And you testified -- and you've indicated that you could

16  not see the hammer right away; is that correct?

17  **A.**   That is correct.

18  **Q.**   You didn't see the hammer until you shined the flashlight

19  on the two of them?

20  **A.**   Yes, ma'am.

21  **Q.**   Mr. Pelosi was holding the hammer in his right hand?

22  **A.**   Yes, ma'am.

23  **Q.**   And they weren't, I think you described it, "flexing."

24       They weren't flexing?

25  **A.**   Yeah, they weren't, like, fighting over it initially.

**CAGNEY - CROSS / LINKER**

1   Q.   They weren't struggling over the hammer?

2   A.   Yeah, not to my opinion.

3   Q.   No one was yelling?

4   A.   No.

5   Q.   There was no expression of distress at that moment?

6   A.   In the initial moment, no.

7   Q.   So neither Mr. Pelosi nor Mr. DePape was attempting to

8   gain further control over the hammer before any questions were

9   asked?

10   A.   No -- yeah.  The initial moment when they opened the door,

11   no.

12   Q.   Everything changed when Officer Willmes said, "Drop the

13   hammer"?

14   A.   Correct.

15   Q.   Changed in that one quick moment?

16   A.   Yes, ma'am.

17   Q.   You -- we just watched a clip from your body cam video;

18   correct?

19   A.   Yes, ma'am.

20   Q.   And that was just a minute and -- a minute and something;

21   is that about right?

22   A.   Yeah.  I think it was a minute 48.

23   Q.   Thank you.

24       You're aware that approximately three minutes into your

25   body cam -- three minutes after the hit, I should say, more

CAGNEY - CROSS / LINKER

1   precisely.

2       About three minutes later, Mr. Pelosi awoken -- he

3   awakened and regained consciousness?

4   A.   I was unaware of that.

5   Q.   When you were still on scene, Mr. Pelosi regained

6   consciousness; correct?

7   A.   Not to my knowledge.  First I'm hearing about it.

8   Q.   You're not aware that he stood up and got into the gurney

9   with assistance?

10  A.   No, I was not aware of that.

11  Q.   You're not aware that he began talking to the officers

12  about what happened while he was still in the house?

13          MS. VARTAIN:  Objection.

14          THE COURT:  I'm just going to remind the jury of the

15  instruction I gave you that questions from the lawyer are not

16  evidence.  Only the witness's answer.

17          THE WITNESS:  Sorry.  What was the last question?

18  BY MS. LINKER:

19  Q.   You're not aware that Mr. Pelosi began giving statements

20  to your co-officers while still in the house?

21  A.   No, I was not aware.  I thought he gave his first

22  statements in the ambulance.

23  Q.   In the ambulance?

24  A.   Yeah.

25  Q.   You had your body cam on for that entire two hours that

CAGNEY - CROSS / LINKER

1  you were on scene; is that correct?

2  **A.**   Yes, ma'am.

3  **Q.**   But you did turn it off at some point; is that correct?

4  **A.**   At the very end.

5  **Q.**   You remained on scene beyond when your body cam was on;

6  isn't that correct?

7  **A.**   Not to my recollection.

8  **Q.**   Didn't Lieutenant Connell -- O'Connell [sic] arrive and

9  ask you to turn off your body cam so you could speak with him?

10  **A.**   I remember that now, as you said that, yeah.

11  **Q.**   After you tackled Mr. DePape, he gave you his full name;

12  correct?

13  **A.**   Yes, ma'am.

14  **Q.**   He gave you his address?

15  **A.**   I don't recall.

16  **Q.**   He gave you the city where he lived?

17  **A.**   Yes, ma'am.

18  **Q.**   He was forthcoming about all information that you asked

19  him?

20  **A.**   Yes, ma'am.

21  **Q.**   And you were then immediately able to go to your patrol

22  car and run him up; correct?

23  **A.**   Yes, ma'am.

24  **Q.**   And you used the information that he gave you?

25  **A.**   Yes, ma'am.

1  Q.   And it all was truthful information; correct?

2  A.   Yes, it was.

3  Q.   You thought Mr. DePape seemed a little 800?

4       **MS. VARTAIN:**  Objection.

5       **THE COURT:**  Relevance?

6       **MS. LINKER:**  All part of his impressions of Mr. DePape

7  at the time.

8       **THE COURT:**  Relevance?

9       **MS. LINKER:**  I think it's relevant to the truthfulness

10 of Mr. DePape's statements and what was going on at the scene.

11      **THE COURT:**  I'm going to sustain it for now.  We can

12 take it up at the break.

13 **BY MS. LINKER:**

14 Q.   Fair to say, Officer Cagney, that you thought this whole

15 incident was F'ing nuts?

16 A.   Yes.

17      **MS. LINKER:**  I have nothing further.

18      **THE COURT:**  Anything further?

19      **MS. VARTAIN:**  No redirect.  Thank you.

20      **THE COURT:**  You are excused.

21      **THE WITNESS:**  Thank you, Your Honor.

22              (Witness excused.)

23      **THE COURT:**  Is the Government prepared to call your

24 next witness?

25      **MS. GILBERT:**  Yes, Your Honor.  The Government calls

```
 1    Officer Alejandro Najarro.
 2                        ALEJANDRO NAJARRO,
 3    called as a witness for the Government, having been duly sworn,
 4    testified as follows:
 5              THE WITNESS:  I do.
 6              THE CLERK:  Could you please state your name and spell
 7    it for the record.
 8              THE WITNESS:  Yes.  It's Alejandro Najarro.
 9    A-L-E-J-A-N-D-R-O, N-A-J-A-R-R-O.
10              THE COURT:  Thank you.  You may be seated.
11              THE WITNESS:  Thank you.
12    BY MS. GILBERT:
13                        DIRECT EXAMINATION
14    BY MS. GILBERT:
15    Q.   Mr. Najarro, where do you work?
16    A.   For the San Francisco Police Department.
17    Q.   What is your position?
18    A.   I'm a police officer.
19    Q.   How long have you been a police officer with the
20    San Francisco Police Department?
21    A.   Approximately four-years.
22    Q.   Are you assigned to a particular location?
23    A.   I am, the Northern District.
24    Q.   And what do you do at the Northern District?
25    A.   I work patrol.
```

**NAJARRO - DIRECT / GILBERT**

1   Q.   What does that mean, to "work patrol"?

2   A.   I respond to calls for service.

3   Q.   Did you receive any training when you became a police

4   officer?

5   A.   I did.

6   Q.   Are you familiar with an incident at the Pelosi home in

7   San Francisco on October 28th of 2022?

8   A.   I am.

9   Q.   And why are you familiar with that incident?

10  A.   I responded to a call there.

11  Q.   Were you working on October 28th of 2022?

12  A.   I was.

13  Q.   What shift were you working?

14  A.   I was working the midnight shift, which is from 9:00 p.m.

15  to 7:00 a.m.

16  Q.   You said you responded to a call at their home.

17       Where was the call from?

18  A.   The call was at the Pelosi home, 2640 Broadway.

19  Q.   And how did you learn about there being a call?

20  A.   Dispatch put the call through our radio.

21  Q.   Do you recall approximately when this call came in from

22  dispatch to your radio?

23  A.   It was around 2:00 a.m.

24  Q.   What do you recall learning from this dispatch call?

25  A.   It was a well-being check.

NAJARRO - DIRECT / GILBERT

1    Q.    What is a well-being check?

2    A.    It's typically a noncriminal call, and it's just to check

3    the health and safety of a person.

4    Q.    Have you responded to well-being checks before?

5    A.    Yes.

6    Q.    Where were you when you heard this call come in from

7    dispatch for a well-being check?

8    A.    I was driving on Polk Street.

9    Q.    What kind of car were you driving?

10   A.    An unmarked police vehicle.

11   Q.    Were you in uniform?

12   A.    I was.

13   Q.    Were you with any other police officers?

14   A.    I was.

15   Q.    Who were you with?

16   A.    I was with Officer Wheeler and Officer Wong.

17   Q.    At that time were Officer Wheeler and Wong patrol officers

18   like you?

19   A.    They are.

20   Q.    And who was driving?

21   A.    I was.

22   Q.    So when you first heard dispatch put out a well-being

23   check, what did you do?

24   A.    Officer Wheeler recognized the address and suggested that

25   we start driving that way.

1   **Q.**   Did you follow his directions?

2   **A.**   I did.

3   **Q.**   And what happened next?

4   **A.**   I heard, over the radio, Officer Willmes ask for units

5   Code 3 and medics Code 3.

6   **Q.**   You say you heard Officer Willmes.  Were you familiar with

7   his voice?

8   **A.**   I am.

9   **Q.**   How so?

10   **A.**   We work together.

11   **Q.**   And you said you heard units Code 3 and medics Code 3.  Do

12   you know what those meant?

13   **A.**   Yes.  Code 3 means fast, with lights and sirens.

14   **Q.**   What does "units" mean?

15   **A.**   Police units.  Sorry.  Like other police cars.

16   **Q.**   What about "medics"?

17   **A.**   Ambulances or fire engines.

18   **Q.**   So what did you do in response?

19   **A.**   I drove Code 3 to the location.

20   **Q.**   You said that means lights and sirens.  Did you do

21   anything with your lights and sirens?

22   **A.**   I activated them.

23   **Q.**   From when you heard dispatch call -- excuse me -- when

24   Officer Willmes called out for Code 3, until when you arrived

25   at the Pelosi residence, do you know approximately how long

1    that took?

2    A.    It was less than a minute.

3    Q.    Were you wearing a body-worn camera that night?

4    A.    I was.

5    Q.    Okay.  Did you activate it?

6    A.    I did.

7    Q.    Are you wearing a body-worn camera right now?

8    A.    I am.

9    Q.    Can you show us what that looks like?

10   A.    It's the camera that's on my chest.

11   Q.    So on the night of October 28th of 2022, when did you turn

12   on your body-worn camera?

13   A.    Before entering the home.

14   Q.    Whose home?

15   A.    Sorry.  2640 Broadway, the Pelosi residence.

16   Q.    Have you reviewed your body-worn camera from that evening?

17   A.    I have.

18   Q.    Does the sound start at the beginning of your video of

19   your body-worn camera?

20   A.    It does not.

21   Q.    Is that normal?

22   A.    Yes.

23   Q.    Why?

24   A.    The sound starts when I activate my camera, but the camera

25   records 30 seconds prior to activation.

NAJARRO - DIRECT / GILBERT

1   Q.   So is it fair to say the video starts 30 seconds before

2   you hit "on"?

3   A.   That's correct.

4   Q.   Okay.  But the sound doesn't start at the same time?

5   A.   Correct.

6   Q.   Okay.  I'd like to now play an excerpt of your body-worn

7   camera that has already been admitted as Exhibit 314.

8           MS. GILBERT:  And if you can just hold for one minute,

9   Ms. Wachs.

10      And I'd like you to just, Ms. Wachs, please, just play the

11  video all the way through one time.

12                  (Video played but not reported.)

13  BY MS. GILBERT:

14  Q.   Officer Najarro, it sounds like towards the end of this

15  clip you said, "You go with him"; is that correct?

16  A.   That's correct.

17  Q.   Who were you talking to?

18  A.   To Officer Wheeler.

19  Q.   And why did you tell him that?

20  A.   Because he, Officer Gray, and Officer Holub were going to

21  search the house for any more suspects.

22  Q.   What did you do at this point?

23  A.   I stayed with Officer Wong to help the victim.

24  Q.   At that point, did you know who the victim was?

25  A.   No.

NAJARRO - DIRECT / GILBERT

1  Q.   You know now who the victim was?

2  A.   Yes.

3  Q.   Who was that?

4  A.   Mr. Pelosi.

5  Q.   At the end of the clip it sounds like some people are

6  saying "Pull him away."

7       Did you hear that?

8  A.   Yes.

9  Q.   What happened after that clips ends?

10 A.   Officer Willmes and Officer Cagney pulled the defendant

11 away.

12 Q.   Away from what?

13 A.   From Mr. Pelosi.

14 Q.   You said "the defendant."

15      Do you recognize the person in that video who was pulled

16 off of Mr. Pelosi here today?

17 A.   I do.

18 Q.   Can you point that person out, please?

19 A.   Yes.  He's over there.  (Indicating.)

20      MS. GILBERT:  Please let the record reflect that

21 Officer Najarro has pointed to the defendant.

22 BY MS. GILBERT:

23 Q.   What did you do next after this clip ends, after the

24 defendant was pulled off of Mr. Pelosi?

25 A.   I helped Officer Wong provide aid to Mr. Pelosi.

**NAJARRO - DIRECT / GILBERT**

1   Q.   Was Mr. Pelosi conscious when you arrived at the Pelosi

2   home that night?

3   A.   He was not.

4   Q.   Did he later gain consciousness?

5   A.   He did.

6   Q.   How did you know that?

7   A.   He spoke and then he tried to get up.

8   Q.   What, if anything, did you do in response to him speaking

9   and trying to get up?

10  A.   When he tried to get up, I told him to stay down.

11  Q.   Why?

12  A.   To keep him from hurting himself any further.

13          MS. GILBERT:  Ms. Wachs, if we could please pull up

14  what's been marked and admitted as Exhibit 30.

15  BY MS. GILBERT:

16  Q.   Officer Najarro, do you recognize this?

17  A.   I do.

18  Q.   What is it?

19  A.   It's a photo of Mr. Pelosi.

20  Q.   Do you know who took this photograph?

21  A.   I did.

22  Q.   And when did you take this photograph?

23  A.   While I was on scene.

24  Q.   On October of -- 28th of 2022?

25  A.   That's correct.

1              MS. GILBERT:  Can we now turn to what's been admitted

2    as Exhibit 33, please.

3    BY MS. GILBERT:

4    Q.   Do you recognize this?

5    A.   I do.

6    Q.   What is this showing?

7    A.   It's a photo of Officer Wong and myself.

8    Q.   Where are you in this photograph?

9    A.   We're in the hallway with Mr. Pelosi.

10   Q.   And which person in the photograph is you?

11   A.   I'm the one on the left.

12   Q.   And what were you doing at this point?

13   A.   Providing aid to Mr. Pelosi.

14   Q.   Do you know where the defendant was at this point?

15   A.   He was outside.

16   Q.   I'd like to turn to another excerpt of your body-worn

17   camera from that evening, please.

18              MS. GILBERT:  Ms. Wachs, could you please pull up what

19   has been admitted as Exhibit 315.  And, Ms. Wachs, could you

20   please just play the first seven seconds.

21                   (Video played but not reported.)

22   BY MS. GILBERT:

23   Q.   Officer Najarro, where were you at this point in the

24   evening?

25   A.   I'm at the bannister.

NAJARRO - DIRECT / GILBERT

1  **Q.**  Are you in the Pelosis' home?

2  **A.**  I am.

3  **Q.**  Okay.  And do you know where Mr. Pelosi was?

4  **A.**  Yes.  He was still in the hallway with the medics.

5  **Q.**  And what were you doing at this point?

6  **A.**  I was taking photos.

7  **Q.**  Why were you taking photos?

8  **A.**  So they can be collected as evidence later.

9  **Q.**  Did you observe anything related to this incident?

10  **A.**  I did.

11  **Q.**  What is that?

12  **A.**  I saw the broken patio door as I was at the living room.

13  **Q.**  Is that depicted where we've ended at this point in the

14  video?

15  **A.**  It is.

16  **Q.**  Okay.

17          **MS. GILBERT:**  Ms. Wachs, could you please continue to

18  the end of this exhibit.

19                  (Video played but not reported.)

20  **BY MS. GILBERT:**

21  **Q.**  Officer Najarro, it sounds like you're asking about a

22  hammer; is that correct?

23  **A.**  That's correct.

24  **Q.**  Why?

25  **A.**  Because when I first arrived into the Pelosi home,

1    Officer Willmes said that he got hit in the head with a hammer.

2    Q.    Why were you looking for the hammer?

3    A.    To take photos of it.

4    Q.    What did you do next?

5    A.    Officer Wheeler told me that -- or Officer Holub already

6    took photos of the hammer.  And then Mr. Pelosi was being taken

7    outside with the medics, so I followed them.

8    Q.    And then after you followed Mr. Pelosi outside with the

9    medics, what did you do?

10   A.    I was instructed by my sergeant to stay with the

11   defendant.

12   Q.    Did you stay with the defendant?

13   A.    I did.

14          MS. GILBERT:  And, Ms. Wachs, could we turn to what's

15   been admitted as Exhibit 4, please.  And if you could just pull

16   it up but not play it yet.

17   BY MS. GILBERT:

18   Q.    Officer Najarro, do you recognize this?

19   A.    I do.

20   Q.    What is this?

21   A.    This is the defendant with the medics.

22   Q.    Do you know where this video is from?

23   A.    Yes.

24   Q.    Where is that?

25   A.    It's outside the Pelosi home.

1  Q.   Do you know who captured this video?

2  A.   This is my body-worn camera.

3  Q.   Okay.  Approximately, how soon after you arrived at the

4  Pelosi home did this portion of your body camera occur, if you

5  recall?

6  A.   This is about 10 to 15 minutes after I arrived.

7       MS. GILBERT:  Ms. Wachs, could you please play

8  Exhibit 4 all the way through.

9            (Video played but not reported.)

10      MS. GILBERT:  Ms. Wachs, would you mind replaying just

11 the section from Minute 2:20 to 2:40.

12 BY MS. GILBERT:

13 Q.   And then, Officer Najarro, I'll have a question for you.

14            (Video played but not reported.)

15 BY MS. GILBERT:

16 Q.   Officer Najarro, what were you doing in this portion of

17 the clip?

18 A.   I was conducting an arrest search on the defendant.

19 Q.   Why?

20 A.   It's our department policy that we conduct searches prior

21 to them being transported.

22 Q.   Do you know why that is?

23 A.   To search for any other potential weapons.

24 Q.   What did you find?

25 A.   I found a lanyard with keys around his neck.  And then I

1    found a piece of paper in his pocket.

