Volume 3

Pages 422 - 680

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )   NO. CR 22-00426-JSC
                                )
DAVID WAYNE DEPAPE,             )
                                )
          Defendant.            )
_____)


                         San Francisco, California
                         Monday, November 13, 2023

                    TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**
For Plaintiff:
                         ISMAIL J. RAMSEY
                         United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California 94102
                  BY:    LAURA E. VARTAIN
                         HELEN L. GILBERT
                         ASSISTANT UNITED STATES ATTORNEYS


For Defendant:
                         JODI H. LINKER
                         Federal Public Defender
                         450 Golden Gate Avenue
                         San Francisco, California 94102
                  BY:    JODI H. LINKER
                         ANGELA CHUANG
                         TODD M. BORDEN
                         ASSISTANT FEDERAL PUBLIC DEFENDERS

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

1    <u>**APPEARANCES**</u>:   (CONTINUED)

2    Also present:          Maddi Wachs, Paralegal
                            Special Agent Stephanie Minor
3                           Sheree Cruz-Laucirica, Paralegal
                            Catherine Goulet, Defense Investigator
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                          I N D E X

 2    Monday, November 13, 2023 - Volume 3

 3    GOVERNMENT'S WITNESSES                        PAGE   VOL.

 4    GRZYMALA, GARY
      (SWORN)                                        441    3
 5    Direct Examination by Ms. Vartain              442    3
      Cross-Examination by Ms. Chuang                450    3
 6
      CLARK, TIMOTHY
 7    (SWORN)                                        452    3
      Direct Examination by Ms. Vartain              452    3
 8
      GUERRA, JONATHAN
 9    (SWORN)                                        457    3
      Direct Examination by Ms. Gilbert              458    3
10
      LITTLEJOHN, DWIGHT
11    (SWORN)                                        463    3
      Direct Examination by Ms. Vartain              463    3
12    Cross-Examination by Ms. Linker                474    3

13    MATTHES, JASON
      (SWORN)                                        487    3
14    Direct Examination by Ms. Gilbert              487    3

15    NG, WING
      (SWORN)                                        497    3
16    Direct Examination by Ms. Gilbert              498    3
      Cross-Examination by Ms. Chuang                523    3
17
      MINOR, STEPHANIE
18    (SWORN)                                        530    3
      Direct Examination by Ms. Gilbert              531    3
19    Cross-Examination by Ms. Linker                605    3

20    PELOSI, PAUL
      (SWORN)                                        644    3
21    Direct Examination by Ms. Vartain              644    3

22                        E X H I B I T S

23    TRIAL EXHIBITS                          IDEN  EVID   VOL.

24     10                                            430    3

25
</pre>

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 11 | | 430 | 3 |
| 12 | | 430 | 3 |
| 13 | | 430 | 3 |
| 14 | | 430 | 3 |
| 15 | | 430 | 3 |
| 16 | | 430 | 3 |
| 17 | | 430 | 3 |
| 18 | | 430 | 3 |
| 19 | | 430 | 3 |
| 20 | | 430 | 3 |
| 116 | | 430 | 3 |
| 146 | | 430 | 3 |
| 148 | | 430 | 3 |
| 151 | | 430 | 3 |
| 228 | | 430 | 3 |
| 229 | | 430 | 3 |
| 230 | | 430 | 3 |
| 231 | | 430 | 3 |
| 232 | | 430 | 3 |
| 233 | | 430 | 3 |
| 234 | | 430 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 235 | | 430 | 3 |
| 236 | | 430 | 3 |
| 237 | | 430 | 3 |
| 240 | | 430 | 3 |
| 241 | | 430 | 3 |
| 242 | | 430 | 3 |
| 243 | | 430 | 3 |
| 244 | | 430 | 3 |
| 247 | | 430 | 3 |
| 248 | | 430 | 3 |
| 250 | | 430 | 3 |
| 268 | | 430 | 3 |
| 269 | | 430 | 3 |
| 270 | | 430 | 3 |
| 271 | | 430 | 3 |
| 274 | | 430 | 3 |
| 276 | | 430 | 3 |
| 277 | | 430 | 3 |
| 278 | | 430 | 3 |
| 279 | | 430 | 3 |
| 280 | | 430 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 281 | | 430 | 3 |
| 282 | | 430 | 3 |
| 284 | | 430 | 3 |
| 285 | | 430 | 3 |
| 286 | | 430 | 3 |
| 287 | | 430 | 3 |
| 288 | | 430 | 3 |
| 290 | | 430 | 3 |
| 291 | | 430 | 3 |
| 292 | | 430 | 3 |
| 293 | | 430 | 3 |
| 295 | | 430 | 3 |
| 297 | | 430 | 3 |
| 298 | | 430 | 3 |
| 305 | | 430 | 3 |
| 310 | | 430 | 3 |
| 321 | | 430 | 3 |
| 322 | | 430 | 3 |
| 500 | | 638 | 3 |
| 579 | | 621 | 3 |
| 592 | | 528 | 3 |
| 593 | | 526 | 3 |

```
 1    Monday - November 13, 2023                        8:17 a.m.

 2                        P R O C E E D I N G S

 3                            ---o0o---

 4    (Proceedings were heard out of the presence of the jury.)

 5         THE CLERK:  Remain seated and come to order.  Court is

 6    now in session.

 7         THE COURT:  Good morning.  So are there any issues we

 8    should discuss?

 9       Yes.

10         MS. GILBERT:  Good morning, Your Honor.  The

11    Government would like to read two stipulations regarding the

12    admissibility of evidence that the parties have entered into

13    and then move to admit certain exhibits.

14       The first stipulation is Docket 147, which is the

15    stipulation regarding business records, which reads that:

16       It is hereby stipulated and agreed between plaintiff, the

17    United States of America, and its undersigned counsel and

18    defendant, David DePape, by his undersigned counsel as follows.

19       The following trial exhibits are relevant as determined by

20    Federal Rule of Evidence 401, authentic as determined by

21    Federal Rule of Evidence 901(a), and as applicable to Exhibits

22    293 and 295, admissible pursuant to the business records

23    exception to hearsay as determined by Federal Rule of Evidence

24    803, subpart six, and it lists Exhibits 12, 13, 15, 16, 17, 18,

25    19, 20, 293, and 295.
```

**PROCEEDINGS**

1        The second stipulation that we would like to enter into

2   this morning is at Docket 153.  This is a stipulation regarding

3   US House of Representatives record.  And it states:

4        It is hereby stipulated and agreed between plaintiff, the

5   United States of America, and its undersigned counsel and

6   defendant, David DePape, and his undersigned counsel as

7   follows:

8        The following trial exhibit is relevant as determined by

9   Federal Rule of Evidence 401, authentic as determined by

10  Federal Rule of Evidence 901(a), and admissible pursuant to the

11  business records exception to hearsay as determined by Federal

12  Rule of Evidence 8036 and the public records exception to

13  hearsay as determined by Federal Rules of Evidence 8038.  And

14  that is regarding Exhibit Number 295.

15        **MS. CHUANG:**  I think that's 297.

16        **MS. GILBERT:**  Thank you.  Thank you.  297.  That was

17  my mistake.

18        **THE COURT:**  Yes, I see that there.

19        **MS. GILBERT:**  At this time, the Government moves to

20  admit the following exhibits:  Exhibits 10 through 20, 116,

21  146, 148, 228 through 237, 250, 268 through 271, 274, 276

22  through 282, 284 through 288, 290 through 292, 295, 297, 298,

23  305, 310, 321, and 322.

24        **THE COURT:**  Okay.  No objection?

25        No objection to those.

1           **THE COURT:**  No objection.  All exhibits, then, are

2   deemed admitted.

3       (Trial Exhibits 10-20, 116, 146, 148, 228-237, 250,

4   268-271, 274, 276-282, 284-288, 290-292, 295, 297, 298, 305,

5   310, 321, and 322 received in evidence.)

6           **MS. CHUANG:**  The Defense has a few exhibits to admit

7   as well.  We would like to admit --

8           **MS. GILBERT:**  Can I just clarify that 293, we did move

9   to admit 293?

10          **THE COURT:**  You did not.

11          **MS. GILBERT:**  290 through 293, so that should be 290,

12  291, 292, and 293.

13          **THE COURT:**  All right.  So admitted.

14      (Trial Exhibit 293 received in evidence.)

15          **MS. CHUANG:**  So we would like to admit some exhibits

16  as well.  Those would be Numbers 151, 240 through 244, 247, and

17  248.

18          **THE COURT:**  No objection?

19          **MS. GILBERT:**  No objection.

20          **THE COURT:**  All right.  Those are admitted as well.

21      (Trial Exhibits 151, 240-244, 247, 248 received in

22  evidence.)

23          **THE COURT:**  And as we discussed, I assume they will

24  all be used in trial.

25          **MS. GILBERT:**  For the Government, yes, Your Honor.

1          **MS. CHUANG:**  Yes, Your Honor.

2          **MS. GILBERT:**  And, Your Honor, Ms. Vartain had a few

3     additional issues.

4          **MS. VARTAIN:**  Your Honor, over the weekend, we

5     received an e-mail from the Defense regarding a potential

6     protest outside the building today, and I think Ms. Means was

7     able to make sure that everyone was able to go in the Turk side

8     of the building.  For the record, though, I'm curious how we

9     knew that there might be a protest.

10         **THE COURT:**  I didn't know.

11        Oh, the Court was made aware that there might be a

12    protest.  But that reminds me of something.  And I will ask the

13    jurors when they come in if they have seen it -- especially

14    because we've had a three-day break -- if they saw anything

15    this morning.

16        I do want to remind the members of the public that there

17    should be no communication with the jury or court staff unless

18    you have court business with the court staff.  So, for example,

19    the court reporter, there should be no communication with the

20    court reporter unless you are requesting to purchase a

21    transcript.  But court staff should be treated just as the jury

22    and -- but the jury as well.  Thank you.

23         **MS. VARTAIN:**  Your Honor, I am aware that, on the

24    corner of Golden Gate and Larkin, there was at least one person

25    handing out a flyer.  I'm not aware of whether there were --

1    there was anyone else or whether they were at the Turk side,

2    but I believe the flyer concerned a show, "Paul Pelosi

3    cover-up" TV and that the person handing it out purports to be

4    the mother of the defendant's children.  And so I think -- I

5    think it's important for the record to have sort of a complete

6    understanding about what we know at this point in time.

7           **THE COURT:**  Yeah, I actually -- one of my court staff

8    as well this morning saw actually a man with a box handing out

9    flyers; although, I don't know she saw the flyer.  And, again,

10   I just want to emphasize that it would be improper and

11   potentially illegal to be providing any such material to the

12   jury.  That would be deemed to be trying to improperly

13   influence the jury, and there should be no communication.

14       But I think other than that, they have a free speech

15   right.

16          **MS. VARTAIN:**  Thank you, Your Honor.  The next item

17   is that, this morning, through a witness from the company

18   Spokeo -- the witness's name is Jason Matthes -- we will enter

19   evidence that includes redactions for PII.  And if the Court is

20   willing, it might be an appropriate time to tell the jury that

21   the parties often redact information regarding personally

22   identifiable information.

23          **THE COURT:**  At that time --

24          **MS. VARTAIN:**  Yes.

25          **THE COURT:**  -- when it comes in, yes.

PROCEEDINGS

1              **MS. VARTAIN:**  Thank you.

2              **MS. CHUANG:**  We're in agreement on that as well.  We

3      may use unredacted versions; and for those, we would turn off

4      the gallery monitors and maybe an instruction saying PII, or

5      personal identifying information, is in this exhibit and that's

6      why the gallery monitors are turning off.

7              **THE COURT:**  And we know how we're turning them off?

8         I think there's just a power button on them.

9              **THE COURT:**  We would have to ask Ms. Means.

10        The gallery monitors.

11             **THE CLERK:**  Oh, yeah, yeah.

12             **THE COURT:**  You can do that?  Okay.  All right.

13        So let's do lots of warning before we show that.

14        Thank you, Your Honor.

15        I want to return to a topic that we discussed last week on

16     Thursday, which was the slow motion video.  The Government has

17     determined that using the regular viewing software that we use

18     to show evidence to the jury, we can slow down the video, we

19     can show the Court how we do it.  And there's no expert

20     testimony.  It is authenticated certainly just by the agent who

21     did it herself, and also the Court can watch.

22        You just use the player we use, and you say slow, slow,

23     slow, slow -- four times, and then it allows anyone watching

24     the viewer to see the video, which is already entered into

25     evidence, that is Exhibit 3, played in slow motion from

**PROCEEDINGS**

1  minutes, approximately, 1:06 to 1:25.

2      And we propose to do that when special Agent Stephanie

3  Minor testifies later this morning.

4      **THE COURT:**  So you're saying she could lay a

5  foundation?

6      **MS. VARTAIN:**  Yes.

7      **THE COURT:**  So I read the cases.  Did you read the

8  cases?

9      **MS. VARTAIN:**  I did read the cases, Your Honor, and I

10  don't think any of them apply here because we are not using

11  specialized software and we are not using any expertise.

12  Literally, even myself -- with my low expertise in technology,

13  can do that myself.

14      **THE COURT:**  Well, I don't know that it was expertise

15  in necessarily doing it; I think it was expertise or testimony

16  in showing that it didn't change it in any way, but you're

17  saying that the special agent -- I don't think it needs to be

18  an expert; I think it needs to be the person who did it.

19  You're saying they can lay the foundation.  Or maybe what

20  you're saying is we need to do it outside the presence of the

21  jury.

22      **MS. VARTAIN:**  We have it ready.  And, Your Honor, we

23  could just show Your Honor how we would do it.  I think it

24  would take under a minute for us to do that.

25      **MS. CHUANG:**  Right.  And I think the Court is exactly

1    right about the issue with that is that the agent herself, she

2    may just be using the software, but she can't speak to or

3    testify to whether even using that function in the software

4    alters anything.  All right?  And we've gotten no discovery

5    about her basis for knowing any of that.

6            THE COURT:  Yeah, I think that's the problem; right?

7    In those cases, the Eighth Circuit, the Sixth Circuit in the

8    very recent -- I mean, the person who -- the analyst who did it

9    kept a log.  Can she even say what software was used?

10       Your Honor, she is going to -- we are going to play it

11   with exactly the same software that we used to play -- to play

12   it in discovery.

13           THE COURT:  What software is it?

14           MS. VARTAIN:  It's VLC media player.  To play any

15   media, as we all likely know, you have to use a viewing

16   software.  So VLC Media and Windows media are the, I think,

17   commonly used media softwares that any of us -- probably the

18   Defense and certainly the Government, used to load our

19   discovery, using that exact -- it's hard to even call it a

20   software.

21       It's simply just the mechanism by which you play a video

22   on your computer.  If it gives you the capacity to play it

23   slowly.  The jury can make a determination, watching us do it

24   whether they think it alters Exhibit 3 in any way.

25           THE COURT:  Well, I don't know about that.  Do you

**PROCEEDINGS**

1    want to go ahead and show it?

2          **MS. VARTAIN:**  Yes, please, Your Honor.

3       Ms. Wachs, if you could please pull up Exhibit 3.

4       And, Ms. Means, I think our -- maybe our computers are not

5    on.

6       For the record, this is VLC media player.

7       And, Ms. Wachs, if you could just please ask the player to

8    slow down by going to playback speed, and slower.  And then

9    could you hit that -- do that four times, please.

10      And for the record, this is Exhibit 3, already entered.

11               (Video played but not reported.)

12         **MS. VARTAIN:**  Thank you, Ms. Wachs.

13      And we would propose to do that precise thing with the

14   jury present.

15         **MS. CHUANG:**  And we would object just on the basis

16   that we've been objecting.  Agent Minor, unless she has some

17   type of knowledge about how that slow-down function works in

18   this particular software and can explain why it wouldn't alter

19   the footage at all --

20         **THE COURT:**  Alter it how?

21         **MS. CHUANG:**  Well, Your Honor, this is just based on

22   the case law.  There needs to be someone who can explain that

23   it's a reliable method of enhancing and that it doesn't affect

24   the original substance.

25      It would be the same thing if VLC had a function that you

1    could brighten the video; that's also enhancing it.  An analyst

2    would similarly need to explain why this function on this

3    software doesn't alter it.

4         **THE COURT:**  Well, how do you think it altered it?  I

5    mean, the thing is, they're not -- it's not enhancing it;

6    they're just slowing it down.  What if they just stopped and

7    took a picture, a freeze frame; are you saying that you would

8    require the same testimony?

9         **MS. CHUANG:**  No.  A freeze frame is different because

10   that's just a single moment in time.  Slowing a video down is

11   different than that.  It is -- based on the cases that I

12   presented to the Court, slowing down a video is altering it,

13   and it's subject to the same type of analysis as an enhanced

14   video.

15        So we don't have to show that it actually alters it, it's

16   the opposite, in fact.  The Government has to have a competent

17   witness who can testify that it did not alter it.

18        **THE COURT:**  Well, can she testify to that?

19        **MS. VARTAIN:**  Well, I think that she can do exactly

20   what we just did, and the jury, frankly, can make the

21   determination whether they think that there's anything that

22   feels altered.  It is an already entered exhibit, so I think

23   the jury can make a determination as to whether they think this

24   is reasonable or not, and I think the process we just went

25   through leads to the inescapable conclusion that is the precise

**PROCEEDINGS**

1   video, just played slowly.

2            **THE COURT:**  Okay.  I'm going to allow it.

3            **MS. CHUANG:**  Just to note --

4            **THE COURT:**  I'll hear what the testimony is.

5            **MS. CHUANG:**  It is not a question of weight, for the

6   jury to assess whether it's reliable or not.  It's a question

7   of authentication, which is basic admissibility.

8            **THE COURT:**  I know.  I understand.  It's initially my

9   decision to determine if a prima facie showing has been made.

10  In the end, assuming that showing has been made, it's the

11  jury's decision.  They are entitled to reject it, but I have to

12  serve as a gatekeeper as to whether do -- what I've heard so

13  far, but I'll hear her testify.  I mean, I do think this is

14  just accessible.  This is not enhancing it, the color.  It's

15  just slowing it down like we slow down an audio if we're

16  listening to it at different speeds.  I think that's somewhat

17  accessible to the jury, but I'll hear it.

18           **MS. VARTAIN:**  Thank you, Your Honor.  Similarly, we,

19  on Thursday, heard cross-examination of Officer Najarro

20  regarding -- I think the questions were implying that

21  Mr. Pelosi stood himself up and got into the gurney.  As

22  the Court has already ordered, we will play the exhibit that

23  was used to refresh Officer Najarro's recollection.

24           **THE COURT:**  What I said was if that was the case, then

25  I wouldn't allow it to come in.  What I said was it wasn't used

1    to recollect and that it was initially -- well, I think it's

2    like surveillance; right?  Surveillance camera footage comes

3    in, even though no one is watching it and can testify that it's

4    what they saw; right?  But I think it was used as substantive

5    testimony.

6          **MS. VARTAIN:**  Thank you, Your Honor.

7          The -- we will lay a foundation.  FBI Special Agent

8    Stephanie Minor is an EMT by qualification.  She maintains

9    several certifications.  These have previously -- it has

10   previously been disclosed to the defense that she is an EMT.

11   She also serves in various roles officially with the FBI.  But

12   pursuant to her EMT status and her reaction, her response to

13   the AUSAs when she heard this testimony was, of course he's

14   upright because that's what you need to do.

15         **THE COURT:**  We're not going into that.  I think we're

16   getting way too collateral.  This is not even that relevant.

17   She didn't watch it.  I'll let you put the video in, and the

18   jury can draw what other conclusions were not.  But not that

19   testimony.

20         Sorry I preempted you, but I assumed you were going to

21   object.

22         **MS. CHUANG:**  Yes.

23         **MS. VARTAIN:**  Final item from the Government.  We

24   learned last week that Lieutenant Hurley, who testified in the

25   Government's case-in-chief, is under defense subpoena for

**PROCEEDINGS**

1    tomorrow.

2         She's already been cross-examined.  I don't think there

3    would have been any objection had she gone outside the scope.

4    At a minimum, I would ask that she be given a precise, or

5    somewhat precise, time that she has to be here because she is

6    on APEC duty and on patrol.  And she will be here if she's told

7    she needs to be, but she would like sort of at least an

8    approximate time.

9              THE COURT:  Why don't we address that at our lunch

10   break, when we can talk about the schedule through trial.

11             MS. VARTAIN:  Thank you, Your Honor.

12             MS. CHUANG:  Right.  That's just impossible to know,

13   right now, when that would be.

14             THE COURT:  Yeah.  Let's take it up at the lunch

15   break.

16        Are all our jurors here?

17             THE CLERK:  Yes, Your Honor.

18             THE COURT:  Are we ready?

19             MS. VARTAIN:  Yes.  Thank you, Your Honor.

20             THE COURT:  Great.  Thank you.

21                    (Pause in proceedings.)

22                  (The jury enters the courtroom.)

23        (Proceedings were heard in the presence of the jury.)

24             THE COURT:  Good morning, members of the jury.

25   Welcome back and thank you again for being so prompt.  Since we

```
 1    had a three-day break, I do need to ask you if any of you were

 2    exposed, again, even inadvertently, to any information at all

 3    about this case.  If so, raise your hand.

 4                          (No response.)

 5              THE COURT:  No.  Great.  You all instead just spent

 6    your time watching that Niner game yesterday with Brock Purdy's

 7    best game ever.  And on your way to the courthouse today, did

 8    anyone approach you at all and attempt to hand you anything

 9    about this case?

10                          (No response.)

11              THE COURT:  All right.  Terrific.  Great.

12         We are, then, going to resume with the Government calling

13    your next witness.

14              MS. VARTAIN:  Thank you, Your Honor.  The Government

15    calls Gary Gryzmala.

16         (Gary Grzymala steps forward to be sworn.)

17              THE CLERK:  Please raise your right hand.

18                          GARY GRZYMALA,

19    called as a witness for the Government, having been duly sworn,

20    testified as follows:

21              THE WITNESS:  I do.

22              THE CLERK:  Can you please state your name and then

23    spell it for the record.

24              THE WITNESS:  Sure.  Gary, G-A-R-Y, Grzymala,

25    G-R-Z-Y-M-A-L-A.
```

```
 1              THE CLERK:  Thank you.

 2              THE COURT:  Good morning.

 3              THE WITNESS:  Good morning.

 4              THE COURT:  You may proceed.

 5              MS. VARTAIN:  Thank you, Your Honor.

 6                       DIRECT EXAMINATION

 7   BY MS. VARTAIN:

 8   Q.   Good morning, Mr. Gryzmala.  Who do you work for?

 9   A.   The FBI.

10   Q.   What is your title?

11   A.   I'm a special agent.

12   Q.   How long have you been a special agent?

13   A.   A little shy of six years.

14   Q.   Did you receive any training in order to become a special

15   agent?

16   A.   I did.

17   Q.   What was that training?

18   A.   It was approximately five months of new agent training in

19   Quantico, Virginia.

20   Q.   Did you have any role in the investigation of the assault

21   on Mr. Pelosi on October 28th, 2022?

22   A.   I did.

23   Q.   How would you describe your role?

24   A.   I was one of the agents who initially responded to the

25   scene after the incident occurred.
```

**GRYZMALA - DIRECT / VARTAIN**

1   Q.   And when you say "the scene," do you mean the Pelosis'

2   home in Pacific Heights?

3   A.   I do.

4   Q.   Did you -- how would you describe what you did when you

5   were on scene?

6   A.   Initially, it was coordinating efforts as far as who was

7   going to be processing the scene.  And then after that, it was

8   observing some of the evidence collection.

9   Q.   And specifically, was there evidence that the FBI

10  collected that day that you participated in?

11  A.   There was.

12  Q.   Just generally, what was that evidence?

13  A.   Preliminarily it was electronic evidence.

14  Q.   And was it located primarily in a specific location?

15  A.   It was.

16  Q.   I'm going to --

17          MS. VARTAIN:  Your Honor, may I approach?

18          THE COURT:  You may.

19              (Counsel approaches witness.)

20  BY MS. VARTAIN:

21  Q.   Special Agent Gryzmala, I've just handed you a laser

22  pointer.  Could you identify, on the board behind you, where

23  the evidence you collected was located?

24  A.   Yes.  It was -- oops, sorry.  Well -- there we go.  Sorry.

25  It was approximately in this area.

**GRYZMALA - DIRECT / VARTAIN**

1        (Indicating.)

2   Q.   And was it located within anything?

3   A.   Yes.  There were two backpacks primarily.

4   Q.   And both of those backpacks were located on the back -- in

5   the back porch area; is that correct?

6   A.   Yes; correct.

7   Q.   I'm going to show you admitted Exhibit 26.

8        Oh, I'm sorry.  We already have that one up in big form.

9        I'm going to show you Exhibit -- admitted Exhibit 126,

10  please.

11       Special Agent Gryzmala, do you recognize this?

12  A.   I do.

13  Q.   What is this?

14  A.   That is a backpack that was on the back porch of the

15  residence.  It's the smaller of the two backpacks, I believe.

16  Q.   Okay.  And I'd like to show you -- let me ask you this

17  first:  Did you seize any evidence from this backpack?

18  A.   Yes.

19  Q.   And was there evidence in this backpack that you did not

20  seize?

21  A.   Yes, I believe so.

22  Q.   And do you have an understanding as to who collected that

23  evidence?

24  A.   I believe everything we did not take, SFPD took.

25  Q.   Okay.  One moment.

1          MS. VARTAIN:  Your Honor, may I approach?

2          THE COURT:  You may.

3          MS. VARTAIN:  May I have permission to approach

4    whenever I hand --

5          THE COURT:  You may.

6          MS. VARTAIN:  Okay.

7                    (Counsel approaches witness.)

8    BY MS. VARTAIN:

9    Q.   Special Agent Gryzmala, I've just handled you Exhibit 228.

10   Do you recognize this?

11   A.   I do.

12   Q.   How do you recognize it?

13   A.   This is a tablet in a case that was inside of that smaller

14   backpack.

15   Q.   And for the record, all of the exhibits that we're

16   covering are already admitted.

17        I'd like to -- I think you referred to multiple backpacks.

18   How many backpacks, if you recall?

19   A.   I believe only two.

20   Q.   And was there -- so there was one in addition to the

21   photograph that we're looking at here; is that correct?

22   A.   Correct.

23          MS. VARTAIN:  Ms. Wachs, would you please put up

24   Exhibit 132.

25   \\\

1   BY MS. VARTAIN:

2   Q.   Do you recognize what we're looking at here, Special Agent

3   Gryzmala?

4   A.   I do.

5   Q.   What is this?

6   A.   That is the larger of the two backpacks.

7   Q.   Did you collect evidence from this backpack?

8   A.   Yes, we did.

9   Q.   And in order to collect the evidence, did you have to

10  unpack the backpack?

11  A.   Yes.

12  Q.   I'd like to show you Exhibit 146, please.  What are we

13  looking at here?

14  A.   This is the contents of at least one of the compartments

15  of the larger backpack.

16  Q.   Okay.  So when you say at least one of the contents, do

17  you mean that this is not the complete contents of the backpack

18  in this photograph?

19  A.   Correct.

20  Q.   Can you identify, in this photograph, some of the evidence

21  that you collected?

22  A.   Yes.  In the center of the photograph is a cellular phone.

23  On the left center, there's a USB thumb drive.  On the top,

24  there is a body camera, maybe both of them.  There were two.

25  Q.   Thank you.

1          **MS. VARTAIN:**  Ms. Wachs, would you please show

2     Exhibit 148.

3          **THE COURT:**  I just want to tell the jury, this

4     morning, again, before you came out, the parties agreed to

5     admit a whole bunch of exhibits just to save time.

6          All right.  Go ahead.

7          **MS. VARTAIN:**  Thank you, Your Honor.

8     **BY MS. VARTAIN:**

9     **Q.**   Special Agent Gryzmala, what are we looking at here?

10    **A.**   This is, I believe, another compartment of the backpack.

11    **Q.**   Okay.  And did you seize anything from this compartment of

12    the backpack?

13    **A.**   In this one, I can't tell -- I can't tell from that

14    picture.

15    **Q.**   Okay.  But you recognize -- you recognize this photograph;

16    is that correct?

17    **A.**   Yes, I do.

18    **Q.**   I've just handed you Exhibit 230.  Do you recognize this?

19    **A.**   I do.

20    **Q.**   And would you describe it for the jury.

21    **A.**   Sure.  It is a Samsung cell phone and also in the package

22    is a SIM card.

23    **Q.**   I'm going to hand you Exhibits 232 and 233.

24                    (Counsel approaches witness.)

25    \\\

GRYZMALA - DIRECT / VARTAIN

1    **BY MS. VARTAIN:**

2    **Q.**   Do you recognize these?

3    **A.**   I do.

4    **Q.**   And what are they?

5    **A.**   The first one is a body-worn camera, and then the second

6    one is a user's guide/manual for that body-worn camera.

7    **Q.**   Is Exhibit 232 -- does it have any brand on it?

8    **A.**   Yes.  It is a BOBLOV, if I'm saying that correctly.

9    B-O-B-L-O-V.

10                    (Counsel approaches witness.)

11   **BY MS. VARTAIN:**

12   **Q.**   Do you recognize the exhibits that I've just handed you?

13   **A.**   I do.

14   **Q.**   And would you identify their numbers and what they are for

15   the jury, please.

16   **A.**   Sure.  I have Exhibit 229, which is a memory card, an SD

17   card.

18        231, which is an additional body-worn camera.

19        And 234, which is a USB thumb drive.

20   **Q.**   I've just handed you Exhibits 235 and 236.  Do you

21   recognize those?

22   **A.**   I do.

23   **Q.**   What are they?

24   **A.**   They are hard drives.

25   **Q.**   And is there a specific brand for those hard drives?

1   **A.**   Yes.   They both appear to be Western Digital 1-terabyte

2   hard drives.

3            **MS. VARTAIN:**   Another exhibit.

4                 (Counsel approaches witness.)

5   **BY MS. VARTAIN:**

6   **Q.**   I've just handed you Exhibit 237.   Do you recognize this?

7   **A.**   Yes.

8   **Q.**   What is this?

9   **A.**   This is a laptop and a case that the laptop was in.

10  **Q.**   Okay.   And are all of the items that I've just handed you

11  exhibits or -- is that evidence that you collected from the

12  back porch of the Pelosis' home on October 28th, 2022?

13  **A.**   Yes.

14  **Q.**   Okay.   I'm going to endeavor -- I'm going to come bring a

15  box up, and we're going to stick them back in the box.   Okay?

16  **A.**   Yes.

17                 (Counsel approaches witness.)

18  **Q.**   After you collected the evidence that we've just gone

19  through, what, if anything else, did you do in this

20  investigation?

21  **A.**   The only other thing was I went to the hospital that

22  morning as well.

23  **Q.**   And why did you go to the hospital?

24  **A.**   It was in an attempt to interview the victim.

25  **Q.**   And were you able to conduct that interview?

GRZYMALA - CROSS / CHUANG

1   **A.**   I was not.

2   **Q.**   Was that your last work on this case prior to your

3   testimony today?

4   **A.**   It was.

5               **MS. VARTAIN:**  Thank you.

6        No further questions.

7               **THE COURT:**  Any questions?

8               **MS. CHUANG:**  Yes, Your Honor.

9                        <u>CROSS-EXAMINATION</u>

10  **BY MS. CHUANG:**

11  **Q.**   Hi, good morning.

12  **A.**   Good morning.

13  **Q.**   So let's just go through some of the electronics that you

14  recovered and count them up together.

15  **A.**   Okay.

16  **Q.**   First, you found a tablet; correct?

17  **A.**   Correct.

18  **Q.**   And you found an SD card; correct?

19  **A.**   Correct.

20  **Q.**   You found a phone; correct?

21  **A.**   Correct.

22  **Q.**   So that's three so far.

23        You also found a USB drive?

24  **A.**   Correct.

25  **Q.**   Four.

GRZYMALA - CROSS / CHUANG

```
1            You found two hard drives; right?
2    A.   Correct.
3            MS. CHUANG:  If we could show what's been admitted as
4    Exhibit 151.
5    BY MS. CHUANG:
6    Q.   That's a picture of the two hard drives that you found;
7    correct?
8    A.   Correct.
9    Q.   What part of the backpack did that come from?
10   A.   I don't remember, honestly.
11   Q.   And then, finally, you also found a laptop; correct?
12   A.   Correct.
13   Q.   In addition to those, you found two body cameras?
14   A.   Correct.
15   Q.   So aside from the body cameras, that means you found seven
16   electronic devices; correct?
17   A.   I'll take your word on the math, yes.
18   Q.   All right.  And you recovered all of them for the FBI;
19   correct?
20   A.   Correct.
21           MS. CHUANG:  Thank you.
22       No further questions.
23           THE COURT:  Any further questions?
24       Thank you.  You may step down.
25           THE WITNESS:  Thank you, Your Honor.
```

CLARK - DIRECT / VARTAIN

```
 1                       (Witness excused.)
 2           THE COURT:  Is the Government prepared to call your
 3   next witness?
 4           MS. VARTAIN:  We are, Your Honor.  The Government
 5   calls Tim Clark.
 6       (Timothy Clark steps forward to be sworn.)
 7           THE CLERK:  Thank you.
 8       Please raise your right hand.
 9                       TIMOTHY CLARK,
10   called as a witness for the Government, having been duly sworn,
11   testified as follows:
12           THE WITNESS:  Yes.
13           THE CLERK:  Can you please state your name and spell
14   it for the record?
15           THE WITNESS:  Timothy Clark.
16       T-I-M-O-T-H-Y, C-L-A-R-K.
17           THE COURT:  Good morning.
18                    DIRECT EXAMINATION
19   BY MS. VARTAIN:
20   Q.  Mr. Clark, good morning.  Who do you work for?
21   A.  United States Capitol Police.
22   Q.  And what is your title?
23   A.  Physical security specialist.
24   Q.  Where are you based?
25   A.  In Washington, D.C.
```

**CLARK - DIRECT / VARTAIN**

1  Q.   How long have you been with the Capitol Police?

2  A.   About five-and-a-half years.

3  Q.   And what are your key job responsibilities as a physical

4  security specialist?

5  A.   My section is responsible for the programming of access

6  control, CCTV, intrusion detection systems --

7         **THE COURT:**  I think you're going to need to slow down

8  a little bit.

9         **THE WITNESS:**  I'm sorry.

10      I'm responsible for the programming of access control,

11  CCTV, and intrusion detection systems.

12  **BY MS. VARTAIN:**

13  Q.   You understand that your testimony today concerns the

14  portion of your responsibilities concerning CCTV.

15  A.   Yes.

16  Q.   And specifically the CCTV on the Pelosis' home in

17  San Francisco?

18  A.   Yes.

19  Q.   Does the US Capitol Police have cameras on the Pelosis'

20  home in San Francisco?

21  A.   Yes, they do.

22  Q.   Does the US Capitol Police have cameras in other places in

23  addition to the Pelosis' home?

24  A.   Across the Capitol complex, yes.

25  Q.   And when you say "Capitol complex," what do you mean by

CLARK - DIRECT / VARTAIN

1   that?

2   **A.**   Congressional buildings, inside, outside the area that

3   they have jurisdiction of in D.C.

4   **Q.**   In October of 2022, did the Capitol Police maintain the

5   cameras on the Pelosis' home in San Francisco?

6   **A.**   Yes.

7   **Q.**   Are you familiar with where the cameras on the Pelosis'

8   home are located?

9   **A.**   Yes, I am.

10  **Q.**   How are you familiar with them?

11  **A.**   I traveled to the site in 2019 to help configure the

12  system when it was being installed.

13  **Q.**   And in addition to your work on the installation in 2019,

14  did you visit the home at any other point in time to work on

15  the cameras?

16  **A.**   Yes.