2    Q.   Is that the paper shown in this portion that we've stopped

3    at, at 2:40 of the video?

4    A.   It is.

5              MS. GILBERT:  Give me one second.

6                        (Pause in proceedings.)

7              MS. GILBERT:  May I approach the witness, Your Honor?

8              THE COURT:  Yes.

9                        (Counsel approaches witness.)

10   BY MS. GILBERT:

11   Q.   I'm handing you what's been marked and admitted as

12   Exhibit 170.

13        Do you recognize this?

14   A.   I do.

15   Q.   What is it?

16   A.   It's the paper I got from the defendant's pocket.

17   Q.   Can you read the first line, please.

18   A.   Yes.

19        The first line is (as read):

20            "2640 Broadway."

21   Q.   Do you recognize that?

22   A.   I do.

23   Q.   What is it?

24   A.   It's the Pelosi residence.

25   Q.   Is there other writing on this piece of paper?

NAJARRO - CROSS / CHUANG

1    **A.**    There is.

2    **Q.**    Can you generally describe what that writing is?

3    **A.**    There is an address and a phone number.

4    **Q.**    Do you recognize that address?

5    **A.**    I do not.

6    **Q.**    Do you recognize that phone number?

7    **A.**    I do not.

8            **MS. GILBERT:**  At this point, I'd like to just pass the

9    piece of paper, which is in a heat-sealed bag, to the jury, and

10   then I have no further questions for Officer Najarro.

11           **THE COURT:**  All right.  You can pass it around.

12                   (Pause in proceedings.)

13           **THE COURT:**  Do you have any questions?

14           **MS. CHUANG:**  Yes.

15           **THE COURT:**  Okay.  Okay.  Thank you.

16   You may proceed.

17                   **CROSS-EXAMINATION**

18   BY MS. CHUANG:

19   **Q.**    Good morning, Officer.

20   **A.**    Good morning.

21   **Q.**    So when you arrived to the house that night, Mr. Pelosi

22   was unconscious when you first got there; right?

23   **A.**    That's correct.

24   **Q.**    He regained consciousness within minutes of when you got

25   there; right?

**NAJARRO - CROSS / CHUANG**

```
 1   A.    I don't know the exact time, how long he did to regain
 2   consciousness.
 3   Q.    Would you it help you remember if you watched part of your
 4   body cam?
 5   A.    It may.
 6                   (Pause in proceedings.)
 7            THE COURT:   Do you have other topics you want to go
 8   to, and then we can come back to this one?
 9            MS. CHUANG:   Sure.   We can do that, Your Honor.
10   BY MS. CHUANG:
11   Q.    So at some point, the medics were with Mr. Pelosi in the
12   hallway; right?
13   A.    That's correct.
14   Q.    During that time they were asking him questions?
15   A.    They were.
16   Q.    And he was answering their questions?
17   A.    He did.
18   Q.    He was giving coherent answers; correct?
19   A.    I wasn't listening to all of his answers.
20   Q.    Okay.   So let's take a look at Exhibit 315 again.
21                   (Video played but not reported.)
22   BY MS. CHUANG:
23   Q.    So in that clip from your body cam, you can hear
24   Mr. Pelosi answering questions in the background; correct?
25   A.    I can.
```

NAJARRO - CROSS / CHUANG

1   Q.   And you can hear the medic asking Mr. Pelosi what city

2   he's in?

3   A.   Yes.

4   Q.   And he responds correctly with "San Francisco"?

5   A.   He did.

6   Q.   You can hear the medic asking Mr. Pelosi what year it is?

7   A.   Yes.

8   Q.   And, again, he responds correctly with "2022"?

9   A.   That's correct.

10  Q.   And then after that, you can hear Mr. Pelosi telling the

11  medic that he, Mr. DePape, hit him in the head; correct?

12  A.   Yes.

13  Q.   And you can also hear Mr. Pelosi telling the medic that

14  he, Mr. DePape, broke into the house; correct?

15  A.   Yes.

16  Q.   Those are coherent answers?

17  A.   Those answers, yes.

18  Q.   Now, after this, Mr. Pelosi was moved to an ambulance;

19  right?

20  A.   That's correct.

21  Q.   And to move him to the ambulance, the medics used a

22  stretcher?

23  A.   A gurney, yes.

24  Q.   A gurney.  A gurney.

25       And when I say "gurney," I mean, it's not a stretcher like

1  where the person lays down completely flat; correct?

2  **A.**   No.  It initially can be flat, and then it can also be

3  moved into, like, a seated position.

4  **Q.**   Okay.  And that's how -- that's how they put Mr. Pelosi

5  into it, correct, in the seated position?

6  **A.**   I didn't see the medics put him in that position, but I

7  did see him later, in a seated position.

8  **Q.**   And to get him to that gurney, the medics had him stand

9  up; correct?

10  **A.**   At -- again, I didn't see that, that part where they put

11  him into the gurney.

12  **Q.**   Your body cam was on during the entire time you were at

13  the house; correct?

14  **A.**   That's correct.

15  **Q.**   I'm going to play you a little clip of later in your

16  body cam.

17           **MS. CHUANG:**  I think we're running into the same

18  technical issues.  Just a moment, Your Honor.

19                    (Pause in proceedings.)

20           **MS. GILBERT:**  Your Honor, we object to these

21  questions.  Lack of foundation.  The witness has stated he did

22  not see it at the time.

23           **THE COURT:**  Is this part of an exhibit that's in

24  evidence?

25           **MS. GILBERT:**  No, not from the Government.

NAJARRO - CROSS / CHUANG

1          THE COURT:  Is the exhibit not in evidence that you're

2   going to play?

3          MS. CHUANG:  Well, I'm going to play for the witness

4   first, Your Honor.

5          THE COURT:  But it's his body camera?

6          MS. CHUANG:  It's his body camera.

7          THE COURT:  I think it can come in if it's his -- if

8   he can lay the foundation that it's his body camera.

9          MS. GILBERT:  Yes, Your Honor.  But it doesn't mean

10  that he saw it.

11         THE COURT:  No, it doesn't.  But it does mean that he

12  took it.

13         MS. GILBERT:  Correct.

14         THE COURT:  So I think that's good enough.  Or the

15  camera took it, I should say.

16                    (Pause in proceedings.)

17         THE COURT:  I'll ask again if there are other areas we

18  can go to while we look for this?

19         MS. CHUANG:  I'm nearly done, Your Honor.

20         THE COURT:  Okay.

21                    (Pause in proceedings.)

22  BY MS. CHUANG:

23  Q.   I'm going to hand you this laptop.  It's a little clunky.

24  A.   Thank you.

25  Q.   Okay.  Officer, if you could just play yourself the first

 1  few seconds of that file.  And then hit stop.

 2                    (Pause in proceedings.)

 3  BY MS. CHUANG:

 4  Q.   So that's the beginning of your body cam footage from that

 5  night; correct?

 6  A.   Yes, ma'am.

 7  Q.   So now I'm going to ask you to go to 9 minutes and

 8  45 seconds in.

 9  A.   Okay.

10  Q.   And then play through 11 minutes and 15 seconds.

11                    (Pause in proceedings.)

12        MS. CHUANG:  And just let me know when you're done.

13                    (Pause in proceedings.)

14  BY MS. CHUANG:

15  Q.   So when you were there that night, you were facing

16  Mr. Pelosi when the medics helped him to the stretcher;

17  correct?

18  A.    In the video, yes, that's correct.

19  Q.   Okay.  And he was helped to the stretcher by the medics;

20  correct?

21  A.   Medics assisted him to the stretcher; correct.

22  Q.   They helped him stand up?

23  A.   Yes.

24  Q.   And they put him into the stretcher in the seated

25  position; correct?

1   **A.**   That's correct.

2   **Q.**   And then they moved him into the ambulance outside; right?

3   **A.**   That's correct.

4   **Q.**   So going back to earlier, you had said previously you

5   didn't recall how long it was after you arrived that Mr. Pelosi

6   regained consciousness.

7        Do you remember that?

8   **A.**   That's correct.

9   **Q.**   You said looking at this body cam footage would help you

10  remember; right?

11  **A.**   The one that I just watched.

12  **Q.**   A different part of it -- okay.

13       I'm going to ask you to go all the way back to the

14  beginning of the file.

15  **A.**   At the very beginning of the --

16  **Q.**   The very beginning.  And then if you could please put on

17  the headphones again, too.

18       And then you can play for yourself until you -- until the

19  moment when Mr. Pelosi regains consciousness.

20                     (Pause in proceedings.)

21  **BY MS. CHUANG:**

22  **Q.**   Officer, I'm going to ask you to pause -- what time stamp

23  are you on?

24  **A.**   I'm sorry.  Can you repeat that?

25  **Q.**   Sure.  What time stamp did you stop that video on?

1   **A.**   I'm still watching -- well, I just stopped it right now,

2   but it's at the 2:25 minute mark.

3   **Q.**   So if you could just watch a little further.  Thank you.

4                       (Pause in proceedings.)

5   **BY MS. CHUANG:**

6   **Q.**   Thank you.  And what time stamp did you stop it at?

7   **A.**   It's currently at 2:34.

8   **Q.**   So that means that's 2 minutes and 34 seconds into the

9   body cam file; correct?

10  **A.**   Into my body cam file, yes.

11  **Q.**   And the file started with you arriving at the house in

12  your car; correct?

13  **A.**   It started with me driving on the way to the house.

14  **Q.**   Okay.  And then by two and a half minutes, roughly, into

15  that footage, Mr. Pelosi regained consciousness; correct?

16  **A.**   At this time stamp, he's trying to get up.

17  **Q.**   Right.  So that's within three minutes of your getting to

18  the house is when he tried to get up; correct?

19  **A.**   Around two and a half minutes.

20  **Q.**   Thank you.  I'll take the computer back.

21  **A.**   Would you like it open still?

22  **Q.**   I'm sorry?

23  **A.**   Would you like it open?

24  **Q.**   Oh, yeah.  That's fine.

25       Okay.  So, Officer, to switch gears a little bit, let's go

1    to when you were with Mr. DePape outside the house.  All right?

2        During that time he was cuffed?

3    A.   That's correct.

4    Q.   And he was handcuffed behind his back specifically?

5    A.   That's correct.

6    Q.   Including in that clip -- the other clip of your body cam

7    that you went over; correct?

8    A.   In which other clip?

9    Q.   Where he's talking to the medics.

10   A.   Oh, yes.

11   Q.   Right.

12   A.   He's handcuffed.

13   Q.   So while you were out there with him, he said that his

14   shoulder was hurting; correct?

15   A.   That's correct.

16   Q.   And he asked if he could be cuffed in the front instead;

17   correct?

18   A.   That's correct.

19   Q.   And you said no?

20   A.   That's correct.

21   Q.   And he, at one point, said he was losing feeling in his

22   arm; correct?

23   A.   I don't remember that part.

24   Q.   Okay.  Would your -- would part of your body cam help you

25   remember whether he said that or not?

NAJARRO - CROSS / CHUANG

```
 1   A.    It may.

 2   Q.    Okay.

 3                       (Pause in proceedings.)

 4   BY MS. CHUANG:

 5   Q.    All right.  I guess I should not have taken this back from

 6   you, Officer.

 7   A.    Okay.  Thank you.

 8   Q.    If you could just play that file for yourself.

 9                       (Pause in proceedings.)

10   BY MS. CHUANG:

11   Q.    Now, after having watched that, do you remember now that

12   Mr. DePape said he was losing feeling in his arm?

13   A.    He said, "I can't feel my right arm anymore."

14   Q.    And while you were still outside the house with him that's

15   when you searched his pockets; correct?

16   A.    That's correct.

17   Q.    And you found the piece of paper that was passed around

18   the jury; correct?

19   A.    That's correct.

20   Q.    So I'm going to show that to you again.  And I'm handing

21   it up to you.

22   A.    Thank you.

23         (Witness examines document.)

24   Q.    The second line of that, the address that is not the

25   Pelosis' address, I want you to take a look at that.
```

1          That's an address in San Francisco; correct?

2   A.   It says it is.

3   Q.   And looking at the phone number underneath that, without

4   saying what the full phone number is, that's a 415 area code;

5   correct?

6   A.   That's correct.

7   Q.   And that's a San Francisco area code?

8   A.   It is.

9   Q.   And while you were searching him and you found this note,

10  you did not find any other weapons on him; correct?

11  A.   No.

12  Q.   Thank you.

13          MS. CHUANG:  No further questions.

14          THE COURT:  Anything further?

15          MS. GILBERT:  Your Honor, the Government would like to

16  move into evidence the two clips that Mr. Najarro watched that

17  Defense asked him about.  That would be 0:00 to 2:34 of his

18  body camera, as well as 9 minutes and 45 seconds to 11 minutes

19  and 15 seconds.

20      We -- the Government can prepare those clips for playing

21  later, but we'd ask if the Defense, clearly, has the videos, we

22  could play them for the jury now so they could observe them.

23          MS. CHUANG:  We would object to the admission of those

24  exhibits.  They were used to refresh the witness's

25  recollection, and then he testified off of them.

NAJARRO - CROSS / CHUANG

1      **THE COURT:**  Okay.  So I'm going to sustain that

2  objection right now.  We can address it later.

3      **MS. GILBERT:**  No further questions.

4      **THE COURT:**  Thank you.  You may step down.

5      **THE WITNESS:**  Thank you, Your Honor.

6                    (Witness excused.)

7      **THE COURT:**  Are you prepared to call your next

8  witness?

9      **MS. GILBERT:**  Yes, Your Honor.  The Government is

10  calling Lieutenant Hurley.  Thank you.

11     (Carla Hurley steps forward to be sworn.)

12     **MS. GILBERT:**  And, Your Honor, I think we can do the

13  direction examination of the witness before a break, but we may

14  need a break after that.

15     **THE COURT:**  For sure.

16     **MS. GILBERT:**  Thank you, Your Honor.

17     **THE CLERK:**  Raise your right hand.

18                    <u>**CARLA HURLEY**</u>,

19  called as a witness for the Government, having been duly sworn,

20  testified as follows:

21     **THE WITNESS:**  Yes.

22     **THE CLERK:**  Can you please state your name and spell

23  it for the record.

24     **THE WITNESS:**  Sure.  Carla, C-A-R-L-A.  Hurley,

25  H-U-R-L-E-Y.

HURLEY - DIRECT / GILBERT

 1          **THE CLERK:**  Thank you.

 2                    **DIRECT EXAMINATION**

 3  BY MS. GILBERT:

 4  **Q.**   Good morning, Lieutenant Hurley.

 5  **A.**   Good morning.

 6  **Q.**   Where do you work?

 7  **A.**   I'm currently employed by the City and County of

 8  San Francisco as a police lieutenant.

 9  **Q.**   Is that commonly referred to as the San Francisco Police

10  Department or "SFPD"?

11  **A.**   Yes.

12  **Q.**   How long have you worked for the San Francisco Police

13  Department?

14  **A.**   A little over 18 years.

15  **Q.**   What is your current assignment?

16  **A.**   I'm currently assigned as a patrol lieutenant at the SFO

17  airport.

18  **Q.**   Were you working for the San Francisco Police Department

19  on October 28th, of 2022?

20  **A.**   Yes.

21  **Q.**   What was your assignment at that time?

22  **A.**   At the time I was assigned as a sergeant in investigations

23  at the Special Investigations Division.

24  **Q.**   What is the Special Investigations Division?

25  **A.**   The Special Investigations Division investigates any

**HURLEY - DIRECT / GILBERT**

 1  hate-based crimes, bomb threats, any kind of crimes against

 2  public officials, crimes against police officers, things of

 3  that nature.

 4  **Q.**   As of October of 2022, how long approximately had you been

 5  in an investigative role at the San Francisco Police

 6  Department?

 7  **A.**   At least 10 years.

 8  **Q.**   Did you receive any training on investigating crimes when

 9  you joined the police department?

10  **A.**   I did.

11  **Q.**   Have you had additional training on investigating crimes

12  during the past 18 years, while you have been an officer?

13  **A.**   Yes.

14  **Q.**   Do you help train SFPD officers on investigative tools and

15  techniques?

16  **A.**   I do.

17  **Q.**   I'd like to focus your attention on October 28th of 2022.

18        Did you learn about an incident the Pelosis' home in

19  San Francisco that day?

20  **A.**   I did.

21  **Q.**   How?

22  **A.**   I received a phone call from Lieutenant Dave O'Connor.

23  **Q.**   Who is Lieutenant Dave O'Connor?

24  **A.**   He is the lieutenant at SID, Special Investigations

25  Division.

**HURLEY - DIRECT / GILBERT**

1  Q.   Was he the lieutenant of that division as of

2  October 28th of 2022?

3  A.   Yes.

4  Q.   Was he your supervisor at the time?

5  A.   Yes.

6  Q.   Do you recall approximately when you received this phone

7  call from Lieutenant O'Connor?

8  A.   It was about 3:00 a.m.

9  Q.   After you spoke with Lieutenant O'Connor, what did you

10 understand about the incident at the Pelosis' home?

11 A.   He informed me that a suspect had broken into the Pelosi

12 residence and that the suspect had attacked Paul Pelosi.

13 Q.   What did you do after you received this phone call from

14 Lieutenant O'Connor?

15 A.   I contacted our department operations center.

16 Q.   Why did you do that?

17 A.   I wanted to get the name of the officer that was handling

18 the report, the incident.

19 Q.   Did you learn who that officer was?

20 A.   I did.

21 Q.   Who was that officer?

22 A.   It was Officer Cagney.

23 Q.   And what did you do after you learned who the officer who

24 was handling the report was?

25 A.   I contacted Officer Cagney.

**HURLEY - DIRECT / GILBERT**

1   Q.   Why did you contact Officer Cagney?

2   A.   I wanted to find out what had happened.

3   Q.   At this point, did you understand that you would play a

4   role in investigating this incident?

5   A.   Yes.

6   Q.   And what role was that?

7   A.   I was going to be the investigating officer.

8   Q.   Are you still the investigating officer assigned to this

9   incident?