17  **Q.**   When was that?

18  **A.**   February of 2020.

19  **Q.**   Just generally speaking, what is the purpose of the

20  cameras on the Pelosis' home?

21  **A.**   Provides video for the detail, protective detail, and also

22  for the Capitol Police in D.C. to view.

23  **Q.**   And when you say for the Capitol Police in D.C. to view,

24  what do you mean by that?

25  **A.**   They can see the feeds of those cameras.

**CLARK - DIRECT / VARTAIN**

1   Q.   Do the feeds of those cameras feed into a specific

2   location?

3   A.   Yes.   Into our command center.

4   Q.   When you say "command center," what is that?

5   A.   It's an office where the officers have situational

6   awareness of what's going on throughout the Capitol.

7   Q.   Have you been to the command center?

8   A.   I have been there.

9   Q.   And do you routinely go there?

10  A.   No, I do not.

11  Q.   In your five years with Capitol Police, can you

12  approximate how many times you've been to the command center?

13  A.   I've been there about five or six times.

14  Q.   Okay.  And do you have an approximate idea of the number

15  of cameras that feed into the command center?

16  A.   Our system has about 1700 cameras.

17  Q.   I'd like to show you Exhibit 322, please, which will show

18  up, Mr. Clark, on the screen in front of you.

19       Do you recognize what we're looking at here?

20  A.   Yes.

21  Q.   What are we looking at?

22  A.   This is the Pelosi residence.

23  Q.   And do you see that there are six or -- triangles on the

24  residence?

25  A.   Yes.

**CLARK - DIRECT / VARTAIN**

1    Q.    Do you know what those are?

2    A.    Those are the locations of the CCTV cameras.

3    Q.    And those are the CCTV cameras that you helped install; is

4    that correct?

5    A.    That's correct.

6          MS. VARTAIN:   Ms. Wachs, would you please put up

7    Exhibit 15 on the screen.   And if you could please play just a

8    few seconds of it.

9                (Video played but not reported.)

10   BY MS. VARTAIN:

11   Q.    Mr. Clark, do you recognize what we're looking at here?

12   A.    Yes.

13   Q.    What are we looking at?

14   A.    That's the image from camera Number 1.

15   Q.    And does the image that we're looking at here have a date

16   time?

17   A.    Yes, it does.

18   Q.    What is the date and time?

19   A.    October 28th, 2022, 4:40 a.m.

20   Q.    Do you have an understanding about what time zone the

21   4:40 a.m. is in?

22   A.    Yes.   That represents East Coast time.

23   Q.    Why is that?

24   A.    The workstation that this video was taken from the system

25   on was in East Coast, so it displayed that time stamp.

**CLARK - DIRECT / VARTAIN**

1   **Q.**   Have you reviewed the footage from cameras two, three,

2   four, five, and six for this time period as well?

3   **A.**   Yes, I have.

4   **Q.**   And what time zone is the footage from those cameras in?

5   **A.**   They're all East Coast time.

6   **Q.**   Thank you.

7           **MS. VARTAIN:**   No further questions.

8           **THE COURT:**   Thank you.   Any questions?

9           **MS. LINKER:**   Thank you, Your Honor.   No, Your Honor.

10          **MS. VARTAIN:**   Thank you, Mr. Clark.

11          **THE COURT:**   Thank you, Mr. Clark.   I hope you enjoyed

12  your trip to San Francisco.

13                          (Laughter.)

14          **THE COURT:**   Is the Government prepared to call your

15  next witness?

16          **MS. GILBERT:**   Yes, Your Honor.   The Government calls

17  Jonathan Guerra.

18      (Jonathan Guerra steps forward to be sworn.)

19          **THE CLERK:**   Could you please raise your right hand.

20                     **JONATHAN GUERRA**,

21  called as a witness for the Government, having been duly sworn,

22  testified as follows:

23          **THE WITNESS:**   I do.

24          **THE CLERK:**   Please be seated.   Can you state your name

25  and spell it for the record?

**GUERRA - DIRECT / GILBERT**

1          **THE WITNESS:**  Jonathan Guerra.  J-O-N-A-T-H-A-N,

2    G-U-E-R-R-A.

3          **THE CLERK:**  Thank you.

4                    <u>**DIRECT EXAMINATION**</u>

5    **BY MS. GILBERT:**

6    **Q.**   Mr. Guerra, where do you work?

7    **A.**   I work for the San Francisco Bay Area Rapid Transit Police

8    Department.

9    **Q.**   Is this the San Francisco Bay Area Rapid Transit,

10   typically known as "BART"?

11   **A.**   Yes.

12   **Q.**   What is your position?

13   **A.**   I'm the detective sergeant.

14   **Q.**   How long have you worked for BART's police department?

15   **A.**   20 years.

16   **Q.**   Are you familiar with whether BART has security cameras on

17   its trains and in its stations?

18   **A.**   Yes.

19   **Q.**   Do they?

20   **A.**   Yes.

21   **Q.**   Is it the regular practice of BART to capture security

22   footage from its stations and trains?

23   **A.**   Yes.

24   **Q.**   You review BART security camera footage as part of your

25   job as a detective sergeant?

GUERRA - DIRECT / GILBERT

1   **A.**   Yes.

2   **Q.**   Are you familiar with how BART security camera footage is

3   maintained?

4   **A.**   Yes.

5   **Q.**   I'd like to turn your attention to what has been marked

6   and admitted as Exhibit 12, which is right in front of you on

7   the witness stand.

8        Are you familiar with this exhibit?

9   **A.**   Yes.

10  **Q.**   Are there any initials on it?

11  **A.**   There are.

12  **Q.**   Whose initials are those?

13  **A.**   Mine.

14  **Q.**   Did you write your initials on Exhibit 12?

15  **A.**   Yes.

16  **Q.**   And sorry.  For the record, what is Exhibit 12 exactly?

17  **A.**   A USB stick.

18  **Q.**   Have you reviewed the contents on Exhibit 12?

19  **A.**   Yes.

20  **Q.**   And what is on Exhibit 12?

21  **A.**   It contains surveillance video from the BART system at the

22  El Cerrito Plaza BART station, the MacArthur BART station, and

23  the Civic Center BART Station as well as two train cars from

24  two different trains.

25  **Q.**   Does this surveillance footage show anyone in particular?

GUERRA - DIRECT / GILBERT

1   A.   Yes.

2   Q.   Who?

3   A.   The defendant.

4   Q.   Does it show the defendant on October 27th and

5   October 28th of 2022?

6   A.   Yeah.

7   Q.   Do these videos contain time stamps?

8   A.   Yes.

9   Q.   Does BART maintain its security camera footage on the same

10  server or system for all of its stations and trains?

11  A.   No.

12  Q.   So let's start with the stations.

13       Are the stations' security footage on different systems or

14  the same system?

15  A.   There's two different types of systems for the station

16  footage.

17  Q.   So I think you said that this Exhibit 12 contains footage

18  from three stations; is that right?

19  A.   Yes.

20  Q.   Are all three of those stations on the same system?

21  A.   No.

22  Q.   So are they on two different systems?

23  A.   Yes.

24  Q.   Let's talk about the trains.  I think you said that

25  Exhibit 12 contains footage from two separate trains; is that

**GUERRA - DIRECT / GILBERT**

1   right?

2   **A.**   Yes.

3   **Q.**   Does BART maintain its security footage for the trains on

4   the same system?

5   **A.**   No.

6   **Q.**   Can you tell us how BART maintains security footage for

7   its trains?

8   **A.**   There's two different systems currently with the old

9   train, and we have new train cars that have a newer, more

10  modern system.  However, each train car has an individual

11  digital video recorder that is isolated to each train car.

12  **Q.**   So is that essentially saying that the security footage on

13  the train kind of just lives on the train?

14  **A.**   That's correct.

15  **Q.**   Okay.  In layman's terms.

16       Does the fact that the security footage is kept on

17  separate systems for BART trains and BART stations have any

18  impact on whether the time stamps on BART security video

19  footage are consistent?

20  **A.**   Yes.  They would be not consistent.

21  **Q.**   So is it fair to say that the time stamps are approximate?

22  **A.**   Yes.

23  **Q.**   I want to ask you about one specific video on Exhibit 12.

24  Does Exhibit 12 contain a video of the defendant on a train

25  from El Cerrito Plaza to MacArthur Station?

GUERRA - DIRECT / GILBERT

1   A.   Yes.

2   Q.   Is the time stamp on this video accurate?

3   A.   No.

4   Q.   How so?

5   A.   The digital video recorder on that train car had not been

6   adjusted for daylight savings time.  It displays standard time.

7   Q.   So if we view the video that I've referenced of that

8   train, would that video be an hour behind the actual time or

9   hour ahead of the actual time?

10  A.   Behind.  It actually says 10:30 p.m. whereas it is

11  actually 11:30 p.m.

12  Q.   Have you seen this happen before?

13  A.   Yes.

14       MS. GILBERT:  No further questions, Your Honor.

15       THE COURT:  Thank you.

16  Any questions?

17       MS. LINKER:  No questions.

18       THE COURT:  Thank you.  You are excused.

19                     (Witness excused.)

20       THE COURT:  Is the Government prepared to call their

21  next witness?

22       MS. VARTAIN:  Yes.  The Government calls Dwight

23  Littlejohn.

24  (Dwight Littlejohn steps forward to be sworn.)

25       THE CLERK:  Please raise your right hand.

LITTLEJOHN - DIRECT / VARTAIN

1                              **DWIGHT LITTLEJOHN**,

2   called as a witness for the Government, having been duly sworn,

3   testified as follows:

4            **THE WITNESS:**  I do.

5            **THE CLERK:**  Can you please sit down, state your name,

6   and spell it for the record, please.

7            **THE WITNESS:**  Dwight Littlejohn.  D-W-I-G-H-T,

8   L-I-T-T-L-E-J-O-H-N.

9            **THE COURT:**  Good morning.

10                         **DIRECT EXAMINATION**

11  BY MS. VARTAIN:

12  **Q.**   Who do you work for?

13  **A.**   US Capitol Police.

14  **Q.**   What is your title?

15  **A.**   I'm a special agent.

16  **Q.**   Where are you based?

17  **A.**   In Washington, D.C.

18  **Q.**   And, Special Agent Littlejohn, how long have you been with

19  the United States Capitol Police?

20  **A.**   About 27 years.

21  **Q.**   What is the United States Capitol Police charged with

22  protecting?

23  **A.**   Capitol Police protects the Capitol complex, visitors,

24  members of Congress, and employees as well.

25  **Q.**   Are you assigned to a specific section within US Capitol

LITTLEJOHN - DIRECT / VARTAIN

1   Police?

2   A.   Yes, I am.

3   Q.   What is that section?

4   A.   Protective service bureau, dignitary protection division.

5   Q.   Okay.  Let's focus in on the first part, protective

6   service bureau.  What does that mean?

7   A.   It's the bureau that's -- it's two different sections.

8   It's, one, a threat and intelligence section, and it's also a

9   protective section which are responsible for the protection of

10  the members in leadership.

11  Q.   And is the second part of what you just described, the

12  protection section, the dignitary protection division that you

13  work for?

14  A.   That is correct.

15  Q.   And what does the dignitary protection division protect?

16  A.   We're mainly assigned to protect the five leaders on the

17  House side and any member of Congress that the House sergeant

18  at arms deems necessary to provide a protection detail for.

19  Q.   Let's take that -- it sounds like that's in two parts; is

20  that right?

21  A.   That's correct.

22  Q.   Let's take the second one first.  You said something about

23  the sergeant at arms.  Who is that?

24  A.   The sergeant at arms is the chief law enforcement officer

25  of the House of Representatives.

**LITTLEJOHN - DIRECT / VARTAIN**

1  **Q.**   And what does the sergeant at arms do as it concerns

2  determining who is protected within your dignitary protection

3  division?

4  **A.**   The two different areas that he assigns protection to, one

5  is automatic and those are the members that are in leadership.

6  And the other members are based on threats.

7  **Q.**   Let's talk about the first category now, which are the

8  members in leadership.  I believe you said there are five

9  leadership positions in the House.

10      Was I right about that?

11  **A.**   That is correct.

12  **Q.**   What are those leadership positions?

13  **A.**   The speaker of the House, the majority leader, and the

14  majority whip, the minority leader, and the minority whip.

15  **Q.**   When you say "majority" in this context, what do you mean?

16  **A.**   It's the political party that's in charge of the House.

17  **Q.**   So do you mean if, for example, the Democrats are in

18  charge of the House, that they are the majority?

19  **A.**   Correct.

20  **Q.**   Okay.  So you used the term "minority."  What does that

21  mean in this context?

22  **A.**   Almost the opposite.  Just the party that is not in

23  charge, which basically means they have the least amount of

24  members.

25  **Q.**   Now, the first leadership position that you mentioned was

**LITTLEJOHN - DIRECT / VARTAIN**

1  the speaker.  Am I right about that?

2  A.   Correct.

3  Q.   What is the -- how would you describe the role of the

4  speaker?

5  A.   The speaker is elected within the caucus of the party

6  that's in power, and she oversees the -- or they oversee the

7  House of Representatives.

8  Q.   Okay.  Is it fair to say that the speaker is the leader of

9  the party that is in control of Congress at any given time?

10  A.   Yes.

11  Q.   And I -- let me be more specific.  I specifically mean of

12  the House of representatives; is that correct?

13  A.   That's correct.

14  Q.   Are you currently assigned to a specific protectee?

15  A.   Yes.

16  Q.   Who is that?

17  A.   Speaker emerita, Nancy Pelosi.

18  Q.   What does the term "speaker emerita" mean?

19  A.   That means former speaker of the House, but they're still

20  serving in the House of representatives after vacating the

21  speaker seat.

22  Q.   So Nancy Pelosi is not the speaker of the House today.  Am

23  I right about that?

24  A.   That's correct.

25  Q.   But she does remain as a member of Congress.  Am I right

LITTLEJOHN - DIRECT / VARTAIN

1   about that?

2   **A.**   Correct.

3   **Q.**   Now, speaker emerita is not one of the five leadership

4   positions that you identified in your list of five; is that

5   right?

6   **A.**   Correct.

7   **Q.**   So why, to your knowledge, does the speaker emerita have

8   protection today?

9   **A.**   It's a threat-based detail.

10  **Q.**   When you say "threat-based," is that referring back to

11  what you talked about earlier, with the sergeant of arms making

12  threat determinations?

13  **A.**   Correct.

14  **Q.**   Okay.

15      I would like to talk specifically about the time period in

16  which Nancy Pelosi was the speaker.   Okay?

17  **A.**   Yup.

18  **Q.**   Actually, I'm going to go back.   That was misleading.   I'm

19  going to go back in time.

20      How long have you been assigned to Nancy Pelosi's

21  protection detail?

22  **A.**   For about 17 years.

23  **Q.**   What does -- what does that put us back to, approximately

24  what year?

25  **A.**   2006.

**LITTLEJOHN - DIRECT / VARTAIN**

1  Q.   At the time that you started working on Congresswoman

2  Pelosi's protection detail, did she already have a detail?

3  A.   Correct.

4  Q.   Why was that?

5  A.   She was the minority leader.  She took that position in

6  2003.

7  Q.   And in the time that you have been with -- assigned to

8  Nancy Pelosi's protection detail, has she continuously held one

9  of the five positions entitling her to a detail until

10  approximately January of 2023?

11  A.   That's correct.

12  Q.   Now we are going to focus on October of 2022.

13       What was Nancy Pelosi's leadership position at that time?

14  A.   She was speaker of the house.

15  Q.   How long had she been speaker of the house in

16  October 2022?

17  A.   That -- two years.

18  Q.   When you say "two years," does she serve -- as -- the

19  speaker serves in two-year terms?

20  A.   Correct.

21  Q.   And the term that she was serving in 2022, do you recall

22  approximately when it started?

23  A.   It started in 2020.

24  Q.   Had she previously been the speaker for other terms prior

25  to then?

**LITTLEJOHN - DIRECT / VARTAIN**

1    A.   Correct.  She was speaker from 2007 to 2011 and, again,

2    from '17 to -- 2017 to 2022.

3    Q.   Fair to say that, at the time that Nancy Pelosi was

4    serving as speaker, then, she was the top House Democrat in the

5    house of representatives?

6    A.   That is fair to say.

7    Q.   And I'm correct -- am I correct that the speaker, Speaker

8    Nancy Pelosi, affiliates with the Democratic Party?

9    A.   Correct.

10   Q.   I'd like to talk about the coverage that the US Capitol

11   Police provided to Speaker Pelosi during the term when she was

12   the speaker in October 2022.  Okay?

13       How were you familiar with her protection at that point in

14   time?

15   A.   I worked it every day.  I was one of the team leaders on

16   the detail.

17   Q.   When you say "one of the team leaders," what do you mean

18   by that?

19   A.   A team leader is a supervisory position within our

20   structure.  And the team leader is responsible for liaisonning

21   [sic] between the Speaker, the staff, and my protection detail

22   team.

23   Q.   How long had you been the team lead on the -- on Nancy

24   Pelosi's protection detail?

25   A.   Since about 2011.

**LITTLEJOHN - DIRECT / VARTAIN**

1    Q.   How many days of the year -- and I'm going to -- I'm

2    focused on 2022 -- did the US Capitol Police provide protection

3    to Speaker Pelosi?

4    A.   Every day of the year.

5    Q.   365 days?

6    A.   Correct.

7    Q.   How many hours a day?

8    A.   24 hours.

9    Q.   And I take it, then, that that's seven days a week?

10   A.   It is.

11   Q.   Did the US Capitol Police protect Speaker Pelosi in

12   shifts?

13   A.   We did.

14   Q.   And can you just generally describe what those shifts are?

15   A.   Two shifts.  An a.m. shift, a p.m. shift, and a midnight

16   shift.

17   Q.   Are there more than one agent assigned to each shift?

18   A.   Right, there is.

19   Q.   You have vehicles that you use on the protection detail?

20   A.   Yes.

21   Q.   And does the Speaker have a designated car?

22   A.   She does.

23   Q.   Is that car different from the other cars in the

24   protection detail?

25   A.   It is.  It's reinforced.  It's an armored vehicle.

**LITTLEJOHN - DIRECT / VARTAIN**

1  **Q.**   Are there times when the Speaker does not have coverage

2  from US Capitol Police?

3  **A.**   No.

4  **Q.**   When she travels, does Capitol Police travel with her?

5  **A.**   Yes.

6  **Q.**   When she's at home in bed, is Capitol Police present at

7  those times as well?

8  **A.**   We are.

9  **Q.**   And in October of 2022, did the US Capitol Police provide

10  any agents to protect members of Speaker Pelosis' family aside

11  from herself?

12  **A.**   No.

13  **Q.**   Are there other agencies, besides the US Capitol Police,

14  that you work with as a member of the Speaker's protection

15  detail?

16  **A.**   We work with various agencies as we travel throughout the

17  country, but the primary agency that we work with is the United

18  States Secret Service.

19  **Q.**   Why is the Secret Service the primary agency that you work

20  with?

21  **A.**   Well, being that the speaker is in the line of succession,

22  the Secret Service needs to be aware of her location at all

23  times in case there's an incident that requires them, the

24  Secret Service, to take over the protection detail.

25  **Q.**   Let me break that down into a few pieces.

1      You said "line of succession."  What do you mean by that?

2  **A.**   She's second in line to the presidency.

3  **Q.**   And when you say -- well, why does the Secret Service need

4  to be -- why is Secret Service the agency that you coordinate

5  with?  What is Secret Service charged with protecting?

6  **A.**   Their main protectee is the president.  So if -- like I

7  said a little earlier, if an incident occurred where something

8  happened to the president or the vice president, then the

9  Speaker would become the president, so, therefore, they would

10  need to know how to connect with her.

11      And the coordination that we have with them is a means of

12  making sure that that's a smooth transition.

13  **Q.**   Can you describe what that coordination between US Capitol

14  Police and the Secret Service looks like as a practical matter?

15  **A.**   Sure.  It's usually a phone call or an e-mail, depending

16  on if we've had previous relationships with a particular area

17  of the country.  And it -- it's -- ultimately it becomes just a

18  notification process, and then there's an information exchange,

19  the stuff that we need to know to make those -- I guess those

20  things possible to coordinate with each other.

21  **Q.**   Is it your goal to be assured that Secret Service is aware

22  of the Speaker's location at any point in time?

23  **A.**   Everywhere we go, they're always aware, through a process

24  that our department has in conjunction with the United States

25  Secret Service.

**LITTLEJOHN - DIRECT / VARTAIN**

1   **Q.**   I'm going to shift gears again.

2       Were you at work with the speaker on October 27th, 2022?

3   **A.**   No.

4   **Q.**   Why not?

5   **A.**   I was actually on leave that day.

6   **Q.**   So you're allowed to take a vacation?

7   **A.**   Not a lot, but sometimes.

8   **Q.**   And do you recall what your last day at work had been?

9   **A.**   It was the 22nd of October.

10   **Q.**   When did you return from your vacation?

11   **A.**   On the 28th.

12   **Q.**   Do you recall when you showed up for work on October 28th,

13   2022?

14   **A.**   6:00 a.m.

15   **Q.**   Is that when the first shift of the day starts?

16   **A.**   Yes.

17   **Q.**   And where did you show up to work?

18   **A.**   To her residence in D.C.

19   **Q.**   Did -- when you showed up to work, did you learn about the

20   assault on Mr. Pelosi?

21   **A.**   Yes, I did.

22   **Q.**   And did the assault on Mr. Pelosi impact your schedule in

23   any way?

24   **A.**   Absolutely.  Everything that we were planning on doing

25   that Friday got erased, and we ended up going directly to

**LITTLEJOHN - CROSS / LINKER**

 1  San Francisco.

 2  **Q.**   And just to be clear, does that mean that you went from

 3  Washington D.C., with the speaker, to San Francisco, where

 4  Mr. Pelosi was?

 5  **A.**   Yes.

 6          **MS. VARTAIN:**  No further questions.  Thank you.

 7          **THE COURT:**  Any questions?

 8          **MS. LINKER:**  Yes, Your Honor.

 9                   <u>CROSS-EXAMINATION</u>

10  **BY MS. LINKER:**

11  **Q.**   Special Agent Littlejohn, my name is Jodi Linker.  I'm

12  just going to ask you a few questions this morning.

13          You are informed of all of Nancy Pelosi's movements;

14  correct?

15  **A.**   That is correct.

16  **Q.**   And you've been her team leader for many years now;

17  correct?

18  **A.**   Yes.

19  **Q.**   You gave us a little civics lesson here this morning; is

20  that fair to say?

21  **A.**   Yes.

22  **Q.**   In your years -- 27 years working for Capitol Police,

23  you've learned a lot about how the House functions?

24  **A.**   I have.

25  **Q.**   And you also worked as a driver, at times, for Nancy

**LITTLEJOHN - CROSS / LINKER**

1    Pelosi; correct?

2    **A.**   Yes.

3    **Q.**   You took her to different places?

4    **A.**   Yes.

5    **Q.**   And you would stay with her when she went into different

6    locations?

7    **A.**   Correct.

8    **Q.**   And even if you're not her driver, as her team leader, you

9    always know where she is; is that correct?

10   **A.**   When I'm actually working, yes.

11   **Q.**   And you work a lot?

12   **A.**   I do.

13   **Q.**   You are provided full access to her schedule?

14   **A.**   Yes.

15   **Q.**   And one of the things, I believe, you testified is that

16   you, as the team leader, coordinate her schedule with her

17   staff; is that correct?

18   **A.**   Correct.

19   **Q.**   And so they provide you with a copy of her schedule?

20   **A.**   Yes.

21   **Q.**   And then you use that to control her movements throughout

22   the day?

23   **A.**   Exactly, yes.

24   **Q.**   And that schedule is kept in the regular course of

25   business?

LITTLEJOHN - CROSS / LINKER

1    A.    Yes.

2    Q.    And that schedule is accurate as to what she's doing; is

3    that fair?

4    A.    Most of the time.

5    Q.    So if there are changes, you adjust the schedule?

6    A.    We do, yes.

7    Q.    And the person that makes that schedule for Nancy Pelosi

8    is called her scheduler?

9    A.    Yes.

10   Q.    And so you have regular contact with her scheduler; is

11   that fair to say?

12   A.    Yes.

13   Q.    Did you bring her schedule from October 2022 with you here

14   today?

15   A.    I did not.

16   Q.    Did you review her schedule from October 2022 in

17   preparation for your testimony here today?

18   A.    I did not.

19   Q.    You're familiar generally, though, with how her schedule

20   looks?

21   A.    I am.

22   Q.    I'd like to show you --

23             MS. LINKER:  May I approach, Your Honor?

24             THE COURT:  You may.

25                     (Counsel approaches witness.)

LITTLEJOHN - CROSS / LINKER

1              **THE COURT:**  What number?

2              **MS. LINKER:**  511.  I don't believe Your Honor has it.

3    BY MS. LINKER:

4    **Q.**   Could you take a look at that?

5    **A.**   (Witness examines document.)

6         Okay.

7    **Q.**   Special Agent Littlejohn, do you recognize that document?

8    **A.**   I do.

9    **Q.**   And what is it?

10   **A.**   It's her -- looks like what we would call the long-term

11   schedule, a portion of that.

12   **Q.**   And that's what's kept in the regular course of business?

13   **A.**   Yes.  And we also get a daily schedule in addition to

14   this.

15   **Q.**   And that's an accurate schedule that's kept at or near the

16   time of the event?

17   **A.**   As far as I know.  I can't remember exactly what was

18   scheduled on the week leading to, obviously, because I wasn't

19   there, and even on the day.  It's been a year now.

20   **Q.**   But based on your experience, those schedules are accurate

21   representations --

22   **A.**   Right.

23   **Q.**   -- that are kept in the regular course of business?

24   **A.**   Correct.

25              **MS. LINKER:**  I move to admit Exhibit 511.

1          **MS. VARTAIN:**  Objection.  There's no business record

2    foundation.  He does not keep the schedule.  He receives the

3    schedule, and I believe the schedule in front of him is full of

4    redactions that the agent cannot explain.

5          **THE COURT:**  Well, all right.  Why don't we admit it

6    provisionally, and then we can address it at another time.  He

7    said this does look like the schedule that he sees.  Now,

8    whether this is the one --

9          **THE WITNESS:**  Well, the format does, but I definitely

10   don't -- it definitely doesn't look like this.  I was just

11   understanding that it was probably done like this.

12         **THE COURT:**  This doesn't look like what you would see?

13         **THE WITNESS:**  Not with the blocks, of course.  It

14   doesn't look like that with the blocks.

15         **THE COURT:**  Not with the redactions --

16         **THE WITNESS:**  Right.

17         **THE COURT:**  -- because you get to see --

18         **THE WITNESS:**  I see everything.  I don't -- there's

19   nothing missing.

20         **THE COURT:**  How about with the unredacted part?

21         **THE WITNESS:**  Right.  It's set up the same.

22         **THE COURT:**  And you would get this every week or every

23   day?

24         **THE WITNESS:**  Every day.

25         **THE COURT:**  Every day.  The long term -- what you

 1  called, I think, the long term.

 2          THE WITNESS:  Right.  That's correct.

 3          MS. VARTAIN:  Your Honor, may I add to my objection?

 4  The witness has testified that he was not with the speaker on

 5  many of these days in question.

 6          THE COURT:  And --

 7          MS. VARTAIN:  And I don't know whether he received

 8  this schedule from those days that he was not on, so I think

 9  he's lacking foundation as to that.

10          THE COURT:  Well, the last day, the 28th, you were

11  with the speaker?

12          THE WITNESS:  That day, I was.

13          THE COURT:  So would you have -- you said every day,

14  you get the long term?

15          THE WITNESS:  I do.

16          THE COURT:  So the day of the 28th, would that have

17  looked like -- do you remember?

18          THE WITNESS:  I don't remember exactly what was

19  scheduled, but it -- the format looks like something that we

20  do.

21          THE COURT:  All right.  I'm going to allow it.

22          MS. LINKER:  Thank you, Your Honor.

23  BY MS. LINKER:

24  Q.   You were off, I think you said, October 23rd to 27th; is

25  that correct?

LITTLEJOHN - CROSS / LINKER

```
1    A.    That's correct.

2    Q.    So you were with her on October 21st?

3    A.    Yes.

4    Q.    And on that date, she flew in from Chicago to Washington

5    National Airport around 2:45 p.m.?

6    A.    Okay.

7    Q.    You can refresh your recollection by looking at that, if

8    you would like.

9    A.    (Witness examines document.)

10         MS. LINKER:  Your Honor, can we publish this to the

11   jury, please?

12         THE COURT:  Which page?

13         MS. LINKER:  We can start with October 21st, when he

14   was with her.

15         THE COURT:  Let's see if he remembers.

16         MS. LINKER:  Well, it's admitted.  You want to hold

17   off still?

18         THE COURT:  Yes.

19         MS. LINKER:  Fair enough.

20         MS. CHUANG:  I'm sorry.  Which day are we talking

21   about?

22   BY MS. LINKER:

23   Q.    October 21st, at 2:45.

24   A.    2:45 on the 21st?

25   Q.    Correct.
```

1    A.   Okay.  I see it.  Okay.

2    Q.   She arrived as Washington National Airport around that

3    time?

4    A.   If -- I don't remember, but if the schedule is saying

5    that, then I would assume that it's accurate.

6    Q.   She then went to a personal appointment at the Capitol

7    from 3:15 to 3:25?

8    A.   Yeah.  I'm sorry.  I don't remember.  It's been a year.

9    Q.   So when you came back from vacation, it was -- it was a

10   big thing to come back to; right?

11   A.   Absolutely.

12   Q.   And so did you think back on your last day with Nancy

13   Pelosi prior to having left on vacation?

14   A.   I did not.

15   Q.   And now, sitting here, that week was a big week.  I sensed

16   a little guilt for going on vacation, not that you should, but

17   you were gone?

18   A.   I was.  But I was there on the day.

19   Q.   You were there with her?

20   A.   Right.

21   Q.   I'm sure that was a hard thing to be there for her.

22        On the 21st, back to the 21st, if you recall, you took her

23   to the DCCC.  Can you tell us, what's the DCCC?

24            MS. VARTAIN:  Objection.  The witness has not

25   testified that he took her to the DCCC.

1                  **THE COURT:**  Okay.  So he didn't, but he can answer

2     what the DCCC is.

3                  **THE WITNESS:**  It's the Democratic Campaign Committee.

4     **BY MS. LINKER:**

5     **Q.**   The Democratic Congressional Campaign Committee.  Does

6     that sound right to you?

7     **A.**   Right.  That's right.

8     **Q.**   It was a regular occurrence for her to go to the DCCC?

9     **A.**   Sure.

10    **Q.**   You went with her to the DCCC often?

11    **A.**   I did.

12    **Q.**   She often spent more than half her day at the DCCC?

13    **A.**   I don't know if that's accurate.  I don't know about half,

14    but she spent time there.

15    **Q.**   A good chunk of time every day?

16    **A.**   As a whole, but I don't know about every day.  I wouldn't

17    say every day.

18    **Q.**   As a whole, she spent a substantial amount of time at the

19    DCCC?

20    **A.**   Yeah.

21    **Q.**   And where is the DCCC?

22    **A.**   It's in Washington, D.C., on the Hill.

23    **Q.**   Do you know the address?

24    **A.**   I want to say 30 Ivy Street maybe.

25    **Q.**   Does it sound right, 430 South Capitol Street Southeast?

**LITTLEJOHN - CROSS / LINKER**

1   **A.**   It actually has two addresses.

2   **Q.**   It has two addresses?

3   **A.**   It does, yes.

4   **Q.**   What's the other address?

5   **A.**   30 Ivy and then the one you mentioned.

6   **Q.**   And that location is located within the Democratic

7   National Committee; is that correct?

8   **A.**   I'm sorry?

9   **Q.**   The DNC headquarters, is the DCCC located within the DNC

10  headquarters?

11  **A.**   Yes, it is.  Yes, it is.

12  **Q.**   So could you tell us, What's the DNC?

13  **A.**   It's the Democratic National Committee, I think.  We don't

14  go there.  We don't go there much.  I think that's a floor

15  above us.

16  **Q.**   In the same building but a different floor?

17  **A.**   Correct.

18  **Q.**   And is the Democratic National Committee headquarters,

19  where the DCCC is located, is that a federal office building?

20  **A.**   I don't think that it is.

21  **Q.**   And --

22  **A.**   I don't know for sure.

23  **Q.**   And you still go with her there?

24  **A.**   Right.  We go with her everywhere.

25  **Q.**   You go with her everywhere.

**LITTLEJOHN - CROSS / LINKER**

1    You testified that you protect her at all times because of

2    her being the -- at that time, she was always the speaker;

3    correct?

4    **A.**   That's correct.

5    **Q.**   So when she is performing her official duties, you protect

6    her?

7         **MS. VARTAIN:**  Objection.  Vague and ambiguous to

8    "official duties."

9         **THE COURT:**  You can answer if you understand.

10        **THE WITNESS:**  I just know what my official duties are,

11   and that's to protect her despite what she does.

12   **BY MS. LINKER:**

13   **Q.**   When she goes to the House floor, you bring her to the

14   House floor?

15   **A.**   Right.

16   **Q.**   When she goes to the White House, you go with her to the

17   White House?

18   **A.**   That's correct.

19   **Q.**   When she's in her House office building, you stay with her

20   in the House office building?

21   **A.**   That's right.

22   **Q.**   When she's in her office in the Capitol, you stay with her

23   when she's in her office in the Capitol?

24   **A.**   Yes.

25   **Q.**   When she comes to do town halls with her constituents, you

1    stay with her to do town hall meetings with her constituents?

2    A.    Yes.

3    Q.    If she has other constituent meetings, you stay with her

4    when she does those constituent meetings?

5    A.    Yes.

6    Q.    You also protect her when she is performing nonofficial

7    duties; correct?

8    A.    Yes.

9    Q.    So, for example, when she celebrates Thanksgiving with her

10   family, you are with her; correct?

11   A.    Yes.

12   Q.    And when she -- if she goes to the grocery store, you are

13   with her; correct?

14   A.    Yes.

15   Q.    And if she gets her hair done, you are with her; correct?

16   A.    Yes.

17   Q.    You also protect her when she is performing political

18   activities; correct?

19   A.    Yes.

20   Q.    Like going to the DCCC to make campaign calls; correct?

21   A.    Yes.

22   Q.    When she goes to campaign rallies, you protect her?

23   A.    Yes.

24   Q.    When she is at fundraising dinners, you protect her?

25   A.    Yes.

**LITTLEJOHN - CROSS / LINKER**

1   **Q.**   When she is what they call dialing for dollars, you

2   protect her?

3   **A.**   Correct.

4   **Q.**   And will you tell us what I mean by -- you can't say what

5   I mean by -- what you understand dialing for dollars to mean?

6   **A.**   I would assume that you mean fundraising.

7   **Q.**   And that's because she's always the speaker, whether she

8   is performing official, personal, or political duties; is that

9   correct?

10  **A.**   Right.  Those three subjects or areas make no difference

11  to me and my team.

12  **Q.**   Thank you.

13          **MS. LINKER:**  Nothing further.

14          **THE COURT:**  Any redirect?

15          **MS. VARTAIN:**  No.  Thank you, Your Honor.

16          **THE COURT:**  Thank you.  You are excused.

17                     (Witness excused.)

18          **THE COURT:**  Is the Government prepared to call your

19  next witness?

20          **MS. GILBERT:**  Yes, Your Honor.  The Government calls

21  Jason Matthes.

22      (Jason Matthes steps forward to be sworn.)

23          **THE CLERK:**  Please raise your right hand.

24  \\\

25  \\\

1    **<u>JASON MATTHES</u>**,

2  called as a witness for the Government, having been duly sworn,

3  testified as follows:

4        **THE WITNESS:**  I do.