10  A.   I am not.

11  Q.   Let's turn back.

12       Did you end up calling Officer Cagney that night?

13  A.   I did.

14  Q.   And what did you understand about the incident after you

15  spoke with Officer Cagney?

16  A.   He told me that he responded to a call at the Pelosi

17  residence at 2640 Broadway Street, and that Mr. Pelosi answered

18  the door after they rang the doorbell.

19       He said once the door was opened, the suspect and

20  Mr. Pelosi were holding a hammer.

21       And he asked Mr. Pelosi:  Do you know him?

22       And at that point, Mr. Pelosi took a step back and the

23  suspect hit Mr. Pelosi with the hammer, at which point

24  Officer Cagney and his partner tackled the suspect.

25  Q.   During this call with Officer Cagney, did you also learn

**HURLEY - DIRECT / GILBERT**

1    who the suspect was?

2    **A.**    I did.

3    **Q.**    And who was that suspect?

4    **A.**    It's David DePape.

5    **Q.**    What did you do after you spoke with Officer Cagney?

6    **A.**    I contacted Officer Fuller.

7    **Q.**    Why?

8    **A.**    Officer Cagney informed me that Officer Fuller was with

9    the victim.

10   **Q.**    And why did you want to speak with Officer Fuller?

11   **A.**    I wanted her to get a statement from the victim in the

12   event that his condition worsened and that I wouldn't be able

13   to get there in time to interview him.

14   **Q.**    Do you know whether Officer Fuller did get a statement

15   from the victim?

16   **A.**    She did.

17   **Q.**    At that point, did you know who the victim was?

18   **A.**    I did.

19   **Q.**    And who was the victim?

20   **A.**    Paul Pelosi.

21   **Q.**    After you -- you said you understood that Officer Fuller

22   did get a statement from Mr. Pelosi.  Did you know that at the

23   time, in the early morning hours of October 28th?

24   **A.**    I'm sorry.  Repeat that question.

25   **Q.**    Let me rephrase.

**HURLEY - DIRECT / GILBERT**

1      You said that you did -- you wanted -- you called

2   Officer Fuller, you wanted her to take a statement.  Do you

3   know whether she took a statement from him?

4   **A.**   She did.

5   **Q.**   Did you learn that on October 28th, after you spoke with

6   her?

7   **A.**   Later on, I learned and reviewed the statement from her --

8   that she had gotten from the victim.

9   **Q.**   But at the time, did you confirm with her that she had

10  been able to take the statement?

11  **A.**   Yes.  At some point later on, yes.

12  **Q.**   So what did you do after that?

13  **A.**   I responded to the hospital, the San Francisco General

14  Hospital.

15  **Q.**   Why?

16  **A.**   I wanted to interview the victim and also wanted to

17  interview the suspect.

18  **Q.**   Did you know that they were both at the hospital at that

19  time?

20  **A.**   I did.

21  **Q.**   Okay.  Do you recall approximately when you went to the

22  hospital?

23  **A.**   It was about 4:00 a.m.

24  **Q.**   Did you end up interviewing the victim at that day?

25  **A.**   I did not.

HURLEY - DIRECT / GILBERT

1   Q.   Why not?

2   A.   When I got there, he was being wheeled into surgery to the

3   operating room.

4   Q.   Did you learn of the -- of Mr. Pelosi's condition at that

5   time?

6   A.   I did.

7   Q.   So once you realized you couldn't interview Mr. Pelosi,

8   what did you do?

9   A.   I responded to the emergency room area where the

10  defendant, David DePape, was.

11  Q.   Why?

12  A.   I wanted to interview him.

13  Q.   Did you end up interviewing him that day?

14  A.   I did.

15  Q.   Do you recognize the defendant here?

16  A.   I do.

17  Q.   Could you please indicate where he is.

18  A.   Sure.  He's sitting at that defense table, and he's

19  wearing a blue sweater with a blue shirt underneath.

20          MS. GILBERT:  Please let the record reflect that

21  Lieutenant Hurley has identified the defendant.

22  BY MS. GILBERT:

23  Q.   So I think you said that you went -- that the defendant

24  was in the emergency room of the hospital; is that correct?

25  A.   Correct.

**HURLEY - DIRECT / GILBERT**

1   Q.   Was the defendant in his own room?  Was he in a bay with

2   other people?  Can you tell us what the scene looked like?

3   A.   Sure.  No, he was in his own room.  He was laying on a

4   gurney, and there were two officers posted outside of his room.

5   Q.   Was the door to his room closed?

6   A.   At some -- no, I don't think it was, but at some point it

7   was.

8   Q.   Do you know why there were two officers outside of his

9   hospital room?

10   A.   That's customary.  When we have a prisoner that's at the

11   hospital, there would be normally two officers there to watch.

12   Q.   Are they usually outside the room or inside the room, or

13   does it vary?

14   A.   It varies.

15   Q.   Did you go inside the defendant's hospital room?

16   A.   I did.

17   Q.   Was the defendant handcuffed?

18   A.   He was.

19   Q.   Why?

20   A.   That's our policy, to handcuff the prisoner to prevent

21   escape.

22   Q.   Were his hands -- can you describe how he was handcuffed?

23   A.   Sure.  He was laying down, and his left hand was

24   handcuffed to the bed rail.

25   Q.   When you went into the defendant's room, was anyone else

HURLEY - DIRECT / GILBERT

```
 1   inside the room with you other than the defendant?

 2   A.   No.

 3   Q.   And approximately, what time did you go into the

 4   defendant's room?

 5   A.   I think it was around 5:30 a.m.

 6   Q.   And was this still on the same day, October 28th of 2022?

 7   A.   Yes.

 8   Q.   Did you inform the defendant of his rights before you

 9   interviewed him?

10   A.   I did.

11   Q.   Did he confirm that he understood his rights?

12   A.   He did.

13   Q.   Did you confirm his name?

14   A.   I did.

15   Q.   Did you record this interview?

16   A.   I did.

17   Q.   Have you listened to that recording since you conducted

18   the interview?

19   A.   Yes.

20   Q.   Approximately how long was your interview of the

21   defendant?

22   A.   It was about an hour.

23   Q.   I'd like to now play portions of the interview you

24   conducted with the defendant in chronological order.

25            MS. GILBERT:  Ms. Wachs, could you please pull up
```

HURLEY - DIRECT / GILBERT

1    what's been marked and admitted as Exhibit 5.

2        And for this one, I'd like if you could please just play

3    the first 10 seconds, and then we'll finish the rest of this

4    recording.

5        And just so everyone is ready, this is about an 11-minute

6    long exhibit.

7                    (Audio played but not reported.)

8    BY MS. GILBERT:

9    Q.   Lieutenant Hurley, do you recognize the two voices in this

10   recording?

11   A.   I do.

12   Q.   Who are they?

13   A.   That's my voice, and that's the defendant's voice.

14   Q.   And is this the interview of the defendant that you've

15   been testifying about?

16   A.   Yes.

17   Q.   And the section that we just played, where does this -- in

18   the hour-long interview, is this towards the beginning, the

19   middle, the end?

20   A.   That's the beginning.

21           MS. GILBERT:   Thank you.

22       Ms. Wachs, could you play the rest of Exhibit 5, please.

23                  (Audio played but not reported.)

24   BY MS. GILBERT:

25   Q.   Officer Hurley, I'm going to -- Lieutenant Hurley, excuse

1   me, I'm going to play another excerpt from the interview.

2           **MS. GILBERT:**  Ms. Wachs, could you --

3       Your Honor, we have about -- we have three more exhibits

4   of clips which are shorter, and then we have additional

5   testimony planned for Lieutenant Hurley, and I'm just

6   wondering --

7           **THE COURT:**  Maybe we should stop for our lunch break.

8       Okay.  Members of the jury, we're going to take a

9   45-minute lunch break; so we will resume as 12:50 p.m.

10      I suggest you don't leave the building.  There is a

11  cafeteria on the second floor if you didn't bring your lunch.

12      Please do not discuss the case with anyone.  We'll see you

13  back at 12:50.  Thank you.

14                  (The jury leaves the courtroom.)

15      (Proceedings were heard out of the presence of the jury.

16          **THE COURT:**  Okay.  Before we go to lunch, we have a

17  few things to discuss.  First, I'm a federal judge, not a state

18  judge, so I don't know what a "little 800" is.  But from the

19  objection, I inferred that it had to do with mental state.

20      It was Ms. Vartain, I think, objected at that.

21      What is a little 800?

22          **MS. VARTAIN:**  I think it has to do with mental state.

23  I remember it from reading reports, but I don't remember

24  precisely what it is.

25          **THE COURT:**  Is that -- what is a little 800?

PROCEEDINGS

1          **MS. VARTAIN:**  My understanding is it means something

2    along the lines of a mentally disturbed person.

3          **THE COURT:**  All right.  So I'm going to sustain my

4    objection under Rule 403.  While there is some relevance in

5    light of the defendant's non-opposition to the Government's

6    motion in limine to exclude any insanity defense or any

7    diminished capacity, I think its ability to confuse the jury

8    outweighs any probative value.

9          **MS. CHUANG:**  Right.  And to note our objection for the

10   record, they're putting in statements that Mr. DePape makes

11   during this period of time when the officers are saying that he

12   may be a mentally disturbed person.  So it goes to a state of

13   mind and the reliability of those statements that the

14   Government is putting in.

15         **THE COURT:**  Okay.  I think it -- under 403, I'm

16   excluding it.

17      So the second is with -- the tapes that you now want to

18   admit.  So the 00:00 to 02:34, that was just offered in terms

19   of establishing when we heard Mr. Pelosi speaking on the tape,

20   and I think the body -- right?  Is that correct?

21         **MS. CHUANG:**  Right.  From the beginning to 2:34 was

22   just to establish the length of time between when

23   Officer Najarro arrived and when Mr. Pelosi regained

24   consciousness.

25         **THE COURT:**  So that I would not let in.  But the

1    9 minutes to 11 minutes, 15 seconds, is that when the body cam

2    shows Mr. Pelosi being stood up and put on the gurney?

3         **MS. GILBERT:**  Yes.

4         **THE COURT:**  So that I would allow in.  You didn't

5    refresh his recollection.  He said he didn't see it.  And when

6    you questioned him, you didn't ask him if he refreshed his

7    recollection, he was just telling you what he had just saw.  So

8    I think it's substantive evidence.

9         **MS. CHUANG:**  Your Honor, it was actually to impeach

10   him.  He said he didn't see it, but then once he was shown the

11   footage, it was clear he was facing that very direction while

12   it was happening.

13        **THE COURT:**  It doesn't mean he saw it.  It doesn't

14   mean he saw it.  I'm facing this direction.  I can't tell you

15   what's going on out there.  That doesn't mean -- I don't think

16   that impeached him.  I don't think that was offered.

17        I think it was offered because you want to create -- it's

18   fine, fair -- a picture of what was being done with Mr. Pelosi.

19   That's fine.  The jury can see it.  They can actually see the

20   picture, but it wasn't done to refresh his recollection.

21        So I would let in the 9 minutes to 11 minutes, 15 seconds.

22   And then you could just figure out when you want to put that

23   in.

24        The third thing is then -- did you get a chance to review

25   the Defense's request for the non-impeachment part of the

1  testimony?

2          MS. GILBERT:  Enough to have this hearing, Your Honor.

3     So I think, Your Honor -- I think the way the Defense gave

4  us the clips was, I think, potentially in the order that they'd

5  use them, but a lot of them are small sections that all go

6  together.  And so I think it would be easier for us to talk

7  about them if we just talked about them page by page.

8          THE COURT:  Sure.

9          MS. GILBERT:  So I don't -- Angela, if you want to

10 take the lead.

11         MS. CHUANG:  Sure.  I don't have it organized by page

12 myself, but -- so we already talked about page 24, 12 through

13 17.  So that was the first one that we had brought up with

14 the Court earlier.

15         THE COURT:  That I allowed.

16         MS. CHUANG:  Right.  And then I'll try to go in order

17 of the pages.

18         MS. GILBERT:  I have marked them if it's -- I'm

19 happy -- I just marked it on here.  I'm happy to say it, and

20 then we can talk about it.

21         MS. CHUANG:  Sure.  That's fine.

22         MS. GILBERT:  So I think the next one is on page 26 of

23 the transcript.  And it looks like the Defense would like to

24 admit line 6 through 13, where the defendant says:  After that,

25 I wanted to go after Gavin Newsom.

 1        **THE COURT:**  Okay.

 2        **MS. GILBERT:**  As well as then line 19 to 22 where

 3   defendant says:  And then I want to have a little talk with Tom

 4   Hanks.

 5        And then the next section is line 24 on page 26, through

 6   line 13 on page 27, where DePape starts with:  He's actually

 7   identified by multiple people as a pedophile, but...

 8        Did I get all of the page 26 excerpts correct?

 9        **MS. CHUANG:**  I think the first one was actually

10   starting on line 7 -- oh, actually, you're right.  Starting on

11   line 6, yes.

12        **THE COURT:**  All right.  So the first one, 26, line 6

13   through 10.  What's the non-hearsay?

14        **MS. CHUANG:**  So for the -- it's actually in separate

15   pieces, but -- so for the line from 26-6 to 26-7, that first

16   sentence, that is being offered for effect on the listener:

17   The subsequent investigative steps that law enforcement took

18   based on this were to contact that person and give them a

19   warning.

20        **THE COURT:**  Not relevant.  Overruled.

21        **MS. CHUANG:**  From 26-7, to 26-13, that is not offered

22   for the truth of the matter.  That's actually asserted about

23   signing a bill restricting guns or the Constitution being

24   pretty clear but to show what Mr. DePape's beliefs were, and

25   motivations.

PROCEEDINGS

1              **MS. GILBERT:**  Your Honor, that is true.  I think that

2     they've argued that that's important that he -- these are the

3     things that he believed.  This is actually true that Newsom --

4     and its only relevance --

5              **THE COURT:**  Well, they're not offering for the -- say,

6     they're offering it for his state of mind.

7         The first line, they are offering for the truth, so I've

8     excluded that.

9         The second line, they say it's for his state of mind.  It

10    may or may not be true.  Just because it happens to be true

11    doesn't mean it's hearsay if it's not being offered for that

12    point.

13             **MS. GILBERT:**  How will the Defense elicit who this is

14    referring to without eliciting hearsay?

15             **MS. CHUANG:**  Lieutenant Hurley can actually speak --

16    she can speak to topics and people that were discussed.  That's

17    not hearsay.

18             **MS. GILBERT:**  That is hearsay, Your Honor.  I think

19    their opening made clear that the reason the defendant

20    discussed these people was because he had a plan to go get

21    them, and they have made it clear that they're offering that

22    for the truth, that that was his plan.

23             **THE COURT:**  How would you use it otherwise?

24             **MS. CHUANG:**  Simply asking Lieutenant Hurley about

25    who -- other people that were discussed during the interview,

1   there's no statement there.

2           THE COURT:  How are you going to use it?  How are you

3   going to use it?

4           MS. CHUANG:  Your Honor, it will tie into other

5   evidence later in the case.

6           THE COURT:  Right.  Which is that that was his purpose

7   so that --

8           MS. CHUANG:  Right.  And there's still no statement --

9   I mean, asking him about who he talked about during an

10  interview, there's no statement there.  There's no hearsay.

11          THE COURT:  That seems right, that it may be, it's

12  true, that they're going to use it later to argue what was in

13  his head.  But this isn't being offered.  The first line is.

14  You see the -- I see the distinction between the first line

15  being offered for the truth and the second is.

16      It is, in fact, what he said.  And then they can argue

17  from that whatever they want to argue.  So I agree that that's

18  non-hearsay and would allow that then.

19          MS. CHUANG:  Okay.  The next one on this page 20, at

20  lines 19 through 22, we had intended to offer for the effect on

21  the listener, similarly.

22          THE COURT:  I'll similarly object that the listener's

23  not on trial.

24          MS. CHUANG:  And then starting from line 24 on this

25  page to line 13 on page 27.

PROCEEDINGS

1          THE COURT:  Well --

2          MS. CHUANG:  Those statements --

3          THE COURT:  -- I think line 19 is being offered for

4    the truth.  But if you get there to line 13, that's clearly not

5    being offered for the truth.

6          MS. CHUANG:  Right.  Sorry.  The section I'm looking

7    at is line 24 on page 26.  That's the beginning of it, those

8    statements, and then through line 13 on the following page.

9          THE COURT:  Okay.  So that's non-hearsay.

10         MS. CHUANG:  Right.

11         MS. GILBERT:  And then, I think, the next section is

12   on page 28, Your Honor.

13      Am I right, Angela?

14         MS. CHUANG:  Mm-hmm.

15         MS. GILBERT:  And it starts -- I believe they would

16   like to put in lines 2 through 5 on 28, lines 7 through 13 on

17   28, lines 20 on 28, through line 7 on 29.

18         MS. CHUANG:  That was line 23 on the last one.  I

19   think that was just my handwriting not being clear.

20         MS. GILBERT:  Your handwriting says here 28-20 to

21   28-23 is the last --

22         THE COURT:  Oh, 2 through 5, is that the same thing,

23   effect on the listener?

24         MS. CHUANG:  Right.

25         THE COURT:  So overruled for the same or -- yeah,

1    I guess.

2         MS. CHUANG:  Right.  So some of this is for the effect

3    on the listener.  I'll just go through it piece by piece.

4         THE COURT:  Sure.

5         MS. CHUANG:  So lines 7 through 13, that would not be

6    for the truth.  It's the earlier piece, lines 2 through 5, that

7    we would have wanted to admit for effect on the listener.

8         THE COURT:  That I won't allow.  I think it's hearsay.

9      That -- I think that's just what he said.  Not being

10   offered for the truth.  So 7 through 13, I would allow.

11        MS. CHUANG:  And then at the bottom of the page,

12   lines 20 through 22, would have been for effect on the

13   listener.

14        THE COURT:  I'll not allow that for the same reason, I

15   think it's hearsay.

16        MS. CHUANG:  But lines 23 through line 6 on the next

17   page would not be for the truth.