5        **THE CLERK:**  Can you please sit down and then state and

6  spell your name for the record.

7        **THE WITNESS:**  Jason, J-A-S-O-N, Matthes,

8  M-A-T-T-H-E-S.

9        **THE COURT:**  Good morning.

10       **THE WITNESS:**  Good morning.

11                    **<u>DIRECT EXAMINATION</u>**

12  **BY MS. GILBERT:**

13  **Q.**   Mr. Matthes, where do you work?

14  **A.**   Spokeo.

15  **Q.**   How long have you worked at Spokeo?

16  **A.**   A little over eight years.

17  **Q.**   What is your position?

18  **A.**   Chief legal officer.

19  **Q.**   What is Spokeo?

20  **A.**   Spokeo is a people search engine.  We aggregate publicly

21  available information, compile that information, and offer it

22  to consumers, businesses, government and law enforcement in the

23  form of profiles.

24  **Q.**   Is Spokeo a paid service?

25  **A.**   It is.

1   Q.   Can you get -- can a user or someone who -- let me take a

2   step back.

3        Does Spokeo maintain a website?

4   A.   It does.

5   Q.   Okay.  And if I went to your website, could I get any

6   information for free?

7   A.   You can -- depending on how you access our website, how

8   you get to our website, you may see limited information for

9   free.

10  Q.   What sort of limited information could someone see for

11  free from your website?

12  A.   Again, depending on how they come to our website and the

13  kind of search that they're running, whether they're searching

14  on a name, postal address, e-mail address, or phone number,

15  when they do that search, they'll see different kinds of

16  limited information.

17       In the case of a phone search, for instance, they'll see

18  limited information, like what carrier the phone number is

19  associated with, what geographic region the phone is registered

20  to, that kind of limited information.

21  Q.   What kind of information can someone who comes to your

22  website search for?

23  A.   So, our website has a universal search bar, much like

24  Google's search bar.  In that search bar, our search bar

25  attempts to recognize whether the user has entered a name,

1  address, phone number, or e-mail address, and those are the

2  search criteria that our search bar responds to, if you will.

3  Q.   So we talked about what -- you testified to what

4  information a user could get for free.  I think -- but you said

5  Spokeo is a paid service, so what kind of information is

6  available if a user pays Spokeo?

7  A.   So if a user subscribes to Spokeo, they'll have access to

8  full profiles.  If they're conducting a name search, we'll

9  provide information about the person, including address

10 history, phone number history, e-mail address history, some

11 demographic information, if you will, about the person.

12     And depending on the level of subscription purchased, they

13 can access -- they can search court records or what we

14 internally call historical data, which is comprised of census

15 records, public census records dating back to, I think, the

16 1930s and '40s, as well as public vital statistics records like

17 birth certificate -- or birth information and death

18 information.

19 Q.   Does Spokeo maintain information about people who purchase

20 subscriptions from Spokeo?

21 A.   Yes.

22 Q.   Are you familiar with how Spokeo maintains these records?

23 A.   I am.

24     MS. GILBERT:  Ms. Wachs, could you please pull up

25 what's been admitted as Exhibit 293.

1    BY MS. GILBERT:

2    Q.   And, Mr. Matthes, it will be on the screen in front of

3    you.

4         Do you recognize this?

5    A.   I do.

6    Q.   What is this?

7    A.   This is a report that our chief information officer

8    prepared in response to a request from the FBI.

9    Q.   And is this report about a particular Spokeo user?

10   A.   Yes.

11        MS. GILBERT:  Ms. Wachs, maybe you could just zoom in

12   on the top half, and then we could do the bottom half so

13   everyone can read it.  Thank you.

14   BY MS. GILBERT:

15   Q.   And who is the user that this information is about?

16   A.   The name that was entered was David DePape.

17   Q.   And you said "entered," so what does that mean?

18   A.   So the information in this report, at least in this

19   section where -- the highlighted section now in yellow, this

20   information comes directly from the user who's using our

21   website.

22        When they reach our payment page, or pay wall, as we would

23   call it, the user is prompted to enter certain information,

24   including a name.  And in this case, this particular user

25   entered the name David DePape.

**MATTHES - DIRECT / GILBERT**

1  Q.   And what about e-mail; is that also entered by the user?

2  A.   E-mail is also entered by the user.

3  Q.   Let's move down to the credit/debit card section.  Can you

4  tell us where this information is from?

5  A.   This is likewise from the pay wall or payment page.  In

6  this case, this particular user paid for a subscription via

7  PayPal, so this section of the report reflects that the user

8  paid via PayPal and did so on October 19th, 2022.

9  Q.   Let's turn to the subscription section.

10      What -- what is detailed in product here?  What does that

11  mean?

12  A.   So as I mentioned earlier, Spokeo has a couple of

13  different subscription types.  When this user first signed up

14  for Spokeo, they subscribed to a subscription type that we call

15  Spokeo NEPA 100.  "NEPA" stands for name, e-mail, phone, and

16  address.  Those are those types of searches that I mentioned.

17      And in this case, the user signed up to a subscription

18  plan that entitles them to up to 100 searches in one month of

19  name, e-mail, phone, or address searches.

20  Q.   And what date did this user, David DePape, sign up for the

21  NEPA 100 subscription?

22  A.   October 19th, 2022.

23  Q.   Can you tell us about the second description listed -- or

24  the second line under "product," please?

25  A.   Sure.  The second line is a different subscription type

1    that we internally call the Spokeo Investigator 150 package.

2    It looks like this was purchased on the same day, October 19th,

3    2022, which signifies that this user started with a NEPA 100

4    subscription and then upgraded that same day to the higher

5    bundle, Spokeo Investigator 150, that entitles the user to 150

6    searches instead of 100.

7         And with the investigator bundle, as I mentioned

8    previously, they would have had access to a court records

9    search as well as those historical records searches.

10   Q.   And how much does the Investigator 150 subscription cost?

11   A.   That is 34.75.

12        MS. GILBERT:   Ms. Wachs, if you could bump out of this

13   and let's just look at maybe just the search history and the

14   first bar there.

15   BY MS. GILBERT:

16   Q.   Mr. Matthes, what is -- what is collected in search

17   history here?

18   A.   This is the history of this user's searches on Spokeo.

19   For instance, in these top three lines that are highlighted

20   here, these are three searches that were conducted on

21   October 27th, 2022, by this user.

22   Q.   And it looks like there's a time.  Do you know what time

23   zone that is in?

24   A.   That is Pacific Standard Time.

25   Q.   And under "query," what is that tracking?

**MATTHES - DIRECT / GILBERT**

1    **A.**   That is the search criteria that was entered into the

2    search bar by this user.

3            **MS. GILBERT:**  Ms. Wachs, could we please turn to

4    page 2 of this exhibit?

5            **THE COURT:**  Maybe this is a good time for me to tell

6    the jury that you'll see black boxes; we're redacting

7    personally identifying information that's not relevant and to

8    protect privacy.

9            **MS. GILBERT:**  And, Your Honor, could I add that the

10   jury will have unredacted versions of each of these themselves

11   to review?

12           **THE COURT:**  Yes, you will at the end of the trial in

13   the jury room.  But for purposes today, that's why they're

14   redacted.  And that's a very normal thing in court.  In all

15   cases, criminal and civil, we redact publicly personally

16   identifying information.

17           **MS. GILBERT:**  Ms. Wachs, would you mind just pulling

18   out kind of the top half of the page here.

19   **BY MS. GILBERT:**

20   **Q.**   Mr. Matthes, did this user, David DePape, search for

21   Nancy P. Pelosi?

22   **A.**   Yes.  It looks like on October 21st, 2022.

23           **MS. GILBERT:**  Ms. Wachs, would you mind pulling up

24   Exhibit 278, please.

25   **BY MS. GILBERT:**

**MATTHES - DIRECT / GILBERT**

1   Q.   Mr. Matthes, do you recognize this?

2   A.   I recognize the look and feel of this.

3   Q.   So what does it look and feel like?

4   A.   This design is similar to the limited profile that Spokeo

5   offers to nonpaying users as part of their searches.   This

6   looks like an excerpt from a non- -- what we call a non-premium

7   profile, which is the free limited information profile that I

8   mentioned earlier.

9   Q.   It looks like there are some blurry parts of this image.

10  Is that consistent with how Spokeo would provide information in

11  this limited format?

12  A.   It is.

13        MS. GILBERT:   And, Ms. Wachs, could you please pull up

14  Exhibit 280?

15  BY MS. GILBERT:

16  Q.   Mr. Matthes, do you recognize this?

17  A.   I do recognize the design of it.

18  Q.   And what does the design look like to you?

19  A.   Likewise, it looks like an excerpt from one of our limited

20  profiles.

21  Q.   And looks like there's blurred parts of this text.   Is

22  that also consistent with the blurring that Spokeo does in its

23  limited profiles?

24  A.   It would.

25        MS. GILBERT:   No further questions, Your Honor.

MATTHES - DIRECT / GILBERT

1          **THE COURT:**  Any questions?

2          **MS. CHUANG:**  No questions.

3          **THE COURT:**  You are excused.

4          **THE WITNESS:**  Thank you.

5                         (Witness excused.)

6          **THE COURT:**  All right.  Is the Government prepared to

7     call your next witness?

8          **MS. GILBERT:**  Yes.  But, first, I'd like to read a

9     stipulation into the record for the jury.  And it's marked

10    Docket 151.  (as read):

11             "The parties have stipulated that on

12         October 29th of 2022, the FBI seized defendant David

13         DePape's computer tower from his residence located on

14         Shasta Street in Richmond, California.

15             "The computer tower is an iBUYPOWER Model I

16         Series A303A65012520, with Serial Number

17         2216-59B9-3082-DD65-2.  It is marked as Exhibit 269.

18             "Exhibit 269 contained a 240-gigabyte hard

19         drive, specifically an Apacer Panther Model 2.5-inch

20         SATA solid state drive with Serial Number

21         142002113178.  The hard drive is marked as

22         Exhibit 270.

23             "Digital forensic examiner Wing Ng created a

24         complete, exact, and accurate copy of Exhibit 270

25         using reliable methods.

1          "The following exhibits are summary reports

2      showing some of the items that were present on

3      Exhibit 270.  That is the hard drive found in

4      Defendant David DePape's computer tower.

5          "The exhibits are Exhibit 271, 274, 276, 277,

6      and 292.

7          "The following exhibits are some of the files

8      that were present on Exhibit 270, that is the hard

9      drive found in David DePape's computer tower."

10     And I will read the exhibit numbers, although, a

11  description is also included.  And the exhibits are 278, 279,

12  280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291.

13         "These exhibits do not include a complete

14     inventory of everything located on the electronic

15     devices."

16     Thank you.

17         **THE COURT:**  Thank you.

18     Members of the jury, as I instructed you on Thursday, as

19  the parties have agreed to these stipulations of fact, those

20  facts that have been read to you are now conclusively

21  established.

22         **MS. CHUANG:**  Your Honor, could we actually take our

23  first break before the witness?  I can use a restroom break.

24         **THE COURT:**  Certainly.  Okay.  All right.

25     We whipped through those witnesses, so we'll take our

1   15-minute break, and we'll resume at 10:00 a.m.

2        As always, please do not discuss the case with each other

3   or anyone else.

4                     (The jury leaves the courtroom.)

5        (Proceedings were heard out of the presence of the jury.)

6             THE COURT:  Okay.  Thanks.

7                     (Recess taken at 9:46 a.m.)

8                 (Proceedings resumed at 10:01 a.m.)

9             THE COURT:  The jury is on their way.

10                    (The jury enters the courtroom.)

11       (Proceedings were heard in the presence of the jury.)

12            THE COURT:  Thank you, members of the jury.

13       And is the Government prepared to call your next witness?

14            MS. GILBERT:  Yes, Your Honor.  The Government calls

15   Wing Ng to the stand.

16            THE CLERK:  Can you please step up.  Raise your right

17   hand.

18                           WING NG,

19   called as a witness for the Government, having been duly sworn,

20   testified as follows:

21            THE WITNESS:  I do.

22            THE CLERK:  Can you please state your name and spell

23   it for the record?

24            THE WITNESS:  Wing Ng, W-I-N-G, N-G.

25            THE CLERK:  Thank you.  You may be seated.

NG - DIRECT / GILBERT

```
 1              THE COURT:  Good morning.
 2                    DIRECT EXAMINATION
 3   BY MS. GILBERT:
 4   Q.   Ms. Ng, where do you work?
 5   A.   I work at the Silicon Valley RCFL, Regional Computer
 6   Forensic Laboratory.
 7   Q.   Is this a laboratory run by a federal government agency?
 8   A.   Yes.
 9   Q.   Which agency is that?
10   A.   Federal Bureau of Investigation.
11   Q.   Where is the lab located?
12   A.   In Menlo Park.
13   Q.   And what is your position?
14   A.   I am a digital forensic examiner.
15   Q.   How long have you held this position?
16   A.   For almost four years.
17   Q.   What are your duties and responsibilities as a digital
18   forensic examiner?
19   A.   Creating images, collecting data and examining them, when
20   necessary.
21   Q.   And what do you create images of?
22   A.   Computer data.
23   Q.   What did you do right before you became a digital forensic
24   examiner at the FBI's lab?
25   A.   I was also a digital forensic examiner at a private
```

NG - DIRECT / GILBERT

1  corporation.

2  Q.    And how long did you serve in this role as a digital

3  forensic examiner at a private corporation?

4  A.    About a year.

5  Q.    So is it fair to say that you've worked as a digital

6  forensic examiner for about five years?

7  A.    Yes.

8  Q.    What is your educational background?

9  A.    I have a bachelor in mathematics and a master's in project

10 management.

11 Q.    Have you had any training in the area of computer

12 forensics?

13 A.    I do.

14 Q.    Can you briefly describe that training?

15 A.    I have over 500 hours of training with the FBI.  I also

16 have certifications from outside organizations.

17 Q.    How many certifications do you hold from outside

18 organizations?

19 A.    Two.

20 Q.    Can you tell us about the first certification, please?

21 A.    I have a CFCE with IACIS, and then --

22 Q.    Can you stop for a second?  Let me ask --

23 A.    Okay.

24 Q.    -- what is a CFCE?

25 A.    I'm a certified forensic computer examiner.

NG - DIRECT / GILBERT

1   Q.   And you said that's with IACIS.  What does IACIS stand

2   for?

3   A.   International Association of Computer Investigative

4   Specialists.

5   Q.   Okay.  When did you obtain this certification?

6   A.   In 2017.

7   Q.   I think you said you have two certifications; is that

8   right?

9   A.   Yes.

10  Q.   So what is the other certification?

11  A.   I have a CCE with ISF -- ISFCE.

12  Q.   So I'm going to ask you, what is a CCE?

13  A.   Certified computer examiner.

14  Q.   What is ISFCE?

15  A.   International Society of Forensic Computer Examiners.

16  Q.   And when did you obtain this certification?

17  A.   In 2016.

18  Q.   You have to do anything to maintain these certifications?

19  A.   Yes.

20  Q.   What do you have to do?

21  A.   I have to work in the field of computer forensics as well

22  as education.

23  Q.   How frequently do you have to maintain these two

24  certifications?

25  A.   I have to renew the CCE every two years and the CFCE every

NG - DIRECT / GILBERT

1    three years.

2    Q.   Have you maintained both of these certifications

3    consistently since you obtained them?

4    A.   Yes.

5    Q.   Are both of your certifications currently active and up to

6    date?

7    A.   Yes.

8    Q.   I would like to turn your attention to two specific

9    computer devices.

10            MS. GILBERT:   May I approach the witness, Your Honor?

11            THE COURT:   You may.

12                 (Counsel approaches witness.)

13   BY MS. GILBERT:

14   Q.   Ms. Ng, I've just handed you what has been admitted as

15   Exhibit 269.   Do you recognize this?

16   A.   Yes.

17   Q.   What is it?

18   A.   It is the computer that was submitted to the lab for

19   examination.

20   Q.   Did you examine this computer?

21   A.   Yes.

22   Q.   And it looks like, on the side, there's a pocket.   I'm

23   going to -- do you see that?

24   A.   Yes.

25   Q.   Can you pull out whatever is in that pocket?   Do you

NG - DIRECT / GILBERT

1    recognize this?

2    **A.**    Yes.

3    **Q.**    What is this?

4    **A.**    It is the hard drive inside the tower.

5    **Q.**    The hard drive that was inside the tower that's on the

6    stand right now?

7    **A.**    Yes.

8    **Q.**    Okay.  And that should be marked Exhibit 270.  Is that

9    marked Exhibit 270?

10   **A.**    Yes.

11   **Q.**    Did you also examine this hard drive?

12   **A.**    Yes.

13   **Q.**    Did you find any other hard drives within this computer

14   tower?

15   **A.**    No.

16   **Q.**    Did you label the computer tower and the hard drive with

17   an evidence number?

18   **A.**    I did.

19   **Q.**    And if you look on the hard drive, is the label that you

20   put on it still on the hard drive?

21   **A.**    Yes.

22   **Q.**    What does it say?

23   **A.**    SVE06 -- sorry -- 4898.

24   **Q.**    So SVE064898; is that right?

25   **A.**    Yes.

NG - DIRECT / GILBERT

1    Q.    I'm going to take that back so we can still see you.

2                    (Counsel approaches witness.)

3    BY MS. GILBERT:

4    Q.    And if it's okay, I'm just going to call Exhibit 270 the

5    hard drive going forward.

6    A.    Yes.

7    Q.    Did you and others generate reports showing some of the

8    items that were present on the hard drive?

9    A.    Yes.

10   Q.    Did you use software to generate these reports?

11   A.    Yes.

12   Q.    Did you use more than one type of software?

13   A.    Yes.

14   Q.    Why did you use multiple types of software?

15   A.    The software displayed different -- displayed the data in

16   different ways.  It makes it easier for the investigator to

17   review the data within them.

18   Q.    But do these two software programs -- did they access the

19   same information on the hard drive?

20   A.    Yes.

21   Q.    Do these reports show everything that was contained on the

22   hard drive?

23   A.    No.

24   Q.    So what do they show?

25   A.    Only items that were marked by Agent Minor and her team.

NG - DIRECT / GILBERT

1   Q.   So did you decide what to bookmark -- or mark from

2   these -- from the hard drive?

3   A.   I did not.

4   Q.   I'm going to turn back to these reports.  Do they show

5   information in categories?

6   A.   Yes.

7   Q.   Did you review these reports?

8   A.   Only for quality -- quality control.

9   Q.   So did you review them for like the actual content of what

10  was on the hard drive?

11  A.   Only making sure that the links worked in the report.

12  Q.   I'm sorry.  The what worked?

13  A.   The links.

14  Q.   The links.

15       What do you mean the links in the report?

16  A.   The -- there are -- there are basically links like on a

17  web page that would -- that, when clicked, it will show the

18  actual documents that were bookmarked.

19  Q.   And I think it might be easier to show the jury when we

20  pull up a report, too.

21       Do you -- you mentioned that Special Agent Stephanie Minor

22  and her team were in charge of bookmarking -- or marking items

23  for the reports; is that right?

24  A.   Yes.

25  Q.   Do you know Special Agent Minor's role in this

NG - DIRECT / GILBERT

1    investigation?

2    **A.**    She was the case agent.

3    **Q.**    And I expect we'll hear more from Special Agent Minor

4    about the contents of these reports, but I'd just like to pull

5    up each one -- we have five reports -- and just have you

6    explain some of the terms in the reports.

7              **MS. GILBERT:**  So if -- Ms. Wachs, would you mind

8    pulling up Exhibit 271.

9    **BY MS. GILBERT:**

10   **Q.**    And, Ms. Ng, it will show up on a screen in front of you,

11   but I also have them in front of you in the binder printed out

12   in paper if that's an easier way for you to review the

13   document.

14   **A.**    Okay.

15   **Q.**    Okay.

16             Ms. Ng, do you recognize this?

17   **A.**    Yes.

18   **Q.**    What is it?

19   **A.**    It is the report that I helped generate.

20   **Q.**    And does this report include information about data found

21   on the hard drive I just handed you?

22   **A.**    Yes.

23             **MS. GILBERT:**  Ms. Wachs, could you turn to page 3,

24   please, and if you could expand that out.  Thank you so much.

25   \\\

```
 1  BY MS. GILBERT:
 2  Q.   Ms. Ng, how do you know that this report includes data
 3  about the hard drive, Exhibit 270?
 4  A.   Because it has the same label, the SVE number that I gave
 5  to the hard drive.
 6  Q.   And can you just tell us -- it looks there are three
 7  separate labels here.  Which is the label that corresponds to
 8  the hard drive?
 9  A.   The second one, SVE064898_SSD.
10  Q.   Thank you.
11       MS. GILBERT:  Ms. Wachs, would you please turn to
12  page 4.  If you could just blow up the top, including the
13  header and the first record.
14       Thank you.
15  BY MS. GILBERT:
16  Q.   Ms. Ng, what items does this report show?
17  A.   Firefox bookmarks.
18  Q.   What is a Firefox bookmark?
19  A.   It is a bookmark for the browser Firefox.
20  Q.   Do you know what a bookmark is?
21  A.   It's -- it's something that a user can do so that they can
22  go back to a web page of -- that they -- of interest that they
23  want to see again.
24  Q.   Does this report show all of the bookmarks that were on
25  the hard drive?
```

NG - DIRECT / GILBERT

```
 1   A.   No.

 2   Q.   So just remind us again, what bookmarks are shown in this

 3   report?

 4   A.   Only items that were tagged by Agent Minor and her team.

 5   Q.   And I just want to ask you about a few of the terms in

 6   what's -- looks like it's called Record 1.

 7        And I just want to focus on the items in the gray box.

 8            MS. GILBERT:  And, Ms. Wachs, if you could highlight

 9   these terms as we go, that would be very helpful.

10   BY MS. GILBERT:

11   Q.   Ms. Ng, what does "tags" mean?

12   A.   It's an item that -- that the agent marked for -- for a

13   report.

14   Q.   Are there different ways that -- that items can be tagged?

15   A.   Yes.

16   Q.   And so here, it looks like the tag was called "evidence."

17        Do you know if that's a tag that the agent created or

18   whether it comes with the software?

19   A.   It's a default label from the software.

20   Q.   So just to be clear, is tags something that's coming from

21   the data on the hard drive, or is it something that's added by

22   the reviewing agent?

23   A.   It's added by the reviewing agent.

24   Q.   Let's turn to the next one.

25        What does URL indicate here?
```

**NG - DIRECT / GILBERT**

1  **A.**   The -- the web address of the page that was bookmarked.

2  **Q.**   And what about added date and time, what does that show?

3  **A.**   When the actual bookmark was created on the computer.

4  **Q.**   And what about last modified date and time, what does that

5  mean?

6  **A.**   When the bookmark was last modified.

7  **Q.**   Do you know what time zone both the added date and time

8  and the last modified date and time are in?

9  **A.**   Pacific.

10  **Q.**   What about title, what does title mean?

11  **A.**   It's the title of the bookmark.

12  **Q.**   And do you know whether this is a title generated by the

13  website that is bookmarked or by the user, the person who makes

14  the bookmark?

15  **A.**   I don't know.

16  **Q.**   Let's turn to source, please.  What is source?

17  **A.**   Where the bookmark was located inside the hard drive.

18  **Q.**   Now, it looks like source starts with the same evidence

19  number that you testified you labeled the hard drive; is that

20  right?

21  **A.**   Yes.

22  **Q.**   So what -- and it looks like this is quite a long path.

23      What would the user of this hard drive see if they were

24  just operating the hard drive, their computer, normally?

25  **A.**   Where -- where it -- Window [sic] is, is usually replaced

1    by the drive letter of the computer, normally C, but it can be

2    any drive letter.

3                    MS. GILBERT:  And, Ms. Wachs, would you mind

4    highlighting this.

5    BY MS. GILBERT:

6    Q.   So it looks like it starts with Windows and that would be,

7    like, the drive letter, and then the rest of the path, it says:

8    Users, David, app data, and so on.

9         Is it correct that that's what a user would see when they

10   were -- if they were using the hard drive?

11   A.   Yes.

12   Q.   And I just want to clarify, the beginning of this source

13   path, it starts with the SVE number.

14        And that's the number that you gave the hard drive; is

15   that right?

16   A.   Yes.

17   Q.   And then after that, it says "partition 4" with some

18   information.

19        What is that?

20   A.   That's -- that's also on the hard drive itself.

21   Q.   What's a -- what is a partition?

22   A.   A hard drive can have numerous partition.  Some of it is

23   user created; some of it is software created, like Windows

24   operating system.

25   Q.   So here, when it's indicating in Source Partition 4, is

1    that -- is that information essentially from the hard drive,

2    telling you where the data that we're looking at is stored?

3    A.   Yes.

4    Q.   Okay.  But the user wouldn't see that path if they were

5    operating the computer?

6    A.   No.

7    Q.   But that is information provided -- that this report

8    generates from the hard drive itself?

9    A.   Yes.

10   Q.   Okay.  What is "location"?

11   A.   Location is where the bookmark is on -- in the hard drive.

12   Q.   And what is "evidence number"?

13   A.   That is the number that I gave -- I gave to this

14   particular evidence item.

15   Q.   And what does "recovery method" mean?

16   A.   It's the method that the software used to -- to get the

17   data.

18   Q.   When you say "software," do you mean the software used to

19   generate the report that we're looking at?

20   A.   Yes.

21   Q.   And, finally, what is "item ID"?

22   A.   It's a -- it's an item ID that was given to it by the

23   software.

24   Q.   So I just want to summarize so we're clear about which

25   categories of information shown here are from the hard drive

NG - DIRECT / GILBERT

1    itself and which are generated by the software program that was

2    used to create this report.

3         So is it -- is it correct that the URL, the added date and

4    time, the last modified date and time, the title, the source

5    information that you've -- I think, is a little bit more

6    complicated, but that you've just testified about, and location

7    are all information from the hard drive itself?

8    A.   Yes.

9    Q.   And so that means, and I just want to clarify that -- is

10   it right that tags, that beginning part of the source that you

11   identified, the evidence number, recovery method, and item ID

12   are all generated by the software program and by the way in

13   which you process the hard drive?

14   A.   Yes.

15   Q.   Okay.

16        MS. GILBERT:   Ms. Wachs, let's please turn to

17   Exhibit 274.

18        And let's just start at page 1.

19   BY MS. GILBERT:

20   Q.   Ms. Ng, do you recognize this?

21   A.   Yes.

22   Q.   What is it?

23   A.   It's the report that I helped generate.

24   Q.   And does this report also include information about data

25   found on the hard drive we've been discussing?

NG - DIRECT / GILBERT

1    **A.**   Yes.

2          **MS. GILBERT:**  Ms. Wachs, could you turn to page 8,

3    please.  And let's just look at the very -- if you don't mind

4    looking at the very top.  Blow that up.

5    **BY MS. GILBERT:**

6    **Q.**   And, Ms. Ng, what does this report show?

7    **A.**   Firefox web history.

8    **Q.**   What is Firefox web history?

9    **A.**   It's -- web history is -- keeps track of where the --

10   where the user have gone.

11   **Q.**   Using Firefox; is that right?

12   **A.**   Using Firefox.

13   **Q.**   Okay.  Does this report show all the websites that this

14   user visited?

15   **A.**   No.

16   **Q.**   So what is shown here?

17   **A.**   Only items that were marked by Agent Minor and her team.

18        **MS. GILBERT:**  And, Ms. Wachs, if we could just look at

19   Record 18.  And just walk through one example with Ms. Ng.

20   **BY MS. GILBERT:**

21   **Q.**   Ms. Ng, is tags consistent with your prior testimony about

22   the meaning of tags?

23   **A.**   Yes.

24   **Q.**   What is "URL" here?

25   **A.**   The address of -- of the web page.

**NG - DIRECT / GILBERT**

1    **Q.**    The web page --

2    **A.**    That the user visited.

3    **Q.**    What is "last visited date and time"?

4    **A.**    When it was last visited by the user.

5    **Q.**    Is that also listed in Pacific Time in this report?

6    **A.**    Yes.

7    **Q.**    What does the "title" mean?

8    **A.**    The title of the web page.

9    **Q.**    What does "visit count" mean?

10   **A.**    The number of times the user visited this web page.

11   **Q.**    Does that include all of the times the user visited the

12   web page that is on the hard drive, or is that specific to

13   something?

14   **A.**    This is only the -- this is only related to the last visit

15   that the user went to this web page.

16   **Q.**    And what does "typed" indicate here?

17   **A.**    Whether or not the address was -- was physically typed

18   into the computer.

19   **Q.**    When you say "computer," what do you mean?

20   **A.**    On -- in -- when the user uses the web browser, Firefox,

21   they have the choice of actually typing in the address on the

22   address -- on the address bar, or they can get to a web page by

23   clicking on a link that's from another -- from a different web

24   page.

25   **Q.**    Okay.  That makes more sense.

1    So when it indicates "typed," is that, then, tracking

2    whether the user actually typed the web address into the

3    Firefox, like, bar as opposed to getting at it some other way?

4    **A.**   Yes.

5    **Q.**   And you previously testified about the meanings of source,

6    location, evidence number, recovery method, and item ID, and

7    tags, which we've talked about already for this report.

8        Do those terms mean the same in this report as you

9    testified about in the last report?

10   **A.**   Yes.

11   **Q.**   So just to summarize, is the information shown for URL,

12   last visited date and time, title, visit count, typed, the part

13   of the source that you previously testified about, and location

14   all information from the actual hard drive, not from the

15   software?

16   **A.**   Yes.

17   **Q.**   Let's turn to the third report.

18       **MS. GILBERT:**   Ms. Wachs, can you pull up Exhibit 276,

19   please.   And just start with page 1.

20   **BY MS. GILBERT:**

21   **Q.**   Ms. Ng, do you recognize this?

22   **A.**   Yes.

23   **Q.**   What is it?

24   **A.**   It's a report that I helped generate for Agent Minor and

25   her team.

**NG - DIRECT / GILBERT**

1   Q.   Does this report also include information about the hard

2   drive we've been discussing?

3   A.   Yes.

4           **MS. GILBERT:**  Ms. Wachs, would you please turn to

5   page 4, and let's start with Record 1.  Could you blow up the

6   top as well?

7        Thank you.

8   **BY MS. GILBERT:**

9   Q.   Ms. Ng, what does this report show?

10  A.   Google Maps queries.

11  Q.   What is Google Maps?

12  A.   It's a -- it's an online map program.

13  Q.   And let's just walk through a few of these terms.

14       What does "search query" mean?

15  A.   It's what the user typed in for -- to find -- it's an

16  address of what the user typed in to the Maps software.

17  Q.   To Google Maps?

18  A.   Yes.

19  Q.   What about "date and time"?

20  A.   When -- when the address -- when the search query was

21  typed in.

22  Q.   By the user?

23  A.   Yes.

24  Q.   And is this also in Pacific Time?

25  A.   Yes.

1   Q.   What does "center of map" mean here?

2   A.   The center of the map that is currently displayed on the

3   web page.

4   Q.   When you say "currently displayed," do you mean displayed

5   during the query that we're looking at in Record 1?

6   A.   Yes.

7   Q.   Okay.  What is "artifact"?

8   A.   It's a digital clue.

9   Q.   And what is artifact showing here?

10  A.   Where the -- where this information is coming from.

11  Q.   Where the information is coming from, from the hard drive;

12  is that right?

13  A.   Yes.

14  Q.   And is artifact -- the next category looks like it's

15  "artifact ID."  Is this something generated by the software

16  like the item ID you previously testified about?

17  A.   Yes.

18  Q.   And for the other categories, so that's tags, source, as

19  we've -- as you've previously testified, location, evidence

20  number, and ID number, are those terms the same for this report

21  as your prior testimony about the other reports?

22  A.   Yes.

23  Q.   So just to summarize, are the categories for search query,

24  date and time, center of map, artifact, the part of the source

25  path that you previously testified about, and location all

NG - DIRECT / GILBERT

 1  information from the actual hard drive?

 2  A.   Yes.

 3          MS. GILBERT:  Ms. Wachs, could you please turn to

 4  Exhibit 277.

 5  BY MS. GILBERT:

 6  Q.   Let's just start with page 1.  Do you recognize this,

 7  Ms. Ng?

 8  A.   Yes.

 9  Q.   What is this?

10  A.   It's the report that I helped Agent Minor generate it.

11  Q.   And does this also include information about data found on

12  the hard drive we've been discussing?

13  A.   Yes.

14          MS. GILBERT:  Ms. Wachs, could you turn to page 15,

15  and let's just start at the very top, with the header.

16  BY MS. GILBERT:

17  Q.   Ms. Ng, what does this report show?

18  A.   Google searches.

19          MS. GILBERT:  And now, Ms. Wachs, would you turn to

20  Record 37 so that we can all see it.

21  BY MS. GILBERT:

22  Q.   I just want to walk through a few new terms here.

23          Ms. Ng, what does "search term" mean?

24  A.   It's what the user typed into the Google search box.

25  Q.   What about "URL"?

**NG - DIRECT / GILBERT**

1  **A.**   It's the -- it's the web address of the results of the

2  search.

3  **Q.**   And what about date and time?

4  **A.**   When the search was actually conducted on the computer.

5  **Q.**   Is this also Pacific Time?

6  **A.**   Yes.

7  **Q.**   And what is the "web page title"?

8  **A.**   It's the title of the web page.

9  **Q.**   Do the other categories -- which are tags; artifact;

10  artifact ID; sources, you've already testified; location,

11  evidence number; and item ID -- do those mean the same thing in

12  this report as they did in the other reports you've already

13  testified about?

14  **A.**   Yes.

15  **Q.**   And so to summarize, is the information shown here for

16  search term, URL, date and time, web page title, artifact, and

17  the part of the source path that you've previously testified

18  about, as well as location, information from the actual hard

19  drive itself?

20  **A.**   Yes.

21  **Q.**   I'd like to turn to the last report, which is Exhibit 292.

22       **MS. GILBERT:**   And why don't we just blow up the very

23  top -- from the top of the page down through the blue box,

24  Ms. Wachs.

25  **BY MS. GILBERT:**

NG - DIRECT / GILBERT

1   **Q.**   Ms. Ng, do you recognize this?

2   **A.**   No -- yes.

3   **Q.**   What is this?

4   **A.**   It's a report that I helped Agent Minor and her team

5   generate it.

6   **Q.**   And does this also include information about data found on

7   the hard drive that we've been discussing?

8   **A.**   Yes.

9   **Q.**   And, actually, I should have --

10       **MS. GILBERT:**   Ms. Wachs, I need you to blow up a

11   little bit more, I apologize.

12       Could you maybe blow up from the very top through the --

13   keep going down to path.   That's great.   Thank you.

14   **BY MS. GILBERT:**

15   **Q.**   Ms. Ng, do you see here in this section something

16   indicating that this is data from the hard drive we've

17   discussed?

18   **A.**   Yes.   In the path.

19   **Q.**   I'm sorry.   I interrupted you.   What did you say?

20   **A.**   In the path.

21   **Q.**   In the path.   Where in the path?

22   **A.**   At the beginning, the SVE Number 064898.

23   **Q.**   Is that the same number that you labeled the hard drive?

24   **A.**   Yes.

25   **Q.**   So --

1          **MS. GILBERT:**  And you could stay on this, Ms. Wachs.

2  Thank you.

3  **BY MS. GILBERT:**

4  **Q.**   This report looks different.  You said before that you

5  used two different software programs to generate reports of

6  some of the items on the hard drive.

7          Was this report generated using a different program than

8  the last reports that you've testified about?

9  **A.**   Yes.

10  **Q.**   What is the title of this report?

11  **A.**   Bookmarked Pelosi Information.

12  **Q.**   Did you create this title?

13  **A.**   I did not.

14  **Q.**   Do you know who created this title?