18        THE COURT:  Starting on 23, page 29?

19        MS. CHUANG:  Starting on page 28, line 23, going

20   through line 6 on page 29.

21        THE COURT:  Well, starting at line 3, I think that's

22   being offered for the truth.  That's exactly him saying what

23   he's going to do.  That's hearsay.

24        MS. CHUANG:  Okay.  So up to line 2.

25        THE COURT:  Up to line 2.  I think lines 23 to line 2.

 1          **MS. GILBERT:**  And then, Your Honor, I believe, the

 2    next section is on page 40 of the transcript, line 14 to 19.

 3          **MS. CHUANG:**  Yes, that's correct.  And that would be

 4    offered not for the truth.

 5          **THE COURT:**  How so?

 6          **MS. CHUANG:**  So it would just be the first -- it would

 7    actually be a line shorter than that.

 8      It's not being offered to show that this was a

 9    particularly good time or any of the statements thereafter that

10    Biden's son is engaged in corruption.  We're not offering it

11    for the actual --

12          **THE COURT:**  You're offering it to show that Mr. DePape

13    thought it was a particularly good time.  So it is being

14    offered for the truth.  It's not just a particularly good time

15    out there.  It's in his head.  Did he think it was a

16    particularly good time?  That is what it's being offered for.

17          **MS. CHUANG:**  Well, that portion of it, but I won't be

18    eliciting that section of the statement.  It would just be

19    talking about his belief or his statement that Hunter Biden is

20    blatant, in-your-face corruption; right?  And that is not being

21    offered for the truth.

22          **THE COURT:**  Okay.  So just line 17.

23          **MS. CHUANG:**  Right.

24          **MS. GILBERT:**  I'm sorry.  I'm just -- could you repeat

25    that.  What line are you actually going to offer?

1        MS. CHUANG:  The statement in line 17.

2        MS. GILBERT:  Just line 17 that says "Such a blatant,

3   in-your-face corruption."  That's it?

4        MS. CHUANG:  It starts on the one before.  "His son is

5   just like -- such a blatant, in-your-face corruption."

6      Yes.

7        MS. GILBERT:  So it starts with:  And his son is just

8   like such a blatant, in-your-face corruption, I mean --

9      Just that section?

10        MS. CHUANG:  Yes.

11        THE COURT:  In other words, they're going to ask

12   Lieutenant Hurley:  Did he say -- bring up that Hunter Biden is

13   blatant, in-your-face corruption?

14        MS. GILBERT:  Thank you.

15        THE COURT:  Okay.  We're not admitting the audio.

16        MS. CHUANG:  I wasn't intending to.

17        THE COURT:  Right.

18        MS. CHUANG:  And then I think there was one last one.

19        MS. GILBERT:  I believe it was page 55, and it looked

20   like it was line 10 through 15.

21        MS. CHUANG:  Right.  And that would have been for

22   effect on the listener, Your Honor, similarly to some of those

23   other excerpts.

24        THE COURT:  Correct.  So I'll not allow it for the

25   same reasons.  I think it's being offered for the truth, if

1    that was, in fact, his intent.

2         Okay.  Thank you.  Enjoy your lunch.

3              **MS. GILBERT:**  Thank you.

4                    (Recess taken at 12:23 p.m.)

5              (Proceedings resumed at 12:53 p.m.)

6         (Proceedings were heard out of the presence of the jury.)

7              **THE CLERK:**  All rise for the jury.

8                    (The jury enters the courtroom.)

9         (Proceedings were heard in the presence of the jury.)

10             **THE COURT:**  You may be seated.

11        Welcome back and thank you for being so timely.

12        We will continue with the direct.  Thank you.

13             **MS. GILBERT:**  Thank you, Your Honor.

14   **BY MS. GILBERT:**

15   **Q.**   Lieutenant Hurley, we were just listening to an excerpt

16   from the interview that you conducted of the defendant; is that

17   correct?

18   **A.**   Correct.

19   **Q.**   And I'd like, at this point, to play a second excerpt from

20   that interview.

21             **MS. GILBERT:**  Ms. Wachs, if you could queue up

22   Exhibit 6, which has already been admitted.  We will play this

23   straight through.  This is about three and a half minutes long.

24                   (Audio played but not reported.)

25   \\\

PROCEEDINGS

1           MS. GILBERT:  Ms. Wachs, would you mind queuing up

2    Exhibit 7, which is another excerpt from the interview that

3    Lieutenant Hurley gave?

4        And this excerpt is about a minute and a half.

5                (Audio played but not reported.)

6    BY MS. GILBERT:

7    Q.   I'd like to just play one more excerpt from your

8    interview, Lieutenant Hurley.

9           MS. GILBERT:  Ms. Wachs, if you could queue up

10   Exhibit 8, which has been admitted.  And this is a short

11   excerpt.  This should be about 24 seconds.

12                (Audio played but not reported.)

13   BY MS. GILBERT:

14   Q.   Lieutenant Hurley, in this last excerpt, you asked the

15   defendant whether he took medication.  Was this towards the end

16   of your interview with him?

17   A.   Yes.

18   Q.   Why did you ask him that question?

19   A.   You know, through the course of the interview, everything

20   he was saying was so jarring and disturbing that I wanted to

21   know if he was on any, like, psychotropic meds or had any

22   conditions.

23   Q.   And it sounds like he responded that he wasn't; is that

24   right?

25   A.   Correct.

PROCEEDINGS

1   Q.   Did you find the defendant coherent during this interview?

2   A.   He was extremely coherent.

3   Q.   How would you describe his demeanor during the course of

4   your interview with him?

5   A.   Calm the entire time.

6   Q.   I'd like to switch gears.  What did you do after -- let me

7   put this back into the setting.

8        So remind us again, what day did you interview the

9   defendant?

10  A.   October 28th, 2022.

11  Q.   I think you said it was in the early morning; is that

12  right?

13  A.   Correct.

14  Q.   On that same day, what did you do after you interviewed

15  the defendant?

16  A.   I immediately went to the Pelosi residence at

17  2640 Broadway Street in San Francisco.

18  Q.   Do you recall approximately what time you went to their

19  home?

20  A.   It was about 9:00 a.m.

21  Q.   And why did you go to the Pelosis' home that morning?

22  A.   Well, I wanted to look at the crime scene and see if there

23  was any evidence there that I could look at or seize to keep

24  investigating.

25  Q.   Were there other SFPD officers there when you arrived?

PROCEEDINGS

1    **A.**    Yes.

2    **Q.**    Were there other law enforcement agencies at the Pelosis'

3    home that morning as well?

4    **A.**    There was.

5    **Q.**    Who was there of the other agencies?

6    **A.**    The FBI was there.  The Capital Police was there.

7    **Q.**    Did you enter the Pelosis' home that day?

8    **A.**    I did.

9    **Q.**    And, approximately, what time did you enter their home?

10   **A.**    It was about 1:00 p.m.

11   **Q.**    It sounds like you said you got there around 9:00 a.m.,

12   but you didn't enter their home until 1:00 p.m.  So what did

13   you do in that five hours?

14   **A.**    I was looking at the outside of the home, and we were

15   waiting to obtain a search warrant before entering.

16   **Q.**    Do you know whether a search warrant was obtained before

17   you entered the home?

18   **A.**    Yes.

19   **Q.**    "Yes," it was obtained or "yes," you know?

20   **A.**    Yes, I know, and it was obtained.

21   **Q.**    Thank you.

22        Did you examine both the interior and exterior of the

23   Pelosis' home on October 28th of 2022?

24   **A.**    I did.

25   **Q.**    Are you familiar with how the home looked that day?

PROCEEDINGS

1   **A.**   I am.

2   **Q.**   How much time approximately did you spend at their home

3   that day?

4   **A.**   About eight hours.

5   **Q.**   Did you walk around the whole outside of the house?

6   **A.**   I did.

7   **Q.**   And did you look through the interior of the home as well?

8   **A.**   I did.

9         **MS. GILBERT:**  Ms. Wachs, if you could pull up what's

10  been admitted as Exhibit 42.

11  **BY MS. GILBERT:**

12  **Q.**   Lieutenant Hurley, do you recognize this?

13  **A.**   Yes.

14  **Q.**   What is this?

15  **A.**   That's the Pelosi residence at 2640 Broadway Street in

16  San Francisco.

17  **Q.**   Is this a fair and accurate representation of how their

18  home looked when you arrived on October 28th?

19  **A.**   Yes.

20  **Q.**   Could you point out to us if -- let me ask it differently.

21       Is the Pelosis' front door depicted in this picture?

22  **A.**   It is.

23  **Q.**   Can you tell us where it is?

24  **A.**   I can touch this; right?

25  **Q.**   Let's try.

PROCEEDINGS

1   **A.**   Okay.   It's right here if you see that -- no, it didn't

2   work.

3   **Q.**   Didn't work?

4   **A.**   Yeah.   If you look on the left-hand side, there's the

5   garage door.   But if you go around, the front door is depicted

6   underneath those large windows right in the middle of the

7   white -- the white area is the front door.

8   **Q.**   Okay.

9            **MS. GILBERT:**   Ms. Wachs, could you pull up Exhibit 43,

10  please.

11  **BY MS. GILBERT:**

12  **Q.**   Do you recognize this, Lieutenant Hurley?

13  **A.**   Yes.

14  **Q.**   What is this?

15  **A.**   This is also a view of the Pelosi residence from the

16  Broadway Street side.

17  **Q.**   Is this a fair and accurate representation of their home

18  that day?

19  **A.**   Yes.

20  **Q.**   And can you tell us where the front door is in this

21  picture?

22  **A.**   Yes.   It's directly right in front of the middle of the

23  picture.   The white door is showing right beneath those large

24  windows.

25           **MS. GILBERT:**   Ms. Wachs, would you mind pulling up

**PROCEEDINGS**

1  Exhibit 26, which has also been admitted.

2  BY MS. GILBERT:

3  Q.   Lieutenant Hurley, do you recognize this?

4  A.   I do.

5  Q.   What is this?

6  A.   This is an aerial view of the Pelosi residence on the

7  ground floor.

8  Q.   Is this an accurate representation of the Pelosis' home

9  and surrounding area on October 28th of 2022?

10  A.   Yes.

11       MS. GILBERT:  Ms. Wachs, would you mind pulling up

12  Exhibit 27, please.

13  BY MS. GILBERT:

14  Q.   Lieutenant Hurley, do you recognize this?

15  A.   Yes.

16  Q.   What is this?

17  A.   This is an aerial view of the ground floor of the Pelosi

18  residence.

19  Q.   Is this a fair and accurate representation of how the

20  ground floor of the Pelosi's home looked when you were there on

21  October 28th of 2022?

22  A.   Yes.

23  Q.   And let's do one more.

24       MS. GILBERT:  Ms. Wachs, could you pull up Exhibit 28,

25  please.

PROCEEDINGS

```
 1    BY MS. GILBERT:
 2    Q.    Lieutenant Hurley, do you recognize this?
 3    A.    I do.
 4    Q.    Can you tell us what it is?
 5    A.    This is another aerial view of the third floor of the
 6    Pelosi residence.
 7    Q.    Is this a fair and accurate representation of the third
 8    floor of the Pelosis' home as you saw it on October 28th of
 9    2022?
10    A.    Yes.
11          MS. GILBERT:  Ms. Wachs, could we please turn to
12    Exhibit 76, which has also been admitted.
13    BY MS. GILBERT:
14    Q.    Lieutenant Hurley, do you recognize this?
15    A.    I do.
16    Q.    What is it?
17    A.    This is when you first enter the Pelosi residence, this is
18    the foyer area leading to their living room.
19    Q.    Is this what it looked like when you walked into the
20    Pelosis' home on October 28th of 2022?
21    A.    Yes.
22          MS. GILBERT:  And I'm going to now put up a poster
23    board of Exhibit 27.  Give me one minute.
24                    (Pause in proceedings.)
25          MS. GILBERT:  Can everyone see the poster board of
```

**PROCEEDINGS**

1   Exhibit 27?

2        Your Honor, you can see it as well?

3        Thank you.

4   **BY MS. GILBERT:**

5   **Q.**   Lieutenant Hurley, I think you have a laser pointer in

6   front of you.  Would you mind pointing out on Exhibit 27, on

7   the poster board, where the photograph on the screen that's

8   Exhibit 76 was taken and what it depicts?

9   **A.**   Sure.  It's right here.  This is the foyer area, and this

10  is the area leading to their living room, and the picture is

11  taken right about here.  (Indicating.)

12       **MS. GILBERT:**  And for the record, it looks like

13  Lieutenant Hurley is indicating in the open doorway in the

14  bottom towards the right of the aerial view.

15  **BY MS. GILBERT:**

16  **Q.**   Is that correct?

17  **A.**   Correct.

18       **MS. GILBERT:**  Ms. Wachs, would you mind turning to

19  Exhibit 78, which has been admitted.

20  **BY MS. GILBERT:**

21  **Q.**   Do you recognize this, Lieutenant Hurley?

22  **A.**   Yes.

23  **Q.**   What is this?

24  **A.**   This is right above the stairway leading to the living

25  room area.

**PROCEEDINGS**

1   Q.   Do you know when this photograph was taken?

2   A.   Yes.

3   Q.   When was that?

4   A.   October 28th, 2022.

5   Q.   Is this a fair and accurate representation of what this

6   area of the Pelosis' home looked like when you were there that

7   day?

8   A.   Yes.

9   Q.   And could you just point out for the jurors where is this

10   photograph showing on Exhibit 27?

11   A.   It's right about here.

12   Q.   Looks like you're indicating just above some stairs on the

13   right side of the graphic; is that right?

14   A.   Correct.

15   Q.   I'd like you to turn back to the screen on Exhibit 78.

16   Let me direct your attention to there.  It looks like there's

17   an item in the middle left of the photograph, a black

18   rectangle.

19       Do you know what that is?

20   A.   Yes.

21   Q.   What is it?

22   A.   That's a cellular phone.

23   Q.   Do you know whose cellular phone that is?

24   A.   Yes.  That's Paul Pelosi's phone.

25   Q.   How do you know that?

**HURLEY - CROSS / CHUANG**

1    A.    I actually picked it up, and I looked at the screen.

2    Q.    And did it indicate on the screen that it was Mr. Pelosi's

3    phone?

4    A.    Yes.  He had received text messages from people.  It was

5    obvious it was a relative of his.

6    Q.    What did you do with this phone, if anything?

7    A.    I put it back down so we could get a picture of it, and

8    then I later gave it to his son.

9    Q.    It looks like there are other items depicted in

10   Exhibit 78.

11         Did you examine these items?

12   A.    I did.

13   Q.    Did you collect these items?

14   A.    I did not, but I had our CSI collect them.

15   Q.    What does "CSI" mean?

16   A.    It's our crime scene investigators.

17         MS. GILBERT:  No further questions, Your Honor.

18         THE COURT:  All right.  Thank you.

19                        <u>CROSS-EXAMINATION</u>

20   BY MS. CHUANG:

21   Q.    Good afternoon, Lieutenant.

22   A.    Good afternoon.

23   Q.    During your direct examination, the Government played four

24   clips from your interview with Mr. DePape; right?

25   A.    Correct.

1   Q.   That wasn't your entire interview with him; correct?

2   A.   Correct.

3   Q.   That wasn't even most of your interview with him.

4   A.   I don't know what portion of it it was.

5   Q.   So the whole interview was around an hour.  That's what

6   you said; right?

7   A.   Correct.

8   Q.   Okay.  So the first clip that we heard was about

9   11 minutes long; is that right?

10  A.   I think so.

11  Q.   Okay.  And the second clip is about three and a half

12  minutes long; right?

13  A.   I think so.  I wasn't keeping track, but --

14          MS. CHUANG:  Okay.  So let's pull it up.  Let's pull

15  up Exhibit 6, and please just put the cursor all the way at the

16  end so that we can see the time stamp at the end.

17  BY MS. CHUANG:

18  Q.   So that second clip is about three and a half minutes

19  long; right?

20  A.   Yes.

21  Q.   The third clip is about one and a half minutes long;

22  right?

23          And let me know if you need to look at that one, too.

24  A.   Sure.  If you could pull it up.

25          MS. CHUANG:  Okay.  So if you could pull up Exhibit 7,

**HURLEY - CROSS / CHUANG**

1  and similarly, put the cursor at the end.

2  BY MS. CHUANG:

3  Q.   The third clip is about a minute and a half long; right?

4  A.   Yes.

5  Q.   And then the fourth clip, the final one, was about 20 -- I

6  think it was exactly 24 seconds.  And let me know if you need

7  to take a look at that.

8  A.   Sure.  I'll take a look at it.

9          MS. CHUANG:  Okay.  Let's pull up Exhibit 8, please,

10  and, again, just bring the cursor to the end.

11  BY MS. CHUANG:

12  Q.   So that last clip is 24 seconds long; right?

13  A.   Correct.

14  Q.   Okay.  So let's add these up together.  First clip,

15  11 minutes long; and second clip, three and a half minutes

16  long.  That's roughly 14 1/2 minutes between the first two

17  clips; right?

18      Is that right?

19  A.   Yes.

20  Q.   And then if we add the third clip, which is about a minute

21  and a half, that brings you to 16 minutes total with the first

22  three clips; correct?

23  A.   Sure.

24  Q.   And then, if you add the last clip, which is 24 seconds --

25  let's call it 30 -- that brings it to 16 1/2 minutes total in

**HURLEY - CROSS / CHUANG**

1   all four clips; correct?

2   **A.**   Sure.

3   **Q.**   Okay.

4     That's 16 1/2 minutes of an hour-long interview that we

5   heard; right?

6   **A.**   Yes.

7   **Q.**   And that means that there is over 40 minutes of that

8   interview that was not played for the jury?

9   **A.**   Correct.

10   **Q.**   All right.  And during those over 40 minutes of that

11   interview, you and Mr. DePape talked about a lot of different

12   things; right?

13   **A.**   Yes.

14   **Q.**   He talked about a blog he had; right?

15   **A.**   I'm sorry.  What?