15  **A.**   Agent Minor.

16  **Q.**   How do you know that?

17  **A.**   Because her -- she -- her username is underneath creator.

18  **Q.**   So S.Minor, is that her username?

19  **A.**   Yes.

20  **Q.**   Does this report break down information into categories

21  like the last reports that you've testified about?

22  **A.**   No.

23  **Q.**   So what does this report show?

24  **A.**   It shows bookmarked items and -- and any items that were

25  tagged underneath this specific bookmark.

1  Q.   And how many items were tagged under this bookmark?

2  A.   Five.

3       MS. GILBERT:   Ms. Wachs, if you could turn to page 3,

4  and I'd like to just blow up the last record.   Starts -- that's

5  perfect.   Thank you.

6  BY MS. GILBERT:

7  Q.   And I just want to walk through some of the terms used in

8  this report so that everyone is on the same page.

9       And I expect that Special Agent Minor will tell us more

10 about the report, so I just want to focus on the meaning of

11 some of the categories.

12      What is name?

13 A.   The name of the file that was bookmarked.

14 Q.   What is created date?

15 A.   When the file was created on the computer itself.

16 Q.   What is modified date?

17 A.   When the file was last modified on the computer.

18 Q.   And what is access date?

19 A.   When the file was last accessed on the computer.

20 Q.   So what is the difference between modified and accessed?

21 A.   Modified is usually with a -- usually attributed to a

22 user, while accessed can be attributed to any opportunity of

23 software within the computer itself.

24 Q.   So can you give me an example of how this file could be

25 accessed by the computer, but not without the user

1    participating in that access?

2    **A.**    Running an antivirus software and running an antivirus

3    scan will change the access date.

4    **Q.**    But in your experience, is modified date something that is

5    tracking the user actually modifying the file?

6    **A.**    Yes.

7    **Q.**    And if you look at path, this looks familiar.  This looks

8    a little bit like what you testified about source in the other

9    reports; is that correct?

10   **A.**    Yes.

11   **Q.**    And so can you just tell us, for this path, what would the

12   user of the computer --

13          **MS. GILBERT:**  And maybe, Ms. Wachs, could you

14   highlight this as Ms. Ng testifies.

15   **BY MS. GILBERT:**

16   **Q.**    What would the user of the computer see if they were

17   operating the computer with the hard drive in it?

18   **A.**    Where root is listed in the path, that is where it would

19   be replaced by a drive letter.

20   **Q.**    So looks like root is in kind of like -- not parentheses,

21   but brackets; is that right?

22   **A.**    Yes.

23   **Q.**    And so then everything after that, so users, David,

24   desktop, stuff, favorite politicians, Pelosi, new text

25   document.txt, is that what the user would see?

NG - CROSS / CHUANG

```
 1   A.    Yes.

 2              MS. GILBERT:  No further questions, Your Honor.

 3              THE COURT:  Any questions?

 4              MS. CHUANG:  Yes, Your Honor.

 5                         CROSS-EXAMINATION

 6   BY MS. CHUANG:

 7   Q.    Hi, good morning.

 8         So if we could please pull back up Exhibit 292.  Wait a

 9   second for that.

10         So you were just talking with the Government about this

11   exhibit, this report; correct?

12   A.    Yes.

13   Q.    At the top, where it says "Bookmark Pelosi Information,"

14   you said Agent Minor is the one who created that bookmark;

15   right?

16   A.    Yes.

17   Q.    And that this report shows bookmarked items?

18   A.    Yes.

19   Q.    By that, you mean that it shows items that Agent Minor

20   bookmarked; correct?

21   A.    Yes.  And/or her team.

22   Q.    Okay.  So -- but bookmarked items, in this context, does

23   not mean the user of the device created those bookmarks; right?

24   A.    Correct.

25   Q.    The FBI did, correct?
```

NG - CROSS / CHUANG

```
 1   A.   Yes.

 2   Q.   And this report shows five bookmarked items under this

 3   category; correct?

 4   A.   Yes.

 5            MS. CHUANG:  If we could go to the next page.  Let's

 6   go to the last page, actually.  And let's blow up access date.

 7   BY MS. CHUANG:

 8   Q.   So you were just talking about what access date means;

 9   correct?

10   A.   Yes.

11   Q.   And what you said is, that might update if the computer

12   runs like an antivirus scan; right?

13   A.   Or any other type of process that the computer would run.

14   Q.   But the antivirus scan was your example?

15   A.   Yes.

16   Q.   Right.

17        So looking at the access date, you can't tell from that

18   whether it was an automatic process like an antivirus scan or

19   whether the user accessed the file; correct?

20   A.   Correct.

21            MS. CHUANG:  Now we can take that down.  Thank you.

22   BY MS. CHUANG:

23   Q.   So all of these reports that we just went over that you

24   generated, they don't show the entire universe of data on this

25   device; correct?
```

NG - CROSS / CHUANG

1   **A.**   Correct.

2   **Q.**   They only show, like what you said, what the FBI tagged;

3   right?

4   **A.**   Correct.

5   **Q.**   And, for example, then, the report that was showing web

6   history, that didn't include all of the web history that was

7   available on the drive; correct?

8   **A.**   Yes.

9   **Q.**   And all of the reports that you talked about, they're all

10  generated from the same hard drive; correct?

11  **A.**   Yes.

12  **Q.**   From the hard drive in that computer tower that you had

13  before you; correct?

14  **A.**   Yes.

15  **Q.**   That's not the only device that you were asked to image,

16  was it?

17  **A.**   No.

18  **Q.**   You were asked to image multiple devices in this case;

19  correct?

20  **A.**   Yes.

21  **Q.**   And when I say "image," I mean you were asked to copy the

22  contents of the device so that it could be analyzed; correct?

23  **A.**   A forensic image, yes.

24  **Q.**   How many devices total were you asked to image?

25  **A.**   I don't recall at the moment.

NG - CROSS / CHUANG

1   Q.   Was it more than five?

2   A.   Yes.

3   Q.   I'm going to show you something.  When you imaged the

4   other devices, you used similar techniques and methods that you

5   did for this hard drive that we're talking about; right?

6   A.   Yes.

7   Q.   And you're experienced with using those methods and those

8   softwares to be able to image different devices; correct?

9   A.   Yes.

10          MS. CHUANG:  May I approach, Your Honor?

11          THE COURT:  You may.

12                (Counsel approaches witness.)

13  BY MS. CHUANG:

14  Q.   So I just handed you had what's been marked for

15  identification as Exhibit 593.  That's another report that you

16  generated in this case; correct?

17  A.   Yes.

18  Q.   You recognize that?

19  A.   Yes.

20          MS. CHUANG:  Move to admit.

21          MS. GILBERT:  No objection.

22          THE COURT:  593 admitted.

23      (Trial Exhibit 593 received in evidence.)

24          MS. CHUANG:  If we could please publish.  This is the

25  redacted version.

NG - CROSS / CHUANG

```
 1              THE COURT:  Thank you.
 2    BY MS. CHUANG:
 3    Q.   So up at the top, there's a title that says "Bookmark";
 4    correct?
 5    A.   Yes.
 6    Q.   And next to it, it says Target 1 in the version on your
 7    screen; correct?
 8    A.   Yes.
 9    Q.   The paper version I handed you, that has an actual name
10    where that is; right?
11    A.   Yes.
12    Q.   Please doesn't say the name.  Now, if we could go a little
13    further down the page, where it says "path."  So you testified
14    before that path tells you where a file is or an item is on the
15    device that you're examining; correct?
16    A.   Yes.
17    Q.   And so everything after root, that would be like something
18    that the user sees in terms of where the file path is?
19    A.   Yes.
20    Q.   So -- and you see that it says -- after root, it says
21    "stuff/favorite politicians/Target 1's name/new text
22    document.txt"; correct?
23    A.   Yes.
24    Q.   So that would indicate that this item was in a folder
25    called "favorite politicians"; correct?
```

NG - CROSS / CHUANG

```
 1    A.   Yes.
 2             MS. CHUANG:  I'm going to approach again.
 3                   (Counsel approaches witness.)
 4    BY MS. CHUANG:
 5    Q.   I just handed you what's been marked for identification as
 6    Exhibit 592.
 7         That's another report that you generated in this case;
 8    correct?
 9    A.   Yes.
10    Q.   And you recognize it?
11    A.   Yes.
12             MS. CHUANG:  Move to admit.
13             MS. GILBERT:  No objection.
14             THE COURT:  Admitted.
15         (Trial Exhibit 592 received in evidence.)
16             MS. CHUANG:  If we could please publish.
17    BY MS. CHUANG:
18    Q.   So at the top of this report, it says "Bookmarked Tom
19    Hank's house"; correct?
20    A.   Yes.
21    Q.   And it has a number of items that have been bookmarked by
22    the FBI in this report; right?
23    A.   Yes.
24    Q.   So towards the top, it says "file count."
25         Do you see that?
```

NG - CROSS / CHUANG

```
 1   A.    Yes.

 2   Q.    So does that tell you how many files are bookmarked in

 3   this category "Tom Hank's house"?

 4   A.    Yes.

 5   Q.    So here in this report, it says there are 17 files;

 6   correct?

 7   A.    Yes.

 8         MS. CHUANG:  Then down a little further, if we could

 9   highlight where it says "path."

10   BY MS. CHUANG:

11   Q.    And just like before, this tells you where on the device

12   this file was; correct?

13   A.    Yes.

14   Q.    And, again, everything after "root," that's the file path

15   that the user would see when they're actually looking at it?

16   A.    Yes.

17   Q.    And here it would be -- it says, "stuff/favorite

18   politicians/Tom Hanks," slash, then a bunch of digits and

19   letters; correct?

20   A.    Yes.

21   Q.    And so what this means is that this file was found in a

22   folder labeled "favorite politicians" and then a folder within

23   that labeled "Tom Hanks"; correct?

24   A.    Yes.

25         MS. CHUANG:  Thank you.
```

NG - CROSS / CHUANG

```
 1        No further questions.
 2              THE COURT:  Anything further?
 3              MS. GILBERT:  No, Your Honor.
 4              THE COURT:  Thank you.  You are excused.
 5                          (Witness excused.)
 6              THE COURT:  Is the Government prepared to call your
 7     next witness?
 8              MS. GILBERT:  Yes, Your Honor.  And at this point in
 9     time, we call FBI Special Agent Stephanie Minor.  And if you'll
10     give me a minute, I just need to put a couple items up on the
11     witness stand.
12              THE COURT:  Of course.
13        (Stephanie Minor steps forward to be sworn.)
14              MS. GILBERT:  Thank you.
15              THE COURT:  Do you want to go ahead and swear the
16     witness?
17        You can sit down now.
18              THE CLERK:  Yes.
19                          STEPHANIE MINOR,
20     called as a witness for the Government, having been duly sworn,
21     testified as follows:
22              THE WITNESS:  Yes, I do.
23              THE CLERK:  Can you please state your name and spell
24     it for the record.
25              THE WITNESS:  Stephanie Minor, S-T-E-P-H-A-N-I-E,
```

**MINOR - DIRECT / GILBERT**

1   M-I-N-O-R.

2           **THE COURT:**  If you have more stuff, that's okay.  I

3   just want to --

4           **MS. GILBERT:**  No.  I appreciate that.  Sorry.  Let me

5   put one more thing up there.

6           **THE COURT:**  Of course.

7                       <u>**DIRECT EXAMINATION**</u>

8   **BY MS. GILBERT:**

9   **Q.**   Which I think should save us a little time.

10          Ms. Minor, where do you work?

11  **A.**   I work for the FBI.

12  **Q.**   What's your position?

13  **A.**   A special agent.

14  **Q.**   How long have you been a special agent with the FBI?

15  **A.**   Since September of 2019.

16  **Q.**   What do you do as a special agent with the FBI?

17  **A.**   I investigate individuals who commit federal crimes.

18  **Q.**   Have you had any training investigating federal crimes?

19  **A.**   Yes, ma'am.

20  **Q.**   Can you briefly describe this training?

21  **A.**   It's approximately 21-week basic new agent training in

22  Quantico, Virginia.

23  **Q.**   Have you had periodic training since then?

24  **A.**   Yes, ma'am.

25  **Q.**   How often?

**MINOR - DIRECT / GILBERT**

1    A.   It varies on the training.

2    Q.   Is it fair to say that you've had additional training at

3    least annually?

4    A.   Yes, ma'am.

5    Q.   Okay.  Let's turn to this case.

6         Are you familiar with the investigation involving the

7    defendant?

8    A.   Yes, I am.

9    Q.   Did you have a role in this investigation?

10   A.   Yes, I do.

11   Q.   What is that role?

12   A.   I'm the case agent.

13   Q.   What does that mean?

14   A.   I'm in charge of the investigation.

15   Q.   How long have you been the case agent on this

16   investigation?

17   A.   Since the beginning, on October 28th of 2022.

18   Q.   Let's turn to the night of October 27th of 2022.

19        Are you familiar with how the defendant traveled to the

20   Pelosis' home that night?

21   A.   Yes, I am.

22   Q.   How did he travel to the Pelosis' home?

23   A.   He used BART, Muni, and he walked.

24   Q.   Let me call your attention to what has been admitted as

25   Exhibit 12, which should be in front of you.

**MINOR - DIRECT / GILBERT**

1          Are you familiar with this exhibit?

2   **A.**   Yes, I am.

3   **Q.**   What is it?

4   **A.**   It is a thumb drive containing security camera footage

5   received from BART.

6   **Q.**   And does the footage show anyone in particular?

7   **A.**   It shows the defendant.

8   **Q.**   And what days or day does it show the defendant?

9   **A.**   October 27th and 28th of 2022.

10  **Q.**   Does Exhibit 12, which is -- is that a thumb drive?

11  **A.**   It is.

12  **Q.**   Does that contain videos from multiple security cameras?

13  **A.**   Yes, it does.

14  **Q.**   Approximately how many videos are on Exhibit 12?

15  **A.**   There's approximately 50 cameras within the videos.

16  **Q.**   Have you watched all of these videos?

17  **A.**   I have.

18  **Q.**   Did you hear the testimony earlier this morning from BART

19  Detective Sergeant Guerra regarding the security camera footage

20  on Exhibit 12?

21  **A.**   Yes, I did.

22  **Q.**   Let me call your attention to another item in front of

23  you, which has been marked and admitted as Exhibit 13.

24          Are you familiar with this exhibit?

25  **A.**   Yes, I am.

**MINOR - DIRECT / GILBERT**

1   **Q.**   In what form is this exhibit?

2   **A.**   It is a thumb drive.

3   **Q.**   Have you reviewed Exhibit 13?

4   **A.**   I have.

5   **Q.**   And what is on Exhibit 13?

6   **A.**   It is security camera footage from one of the Muni buses.

7   **Q.**   What is Muni?

8   **A.**   Muni runs the buses in San Francisco.

9   **Q.**   Does Exhibit 13 contain security camera footage from a

10  specific Muni bus?

11  **A.**   Yes, it does.

12  **Q.**   Is someone specific shown in the Muni footage on

13  Exhibit 13?

14  **A.**   Yes, the defendant.

15  **Q.**   And does Exhibit 13 contain security camera footage from a

16  specific date?

17  **A.**   Yes.

18  **Q.**   And what date is that?

19  **A.**   It's October 28th of 2022.

20  **Q.**   And what, just generally, does Exhibit 13 show defendant

21  doing?

22  **A.**   It shows the defendant getting on the Muni bus at

23  McAllister and Van Ness and then getting off the bus at North

24  Point and Van Ness.

25  **Q.**   Does Exhibit 13 contain footage from multiple security

**MINOR - DIRECT / GILBERT**

1  cameras like Exhibit 12 does?

2  **A.**   Yes, it does.

3  **Q.**   Approximately how many different security cameras' footage

4  is shown on Exhibit 13?

5  **A.**   Approximately 10.

6  **Q.**   Have you watched all of the security footage on

7  Exhibit 13?

8  **A.**   Yes, I have.

9          **MS. GILBERT:**  Now, Ms. Wachs, could you please pull up

10  what's been admitted as Exhibit 11.  Wait for one minute.

11  **BY MS. GILBERT:**

12  **Q.**   Special Agent Minor, are you familiar with Exhibit 11?

13  **A.**   Yes, I am.

14  **Q.**   What is Exhibit 11?

15  **A.**   It is a compilation of video excerpts from the security

16  camera footage from BART and Muni.

17  **Q.**   And is that the footage that's on Exhibits 12 and 13?

18  **A.**   Yes, it is.

19  **Q.**   Does Exhibit 11 contain every camera angle and video from

20  Exhibit 12 and 13?

21  **A.**   No, it doesn't.

22  **Q.**   Is Exhibit 11 a fair and accurate summary of the multiple

23  videos in Exhibit 12 that you testified are from BART and

24  Exhibit 13 that you testified are from Muni in addition to

25  information provided this morning through the testimony of BART

MINOR - DIRECT / GILBERT

1    Detective Sergeant Guerra?

2    **A.**    Yes, it is.

3    **Q.**    Does Exhibit 11 have any sound?

4    **A.**    No, it does not.

5    **Q.**    And at what location do the videos start showing

6    defendant's travel?

7    **A.**    At El Cerrito Plaza.

8    **Q.**    And on what day?

9    **A.**    On October 27th of 2022.

10           **MS. GILBERT:**  So at this time, Ms. Wachs, I'm going to

11   ask you to start Exhibit 11.

12        And I want to prep the jurors because this is about a

13   17 1/2-minute-long video, and I will stop on occasion to ask

14   Special Agent Minor some questions.

15        And, Ms. Wachs, if you could just play to 22 seconds in,

16   please.

17                    (Video played but not reported.)

18   **BY MS. GILBERT:**

19   **Q.**    Special Agent Minor, can you just talk us through what

20   we're looking at here.  Let's start with the two videos,

21   please.  Why are there two different videos shown here?

22   **A.**    Those are two different camera angles within the same

23   general area at the El Cerrito Plaza station.

24   **Q.**    And is that -- the location where those videos were taken,

25   is that located somewhere on this exhibit?

**MINOR - DIRECT / GILBERT**

1   A.   Yes.

2   Q.   Where is that?

3   A.   The defendant's at the El Cerrito Plaza station, and the

4   two videos are from Exhibit 12.

5   Q.   And is it -- if you look at the legend in the bottom-left

6   corner, will that indicate, going forward, the location of the

7   videos that are showing at the time?

8   A.   Yes.

9   Q.   So here, it says "El Cerrito Plaza," and going forward,

10  will that change as the security footage changes?

11  A.   Yes.

12  Q.   Okay.  What is the red teardrop in the videos showing?

13  A.   It's showing where the defendant is in the video.

14  Q.   Do you recognize what the defendant is holding here?

15  A.   Yes, I do.

16  Q.   What is that?

17  A.   He is holding the smaller backpack and the sleeping bag

18  that was found at the Pelosis' home.

19  Q.   And do you see anything on his back?

20  A.   Yes.

21  Q.   What is that?

22  A.   That is the larger backpack that was found at the Pelosis'

23  home.

24  Q.   It looks like there is a time and, below that, a date

25  right above the legend; is that right?

**MINOR - DIRECT / GILBERT**

1   A.   Yes.

2   Q.   Where is that time and that date derived from?

3   A.   It's from the videos received from BART.

4   Q.   So -- so it looks like the video -- I see like a little

5   bit of white in the bottom-left corner of the videos.

6        Is that a date and time?

7   A.   Yes, it is.

8   Q.   And so is the date and time that's bigger in black and

9   tracking the video's date and time themselves?

10  A.   Yes.

11  Q.   Looks like that's military time; is that correct?

12  A.   That's correct.

13  Q.   Do you recall Detective Sergeant Guerra's testimony that

14  some of the stations and trains are on different systems for

15  BART?

16  A.   Yes.

17  Q.   And do you recall what he said about whether the time was

18  approximate or not?

19  A.   He did say the times were approximate due to the different

20  servers.

21  Q.   What is shown behind the two video images?

22  A.   It is a map of the San Francisco area and the East Bay

23  area.

24  Q.   Let's start at the top right of the map; it looks like

25  there's a black dot labeled DePape's residence.

**MINOR - DIRECT / GILBERT**

1     What is that showing?

2  **A.**   That's showing the approximate location of the defendant's

3  residence.

4  **Q.**   How do you know that?

5  **A.**   Because I've been to his home.

6  **Q.**   Why were you at his home?

7  **A.**   To execute a federal search warrant.

8  **Q.**   When was that?

9  **A.**   October 29th of 2022.

10  **Q.**   It looks like there is now a red dot instead of a black

11  dot for El Cerrito Plaza.  Why is this dot red?

12  **A.**   The red indicates the location of the defendant within the

13  video footage.

14  **Q.**   So if you look down at the legend, it looks like there's a

15  red dot and a red line.  It says "location of video footage."

16     What is the red line for?

17  **A.**   It's showing the location of the video footage.

18  **Q.**   And will the red line start to move as the defendant moves

19  through the East Bay?

20  **A.**   Yes, it will.

21  **Q.**   It looks like there are other black dots on the map for

22  MacArthur station, Civic Center, UN Plaza, Van Ness Avenue, and

23  the Pelosi residence.

24     Why are those in there?

25  **A.**   They are locations of interest on the map.

**MINOR - DIRECT / GILBERT**

```
 1   Q.   Okay.

 2            MS. GILBERT:   Thank you, Ms. Wachs.   Could you please

 3   play until 32 seconds.

 4                      (Video played but not reported.)

 5   BY MS. GILBERT:

 6   Q.   Now, Special Agent Minor, looks like there was just a time

 7   jump in this video, from 22:37, which I believe would be

 8   10:37 p.m., to what's now showing at 23:00, which I believe is

 9   11:00 p.m.

10        Do you know why this time jump happens?

11   A.   No.   It's based on the video that we received from BART.

12   Q.   But do you still see the defendant in this video screen?

13   A.   Yes.

14   Q.   And where is he located here?

15   A.   He's located within El Cerrito Plaza.

16   Q.   So he's still at the BART Station, El Cerrito?

17   A.   Yes, he is.

18   Q.   Will there be other times jump during the course of these

19   BART videos?

20   A.   Yes.

21   Q.   And will those time jumps be consistent with what you just

22   testified, that they're just based on the videos you received

23   from BART?

24   A.   Yes.

25            MS. GILBERT:   Ms. Wachs, could you please play until
```

**MINOR - DIRECT / GILBERT**

1   1:37.

2                    (Video played but not reported.)

3   BY MS. GILBERT:

4   Q.   What does this video show?

5   A.   It shows the defendant on one of the platforms within El

6   Cerrito Plaza.

7             **MS. GILBERT:**  Ms. Wachs, could you please play until

8   4:07.

9                    (Video played but not reported.)

10  BY MS. GILBERT:

11  Q.   Let me ask you a few questions about what we're looking at

12  here.

13       Looks like there's a time stamp in the bottom left corner

14  of the video; is that right?

15  A.   That's correct.

16  Q.   Does that time stamp match the black time stamp just

17  beneath it?

18  A.   No, it does not.

19  Q.   Do you know why that is?

20  A.   Based on Detective Guerra's testimony earlier, he stated

21  that one of the trains was based -- was not updated to daylight

22  savings.

23  Q.   And do you recall that he stated it was the train that the

24  defendant took from El Cerrito to MacArthur Station?

25  A.   Yes.

**MINOR - DIRECT / GILBERT**

1   **Q.**   So is that the video here?

2   **A.**   Correct.

3   **Q.**   In the video clip, there's also a black box with red

4   writing.  What does that say?

5   **A.**   Says:  Faster than original speed.

6   **Q.**   Was the original video of this train that you reviewed

7   normal speed?

8   **A.**   Yes, it was.

9   **Q.**   And is the original video on Exhibit 12?

10  **A.**   It is.

11  **Q.**   So the jury could watch it in normal speed if they wanted

12  to?

13  **A.**   Yes.

14  **Q.**   Why has this been sped up?

15  **A.**   To save time in the summary exhibit.

16       **MS. GILBERT:**  Ms. Wachs, could you please play until

17  4:26.

18            (Video played but not reported.)

19  BY MS. GILBERT:

20  **Q.**   Special Agent Minor, is there something here about the

21  defendant's movements that's worth noting?

22  **A.**   Yes.

23  **Q.**   And what is that?

24  **A.**   In the faster-than-original-speed video, the defendant

25  appears to be kind of twitching or jittery.  In the original

**MINOR - DIRECT / GILBERT**

1    speed video, it appears normal movements.

2    Q.    Defendant's movements appear normal to you?

3    A.    Yes.

4              MS. GILBERT:  Ms. Wachs, could you please play until

5    5:52.

6                   (Video played but not reported.)

7    BY MS. GILBERT:

8    Q.    I'm going to ask you a question while it's playing because

9    it's silent.  What is the red line showing on the right hand of

10   the screen here?

11   A.    It's showing the approximate location of the video as the

12   train travels on the map.

13   Q.    And it looks like the time, the clock that has been added

14   in black, is that also moving at a faster speed to track the

15   time in the video?

16   A.    Yes, it is.

17                  (Video played but not reported.)

18   BY MS. GILBERT:

19   Q.    Special Agent Minor, what are these two videos from?

20   A.    Those two videos are from MacArthur Station, at one of the

21   platforms, and it's two different camera angles.

22   Q.    Are those camera angles showing essentially the same

23   thing?

24   A.    Same thing, same time.

25   Q.    And it looks like both of these are also labeled "faster

MINOR - DIRECT / GILBERT

1  than original speed."

2       Are these going to play at a faster speed as well?

3  **A.**   Yes.

4  **Q.**   And is the footage you reviewed on Exhibit 12 at normal

5  speed?

6  **A.**   Yes, it is.

7  **Q.**   And were these sped up for the same reasons that the

8  MacArthur train video was sped up?

9  **A.**   Correct.

10      **MS. GILBERT:**  Ms. Wachs, could you play until 7:52,

11  please.

12             (Video played but not reported.)

13  **BY MS. GILBERT:**

14  **Q.**   Special Agent Minor, what is the speed of the video that

15  is shown here?

16  **A.**   It's faster than original speed.

17  **Q.**   And did you review this video at normal speed?

18  **A.**   I did.

19  **Q.**   And does Exhibit 12 contain the video at normal speed?

20  **A.**   Yes, it does.

21  **Q.**   Was this sped up for the same reasons that you previously

22  testified?

23  **A.**   Yes.

24      **MS. GILBERT:**  Ms. Wachs, would you please play to

25  9:56.

MINOR - DIRECT / GILBERT

1              (Video played but not reported.)

2    BY MS. GILBERT:

3    Q.   Special Agent Minor, where is the defendant now in the

4    video?

5    A.   He's at Civic Center UN Plaza Station.

6    Q.   What time and what day is it in the video?

7    A.   October 28th of 2022, at 12:05 a.m.

8         MS. GILBERT:  Ms. Wachs, would you mind playing to

9    11 minutes in.

10             (Video played but not reported.)

11   BY MS. GILBERT:

12   Q.   Special Agent Minor, was there some overlap between the

13   last video and this current video?

14   A.   Yes, there was.

15   Q.   Why?

16   A.   So those two videos are different camera angles within the

17   station.  And they show approximately different times but in

18   the same area, which is why there's a little bit of overlap.

19   So instead of playing the screen side by side like we saw

20   earlier, they're played sequentially with a little bit of

21   overlap.

22        MS. GILBERT:  Ms. Wachs, could you please play to

23   12:19.

24             (Video played but not reported.)

25   \\\

MINOR - DIRECT / GILBERT

```
1    BY MS. GILBERT:

2    Q.   Special Agent Minor, do you know what defendant is

3    standing in front of in this video?

4    A.   Yes.  He's standing in front of an add-fare machine within

5    the station.

6         MS. GILBERT:  Ms. Wachs, could you please play to

7    15:50.

8              (Video played but not reported.)

9    BY MS. GILBERT:

10   Q.   Special Agent Minor, does this conclude the BART portion

11   of this exhibit, Exhibit 11?

12   A.   Yes.

13   Q.   What does it show defendant doing at the end of this

14   series of videos?

15   A.   It shows the defendant leaving the Civic Center UN Plaza

16   Station.

17   Q.   Now, Special Agent Minor, what comes next in Exhibit 11?

18   A.   Some of the Muni footage.

19        MS. GILBERT:  Ms. Wachs, could you please play to

20   16:06.

21             (Video played but not reported.)

22   BY MS. GILBERT:

23   Q.   Let's just set the scene.  This looks a little bit

24   different than the last video that we saw.  Is the legend here

25   the same, with the same red teardrop for the defendant, the
```

**MINOR - DIRECT / GILBERT**

1    location of the video footage, and the red line showing the

2    path of the vehicle, and locations and interests as the prior

3    videos that we just watched in Exhibit 11?

4    **A.**    Yes, that's correct.

5    **Q.**    And it looks like the map has changed; is that right?

6    **A.**    Correct.

7    **Q.**    How has it changed?

8    **A.**    It's focused solely on the San Francisco area.

9    **Q.**    Where does this video start?

10   **A.**    It starts at Van Ness and McAllister Street bus stop.

11   **Q.**    Is that indicated with a red dot?

12   **A.**    Yes.

13   **Q.**    And can you remind us, where did the BART video end?

14   **A.**    At North Point and Van Ness.

15   **Q.**    I'm sorry.  The BART video.

16   **A.**    Oh.  My apologies.

17         It ended at Civic Center UN Plaza.

18   **Q.**    Is that indicated on the map as well?

19   **A.**    Yes, it is.

20   **Q.**    I've left on the stand in front of you what has been

21   admitted as Exhibit 168, which is a Muni card.  Are you

22   familiar with this?

23   **A.**    Yes, I am.

24   **Q.**    Will you remind us, where was Exhibit 168 found?

25   **A.**    It was found at the Pelosis' home, in the foyer area.

**MINOR - DIRECT / GILBERT**

1  Q.   On what date?

2  A.   October 28th, 2022.

3  Q.   If you look at that Muni card, does it say when it was

4  issued?

5  A.   Yes, it does.

6  Q.   When was that?

7  A.   October 28th of 2022, at 12:31 a.m.

8  Q.   Does that Muni card include the vehicle number and the

9  route?

10  A.   Yes, it does.

11  Q.   Are the vehicle number and the route on the Muni card

12  consistent with the video that we are watching right now?

13  A.   Yes.

14  Q.   I want to ask you a question.  So you just said that the

15  Muni card was issued at 12:31, and now let's turn back to the

16  exhibit.

17       What does it appear that the defendant is doing in this

18  video here?

19  A.   Purchasing a Muni bus ticket.

20  Q.   And what is the time shown in this video?

21  A.   It shows 12:34 a.m.

22  Q.   Can you explain the difference between the Muni ticket and

23  the time shown in Exhibit 11?

24  A.   Yes.  The security camera footage that I received from

25  Muni had its own player within it that had to use to view the

MINOR - DIRECT / GILBERT

1  videos, and the player is based on the computer system's time,

2  not the time that's embedded within the videos.

3  Q.   So is the time shown here -- it looks like 12:34 a.m.; is

4  that right?

5  A.   Correct.

6  Q.   So is that from the Muni videos, but based on the player

7  time?

8  A.   Correct.

9  Q.   And so it seems like there might be a discrepancy of a few

10 minutes between the time that that ticket was stamped; is that

11 right?

12 A.   That's correct.

13 Q.   So I just want to be really clear.  Is it fair to say,

14 then, that the time shown here, 12:34, and the rest of the time

15 for the Muni video, that's just approximate?

16 A.   Correct.

17 Q.   Okay.  Final question:  What speed will this Muni video

18 play at?

19 A.   Faster than original speed.

20 Q.   And the videos that you reviewed in Exhibit 13, are those

21 at fast speed or normal speed?

22 A.   They're at normal speed.

23 Q.   And was this video sped up for the same reasons that you

24 previously testified about the BART video?

25 A.   Yes.

**MINOR - DIRECT / GILBERT**

1        **MS. GILBERT:**  Ms. Wachs, could you please play to

2   17:32.

3        (Video played but not reported.)

4   **BY MS. GILBERT:**

5   **Q.**   Special Agent Minor, what did the video just show?

6   **A.**   It showed the defendant getting off the Muni bus at the

7   North Point and Van Ness bus stop.

8   **Q.**   And what time did the defendant get off the boss?

9   **A.**   Approximately 12:44 a.m.

10       **MS. GILBERT:**  Ms. Wachs, you can let it finish

11  playing.

12      Thank you.

13       (Video played but not reported.)

14  **BY MS. GILBERT:**

15  **Q.**   Let's turn to later in the early morning hours of October

16  28th of 2022.  Let me turn your attention to what has been

17  admitted as Exhibits 15, 16, 17, 18, 19, and 20.

18      Are you familiar with these exhibits?

19  **A.**   Yes, I am.

20  **Q.**   What are they?

21  **A.**   They're security camera footage around the Pelosi home

22  that's maintained by US Capitol Police.

23  **Q.**   Have you watched each of these exhibits?

24  **A.**   Yes, I have.

25  **Q.**   What day do they depict?

**MINOR - DIRECT / GILBERT**

1  **A.**   October 28th of 2022.

2  **Q.**   Do you recall approximately the time shown on these

3  videos?

4  **A.**   Approximately 1:40 a.m.

5  **Q.**   Is that when they start?

6  **A.**   Yes.

7  **Q.**   And do you recall approximately when each of these videos

8  ends?

9  **A.**   Approximately 4:00 a.m.

10 **Q.**   And so how long, approximately, is each of these videos?

11 **A.**   Approximately 2 hours and 21 minutes.

12 **Q.**   So approximately how much video footage is shown in these

13 six exhibits total?

14 **A.**   Approximately 14 hours.

15 **Q.**   And have you watched all 14 hours of these videos?

16 **A.**   Yes, I have.

17 **Q.**   Do these videos have sound?

18 **A.**   No, they do not.

19 **Q.**   Did you listen to the testimony, earlier this morning,

20 from Timothy Clark of the US Capitol Police regarding

21 Exhibits 15 through 20.

22 **A.**   Yes.

23         **MS. GILBERT:**  And, Ms. Wachs, would you mind pulling

24 up what has been admitted as Exhibit 14, but don't hit play

25 just quite yet.

MINOR - DIRECT / GILBERT

```
 1   BY MS. GILBERT:
 2   Q.   Special Agent Minor, are you familiar with Exhibit 14?
 3   A.   Yes, I am.
 4   Q.   What is it?
 5   A.   They are video excerpts from the US Capitol Police
 6   security camera footage from the Pelosis' home.
 7   Q.   Is it -- and those would be -- are those excerpts of
 8   Exhibits 15 through 20?
 9   A.   Correct.
10   Q.   What does the summary of these videos show?
11   A.   It shows the defendant arriving to the Pelosis' home and
12   breaking into their home.
13   Q.   Is Exhibit 14 a fair and accurate representation of
14   excerpts of the videos in Exhibit 15 through 20, as well as the
15   testimony of Timothy Clark regarding these videos?
16   A.   Yes, it is.
17   Q.   This whole video is just under 9 minutes long, and I will
18   stop it fewer times.
19        MS. GILBERT:  Let's please play just to 12 seconds in.
20             (Video played but not reported.)
21   BY MS. GILBERT:
22   Q.   Special Agent Minor, can you help us understand what we're
23   looking at here?  And let me -- I can start.  Let's start with
24   what looks like an aerial photo in the bottom-right corner of
25   the exhibit.
```

**MINOR - DIRECT / GILBERT**

1          What is that?

2     **A.**    That's an aerial photo of the Pelosis' home.

3     **Q.**    And what are the little blue bell-shaped items?

4     **A.**    Those are the security cameras maintained by US Capitol

5     Police.

6     **Q.**    And why are they numbered?

7     **A.**    They correlate the cameras to the video footage.

8     **Q.**    What is the yellow coming out of cameras marked 2 and 3 in

9     the bottom right of the exhibit?