16   **Q.**   He talked about a blog he had?

17       **MS. GILBERT:** Objection.  Calls for hearsay.

18       **THE COURT:** I don't know what were we -- if he just --

19   I think -- overruled.

20   **BY MS. CHUANG:**

21   **Q.**   He talked about a blog that he had had?

22   **A.**   I don't recall if he said a blog.  I know he said some

23   type of website.

24   **Q.**   And he talked about a lot of different people, too;

25   correct?

**HURLEY - CROSS / CHUANG**

1   **A.**   Correct.

2   **Q.**   Nancy Pelosi was one of the people he talked about; right?

3   **A.**   Yes.

4   **Q.**   And so was Paul Pelosi; right?

5   **A.**   Yes.

6   **Q.**   They weren't the only people he talked about; correct?

7   **A.**   Correct.

8   **Q.**   All right.  So let's -- and he talked about several other

9   individual people; correct?

10  **A.**   Yes.

11  **Q.**   All right.  So let's go through some of those.

12      He brought up someone who we are referring to as Target 1;

13  correct?

14  **A.**   I don't recall if he said Target 1.  I'm sorry.  If he

15  did, I don't know who he was referring to.

16          **MS. GILBERT:**  Your Honor, can we have a quick sidebar?

17          **THE COURT:**  Of course.  Or do you just need to talk to

18  the witness for a moment?

19          **MS. GILBERT:**  Yes.

20          **THE COURT:**  Why don't we just do that.

21          **MS. GILBERT:**  May I approach?

22          **THE COURT:**  Of course.

23          (Government counsel and witness conferring.)

24          **MS. GILBERT:**  Thank you, Your Honor.

25          **THE COURT:**  Of course.  Thank you.

**HURLEY - CROSS / CHUANG**

```
 1        You may proceed.
 2   BY MS. CHUANG:
 3   Q.   Lieutenant -- so he talked about -- he brought up a person
 4   who we were referring to as Target 1; correct?
 5   A.   Okay.  Yes.
 6   Q.   And now you know what -- who Target 1 refers to?
 7   A.   I do.
 8   Q.   Okay.
 9        Mr. DePape told you that Target 1 was a communist;
10   correct?
11   A.   Yes, I think he did.
12   Q.   And he also told you that an article that Target 1 wrote
13   was about turning schools into pedophile molestation factories;
14   correct?
15   A.   Correct.
16   Q.   He said that that was to make it easier to turn children
17   into communists; correct?
18   A.   Yes.
19   Q.   Okay.  Let's move on.
20        He also brought up Tom Hanks; correct?
21   A.   Correct.
22   Q.   That's Tom Hanks, the actor?
23   A.   Yes.
24   Q.   He, Mr. DePape, told you that Tom Hanks had been
25   identified as pedophile; correct?
```

1   **A.**   He did.

2   **Q.**   And he told you that one of the people who identified him

3   as a pedophile was killed under very suspicious circumstances;

4   right?

5   **A.**   I remember vaguely something about that, yeah.

6   **Q.**   He identified that person as Isaac Kappy?

7   **A.**   I don't remember that.

8   **Q.**   He told you that this person's death looked like it was

9   assisted suicide?

10  **A.**   Yes, that's familiar.

11  **Q.**   And Mr. DePape also told you that Tom Hanks fled the

12  country?

13  **A.**   He did.

14  **Q.**   And he also told you that a 13- or 14-year-old girl had

15  accused Tom Hanks of buying her from her father for sex;

16  correct?

17  **A.**   Correct.

18  **Q.**   All right.  Mr. DePape also brought up Gavin Newsom,

19  didn't he?

20  **A.**   Excuse me.  Yes, he did.

21  **Q.**   And Gavin Newsom is the governor of California?

22  **A.**   Correct.

23  **Q.**   Mr. DePape told you that Gavin Newsom had signed a bill

24  restricting guns; correct?

25  **A.**   Correct.

**HURLEY - CROSS / CHUANG**

1  Q.   And that it was an infringement of constitutional rights;

2  correct?

3  A.   Yes.

4  Q.   Moving on, Mr. DePape also brought up Mike Pence, didn't

5  he?

6  A.   He did.

7  Q.   Mike Pence -- you're aware that Mike Pence was

8  vice president under Donald Trump; correct?

9  A.   Yes.

10  Q.   And Mr. DePape told you that if Mike Pence counted

11  fraudulent electors, he would be responsible for the stolen

12  election; correct?

13  A.   Yes.

14  Q.   And he told you that Mike Pence knew there was corruption

15  and fraud and laundered it through his name; correct?

16  A.   I don't remember that part, yeah.

17  Q.   Would it refresh your recollection to listen to some of

18  the interview?

19  A.   No.  I don't need to, I don't think.

20  Q.   All right.  Mr. DePape also talked about Hunter Biden;

21  right?

22  A.   He did.

23  Q.   And you know that Hunter Biden is President Biden's son;

24  correct?

25  A.   Yes.

1    **Q.**   He's not a government official; correct?

2    **A.**   Correct.

3    **Q.**   Mr. DePape told you that they just sent 450 charges

4    against Hunter to Congress; correct?

5    **A.**   Yes.

6    **Q.**   And he told you that they're going to throw Hunter under

7    the bus to cover up everything else; correct?

8    **A.**   Correct.

9    **Q.**   He didn't specify who he meant by "they"; correct?

10   **A.**   Correct.

11   **Q.**   Mr. DePape also said that Hunter Biden was blatantly

12   in-your-face corrupt; correct?

13   **A.**   Something to that effect, yes.

14   **Q.**   So I think you said on direct that some of the things that

15   Mr. DePape said during this interview were jarring and

16   disturbing to you; right?

17   **A.**   Yes.

18   **Q.**   So some of those things that we just went through that he

19   talked about other people, like Tom Hanks being a pedophile,

20   that was something that seemed -- that seemed strange to you;

21   right?

22   **A.**   Yes.

23   **Q.**   And that's what prompted you to ask him if he was taking

24   any medications; correct?

25   **A.**   It wasn't just that.  It was several things that he said

**HURLEY - CROSS / CHUANG**

1  that prompted me to ask that.

2  Q.   It was one of the things that was -- that sounded jarring

3  enough to you that you thought you should follow up; correct?

4  A.   Yes.

5  Q.   You also knew going into this interview that Mr. DePape

6  had been injured recently; right?

7  A.   Yes.

8  Q.   All right.  I mean, you saw him in the emergency room;

9  right?

10  A.   Correct.

11  Q.   That's where he was being treated?

12  A.   Correct.

13  Q.   So he -- his shoulder was dislocated at that time?

14  A.   Correct.

15  Q.   And while you were going through this interview, this all

16  took place in the emergency room; correct?

17  A.   Yes.

18  Q.   During the interview there are also times when Mr. DePape

19  appeared to get emotional; right?

20  A.   Yes.

21  Q.   It was almost like he was on the verge of crying?

22  A.   Yes.

23  Q.   So let's listen to one of those times.

24          MS. CHUANG:  If we could pull up Exhibit 5 and play

25  from 2 minutes 56 seconds to 3 minutes and 10 seconds.

```
 1              (Audio played but not reported.)

 2         MS. CHUANG:  You can stop that now.  Thank you.

 3   BY MS. CHUANG:

 4   Q.   So that short piece we just listened to, you can hear him

 5   get emotional during that; right?

 6   A.   Yes.

 7   Q.   And that's what he was like when you interviewed him,

 8   that's what you saw in person; right?

 9   A.   Right.  At that moment, yes.

10   Q.   Right.  Okay.

11        So after you spoke with Mr. DePape at the hospital, I

12   think you said you went to the Pelosi house from there; right?

13   A.   Yes.

14   Q.   And that was to assist in the search for evidence;

15   correct?

16   A.   Correct.

17   Q.   So this floor plan that's up, I think it's Exhibit 27 --

18   right? -- that's one of the two floor plans that you went

19   through with the Government during your direct examination;

20   right?

21   A.   Correct.

22   Q.   This floor plan is of the ground floor, the entrance

23   floor; right?

24   A.   Correct.

25   Q.   And the second floor plan that you talked about with the
```

**HURLEY - CROSS / CHUANG**

1   Government was of the third floor; right?

2   **A.**   Correct.

3   **Q.**   There is a second floor in between the first and third

4   floors, isn't there?

5   **A.**   Yes.

6   **Q.**   But you didn't talk about -- you didn't go over a floor

7   plan for the second floor during your direct examination;

8   correct?

9   **A.**   Correct.

10  **Q.**   You're aware there's a second floor because you were

11  physically there?

12  **A.**   Yes.

13  **Q.**   And there are multiple rooms on that floor?

14  **A.**   Yes.

15  **Q.**   There's a kitchen on the second floor?

16  **A.**   Yes.

17  **Q.**   A dining room on the second floor?

18  **A.**   Yes.

19  **Q.**   Other rooms as well; right?

20  **A.**   I don't remember.  I think there was like another sitting

21  room or something.  I'm not sure exactly what it was.

22  **Q.**   There is also a basement in the house, isn't there?

23  **A.**   Yes.

24  **Q.**   And, again, you didn't go over a floor plan for the

25  basement during your direct examination, did you?

1    **A.**   Correct.

2    **Q.**   But you know it exists -- you know it exists because you

3    were there; right?

4    **A.**   Yes.

5    **Q.**   Okay.  There's also a fourth floor in the house; correct?

6    **A.**   I didn't know that.

7    **Q.**   Yeah.  So did you go through the whole house yourself?

8    **A.**   I went through most of it.

9    **Q.**   Okay.  So you never went to a fourth floor, a floor above

10   where the bedroom was?

11   **A.**   If I did, I don't remember.

12   **Q.**   Okay.  All right.

13        So now, let's take a look at --

14        **MS. CHUANG:**  If we could pull up Exhibit 78, please.

15   **BY MS. CHUANG:**

16   **Q.**   So this is one of the photos that you just talked to the

17   Government about, and you said that phone that you can see on

18   the floor, that is Paul Pelosi's phone; correct?

19   **A.**   Yes.

20   **Q.**   And it's mixed with other items like a Clipper Card and

21   money and things like that; right?

22   **A.**   Correct.

23   **Q.**   And your understanding was that, of everything that was

24   strewn around the floor, that had been found on Mr. DePape's

25   person at the time of the incident; right?

1  **A.**   Correct.

2  **Q.**   Including the phone came from his person; right?

3  **A.**   Yes.

4  **Q.**   So you picked up the phone, you said; right?

5  **A.**   Yes.

6  **Q.**   You looked at it just to see whose phone it was; right?

7  **A.**   Correct.

8  **Q.**   Put it back down for the photo?

9  **A.**   Yes.

10 **Q.**   Then you returned it to Mr. Pelosi's son; correct?

11 **A.**   Yes.

12 **Q.**   And Mr. Pelosi's son was there at the house while the

13 search was happening, wasn't he?

14 **A.**   He was.

15 **Q.**   And that's when you returned it to him?

16 **A.**   I don't remember exactly when I returned it to him, but at

17 some point during those few minutes, yeah.

18 **Q.**   Okay.  Why did you return it to him?

19 **A.**   I had no reason to keep it.

20 **Q.**   You didn't collect it as evidence; right?

21 **A.**   No.

22 **Q.**   So everything else on the floor in that photo, that was

23 all collected as evidence, wasn't it?

24 **A.**   Yes.

25 **Q.**   You -- the only thing on that floor that you did not

**HURLEY - CROSS / CHUANG**

1  collect as evidence was Paul Pelosi's phone; right?

2  **A.**   Correct.

3  **Q.**   So that means its data was never downloaded; correct?

4  **A.**   Correct.

5  **Q.**   Its contents were never searched; correct?

6  **A.**   Correct.

7  **Q.**   And -- even though that's the phone that came from

8  Mr. DePape's person; correct?

9  **A.**   Yes.

10  **Q.**   Right.  And even though that's the phone that Mr. Pelosi

11  called 9-1-1 from; right?

12  **A.**   Correct.

13  **Q.**   Never searched; correct?

14  **A.**   No.

15  **Q.**   Okay.  Let's talk about interviewing Mr. Pelosi.

16       You did eventually interview Mr. Pelosi; correct?

17  **A.**   Yes.

18  **Q.**   It wasn't on October 28th, because he was going into

19  surgery, you said; right?

20  **A.**   Correct.

21  **Q.**   You interviewed him two days later?

22  **A.**   I think so, correct.

23  **Q.**   And that was at the hospital?

24  **A.**   Yes.

25  **Q.**   All right.  Your understanding was that before you spoke

**HURLEY - CROSS / CHUANG**

1  to him, he had already spoken to other officers previously;

2  right?

3  A.   Correct.

4  Q.   I think you mentioned Officer Fuller during your direct

5  examination.  He spoke with Officer Fuller, from your

6  understanding; correct?

7  A.   Yes.

8  Q.   And that conversation, as far as you know, occurred on

9  October 28th?

10  A.   Yes.

11  Q.   Right.  And your understanding was that during that

12  conversation, he was able to answer Officer Fuller's questions?

13  A.   Yes.

14  Q.   And you are also aware that he also gave statements in the

15  ambulance on the way to the hospital; correct?

16  A.   Right.

17  Q.   So back to your interview of Mr. Pelosi.

18       At the point you were interviewing him, had you been told

19  what he had said in his previous statements to other officers?

20  A.   I knew that -- I believe at that time had already reviewed

21  Officer Fuller's statement, which was on body-worn camera.

22  Q.   Okay.  I'm sorry.  Finish.

23  A.   Go ahead.

24  Q.   So by reviewing Officer Fuller's body-worn camera, you

25  knew essentially what Mr. Pelosi told him?

**HURLEY - CROSS / CHUANG**

1    **A.**   Told her.

2    **Q.**   Told her.

3    **A.**   Yes.

4    **Q.**   Apologies.

5         And when you interviewed Mr. Pelosi, what he told you

6    about what happened was largely consistent with what he had

7    told Officer Fuller; correct?

8             **MS. GILBERT:**  Objection.  This calls for hearsay.

9             **THE COURT:**  It does.

10            **MS. CHUANG:**  I'm not entering any type of statement.

11   It's just whether what she heard during the interview was

12   largely consistent with what she had heard from the body --

13            **THE COURT:**  It's hearsay.  I don't know why you

14   object, but it is hearsay; right?  So sustained.

15   **BY MS. CHUANG:**

16   **Q.**   So this interview you did with Mr. Pelosi, you recorded

17   it; right?

18   **A.**   I did.

19   **Q.**   You audio-recorded it?

20   **A.**   I did, yeah.

21   **Q.**   But after you stopped the recording, you actually

22   continued to speak with him afterward; isn't that right?

23   **A.**   I don't remember.

24   **Q.**   Okay.  You actually stopped recording in the middle of a

25   sentence?

```
 1   A.    Maybe.  I don't remember.

 2   Q.    I'm going to play you part of your audio to see if that

 3   helps you remember.  Okay?

 4                      (Pause in proceedings.)

 5             MS. CHUANG:  May I approach, Your Honor?

 6             THE COURT:  Yes.

 7                   (Counsel approaches witness.)

 8             THE WITNESS:  Play it now?

 9   BY MS. CHUANG:

10   Q.    Yes, please.  And just let me know when you're done.

11                      (Pause in proceedings.)

12             THE WITNESS:  Okay.

13   BY MS. CHUANG:

14   Q.    You stopped recording your conversation with Mr. Pelosi in

15   the middle of a sentence; correct?

16   A.    Correct.

17   Q.    And at the beginning of the interview, you informed

18   Mr. Pelosi that you -- that you would answer his questions

19   afterwards so that it's not recorded?

20   A.    Probably, yes.

21   Q.    Correct.  So that's what you were trying to do is

22   purposely not record parts of conversations with witnesses?

23   A.    Yes.

24   Q.    Okay.

25             MS. CHUANG:  No further questions.  I will take that
```

 1   back.

 2          THE COURT:  Any redirect?

 3          MS. GILBERT:  No, Your Honor.

 4          THE COURT:  Thank you.  You are excused.

 5          THE WITNESS:  Okay.  Thank you.

 6                     (Witness excused.)

 7          THE COURT:  Is the Government prepared to call your

 8   next witness?

 9          MS. GILBERT:  Yes, Your Honor.  The Government calls

10   Tracy Demkowski.

11      (Tracy Demkowski steps forward to be sworn.)

12          THE CLERK:  Please raise your right hand.

13                     TRACY DEMKOWSKI,

14   called as a witness for the Government, having been duly sworn,

15   testified as follows:

16          THE WITNESS:  I do.

17          THE CLERK:  Can you please state your name and then

18   spell it for the record.  And use the mic, please.

19          THE WITNESS:  My name is Tracy Demkowski.  T-R-A-C-Y,

20   D-E-M-K-O-W-S-K-I.

21          THE COURT:  Good afternoon.

22          THE WITNESS:  Good afternoon.

23                     DIRECT EXAMINATION

24   BY MS. GILBERT:

25   Q.  Good afternoon, Ms. Demkowski.  Where do you work?

**DEMKOWSKI - DIRECT / GILBERT**

1   **A.**   I work for the City and County of San Francisco as a

2   police officer.

3   **Q.**   Is that commonly referred to, the San Francisco Police

4   Department, or "SFPD"?

5   **A.**   Yes.

6   **Q.**   What is your -- do you have an assignment?

7   **A.**   I'm currently assigned to the crime scene investigations

8   unit.

9   **Q.**   What does the crime scene investigations unit do?

10  **A.**   We respond out to crime scenes, anywhere from a burglary

11  to a homicide, where we identify, process, collect, preserve,

12  and book evidence.

13  **Q.**   How long have you been assigned to the crime scene

14  investigations unit?

15  **A.**   It's been about four-and-a-half years now.

16  **Q.**   And how long have you been a police officer with the

17  San Francisco Police Department?

18  **A.**   About nine-and-a-half.

19  **Q.**   Nine-and-a-half years?

20  **A.**   Yes.

21  **Q.**   Okay.  Have you had any training in collecting and

22  processing evidence from crime scenes?