10    **A.**    They are showing a view of the security cameras that have

11    the defendant in the video.

12    **Q.**    And do those correspond to the two videos at the top of

13    the exhibit which are labeled Camera 3 and Camera 2?

14    **A.**    Yes.

15    **Q.**    Why are there multiple videos on the screen at once here?

16    **A.**    It shows different camera angles at the same time.

17    **Q.**    And what is the red teardrop in Camera 2 and 3 showing?

18    **A.**    Depicting the defendant within the camera.

19    **Q.**    And what about the red circle on the bottom right of the

20    exhibit; what is that?

21    **A.**    It's the location of the defendant within the video

22    footage on the map.

23    **Q.**    So where is the defendant at this moment in these videos?

24    **A.**    On the sidewalk along Broadway in front of the Pelosi'

25    home.

**MINOR - DIRECT / GILBERT**

1   Q.   I'm going to ask you actually to turn to the exhibit we

2   have here and I think you have.  This is Exhibit 26.  This is

3   the poster board.

4        Could you show us, using the pointer, where the defendant

5   is in the video we're watching in Exhibit 14.

6   A.   Approximately in this area.

7        (Indicating.)

8   Q.   Let's turn back to the screen.  Let's touch on time zones.

9        What time zone is shown in the videos themselves?

10  A.   In the videos received from US Capitol Police, it's

11  East Coast time.

12  Q.   And how do you know that?

13  A.   Based on US Capitol Police Tim Clark's testimony.

14  Q.   And what time is shown in the clock on the bottom

15  left-hand corner of this exhibit?

16  A.   It shows 1:58 a.m., which is Pacific Time.

17  Q.   And you previously testified that the defendant got off

18  the Muni bus on the same day at about 12:45 p.m.; is that

19  right?

20  A.   That's correct.

21          THE COURT:  A.m.

22          MS. GILBERT:  Oh, a.m.  Thank you, Your Honor.

23  BY MS. GILBERT:

24  Q.   A.m.

25       And based on the video we're looking at here, what time

**MINOR - DIRECT / GILBERT**

1  did the defendant arrive at the Pelosis' home?

2  A.   Approximately 1:58 a.m.

3  Q.   Are you familiar with the distance between where the

4  defendant got off the bus and where the Pelosis' home is?

5  A.   Yes, I am.

6  Q.   Is it possible that it would have taken that long to walk,

7  so about an hour and 15 minutes, between that bus stop and the

8  Pelosis' home?

9  A.   Yes, it would probably take that long.

10      **MS. GILBERT:**  Ms. Wachs, could you please play until

11  1:22.

12      (Video played but not reported.)

13  BY MS. GILBERT:

14  Q.   Special Agent Minor, what's happening here?

15  A.   The defendant is out of view of the cameras.

16  Q.   Does this happen a few more times in this exhibit?

17  A.   Yes, it does.

18  Q.   And every time, will there be a screen indicating that

19  he's not being picked up on the cameras and for how long?

20  A.   Yes, it will.

21  Q.   And when we return to the portion of the video showing the

22  defendant actually in the cameras, will the clock in the

23  bottom-left portion be adjusted to match the fact that we

24  haven't seen the defendant for 15 seconds in this case?

25  A.   Yes, it will.

MINOR - DIRECT / GILBERT

1          MS. GILBERT:  Ms. Wachs, could you please play to

2    1 minute and 29 seconds.

3                    (Video played but not reported.)

4    BY MS. GILBERT:

5    Q.    Special Agent Minor, what is the speed of Camera 6 in this

6    portion of the exhibit?

7    A.    It is slower than the original speed.

8    Q.    And in the exhibit that corresponds to Camera 6, which is

9    Exhibit 20, is that video available to review at normal speed?

10   A.    Yes, it is.

11   Q.    And why was this portion slowed down?

12   A.    To be able to see the defendant within the camera a little

13   bit easier.

14   Q.    Ms. Wachs, please play to 2 minutes and 28 seconds.

15                   (Video played but not reported.)

16   BY MS. GILBERT:

17   Q.    Special Agent Minor, is the speed slowed down here, too?

18   A.    Yes, it is.

19   Q.    For the same reason that you previously testified?

20   A.    Yes.

21          MS. GILBERT:  Ms. Wachs, can you please play to

22   3 minutes and 15 seconds.

23                   (Video played but not reported.)

24   BY MS. GILBERT:

25   Q.    Where is the defendant at this point in the video?

1   **A.**    The back patio area of the Pelosis' home.

2   **Q.**    Can you indicate, on Exhibit 26 -- so let's turn to the

3   poster board -- where that is on the exhibit?

4   **A.**    Approximately this area.

5         (Indicating.)

6   **Q.**    And can you describe what we just saw, where the defendant

7   walked from the northeast corner of the home to the back patio?

8   Can you show us the path the defendant took using Exhibit 26,

9   please?

10  **A.**    So he started here.  (Indicating).  And then he walked up

11  this way.  (Indicating).  Was in this area.  (Indicating).

12  Then he came back, took the path in front of the Pelosis' home

13  and crossed through this gate and went into the back patio area

14  here.  (Indicating).

15         **MS. GILBERT:**  Ms. Wachs, let's turn back to the

16  screen, and could you just play to the end of this video,

17  please.

18               (Video played but not reported.)

19         **MS. GILBERT:**  Thank you, Ms. Wachs.

20  **BY MS. GILBERT:**

21  **Q.**    Special Agent Minor, I'd like to move on to a different

22  topic.

23      Prior to being in court last week, had you watched SFPD

24  Officer Cagney's body-worn camera footage capturing the assault

25  of Mr. Pelosi?

**MINOR - DIRECT / GILBERT**

 1    A.    Yes, I have.

 2          MS. GILBERT:  And, Ms. Wachs, I'd ask that you pull up

 3    Exhibit 3, but do not play it.  And could you pull up the

 4    version without the transcript, which is what the jury will

 5    take back with them.

 6    BY MS. GILBERT:

 7    Q.    Special Agent Minor, approximately when did you first

 8    watch this portion of Officer Cagney's body-worn camera?

 9    A.    Approximately a week after October 28th of 2022.

10    Q.    Did you watch it at normal speed?

11    A.    I did.

12    Q.    What did you do after you watched it at normal speed?

13    A.    Within the VLC player, I slowed it down.

14    Q.    Let me take a second.

15          What is a VLC player?

16    A.    It's a media player that will play video.

17    Q.    Had you used VLC player before you used it to watch this

18    video?

19    A.    Yes, I have.

20    Q.    How often have you used VLC player?

21    A.    It's typically my default media player.

22    Q.    Do you know if VLC player is widely available?

23    A.    It is.

24    Q.    And you said this player allows a user to slow down a

25    video; is that right?

**MINOR - DIRECT / GILBERT**

1  A.   That's correct.

2  Q.   And I'm not going to have you play this, but can you tell

3  us how the player allows a user to slow down the video.

4       MS. GILBERT:  And, Ms. Wachs, could you just show us

5  while Special Agent Minor testifies?

6       THE WITNESS:  Yes.  If you go to the playback in the

7  drop-down to "speed," and then you can press slower multiple

8  times, and it will continually slow down the video the more

9  times you press it.

10  BY MS. GILBERT:

11  Q.   So let's just press that once for now.  Special Agent

12  Minor, when you watched this video at slower speed, did you

13  slow it down to different levels?

14  A.   Yes, I did.

15  Q.   So did you watch it by playing slower just once?

16  A.   Yes, I did.

17  Q.   And after you watched that slightly slower version, what

18  did you do?

19  A.   I slowed it down again.

20  Q.   And then did you watch a second time with it even slower?

21  A.   Yes, I did.

22  Q.   And after that, what did you do?

23  A.   Slowed it down again.

24  Q.   And did you watch that now -- is it fair to say now more

25  slow -- slower version at that point?

1    **A.**    Correct.

2    **Q.**    Then what did you do?

3    **A.**    I watched -- re-watched it at normal speed.

4    **Q.**    And why did you -- first let me you ask you, why were you

5    watching it at a slow speed?

6    **A.**    To try and pick up any additional details within the video

7    that is harder to see at normal speed.

8    **Q.**    Then after you watched it at slowed-down speed, you said

9    you watched it at normal speed; is that right?

10   **A.**    That's correct.

11   **Q.**    Why do you watch it at normal speed then?

12   **A.**    Because after watching it slowed down, I wanted to be able

13   to see the normal speed to see if the video was the same and

14   appeared -- the details within the video.

15   **Q.**    If they appeared consistent, is that what you're saying?

16   **A.**    Correct.

17   **Q.**    And did they -- was the -- based on your review, was the

18   slowed-down version consistent with the normal-speed version?

19   **A.**    Yes, it was.

20   **Q.**    Can you guess, approximately how many times have you seen

21   this video?

22   **A.**    I've probably watched this video at least 20 times.

23          **MS. GILBERT:**  At this time, Your Honor, we'd like to

24   play the version -- the slowed-down version of this exhibit as

25   Special Agent Minor watched it.

MINOR - DIRECT / GILBERT

1          **THE COURT:**  All right.

2      Objection noted for the record.

3      You may.

4          **MS. GILBERT:**  So, Ms. Wachs --

5  **BY MS. GILBERT:**

6  **Q.**   Let me ask again.  Special Agent Minor, how many times did

7  you click slower when you watched the slow version?

8  **A.**   I pressed it multiple times, but the speed that helped me

9  see the details the best was four times.

10         **MS. GILBERT:**  So, Ms. Wachs, could you please hit

11 slower four times -- have you hit it one time already?

12         **MS. WACHS:**  Yes.

13         **MS. GILBERT:**  So three more times.  And I'd just like

14 to play from 1:06 seconds until 1:25.  Thank you.

15                 (Video played but not reported.)

16 **BY MS. GILBERT:**

17 **Q.**   Special Agent Minor, how many times did you see the

18 defendant hit Mr. Pelosi in that video?

19 **A.**   Three times.

20 **Q.**   Special Agent Minor, were you here on Thursday when SFPD

21 Officer Najarro testified?

22 **A.**   Yes.

23 **Q.**   And do you recall when defense counsel asked him about the

24 type of stretcher or gurney that the responding emergency

25 workers used to move Mr. Pelosi out of his home and into the

**MINOR - DIRECT / GILBERT**

1    ambulance?

2         MS. LINKER:  Your Honor, I just want to make sure

3    we're not going into the --

4         MS. GILBERT:  I have no intention to do that.

5         MS. LINKER:  Thank you.

6         THE WITNESS:  Yes, I do.

7    BY MS. GILBERT:

8    Q.   And do you recall defense counsel had Officer Najarro

9    watch a portion of his body-worn camera so that he could

10   testify about how Mr. Pelosi got into that chair or gurney or

11   stretcher?

12   A.   Yes.

13   Q.   So I'd like to now play for the jury the same clip that

14   Officer Najarro watched last week, which has been admitted as

15   Exhibit 321.  And I'll just note this is about one minute and

16   30 seconds long, and there's no transcript for this.

17        MS. GILBERT:  Ms. Wachs, could you please play this

18   just straight through.

19             (Video played but not reported.)

20   BY MS. GILBERT:

21   Q.   Your Honor, I have a fair bit more to do with Special

22   Agent Minor.  This might be a good stopping point.

23        THE COURT:  Members of the jury, we'll take our

24   45-minute lunch.  We'll resume at 12:30 p.m.  And as usual, do

25   not discuss the case.  Thank you.

 1                    (The jury leaves the courtroom.)

 2         (Proceedings were heard out of the presence of the jury.)

 3              THE COURT:  How much longer do you anticipate with

 4    her?

 5              MS. GILBERT:  I think she could be about 45 minutes

 6    more, and -- but I think we can --

 7              THE COURT:  Okay.

 8              MS. GILBERT:  I think we're potentially on track to

 9    finish today, Your Honor.  We're just not sure, but I think it

10    depends on how long defense will spend with Agent Minor.  I

11    spoke this morning with defense counsel about our anticipated

12    schedule.

13              THE COURT:  Great.  All right.  Thank you.

14              MS. LINKER:  Thank you, Your Honor.

15              MS. CHUANG:  Thank you.

16                    (Recess taken at 11:45 a.m.)

17                 (Proceedings resumed at 12:33 p.m.)

18              THE COURT:  All rise, please.

19                    (The jury enters the courtroom.)

20         (Proceedings were heard in the presence of the jury.)

21              THE COURT:  Thank you.  You may be seated.

22         We will continue with the Government's direct of Agent

23    Minor.

24              MS. GILBERT:  Thank you, Your Honor.

25    \\\

MINOR - DIRECT / GILBERT

```
 1    BY MS. GILBERT:
 2    Q.   Special Agent Minor, I'd like to show you what has been
 3    marked and admitted as Exhibit 297.
 4         MS. GILBERT:  Ms. Wachs, would you mind pulling this
 5    up and just start on the first page.
 6         If you could just enlarge the -- sort of the top big
 7    header above "Alabama."
 8    BY MS. GILBERT:
 9    Q.   Special Agent Minor, do you recognize this?
10    A.   Yes, I do.
11    Q.   What is this?
12    A.   This is the official list of members of the house of
13    Representatives of the United States.
14    Q.   Does it specify which Congress this list is for?
15    A.   Yes, it does.
16    Q.   And which Congress is that?
17    A.   117th Congress.
18    Q.   And when is this document dated?
19    A.   December 12th, 2022.
20    Q.   Are you familiar with what the term of the 117th Congress
21    was?
22    A.   Yes, I am.
23    Q.   And what was that?
24    A.   January 3rd of 2021 to January 3rd of 2023.
25         MS. GILBERT:  Ms. Wachs, would you mind turning to the
```

**MINOR - DIRECT / GILBERT**

1   second page of this document.

2       And if you could blow up just the first half of the page.

3   That's perfect.

4   **BY MS. GILBERT:**

5   **Q.**   Special Agent Minor, does this list of official members

6   include Nancy Pelosi?

7   **A.**   Yes, it does.

8   **Q.**   And what does it say she's a representative of?

9   **A.**   The 12th district in San Francisco.

10  **Q.**   Have you reviewed this entire document, Special Agent

11  Minor?

12  **A.**   Yes, I have.

13  **Q.**   Does this document include any mention of the leadership

14  of the house of Representatives during this time?

15  **A.**   No, it doesn't.

16  **Q.**   I'd like to turn to something else.

17      **MS. GILBERT:**   Ms. Wachs, you can take down this

18  exhibit, please.

19  **BY MS. GILBERT:**

20  **Q.**   Special Agent Minor, when you were discussing Exhibit 11,

21  the summary video of the BART and the Muni footage, you

22  testified that you had searched defendant's residence; is that

23  correct?

24  **A.**   That's correct.

25  **Q.**   When did you search his residence?

**MINOR - DIRECT / GILBERT**

1   A.   October 29th of 2022.

2   Q.   And where is his residence located?

3   A.   On Shasta Street in Richmond, California.

4   Q.   Did you obtain a search warrant to search his residence?

5   A.   Yes, I did.

6   Q.   And to be clear, did you personally search his residence?

7   A.   Yes, I did.

8        MS. GILBERT:  So, Ms. Wachs, if you could start with

9   Exhibit 240, please.

10  BY MS. GILBERT:

11  Q.   Special Agent Minor, do you recognize this?

12  A.   Yes, I do.

13  Q.   What is this?

14  A.   This is a photo within the defendant's residence.

15       MS. GILBERT:  And, Ms. Wachs, would you mind showing

16  Exhibit 241, please.

17  BY MS. GILBERT:

18  Q.   What is this showing, Agent Minor?

19  A.   This is another photo with a different view within the

20  defendant's residence.

21  Q.   Do you know when these photos were taken?

22  A.   On October 29th of 2022.

23  Q.   Were these taken during the search --

24  A.   Yes.

25  Q.   -- that you helped execute?

**MINOR - DIRECT / GILBERT**

1  A.   Yes, they were.

2       MS. GILBERT:  Ms. Wachs, would you mind turning to

3  Exhibit 242.

4  BY MS. GILBERT:

5  Q.   Special Agent Minor, do you recognize this?

6  A.   Yes, I do.

7  Q.   What is this?

8  A.   This is a photo within the defendant's residence, showing

9  a sleeping pad.

10       MS. GILBERT:  And, Ms. Wachs, could you pull up

11  Exhibit 243?

12  BY MS. GILBERT:

13  Q.   Do you recognize this?

14  A.   Yes, I do.

15  Q.   What is this?

16  A.   It's a photo within the defendant's residence, showing

17  some of the electronic devices.

18       MS. GILBERT:  And, Ms. Wachs, could you pull up

19  Exhibit 244, please.

20  BY MS. GILBERT:

21  Q.   Special Agent Minor, what is this?

22  A.   This is a similar photo, showing the electronic devices

23  with markers next to them.

24  Q.   Were those markers there when you searched the residence?

25  A.   No, they were not.

**MINOR - DIRECT / GILBERT**

1    **Q.**   Who added those markers?

2    **A.**   Individuals on my team executing the search warrant.

3    **Q.**   Is there a marker next to an item that we've already

4    discussed during the course of this trial?

5    **A.**   Yes.

6    **Q.**   And what item is that?

7    **A.**   It's the iBUY computer tower.

8    **Q.**   Special Agent Minor, I'm just going to hold this up.  Do

9    you recognize I'm holding what's been marked as Exhibit 269?

10    Do you recognize this?

11    **A.**   Yes, I do.

12    **Q.**   What is this?

13    **A.**   That is the computer tower that is in that photograph.

14    **Q.**   Where did you seize this from?

15    **A.**   From the defendant's residence.

16    **MS. GILBERT:**  Could -- Ms. Wachs, would you mind

17    turning to Exhibit 247, please.

18    **BY MS. GILBERT:**

19    **Q.**   Do you recognize this, Agent Minor?

20    **A.**   Yes, I do.

21    **Q.**   What is this?

22    **A.**   This is another photo within the defendant's residence,

23    showing a clear plastic container.

24    **Q.**   Are there markers shown in this photo as well?

25    **A.**   Yes, there are.

**MINOR - DIRECT / GILBERT**

1  Q.   Were those there when you searched, or were those added by

2  the FBI team?

3  A.   That was added by the FBI team.

4       MS. GILBERT:  And, Ms. Wachs, could we look at 248,

5  please.

6  BY MS. GILBERT:

7  Q.   Special Agent Minor, do you recognize this?

8  A.   Yes, I do.

9  Q.   What is this?

10  A.   That is showing the contents of one of the plastic

11  containers, showing zip ties and one of the markers that

12  someone on my FBI team had placed.

13  Q.   Did you or anyone on your team seize any items that are

14  depicted in this photograph?

15  A.   No, we did not.

16  Q.   Why not?

17  A.   At the time of the search and the information I had known,

18  I did not believe that anything was of evidentiary value.

19  Q.   At the time that you conducted this search on

20  October 29th of 2022, had you seen any of the physical evidence

21  that the San Francisco Police Department collected from the

22  Pelosis' home the day before?

23  A.   I had not.

24  Q.   Sitting here today, would you have seized anything --

25  sitting here today, given what you know now, would you have

**MINOR - DIRECT / GILBERT**

1   seized anything indicated in Exhibit 248?

2          MS. LINKER:  Don't answer.

3          THE COURT:  Yeah.  Relevance.  I'll sustain the

4   objection.

5   BY MS. GILBERT:

6   Q.   Special Agent Minor, I have left an exhibit in front of

7   you on the stand which has been admitted and labeled as 268.

8        Do you recognize this?

9   A.   Yes, I do.

10  Q.   And what is it?

11  A.   It is a Wells Fargo Bank transaction receipt.

12  Q.   Could you just hold it up for a moment, for the jury?

13  A.   (Witness complies.)

14  Q.   Do you know where this was recovered from?

15  A.   It was recovered from a trashcan within the defendant's

16  residence.

17          MS. GILBERT:  And, Ms. Wachs, would you mind pulling

18  up Exhibit 250.

19  BY MS. GILBERT:

20  Q.   Special Agent Minor, do you recognize this?

21  A.   Yes, I do.

22  Q.   What is this?

23  A.   It is showing inside of the trashcan where we found the

24  receipt.

25  Q.   Does Exhibit 250 show -- is there a marker showing where

**MINOR - DIRECT / GILBERT**

1   the receipt was found depicted in this photograph?

2   A.   Yes.  Marker 7.

3   Q.   Okay.  If you could turn back to the physical exhibit in

4   front of you, Exhibit 268.

5        What is the date of this receipt?

6   A.   October 25th of 2022.

7   Q.   And what type of transaction does it show?

8   A.   Cash dispensed.

9   Q.   How much cash was dispensed?

10  A.   $7,000.

11  Q.   Does the receipt say who the customer was who was a party

12  to this transaction?

13  A.   No, it does not.

14  Q.   Did you search the defendant's whole residence?

15  A.   Yes, I did.

16  Q.   Did you see any indication that anyone other than the

17  defendant lived there?

18  A.   No, I did not.

19  Q.   I'd like to turn to some of the reports that Digital

20  Forensic Examiner Ng previously testified to.  Do you recall

21  the testimony of Ms. Ng?

22  A.   Yes, I do.

23  Q.   And were you also here when I read into the record the

24  stipulation of fact about the user of the computer tower that

25  Ms. Ng testified about that's Exhibit 269 that I just lifted

**MINOR - DIRECT / GILBERT**

1    up?

2    **A.**    Yes.

3    **Q.**    And who was the user of the computer tower?

4    **A.**    The defendant.

5    **Q.**    Were you involved in the review of the data found on the

6    hard drive in the defendant's computer tower?  So that would be

7    Exhibit 270.

8    **A.**    Yes, some of it.

9    **Q.**    And for the parts of that data that you reviewed, did you

10   tag and bookmark items?

11   **A.**    Yes.

12   **Q.**    Did you review the reports showing the tagged and

13   bookmarked items for Exhibit 270, the defendant's hard drive

14   that was in that computer tower?

15   **A.**    Yes, I did.

16        **MS. GILBERT:**  So, Ms. Wachs, if we could start with

17   Exhibit 271, please.  And just turn to page 4.

18        If you could blow up the header and the first record.

19   **BY MS. GILBERT:**

20   **Q.**    Agent Minor, can you remind us, what is this report

21   showing?

22   **A.**    It's showing Firefox bookmarks.

23   **Q.**    From what device?

24   **A.**    The computer tower, the hard drive within the computer

25   tower.

**MINOR - DIRECT / GILBERT**

1  Q.   Does this show all of the bookmarks on that hard drive?

2  A.   No, it doesn't.

3  Q.   Which ones are shown here?

4  A.   It's showing two Spokeo bookmarks.

5  Q.   And what are those bookmark pages about?  What is the

6  title of those pages?

7  A.   "Nancy P. Pelosi, San Francisco, California."

8  Q.   And when did the user create this bookmark?

9  A.   On October 19th of 2022.

10       MS. GILBERT:  I'd like to turn, Ms. Wachs, to

11  Exhibit 274, and if we could start with page 6.

12  BY MS. GILBERT:

13  Q.   And I think you found it, Agent Minor, but yes, there's a

14  binder up with the paper versions of the same exhibits that

15  we're putting up on the screen, if that's easier for you to

16  review.

17       MS. GILBERT:  Could you just -- Ms. Wachs, would you

18  mind just highlighting the very top.

19  BY MS. GILBERT:

20  Q.   And, Agent Minor, will you remind us, what does this

21  report show?

22  A.   Firefox web history.

23  Q.   From what device?

24  A.   The hard drive found within the computer tower.

25  Q.   And does this report show web history related to, then,

MINOR - DIRECT / GILBERT

1   Speaker Nancy Pelosi?

2   A.   Yes.

3   Q.   And I'd like to walk you through some of these records.

4   Let's start at the bottom of the page.  I would like to start

5   with -- on page 6, the Record 13.

6        What web page did the user of this computer visit, as

7   shown in Record 13?

8   A.   Spokeo.

9   Q.   Was it about a specific person?

10  A.   Yes.  Nancy Pelosi.

11       MS. GILBERT:  And, Ms. Wachs, if you could go to the

12  next page, please.  And maybe highlight the top two records.

13  BY MS. GILBERT:

14  Q.   So, Agent Minor, is the top of this page a continuation of

15  Record 13 from the page before?

16  A.   Yes, it is.

17  Q.   And so what date did the user visit that Spokeo web page

18  regarding Nancy Pelosi?

19  A.   October 19th of 2022.

20  Q.   And I think I just like to ask you about a number of these

21  records.

22       Record 14, can you tell us what was the web page visited

23  by the user?

24  A.   Spokeo.com/nancy-pelosi.

25  Q.   What date?

MINOR - DIRECT / GILBERT

1  A.   October 19th of 2022.

2          MS. GILBERT:  Ms. Wachs, I'd like to focus on

3  Records 15, 16, and 17.  Maybe we can capture that all

4  together.

5  BY MS. GILBERT:

6  Q.   Can you tell us about the website visited in Record 15,

7  please?

8  A.   Spokeo.com/nancy-pelosi.

9  Q.   What was the date?

10  A.   October 19th of 2022.

11  Q.   And Record 16, please.

12  A.   It is a Google search for "Nancy Pelosi family."

13  Q.   Where do you see that in Record 16?

14  A.   In the title.

15  Q.   And when was this search conducted?

16  A.   October 19th of 2022.

17  Q.   What about Record 17?  What is the site visited by the

18  user in Record 17?

19  A.   It was the Wikipedia for "Nancy Pelosi."

20  Q.   And what was the date?

21  A.   October 19th of 2022.

22          MS. GILBERT:  Ms. Wachs, I'd like to look at

23  Record 18, which I think starts the next page.

24          18, 19, and 20, please.  Thank you.

25  \\\

MINOR - DIRECT / GILBERT

1  BY MS. GILBERT:

2  Q.    What website did the user visit in Record 18,

3  Special Agent Minor?

4  A.    Went to pelosi.house.gov, and it was a -- the title states

5  that it's a biography of Congresswoman Nancy Pelosi.

6  Q.    And when did the user visit this website?

7  A.    October 19th of 2022.

8  Q.    What about Record 19?  What website is depicted there?

9  A.    It is another Wikipedia search for "Nancy Pelosi."

10  Q.    And when was that website visited by the user?

11  A.    October 19th of 2022.

12  Q.    And Record 20, what website was this?

13  A.    ABC27.com, which was a news article about Nancy Pelosi's

14  home vandalized with pig's head fake blood.

15  Q.    Have you visited the website shown in this URL?

16  A.    Yes, I have.

17  Q.    And just generally, what is that web page?

18  A.    It is an article about a pig's head and fake blood that

19  was placed at the Pelosis' home in approximately January of

20  2021.

21  Q.    And on what date did the user of this computer visit that

22  website?

23  A.    October 19th of 2022.

24  Q.    Can we turn to Record 21.

25        What website is this?

**MINOR - DIRECT / GILBERT**

1   **A.**   This is a Google search for "Pelosi pig blood."

2   **Q.**   And when did the user make this search?

3   **A.**   October 19th of 2022.

4         **MS. GILBERT:**   Ms. Wachs, if you could turn to the next

5   page.   Blow up 22 to 24.   Thank you.

6   **BY MS. GILBERT:**

7   **Q.**   Record 22, what website does that depict?

8   **A.**   It's another Google search for "Pelosi pig blood."

9   **Q.**   On what day?

10  **A.**   October 19th of 2022.

11  **Q.**   And what does Record 23 show?

12  **A.**   It shows an article from Daily Mail online of a YouTuber

13  live streams himself defecating in the driveway of Nancy

14  Pelosi's San Francisco home.

15  **Q.**   Have you visited the URL that's included in this report?

16  **A.**   Yes, I have.

17  **Q.**   And what does it generally show?

18  **A.**   It is showing -- it has a link to a video of an individual

19  defecating in the driveway of Nancy Pelosi's home in

20  San Francisco.

21  **Q.**   And on what date did the user of this computer visit this

22  web page?

23  **A.**   October 19th of 2022.

24  **Q.**   Let's look at Record 24, please.

25        What website was visited by the user?

MINOR - DIRECT / GILBERT

1   A.   Spokeo.

2   Q.   For anyone in particular?

3   A.   Nancy P. Pelosi, San Francisco, California.

4   Q.   And what date was this record?

5   A.   October 21st of 2022.

6   Q.   Can we turn to Record 25, which is at the very bottom of

7   the page.

8        And, Special Agent Minor, what website did the user visit

9   as shown in Record 25?

10  A.   Spokeo.

11  Q.   And on what date?

12  A.   October 19th of 2022.

13       MS. GILBERT:  And, Ms. Wachs, if we could just turn

14  the page, I want to ask about three more records, 26, 27, and

15  28.

16  BY MS. GILBERT:

17  Q.   And, Special Agent Minor, what web page did the user visit

18  as shown in Record 26?

19  A.   Spokeo.

20  Q.   For anyone in particular?

21  A.   Nancy P. Pelosi.

22  Q.   And when did the user visit that website?

23  A.   October 19th of 2022.

24  Q.   Let's turn to Record 27.  What website was this?

25  A.   It was a Google search.

**MINOR - DIRECT / GILBERT**

1   Q.    What was the Google search for?

2   A.    "Nancy Pelosi house, Broadway, San Francisco."

3   Q.    And when did the user search Google for these items?

4   A.    October 19th of 2022.

5   Q.    Finally, Record 28.  What website did the user visit here?

6   A.    Wikimapia.

7   Q.    And was that for a specific person?

8   A.    "Nancy Pelosi's home, San Francisco, California."

9   Q.    And when did the user visit this website?

10  A.    October 19th of 2022.

11        MS. GILBERT:  I'd like to turn to a different exhibit.

12  Could we pull up Exhibit 276, please, and let's start with

13  page 4.

14        And you could just blow up the header and the very first

15  record.

16  BY MS. GILBERT:

17  Q.    Special Agent Minor, can you remind us, what does this

18  document show?

19  A.    It shows Google Maps queries.

20  Q.    From which device?

21  A.    The defendant's computer, the iBUYPOWER computer.

22  Q.    And have you reviewed all of Exhibit 276?

23  A.    Yes, I have.

24  Q.    And what do Records 1 through 78, which is on page 21,

25  show?

**MINOR - DIRECT / GILBERT**

1  A.    It's mostly of 2640 Broadway, San Francisco.

2  Q.    Mostly what of 2640 Broadway?

3  A.    Google Map queries.

4  Q.    Are there some for other addresses nearby?

5  A.    Yes.

6  Q.    How many other addresses?

7  A.    One.

8  Q.    What address is that?

9  A.    2500 Broadway, San Francisco.

10  Q.    Do you know how close 2500 Broadway is to 2640 Broadway?

11  A.    Not exactly.  But generally, yes.

12  Q.    Is it close?

13  A.    Yes.

14  Q.    Will you remind us.  Do you know who lives as

15  2640 Broadway?

16  A.    Yes.

17  Q.    Who's that?

18  A.    The -- Nancy Pelosi and Paul Pelosi.

19  Q.    When did the searches occur as shown in Records 1 through

20  78?

21  A.    October 26th of 2022.

22  Q.    Will you remind us, again.  When did the defendant begin

23  traveling to the Pelosis' home?

24  A.    October 27th of 2022.

25  Q.    Now, I've -- you've said that -- you've testified that

**MINOR - DIRECT / GILBERT**

1    Records 1 through 78 show a number of searches all for that

2    2640 address or another nearby address.

3         Do you know why there are so many entries in this report?

4    **A.**   Yes.

5    **Q.**   Why is that?

6    **A.**   So --

7    **Q.**   And I think -- would it help --

8         **MS. GILBERT:**  Ms. Wachs, maybe could you pull up

9    Records 1 and 2.

10        Thank you.

11   **BY MS. GILBERT:**

12   **Q.**   Sorry to interrupt you, Agent Minor.

13   **A.**   So within Google Maps, it will capture the history of the

14   center of the map based on when you are dragging and dropping

15   the map.

16   **Q.**   So if you look, compare Record 1 and Record 2 for center

17   of the map?

18        **MS. GILBERT:**  And maybe, Ms. Wachs, you could

19   highlight those.

20   **BY MS. GILBERT:**

21   **Q.**   Are those the same, or are those different?

22   **A.**   They're different.

23        **MS. GILBERT:**  I'd like to turn to Exhibit 277, please.

24        And let's start on page 14, Ms. Wachs.

25        Perhaps just -- I'd like to ask about 35.  Is it possible

 1    to also, Ms. Wachs, do a close-in of the very top of the page

 2    so we can orient to what this report is.

 3        Fabulous.

 4    **BY MS. GILBERT:**

 5    **Q.**   Special Agent Minor, what does this report show?

 6    **A.**   Google searches.

 7    **Q.**   And what did the user search in Record 35?

 8    **A.**   "Nancy Pelosi age."

 9    **Q.**   And when did that search occur?

10    **A.**   October 19th of 2022.

11    **Q.**   I'd like to ask just about a couple more records?

12            **MS. GILBERT:**   Ms. Wachs, if you could turn to the next

13    page, to Record 37 and 38.

14    **BY MS. GILBERT:**

15    **Q.**   And, Special Agent Minor, what did the user search in

16    Record 37?

17    **A.**   "Nancy Pelosi family."

18    **Q.**   And when did the user conduct this search?

19    **A.**   October 19th of 2022.

20    **Q.**   And what about Record 38; what search was conducted as

21    shown there?

22    **A.**   "Pelosi pig blood."

23    **Q.**   And when did that search occur?

24    **A.**   October 19th of 2022.

25    **Q.**   Are there more searches, as shown in this Exhibit 277, for

**MINOR - DIRECT / GILBERT**

1   Pelosi pig blood?

2   A.   Yes.

3        MS. GILBERT:  Ms. Wachs, would you mind turning the

4   next page to page 16.

5        If you could just blow up the first, maybe the middle

6   two records.

7   BY MS. GILBERT:

8   Q.   Special Agent Minor, what are these searches for?

9   A.   "Pelosi pig blood."

10  Q.   And, Special Agent Minor, are the rest of the records

11  through 68, except for Record 64, searches for "Pelosi pig

12  blood"?

13  A.   Yes.

14  Q.   I'd like to just look at Record 65, which is at the bottom

15  of page 23.

16       And what did the user search for in Record 65?

17  A.   "Nancy Pelosi house, Broadway, San Francisco."

18       MS. GILBERT:  And, Ms. Wachs, could you just turn to

19  the next page.  And pull up the top.

20  BY MS. GILBERT:

21  Q.   And, Special Agent Minor, when did this search occur?

22  A.   October 19th of 2022.

23       MS. GILBERT:  And thank you, Ms. Wachs, you can pull

24  this document down.

25  BY MS. GILBERT:

**MINOR - DIRECT / GILBERT**

1   Q.   Special Agent Minor, did you also find images saved on

2   defendant's hard drive?

3   A.   Yes.

4   Q.   And where were those images saved?

5   A.   Within multiple folders, so it started on the desktop.

6   There was a "stuff" folder, there's a "favorite politician"

7   folder, and multiple folders within that folder and "Pelosi"

8   folder within the favorite politicians.

9   Q.   You said there were multiple folders within the favorite

10  politicians folder; is that right?

11  A.   That's correct.

12  Q.   And there was one folder called "Pelosi"; is that correct?

13  A.   Correct.

14  Q.   And did you find images related to the Pelosis in this

15  folder?