23  **A.**   Yes.

24  **Q.**   Do you teach other officers about the proper handling and

25  collection of evidence?

**DEMKOWSKI - DIRECT / GILBERT**

1  **A.**   I do.

2  **Q.**   Were you working on October 28th of 2022?

3  **A.**   Yes.

4  **Q.**   What was your shift that day?

5  **A.**   I was working the day shift.

6  **Q.**   What hours are the day shift?

7  **A.**   That is from 6:00 a.m. until 4:00 p.m.

8  **Q.**   At some point on October 28th of 2022, did you respond to

9  the home of Congresswoman Nancy Pelosi and Paul Pelosi?

10 **A.**   Yes.

11 **Q.**   For what purpose did you respond to their home?

12 **A.**   To process a crime scene.

13 **Q.**   How did that come about?

14 **A.**   I was notified by my day shift partner, Officer Gamble,

15 that we were going to respond out there to relieve our on-call

16 unit and take over the investigation from the crime scene side.

17 **Q.**   Was that on-call unit also part of crime scene

18 investigations?

19 **A.**   Yes.

20 **Q.**   Approximately what time did you arrive at the Pelosis'

21 home that day?

22 **A.**   It would have been a little bit after 7:00 a.m.

23 **Q.**   And was anyone else from your -- from crime scene

24 investigations there when you arrived?

25 **A.**   Yes.

**DEMKOWSKI - DIRECT / GILBERT**

1   **Q.**   Who was there?

2   **A.**   Officer Gamble.

3   **Q.**   Did anyone else from your unit, from crime scene

4   investigations, show up later that day?

5   **A.**   Yes.

6   **Q.**   Who was that?

7   **A.**   My acting lieutenant.  That would be Sergeant O'Connor.

8   **Q.**   We've heard a few O'Connors, can you tell us

9   Sergeant O'Connor's first name, please?

10  **A.**   Lyn.

11  **Q.**   Is that different from an O'Connor who works for the

12  Special Investigations Division of the San Francisco Police

13  Department?

14  **A.**   Yes, it is.

15  **Q.**   Were there any law enforcement officers from other

16  agencies at the Pelosis' home that day?

17  **A.**   Yes.

18  **Q.**   What agencies were those?

19  **A.**   SID was there, which is our Special Investigations

20  Division.  There was also Capitol Police and the FBI.

21  **Q.**   Did you end up processing the scene?

22  **A.**   Yes.

23  **Q.**   When did you start processing the scene?

24  **A.**   We began taking exterior photographs of the scene around

25  11, but we didn't go inside the residence until about 1:10 p.m.

DEMKOWSKI - DIRECT / GILBERT

1   Q.   Why did you wait to go inside?

2   A.   We were waiting to get clarification as to whether we

3   would be handling or if the FBI would be handling, and then if

4   there was a search warrant that would be written.

5   Q.   Do you know whether a search warrant was written?

6   A.   Yes.

7   Q.   "Yes" it was written or "yes" you know?

8   A.   To both, yes.

9   Q.   Okay.  You said another CSI officer was with you.  I think

10  you called this person Officer Gamble; is that right?

11  A.   Correct.

12  Q.   Did you split up tasks with Officer Gamble for processing

13  the Pelosis' home?

14  A.   Yes.

15  Q.   And how did you split those tasks up?

16  A.   So Officer Gamble was considered the primary officer,

17  which would mean that he would be writing the report, and he

18  also was the photographer.  And then I was the one who was

19  marking and picking up evidence, also known as the custodian of

20  evidence.

21  Q.   What did you and Officer Gamble do first when you started

22  processing the scene?

23  A.   Took photographs.

24  Q.   Why did you take photographs first?

25  A.   We do that first because we want to document what the

DEMKOWSKI - DIRECT / GILBERT

1  scene looks like before anything is moved or touched.

2  Q.   And then what did you do after you took photographs?

3  A.   We identify items that may be related to the crime and

4  then we put down markers.

5  Q.   Why do you do that?

6  A.   For a couple of reasons.  One is because in the

7  photographs, it makes the items of evidence really pop out; and

8  in addition to that, for documentation purposes, when we write

9  our reports, it keeps things organized.

10  Q.   What did you do after you put down markers in the Pelosis'

11  home?

12  A.   We took more photographs.

13  Q.   And after you took another set of photographs, what did

14  you do?

15  A.   We collected the evidence.

16  Q.   Did you take the evidence somewhere after it was

17  collected?

18  A.   It would have been myself or Officer Gamble, but we did

19  take it back to CSI impound, yes.

20  Q.   And "CSI" is crime scene investigations?

21  A.   Yes.

22  Q.   That's your unit?

23  A.   Yes.

24  Q.   Okay.

25  \\\

1        **MS. GILBERT:**  Ms. Wachs, if you could pull up what has

2   been marked and admitted as Exhibit 75, please.

3   **BY MS. GILBERT**

4   **Q.**   Officer Demkowski, do you recognize this?

5   **A.**   I do.

6   **Q.**   What does this show?

7   **A.**   It's a photograph of the entryway of the Pelosi home,

8   looking towards a living room area.

9   **Q.**   Is this how it looked when you arrived on October 28th?

10  **A.**   Yes.

11  **Q.**   Now, in front of you should be a laser pointer, and on the

12  other side of you is what has been marked as Exhibit 27.

13       Do you recognize Exhibit 27?

14  **A.**   I do.

15  **Q.**   What is that?

16  **A.**   It's a layout of the first floor of the Pelosi home.

17  **Q.**   Is that a consistent, fair, and accurate representation of

18  the first floor of their home, how it looked when you were

19  there on October 28th of 2022?

20  **A.**   Yes.

21  **Q.**   Could you indicate with your laser pointer on Exhibit 27,

22  the blowup, where the photograph that's on your screen, that

23  would be Exhibit 75, where that is, where that depicts?

24  **A.**   The photograph would have been taken about here looking

25  east towards that living room area.

1          MS. GILBERT:  Could we pull up, Ms. Wachs, Exhibit 76,

2    please.

3    BY MS. GILBERT:

4    Q.    Do you recognize this, Officer Demkowski?

5    A.    Yes.

6    Q.    What is it?

7    A.    It's another photograph of the inside of the Pelosi home,

8    specifically standing in the entryway, looking towards, again,

9    that living room area.

10   Q.    Could you just show us -- I won't have you do this after

11   every photograph, I promise, but could you just show on

12   Exhibit 27 where this is depicted?

13   A.    That would have been taken about here, again, looking

14   east.

15   Q.    Looking east through the doors that are shown in the

16   bottom right of the image; is that correct?

17   A.    Yes.

18          MS. GILBERT:  Okay.  And, Ms. Wachs, could you pull up

19   Exhibit 78, please.  It's already been admitted.

20   BY MS. GILBERT

21   Q.    Do you recognize this, Officer Demkowski?

22   A.    I do.

23   Q.    What is this?

24   A.    It's the floor of a hallway that's within the living room

25   area of the Pelosi home.

1          MS. GILBERT:  And, Ms. Wachs, can you please pull up

2    Exhibit 79?

3    BY MS. GILBERT

4    Q.   Do you recognize this, Officer Demkowski?

5    A.   Yes.

6    Q.   What is this?

7    A.   It's the same area as the last photograph just from a

8    slightly different angle.

9    Q.   Can you just point out on Exhibit 27 where this

10   photograph -- what this photograph depicts, what area?

11   A.   It would have been this area around here.

12   Q.   It looks like right below the elevator; is that right?

13   A.   Yes.

14   Q.   Did you come back after these photographs were taken and

15   put down markers?

16   A.   Yes.

17          MS. GILBERT:  And, Ms. Wachs, could you pull up

18   Exhibit 84, please?

19   BY MS. GILBERT

20   Q.   Do you recognize this, Officer Demkowski?

21   A.   I do.

22   Q.   What is this?

23   A.   It's, again, a photograph of the entryway looking down

24   into the living room, and now with markers that I had placed.

25   Q.   Were any of the items depicted in these photographs of

1  this front entryway seized that day?

2  **A.**  Yes.

3        **MS. GILBERT:**  Your Honor, may I approach the witness?

4        **THE COURT:**  You may.

5        **MS. GILBERT:**  Thank you.

6              (Counsel approaches witness.)

7  **BY MS. GILBERT:**

8  **Q.**  Officer Demkowski, I've handed you a big plastic bag with

9  some items inside, and I see you have found the gloves that are

10 on the witness stand, and you're welcome to put those on.

11       I've handed you a bag with exhibits that have been marked

12 and admitted already from 161 through 169.  And I'd like, if

13 you wouldn't mind, you to pull each exhibit out of the bag and

14 tell us the number and what it is, and I'll ask you a question

15 about it.

16              (Pause in proceedings.)

17 **BY MS. GILBERT**

18 **Q.**  Can you tell us what number that is?

19 **A.**  This is Exhibit 171.

20 **Q.**  I've handed you the wrong bag.  I'm going to take that

21 back.  I apologize.

22       Let's try this again.  Do you mind?

23       What exhibit is that, Officer Demkowski?

24 **A.**  162.

25 **Q.**  What is that?

DEMKOWSKI - DIRECT / GILBERT

1   **A.**   It's a zip tie.

2   **Q.**   Did you -- was that collected from the Pelosis' home?

3   **A.**   Yes.

4   **Q.**   From which area?

5   **A.**   It would have been from either Marker Number 2 or 3.

6   **Q.**   And that's in the Exhibit 84 that's in front of the -- in

7   front of everyone?

8   **A.**   Yes.

9   **Q.**   Okay.  Thank you.

10   What exhibit is that?

11   **A.**   That is Exhibit 161.

12   **Q.**   And what is that depicting?

13   **A.**   It's a packet of zip ties.

14   **Q.**   Where was that found?

15   **A.**   That was found, again, in that entryway area in the Nancy

16   Pelosi home.

17   **Q.**   What's next?

18   **A.**   Exhibit 164.  It's a cup.

19   **Q.**   Where was that recovered?

20   **A.**   That was, again, found in the Nancy Pelosi home,

21   specifically near Marker Number 3.

22   **Q.**   Thank you.

23   Can you tell us what's next?

24   **A.**   Exhibit 166.

25   **Q.**   What is that?

1   **A.**    It's a Clipper Card.

2   **Q.**    From where was it recovered?

3   **A.**    The Nancy Pelosi home, near Marker Number 2.

4   **Q.**    Thank you.

5   **A.**    Exhibit 167, which is another Clipper Card found next to

6   the same Clipper Card.

7   **Q.**    Thank you.

8   **A.**    Exhibit 168, which is a Muni ticket, and this was found in

9   the Nancy Pelosi home near the Clipper Cards.

10  **Q.**    Thank you.

11  **A.**    Exhibit 169, it's a slip of paper with some writing on it,

12  and that was also found next to the Muni ticket and the Clipper

13  Cards.

14  **Q.**    I think there's one left in there.

15  **A.**    Exhibit 165, which is some cash, and that was found near

16  the Clipper Cards and the Muni card.  And then Exhibit 163

17  which is another zip tie that would have been found near

18  Marker 2 or Marker 3 in the Nancy Pelosi home.

19  **Q.**    Thank you.

20       Would you mind putting those all back into the bag.

21            **MS. GILBERT:**  I will approach, if that's okay.

22                      (Counsel approaches witness.)

23  **BY MS. GILBERT:**

24  **Q.**    I'd like to turn your attention to a different part of the

25  Pelosis' home, if that's okay.

1      Did you process the ground floor living room?

2  A.   Yes.

3          MS. GILBERT:  And, Ms. Wachs, would you mind pulling

4  up Exhibit 95.

5  BY MS. GILBERT:

6  Q.   You recognize this, Officer Dembrowski?

7  A.   I do.

8  Q.   Demkowski, I apologize.

9      What is this?

10 A.   It's a photograph of the living room area looking out

11 towards the back doors that go to the backyard.

12 Q.   Would you mind indicating on Exhibit 27 where this

13 photograph is showing?

14 A.   The photograph would have been taken on the steps looking

15 towards these doors right here.

16 Q.   Did you examine these glass doors?

17 A.   I did.

18 Q.   And what did you determine?

19 A.   We determined that that was the POE, the point of entry.

20 Q.   Do you see any broken glass in this area?

21 A.   Yes.

22 Q.   Is it -- can you see it in Exhibit 95?

23 A.   I can.

24 Q.   Can you describe where that is?

25 A.   It's the living room area.

DEMKOWSKI - DIRECT / GILBERT

1    Q.    Of where the broken glass is.  Excuse me.

2    A.    On the interior side of the residence.

3          MS. GILBERT:  Ms. Wachs, would you mind pulling up

4    Exhibit 96, please.

5    BY MS. GILBERT:

6    Q.    Do you remember this, Officer Demkowski?

7    A.    Yes.

8    Q.    What is this?

9    A.    It's a closer-up version of the POE.

10   Q.    Remind us what that is again.

11   A.    The point of entry.

12   Q.    Thank you.

13         Did you also examine this broken glass from the other

14   side, from the outside of the home?

15   A.    Yes.

16         MS. GILBERT:  Would you mind pulling up Exhibit 59,

17   please.

18   BY MS. GILBERT:

19   Q.    Do you recognize this?

20   A.    I do.

21   Q.    What is this?

22   A.    It's a photograph of those back doors but taken from the

23   exterior side.

24         MS. GILBERT:  And could you pull up Exhibit 61,

25   please.

DEMKOWSKI - DIRECT / GILBERT

1    BY MS. GILBERT:

2    Q.   And do you recognize this, Officer Demkowski?

3    A.   Yes.

4    Q.   What is this?

5    A.   That's the point of entry seen from the exterior side.

6    Q.   You said there was broken glass inside the home.  Did you

7    also see broken glass outside of the home?

8    A.   Yes.

9    Q.   Let's turn back to the ground floor living area.

10        MS. GILBERT:  Ms. Wachs, would you mind pulling up

11   Exhibit 89.

12   BY MS. GILBERT:

13   Q.   Do you recognize this, Officer Demkowski?

14   A.   Yes.

15   Q.   What is this?

16   A.   It's the living room area of the Pelosi home.

17   Q.   Can you show us in Exhibit 27 what this photograph is

18   depicting?

19   A.   It's a photograph that's taken about here, looking north

20   towards this couch. (Indicating.)

21   Q.   So a photograph taken from what looked like -- are those

22   stairs, in your memory?  You pointed to -- it looks like on the

23   aerial they might be stairs.

24        Do you remember those being stairs, right there?

25   A.   Stairs or steps, yes.

1   Q.   And pointing north towards the couch; is that correct?

2   A.   Yes.

3   Q.   Was any evidence seized from this area of the room?

4   A.   Yes.

5   Q.   What was seized from this area?

6   A.   A hammer.

7   Q.   Do you see it depicted in Exhibit 89?

8   A.   I do.

9   Q.   Where is it?

10  A.   It's in the bottom corner.  You can see it through the

11  bars.

12          **MS. GILBERT:**  Let's show Exhibit 90 which might be

13  easier to see.  And this has also been admitted.

14  **BY MS. GILBERT:**

15  Q.   Do you recognize this, Officer Demkowski?

16  A.   Yes.

17  Q.   What is this?

18  A.   That's the hammer.

19  Q.   Is this the location of where it was recovered?

20  A.   Yes.

21  Q.   Can you just indicate on Exhibit 27 where you found --

22  where you saw the hammer?

23  A.   It was between the wall and the couch about right here.

24  Q.   Was this hammer seized?

25  A.   Yes.

**DEMKOWSKI - DIRECT / GILBERT**

1          **MS. GILBERT:**  May I approach, Your Honor?

2          **THE COURT:**  You may.

3                    (Counsel approaches witness.)

4   **BY MS. GILBERT:**

5   **Q.**   I'm handing you what has been marked and admitted as

6   Exhibit 160.

7          Do you recognize this, Officer Demkowski?

8   **A.**   Yes.

9   **Q.**   What is this?

10  **A.**   This is the hammer that was seized behind the couch in the

11  Pelosi home.

12  **Q.**   I'm going to take that back, if that's okay.

13         Did you process the crime scene in the upper floors of the

14  Pelosis' home that day?

15  **A.**   One of the upper floors.

16  **Q.**   More specifically, did you find evidence that was seized

17  in the Pelosis' bedroom?

18  **A.**   Yes.

19  **Q.**   What floor is their bedroom on?

20  **A.**   The third floor.

21  **Q.**   I'm going to swap out the poster boards.  Give me one

22  second.

23                    (Pause in proceedings.)

24         **MS. GILBERT:**  Can everyone see that -- where it's

25  located?

 1          Okay.

 2     BY MS. GILBERT:

 3     Q.    I've put up a crooked Exhibit 28, but I put up Exhibit 28.

 4           Do you recognize this, Officer Demkowski?

 5     A.    Yes.

 6     Q.    What is this?

 7     A.    It's a layout of the third floor of the Pelosi home.

 8     Q.    Are the areas that you examined when you were there on

 9     October 28th depicted fairly and accurately in this exhibit?

10     A.    Yes.

11              MS. GILBERT:  Ms. Wachs, would you mind putting up

12     Exhibit 104 on the screen.

13     BY MS. GILBERT:

14     Q.    Do you recognize this?

15     A.    Yes.

16     Q.    What is this?

17     A.    That's a photograph of the stairs, specifically looking

18     down from the third floor to the bottom floor.

19     Q.    Could you indicate on Exhibit 28 what this photograph is

20     showing?

21     A.    It would have been taken around here looking down at these

22     stairs.

23     Q.    The kind of spiral-looking semi-circle in the middle of

24     the exhibit; is that right?

25     A.     Yes.

1            **MS. GILBERT:**  Ms. Wachs, would you mind pulling up

2    Exhibit 106.

3    **BY MS. GILBERT:**

4    **Q.**   Do you recognize this?

5    **A.**   Yes.

6    **Q.**   What is this?

7    **A.**   It's the third floor of the Pelosi home, looking east

8    towards the Pelosi bedroom.