16  A.   Yes.

17        MS. GILBERT:   So, Ms. Wachs, would you mind pulling up

18  Exhibit 281.

19  BY MS. GILBERT:

20  Q.   Do you recognize this?

21  A.   Yes, I do.

22  Q.   What is this?

23  A.   This is a photo of the Pelosi home.

24  Q.   And where was this photo found?

25  A.   On the defendant's computer.

MINOR - DIRECT / GILBERT

1  Q.   In which folder?

2  A.   In the Pelosi folder.

3  Q.   And I think it's -- I think that shorthand is fine.  I

4  just want to clarify.  That's the folder that was on the

5  desktop, and the path was "stuff, favorite politicians,

6  Pelosi"; is that right?

7  A.   Correct.

8  Q.   Okay.

9        MS. GILBERT:  Ms. Wachs, could you please pull up

10 Exhibit 282.

11 BY MS. GILBERT:

12 Q.   Do you recognize this?

13 A.   Yes.

14 Q.   What is this?

15 A.   This is the Pelosi home, and it was a photo pulled from

16 one of the articles that was searched.

17 Q.   Do you recall which article this photograph was from?

18 A.   This was from the individual who was defecating in the

19 Pelosi home driveway.

20 Q.   Where was this image found?

21 A.   In the "Pelosi" folder.

22        MS. GILBERT:  Ms. Wachs, could you pull up

23 Exhibit 284, please.

24 BY MS. GILBERT:

25 Q.   Do you recognize this, Agent Minor?

**MINOR - DIRECT / GILBERT**

1   **A.**   Yes, I do.

2   **Q.**   What is this?

3   **A.**   This is the Pelosi home.

4   **Q.**   Where was this -- is this an image?

5   **A.**   This is an image.

6   **Q.**   Where was this image found?

7   **A.**   Within the "Pelosi" folder.

8   **Q.**   On the defendant's hard dive?

9   **A.**   Yes.

10         **MS. GILBERT:**  Exhibit 285, please.

11  **BY MS. GILBERT:**

12  **Q.**   Do you recognize this, Agent Minor?

13  **A.**   Yes.

14  **Q.**   What is this?

15  **A.**   This is a photo of what appears to be the garage of the

16  Pelosi home from one of the articles with the pig blood and the

17  pig head.

18  **Q.**   And where was this image found?

19  **A.**   Within the "Pelosi" folder on the defendant's computer.

20         **MS. GILBERT:**  Ms. Wachs, could you pull up

21  Exhibit 286, please.

22  **BY MS. GILBERT:**

23  **Q.**   Special Agent Minor, do you recognize this?

24  **A.**   Yes, I do.

25  **Q.**   What is this?

**MINOR - DIRECT / GILBERT**

1  A.   This is a photo of what appears to be the garage of the

2  Pelosi home.

3  Q.   And where was this found?

4  A.   This was found within the "Pelosi" folder on the

5  defendant's computer.

6       MS. GILBERT:   Ms. Wachs, could you pull up

7  Exhibit 287, please.

8  BY MS. GILBERT:

9  Q.   Do you recognize this?

10  A.   Yes.

11  Q.   What is this?

12  A.   This is a photo of Speaker Emerita Nancy Pelosi as well as

13  the Pelosi home and what appears to be the garage of the Pelosi

14  home.

15  Q.   Where was this image found?

16  A.   Within the Pelosi folder on the defendant's computer.

17       MS. GILBERT:   Ms. Wachs, could you pull up

18  Exhibit 288, please.

19  BY MS. GILBERT:

20  Q.   Do you recognize this, Special Agent Minor?

21  A.   Yes, I do.

22  Q.   What is this?

23  A.   This is a photo of what appears to be the garage of the

24  Pelosi home and a blurred out picture of the pig's head.

25  Q.   And where was this found?

MINOR - DIRECT / GILBERT

```
 1   A.   This was found within the "Pelosi" folder on the

 2   defendant's computer.

 3             MS. GILBERT:  Ms. Wachs, could you pull up

 4   Exhibit 290, please.

 5   BY MS. GILBERT:

 6   Q.   Do you recall this, Special Agent Minor?

 7   A.   Yes, I do.

 8   Q.   What is this?

 9   A.   This is another photo of what appears to be the garage of

10   the Pelosi home with the pig's head and fake blood.

11   Q.   And where was this found?

12   A.   In the "Pelosi" folder on the defendant's computer.

13             MS. GILBERT:  Ms. Wachs, could we turn to Exhibit 292,

14   please.  And could you just blow up the top through files --

15   maybe the top through the first file.

16        Thank you.

17   BY MS. GILBERT:

18   Q.   Special Agent Minor, do you recognize this document?

19   A.   Yes, I do.

20   Q.   What is this showing?

21   A.   This is a report of files that were tagged on the hard

22   drive.

23   Q.   Do you know who created this bookmark?

24   A.   Yes.  I did.

25   Q.   And how many files were tagged under this bookmark?
```

**MINOR - DIRECT / GILBERT**

1  A.   Five.

2  Q.   Where were all of these files saved?

3  A.   They were saved in the Pelosi folder on the defendant's

4  computer.

5  Q.   And is that depicted in the path section of this report?

6  A.   Yes, it is.

7  Q.   I'd just like to look at this first file.

8       When was this first file modified and created?

9  A.   On October 19th of 2022.

10 Q.   And at the bottom of this section, it looks like there's a

11 little image.  What is that?

12 A.   That is a thumbnail version of the actual image that was

13 found in the folder.

14 Q.   Did you review the actual image?

15 A.   Yes, I did.

16      **MS. GILBERT:**  So, Ms. Wachs, I'm going to have you

17 jump between these two documents a bit.

18      Could you pull up Exhibit 280, please.

19 BY MS. GILBERT:

20 Q.   Do you recognize this?

21 A.   Yes, I do.

22 Q.   What is this?

23 A.   This is a photo that was in the folder with information on

24 Nancy Pelosi.

25 Q.   Do you recall Mr. Matthes' testimony earlier today about

**MINOR - DIRECT / GILBERT**

1  Exhibit 280?

2  A.   Yes, I do.

3  Q.   And what did he say about Exhibit 280?

4  A.   That it appeared to be information that had come off of

5  Spokeo.

6       MS. GILBERT:  Ms. Wachs, could we turn back to

7  Exhibit 292, on the first page.  And I'd like to look at the

8  second -- information about the second file, please.

9       Thank you.

10  BY MS. GILBERT:

11  Q.   And can you tell us the modified date of this file?

12  A.   October 19th of 2022.

13       MS. GILBERT:  And, Ms. Wachs, could you turn to the

14  second page of this exhibit so we can see the bottom of this

15  record.

16       And maybe blow up just the top through the first...

17  BY MS. GILBERT:

18  Q.   Do you recognize this, Agent Minor?

19  A.   Yes, I do.

20  Q.   Did you review the actual image?

21  A.   Yes, I did.

22       MS. GILBERT:  And, Ms. Wachs, could you turn to

23  Exhibit 278, please.

24  BY MS. GILBERT:

25  Q.   Do you recognize this, Agent Minor?

**MINOR - DIRECT / GILBERT**

1   A.   Yes.

2   Q.   What is this?

3   A.   This is a photo that's showing information about Broadway

4   Street, San Francisco, that had come off of Spokeo.

5   Q.   Or do you know if it came off of Spokeo?

6   A.   It's what appears to have come off Spokeo based on Spokeo

7   testimony earlier.

8   Q.   And is this the actual file that corresponds with the

9   information that we just discussed in Exhibit 292?

10  A.   Yes.

11  Q.   And where was this file saved?

12  A.   Within the "Pelosi" folder on the defendant's computer.

13        MS. GILBERT:   Ms. Wachs, could we turn back to

14  Exhibit 292, page 2, and let's pull up information about that

15  third file.

16  BY MS. GILBERT:

17  Q.   When was this file created and modified,

18  Special Agent Minor?

19  A.   October 27th of 2022.

20  Q.   Did you review the actual image saved related to the data

21  about this file?

22  A.   Yes, I did.

23        MS. GILBERT:   And, Ms. Wachs, could you pull up

24  Exhibit 279, please.

25  BY MS. GILBERT:

MINOR - DIRECT / GILBERT

1   Q.   Do you recognize this, Agent Minor?

2   A.   Yes, I do.

3   Q.   What is this?

4   A.   It is a photo of a screenshot of wikimapia.org, of Nancy

5   Pelosi's home.

6   Q.   And, Special Agent Minor, is this the image, the actual

7   image, that relates to the date we just looked at in

8   Exhibit 292 that was created and modified on October 27th of

9   2022?

10  A.   Yes, it is.

11  Q.   Okay.  And where was this filed saved?

12  A.   Within the "Pelosi" folder on the defendant's computer.

13       MS. GILBERT:  Ms. Wachs, let's look back -- last time,

14  I promise -- at Exhibit 292 and the last page.  Could you pull

15  up the last -- information about that last file.

16       Thank you.

17  BY MS. GILBERT:

18  Q.   And, Special Agent Minor, what was the name of this file?

19  A.   "New text document."

20  Q.   And when was it created and modified?

21  A.   October 19th of 2022.

22  Q.   Did you review this file?

23  A.   Yes, I did.

24       MS. GILBERT:  Ms. Wachs, could you please pull up

25  Exhibit 291.  And maybe make it bigger.

**MINOR - DIRECT / GILBERT**

```
 1        Thank you.
 2   BY MS. GILBERT:
 3   Q.   Do you recognize this, Special Agent Minor?
 4   A.   Yes, I do.
 5   Q.   What is this?
 6   A.   This was the contents within the "new text" document.
 7   Q.   The "new text" document that you just discussed in
 8   Exhibit 292?
 9   A.   Yes.
10   Q.   And will you remind us where this was saved?
11   A.   Within the "Pelosi" folder on the defendant's computer.
12   Q.   Does it include the Pelosis' address?
13   A.   Yes, it does.
14   Q.   Does it include any information about Mr. Pelosi?
15   A.   Yes, it does.
16        MS. GILBERT:   Thank you, Ms. Wachs.
17        If you could please pull up Exhibit 295.
18   BY MS. GILBERT:
19   Q.   Special Agent Minor, I'd like to switch gears.
20        Did you receive records from Amazon about the defendant?
21   A.   Yes, I did.
22   Q.   And we have Exhibit 295 pulled up.   It's been admitted.
23        Do you recognize this?
24   A.   Yes, I do.
25   Q.   What is it?
```

**MINOR - DIRECT / GILBERT**

1   **A.**   It is the document that I had received from Amazon.

2   **Q.**   And are these records about the defendant?

3   **A.**   Yes, they are.

4   **Q.**   In what format did you receive these records?

5   **A.**   Excel.

6   **Q.**   And that's the format that we're looking at here; correct?

7   **A.**   Correct.

8   **Q.**   So let's start with Tab 1, which I think Ms. Wachs has

9   already.

10      What does this first tab show?

11   **A.**   It shows account information, payment information, address

12   history.

13   **Q.**   Do you see the address for the defendant that you searched

14   on October 29th of 2022?

15   **A.**   Yes, I do.

16   **Q.**   And where do you see that?

17   **A.**   Under the billing address, on line 8.

18   **Q.**   And do you see the address -- the same address in another

19   part of this document as well?

20   **A.**   Within the address history.

21        **MS. GILBERT:**  And, Ms. Wachs, would you mind scrolling

22   down.  It looks like the address history scrolls down.

23      And you can stop.

24   **BY MS. GILBERT:**

25   **Q.**   Do you recognize the defendant's address here?

MINOR - DIRECT / GILBERT

```
 1   A.    Yes.
 2         MS. GILBERT:  Ms. Wachs, do you have the ability to
 3   highlight here?  Probably not.  Maybe.  Sort of.  That's pretty
 4   good.  Okay.
 5         Thank you.
 6         Let's turn to the second tab, which looks like it says
 7   "order history."
 8   BY MS. GILBERT:
 9   Q.    Special Agent Minor, it looks like there are a number of
10   columns here.
11         Is this how it was produced to you from Amazon?
12   A.    Yes.
13   Q.    But for some redactions; is that correct?
14   A.    Yes.
15   Q.    But let me ask you a question, because it looks like we
16   saw some redactions in black on the subscription info.
17         Do you know whether those were added by Amazon or added by
18   us pursuant to the Court's earlier statement about protecting
19   identifiable information?
20   A.    They were added by us.
21   Q.    And then here, it looks like there's some items that just
22   say "redacted."  Like if you look at line 6 -- Ms. Wachs -- it
23   just said redacted, but there's no black.
24         Is that how it came from Amazon?
25   A.    Yes.
```

**MINOR - DIRECT / GILBERT**

1  **Q.**   So I'd like to -- that's perfect.  We're looking now, it

2  looks like, at order date, quantity, and item description; is

3  that correct?

4  **A.**   Correct.

5  **Q.**   And what is your understanding of what this shows?

6  **A.**   It shows some of the orders that the defendant had made.

7  **Q.**   From Amazon?

8  **A.**   From Amazon.

9  **Q.**   Did you review this whole spreadsheet?

10  **A.**   Yes, I did.

11  **Q.**   Did you see anything in here related to your investigation

12  of the defendant?

13  **A.**   Yes, I did.

14  **Q.**   And just generally, what did you see in his orders that

15  was related to this investigation?

16  **A.**   It included some of the items that were seized from the

17  Pelosis' home.

18  **Q.**   And how did you make that determination?

19  **A.**   It was -- when I looked at the Amazon record and the item

20  description, I had researched it within actual Amazon to see

21  what the picture was of the item purchased and then I looked at

22  the evidence.

23  **Q.**   The physical evidence seized from the Pelosis' home; is

24  that right?

25  **A.**   Yes.

**MINOR - DIRECT / GILBERT**

```
 1   Q.   So let's walk through a few of these, if that's okay.   And
 2   I'm going to start chronologically from order date.
 3          MS. GILBERT:   Ms. Wachs, could you scroll down to Row
 4   176, please.
 5   BY MS. GILBERT:
 6   Q.   And, Special Agent Minor, what is -- what did the
 7   defendant order in Row 176?
 8   A.   A mini body cam.
 9   Q.   And what date did the defendant order that?
10   A.   July 4th of 2022.
11   Q.   And did this correspond with any of the physical evidence
12   you reviewed?
13   A.   Yes.
14   Q.   I'm going to grab something.   One second.
15        If it's okay with you, I'm just going to hold some of
16   these up instead of walking over there.   Is that okay?
17        I'm holding up what's been marked as 231.   Is this
18   consistent with what the defendant ordered on July 4th of 2022?
19   A.   Yes, it is.
20   Q.   And what is this?
21   A.   That is the mini body camera.
22   Q.   Okay.   What about the -- what's the next item you see
23   that's related to this investigation?
24   A.   Spooktacular unicorn costume.
25   Q.   And what date was that ordered?
```

**MINOR - DIRECT / GILBERT**

1    A.    August 24th of 2022.

2    Q.    And I'm holding up Exhibit 206.  Is this what you believe

3    the defendant ordered on that day?

4    A.    Yes.

5    Q.    Can you go to the next item that you believe is related to

6    this investigation?

7        What is that?

8    A.    The Wyler's Light singles.

9    Q.    When did the defendant order those?

10    A.    August 24th of 2022.

11    Q.    I'm holding up what has been marked as Exhibit 201.  Are

12    these -- is Exhibit 201 consistent with what you see he ordered

13    on that day?

14    A.    Yes.

15    Q.    Okay.  What about Row 180; what did the defendant order

16    there?

17    A.    Teclast Android 11 tablet.

18    Q.    What day was that ordered?

19    A.    August 24th of 2022.

20    Q.    I'm showing you what's been marked Exhibit 228.  Is this

21    consistent with what the defendant ordered that day?

22    A.    Yes.

23    Q.    What about Row 181?

24    A.    It is a 100-liter camping/hiking backpack.

25    Q.    What date did the defendant order this?

**MINOR - DIRECT / GILBERT**

1    A.    August 24th of 2022.

2    Q.    I'm trying to find the exhibit label.

3                    (Pause in proceedings.)

4    BY MS. GILBERT:

5    Q.    I'm holding up what's been marked as Exhibit 177.  Do you

6    recognize this as the same item that he ordered in Row 181?

7    A.    Yes.

8    Q.    Can you look at Row 183, please.  What did the defendant

9    order then?

10   A.    A BOBLOV body camera.

11   Q.    When did the defendant order that?

12   A.    August 24th of 2022.

13   Q.    I'm holding up Exhibit 232.  Do you recognize this as the

14   same item that the defendant ordered on that day?

15   A.    Yes.

16   Q.    Can you look at Row 184?  What did the defendant order?

17   A.    Crayons.

18   Q.    And what day?

19   A.    August 24th of 2022.

20   Q.    Holding up Exhibit 211.  Is this consistent with what the

21   defendant ordered that day?

22   A.    Yes.

23   Q.    Can you look at Row 185?

24         What did the defendant order?

25   A.    An ALPS Mountaineering sleeping bag.

MINOR - DIRECT / GILBERT

1   **Q.**   On what day?

2   **A.**   August 24th of 2022.

3   **Q.**   I'm holding up what's been marked Exhibit 174.  Is this

4   sleeping bag consistent with the sleeping bag you see he

5   ordered on this day?

6   **A.**   Yes.

7   **Q.**   Would you look at Row 186, please, and tell us what the

8   defendant ordered?

9   **A.**   Solar power banks and three of them.

10   **Q.**   What day did he order these?

11   **A.**   August 24th of 2022.

12   **Q.**   I'm holding up what's been marked Exhibit 207.  Are these

13   three items consistent with what the defendant ordered on that

14   day?

15   **A.**   Yes.

16   **Q.**   What about Row 187?

17   **A.**   USB-C memory stick.

18   **Q.**   When was that ordered?

19   **A.**   September 6th of 2022.

20   **Q.**   I'm holding up what we entered this morning as

21   Exhibit 234.  Is this memory stick consistent with the item you

22   see he ordered on that day?

23   **A.**   Yes.

24   **Q.**   What about the -- Row 188, please.

25   **A.**   Cable Matters braided USB-C to micro USB-C cable.

MINOR - DIRECT / GILBERT

1  Q.   When did the defendant order that item?

2  A.   September 6th of 2022.

3  Q.   So I'm going to hand you what's been marked Exhibit 209,

4  which contains a few items inside, and ask if you can identify

5  the item in Row 188.

6          MS. GILBERT:  May I approach, Your Honor?

7          THE COURT:  You may.

8                (Counsel approaches witness.)

9  BY MS. GILBERT:

10 Q.   Can you describe what you're holding up, Agent Minor?

11 A.   This is a USB-C to micro USB cable.

12 Q.   And could you tell us what the defendant ordered in Row

13 189, please.

14 A.   Type C charger 10-foot cable.

15 Q.   When was that ordered?

16 A.   September 6th of 2022.

17 Q.   Do you see that item within Exhibit 209?

18 A.   Yes.

19 Q.   Can you describe what you're holding up?

20 A.   This is the USB-C cable.

21 Q.   What about Row 190?

22 A.   FOVAL car power inverter.

23 Q.   What date did the defendant order this?

24 A.   September 6th of 2022.

25 Q.   Do you recognize it within Exhibit 209?

**MINOR - DIRECT / GILBERT**

1  A.   Yes.

2  Q.   Looks like you're holding up an item with a red box; is

3  that correct?

4  A.   That's correct.

5  Q.   What about Row 191?

6  A.   A laptop sleeve.

7  Q.   And when did the defendant order this?

8  A.   September 7th of 2022.

9  Q.   I'm holding up what's been marked Exhibit 237.  Is this

10  consistent with what the defendant ordered?

11  A.   Yes.

12  Q.   And does 237 contain items in addition to a laptop sleeve?

13  A.   Yes, it does.

14  Q.   What did the defendant order this day that's consistent

15  with 237?

16  A.   Just the sleeve.

17  Q.   What about Row 192?

18  A.   Another Spooktacular unicorn costume.

19  Q.   On what day?

20  A.   September 13th of 2022.

21  Q.   Is that consistent with Exhibit 206, which I'm holding up?

22  A.   Yes.

23  Q.   And finally, what did the defendant order in the last row?

24  A.   An upgraded Switch battery replacement.

25  Q.   On what day?

1  A.   September 13th of 2022.

2  Q.   Do you know what a Switch is?

3  A.   Yes.

4  Q.   What is it?

5  A.   It is a gaming device.

6  Q.   Did the SFPD recover a Switch from the defendant's items?

7  A.   Yes, they did.

8  Q.   I'm holding up what's been marked Exhibit 208.  Is this

9  the Switch that was recovered?

10  A.   Yes, it was.

11  Q.   I have one final thing to ask you about, but let me just

12  take the gloves off, if that's okay.

13        THE COURT:  Okay.

14        MS. GILBERT:  Your Honor, at this time, I'd like to

15  read into the record another stipulation entered into by the

16  parties regarding Exhibit 10.

17        THE COURT:  Go ahead.

18        MS. GILBERT:  The stipulation states:

19     On January 27th of 2023, David DePape called Amber Lee, a

20  reporter with KTVU.  That call was recorded and an excerpt of

21  that call is Exhibit 10.

22     Ms. Wachs, could you please pull up Exhibit 10.  This is

23  just over two minutes long, and could you please play this all

24  the way through, and then I will ask Special Agent Minor a few

25  final questions.

**MINOR - DIRECT / GILBERT**

1       (Audio played but not reported.)

2  **BY MS. GILBERT:**

3  **Q.**   Special Agent Minor, did you hear the reporter Amber Lee

4  say:  They released the video earlier today?

5  **A.**   Yes.

6  **Q.**   And did you hear the defendant say:  Now that you all have

7  seen the body cam footage?

8  **A.**   Yes.

9  **Q.**   Do you know whether body camera footage related to this

10  case was publicly released on the day of this call,

11  January 27th of 2023?

12  **A.**   Yes.

13  **Q.**   Do you know what body cam footage was released?

14  **A.**   Yes.

15  **Q.**   What was that?

16  **A.**   It was the body cam footage from one of the responding

17  officers.

18  **Q.**   What did it show?

19  **A.**   It showed the assault.

20  **Q.**   On who?

21  **A.**   On Paul Pelosi by the defendant.

22  **Q.**   And was this portion of that video published by news

23  agencies?

24  **A.**   Yes, it was.

25          **MS. GILBERT:**  No further questions, Your Honor.

MINOR - CROSS / LINKER

1          **THE COURT:**  Thank you.

2       Ms. Linker.

3                          <u>CROSS-EXAMINATION</u>

4    **BY MS. LINKER:**

5    **Q.**   Good afternoon, Special Agent Minor.

6       You testified you're the lead investigator in this case;

7    correct?

8    **A.**   That's correct.

9    **Q.**   And that's just on the federal case; correct?

10   **A.**   That's correct.

11   **Q.**   And you had been an agent for about three years when you

12   were assigned to this investigation?

13   **A.**   That's correct.

14   **Q.**   You keep track, as the lead investigator, of everyone who

15   is interviewed for this case; correct?

16   **A.**   Correct.

17   **Q.**   You're informed of any interview or investigation done by

18   any federal agent; correct?

19   **A.**   Correct.

20   **Q.**   And in coordination with the SFPD, you're informed of any

21   interview that's done by the SFPD on this case as well;

22   correct?

23   **A.**   For the most part.

24   **Q.**   Are you aware of anything you have not been informed of by

25   SFPD?

**MINOR - CROSS / LINKER**

1  A.   Not that I'm aware of.

2  Q.   You're in regular contact with the State investigators?

3  A.   Generally.

4  Q.   And you're trained to write reports of your interviews;

5  correct?

6  A.   That's correct.

7  Q.   You write reports every time you talk to a witness?

8  A.   That's correct.

9  Q.   That includes writing reports when you talk to an alleged

10  victim?

11  A.   Correct.

12  Q.   Or any other family member of a victim?

13  A.   Specifically that.

14  Q.   If you interview the family member of a victim, do you

15  write a report of that?

16  A.   Yes.

17  Q.   If you interview any witness, do you write a report of

18  that?

19  A.   Yes.

20  Q.   So that there can be a complete and accurate report of

21  what you talked to that individual about; correct?

22  A.   Yes.

23  Q.   And what was said during those interviews; correct?

24  A.   Yes.

25  Q.   And that's true of all FBI agents?

MINOR - CROSS / LINKER

1    **A.**    Correct.

2    **Q.**    And the FBI calls these reports 302s?

3    **A.**    Correct.

4    **Q.**    That's our government shorthand because it's the form

5    number; correct?

6    **A.**    Yes.

7    **Q.**    And as the lead agent on this case, you are familiar with

8    all of the 302s, all of the reports, related to this -- the

9    federal case?

10   **A.**    For the most part.

11   **Q.**    For the most part?

12   **A.**    Yes.

13   **Q.**    As the lead case agent, would you not receive every 302

14   that is relevant to this federal case?

15   **A.**    Yes, I would receive them within my case file.

16   **Q.**    And you review them; correct?

17   **A.**    Yes.

18   **Q.**    Because you need to be the person most knowledgeable about

19   the investigation; correct?

20   **A.**    Correct.

21   **Q.**    And you have personally interviewed several people to

22   thoroughly investigate this case; correct?

23   **A.**    Yes.

24   **Q.**    And work has been done by other agents of the FBI as well;

25   correct?

**MINOR - CROSS / LINKER**

1    **A.**    Correct.

2    **Q.**    And work has been done by San Francisco Police Department

3    officers as well?

4    **A.**    Correct.

5    **Q.**    Related to this case as well as the State case; correct?

6    **A.**    I'm only aware of my case.

7    **Q.**    Among others, you interviewed Paul Pelosi on -- I think

8    it's now three occasions; is that correct?

9    **A.**    Correct.

10   **Q.**    That was on October 30th, 2022?  Yes?

11   **A.**    Correct.

12   **Q.**    October 24th, 2023?

13   **A.**    Correct.

14   **Q.**    And just yesterday; correct?

15   **A.**    Correct.

16   **Q.**    And that was after he had given two statements to

17   San Francisco Police Department officers; correct?

18   **A.**    Yes.  In the body cam, yes.

19   **Q.**    He gave a statement to Officer Starks while he was in the

20   ambulance on the way to the hospital; correct?

21   **A.**    Yes.

22   **Q.**    And he also gave a statement to Officer Fuller when he was

23   at the hospital; correct?

24   **A.**    Correct.

25   **Q.**    And you were present with Sergeant Hurley when she spoke

**MINOR - CROSS / LINKER**

1  with Mr. Pelosi on the 30th; correct?

2  **A.**  Yes, I was.

3  **Q.**  And she did the lead of the interview of Mr. Pelosi;

4  correct?

5  **A.**  Correct.

6  **Q.**  But you were also present?

7  **A.**  I was.

8  **Q.**  How many times did you interview Nancy Pelosi about this

9  case?

10  **A.**  I did not.

11  **Q.**  How many times did any other federal agent interview Nancy

12  Pelosi about this case?

13  **A.**  None that I am aware of.

14  **Q.**  How many times did the SFPD interview her about this case?

15  **A.**  I'm not aware of any.

16  **Q.**  I want to shift gears for a moment to some of the photos

17  that we just looked through.

18         **MS. LINKER:**  Ms. Cruz-Laurcirica, could you pull up --

19  let's start with Exhibit 282.  It's already been admitted.

20      Exhibit 282, then go to 284.

21  **BY MS. LINKER:**

22  **Q.**  If you could look at these, Agent Minor, please.  285,

23  286, 287, 288, 290.

24      Those are all photos that were downloaded from the

25  internet; correct?

MINOR - CROSS / LINKER

1    A.    Correct.

2    Q.    Those are not photos that Mr. DePape took; correct?

3    A.    Correct.

4    Q.    Those are not anything that he had anything to do with

5    other than download them onto his computer; correct?

6    A.    Correct.

7    Q.    At Exhibit 291 --

8          MS. LINKER:   Ms. Cruz-Laurcirica, if you could pull

9    that up.

10   BY MS. LINKER:

11   Q.    In the middle of that -- the largest paragraph that

12   starts -- do you see those numbers in the middle, 304, 305?

13   A.    Yes.

14   Q.    And those look to be maybe footnotes embedded in

15   something?

16   A.    Potentially.

17   Q.    And you testified earlier that you went to a lot of the

18   web pages that Mr. DePape went through with his search history;

19   correct?

20   A.    I only talked about visiting those two.

21   Q.    In your investigation, did you go to several of the

22   web pages that Mr. DePape looked at?

23   A.    Generally, no, I did not.

24   Q.    You only looked at two web pages?

25   A.    No.  I said I generally looked at some of them but not all

**MINOR - CROSS / LINKER**

1   of them.

2   Q.   Did you look at Nancy Pelosi's Wikipedia page?

3   A.   I did not.

4   Q.   If I could direct you to Exhibit 274.  If we could go to

5   page 8 of that exhibit on Record 19.

6        That shows that Mr. DePape went to the personal life

7   section of Nancy Pelosi's Wikipedia page; correct?

8   A.   That's correct.

9   Q.   Are you generally familiar with Wikipedia?

10  A.   Yes.

11  Q.   And it contains biography information?

12  A.   Yes.

13  Q.   And it has footnotes embedded in it?

14  A.   Yes.

15  Q.   And the image that we looked at at Exhibit 291 looks like

16  something that very well could have been cut and pasted from

17  Wikipedia; correct?

18  A.   I don't know.

19        MS. LINKER:  You can take that down, please.  Thank

20  you.

21  BY MS. LINKER:

22  Q.   We just listened to a clip of a call to a reporter that

23  was Exhibit 10; correct?

24  A.   Yes.

25  Q.   And that's not the entirety of the call to the reporter;

**MINOR - CROSS / LINKER**

1   correct?

2   **A.**   Correct.

3   **Q.**   That's just an excerpt?

4   **A.**   Yes.

5   **Q.**   And it's only two minutes of that call?

6   **A.**   Yes.

7   **Q.**   You testified that you executed a search of Mr. DePape's

8   residence in Richmond, California?

9   **A.**   Correct.

10  **Q.**   And in order to have authority to do such a search, you

11  needed to get a search warrant; correct?

12  **A.**   Correct.

13  **Q.**   How do you get a search warrant?

14  **A.**   I requested one, and I wrote an affidavit.

15  **Q.**   And you say you wrote an affidavit.  What do you include

16  in an affidavit?

17  **A.**   I included information that I had watched on the body cam.

18  **Q.**   And you swear under oath to certain facts to try to

19  convince a judge that there's probable cause that evidence of a

20  crime will be located in a particular place; correct?  Is that

21  a --

22  **A.**   Correct.

23  **Q.**   -- fair statement?

24       You can't talk over me.

25       Is that correct?

**MINOR - CROSS / LINKER**

1    **A.**   That's correct.

2    **Q.**   Thank you.

3         And you were the one who personally swore, under oath,

4    these facts to get a judge to sign a search warrant; correct?

5    **A.**   Correct.

6    **Q.**   And you signed that affidavit under penalty of perjury?

7    **A.**   Yes.

8    **Q.**   And that was on October 29, 2022?

9    **A.**   Yes.

10   **Q.**   And you attested to certain facts based on your training

11   and experience?

12   **A.**   Yes.

13   **Q.**   You also swore to facts based on watching SFPD responding

14   officers' body-worn camera footage and dispatch and police

15   reports; correct?

16   **A.**   Yes.

17   **Q.**   So that included the body-worn camera footage that was

18   shown to the jury; correct?

19   **A.**   Correct.

20   **Q.**   And you also had listened to the entire recording of

21   Mr. DePape that had been conducted -- of the interview that had

22   been conducted by Sergeant Hurley; correct?

23   **A.**   I didn't listen to all of it at the time.

24   **Q.**   How much of it do you think you had listened to at that

25   time?

MINOR - CROSS / LINKER

1   A.   I can't recall.

2   Q.   A good chunk of it; fair to say?

3   A.   Not a good chunk of it.  Not even half of it.

4   Q.   Not even half of it.

5        You spoke with Sergeant Hurley about it?

6   A.   Yes, I did.

7   Q.   And so you had an understanding of what was contained in

8   that -- those statements during that interview; correct?

9   A.   Correct.

10  Q.   And you used the information that you gleaned from

11  Sergeant Hurley, and from your review of at least portions of

12  that interview, in your search warrant affidavit; correct?

13  A.   Correct.

14  Q.   And you know it was important to be truthful in that

15  affidavit; correct?

16  A.   Yes.

17  Q.   And thorough?

18  A.   Yes.

19  Q.   Accurate?

20  A.   Yes.

21  Q.   As detailed as possible?

22  A.   Yes.

23  Q.   You had not personally interviewed Mr. DePape; correct?

24  A.   Correct.

25  Q.   You have never interviewed Mr. DePape; correct?

**MINOR - CROSS / LINKER**

1   **A.**   Correct.

2   **Q.**   Sergeant Hurley is the one who took the lead on that

3   interview?

4   **A.**   Correct.

5   **Q.**   And that's the one we discussed on Thursday that lasted

6   about an hour?

7   **A.**   Correct.

8   **Q.**   And was recorded?

9   **A.**   Correct.

10   **Q.**   You were present in court when we heard a few excerpts

11   from it; correct?

12   **A.**   Correct.

13   **Q.**   And since doing your affidavit, you've listened to the

14   whole hour; correct?

15   **A.**   Correct.

16   **Q.**   So, as I said, information from Sergeant Hurley's

17   interview with Mr. DePape contributed to your investigation;

18   correct?

19   **A.**   Correct.

20   **Q.**   Part of the basis for seeking the search warrant was

21   because you knew that Mr. DePape had a list of targets?

22   **A.**   That is what he said in the interview.

23   **Q.**   And part of the basis that you got the search warrant was

24   because you knew that Mr. DePape had a list of targets;

25   correct?

**MINOR - CROSS / LINKER**

1  **A.**   Correct.

2  **Q.**   That list of targets extended beyond Nancy Pelosi;

3  correct?

4  **A.**   Correct.

5  **Q.**   And you wanted to investigate further to find out if

6  anyone else was in danger; fair to say?

7  **A.**   Correct.

8  **Q.**   And also to investigate what happened here?

9  **A.**   Correct.

10 **Q.**   You included that information that you learned from

11 Sergeant Hurley in your affidavit as a basis for your probable

12 cause to search his apartment and to seize his electronic

13 devices; correct?

14 **A.**   Correct.

15 **Q.**   You included in that search warrant affidavit that -- a

16 list of -- that he had a list of politicians and celebrities

17 that he wanted to contact; correct?

18        **MS. GILBERT:**  Objection, Your Honor.  Calls for

19 hearsay.

20        **THE COURT:**  Well, yeah.  The purpose.  What is the

21 purpose?

22        **MS. LINKER:**  To show how the investigation was guided

23 in going to the home.

24        **THE COURT:**  I don't see how that's relevant.  I don't

25 see -- I think this is similar to the other.  I'm going to

 1   sustain it.  How the investigation was guided I don't think has

 2   any bearing.  At this point, at least a showing has been made,

 3   and it does seem to go directly to being offered for the truth.

 4          MS. LINKER:  If I may just briefly.  We went through a

 5   great deal of detail about what was on those electronic

 6   devices.  The basis for searching those electronic devices was

 7   this officer's -- this agent's understanding of what they were

 8   going to be able to get on those, and we want to be able to

 9   show what was on those devices.

10          THE COURT:  Okay.  Objection sustained.

11   BY MS. LINKER:

12   Q.   You understood information about that list we've

13   discussed, and that list included Target 1?

14   A.   Correct.

15   Q.   Included Tom Hanks?

16   A.   Correct.

17   Q.   It included Gavin Newsom?

18   A.   Correct.

19   Q.   It included George Soros?

20   A.   I'm not aware.

21   Q.   It included Mike Pence?

22   A.   Yes.

23   Q.   It included Hunter Biden?

24   A.   Yes.

25   Q.   You knew that Mr. DePape had researched Nancy Pelosi and

**MINOR - CROSS / LINKER**

1  Target 1's residences; correct?

2  **A.**   Correct.

3  **Q.**   And you knew that he believed that Nancy Pelosi's

4  residence would be easier to access?

5         **MS. GILBERT:**  Objection, Your Honor.  Calls for

6  hearsay.

7         **THE COURT:**  Sustained.

8         **MS. LINKER:**  I asked what she knew, Your Honor.