9    **Q.**   Would you indicate on Exhibit 28 where this -- what this

10   photograph is depicting.

11   **A.**   It would have been taken around here, looking east, this

12   way. (Indicating.)

13   **Q.**   And around here would be at the top of the stairs; is that

14   what you've indicated?

15   **A.**   Yes.

16   **Q.**   Looking east towards the bedroom; is that what you said?

17   **A.**   Correct.

18   **Q.**   There's an open door in this photograph.  Do you know what

19   that door is for?

20   **A.**   Yes.

21   **Q.**   What is that?

22   **A.**   It's a door to an elevator.

23   **Q.**   Is the elevator depicted in Exhibit 28?

24   **A.**   Yes.

25   **Q.**   Can you show us where?

DEMKOWSKI - DIRECT / GILBERT

1 **A.** Right here.  (Indicating.)

2 **Q.** And you said it was towards the far end -- the photo looks

3 into the Pelosi' bedroom.

4   Can you tell us where the bedroom is indicated in this

5 photograph?

6 **A.** It would be indicated by the back door.  You can see that

7 one is closed and one is open.  That would be the entryway to

8 the Pelosi bedroom.

9    **MS. GILBERT:**  Ms. Wachs, would you pull up

10 Exhibit 107, please.

11 **BY MS. GILBERT:**

12 **Q.** Do you recognize this?

13 **A.** Yes.

14 **Q.** What is this?

15 **A.** It's the elevator.

16 **Q.** It looks like there's a black item in the elevator.  Do

17 you know what that is?

18 **A.** Yes.

19 **Q.** What is it?

20 **A.** A telephone.

21 **Q.** Let's turn to the Pelosis' bedroom.

22    **MS. GILBERT:**  Could we pull up Exhibit 109, please.

23 **BY MS. GILBERT:**

24 **Q.** Do you recognize this?

25 **A.** I do.

**DEMKOWSKI - DIRECT / GILBERT**

1    Q.   What is this?

2    A.   It's a photograph of the entryway into the Pelosi home --

3    or bedroom.

4    Q.   Could you indicate on Exhibit 28 what this photograph

5    depicts.

6    A.   It was taken around here.  Looking this way. (Indicating.)

7    Q.   So it looks like you're indicating the far right lower

8    portion of the aerial; is that correct?

9    A.   Yes.

10        MS. GILBERT:  Could we please turn to Exhibit 110.

11   BY MS. GILBERT:

12   Q.   Do you recognize this?

13   A.   Yes.

14   Q.   What is this?

15   A.   It's a pile of pillows and a glove and a zip tie that we

16   located inside the Pelosi bedroom.

17        MS. GILBERT:  And could we please turn to Exhibit 115.

18   BY MS. GILBERT:

19   Q.   Do you recognize this?

20   A.   Yes.

21   Q.   What is this?

22   A.   It's a packet of rope.

23   Q.   And where was this photograph taken?

24   A.   It was found between those pillows that were in the last

25   photograph and the curtains.

DEMKOWSKI - DIRECT / GILBERT

1  Q.   Could you show us?  I don't think I see any pillows on the

2  floor depicted in Exhibit 28.  Could you show us where those

3  pillows were that are in the photographs on Exhibit 28?

4  A.   They would have been about here, and this would be the

5  curtains.

6  Q.   Now, I'd like to hand you another bag with a few exhibits.

7          MS. GILBERT:  May I approach, Your Honor?

8          THE COURT:  You may.

9                (Counsel approaches witness.)

10 BY MS. GILBERT:

11 Q.   Officer Demkowski, would you mind pulling these out and

12 telling us what exhibit numbers they are.

13 A.   Exhibit 172.

14 Q.   And what is that?

15 A.   It's the glove that we found on the pillow in the Pelosi

16 home.

17         MS. GILBERT:  Ms. Wachs, would you mind pulling up

18 Exhibit 110 again.

19 BY MS. GILBERT:

20 Q.   Is this the glove that's depicted in Exhibit 110?

21 A.   Yes.

22 Q.   Thank you.

23      Could you please move to the next exhibit.

24 A.   173.  It's a pack of zip ties.

25 Q.   Is that also depicted in the photograph, Exhibit 110?

1   A.   Yes.

2   Q.   And finally, the last exhibit, please.

3   A.   171, which is a pack of rope.

4   Q.   And where did you find this?

5   A.   That was found between the pillow that's depicted in the

6   photo and the curtains.

7   Q.   Would that be the rope that we just saw in Exhibit 115?

8   A.   Yes.

9   Q.   You can just put those aside.  Thank you.

10       Did you examine other parts of the Pelosis' bedroom and

11  adjoining rooms?

12  A.   Yes.

13       MS. GILBERT:  Ms. Wachs, would you mind pulling up

14  117.

15  BY MS. GILBERT:

16  Q.   Officer Demkowski, do you recognize this?

17  A.   I do.

18  Q.   What is this?

19  A.   It's a photograph of the Pelosi bedroom, specifically

20  looking at the bed and facing north.

21  Q.   Is this how their bedroom looked when you examined it on

22  October 28th of 2022?

23  A.   Yes, it is.

24       MS. GILBERT:  Could you pull up Exhibit 118, please,

25  Ms. Wachs.

DEMKOWSKI - DIRECT / GILBERT

1   BY MS. GILBERT:

2   Q.   Do you recognize this?

3   A.   Yes.

4   Q.   What is this?

5   A.   It, again, depicts the bed in the Pelosi bedroom, looking

6   north, towards the closet area.

7        MS. GILBERT:   And, Ms. Wachs, would you mind pulling

8   up 119.

9   BY MS. GILBERT:

10  Q.   Do you recognize this, Officer Demkowski?

11  A.   Yes.

12  Q.   What is this?

13  A.   That's a photograph, again, in the Pelosi bedroom but

14  looking towards the closet and bathroom area.

15  Q.   Would you mind showing us on Exhibit 28 where this

16  photograph was taken and what it depicts.

17  A.   This photograph would have been taken about here, looking

18  this way. (Indicating.)

19       MS. GILBERT:   Could -- Ms. Wachs, would you mind

20  turning to Exhibit 123.

21  BY MS. GILBERT:

22  Q.   Do you recognize this, Officer Demkowski?

23  A.   Yes.

24  Q.   What is this?

25  A.   It's the Pelosi bedroom bathroom.

1   Q.   Would you show us on Trial Exhibit 28, the poster board,

2   what this photograph depicts?

3   A.   The photograph was taken around here, looking into the

4   bathroom.

5         MS. GILBERT:   Ms. Wachs, would you mind pulling

6   Exhibit 119 back up.

7   BY MS. GILBERT:

8   Q.   Officer Demkowski, were you -- did you walk through this

9   area of the Pelosis' home?   It looks like kind of a little

10  space before the bathroom and then into the bathroom from the

11  bedroom?

12  A.   Yes.

13  Q.   How would you describe the amount of room in this area,

14  this space between what looks, here, like a dresser, and a

15  door, and then the bathroom opening?

16  A.   It was relatively tight.

17        MS. GILBERT:   We have no further questions.   Thank

18  you.

19        THE COURT:   Should we take our 10-minute break, or are

20  you quick and we'll do it after this witness?

21        MS. CHUANG:   We can take the break now.

22        THE COURT:   We'll just take a quick 10-minute break.

23  It's the afternoon.   We need them more frequently.   The last

24  break of the day.

25        Please do not discuss the case at all.   Thank you.

1            (The jury leaves the courtroom.)

2     (Proceedings were heard out of the presence of the jury.)

3        **THE COURT:**  Thank you.

4             (Recess taken at 2:01 p.m.)

5          (Proceedings resumed at 2:11 p.m.)

6        **THE COURT:**  Just one scheduling matter to bring up.

7  One of our jurors has a meeting in Oakland at 4:00 p.m., so if

8  we could -- I don't know who the next witness is or how long

9  with that.  He's the one that's all dressed up.  I think it's

10  kind of an important meeting, so we should try to end around

11  2:50 or so, so that he can get there.

12        **MS. GILBERT:**  That's fine, Your Honor.  Thank you.

13        **THE COURT:**  Okay.

14        **THE CLERK:**  All rise.

15            (The jury enters the courtroom.)

16     (Proceedings were heard in the presence of the jury.)

17        **THE COURT:**  Thank you, you may be seated.

18  And now for the cross.

19                **<u>CROSS-EXAMINATION</u>**

20  **BY MS. CHUANG:**

21  **Q.**   Good afternoon.

22  **A.**   Good afternoon.

23  **Q.**   Okay.  So you testified on direct examination that you

24  processed two floors in the Pelosi house; correct?

25  **A.**   Correct.

DEMKOWSKI - CROSS / CHUANG

1  Q.   That would be the ground floor; right?

2  A.   Yes.

3  Q.   And then the third floor; right?

4  A.   Yes.

5  Q.   You didn't process anything on the second floor; correct?

6  A.   Correct.

7  Q.   Or the fourth floor; correct?

8  A.   Correct.

9  Q.   Or the basement; correct?

10 A.   Correct.

11 Q.   And you actually weren't allowed in some of the rooms at

12 the house that day; correct?

13 A.   Yes.

14 Q.   That's what you had been told by Mr. Pelosi's son;

15 correct?

16 A.   That's what I had been told by SID.

17 Q.   So that's what's you had been told by the Special

18 Investigations Division; correct?

19 A.   Yes.

20 Q.   So you understood that there was a search warrant for the

21 house; correct?

22 A.   Yes.

23 Q.   And that's what you were waiting for before going in;

24 right?

25 A.   Yes.

1  Q.   And so even though you had a search warrant, you didn't

2  search the entire house; correct?

3  A.   Yes.

4  Q.   Do you normally not search entire floors of houses that

5  you have search warrant for?

6  A.   Normally, I do whatever the investigating unit instructs

7  me to do.

8  Q.   Okay.  So you were just doing what you were instructed to

9  do; right?

10  A.   Yes.

11  Q.   So on direct examination, one of the pieces of physical

12  evidence that you talked about was the hammer that was

13  collected.  Remember that?

14  A.   Yes.

15  Q.   Okay.  So when you collected that hammer, you swabbed it

16  for trace evidence; right?

17  A.   Yes.

18  Q.   And that's like a cotton swab; correct?

19  A.   Yes.

20  Q.   And you do that to try to collect things like blood or

21  DNA; right?

22  A.   Yes.

23  Q.   Okay.  Other than that, you didn't alter the hammer at

24  all, did you?

25  A.   I also conducted a leucocrystal violet test on it, but

1   other than that, no.

2   Q.   So you didn't, like, wipe it clean, did you?  Right?

3   A.   No.

4   Q.   And you didn't rub anything off of it?

5   A.   No.

6   Q.   Because that would be tainting the evidence; right?

7   A.   Yes.

8   Q.   Okay.  So we're going to look again at one of the photos

9   that we went over during your direct examination.

10          MS. CHUANG:  If we could please pull up Exhibit 117.

11  BY MS. CHUANG:

12  Q.   Can you see that on your screen?

13  A.   Yes.

14  Q.   Okay.  So this is a photo of the bedroom; right?

15  A.   Correct.

16  Q.   And then at the bottom to the -- a little left of center,

17  you can see some items on a nightstand; right?

18  A.   Yes.

19  Q.   So that white thing that's on the nightstand, do you

20  remember what that is?

21  A.   I don't recall.

22  Q.   Okay.  So I'm going to hand you what's been premarked as

23  Exhibit 569 for identification.

24          That's a different photo of the bedroom; right?

25  A.   Yes.

**DEMKOWSKI - CROSS / CHUANG**

1   Q.   It shows a slightly different angle?

2   A.   Yes.

3   Q.   And it fairly and accurately depicts the bedroom as it

4   appeared on that day; correct?

5   A.   Yes.

6           MS. CHUANG:  Move to admit.

7           MS. GILBERT:  No objection.

8           THE COURT:  569 admitted.

9       (Trial Exhibit 569 received in evidence.)

10          MS. CHUANG:  If we could please pull that up on the

11  screens to publish to the jury.

12  BY MS. CHUANG:

13  Q.   Okay.  Can you see that on your screen?

14  A.   Yes.

15  Q.   So in this picture you can see more of the nightstand;

16  right?

17  A.   Yes.

18  Q.   And that white thing on top of the nightstand, you see

19  it -- you see it in its entirety now; right?

20  A.   Yes.

21  Q.   It looks like some type of machine?

22  A.   Correct.

23  Q.   There's a hose coming out of it; right?

24  A.   Yes.

25  Q.   Do you know if that's a CPAP machine for sleep apnea?

1   **A.**    I don't know.

2   **Q.**    Okay.

3            **MS. CHUANG:**  No further questions.

4            **THE COURT:**  Anything further?

5            **MS. GILBERT:**  No, Your Honor.

6            **THE COURT:**  Thank you.  You are excused.

7                          (Witness excused.)

8            **THE COURT:**  Is the Government prepared to call your

9   next witness?

10           **MS. CHUANG:**  Your Honor, could I just take that back?

11           **THE COURT:**  Oh, of course.

12           **MS. VARTAIN:**  Yes, Your Honor, the Government calls

13   Lyn O'Connor, but if I could have one moment while she comes in

14   to move some stuff around?

15           **THE COURT:**  Of course.

16           **MS. VARTAIN:**  Thank you.

17       (Lyn O'Connor steps forward to be sworn.)

18                          <u>**LYN O'CONNOR**</u>,

19   called as a witness for the Government, having been duly sworn,

20   testified as follows:

21           **THE WITNESS:**  Yes.

22           **THE CLERK:**  Do me a favor.  Please state your name and

23   spell your name for the record, but you can do that sitting

24   down.

25           **THE WITNESS:**  My name is Lyn, L-Y-N, O'Connor,

**O'CONNOR - DIRECT / VARTAIN**

1    O, apostrophe, C-O-N-N-O-R.

2              THE COURT:  Good afternoon.

3              THE WITNESS:  Good afternoon.

4              THE COURT:  You may proceed.

5                        DIRECT EXAMINATION

6    BY MS. VARTAIN:

7    Q.   Good afternoon, Ms. O'Connor.

8         What do you do for work?

9    A.   I'm the acting lieutenant of crime scene investigations

10   for the San Francisco Police Department.

11   Q.   So acting lieutenant is your title; is that correct?

12   A.   Yes.

13   Q.   And you work for -- are the -- are you the sort of the top

14   of the chain at CSI?

15   A.   Yes.

16   Q.   Did you respond to the Pelosi residence on -- one more

17   question:  How long have you been with SFPD?

18   A.   I'm on my 26th year with the SFPD.

19   Q.   Did you respond to the Pelosis' home on October 28th,

20   2022?

21   A.   I did.

22   Q.   Why?

23   A.   I was responding there basically in a supervisory role.

24   Q.   And can you just describe in sort of an overarching way

25   what you did at the Pelosis' home on October 28th, 2022?

1   **A.**   When I responded there, I met with other CSI members that

2   were on scene, Officer Demkowski and Officer Gamble.  I was

3   briefed basically on the scene, stood on the exterior,

4   contacted Lieutenant O'Connor, was briefed briefly by him, and

5   then subsequently went to the back patio area and observed and

6   collected evidence.

7   **Q.**   Okay.  I -- and can you describe the scene in the back

8   patio area?

9   **A.**   The back patio area has a landing with benches.  There was

10  a large backpack, a smaller backpack, and a sleeping bag in

11  that area.  There was broken glass from a broken window and

12  some various other items in that area.

13  **Q.**   I'm going to show you admitted Exhibit 124, and it will

14  come up in your screen in front of you.

15      Do you recognize this?

16  **A.**   I do.

17  **Q.**   And what is it?

18  **A.**   This is a picture of that back patio that I was just

19  describing.  And in the image, you can see the large backpack,

20  the smaller backpack, and the sleeping bag.

21  **Q.**   I'm going to show you Exhibit 126, please.

22      What are we looking at here?

23  **A.**   Yes, that's an image of the smaller backpack opened up.

24      **MS. CHUANG:**  127, please, Ms. Wachs.

25  \\\

**O'CONNOR - DIRECT / VARTAIN**

1  BY MS. CHUANG:

2  Q.   Acting Lieutenant, what are we looking at here?

3  A.   Exhibit 127 is a picture of that backpack from 126 with

4  the contents removed and displayed.

5  Q.   And were you there when the contents were removed?

6  A.   Yes.

7  Q.   Okay.

8       MS. CHUANG:  And could we please look at Exhibit 132,

9  Ms. Wachs.

10  BY MS. CHUANG:

11  Q.   Do you recognize this?

12  A.   Yes.

13  Q.   What is it?

14  A.   This is a picture of the larger backpack that was

15  described earlier, with a couple of items next to it.

16       MS. CHUANG:  And 135, please.

17  BY MS. CHUANG:

18  Q.   Do you recognize Exhibit 135?

19  A.   Yes.

20  Q.   What is this?

21  A.   This is a picture of that larger backpack opened up so you

22  can see the contents.

23  Q.   Did SFPD collect the items from the two backpacks?

24  A.   Yes.

25  Q.   And did you collect all of the items and take them into

O'CONNOR - DIRECT / VARTAIN

1  SFPD custody?

2  **A.**   No, not all of the items.   There was some items that were

3  collected by the FBI.

4  **Q.**   Okay.  And is there sort of a -- what was the general

5  division of labor as that was concerned?

6  **A.**   The division of labor was that the SFPD would take all the

7  items that the FBI was not interested in.  So the FBI would

8  collect the electronics, and we would take everything else.

9  **Q.**   Okay.  And with respect to the electronics, was it all of

10  the electronics, to your knowledge, that FBI took?

11  **A.**   It was all the electronics except for, I believe, a

12  Nintendo Switch.

13  **Q.**   Do you have an understanding about why the FBI collected

14  the electronics?

15  **A.**   It was my understanding that they were going to bring it

16  down to the -- one of the criminal labs and have them analyzed.

17  **Q.**   Were you present when law enforcement unpacked the large

18  backpack?

19  **A.**   Yes.

20  **Q.**   And did you help unpack it?