9         **THE COURT:**  I know you asked what she knew, but the

10  question is what is the purpose?

11     Objection sustained.

12  **BY MS. LINKER:**

13  **Q.**   You knew that he had a piece of paper in his pocket that

14  had two addresses on it?

15  **A.**   Correct.

16  **Q.**   And one phone number?

17  **A.**   Correct.

18  **Q.**   I want to pull up a couple more -- look again at a couple

19  of the photos you talked about when you searched Mr. DePape's

20  residence.

21     You searched the whole residence.  Did I understand that

22  correctly?

23  **A.**   I had a team of agents help me search the whole residence.

24  **Q.**   But you looked around the whole unit where he lived?

25  **A.**   Correct.

MINOR - CROSS / LINKER

1   **Q.**   And you saw all of the rooms?

2   **A.**   The one room, yes.

3   **Q.**   The whole unit where he lived was one room; is that

4   correct?

5   **A.**   Correct.

6          **MS. LINKER:**  So if we could pull up Exhibit 240,

7   please.

8   **BY MS. LINKER:**

9   **Q.**   Do you see, in the right-hand middle side of that picture,

10  there's a fridge?

11  **A.**   Yes.

12  **Q.**   Is that considered, then, his kitchen?

13  **A.**   I don't know.

14  **Q.**   There was no other kitchen area, was there?

15  **A.**   Not there.

16         **MS. LINKER:**  If we could pull up Exhibit 242.

17  **BY MS. LINKER:**

18  **Q.**   And that mat, you said that's the only sleeping mat or bed

19  that you saw in that one room; correct?

20  **A.**   Correct.

21  **Q.**   And we didn't see any pictures of any bathroom; correct?

22  **A.**   Correct.

23  **Q.**   Was there a bathroom in that unit?

24  **A.**   No.

25  **Q.**   You found several of the items that have been presented at

MINOR - CROSS / LINKER

| | |
|---|---|
| 1 | this trial; correct? |
| 2 | A.   Correct. |
| 3 | Q.   You found quite a bit of gaming equipment? |
| 4 | A.   Correct. |
| 5 | Q.   You found several books? |
| 6 | A.   Correct. |
| 7 | Q.   You found articles that he had printed out? |
| 8 | A.   Correct. |
| 9 | Q.   And I'd like to show you what's been marked as |
| 10 | Exhibit 579. |
| 11 | MS. LINKER:  May I approach, Your Honor? |
| 12 | THE COURT:  You may. |
| 13 | (Counsel approaches witness.) |
| 14 | BY MS. LINKER: |
| 15 | Q.   What's that? |
| 16 | A.   It is an article. |
| 17 | Q.   And is this an article that you found in Mr. DePape's |
| 18 | residence? |
| 19 | A.   I believe it is, yes. |
| 20 | Q.   And that you seized as part of your search of his |
| 21 | residence? |
| 22 | A.   Correct. |
| 23 | Q.   And you seized it based on the search warrant that you |
| 24 | swore under oath? |
| 25 | A.   Correct. |

1           MS. LINKER:  I'd like to move Exhibit 579 into

2    evidence.

3           MS. GILBERT:  No objection, Your Honor.

4           THE COURT:  579 admitted.

5       (Trial Exhibit 579 received in evidence.)

6           MS. LINKER:  If we could publish that?

7           THE COURT:  You may.

8    BY MS. LINKER:

9    Q.   What's the title of that article?

10   A.   The title is "Is George Soros Carrying on the Work of

11   Hitler?"

12   Q.   And is this a representative example of some of the

13   articles and things you found in Mr. DePape's residence?

14   A.   Yes.

15   Q.   As the lead case agent, you're also aware of everything

16   that was found in the search of his belongings at the Pelosi

17   home; correct?

18   A.   Yes.

19   Q.   In all of the searches that were done, no bombs were

20   found; correct?

21   A.   No.

22   Q.   No explosives were found?

23   A.   No.

24   Q.   No hazardous materials were found?

25   A.   No.

MINOR - CROSS / LINKER

1  **Q.**    No firearms were found?

2  **A.**    No.

3  **Q.**    No knives were found?

4  **A.**    There was a sword or cutlass or saber.

5  **Q.**    With a lot of cobwebs on it that looked like an old, sort

6  of ornamental sword?

7  **A.**    Correct, yes.

8  **Q.**    You did find quite a few electronic devices; correct?

9  **A.**    Correct.

10  **Q.**    And the FBI was allowed to seize numerous electronic

11  devices based on the search warrant; correct?

12  **A.**    Correct.

13  **Q.**    And you were also able to search --

14        **THE COURT:**  Hold on a second.

15        **UNIDENTIED SPEAKER:**  So sorry.

16        **THE COURT:**  Go ahead.  Repeat your question.

17  **BY MS. LINKER:**

18  **Q.**    You were able to seize several electronic devices?

19  **A.**    Correct.

20  **Q.**    And search them?

21  **A.**    Correct.

22  **Q.**    Because you had requested permission to search them based

23  on your search warrant affidavit; correct?

24  **A.**    Correct.

25  **Q.**    And you requested that permission because you believed

MINOR - CROSS / LINKER

1   evidence of the crimes would be found on those electronic

2   devices; correct?

3   **A.**   Correct.

4   **Q.**   You knew that searching the information on the computer

5   and other electronic storage media would help answer the why of

6   the criminal conduct; correct?

7   **A.**   Correct.

8   **Q.**   You knew information stored within a computer and other

9   electronic storage media may provide crucial evidence of the

10   who, what, why, when, where, and how of the criminal conduct

11   under investigation, thus enabling the United States to

12   establish and prove each element, or alternatively, to exclude

13   the innocent from further suspicion; correct?

14            **MS. GILBERT:**   Your Honor, we object.   This is all

15   hearsay that the counsel is leading in the witness's prior

16   statement.

17            **THE COURT:**   Well, she's asking her if she agrees with

18   the question, so overruled.

19            **THE WITNESS:**   Generally, yes.   That was a long

20   question.

21   **BY MS. LINKER:**

22   **Q.**   You knew that the stuff on the computer would tell you the

23   why?

24   **A.**   I believed it would help answer the why.

25   **Q.**   You also knew that the information stored within a

1   computer may provide relevant insights into the computer user's

2   state of mind as it relates to the offense under investigation.

3   For example, information within the computer may indicate the

4   owner's motive and intent to commit a crime; is that true?

5   **A.**   Yes.

6   **Q.**   How many devices total do you estimate you seized and

7   searched from Mr. DePape in total?

8   **A.**   I can't recall.

9   **Q.**   Over 10?

10  **A.**   I cannot recall.

11  **Q.**   15 seem like a fair number to you?

12  **A.**   I cannot recall.

13  **Q.**   Does 15 seem like a fair number to you?

14  **A.**   I'm not going to estimate the numbers if I don't know.

15  **Q.**   Should we go through them?  There was a tablet; correct?

16  **A.**   Correct.

17  **Q.**   An SD card?

18  **A.**   Correct.

19  **Q.**   A phone?

20  **A.**   Correct.

21  **Q.**   Several USB devices?

22  **A.**   I can't recall how many.

23  **Q.**   More than one?

24  **A.**   I can't recall exactly.

25  **Q.**   Two hard drives?

MINOR - CROSS / LINKER

```
1    A.    I can't recall how many hard drives.

2    Q.    A laptop?

3    A.    Correct.

4    Q.    Another two hard drives?

5    A.    I can't recall how many hard drives.

6    Q.    Body-worn cameras?

7    A.    Correct.

8    Q.    Several other gaming machines that have hard drives?

9    A.    Correct.

10   Q.    So fair to say more than 10 devices?

11   A.    Correct.

12   Q.    Close to 15?

13   A.    Correct.

14   Q.    And you conducted forensic evaluations of all of those

15   devices?

16   A.    No.

17   Q.    You conducted forensic evaluations of all of the -- of all

18   of the hard drives?

19   A.    Correct.

20   Q.    Of all of the USB drives?

21   A.    Correct.

22   Q.    Of all of the SD cards?

23   A.    Correct.

24   Q.    Of all of the phones?

25   A.    Correct.
```

**MINOR - CROSS / LINKER**

1   **Q.**   Of all of the tablets?

2   **A.**   Correct.

3   **Q.**   And you specifically searched each device for information

4   about all of the targets on his list; correct?

5   **A.**   I personally did not search all of the devices.  I had a

6   team helping me.

7   **Q.**   So the FBI team searched each of those devices for

8   information about all of the -- all of his targets; correct?

9   **A.**   The potential targets, yes.

10  **Q.**   And the forensic team tagged all of the evidence on the

11  devices on the targets?

12  **A.**   Correct.

13  **Q.**   And as we talked about, to "tag it" just means to note it

14  so that you can create one of those reports we looked at?

15  **A.**   Yes.

16  **Q.**   Is that fair?

17      And you found, on his devices, information on each of the

18  targets Mr. DePape discussed with Sergeant Hurley; correct?

19          **MS. GILBERT:**  Objection, Your Honor.  Calls for

20  hearsay.

21          **THE COURT:**  Overruled.

22          **THE WITNESS:**  I personally did not.  I had a team of

23  agents assist me.

24  **BY MS. LINKER:**

25  **Q.**   You and your team of agents found information on each of

MINOR - CROSS / LINKER

1   the targets Mr. DePape discussed with Sergeant Hurley; correct?

2   A.   I can't recall.   I was focused on one individual.

3   Q.   You were focused just on one individual?

4   A.   Correct.

5   Q.   You didn't focus on all of the other targets?

6   A.   Correct.   That's why I had a team of agents.

7   Q.   So your team of agents, though, reported back to you what

8   they found?

9   A.   For the most part.

10  Q.   And they found information on each of the targets that

11  Mr. DePape discussed with Sergeant Hurley; correct?

12  A.   Correct.

13  Q.   You found -- your team of agents -- you and your team of

14  agents found numerous photos of those targets; correct?

15  A.   On some of them, yes.

16  Q.   Found numerous photos of Tom Hanks?

17  A.   Correct.

18  Q.   Found evidence that Mr. DePape had researched each of

19  these individuals; correct?

20  A.   Yes.

21  Q.   You found that based on his Firefox web history; correct?

22  A.   Correct.

23  Q.   Based on his Google searches; correct?

24  A.   Correct.

25  Q.   Based on his Google Map searches; correct?

1   A.   Correct.

2   Q.   And based on his Spokeo searches; correct?

3   A.   Correct.

4   Q.   Let's go through a few of the examples.

5           MS. LINKER:   Let's look at Exhibit 274, please,

6   Ms. Cruz-Laurcirica.   If we could pull that up.

7       And we'll pull up the redacted version of that.

8   BY MS. LINKER:

9   Q.   I just want to be clear:   This report only includes the

10  information that you tagged; correct?

11  A.   Myself and team of agents.

12  Q.   And you were focused on one person on the list at this

13  point; correct?

14  A.   Correct.

15  Q.   So this report includes -- is primarily focused on Nancy

16  Pelosi; correct?

17  A.   Correct.

18  Q.   It doesn't collect the universe of information that was on

19  his device; correct?

20  A.   Correct.

21          MS. LINKER:   So at page 4, Record 1, and the jury --

22      If Your Honor could remind the jury, they will get an

23  unredacted version of this.

24          THE COURT:   So we've redacted, again, the personally

25  identifying information.

MINOR - CROSS / LINKER

```
 1   BY MS. LINKER:
 2   Q.   This shows that Mr. DePape visited Target 1's Wikipedia
 3   page two times; correct?
 4   A.   Correct.
 5   Q.   And that he last visited that on October 26th, 2022?
 6   A.   Correct.
 7   Q.   And just to repeat something that -- is it Agent Ng or
 8   Ms. Ng?  I don't know if she's an agent.
 9   A.   She's not an agent.
10   Q.   -- that she stated -- where it says "evidence," that's
11   just the default of what the program puts in there; correct?
12   A.   Correct.
13   Q.   There's no weight to be put on that label; correct?
14   A.   Correct.
15   Q.   If we could turn, then, to page 86, Record 318.
16        This shows a visit to the website
17   sanayhealth.com/tomhankshouse; correct?
18   A.   Correct.
19   Q.   And that was last visited on October 27th, 2022, at
20   7:05 p.m.?
21   A.   Correct.
22   Q.   So the night of the incident; correct?
23   A.   Correct.
24        MS. LINKER:  We could then, Ms. Cruz-Laurcirica, turn
25   to page 172, Record 567.
```

MINOR - CROSS / LINKER

**BY MS. LINKER:**

Q.   And this shows a visit to something titled "356 Tom Hanks House Photos and Premium High-Res Pictures, Getty Images"; correct?

A.   Correct.

Q.   And that was last visited that same day, October 27th, 2022, at 7:10 p.m.?

A.   Correct.

Q.   And if we could now turn to page 237, Record 765.

     And that has something titled "Tom Hanks Accusations of Rape and the Meat Clock"; correct?

A.   Correct.

Q.   And that was also visited on that same date, October 27, 2022, at 7:46 p.m.?

A.   Correct.

Q.   I'd like to go back -- on page 8 of that, at Record 18, you testified about this entry.

     In that, it shows, where it says "typed," what does it say?

A.   "No."

Q.   So he was led there from another website to get to that link; is that correct?

A.   Based on Ms. Ng's testimony, yes.

Q.   And it's to the biography portion of Nancy Pelosi's website; is that correct?

MINOR - CROSS / LINKER

```
 1   A.    Correct.

 2   Q.    And have you looked at her house.gov web page?

 3   A.    I have not.

 4   Q.    You're not familiar with it at all?

 5   A.    Not at all.

 6   Q.    If we could turn to Exhibit 277, I want to point out a few

 7   other things that we didn't talk about earlier.

 8         At page 4, Record 1, there's a search about Hunter Biden

 9   meme ballot, write in Hunter Biden; is that correct?

10   A.    Correct.

11         MS. LINKER:  And at pages 9 through 11 -- and I'll

12   allow Ms. Cruz-Laurcirica some time to do it.

13   BY MS. LINKER:

14   Q.    Starting at Record 19 and then we'll go on to page -- to

15   Records 20 to 25.  Those are all related to Target 1?

16   A.    I'd have to see them to verify.

17   Q.    Do you have Exhibit 277 up there?

18   A.    Yes.

19   Q.    And that's at page 9 to 11, records 19 to 25?

20   A.    Correct.

21   Q.    Those are all related to Target 1; correct?

22   A.    Correct.

23   Q.    Page 14, Record 32.

24         That's related to Adam Schiff?

25   A.    Correct.
```

1    **Q.**    Page 26, Record 71.   Related to Gavin Newsom?

2    **A.**    Correct.

3    **Q.**    Then page 29, Record 82, again, related to Tom Hanks

4    family photos?

5    **A.**    Correct.

6          **MS. LINKER:**   Your Honor, we're going to look at

7    Exhibit 276 in an unredacted form, so if we could turn off the

8    monitors, the public-facing monitors.

9          **THE COURT:**   We're showing the jury some exhibits with

10   personally identifying information.   So it's being shown to the

11   jury and not to the public.

12                    (Pause in proceedings.)

13        **THE COURT:**   Why don't we do this, since it's 2:00.

14   Let's take our 10-minute afternoon break, and we'll figure out

15   this issue.

16      So, members of the jury, please do not discuss the

17   evidence whatsoever.

18                    (The jury leaves the courtroom.)

19     (Proceedings were heard out of the presence of the jury.)

20        **THE COURT:**   You may be seated.   We can either -- do

21   you have -- hard copies can be made to hand to them?

22        **MS. LINKER:**   I think it's going to be fine.   She's

23   going to be able to see it.

24        **THE COURT:**   Oh, you just want her, not the jury.

25        **MS. LINKER:**   I just want her to be able -- that's why

 1  we turned off their monitors.

 2          THE COURT:  I thought Ms. Means was saying that they

 3  couldn't be turned off.

 4          MS. CHUANG:  I think we physically turned off the

 5  monitors.

 6          THE COURT:  You did it already?

 7          MS. CHUANG:  Yes, yes.

 8          MS. LINKER:  We'll just try it right now, but we

 9  physically turned off -- we basically pulled the plug.

10          THE COURT:  Yeah.  Okay.  So you did that already, or

11  are you going to --

12          MS. LINKER:  They just did.  Yeah.

13          THE COURT:  -- this second?

14          THE CLERK:  They unplugged the TV.

15          MS. CHUANG:  I think they hit the power button.

16                  (Recess taken at 2:01 p.m.)

17                  (Proceedings resumed at 2:10 p.m.)

18          THE COURT:  The jury is coming in.

19      Can I ask you a little bit about scheduling?  I could ask

20  the jury if they'd be willing to stay a little bit longer.  I

21  don't know how long your last two witnesses will be.

22          MS. VARTAIN:  Your Honor, our next witness, we would

23  not like to put on the stand and have him come back the next

24  day.  Depending on when Ms. Linker finishes, if we -- which she

25  thinks is soon, I would like to ask that Mr. Pelosi testify and

1    that we complete his testimony today.

2            THE COURT:  Yes.

3            MS. VARTAIN:  I think then we would -- the Government

4    would then hold our next witness until tomorrow morning, unless

5    the jury wants to stay until 4:00, but I think that could be a

6    while.

7            THE COURT:  No.  If we're coming back tomorrow, it

8    makes no difference.  But if we could finish with Mr. Pelosi,

9    then we don't have to -- yeah.  I think that would be good.

10           MS. VARTAIN:  Thank you for asking, Your Honor.

11       If we could finish with all of them, I think we should

12   try, if we don't have to stay too late.

13           THE COURT:  We'll see what time it is.  Hopefully -- I

14   mean I don't -- I haven't heard that a juror has a 4:00 p.m.

15   meeting today, so we'll see.

16           MS. VARTAIN:  And I did anticipate the schedule.  I

17   just released the witness, the last witness, so I would want --

18   I'm going to let him go.  And we'll start with him tomorrow.

19           THE COURT:  That's fine.  We'll do him first thing in

20   the morning.

21           MS. VARTAIN:  Thank you, Your Honor.

22           THE COURT:  Okay.  Someone tell Ada.  Can you tell

23   Ada?

24               (The jury enters the courtroom.)

25       (Proceedings were heard in the presence of the jury.)

1          **THE COURT:**  Thank you.  You may be seated.

2      Ms. Linker, you may continue.

3          **MS. LINKER:**  Thank you, Your Honor.

4  BY MS. LINKER:

5  Q.   Hello.  We were at Exhibit 276.  And that's the Google Map

6  queries.

7  A.   Yes.

8  Q.   And I have handed you an unredacted version of that, which

9  I think can also be shown to the jury as well.

10      If we look at page 21, Record 79, the search query there,

11  please don't say it aloud.  What do you see there?

12  A.   An address that I believe belongs to Target 1.

13  Q.   And that was searched on October 26, 2022, at 7:57 p.m.;

14  correct?

15  A.   Correct.

16  Q.   And that's an address in San Francisco?

17  A.   Correct.

18  Q.   At page 27, Record 106, again, without saying the address

19  aloud, what do you see in the search query there?

20  A.   An address.

21  Q.   Located in?

22  A.   Pacific Palisades, California.

23  Q.   And you understand that to be Tom Hanks' address?

24  A.   I am not sure.

25  Q.   Did you do any investigation into Tom Hanks' address?

**MINOR - CROSS / LINKER**

1    **A.**    No, I did not.

2                **MS. LINKER:**  You can take that down.

3    **BY MS. LINKER:**

4    **Q.**    All of the forensic reports that you went over with the

5    Government and with me are all from one device; correct?

6    **A.**    I believe so, yes.

7    **Q.**    They're all from the hard drive that was recovered from

8    the residence in Richmond; correct?

9    **A.**    Yes.

10   **Q.**    So despite collecting 10 to 15 or so devices, the

11   Government has only sought to admit documents from that one

12   device; correct?

13   **A.**    Correct.

14   **Q.**    And you also testified a bit about this favorite

15   politicians folder; is that correct?

16   **A.**    Correct.

17   **Q.**    And that folder did not have only politicians in it, as

18   you understand politicians to be; correct?

19   **A.**    Correct.

20   **Q.**    It included names that were on his list; correct?

21   **A.**    I'm not aware of all of the names of the folders within

22   that favorite politicians folder.

23   **Q.**    How many names were in that folder?

24   **A.**    I don't know.

25   **Q.**    How many folders were in that folder?

MINOR - CROSS / LINKER

```
 1   A.   I don't know.

 2   Q.   It included a folder for Target 1?

 3   A.   Yes.

 4   Q.   It included a folder for Tom Hanks?

 5   A.   I can't recall.

 6   Q.   It included a folder for someone named Audacious Annie?

 7   A.   I can't recall.

 8        MS. LINKER:  Let me get something to refresh your

 9   recollection.  One moment.

10              (Pause in proceedings.)

11   BY MS. LINKER:

12   Q.   It also included a folder for George Soros; correct?

13   A.   I can't recall.

14   Q.   It had at least 10 names in that folder; correct?

15   A.   I can't recall.

16   Q.   Less than half of those names were politicians; correct?

17   A.   I can't recall.

18   Q.   In your investigation, you also found his website,

19   Mr. DePape's website; correct?

20   A.   I personally did not find his website.

21   Q.   Someone on your FBI team found his website; correct?

22   A.   I don't know if they found it on his hard drive.

23   Q.   Not necessarily on his hard drive, but you have seen his

24   website; correct?

25   A.   I have not seen the website live.
```

**MINOR - CROSS / LINKER**

1   **Q.**   You've seen downloads from the website?

2   **A.**   Not downloads.

3   **Q.**   You have seen images of the website?

4   **A.**   Correct.

5   **Q.**   And from where did you get those images?

6   **A.**   Another agent had gone to the website and taken

7   screenshots.

8   **Q.**   And I'm going to show you what's been marked as

9   Exhibit 500.

10         Do you recognize that?

11  **A.**   Yes, I do.

12  **Q.**   What is it?

13  **A.**   It is the screens another agent on my team had taken of

14  the website.

15         **MS. LINKER:**  I move to admit Exhibit 500.

16         **MS. GILBERT:**  No objection.

17         **THE COURT:**  500 admitted.

18      (Trial Exhibit 500 received in evidence.)

19         **MS. LINKER:**  Can we publish the front of that?

20         **THE COURT:**  Could we turn the monitors back on.

21         **MS. LINKER:**  Can we turn the monitors back on?

22         **THE COURT:**  In the meantime, you can keep going.

23         **MS. LINKER:**  Your Honor, I think you have my copy of

24  that exhibit because we already gave you one and my folder is

25  empty.  I apologize.

1              THE COURT:  It's okay.

2              MS. LINKER:  Thank you.

3    BY MS. LINKER:

4    Q.   Did you look at this -- all of these -- what are you

5    calling them?  Not downloads.

6    A.   Screenshots.

7    Q.   Screenshots?

8    A.   Yes, I looked at all of the screenshots.

9    Q.   And I'd like to point your attention -- we can look on any

10   page.  Let's just take the second page, 1237.  On the left-hand

11   side, there's a list of topics.

12        Do you see that?

13   A.   Yes.

14   Q.   And could you read that list?

15   A.   Yes.  It's Blog, Subscribe, Plans Price -- Plans &

16   Pricing, A. Turd, Ai Art, Aliens, Bleck, Bullies, Climate

17   Hysteria, Communism, Corruption, COVID, Da Jewbs, Gamer Gate,

18   Great Reset, Groomer Schools, Guns, Humor, Immigrants, James

19   Lindsay, Jesuits, Kids, Memes, Pedo Gate, Propaganda, Red

20   Skull, Spirituality, Trannies, Ukraine, Uncategorized, Voter

21   Fraud, wAmEn, and home.

22   Q.   Thank you.

23        And I believe you testified you never looked at this

24   website when it was live; correct?

25   A.   That's correct.

MINOR - CROSS / LINKER

1   Q.   It was taken down at some point?

2   A.   From my understanding, yes.

3   Q.   Did the Federal Government have something to do with it

4   being taken down?

5   A.   No.

6   Q.   We're going to switch gears and show you what's been

7   admitted as Exhibit 170.  That's the note that was found in

8   Mr. DePape's pocket when he was arrested; correct?

9   A.   Correct.

10  Q.   And there are three items listed on that?

11  A.   Correct.

12  Q.   The first is the Pelosi address?

13  A.   Correct.

14  Q.   The second is Target 1's address?

15  A.   Correct.

16  Q.   The third is Target 1's phone number?

17  A.   I'm not aware of her phone number.

18  Q.   Agents met with Target 1; correct?

19  A.   Correct.

20  Q.   Agents met with Target 1 several times; correct?

21  A.   I'm not aware of how many times.

22  Q.   You're provided 302s of every time an agent meets with

23  Target 1?

24  A.   It should be serialized in my case, yes.

25  Q.   And so there are more than two, if not three, meetings

MINOR - CROSS / LINKER

1    with Target 1; correct?

2    A.    I can't recall.

3    Q.    And the FBI asked her what her phone number was; correct?

4    A.    I can't recall.

5    Q.    You can't recall what her phone number was or you can't

6    recall if they asked her what her phone number was?

7    A.    Both.

8    Q.    In your investigation, did you look up what that phone

9    number was?

10   A.    Not that I remember.

11   Q.    You had three items listed on that piece of paper, and you

12   did not look up that third item?

13   A.    No.

14   Q.    And you found evidence, though, on Mr. DePape's computer

15   showing that he had researched those three things; correct?

16   A.    Correct.

17   Q.    That he had researched the Pelosi address; correct?

18   A.    Correct.

19   Q.    That he had researched Target 1's address; correct?

20   A.    Correct.

21   Q.    And that he had researched Target 1's phone number;

22   correct?

23   A.    I can't recall the phone number.

24          MS. LINKER:  I'll take that back.

25                  (Counsel approaches witness.)

MINOR - CROSS / LINKER

1    BY MS. LINKER:

2    Q.   When the FBI believes that someone is at risk, you have an

3    obligation to notify that person; correct?

4    A.   Correct.

5    Q.   That's called a duty to warn?

6    A.   Correct.

7    Q.   Based on the investigation in this case, the FBI

8    determined that several individuals needing to warned; correct?

9    A.   Correct.

10   Q.   And agents provided such duties to warn to the following

11   people:  Tom Hanks?

12   A.   Correct.

13   Q.   Gavin Newsom?

14   A.   Correct.

15   Q.   Adam Schiff?

16   A.   Correct.

17   Q.   Hunter Biden?

18   A.   Correct.

19   Q.   George Soros?

20   A.   I can't recall.

21   Q.   Other individuals we haven't even mentioned in this trial,

22   for example, the person who lived at Adam Schiff's former

23   address?

24   A.   Correct.

25   Q.   Target 1?

MINOR - CROSS / LINKER

```
 1   A.    Correct.
 2            MS. LINKER:  Nothing further, Your Honor.
 3            THE COURT:  Okay.
 4       Anything further?
 5            MS. GILBERT:  No, Your Honor.
 6            THE COURT:  Agent, you may step down.
 7                      (Witness excused.)
 8            THE COURT:  Is the Government prepared to call your
 9   next witness?
10            MS. VARTAIN:  Your Honor, if you could just give me
11   one moment.
12            THE COURT:  So members of the jury, I believe our next
13   witness is Paul Pelosi.  So in order to finish him so he
14   doesn't have to come back tomorrow, we may need to stay a bit
15   after 3:00.  Is that okay?  If it's a problem, just let me
16   know.  Oh, it is a problem.
17            JUROR:  I have a 3:15 phone call.  I have to notify
18   them that I'm going to be late.
19            THE COURT:  Oh, sure.  Do you want to go do that right
20   now?
21            JUROR:  I can do that.
22            THE COURT:  You know, I can't say for sure.  I would
23   say if you do it after 4:00 or later, we'd be safe.
24            JUROR:  Thank you.
25            THE COURT:  The rest of us, you can stand and stretch,
```

 1   if you like.

 2        Good afternoon, Mr. Pelosi.  You can just go ahead and sit

 3   down.  We're waiting for one juror who just had to go make a

 4   phone call and say he was going to be late.  He's back.

 5             THE WITNESS:  Thank you.

 6             THE COURT:  You may be seated.

 7             THE CLERK:  Raise your right hand.

 8             THE COURT:  Oh, you can stay seated, if you want.

 9                         PAUL PELOSI,

10   called as a witness for the Government, having been duly sworn,

11   testified as follows:

12             THE WITNESS:  I do.

13             THE CLERK:  Can you please state your name and spell

14   it for the record.

15             THE WITNESS:  Paul Pelosi.  P-A-U-L, P-E-L-O-S-I.

16             THE COURT:  Great.  Thank you.  You may be seated.

17             THE WITNESS:  Thank you.

18                      DIRECT EXAMINATION

19   BY MS. VARTAIN:

20   Q.   Good afternoon, Mr. Pelosi.

21   A.   Good afternoon.

22   Q.   What is your wife's name?

23   A.   Nancy Pelosi.

24   Q.   What is your wife's current professional title?

25   A.   Speaker emerita of the US Congress.

PELOSI - DIRECT / VARTAIN

1  **Q.**   What does speaker emerita mean?

2  **A.**   She has been speaker twice, and when she stepped down last

3  year, they created the title of emerita.  Since she was still

4  staying in the Congress, they created the title of emerita.

5  **Q.**   You said she still was staying in the Congress.  Do you

6  mean that she remains a member of Congress today?

7  **A.**   Yes.  She's a member of Congress, yes.

8  **Q.**   And she represents San Francisco; is that correct?

9  **A.**   Basically San Francisco, yes.

10  **Q.**   In October of 2022, what was her title?

11  **A.**   She was speaker of the house of Representatives.

12  **Q.**   And as speaker of the house of Representatives, does she

13  represent a specific political party?

14  **A.**   She is a Democrat, and ran the Congress as the speaker,

15  being second in line to the president.

16  **Q.**   Okay.  And when you say second in line to the president,

17  what do you mean by that?

18  **A.**   That means that it's the president, and if he's

19  incapacitated, becomes the vice president.  And then after

20  that, it would become the speaker of the house.

21  **Q.**   In October of 2022, what type of protection did your wife

22  have through the US Capitol Police?

23  **A.**   She had -- she has a full detail 24/7.  They are with her

24  24/7, wherever she is.

25  **Q.**   And do the agents from the Capitol Police protect you

1   personally?

2   A.    No.

3   Q.    Do you have cameras on your house?

4   A.    Yes.   The -- the government has installed cameras all

5   around our home, and they are monitored in Washington by the

6   Capitol Police.   And then, I believe, when the detail -- when

7   she's in San Francisco, I believe the detail can also see the

8   cameras on their laptops.

9   Q.    In October of 2022, was there an alarm system on your

10  San Francisco home?

11  A.    Yes.

12  Q.    In that time period, did you generally set the alarm when

13  you were home?

14  A.    No.

15  Q.    Why not?

16  A.    Well, because the alarm system that we had had motion

17  detectors in it.   And so if I would go up and down the stairs,

18  it would trigger the alarm.   So when I was home, I would never

19  turn it on.   I would turn it on when -- when you leave the

20  house, but I would never use it in the house because of that.

21  Q.    I want to turn to Thursday, October 27th, 2022.   Okay?

22  A.    Okay.

23  Q.    What city were you in on October 27th?

24  A.    San Francisco.

25  Q.    Was the speaker in San Francisco with you?

1   A.   No.  She was in Washington.

2   Q.   Based on your earlier testimony, does that mean that there

3   were no United States Capitol Police agents protecting your

4   home?

5   A.   Correct.  Yeah, there was -- no.

6   Q.   Focusing in on the evening of October 27th, were you at

7   home that evening?

8   A.   Yes.

9   Q.   Did you -- were you home all evening?

10  A.   No.  I had been out to dinner and came home I think about

11  10:30 -- 10:00 or 10:30, something like that.

12  Q.   When you came home, were you alone?

13  A.   Yes.

14  Q.   Based on your earlier testimony, I take it you did not set

15  the alarms while you were --

16  A.   Correct.

17  Q.   Do you recall approximately when you went to bed that

18  evening?

19  A.   I would guess 11:30-ish, something like that.  Somewhere

20  between 11:30 and 12:00.

21  Q.   And when you say you guess, are you guessing based off of

22  your specific recollection or your habits about your bedtime?

23  A.   Habits.  I tend to go up in the evening, watch a little

24  bit of television, maybe one of the late -- you know, one of

25  the late shows and then go to sleep.

1    **Q.**    Which floor of your home is the bedroom on?

2    **A.**    The third floor.

3              **MS. VARTAIN:**  May I approach the witness, Your Honor?

4              **THE COURT:**  You may.

5                        (Counsel approaches witness.)

6    **BY MS. VARTAIN:**

7    **Q.**   Mr. Pelosi, I'm going to come and approach with

8    Exhibit 164.  Do you recognize Exhibit 164?

9    **A.**   Yes.

10   **Q.**   How do you recognize it?

11   **A.**   Well, I recognize it because it's a thermal cup.  I have

12   several of them, and I use one of those every night.  I put ice

13   water in it and bring it up upstairs on my bed stand when I go

14   to sleep.

15   **Q.**   Did you follow that same habit, to the best of your

16   recollection?

17   **A.**   I'm sure I did.

18   **Q.**   I'm going to come take the cup back.

19   **A.**   Okay.

20   **Q.**   I think you said you take the ice water upstairs when you

21   go to bed.  Did I understand that correctly?

22   **A.**   Yes.

23   **Q.**   And on the -- I'm going to -- on the evening of

24   October 27th, 2022, I take it you did go to bed that evening;

25   correct?

PELOSI - DIRECT / VARTAIN

1    A.    Yes.

2    Q.    I'd like to show you -- let me ask you this:  You have an

3    elevator in your home; is that right?

4    A.    Yes.

5    Q.    Where is the elevator in relationship to your bedroom?

6    A.    It's right outside the door of the bedroom.

7    Q.    I'd like to show you admitted Exhibit 106, please, and,

8    Mr. Pelosi, it will show up on the screen right in front of

9    you.

10   A.    Yes.

11   Q.    Do you see the elevator door in this photograph?

12   A.    Yes, mm-hmm.

13   Q.    And can you describe for the jury where it is, please?

14   A.    Well, at the top of the stairs there, third floor, walking

15   towards that doorway, the open door is the elevator door, and

16   then beyond that is the door into the bedroom.

17   Q.    Is --

18   A.    There's a double door, and I usually leave one of them

19   open and then close it when I go to bed.

20   Q.    Okay.  Is the door that's sort of open into the hallway

21   the elevator door?

22   A.    Yes.

23   Q.    And we're going to come back to this exhibit in just a

24   moment.

25          MS. VARTAIN:  But, Ms. Wachs, would you please pull up

```
 1   admitted Exhibit 107.
 2   BY MS. VARTAIN:
 3   Q.   Do you recognize this, Mr. Pelosi?
 4   A.   Yes.  That's the elevator -- elevator cabin or whatever
 5   you call it, yeah.
 6   Q.   This is right inside the door that we're just discussing?
 7   A.   Yes, mm-hmm.
 8            MS. VARTAIN:  Ms. Wachs, please go to -- back to
 9   Exhibit 106.
10   BY MS. VARTAIN:
11   Q.   I think you were discussing, Mr. Pelosi, that there are
12   then -- right past the elevator door is the door to your
13   bedroom.
14        Am I right about that?
15   A.   Yes.
16   Q.   Is one door to the bedroom open, and is the other closed?
17   A.   Yes.  It appears so.
18   Q.   Are there sort of two doors that you use to open --
19   A.   The bedroom has two large doors.  We usually leave one of
20   them closed, and we use the other one to go in and then we go
21   to bed, close it.
22   Q.   When you go to bed, is it your practice to close both of
23   those doors?
24   A.   Yes.  Not necessarily the one to the elevator, we don't --
25   you know, just leave that however it is.  But to always close
```

1    the bedroom doors, yes.