21  **A.**   I did.

22  **Q.**   I'm going to start handing you physical exhibits from the

23  back porch now.  They've already been admitted, so we can go

24  through this, hopefully, fairly quickly.

25       Do you recognize this, Acting Lieutenant?

O'CONNOR - DIRECT / VARTAIN

```
 1  A.    Yes.

 2  Q.    What is this?

 3  A.    This is the sleeping bag I was referring to that was on

 4  the back patio.

 5  Q.    Okay.

 6        MS. VARTAIN:  And for the record, this is Exhibit 174.

 7  Rather than hand it up to, you I'm just going to put it back in

 8  its home for now.

 9        MS. GILBERT:  May I approach, Your Honor?

10        THE COURT:  You may.

11             (Counsel approaches witness.)

12  BY MS. VARTAIN:

13  Q.    Do you recognize that?

14  A.    I do.

15  Q.    What is that?

16  A.    Would you like me to remove them or just --

17  Q.    And just describe them.

18  A.    This is a box containing toothpaste, and then a white box

19  that I can't remember exactly what this was, with batteries

20  that was found next to the large backpack in the back patio.

21  Q.    Okay.  Thank you.

22        MS. VARTAIN:  For the record, I've handed the witness

23  Exhibits 175 and 176, already admitted.

24  BY MS. VARTAIN:

25  Q.    Acting Lieutenant O'Connor, I'm going to hand you
```

1    Exhibit 177.

2    **A.**    Can I put on some gloves, if you don't mind?

3    **Q.**    Yes.

4    **A.**    Are these clean?

5    **Q.**    Yes.  I think the purple ones might fit you better, but

6    whatever.

7    **A.**    Oh.

8            **MS. VARTAIN:**  Okay.  May I approach?

9            **THE COURT:**  You may.

10           **MS. VARTAIN:**  Thank you.

11                   (Counsel approaches witness.)

12           **THE WITNESS:**  I do recognize this as being the large

13   backpack that was on the patio that we spoke about earlier.

14   **BY MS. VARTAIN:**

15   **Q.**   Okay.  Thank you.

16       And if you could just hold it up for the jury, and then if

17   you don't mind setting it down, I'll come get in a big pile of

18   stuff in a moment.

19   **A.**   Certainly.

20   **Q.**   Okay.  Thank you.

21       I'm going to hand you Exhibits 179, 180, 181, 182, and

22   183, which are all in a bag together.  And I will take back the

23   large backpack.

24       Acting Lieutenant O'Connor, if you could just take those

25   out one by one and identify them and show them to the jury,

1   please.

2   **A.**   Sure.

3        Exhibit 180 is a roll of black duct tape.

4        Exhibit 183 is a package of black zip ties.

5        Exhibit 182 is another package of white multi-purpose zip

6   ties.

7        Item 181, exactly the same item, multi-purpose zip ties,

8   white.

9        Item 179 is a sledgehammer.

10  **Q.**   Acting Lieutenant O'Connor, the photograph that we looked

11  at earlier is still up on the screen.

12       Do you see the sledgehammer in that photograph?

13  **A.**   I do.  I see the yellow handle of it sticking out.

14  **Q.**   Okay.  Thank you.

15       If you could -- I'm sorry to ask -- but put them back in

16  the bag.

17  **A.**   Sure.

18  **Q.**   I'll come get it.  Thank you.

19            **MS. VARTAIN:**  May I approach, Your Honor?

20            **THE COURT:**  You may.

21                 (Counsel approaches witness.)

22  **BY MS. VARTAIN:**

23  **Q.**   I've just handed you admitted Exhibit 178.

24       Do you recognize this?

25  **A.**   Yes.

O'CONNOR - DIRECT / VARTAIN

1   **Q.**   And if you think it might help you to take it out of the

2   larger bag, and then if you would please identify it for the

3   jury.

4   **A.**   Item -- Exhibit Item Number 178 is cash.

5   **Q.**   Okay.  And do you remember approximately how much cash it

6   was?

7   **A.**   I believe it was over $9,000.

8   **Q.**   You have -- do you have other exhibits in front of you?

9   **A.**   Yes.

10   **Q.**   Can you identify the exhibit number as you identify it for

11   the jury, please.

12   **A.**   Exhibit Number 186 is a Social Security card.

13       And 187 is a Canadian passport.

14       Item 192 is a SanDisk adapter.

15       Item 188 is a California driver's license.

16       I'm sorry, two.

17   **Q.**   That's fine.

18   **A.**   Two California driver's licenses.

19       Item 189 is a State of California benefits identification

20   card.

21       Exhibit 190 is a Wells Fargo ATM card.

22       191 is a -- what appears to be a PayPal Mastercard.

23       Item 185 is a Canadian birth certificate.

24       Item 184 is a plastic bag that I believe the money was in.

25       And Item 193 are two bank envelopes that the money was

 1  definitely in.

 2  Q.   Okay.  And could I ask you to please put those back in the

 3  bag, Acting Lieutenant.

 4       Okay.  I'm going to swap.

 5            **MS. VARTAIN:**  Your Honor, may I approach whenever I

 6  need to swap bags?

 7            **THE COURT:**  Yes.

 8            **MS. VARTAIN:**  Thank you.

 9                 (Counsel approaches witness.).

10  **BY MS. VARTAIN:**

11  Q.   I have handed you Exhibits 194 through 205.  And if you

12  would take them out of the bags, identify them and their number

13  for the jury.  Thank you.

14  **A.**   Sure.

15       Item 197 is four batteries, two triple A and two double A.

16       Item 204 is a black cloth mask.

17       Item 203 is a pair of purple cloth gloves.

18       Item 205 are two empty bottles.

19  Q.   Can we just pause you on that a second.

20       Acting Lieutenant O'Connor, do you know why the bottles

21  are empty?

22  **A.**   Yes.  I emptied them after taking a sample of each bottle.

23  Q.   Why do you take a sample?

24  **A.**   Because we want to know what the contents are if they

25  later need to be analyzed.

1    **Q.**    Okay.  Thank you.

2    **A.**    Item 199 is some sort of a battery and electronic

3    accessories clip.

4         201 is numerous electrolyte packets.

5         Item 196 is a toothbrush.

6         Sorry.

7         Item 200 are two matchboxes.

8         Item 194 is a pair of scissors.

9         Item 198 is a charger of some sort.

10        Item 195 is dental floss.

11        And Item 202 is a body-worn camera user manual.

12   **Q.**    Are you familiar with what a body-worn camera is?

13   **A.**    I am.

14   **Q.**    And how would you describe it?

15   **A.**    A body-worn camera is really just that; it's a camera that

16   you wear on your body that will capture everything that you're

17   doing and what's in front of you.

18   **Q.**    Thank you.

19        Can I trouble you to please put them back in the bag?

20        Let me ask you this, have we still been discussing the

21   contents of the large backpack that we looked a few moments

22   ago?

23   **A.**    Yes.

24   **Q.**    I'm going to hand you Exhibits 206 to 219.  And if you

25   would go through the same procedure with the box, please,

O'CONNOR - DIRECT / VARTAIN

1   Acting Lieutenant.

2   **A.**     Sure.

3        Item 216 are a pair of socks -- four pairs of socks.

4        Item 217 are two pair of black shorts.

5        Item 218 are numerous pairs of underwear, men's underwear.

6        Item 208 is a Nintendo Switch inside a case.

7        Item 207 are solar panel chargers.  There are three of

8   them.

9        Do you mind if I stand up?

10            **THE COURT:**  Go ahead.

11            **THE WITNESS:**  Item -- it looks like a 209.  It could

12  be a 204 -- I think it's 209 -- bag of electronic cords,

13  cables.

14       Item 211 are a box of crayons, 64-count.

15       Item 212 is a book entitled "The Gulag."

16       Item 210 is some sort of a light, a portable light.

17       Item 213 is what appears to be a drinking glass.

18       Item 214 is a charger of some sort, black.

19       Item 219 is a container of powdered greens.

20       And I believe this is the last item.  Number 206 are

21  two unicorn costumes.

22  **BY MS. VARTAIN:**

23  **Q.**   Before you put that big one back in, Acting Lieutenant, I

24  think 215 might be small and sort of on the bottom.

25  **A.**   Oh, yes.  Thank you.

**O'CONNOR - DIRECT / VARTAIN**

1       215 is what looks like a thumb drive.

2  **Q.**   Okay.  Lieutenant O'Connor, I'm handing you what has been

3  marked as Exhibit 320.

4       Do you recognize this?

5  **A.**   I do.

6  **Q.**   What is it?

7  **A.**   Exhibit 320 is the smaller backpack I was describing in

8  the back patio area, next to the big backpack.

9  **Q.**   Did you also unpack the smaller backpack on scene?

10  **A.**   I did.

11  **Q.**   Okay.  I'm going to come take that from you.  I have a

12  much smaller box this time.

13       Thank you.  You're ahead of me.

14       Could you please identify the exhibits and what they are

15  for the jury again, please.

16  **A.**   Yes.  Item 224 is a package of Goji berries.

17       Item 222 is two containers of glucosamine.

18       Item 220 is a large bag of hot sticks, beef jerky.

19       Item 226 is a blue and gray glove.

20       221 is a container of woman's vitamins.

21       225 is a pencil.

22       227 is a label that belongs on the blue latex glove.

23       And 223 is a watermelon mint lemonade container, empty.

24  **Q.**   Is it empty for the same reason that you previously

25  described with the other bottles of liquid?

O'CONNOR - DIRECT / VARTAIN

1    **A.**    Yes.  It was sampled and then I poured the liquid out.

2    **Q.**    Thank you.

3           We're done with the physical evidence, so if you want to

4    take your gloves off, you should be all done with that.

5    **A.**    Thank you.

6    **Q.**    After collecting the evidence that we just looked at, can

7    you briefly describe what you did with it?

8    **A.**    The evidence was collected, and I brought it back to the

9    crime scene lab on the first floor, the forensic services

10   division, and packaged and booked each item of evidence into

11   property control.

12   **Q.**    I'm going to go back for a moment to the bag that had the

13   IDs and the birth certificates.

14          Do you remember checking to see if they were all for the

15   same person?

16   **A.**    I believe so, yes.

17   **Q.**    Okay.  And do you know who they were for?

18   **A.**    For -- I don't remember the middle name, but it was for

19   David Papale (phonetic) or -- I can't remember exactly the

20   spelling of the last name.

21   **Q.**    Do you know what his role in this case is?

22   **A.**    I know he is the suspect in this case.

23   **Q.**    Thank you.

24          **MS. VARTAIN:**  I have no further questions.

25          **THE COURT:**  Think you can get it in?

1     **MS. LINKER:**  I'm going to do it.

2                  <u>**CROSS-EXAMINATION**</u>

3     BY MS. LINKER:

4     **Q.**   I'm going to cut to the chase so we can get out of here.

5          Lieutenant, you have been a crime scene investigator for

6     over 20 years; is that right?

7     **A.**   Yes.

8     **Q.**   And you're trained in the procedures and policies of CSI?

9     **A.**   Yes.

10    **Q.**   People know CSI these days?

11    **A.**   Yes.

12    **Q.**   And you know that it's important to follow those

13    procedures and those policies; correct?

14    **A.**   Yes.

15    **Q.**   Regardless of -- regardless of who the alleged suspect is?

16    **A.**   Yes.

17    **Q.**   And regardless of who the alleged victim is?

18    **A.**   Yes.

19    **Q.**   You decided you needed to show up that night -- or that

20    morning, early that morning, even though you were off duty that

21    day; is that correct?

22    **A.**   Correct.

23    **Q.**   And when you arrived on scene, there were several other

24    agencies already there; correct?

25    **A.**   There was at least two agencies -- well, my agency and the

O'CONNOR - CROSS / LINKER

1    FBI, yes.

2    Q.   Your agency, which is SFPD?

3    A.   Yes.

4    Q.   There were several divisions of SFPD?

5    A.   Yes.

6    Q.   Including the division that handles those special

7    important cases; correct?

8    A.   Yes.

9    Q.   And the Capitol Police were also there?

10   A.   I did not meet with them, I don't believe, but, yes,

11   I believe they were there.

12   Q.   You had to wait around for a while for a determination to

13   be made if SFPD or the FBI were going to be the lead agency;

14   isn't that correct?

15   A.   Yes.

16   Q.   And it was determined that the state, SFPD, would actually

17   take the lead; isn't that correct?

18   A.   I honestly don't know.

19   Q.   You met with prosecutors in this case in preparation for

20   your testimony; is that correct?

21   A.   I did.

22   Q.   And when you talked to those individuals, didn't you

23   inform them that it was SFPD that took the lead in the case?

24   A.   I did not inform them of that, no.

25   Q.   In this case, you were told not to make an evidence

**O'CONNOR - CROSS / LINKER**

1   inventory log; is that correct?

2   **A.**   I was asked not to upload any evidence into any shared

3   networks, that is true.

4   **Q.**   SFPD leadership told you not to make an evidence inventory

5   log because you did not want people getting access to it; is

6   that correct?

7   **A.**   Yes, they did not want any shared information, it was

8   confidential.

9   **Q.**   So you did not make an evidence inventory log; is that

10   correct?

11   **A.**   Well, I didn't make one because I was supervising, but one

12   was not uploaded for that reason.

13   **Q.**   So you did not make one?

14   **A.**   I did not make one.

15   **Q.**   Thank you.

16       You don't normally work with other agencies, as you did

17   here; correct?

18   **A.**   Not normally, no.

19   **Q.**   And while at the scene, you assisted in pulling items out

20   of the backpacks and laying them out to be photographed;

21   correct?

22   **A.**   Yes.

23   **Q.**   And you worked with the other agencies on doing this?

24   **A.**   Yes.

25   **Q.**   You would normally take the evidence back to the lab and

 1    then remove the contents of the backpack in a more controlled

 2    environment; is that correct?

 3    A.   Yes.

 4    Q.   And that's not what you did here?

 5    A.   No.

 6    Q.   I would like to look at that backpack and pick it up for a

 7    second.  I noticed you all have been wearing gloves.

 8         Can you explain to me why you've been wearing gloves here

 9    in the courtroom?

10    A.   I'm a CSI investigator, I always wear gloves when I touch

11    evidence, for no other reason.

12    Q.   Are you okay with me picking that up right now without

13    gloves on?

14    A.   I am.

15    Q.   Great.

16         We're looking at the larger backpack; correct?

17    A.   Yes.

18    Q.   And on this larger backpack, there's several small

19    pockets; correct?

20    A.   Yes.

21    Q.   Numerous small pockets; correct?

22    A.   Yes.

23    Q.   And many of the items that you looked at today were in

24    these smaller pockets; correct?

25    A.   Yes.

**O'CONNOR - CROSS / LINKER**

1  Q.   They were not sorted together the way they are in those

2  plastic bags you just went through; correct?

3  A.   Correct.

4  Q.   You all put them together for some categorization or some

5  reason of your own; correct?

6  A.   I didn't package them that way, no.

7  Q.   Fair enough.

8       But they were not in the backpack in that manner; correct?

9  A.   They were not.

10  Q.   The liquids that you discussed, were they analyzed?

11  A.   I have no idea.

12  Q.   Are you aware that anything -- any toxins, any -- anything

13  like that was found in this case?

14  A.   I'm not aware.

15  Q.   Exhibit 206 --

16          **MS. LINKER:**  May I approach, Your Honor?

17          **THE COURT:**  You may.

18                  (Counsel approaches witness.)

19  BY MS. LINKER:

20  Q.   I just wanted to make sure I understood correctly.

21  Exhibit 206, you said are what costumes?

22  A.   Unicorn costumes.

23  Q.   And they are -- appear to be two of them in there; is that

24  correct?

25  A.   Yes.  There appears to be one still in the original

**PROCEEDINGS**

1  packaging and one that was loose.

2  **Q.**   And those are inflatable unicorn costumes?

3  **A.**   I believe so.

4  **Q.**   Thank you.

5       **MS. LINKER:**  I have nothing further.

6       **THE COURT:**  Anything further?

7       **MS. GILBERT:**  No, Your Honor.

8       **THE COURT:**  You may step down.

9       **THE WITNESS:**  Thank you.

10              (Witness excused.)

11       **THE COURT:**  So, members of the jury, that concludes

12  the evidence for today.  We -- as you know, there's no trial

13  tomorrow because it's Veterans Day, and then no trial Saturday

14  or Sunday, so we're taking a bit of a long break.

15       Super important:  Everyone's going to ask you what are you

16  doing, what trial are you on.  Please don't even tell them the

17  name of the trial.  Tell them that judge, that silly judge

18  ordered us not to say anything.  And don't discuss it at all.

19  Please try not to read anything at all.

20       And we're going to return Monday at 8:30.  I'll ask you

21  then to see if you were exposed to anything, but do your best

22  not to read anything.

23       Now, APEC.  APEC.  You've all heard APEC happening, I

24  think, today -- starting today, two lanes of the Bay Bridge are

25  going to be closed.  For those of you coming from the East Bay,

**PROCEEDINGS**

1  take BART.  Take BART.  And if you can, give yourself some

2  extra time.  I think the Bay Bridge is going to be an absolute

3  disaster.

4       We're fortunate, we don't have closures right around this

5  courthouse, but I think BART is the way to go.  But just please

6  keep that in mind.

7       Thank you so much for your close attention today.  Have a

8  good weekend, and we'll see you Monday at 8:30.

9                    (The jury leaves the courtroom.)

10  (Proceedings were heard out of the presence of the jury.)

11       **THE COURT:**  Okay.  APEC, that goes for everyone else.

12  Next week, that's going to be an issue, so we need to leave

13  lots of time.  And thank you so much for working well together

14  to present the evidence.  I appreciate that.

15       **MS. GILBERT:**  Thank you, Your Honor.

16       **MS. LINKER:**  Thank you, Your Honor.

17       **THE COURT:**  We'll see you Monday 8:15 or so.

18            (Proceedings adjourned at 2:50 p.m.)

19                    ---o0o---

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Saturday, November 11, 2023




_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court