2           MS. VARTAIN:  Ms. Wachs, could you please pull up

3    Exhibit 116.

4    BY MS. VARTAIN:

5    Q.   What are we looking at here, Mr. Pelosi?

6    A.   Well, we're looking at the master bedroom and the two

7    doors as you can -- as you can see, the two doors that go into

8    it, one is open, and that's the one that we usually leave open

9    and then go to sleep and close it.

10   Q.   And when you get ready for bed, what do you do with the

11   pillows that are on the bed?

12   A.   I stack them -- I usually stack them along that curtain

13   there on the window on the south side of the house.

14          MS. VARTAIN:  I'd like to look at, please,

15   Exhibit 117.

16   BY MS. VARTAIN:

17   Q.   What are we looking at here?

18   A.   Looking at a messy bed.

19                        (Laughter.)

20   A.   So we're looking at the bed with the covers off, and then

21   straight in front of you, that opening is the entrance into my

22   bathroom.  And the one before that to the left is the hallway

23   that goes down to my wife's bathroom.

24   Q.   Let's just stay with the bed for just a moment.

25          Is the side of the bed that's folded down, the messy side,

1   is that your side, Mr. Pelosi?

2   **A.**   Yes.   I sleep on the closest side of the -- I sleep on the

3   closest side of the bed, which is closest to the door to the

4   bedroom -- I mean, to the, you know, outside.

5   **Q.**   The doors we've just been discussing; is that correct?

6   **A.**   Yes.

7   **Q.**   Okay.

8          **MS. VARTAIN:**   And now, if we could, please, Ms. Wachs,

9   look at Exhibit 118.

10  **BY MS. VARTAIN:**

11  **Q.**   Are we looking at a different angle of your bedroom here,

12  Mr. Pelosi?

13  **A.**   Yes.

14         **MS. VARTAIN:**   And I'd now like to look at Exhibit 569.

15  **BY MS. VARTAIN:**

16  **Q.**   Same bedroom, different angle?

17  **A.**   Yes.

18  **Q.**   What is the machine next to your bed?

19  **A.**   That's a CPAP machine on my nightstand.

20  **Q.**   What is the purpose of the CPAP machine?

21  **A.**   The practical purpose of it is that it stops me from

22  snoring so my wife can get some sleep when she's home.

23  **Q.**   And do you use the machine?

24  **A.**   I do use it.   Yes.   Every -- I guess I've had it about,

25  maybe -- I don't know.   Maybe 10 years, but something like

1    that.  I use it every night.

2    **Q.**   Important to preserve the quality of the marriage through

3    the inhibiting the snoring, I take it?

4    **A.**   I hope so.

5    **Q.**   Okay.  Do you recall whether you were using it the night

6    that we've been discussing, which is October 27th?

7    **A.**   I don't know.  I probably was.

8    **Q.**   And --

9    **A.**   Upon occasion, if I'm home alone, I might not always use

10   it.  I always use it when she's home.  But if she's not home,

11   I -- I can't say that I use it every night.

12   **Q.**   I'd like to return to some of your habits as you are

13   getting ready for bedtime.

14        Do you sleep with the lights on or --

15   **A.**   No.

16   **Q.**   Off?

17   **A.**   Off.

18   **Q.**   And those drapes that we were looking at --

19   **A.**   They're closed.

20   **Q.**   They're closed.

21        Do you recall when you fell asleep on the sort of October

22   27th/October 28 night?

23   **A.**   Do I recall -- I'm sorry.  What?

24   **Q.**   When you fell asleep?

25   **A.**   I think somewhere between 11:30, 12:00, something like

1    that.

2    Q.    Is that your typical bedtime?

3    A.    That would be a typical bedtime for me, yeah.

4    Q.    What woke you up on October 28th, 2022?

5    A.    The door opened and a very large man came in with a hammer

6    in one hand and some ties in the other hand.

7          And I think he said:  Where is Nancy?  I think that woke

8    me up.

9    Q.    And when you woke up and I take it -- were you laying

10   down, Mr. Pelosi?

11   A.    I'm sorry?

12   Q.    I'm sorry.  Let me ask that again.  When you first saw the

13   defendant, were you laying down?

14   A.    Yes.

15   Q.    And then --

16   A.    I'm asleep.  He burst into the door and so that wakes me

17   up.

18   Q.    And can you describe approximately how close to you the

19   defendant was?

20   A.    The distance between my side of the bed and the wall, I

21   think, is about 6 feet.  And so he was standing in the doorway,

22   so I assume he was, you know, 3 to 4 feet away from me.

23   Q.    And when you woke up, was the defendant the first thing

24   that you saw then?

25   A.    Yes.

**PELOSI - DIRECT / VARTAIN**

1   **Q.**   What did you do?

2   **A.**   What did I do?

3   **Q.**   Um-hmm.

4   **A.**   Well, it was a tremendous shock to recognize that,

5   you know, somebody had broken into the house.

6   And looking at him and looking at, you know, the hammer

7   and the ties, I was -- I recognized that I was in serious

8   danger.

9   And so I tried to stay as calm as possible.

10  **Q.**   And I think you said that the defendant said something to

11  the effect of:  Where is Nancy?

12  **A.**   Yes.  He asked that several times.

13  **Q.**   Did you respond to the defendant in any way?

14  **A.**   Sure.  I said:  She's not here.  And then I get -- he said

15  it again, I guess.  And I said:  Well, she's in Washington.

16  **Q.**   But at this time, you had not seen the defendant before;

17  is that correct?

18  **A.**   Correct.

19  **Q.**   And once you told the defendant that your wife was in

20  Washington, did he say anything back to you?

21  **A.**   Yes.  He said:  Well, then we're going to have to -- we're

22  going to have to wait for her.  I'm going to have to tie you up

23  and we'll wait for her.

24  **Q.**   Did you have an understanding, at that time, about what he

25  might tie you up with?

PELOSI - DIRECT / VARTAIN

1   **A.**   Yes, because he had these cords in his hand, so I assumed

2   that that's what he was going to use.

3   **Q.**   Did you try to do anything, Mr. Pelosi?

4   **A.**   I was trying -- I realized that it was a very serious

5   situation.

6        I tried to stay as calm as possible.

7        The first thing I tried to do, after some back and forth

8   with him, was to get up and try to get to the elevator.

9   **Q.**   Why the elevator, Mr. Pelosi?

10  **A.**   Well, because first of all, if I could get in the

11  elevator, there's a phone in the elevator.  I could close the

12  door and he wouldn't be able to get me.

13  **Q.**   Were you able to get in the elevator?

14  **A.**   No.

15  **Q.**   Why not?

16  **A.**   Because -- so I got out of bed, I stood up, and then I

17  walked towards the elevator.  But he blocked me as I was trying

18  to get to the elevator.  He held onto that open door that you

19  saw before.

20  **Q.**   Let's go back and take a look at Exhibit --

21       **MS. VARTAIN:**  I think we're looking for Exhibit 107,

22  please, Ms. Wachs.

23  **BY MS. VARTAIN:**

24  **Q.**   Is this the door that you're describing, this metal gate?

25  **A.**   No.  That's the metal -- in other words, there's the door

**PELOSI - DIRECT / VARTAIN**

1   and then when you go into the elevator, you close that -- that

2   gate, and then you close the door, and then you can operate the

3   elevator.

4        But as you saw from that first -- that picture before, the

5   elevator door -- thank you -- the elevator door was open.  And

6   so I walked from the bedroom towards the elevator, but he

7   went -- he went and grabbed this open door.

8        So I couldn't get in the elevator or close the gate or

9   anything like that.

10  **Q.**   After you -- the defendant blocked you from getting into

11  the elevator, did you try to do anything different?

12  **A.**   Well, I went back -- I went back in and -- I went back in

13  and sat on the bed.  And we had some conversation about him

14  saying that she was the leader of the pack.  He had to take her

15  out.  He was going to wait for her.  And something like that.

16       And so he was going to tie me up, and we were going to --

17  he was going to tie me up and wait for her.

18  **Q.**   Did you make any efforts to go anywhere aside from the

19  elevator which you had already tried to get to?

20  **A.**   Yes.  So that's the case.  So I'm back sitting on --

21  again, I'm back sitting on the bed, and he's in front of me.

22       And so then I got the idea.  I got up and walked over to

23  my bathroom.  And I went into my bathroom and I grabbed my cell

24  phone.  I always -- I always leave my cell phone and my watch

25  being charged there in my bathroom.

**PELOSI - DIRECT / VARTAIN**

1    So I walked into the bathroom, I grabbed my phone, and I

2    dialed 9-1-1.

3    Q.   Let me just --

4         MS. VARTAIN:   Ms. Wachs, can you please pull up

5    Exhibit 123 so we can look at the bathroom Mr. Pelosi is

6    describing?

7         THE WITNESS:   Yes, so you see the bathroom and -- with

8    all of this stuff on the counter.   One of them is a charging --

9    charging unit from Apple that you can put your phone and your

10   watch on to charge it.   And so it's easy access.   You just,

11   you know, walk in, pick it up, and dial 9-1-1.

12   BY MS. VARTAIN:

13   Q.   And so I want to talk a little bit about what you're

14   thinking and feeling as you called 9-1-1.

15        Before we get to that, where was the defendant standing as

16   you called 9-1-1?

17   A.   He followed me to the bathroom.   And so on this -- on this

18   picture that you're showing, I was standing there talking on

19   the phone and he was right there at the doorway of the

20   bathroom.

21   Q.   Did you feel like you could be candid with 9-1-1?

22   A.   I'm sorry.   Did I?

23   Q.   Did you feel like you could be candid with 9-1-1?

24   A.   Absolutely not.

25   Q.   Why not?

PELOSI - DIRECT / VARTAIN

1   **A.**   Why not?

2       Because there was this very large man there threatening

3   me -- or he had told me he was going to take me out.

4       And I had to try to convey to the 9-1-1 person that I was

5   in trouble and send somebody.

6   **Q.**   Did you feel like you were having difficulty conveying to

7   9-1-1?

8   **A.**   I thought I had a very difficult time trying to let them

9   know.  And he was saying -- he was saying:  Oh, just tell them

10  it's a friend.  Tell them it's a friend.  And I think -- I

11  don't know.  I haven't listened to the 9-1-1 call, haven't

12  watched any of the tapes.  I haven't done any of that.

13      But my recollection is that I was on the phone, trying to

14  convey to them that there was somebody in the house.  And he

15  was, I think, saying:  Well, tell them it's a friend.  So I was

16  trying to convey the information without aggravating him any

17  further.

18  **Q.**   At this time, was the defendant still holding the hammer

19  that --

20  **A.**   Yes.

21  **Q.**   And after you made the call to 9-1-1, what, if anything,

22  happened to the cell phone that you just called 9-1-1 with --

23  **A.**   He took it.  He took the cell phone from me.

24  **Q.**   I'd like to talk about the period of time between when you

25  called 9-1-1 and when the police arrived.

1    At some point, did you leave the third floor, where your

2   bedroom is?

3   **A.**   Yes.

4   **Q.**   How did you manage that?

5   **A.**   So he said -- basically, he said:  I'm tired.  I have to

6   get some sleep.  So I'm going to tie you up, and we're going to

7   go to sleep.

8        So I said:  Well, okay.  I get it.  That's what you want

9   to do.

10       Why don't we go downstairs.  Your stuff is -- because he

11   said his stuff was downstairs.  He had all this equipment and

12   stuff.

13       And I had said:  Well, since all your stuff is downstairs,

14   why don't we go downstairs and you can tie me up there and we

15   can go to sleep.

16       And so then I proceeded out of the bedroom to go down the

17   stairs and he followed me.

18   **Q.**   Mr. Pelosi, can I just pull up Exhibit 104 so we can

19   follow you along.

20   **A.**   Sure.

21   **Q.**   When you say "the stairs," are these the stairs you're

22   talking about?

23   **A.**   Yes.  To the right of this is where the bedroom -- up top.

24   The right of this is where the bedroom is, and that's where we

25   were.  So we came down along this and went down the two flights

PELOSI - DIRECT / VARTAIN

1    of stairs.

2    Q.   When you describe -- where were you in relationship to the

3    defendant?

4    A.   I was walking down the stairs holding onto the -- holding

5    on to the banister, and he was right behind me.

6    Q.   He's still carrying the hammer at this point in time?

7    A.   Yes, yes.

8    Q.   Can you describe what you're thinking as you sort of make

9    your way downstairs?

10   A.   I'm thinking, I hope the police got my message.  But what

11   I knew was my only shot was going to be if we were downstairs

12   and the police came, they would -- you know, it would be so

13   much easier to arrest him rather than being up on the third

14   floor.  God knows what he would have done if we were still up

15   on the third floor and the police were banging on the door

16   downstairs.

17   Q.   When you got downstairs, what happened next?

18   A.   So we got down to the -- we got downstairs.  And when you

19   get to the bottom of the stairs, to the left is where the --

20   the front door is right in front of you, and then to your left

21   is the elevator door.  And then beyond that, there's a family

22   room down a few steps, and that's the door that he broke into

23   to get into the house.

24   Q.   And you could see that?

25   A.   I could see that, and I could see his stuff down there

**PELOSI - DIRECT / VARTAIN**

1  because he said he had a lot of stuff, and I could see his

2  backpacks and things were out there.

3  **Q.**   Where were -- where were you when the police arrived at

4  your house?

5  **A.**   Oh, so right there.  We were at the -- we were in --

6  basically in front of the elevator door.  It's closed.  The

7  only one is -- because the elevator was upstairs.  So we were

8  standing there looking down, looking down to where he had

9  broken in and where his stuff was.

10      And -- and so that's where we were, so he was on my right.

11  And then he said:  Well, you know, the police are going to be

12  here.  It's over for me.  I'm going to have to take you out.

13  You know, things like that.

14      And I said:  No, no, they're -- you know, they're probably

15  not going to come.  You know, they're probably not going to

16  come.

17      And then the police were at the door.

18  **Q.**   And what happened then?

19  **A.**   So the police were at the door, and so I'm here and so the

20  front door is maybe 3 or 4 feet to my left.  So I went over and

21  I opened the door, and the policeman were outside.

22      And he followed behind me.  He followed behind me.  So he

23  was -- when he was standing behind me on my right and the

24  police are -- are there, at the door --

25  **Q.**   Can I -- Mr. Pelosi, can I ask you, what were you thinking

1    when the police opened the door or when the door -- when you

2    opened the door?

3    **A.**   Well, when I opened the door, I thought, Thank God, the

4    police are here.  And there's this huge guy with a hammer in

5    his hand.

6        I -- I don't know what is going to happen next.  So I --

7    he had the hammer in his right hand, and so, recognizing that

8    he saw the police and so forth, I turned and tried to put my

9    hand on his hand on the -- on the hammer.  And then he just,

10   you know, pushed me aside and whacked me on the head.  In the

11   arm and the hand, whatever.

12   **Q.**   What was the next thing you remember?

13   **A.**   Waking up in a pool of blood.

14   **Q.**   And after you woke up, do you recall what happened?

15   **A.**   No.  I mean, I know that -- I know that I was put in an

16   ambulance and taken to the hospital.  I know that there was

17   some conversation with the medics that had come, but I don't

18   know what the heck it was.

19   **Q.**   You were treated at SF General; is that right?

20   **A.**   Yes.

21   **Q.**   And do you recall about how long you were in the hospital

22   for?

23   **A.**   Somewhere between a week and 10 days.  They were

24   spectacular.  They did a great job.

25   **Q.**   While you were in the hospital, how would you describe the

1  pain you were in?

2  **A.**   It -- very painful.  They told me be very careful of light

3  and noise and don't watch television.  If you're going to watch

4  television, watch sports, but don't watch the news.  And -- so

5  that's what I did.

6  **Q.**   And you followed those directions, I take it?

7  **A.**   I did.

8  **Q.**   Yeah.

9  **A.**   I have not -- I don't know how this -- how believable this

10  is, but -- but basically this is a little over a year now, and

11  I've rehabbed pretty well.  I'm pretty close to being back to

12  normal.

13      But I have not discussed this incident with anybody.  I

14  haven't seen any of the news.  I haven't listened to any of the

15  tapes.  And I've encouraged my family not to either because I

16  think it's too traumatic for my family.

17      So I just have tried to put it out of my mind, and it

18  wasn't until, well, my two meetings with you and your

19  associates yesterday and one a couple of weeks ago, when you

20  were asking me some of these questions, that I even -- I'm

21  trying to come back -- I'm just trying -- I made the best

22  effort I possibly can to not relive this.

23  **Q.**   In other words, you've gone through the facts today with

24  the jury, and it sounds like you and I have met two times.  Is

25  that your recollection?

1   **A.**    Yes.  Yes.

2   **Q.**    And then prior to that, were the other times that you've

3   gone through the facts, would they be only with the SFPD

4   officers right afterwards?

5   **A.**    No -- yeah.  The only thing I did was in the hospital,

6   SFPD and the Feds and the -- you know, a group of -- a group of

7   y'all came to talk with me in the hospital, and I, at that

8   time, gave them the best of my recollections.  And I -- I know

9   that I did that, but I don't really remember everything that I

10  said.

11          And, again, it's a year later, and I've tried to put it

12  out of my mind.

13  **Q.**    I'd like to talk, just for a final few moments, about your

14  recovery, Mr. Pelosi.

15          While you were in the hospital, can you describe some of

16  the types of medical treatment that you were receiving as you

17  sort of -- at the very early stages of your recovery?

18  **A.**    Yes.  They -- they were just spectacular there at the

19  hospital.  They had -- they had people come get me out of bed

20  to help me walk -- you know, help me walk and, you know, start

21  to get mobile again.  And so there was a lot of that.

22          And then when I did go home, then they had -- they had

23  people come out to take care of me at the house, both on the

24  medication and on physical therapy and so forth.  And I'm still

25  doing physical therapy a couple of days a week at a facility

PELOSI - DIRECT / VARTAIN

1    and doing the exercises every day of balance and getting my

2    walking back and that sort of thing.

3    **Q.**   The balancing and getting your walking back, is that

4    something that changed as a result of the defendant's assault

5    of you?

6    **A.**   Completely, yeah.

7    **Q.**   Now, I think you've -- do you have -- do you experience

8    pain to this day related to the head wounds?

9    **A.**   Yes.  It's a lot less now.  I would -- I would -- I was

10   constantly getting headaches and dizziness when I would stand.

11   It would -- pain would start in the back of my neck and then I

12   knew -- back of my skull and I knew -- I knew I was going to

13   get dizzy and I knew I was going to -- so I would immediately

14   sit down.  I do a lot of sitting.

15       But -- and -- and I had to take naps.  I couldn't get

16   through the day very well.  Now, here we are a year later.

17   They told me it would take at least a year.

18       And so now, I still get a little lightheaded sometimes.

19       And I get some headaches, not as much.

20       And I -- I don't have to nap as much.  I'm, you know,

21   getting back to pretty much...

22   **Q.**   And how about to the touch, Mr. Pelosi, how does your --

23   does your head and your scalp feel different now than it did

24   before?

25   **A.**   Well, first of all, I had no hair for, whatever, six or

1  eight months.  I finally got rid of -- I was wearing hats

2  and -- beanies and hats and things for -- for basically nine --

3  nine months.  And the last couple of months, the hair came

4  back.

5       Good Italian roots or something.  So the hair came back,

6  so now I've given up the hats.  But I -- it's -- there's still

7  lumps.  There's still lumps in my head.  If I run my fingers, I

8  can still feel dents and lumps, but they're not as bad as they

9  were.  And they're not as sensitive to the touch as they -- as

10 they were, so it's getting better.

11 Q.   Did you sustain injuries in addition to your head?

12 A.   Yes.  I had about 12 stitches on the back of my right arm.

13 And then my left hand was really messed up, but they did a

14 spectacular job.  The plastic surgeon there at the hospital did

15 a great job with the reconstructing the hand, and they

16 eventually avoided having to do skin grafts, which they thought

17 they were going to have to do originally.  But it held, and I

18 have full use of that hand again.

19 Q.   Mr. Pelosi, how old are you now?

20 A.   83.

21 Q.   In October of 2022, were you 82?

22 A.   Pretty much, yes.

23 Q.   Okay.  And, I think, if I understood you correctly, you

24 have not watched any video, listened to your 9-1-1 call?

25 A.   Correct.

1          **MS. VARTAIN:**  Okay.  I have no further questions.

2      Thank you, Mr. Pelosi.

3          **MS. VARTAIN:**  We have no questions for this witness,

4      Your Honor.

5          **THE COURT:**  All right.  Thank you.

6      Mr. Pelosi, you are excused.

7          **THE WITNESS:**  Thank you very much.

8                          (Witness excused.)

9          **THE COURT:**  Members of the jury, that actually ends

10     the evidence for today.  It -- I'm sorry you moved your phone

11     call.  Maybe you can move it back.  The parties are on schedule

12     to get the case to you, I think we said by Wednesday, maybe

13     even tomorrow.  Don't know for certain, but just so you know,

14     we're completely on schedule.

15         So tomorrow is the first APEC day, in which a lane or

16     lanes on the Bay Bridge are going to be closed.  It's also

17     supposed to be the biggest rain we've had since March, so

18     please plan accordingly.  I would not drive over the Bay

19     Bridge.  But, also, for those coming from Sonoma County, likely

20     the Golden Gate Bridge and the like are going to be heavier.

21     BART is going to be heavier.  So just plan accordingly.

22         And as always, please do not discuss the case yet.  We're

23     getting there, but you need to keep an open mind and not

24     discuss anything.

25         We'll see you tomorrow at 8:30 a.m.  Thank you.

 1                (The jury leaves the courtroom.)

 2        (Proceedings were heard out of the presence of the jury.)

 3             **THE COURT:**  Okay.  So let's discuss schedule.  The

 4    Government has just one more witness in your case-in-chief?

 5             **MS. VARTAIN:**  That's correct, Your Honor.

 6             **THE COURT:**  And I imagine he's not too long.

 7             **MS. VARTAIN:**  30 to 40 -- 30 to 45 minutes.

 8             **THE COURT:**  So maybe an hour or so total?

 9             **MS. CHUANG:**  I think maybe, best estimate, roughly

10    half a day for our case.

11             **THE COURT:**  Okay.

12             **MS. CHUANG:**  We will finish evidence tomorrow, but --

13             **THE COURT:**  What I'm hearing is we don't want to

14    close.

15             **MS. CHUANG:**  Yes.  The Government and I, we spoke

16    during a break.  We'd like to do the final charging conference

17    in the afternoon and then have the overnight before closing.

18             **THE COURT:**  Okay.  Sure.  I mean, I told the jury --

19    to get it to them by Wednesday, and we'll get it to them by

20    Wednesday.  So I think that's fine.  And another day.  We'll

21    even keep it as professionally presented as you all have done

22    so far.

23        So don't string things along tomorrow.  Don't worry even

24    if it's a short day, and I'm sure the jurors would be happy

25    anyway.  We'll come back Wednesday morning for closing

1    arguments, then, at 8:30.

2        I will file today.  I mean, you stipulated to the jury

3    instructions.  I don't know if anybody has some additional

4    ones.  If you could get them on file tonight, that would be

5    helpful.

6        **MS. CHUANG:**  I think that will be somewhat dependent

7    on how the testimony comes in tomorrow.  We'll try to get it to

8    the Court and the Government as soon as we can, but some of it

9    we just have to wait on.

10       I also just want to note that when we did file the joint

11   proposed instructions, we had noted that both parties were

12   reserving the right to modify any of them.  So I expect that we

13   may have some requests for modifications as well.

14       **THE COURT:**  Okay.  All right.

15       Well, we'll have the afternoon, I imagine, to address

16   them.

17       Whenever the evidence closes, if it closes by lunch or if

18   it's close -- if it's around lunch and you're close to

19   finishing up, then we might just take a later lunch so that we

20   can excuse them for the day.  We'll just play that by ear.

21       And then we'll take a break between whenever we end and we

22   do the charging conference.

23       **MS. VARTAIN:**  May I take up a couple other items, Your

24   Honor?  Is this an okay time?

25       **THE COURT:**  Please.

1        **MS. VARTAIN:**  May the Government release our witnesses

2   who have testified so far?  Obviously, not Lieutenant Hurley,

3   who I understand has her own subpoena from the defendant.

4        **MS. CHUANG:**  We can release her.

5        **MS. VARTAIN:**  Wonderful.  We will let

6   Lieutenant Hurley know.

7        And may we release -- I understand, then, that we can

8   release all of our other witnesses; is that correct?

9        **MS. CHUANG:**  Yes.

10        **THE COURT:**  Thank you.

11        **MS. VARTAIN:**  Your Honor, I'd like to address

12   Exhibit -- Defense Exhibit 511, which I believe -- and I don't

13   want to put words into the Court's mouth, but I might have

14   heard was provisionally admitted --

15        **THE COURT:**  Which was 511?

16        **THE CLERK:**  This.

17        **THE COURT:**  Oh, yes.

18        **MS. VARTAIN:**  -- and was not published to the jury.

19        **THE COURT:**  It was not because the witness wasn't

20   talking about.

21        I suppose if the purpose of it being used is -- I guess

22   the question is, what's the purpose?  He gave some oral

23   testimony which, I think, is appropriate as to the type of

24   things that then-Speaker Pelosi was doing.

25        **MS. LINKER:**  Your Honor, I think he verified that this

**PROCEEDINGS**

1   is the kind of document that he sees, that he sees it

2   regularly, that he's familiar with it.  It is perfectly

3   appropriate and Your Honor admitted it because it is a relevant

4   document.

5        The Government's concerns, as I understand it, are as to

6   the explanation of the redactions.  I don't think we're talking

7   about anything in the redactions.  We're talking about the

8   unredacted, and so it doesn't matter.

9        **THE COURT:**  This was produced to you by the House in

10  this redacted form?

11       **MS. LINKER:**  Correct.

12       **THE COURT:**  So you don't know, actually, what's in the

13  redaction?

14       **MS. LINKER:**  Correct.

15       **MS. VARTAIN:**  Your Honor, may I respond?

16       This document came from the House in response to a defense

17  subpoena, which we then asked the House for via our own

18  subpoena, and it came with an approximately eight-page letter

19  explaining this document, including that two pages of it are

20  redacted.

21       Ms. Linker attempted to admit this under the business

22  records exception, but the witness who was on the stand cannot

23  either authenticate or establish a business record because he

24  did not make it.

25       And so it's very --

1       **THE COURT:**  I don't know that that's a requirement for

2   a business record.  I mean, you admit that the defense

3   subpoenaed the house of Representatives that the house of

4   Representatives -- for, I believe, because I saw the subpoena,

5   for the official, actually the official calendar, not an

6   unofficial.  They subpoenaed the house of representatives for

7   an official calendar, and this is what they produced.  That

8   sounds like a business record to me if there is a business

9   record.

10      **MS. VARTAIN:**  I think that -- I mean, it is -- what

11  was produced is not what was subpoenaed, Your Honor.  They

12  requested an unredacted and complete schedule.  There are two

13  full dates missing.

14      **THE COURT:**  Okay.  But I don't know.  Okay.  I'm sure

15  they would like them if they could have had them, but they

16  didn't actually fight it, which the house of representatives is

17  probably grateful for.  So I don't understand what the problem

18  is if there's two full dates.  I mean, I guess we don't know in

19  particular.

20      But he also testified that the schedule changes; right?

21  That's in evidence, that anyone could -- so the fact that

22  something is here doesn't necessarily mean that it happened.

23  That was the schedule.  But this was her schedule for this

24  week.

25      **MS. VARTAIN:**  Your Honor, my final point on this, and

1    then I will submit on this one, is that I think the Court has

2    been concerned with all the evidence that we have.  We show a

3    document.  We do not admit things that we can't describe.  And

4    to date, even this witness could not describe this document.

5        He's not familiar with the redactions.  He wasn't present.

6    He was on vacation.  He did not receive or see the pages that

7    were submitted to him, and so I don't know that we have

8    competent testimony to describe this document.

9              THE COURT:  Well, he did say that the October 28th,

10   which is when he was called, he would have seen.  He did say

11   that.  And he said it was in a format, I thought, that he would

12   receive.

13       And so I just -- I guess I see no reason to think that

14   it's not reasonable.  I guess that's what I'm looking for.

15   What is the reason to think that it's not reasonable?

16             MS. VARTAIN:  I think the reason is that it's not

17   complete.  It's missing two dates, and it's missing a whole lot

18   of information under these black boxes, which are a predominant

19   portion of the document.

20             THE COURT:  Do we know what SPI stands for?

21             MS. VARTAIN:  We do.  It stands for different things.

22   It stands for -- security is the S.  The P is either personal

23   or privacy, and I don't remember -- and I don't remember what

24   the -- on the top of my mind what the I stands for.

25             THE COURT:  Okay.  So why is the Government prejudiced

1  because security or private information has been redacted and

2  withheld and that there are -- what are the two days that are

3  missing?

4        MS. VARTAIN:  They are two dates that, according to

5  the letter, the speaker was in Croatia on official business.

6  And without a witness to describe that, it is prejudicial to

7  have two days of official business missing from the schedule

8  because I anticipate that the defense is going to want to argue

9  something along the lines of, Well, the speaker doesn't always

10  do official business.  She wasn't doing official business while

11  he was -- her husband was assaulted.  So I think it's

12  misleading to leave out two dates that are not in the schedule.

13        THE COURT:  Well, they're not going to argue anything

14  as to those two dates, are you, Ms. Linker?

15        MS. LINKER:  We're not.

16        THE COURT:  They're not going to do that.  They're

17  missing.  We don't know.

18        MS. VARTAIN:  But if I had a witness on the stand to

19  authenticate it, we would then ask that witness about those two

20  missing dates.

21        THE COURT:  But why would it matter?  They will

22  stipulate that she was on official business then.

23        MS. LINKER:  Your Honor, if we needed to, we would.

24  The Government was well aware that we wanted this, that we

25  wanted to admit it.  We have been agreeing to so many exhibits.

1    **THE COURT:**  Okay.  I know it's not tit for tat.  I

2  guess I just don't see any prejudice for those two dates.  I

3  mean, she's the speaker of the house.  She's on official

4  business all the time.

5    **MS. VARTAIN:**  Yes, but that's not what -- I expect the

6  defense to argue, so I would like a stipulation, then, or I

7  would like to be able to present, through some form, that

8  the -- those two dates are missing because the speaker was on

9  official business in -- and outside the country on that

10  business.

11    **MS. LINKER:**  Your Honor, let me just point out.  The

12  Government subpoenaed this exact same time frame.  If they --

13  when they got it, if they thought it was misleading, they could

14  have asked for a different format.  They could have asked for a

15  different time frame.  They could have gotten any other

16  document that they wanted.

17    We have put into evidence other exhibits that are summary

18  exhibits that don't show everything.  We just went through how

19  many forensic evidence reviews of stuff that they pulled that

20  are different.  They could have asked the Capitol Police

21  officer anything about it if they wanted to.  They could have

22  called their own witness.  They could have done any of those

23  things.

24    They have all of the information, if not more than we do,

25  from the house of Representatives about this.  We are not going

1   to be arguing that those two dates are not official business.

2   We are officers of the court.  We're not going to do anything

3   that is counter to what the facts show.  We are not going to do

4   that.

5           THE COURT:  Well, but what's the objection if the

6   letter came with an explanation that she was out of the country

7   on official business those two days, because the jury might

8   wonder why those two days are missing.

9           MS. LINKER:  Your Honor, we offered with the

10  Government before, given the letter, to come up with something

11  to admit this, and they said no, so --

12          THE COURT:  People change their mind.

13          MS. LINKER:  They change their mind because they're

14  losing.  But I don't think it's an appropriate stipulation to

15  enter of what was going on unless we're going to go through

16  every different thing of what was behind these redactions.  The

17  only redaction that we've been informed of is those two dates.

18  Those two dates when she was gone, we've been informed where

19  she was.  The other parts that are redacted, we have not been

20  informed what they are.

21          THE COURT:  No, I'm not going to say anything about

22  those redactions.  I don't know what they are.  But there are

23  two dates missing, and I think what their concern is is that

24  because they're missing, the jury might infer, because this is

25  the official calendar, that that means unofficial business.  I

**PROCEEDINGS**

 1   think that's the concern.  And that would be an improper

 2   inference because -- that's all, I think.

 3       I think I would just -- you don't have to stipulate.  I

 4   think I would just admit it with -- I mean, we probably don't

 5   even want to bring it that it's -- there's two days missing and

 6   that the speaker was out of the country on official business,

 7   period.

 8           **MS. LINKER:**  And, Your Honor, could -- also instead

 9   just tell them they shouldn't infer anything from the

10   redactions.  They shouldn't infer anything from the absence of

11   information.  They can look at the document for what it is and

12   not infer anything from what is not revealed.

13           **THE COURT:**  What is your concern?

14           **MS. VARTAIN:**  It's more prejudicial to have two dates

15   entirely missing when some dates -- when each entry for each

16   date that is here has some information.  So at a minimum, I

17   think the two dates with some explanation will obviate most of

18   the Government's concerns, and that would be acceptable to the

19   Government.

20           **THE COURT:**  Fine.  It doesn't matter if it's

21   acceptable or not.

22           **MS. VARTAIN:**  I appreciate that, Your Honor.

23           **THE COURT:**  Right.  I would do that.  I don't think

24   anyone is prejudiced by that.  I think number one, it's the

25   truth.  It's the truth.  So there we are.  I understand you

**PROCEEDINGS**

1    offered before.  Trial is a fluid thing.

2         **MS. LINKER:**  Your Honor, we then asked for information

3    about the additional redactions to see if there are other

4    things that have been redacted that we're not alerted to that

5    we think are relevant to our defense.

6         **THE COURT:**  They don't know what they are.

7         **MS. LINKER:**  I understand that they don't, but we

8    would like to know.

9         **THE COURT:**  I don't know.  How are you going to know?

10        **MS. LINKER:**  If Your Honor orders the house of

11   representatives to give us an unredacted version.

12        **THE COURT:**  No, too late.  You're putting your case in

13   tomorrow.  They made an appearance over a week ago.  If you

14   wanted it, you knew exactly who you could contact about that.

15   We're not going to do that.

16        **MS. LINKER:**  We do have a witness under subpoena who

17   could do that.

18        **THE COURT:**  Well, if they're here, they're here.  You

19   can call anybody you want, I suppose.  But I mean, to what end?

20   I mean, to what end?  Really?  I mean, you got, I think,

21   testimony whatever argument you're going to make.  Nobody

22   thinks that she's been 24/7, right, on official business.  So

23   just -- it's common sense.  I mean; right?  We can just look at

24   this from a practical point of view.

25        I think you have -- you got him to admit she goes to --

**PROCEEDINGS**

1   gets her hair cut and various other things, so I don't know.

2   But I will admit it.  I think I did admit it.  I think I took

3   away the provisionally.  But nonetheless, I think it's fair,

4   with the two pages, that we simply advise the jury:  You can

5   figure out by the stipulation that there are two pages missing,

6   that she was out of the country on official business.

7        I'm -- not where, not how, not doing what.

8            **MS. VARTAIN:**  Thank you, Your Honor.

9        Nothing else from the Government, Your Honor.

10           **THE COURT:**  Anything here?

11           **MS. LINKER:**  I think that's it for us, Your Honor.

12   Thank you.

13           **THE COURT:**  Okay.  Okay.  Great.

14           **MS. VARTAIN:**  Thank you, Your Honor.

15           **THE COURT:**  We'll see you at 8:15.

16           **MS. LINKER:**  Thank you, Your Honor.

17           **MS. CHUANG:**  Thank you.

18           **THE CLERK:**  Court is adjourned.

19               (Proceedings adjourned at 3:18 p.m.)

20                   ---o0o---

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Monday, December 18, 2023

_____

Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court