**Volume 4**

**Pages 681 - 879**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

UNITED STATES OF AMERICA,               )
                                        )
            Plaintiff,                  )
                                        )
  VS.                                   )   **NO. CR 22-00426-JSC**
                                        )
DAVID WAYNE DEPAPE,                     )
                                        )
            Defendant.                  )
_____ )

San Francisco, California
Tuesday, November 14, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                        ISMAIL J. RAMSEY
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                **BY:   LAURA E. VARTAIN**
                        **HELEN L. GILBERT**
                        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

                        JODI H. LINKER
                        Federal Public Defender
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                **BY:   JODI H. LINKER**
                        **ANGELA CHUANG**
                        **TODD M. BORDEN**
                        **ASSISTANT FEDERAL PUBLIC DEFENDERS**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

```
 1    APPEARANCES:   (CONTINUED)

 2    For Interested Party "Target 1":
                                 SWANSON & MCNAMARA
 3                               300 Montgomery Street - Suite 1100
                                 San Francisco, California  94104
 4                      BY:   EDWARD W. SWANSON, ATTORNEY AT LAW
                              CARLY BITTMAN, ATTORNEY AT LAW
 5
      Also present:        Maddi Wachs, Paralegal
 6                         Special Agent Stephanie Minor
                           Sheree Cruz-Laucirica, Paralegal
 7                         Catherine Goulet, Defense Investigator

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# I N D E X

Tuesday, November 14, 2023 - Volume 4

|                                          | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| Government Rests                         | 703      | 4        |
| Defendant Rests                          | 839      | 4        |
| Charging Conference                      | 841      | 4        |

| **GOVERNMENT'S WITNESSES**               | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| **HUANG, MICHAEL**                       |          |          |
| (SWORN)                                  | 687      | 4        |
| Direct Examination by Ms. Gilbert        | 687      | 4        |
| Cross-Examination by Ms. Linker          | 702      | 4        |

| **DEFENDANT'S WITNESSES**                | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| **DEPAPE, DAVID**                        |          |          |
| (SWORN)                                  | 708      | 4        |
| Direct Examination by Ms. Chuang         | 709      | 4        |
| Cross-Examination by Ms. Vartain         | 761      | 4        |
| **TARGET 1,**                            |          |          |
| (SWORN)                                  | 778      | 4        |
| Direct Examination by Ms. Linker         | 779      | 4        |
| **YATES, ELIZABETH**                     |          |          |
| (SWORN)                                  | 798      | 4        |
| Direct Examination by Ms. Chuang         | 799      | 4        |
| **BERNAL, DANIEL**                       |          |          |
| (SWORN)                                  | 806      | 4        |
| Direct Examination by Ms. Linker         | 807      | 4        |
| Cross-Examination by Ms. Vartain         | 833      | 4        |
| Redirect Examination by Ms. Linker       | 838      | 4        |

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|--------------------|----------|----------|----------|
| 595                |          | 825      | 4        |

| | |
|---|---|
| **Tuesday - November 14, 2023** | **8:17 a.m.** |

1    **Tuesday - November 14, 2023**                            **8:17 a.m.**

2                          P R O C E E D I N G S

3                              ---o0o---

4        (Proceedings were heard out of the presence of the jury.)

5              THE CLERK:  Remain seated.  Come to order.  Court is

6    now in session.

7              THE COURT:  Good morning.

8              MS. VARTAIN:  Good morning, Your Honor.

9              THE COURT:  You probably have some matters.  I have a

10   couple of matters.

11       One, with respect to Target 1, Ms. Means, when she swears

12   her in, will not ask her to say and spell her name.

13       Two, for the House of Representative witness,

14   Mr. Bernal -- is that how you pronounce it?  I don't know if

15   his attorney is here.  I had missed that there was a motion to

16   sit in the well.  That's fine.  That's granted.

17       Okay.  What else do we want to discuss?

18             MS. VARTAIN:  Your Honor, we filed -- the parties

19   jointly filed a stipulation this morning taking up the issue of

20   Exhibit 511.  And we will read that to the jury before the

21   Government rests.  And I can tell the Court what it says now if

22   that's helpful to the Court.

23             THE COURT:  Sure.

24             MS. VARTAIN:  So aside from the preliminaries, the

25   text is quite short.  The record at 511 does not include the

PROCEEDINGS

1  speaker's schedule for October 24th and 25th, 2022, when she

2  was out of the country on work travel.

3          THE COURT:  Perfect.  Thank you.

4          MS. VARTAIN:  Thank you.

5          THE COURT:  All right.  Anything else?

6          MS. CHUANG:  I think right before we came in here, we

7  saw that the Court had filed proposed jury instructions.  Were

8  those just the ones that we had filed previously, or were there

9  changes?

10          THE COURT:  Well, I put them in order -- no, I don't

11  think there were any substantive changes to what you did.  I

12  actually filed it yesterday, but...

13          MS. CHUANG:  I just saw it come through.

14          THE COURT:  You were busy.

15          MS. CHUANG:  Okay.

16          THE COURT:  No, there weren't.  I just wanted to give

17  them to you to look at them.  I don't think we added any

18  instruction.  No.

19          MS. CHUANG:  And we will have some requests in writing

20  for theory of defense instruction and a few modifications, so

21  we'll get that on file sometime during the day today.

22          THE COURT:  Great.  Thank you.

23          MS. VARTAIN:  Thank you, Your Honor.

24          THE COURT:  Okay.  All right.

25      Well, the jury has been timely every day, so I assume

**PROCEEDINGS**

1    they'll be timely today.

2         **MS. CHUANG:** One last thing. Since the Government has

3    one remaining witness for our Rule 29 motion at the close of

4    their case, is that when we would take the first morning break?

5         **THE COURT:** I think so. I guess it will be an early

6    break, but why don't we do that.

7         **MS. VARTAIN:** Thank you, Your Honor.

8         **MS. CHUANG:** Thank you.

9         **THE COURT:** All right. Thank you.

10                    (Recess taken at 8:20 a.m.)

11                 (Proceedings resumed at 8:24 a.m.)

12         **THE CLERK:** All rise for the jury.

13                  (The jury enters the courtroom.)

14         **THE COURT:** Good morning, members of the jury. Thank

15   you. Thank you again for being so prompt. I think this is the

16   first time I've ever started a trial day a little bit early

17   because my jurors were so timely.

18        All right. Is the Government ready to call your next

19   witness?

20         **MS. VARTAIN:** Your Honor, we are ready to call our

21   next witness, but first may I read a stipulation?

22         **THE COURT:** You may.

23         **MS. VARTAIN:** It's Docket 163, and the stipulation

24   reads (as read):

25              "It is hereby stipulated and agreed between

1         plaintiff, the United States of America, by its

2         undersigned counsel and defendant, David DePape, by

3         his undersigned counsel as follows:

4             "The record at Exhibit 511 does not include the

5         speaker's schedule for October 24th and 25th, 2022,

6         when she was out of the country on work travel."

7         Thank you.

8             THE COURT:  Thank you.

9             MS. GILBERT:  At this time, the Government calls

10   Dr. Michael Huang.

11       (Michael Huang steps forward to be sworn.)

12           THE CLERK:  Good morning.

13           THE WITNESS:  Good morning.

14           THE CLERK:  Can you please raise your right hand.

15                       **MICHAEL HUANG**,

16   called as a witness for the Government, having been duly sworn,

17   testified as follows:

18           THE WITNESS:  I do.

19           THE CLERK:  Can you please state your name and spell

20   if for the record.

21           THE WITNESS:  Sure.  It's Michael, M-I-C-H-A-E-L,

22   Huang, H-U-A-N-G.

23           THE CLERK:  Thank you.

24                     **DIRECT EXAMINATION**

25   \\\

BY MS. GILBERT:

Q.   Mr. Huang, what do you do for a living?

A.   I am a neurosurgeon at the University of California,
San Francisco.

Q.   Do you have a primary location where you practice?

A.   Yes.  I primarily practice at Zuckerberg San Francisco
General Hospital.

Q.   Approximately how long have you been a neurosurgeon?

A.   Since 2010, about 13 years.

Q.   Can you please tell us about your medical education and
training?

A.   I graduated medical school from Weill Cornell Medical
School in 2003.  I did six years of neurosurgery residency as
Georgetown University Hospital and then one year of
cerebrovascular neurosurgery fellowship in Tampa, Florida.

Q.   Are you a board-certified doctor?

A.   Yes.

Q.   By which medical board are you certified?

A.   The American Board of Neurological Surgery.

Q.   You have experience treating traumatic brain injuries?

A.   Yes, I do.

Q.   How long approximately have you been treating traumatic
brain injuries?

A.   Since 2010.

Q.   I'd like to focus your attention on October 28th of 2022.

**HUANG - DIRECT / GILBERT**

1   A.   Okay.

2   Q.   Were you working on that day?

3   A.   Yes.  I was the on-call neurosurgeon that day.

4   Q.   What does it mean to be the on-call neurosurgeon?

5   A.   It means that I cover all the patients with neurosurgical

6   needs in the hospital, and I respond to consultation and

7   emergency evaluation requests from the hospital and the

8   emergency room.

9   Q.   Did you end up going to the hospital that day?

10   A.   I did.

11   Q.   Why?

12   A.   I was informed by my team that there was a patient who had

13   a head injury that required surgical intervention.

14   Q.   After you went to the hospital, did you learn who this

15   patient was?

16   A.   I did.

17   Q.   And who was this patient?

18   A.   It was Mr. Pelosi.

19   Q.   When you went to the hospital, did you meet with

20   Mr. Pelosi?

21   A.   Yes.  I met with him in the resuscitation room.

22   Q.   And did you evaluate him at that time?

23   A.   I did.

24   Q.   And what did you determine about Mr. Pelosi's injuries

25   after you evaluated him?

**HUANG - DIRECT / GILBERT**

1    **A.**   He had, on his head, on the right side, in two different

2    areas, evidence of an open skull fracture.   There was bleeding

3    from the edges of the scalp, where the lacerations were.   And

4    those, I thought, required surgical treatment.

5    **Q.**   Let's take these in parts if that's okay.

6         What is an open skull fracture?

7    **A.**   Yeah.   So skull fracture is any time there is a break in

8    the skull.   And "open" refers to the fact that there is an

9    overlying laceration in the scalp such that now the outside

10   world is communicating with the skull.

11   **Q.**   And can you just explain for all of us, what actually is

12   the scalp?

13   **A.**   The scalp is everything from the skin through -- there are

14   actually five layers -- but through the connective tissue

15   underneath and all the way down to the skull to the bone.

16   **Q.**   And why did you determine at that time that this open

17   skull fracture would require surgical repair?

18   **A.**   So the fractured fragment was also displaced, meaning that

19   it was no longer in alignment with the rest of the skull.   And

20   the -- especially the one on the right frontal area, so over

21   the top of the head, was displaced quite significantly.   It was

22   more than the thickness of the skull.

23        And given that it is in an area -- sorry.  Given that it's

24   open, we needed to be able to clean it thoroughly to avoid the

25   risk of infection.   We also needed to elevate or move the skull

1  piece back into place so that there's no cosmetic defect.  And

2  we needed to evaluate to make sure the underlying covering of

3  the brain was not violated.

4  **Q.**   Now, I want to ask you a few more questions about what you

5  just said, I think, during the course of this surgery.

6       But let me first ask you:  Did you interact with

7  Mr. Pelosi when you examined him?

8  **A.**   I did.

9  **Q.**   And was he coherent?

10  **A.**   He was.

11  **Q.**   And how did you determine that he was coherent?

12  **A.**   He knew his surroundings.  He knew the date, and he knew

13  the reason he was in the hospital.

14  **Q.**   Did you operate that day on Mr. Pelosi?

15  **A.**   Yes, we did.

16  **Q.**   Do you remember approximately when you operated on him?

17  **A.**   I think it was around 4:00 in the morning.

18  **Q.**   And you've described the injuries as you saw them when you

19  evaluated Mr. Pelosi.

20       Did you reexamine those injuries during surgery?

21  **A.**   Yes.  Once Mr. Pelosi was under anesthesia, we removed the

22  hair over the right side of the head so we could get a better

23  evaluation of the injuries.

24  **Q.**   Now, I think you said, earlier in your testimony, that

25  there were two injuries to his head; is that correct?

1   **A.**   Correct.

2   **Q.**   So let's take those in pieces.

3        Can you describe, where was the location of the first

4   injury?  And if you need to point to your own head, that might

5   help those of us who are less familiar with the anatomy of the

6   brain.

7   **A.**   Sure.  So both, the primary injury that I was concerned

8   about was near the top, near the middle of the head.  It -- the

9   scalp was lacerated.  It was about a 5-centimeter laceration,

10  so about 2 inches.

11  **Q.**   I'm going to stop you for a second.

12       So it was about a 5-centimeter laceration on the top of

13  his head, you said.

14       How was the laceration shaped?

15  **A.**   It was -- it had a, primarily, a long shape.  But there

16  were also a couple branches off of that primary line.

17  **Q.**   And was it bleeding?

18  **A.**   Yes.

19  **Q.**   How deep was the laceration?

20  **A.**   The laceration was through the full thickness of the

21  scalp, so it was down to bone.

22  **Q.**   Could you see the bone of Mr. Pelosi's skull through the

23  laceration?

24  **A.**   Yes.

25  **Q.**   And then is it -- is it right medically, that under the

**HUANG - DIRECT / GILBERT**

1   laceration, that's where the skull fracture was?

2   **A.**   Correct.  Yeah.

3   **Q.**   And can you describe the skull fracture in that area of

4   Mr. Pelosi's head?

5   **A.**   Yes.  It was a circular fracture.  The fragment was

6   depressed and kind of wedged underneath the rest of the skull.

7   **Q.**   And is that -- I think you earlier testified about how one

8   of the skull fractures was pressed down through the thickness

9   of the skull.

10       Was this the injury that was pressed down through the

11  thickness of the skull?

12  **A.**   Correct.  This was.

13  **Q.**   Was this skull fracture near any blood vessels?

14  **A.**   It was next to a structure, a blood vessel called the

15  superior sagittal sinus which is a very large vein running

16  right down the middle of the skull from front towards the back.

17       The fracture was about a centimeter away, but the edge of

18  the fracture was, yeah, very close to this vessel.

19  **Q.**   What's the purpose of this blood evaluation?

20  **A.**   So this is a vein, which means that it collects the blood

21  and drains it back towards the heart.  And this particular

22  vein, the superior sagittal sinus, is responsible for draining

23  most of the front of the head, the blood from the front of the

24  brain.

25  **Q.**   Have you seen head injuries that involved lacerations of

HUANG - DIRECT / GILBERT

1   this vein?

2   A.   Yes.

3   Q.   And what are the consequences of such a laceration?

4   A.   It's usually associated with a significant or even

5   catastrophic amount of bleeding, given that there's a very high

6   volume of blood traveling through this vein.

7   Q.   What do you mean when you say a "catastrophic amount of

8   bleeding"?

9   A.   So you can lose nearly a liter of blood in about two to

10  three minutes.

11  Q.   And what would the effect of losing that much blood in

12  that short of time be?

13  A.   So you would cause -- it would stimulate response where a

14  patient's blood pressure could drop, and it can become

15  life-threatening.

16  Q.   Let's turn back to Mr. Pelosi's injury.

17       So I just want to talk about -- the one fracture that

18  we're addressing, I think you said, is sort of on the top of

19  his skull; correct?

20  A.   Yeah.

21  Q.   What did you do during surgery to treat this particular

22  injury?

23  A.   So we had to extend the laceration both forwards and

24  backwards in order to get full exposure of the fracture.  We

25  could not elevate the fracture fragment as it sat on the skull

1  because it was wedged underneath the rest of the skull, so we

2  had to drill around the fracture fragment to remove a piece of

3  the skull in order to then elevate or push this fracture

4  fragment back to the normal contour and then put the fracture,

5  the whole thing back on the skull and fix it in place with

6  screws and plates.

7  Q.   Will those screws and plates be removed at any point?

8  A.   No.  They were permanent.

9  Q.   I think you said earlier, when you were discussing your

10  initial assessment of Mr. Pelosi's injury, that you were

11  concerned about making sure that the -- that the fracture

12  didn't press down onto a different layer of the brain; is that

13  right?

14  A.   Yes.  So the brain is contained in a sack which we call

15  the dura, and inside the sack there's brain and spinal fluid,

16  so one of the things we look at during surgery is to make sure

17  that sack, that dura was not cut by the bone fragment to make

18  sure that there's no leakage of the spinal fluid.

19  Q.   Why would you be concerned about there being leakage of

20  the spinal fluid?

21  A.   If there's a leakage of the spinal fluid, that would

22  increase the risk of infection into the brain.

23  Q.   And was the dura -- was Mr. Pelosi's dura intact?

24  A.   It was.

25  Q.   In addition to checking, I think you said there's blood

**HUANG - DIRECT / GILBERT**

1  and spinal fluid in that area; is that right?

2  A.   Correct.

3  Q.   And did you also determine whether -- did you also look to

4  see whether there was any blood in that area?

5  A.   We did.  There was not a -- a lot of blood underneath the

6  skull fracture.  Most of the -- the bleeding was coming from

7  the edges of the torn scalp.

8  Q.   So the bleeding -- is it -- so the bleeding.  Excuse me.

9       Was the bleeding above the skull, then?

10  A.   Correct, yes, the bleeding was above the skull.

11  Q.   But you were looking for bleeding below the dura; is that

12  right?

13  A.   Not during surgery.  The evaluation of bleeding underneath

14  the dura was done with CAT scans before the surgery and after

15  surgery.

16  Q.   And did you review those CAT scans?

17  A.   We did.  The initial CAT scan was questionable, whether

18  there was a small amount of bleeding.  But after surgery, the

19  CAT scan showed that there was no real bleeding -- there was no

20  bleeding inside the dura.

21  Q.   So did you have to do anything to treat that?

22  A.   We did not.

23  Q.   I think you said there was a second injury to Mr. Pelosi's

24  head; is that right?

25  A.   That's correct.

1    Q.   Can you --

2             MS. GILBERT:  Ms. Wachs, would you mind pulling up

3    Exhibit 310.

4         And this has been admitted.  Submitted yesterday, Your

5    Honor.

6    BY MS. GILBERT:

7    Q.   Dr. Huang, do you recognize this?

8    A.   Yes.

9    Q.   What is this?

10   A.   This is a picture of Mr. Pelosi out -- the side view on

11   the right side of the head.

12   Q.   Do you know if there is before or after the surgery that

13   you performed?

14   A.   This is after surgery.

15   Q.   Is the second injury that he sustained shown here?

16   A.   It is.  It is that half-circular-shaped incision above his

17   ear.

18   Q.   And can you talk us through what -- the extent of this

19   injury, please?

20   A.   Yes.  So this injury, the scalp was also lacerated or cut

21   full thickness.  In this area, there's actually muscle

22   underneath the scalp, above the skull, above the bone, so that

23   muscle was also torn, and we could feel the fracture underneath

24   or through the muscle.

25   Q.   So I just want to be clear.  So it sounds like there was

HUANG - DIRECT / GILBERT

1  another laceration, there was a tear through muscle which is in

2  this area, and then there was -- is it -- there was also

3  another skull fracture here?

4  **A.**   Correct, there was also a fracture in this area.

5  **Q.**   And was this skull fracture different than the one you

6  described on top of Mr. Pelosi's head?

7  **A.**   It was also depressed; however, it was not depressed to

8  the same extent as the one on the top of his head.

9        And therefore, we did not elevate -- or we did not raise

10  up that fracture fragment.

11  **Q.**   Did you do anything to treat this second injury during

12  surgery?

13  **A.**   We washed the area out with antibiotic solution, and we

14  cleaned up the edges of laceration, and then we closed it.

15  **Q.**   What do you mean when you say you "closed it"?

16  **A.**   I'm sorry.  We sutured the cut shut.

17  **Q.**   Did you also wash the injury on the top of Mr. Pelosi's

18  head with antibiotics?

19  **A.**   Yes, we did.

20  **Q.**   Did Mr. Pelosi have any additional injuries other than the

21  two injuries to his head that you've testified about?

22  **A.**   He also had injuries to his hand and arm.

23        **MS. GILBERT:**  Ms. Wachs, would you mind pulling up

24  Exhibit 305.

25  \\\

1   BY MS. GILBERT:

2   Q.   Do recognize this, Dr. Huang?

3   A.   Yes.

4   Q.   What is this?

5   A.   This is a picture of Mr. Pelosi's arm during surgery.

6   Q.   And is this before or after it's been treated?

7   A.   It's after.   There are already sutures in the laceration.

8   Q.   And does this depict the arm injury that you saw?

9   A.   It does.

10  Q.   Did you operate on this arm yourself?

11  A.   I did not.

12  Q.   Do you know who did?

13  A.   It was done by the trauma surgeons.   I don't know which

14  exact surgeon.

15  Q.   But did you see this injury when you were in the operating

16  room with Mr. Pelosi?

17  A.   We, did.   Yes, I did.

18  Q.   And I think you said also that he sustained an injury to

19  his hand; is that right?

20  A.   Correct.

21       MS. GILBERT:   Ms. Wachs, would you mind pulling up

22  what's been marked as Exhibit 298.

23  BY MS. GILBERT:

24  Q.   Do you recognize this, Dr. Huang?

25  A.   Yes.   It's a picture of Mr. Pelosi's left hand.

**HUANG - DIRECT / GILBERT**

1   **Q.**   Do you know if this was taken before or after surgery?

2   **A.**   Before it was repaired.

3   **Q.**   Do you know how large this laceration was?

4   **A.**   I do not know the exact size.

5   **Q.**   And, do you know, was this laceration also treated in

6   surgery?

7   **A.**   It was.

8   **Q.**   Did you treat his hand as well?

9   **A.**   I did not.

10  **Q.**   Do you know who treated his hand?

11  **A.**   It was by the plastic surgeon that was on-call that night.

12  **Q.**   Do -- do you know whether plastic surgeons always treat

13  hand injuries at your hospital?

14  **A.**   The plastic surgeons do treat hand injuries at my

15  hospital.   They rotate with the orthopedic surgeons.

16  **Q.**   Do you know why that is?

17  **A.**   I don't know exactly why, but the hand is a very special

18  area because of the number of muscles, tendons, and nerves and

19  bones, and it requires special expertise to repair the hands.

20  So they have to -- so there are only certain surgeons that are

21  qualified to treat them.

22       **MS. GILBERT:**   And, Ms. Wachs, you can pull this down.

23  Thank you.

24  **BY MS. GILBERT:**

25  **Q.**   Dr. Huang, did you continue to care for Mr. Pelosi after

**HUANG - DIRECT / GILBERT**

1  his surgery?

2  **A.**   I did.

3  **Q.**   And did Mr. Pelosi remain in the hospital after surgery?

4  **A.**   Yes.  He was in -- admitted to the intensive care unit

5  after the surgery, and then he remained in the hospital for --

6  **Q.**   Do you know how long he stayed in the hospital?

7  **A.**   I believe for six days or so.

8  **Q.**   And given the injuries that you've described, were you and

9  others monitoring Mr. Pelosi during this time for anything

10  specific?

11  **A.**   So, yes.  So after he was in the -- admitted to the

12  intensive care unit, we monitor his blood pressure, his

13  breathing, and we were also worried about his kidneys because

14  he has underlying kidney disease.  And he was also evaluated by

15  the physical therapist in the hospital.

16  **Q.**   Do you know if he received any types of physical therapy,

17  other types of therapy while he was in the hospital?

18  **A.**   He did.  He was seen by physical therapy, occupational

19  therapy, and speech therapy.

20  **Q.**   Do you know if any of these therapies continued after he

21  left the hospital?

22  **A.**   I believe he was recommended to have continued physical

23  therapy after discharge.

24  **Q.**   Do you know whether Mr. Pelosi also suffered a concussion?

25  **A.**   He did.

HUANG - CROSS / LINKER

1   **Q.**   Was there any specific treatment prescribed for that?

2   **A.**   So the treatment, a lot of it is expectant management, so

3   initially it's a matter of cognitive rest, avoiding

4   stimulation.  And then after discharge is continued management

5   of symptoms such as headaches and those type of things.

6           **MS. GILBERT:**  No further questions, Your Honor.

7           **THE COURT:**  Any cross?

8           **MS. LINKER:**  It would be short.

9           **THE COURT:**  Sure.

10                      <u>**CROSS-EXAMINATION**</u>

11  BY MS. LINKER:

12  **Q.**   Good morning, Dr. Huang.  My name is Jodi Linker.  I'm

13  just going to ask you a couple of questions.

14          You were surprised by how lucid Mr. Pelosi was when he

15  came -- when you spoke with him before surgery; is that

16  correct?

17  **A.**   Yes, I was surprised.

18  **Q.**   And he did not show any type of physical weakness when you

19  saw him; is that correct?

20  **A.**   When we did our neurological exam, we did not find any

21  focal, meaning specific muscle group, weakness in the context

22  of limitations by his other injuries.

23  **Q.**   And I just want to get some clarity.  You talked about a

24  vein that goes, I think, from the back to the front or front to

25  back probably all the way around.

**HUANG - CROSS / LINKER**

1          Do you remember talking about that?

2     **A.**   Yes.

3     **Q.**   And that vein was not hit or damaged in any way on

4     Mr. Pelosi; correct?

5     **A.**   It was not.

6     **Q.**   And Mr. Pelosi stayed in the hospital a bit longer than

7     normal because you wanted to be cautious with him; is that

8     correct?

9     **A.**   He -- there -- so he stayed for clearance from the various

10    therapies, from physical, occupational, and speech therapies.

11    **Q.**   Even given all of this, you characterized this injury as a

12    mild traumatic brain injury; is that correct?

13    **A.**   Yes.  Given the -- his initial presenting condition, yes,

14    we characterized it as a mild.

15              **MS. LINKER:**  Thank you.  I have nothing further.

16              **THE COURT:**  Any further questions?

17              **MS. GILBERT:**  No, Your Honor.

18              **THE COURT:**  Thank you, Dr. Huang, and you are excused.

19              **THE WITNESS:**  Thank you.

20                        (Witness excused.)

21              **THE COURT:**  Does the Government have any further

22    witnesses?

23              **MS. VARTAIN:**  No, Your Honor.  The Government rests at

24    this time.

25              **THE COURT:**  Okay.  So, members of the jury, given that

1   the Government has rested, we're going to take a 15-minute

2   break while I address some other matters, and then we're going

3   to start with the Defense's evidence.  So we're doing it a

4   little early today.  May be a little squirrelly in terms of

5   schedule.

6       So yes.  We'll take a 15-minute break again.  You are not

7   free to talk about the case yet.  Talk about other things.

8   Thank you.

9                   (The jury leaves the courtroom.)

10  (Proceedings were heard out of the presence of the jury.)

11          MS. CHUANG:  Your Honor, at this time, we move, under

12  Rule 29, for a judgment of acquittal as to all elements on both

13  counts.

14    I'm going to specifically focus on the link to official

15  duties which is required under both counts.  So the Government

16  hasn't offered any evidence of Nancy Pelosi being engaged in

17  the performance of any sort of official duties at the time of

18  the charged incident.

19      And nor have they offered sufficient evidence to show that

20  Mr. DePape was motivated by any performance of her official

21  duties as a member of Congress, rather than anything else.

22          THE COURT:  Okay.

23          MS. VARTAIN:  Your Honor, the Government has offered

24  evidence that the defendant was aware that Nancy Pelosi was in

25  Congress.  He searched that information.  His own statements

1  indicate that he was targeting her because she was the leader

2  of the pack.  He made statements that are admitted into

3  evidence regarding his feelings about her -- the political

4  party, the Democrats.

5       And I think there is ample evidence for the jury to

6  find -- and certainly sufficient at the Rule 29 stage -- that

7  the official duties elements in both statutes are satisfied.

8           **THE COURT:**  Okay.  All right.  Motion is denied.

9       I think you've misstated the standing somewhat.  It's on

10 account of her official duties -- I think the evidence is

11 ample -- that he went to that house because of

12 then-Speaker Pelosi's position as Speaker Pelosi, and a jury

13 could easily find that it was on account of her official

14 duties.  Not during the performance of, I agree, but on account

15 of, which is also an option with respect to Count 1.

16      And in Count 2, I think they could also find, retaliated

17 against the official.  Based on Mr. Pelosi's testimony alone

18 and based on Mr. DePape's own words that we've heard, they

19 could also find that.  And, again, or with intent to impede,

20 intimidate, or interfere with -- well, I guess, intent to

21 retaliate.

22      With respect to the second count, what would be the

23 argument there?  Because it's while engaged in or to retaliate.

24          **MS. VARTAIN:**  Yes.  I'm going to take that in reverse

25 order.  Let me do the retaliation.  I think, as the Court has

1   highlighted, there's ample evidence of retaliation.  So let me

2   go to the first part.

3       I think it would be an inappropriately narrow reading to

4   read "while engaged in" to mean, for example, that she had to

5   physically be on the House floor.  That would render the

6   statute actually almost meaningless and should not be construed

7   so narrowly.

8       So I think there is also evidence that, specifically

9   through Special Agent Littlejohn, that the Speaker is the

10  Speaker 365, 24 hours a day, and doesn't take her hat on and

11  off at any point in time.  So also for the jury to find that

12  she's always engaged in her official duties.

13          MS. CHUANG:  Right.  And we disagree as to that, the

14  language "while engaged in performance of official duties"

15  connotes some type of action, some type of doing.  Not just a

16  state of being the Speaker.

17      It would also render that prong completely superfluous in

18  the statute because if the Government's theory is that she's

19  always the Speaker, always performing official duties, that is

20  essentially -- it's enough for them to show that she was a

21  federal official, a member of Congress, which is a separate

22  element.

23          THE COURT:  Okay.  I do think that is too broad, but I

24  do think the evidence is sufficient to find, in particular,

25  just Mr. DePape's own testimony, about how if she didn't tell

 1   the truth, he would do something to her knees and wheel her

 2   onto the floor of the House of Representatives to show everyone

 3   else what would happen.

 4       I think that testimony in itself satisfies -- or could be

 5   found by a jury to satisfy that element beyond a reasonable

 6   doubt.  So I'll deny the motion.

 7           **MS. CHUANG:**  Thank you, Your Honor.

 8           **THE COURT:**  All right.  So we'll return in 10 minutes.

 9           **MS. CHUANG:**  Sure.  Thank you.

10           **MS. VARTAIN:**  Your Honor, I did want to take up one

11   matter regarding Target 1, which is fine to take up in the open

12   courtroom.  And that is, specifically, that at this point in

13   time the evidence of her -- there is no evidence that the

14   defendant intended to lure or had some plan to go target her in

15   any way other than the fact that he searched for her, but

16   that -- there's no -- there's no record of his planning there.

17       And there's also -- the only other evidence is his

18   statements that were admitted through Lieutenant Hurley about

19   the reasons he feels the way he does about Target 1.

20       And I raised that because, once again, I want to go back

21   to the relevance of Target 1.

22           **THE COURT:**  But her name and address or her phone

23   number -- well, her address.  I don't know that we've yet got

24   on the phone number, but we know that's the case -- were on

25   that piece of paper along with the Pelosis'.

1          **MS. VARTAIN:**  Yes.  I understand that.  But there's no

2    statement or evidence, and she has no percipient knowledge of

3    what the defendant intended to do.  So I flag that because the

4    Government will be objecting to any lines of questioning that

5    inappropriately try to get in his own hearsay about his plan.

6          **THE COURT:**  She's not going to have any knowledge of

7    that whatsoever.

8          **MS. VARTAIN:**  Thank you, Your Honor.

9          **THE COURT:**  So I don't think they'll ask.

10         **MS. CHUANG:**  Right.

11         **THE COURT:**  All right.  Thank you.

12               (Recess taken at 8:57 a.m.)

13            (Proceedings resumed at 9:07 a.m.)

14         **THE COURT:**  All rise.

15               (The jury enters the courtroom.)

16     (Proceedings were heard in the presence of the jury.)

17         **THE COURT:**  Thank you, members of the jury.

18     Is the Defense prepared to call your first witness?

19         **MS. CHUANG:**  Yes, Your Honor.  The Defense calls David

20    DePape to the stand.

21     (David DePape steps forward to be sworn.)

22                    **DAVID DEPAPE**,

23    called as a witness for the Defendant, having been duly sworn,

24    testified as follows:

25         **THE WITNESS:**  Yes.

DEPAPE - DIRECT / CHUANG

1        **THE CLERK:**  Can you please sit down and then state

2   your name.

3        **THE WITNESS:**  David Wayne DePape.

4        **MS. CHUANG:**  You don't have to be quite so close to

5   the microphone.  And I think you need to spell it for the court

6   reporter.

7        **THE WITNESS:**  D-A-V-I-D, W-A-Y-N-E, D-E-P-A-P-E.

8                  **DIRECT EXAMINATION**

9   BY MS. CHUANG:

10  **Q.**   Good morning, Mr. DePape.

11  **A.**   Good morning.

12  **Q.**   Where are you from originally?

13  **A.**   Canada.

14  **Q.**   And when did you come to the US?

15  **A.**   I think about the year 2000.

16  **Q.**   So have you lived in the US since then?

17  **A.**   Yes.

18  **Q.**   And do you consider the US your home at this point?

19  **A.**   Yes.

20  **Q.**   Why did you first come here?

21  **A.**   I came here on a trip to Hawaii with my karate class.

22  **Q.**   And how long have you been in the Bay Area?

23  **A.**   I think I was in Hawaii for about two years and been in

24  the Bay Area since then.

25  **Q.**   Turning your attention to October 2022, what were you

DEPAPE - DIRECT / CHUANG

1  doing for work at the time?

2  **A.**   Carpentry.

3  **Q.**   Sorry.  Was that carpentry?

4  **A.**   Carpentry, yes.

5  **Q.**   Did you work for yourself or for someone else?

6  **A.**   I worked for Frank Ciccarelli.

7  **Q.**   And how long were you doing that for?

8  **A.**   I think approximately six to eight years.

9  **Q.**   Did you have your own tools that you used for work?

10 **A.**   I used his tools.

11 **Q.**   What kind of carpentry did you do?

12 **A.**   Decks and fences mostly.

13 **Q.**   Where were you living at that time?

14 **A.**   Edge of Richmond, close to El Cerrito.

15 **Q.**   Who did you live with, if anyone?

16 **A.**   Malcolm Lubliner, a friend of Frank's.

17 **Q.**   Did you live in the same house as him, or what was the

18 setup?

19 **A.**   I lived in the garage.

20 **Q.**   Did he live in the main house?

21 **A.**   Yes.

22        **MS. CHUANG:**  I'm going to show you what's in evidence

23 as Exhibit 241, if we could pull that up.  There it is.

24 **BY MS. CHUANG:**

25 **Q.**   Do you see that on the screen?

DEPAPE - DIRECT / CHUANG

```
1   A.   Yes.

2   Q.   Is that how your living space appeared at the time?

3   A.   Yes.  Approximately.

4   Q.   Where was your bathroom?

5   A.   I would go to parks or restaurants or use the bathroom

6   somewhere else.

7   Q.   And where did you shower?

8   A.   At -- across the street at Elizabeth's.

9   Q.   Now, I'm going to show you what's in evidence as

10  Exhibit 242.

11       Is that another picture of part of your living space?

12  A.   Yeah.

13  Q.   What's that cushion resting against the wall for?

14  A.   Futon that I slept on.

15       MS. CHUANG:  We can take that down, please.

16  Thank you.

17  BY MS. CHUANG:

18  Q.   When you weren't working, how did you spend your time?

19  A.   All my time I spent playing video games, and I would

20  listen to, like, politics at the same time.  Like I stopped

21  turning -- I turned the sound off the video games, and I would

22  listen to stuff instead.

23  Q.   Okay.  So what format did you listen to things about

24  politics?

25  A.   Mainly, YouTube videos, podcasts.  Stuff playing usually
```

DEPAPE - DIRECT / CHUANG

1   in the video format, and it would be, like, on my computer.

2   Q.   How many hours a day would you say you were listening to

3   these types of things?

4   A.   Like weekends, would be from the time I got up to the time

5   I went to bed.  And weekdays, it would be as soon as I got home

6   until I went to bed.  And I think we worked -- typically, the

7   schedule varied, but it was -- often it would be like six hours

8   a day or sometimes five hours a day.  It was a little bit more

9   than part-time.

10  Q.   So what specific podcasts or YouTube channels did you

11  listen to?

12  A.   The one I listened to the most would probably be Tim Pool.

13  And then after that -- I don't know what I listened to most,

14  but I would listen to Jimmy Dore once in a while, Glenn Beck a

15  bit, James Lindsay.

16  Q.   And so you mentioned before that these podcasts or YouTube

17  channels were about politics.

18       What do you mean by the word "politics"?

19  A.   Kind of like current events.  Like a lot of culture war

20  stuff.  Tim Pool was kind of like the main one I listened to,

21  so...

22  Q.   So let's talk about -- more about what you listened to.

23       How would you describe the political leanings of Tim Pool?

24  A.   Tim Pool is kind of like -- I mean, at heart, he's kind of

25  a lefty.  He tries really hard to be like a centrist, but his

1  reporting is kind of falling on the right because, like, even

2  though he's a lefty, his reporting, I would describe it as more

3  right-wing because he really cares about the truth.

4       And like, so even if it kind of goes against where his

5  preferences are, it's like his -- his allegiance to the truth.

6  So it's, like, when the truth falls on the right, his reporting

7  will be on the right.  And if the truth is on the left, he'd

8  report the left.

9       But he tries very hard to be balanced and centrist, and he

10 said some ridiculous things because he was trying so hard to be

11 a centrist, like, when the evidence was really clear, he would

12 try to present another side of the story.

13 Q.   All right.  What about Jimmy Dore?  How would you describe

14 him?

15 A.   Extreme far-left communist.

16 Q.   What about Glenn Beck?

17 A.   Glenn Beck would be right-wing.  Say a little bit more

18 right than Fox.

19 Q.   What about James Lindsay?

20 A.   James Lindsay is a college professor, and I would describe

21 him as left-wing, but he started to notice, like, the rot in

22 the universities from the left.  And so now, his podcast is

23 basically reading the communist academic literature and

24 interpreting it for his audience.

25 Q.   How did you first become interested in politics?

1   **A.**   Gamergate.  Although I was kind of late to the show.

2   Gamergate was kind of already over by the time I found out

3   about it.

4   **Q.**   Can you just briefly describe what Gamergate is?

5   **A.**   It's very complex.

6        So I kind of found out about it -- like, I'd be playing

7   video games, and I'd look up tutorials.  And so it's like these

8   people would be talking about Anita Sarkeesian, like, she's,

9   like, super toxic.  And then I'd be playing another game.  I'd,

10  say, get stuck on a boss, and look up for a video on how to

11  beat it.  It would be a totally different person, completely

12  random video talking about how toxic Anita Sarkeesian is.

13       And this kept happening over and over and over.  And I'm

14  like:  What the fuck?  Everybody is talking about this person,

15  like, she's super toxic.  And it's like, I don't want to be

16  biased against her because everyone is talking shit about her,

17  so it was like, I kind of need to find out what's going on

18  here.  And it's like, I need to hear both sides of the story.

19       So it's like, I would listen to one side of the story.

20  And it's like, I agreed with them.  And then it's like:  What's

21  the other side of the story?

22       So I listened to the other side of the story.  And it'd be

23  like, okay, they're right, and I agree with them.  And then

24  it'd be like, what's the counterargument to this?  And I'd go

25  back to the other side.  And I kept doing this, going deeper

DEPAPE - DIRECT / CHUANG

1  and deeper into it until one of the sides basically fell --

2  their argument fell apart under the weight of their own lies.

3  Q.   So how would you describe your own political leanings

4  right now?

5  A.   I would say I'm right of center.

6  Q.   Okay.  Was there a time in your past when you considered

7  yourself to the left?

8  A.   Yes.  When Bush was in office, I was of the opinion that

9  9/11 was an inside job, and I would definitely describe myself

10  as left-wing.

11  Q.   So what changed to make you go from the left to the right?

12  A.   Gamergate kind of introduced me to the culture war.  And

13  from there, I started learning more and more about the culture

14  war.  Because Gamergate, in a sense, was kind of like a

15  consumer revolt against the creeping Communism in our culture.

16      And the other big thing was like, I assume that Trump was,

17  like, another one of their puppets like Bush.  And so I had a

18  very strong anti-Trump bias.

19  Q.   And did that change at some point?

20  A.   So -- so I was watching a YouTube video -- I can't

21  remember about what right now --

22  Q.   Do you need a tissue?  Let me get you a tissue.

23          MS. CHUANG:  Can I approach, Your Honor?

24              (Counsel approaches witness.)

25  \\\

1  BY MS. CHUANG:

2  Q.   Mr. DePape, are you feeling up to proceeding?

3  A.   Yeah.

4  Q.   All right.

5  A.   I don't know where that came from, but -- so I watched a

6  gamer YouTube video.  I can't remember what it was about.  I

7  happened to be browsing the comments, and somebody was like,

8  they used to be, like, extremely anti-Trump and -- but then I

9  saw a video.

10  Q.   Do you need a moment?  Just take a minute.

11  A.   About how much --

12       MS. CHUANG:  Should we take a short break, Your Honor,

13  or?

14       THE WITNESS:  It's like about how much they're, like,

15  lying about Trump.  And at this time, I was, like, biased

16  against Trump, but there's, like, truth out there.  It's, like,

17  I want to know it.

18       MS. CHUANG:  Your Honor, I think we -- maybe we should

19  take just a five-minute --

20       THE COURT:  Maybe you can go to a different topic.

21       THE WITNESS:  So it's like, if there's truth out there

22  that I don't know, I want to know it.  So it's like I started

23  searching to find out, like -- like, I started trying to look

24  for this.  And so it's, like, I searched for, like, lies and

25  Trump.

1        And, like, most of it was mainstream media, and they were,

2   like, all lying about Trump.  But it's like I kept digging.

3   And I found -- I don't know if it was the same video, but I

4   found a video talking about how they were lying about Trump,

5   and it showed things like the koi fish video.  Like, Trump did

6   a visit to Japan with, like, the prime minister and, like, the

7   prime minister dumped some food for the koi fish and then Trump

8   mimics him, and he dumped some food for the koi fish.  And the

9   prime minister dumps in the whole box, and then Trump mimics

10  him and dumps in the whole box.  And when CNN reported this,

11  they edited the video so that they don't show the prime

12  minister of Japan dumping in the whole box, and so it makes it

13  look like Trump is, like, a total buffoon, and that's how they

14  reported on the video.

15       And then there was other things.  Like, as soon as he got

16  in office, they were, like, pretending like he took the bust of

17  Martin Luther King out of the White House so that they could

18  pretend like he was racist, and then they later had to retract

19  it.  And then there was others.  And it's, like, once I started

20  seeing how they were lying about Trump, it's like everything

21  that they reported about him, it's like they report one thing,

22  and then it's like, Well, what's the actual truth?

23       And then, when you actually dig into it, you find out that

24  there was things that they were omitting or distorting or lying

25  about him.  And just, like, everything was a lie from the --

DEPAPE - DIRECT / CHUANG

1    coming from the press.

2    BY MS. CHUANG:

3    Q.   So I think before, when you said that you were first

4    anti-Trump, you mentioned that you assumed he was one of their

5    puppets.  Whose puppets are you talking about?

6    A.   Puppets of the ruling class.  Wall Street.  I don't know

7    exactly, but just vaguely.

8    Q.   What's your understanding of what the ruling class is?

9    A.   The easiest answer would be, like, say, Wall Street and

10   the super rich and whoever.  But there is reason to believe

11   that, like, this traces back to, like, the Jesuits and the

12   Vatican, through secret societies and stuff.

13   Q.   So let's talk a little bit more about James Lindsay, who

14   you mentioned before.

15   A.   Okay.

16   Q.   Did James Lindsay talk on his podcast about any person in

17   particular who drew your interest?

18   A.   Yes.  He had a couple podcasts about Target 1.

19   Q.   And that's the person that we've been referring to as

20   Target 1 during this trial; right?

21   A.   Yes.  I learned about Target 1 through James Lindsay's

22   podcasts.

23   Q.   And what is your understanding of who Target 1 is?

24   A.   I understand her to be a professor who is a published

25   pedo-activist.

1  Q.   What do you mean by "pedo-activist"?

2  A.   She basically advocates for cross-generational encounters

3  between adults and children.

4  Q.   Is there anything that you understand she's doing to

5  schools?

6  A.   James Lindsay reads her academic papers, and it's very

7  information-packed podcast, but the takeaway I got is that

8  she's trying to turn our schools into basically pedophile

9  molestation factories.  She wants to destroy children's sense

10 of identity because it's her opinion that this will lead them

11 to grow up dysfunctional and unhappy.  And if they're

12 dysfunctional and unhappy, they will be maladjusted to society,

13 hate society, and want to become communist activists.

14 Q.   And how did that make you feel when you learned that about

15 Target 1?

16 A.   I was outraged.

17 Q.   So did you do any additional research into Target 1?

18 A.   Beyond finding out her address, not that I recall.

19 Q.   And how did you look up her address?

20 A.   I don't recall.  Spokeo probably.  I was doing other

21 searches like Google searches, image searches, street view

22 searches, satellite image searches.

23      I can't remember which combination I used to determine her

24 address.  And, like, I would find their address, but I'd also

25 try to find it from multiple sources to confirm that it was

DEPAPE - DIRECT / CHUANG

1   actually the right address so I wouldn't end going to the wrong

2   house or a house they no longer lived at.

3          **MS. CHUANG:**  So I'm about to show an unredacted

4   exhibit, Your Honor.  If I could just turn off the gallery

5   monitors.

6                    (Pause in proceedings.)

7          **THE COURT:**  Okay.

8   **BY MS. CHUANG:**

9   **Q.**   All right.  So I'm showing you what's in evidence as

10  Exhibit 293.

11         **MS. CHUANG:**  And if we could blow up sort of the

12  bottom part of that, the search history.  Thank you.

13  **BY MS. CHUANG:**

14  **Q.**   Okay.  Now, at the bottom of this page, do you see

15  Target 1's name -- and without saying her name, do you see

16  Target 1's name?

17  **A.**   Yes, I see Target 1's name.

18  **Q.**   And is this how you searched for her through Spokeo?

19  **A.**   Yes.

20  **Q.**   A couple of rows above her name, do you see an address

21  that's in San Francisco?

22  **A.**   Yes.

23  **Q.**   And is that what you believed to be her address?

24  **A.**   Yes, I believe that to be her address.

25  **Q.**   Is that the same address you wrote on the note that was

DEPAPE - DIRECT / CHUANG

1  found in your pocket?

2  **A.**   I believe so.

3  **Q.**   And then right underneath that address, do you see a

4  415 phone number?  Please don't say the phone number.

5  **A.**   Yes.

6  **Q.**   Is that the phone number that you found for Target 1?

7  **A.**   I believe so.

8  **Q.**   Is that the same number you wrote on the note that was

9  found in your pocket?

10  **A.**   I believe so.

11         **MS. CHUANG:**  Thank you.  We can take this exhibit

12  down.

13  **BY MS. CHUANG:**

14  **Q.**   Why did you search for Target 1's address?

15  **A.**   Because she was one of my targets as well.

16  **Q.**   But now, directing your attention to late October 27th,

17  very early morning of October 28th, 2022, do you remember that

18  night?

19  **A.**   Say that again.  I wasn't -- yeah, I believe so.

20  **Q.**   In the middle of the night, did you go to Nancy Pelosi's

21  house in San Francisco?

22  **A.**   Yes.

23  **Q.**   How did you find her address?

24  **A.**   I probably searched for it on Spokeo.  Spokeo comes up

25  with a bunch of records, and I don't necessarily know which is

DEPAPE - DIRECT / CHUANG

1    the correct one.  So I used Google searches, and I found out

2    about a protest.  And they had pictures of the house, and so

3    that kind of means that must be the house, so I saved those.

4         And I was able to find -- like, there was a street sign in

5    one of the pictures, but it was, like, super blurry, so I

6    searched more to find one that showed it correctly.

7         And it was like -- I don't want to say it because that's

8    probably protected information.

9    Q.   The Pelosi address?

10   A.   The street address in the sign.

11   Q.   Right.

12   A.   But, like, there was a stop sign that showed the cross

13   street, and that was actually different from what was coming up

14   in the Spokeo searches, so I had to do a lot of extra searches

15   to try and make sure that that was actually correct, and

16   actually found it on some other random website, and then

17   double-checked everything.

18   Q.   So earlier you testified that you had found a

19   San Francisco address for Target 1.  Did you consider going to

20   her house?

21   A.   Yes, I was considering going to her house first.  The main

22   reason is simply proximity; it was the closest to BART.

23   Q.   Why didn't you go there that night?

24   A.   I did a search of, like, Google Street Views, and the

25   street view of her house, it was like a solid wall of

DEPAPE - DIRECT / CHUANG

1    buildings, and it seemed extremely hard to gain entry.

2    Q.   Would that -- would Target 1's address have been your

3    first stop if it looked like it was easier to gain entry?

4    A.   Yes.  Because it was so hard to gain entry, I thought that

5    maybe I could use the Pelosis to lure her out instead.

6    Q.   All right.  So you mentioned that you had a list of

7    targets.  What other names were on your target list?

8    A.   Gypsy, Adam Schiff, Tom Hanks, Bill Barr, Mike Pence,

9    Marina Abramovic, Soros, Bernie, Hunter Biden, Gavin Newsom --

10   did I say that yet?

11   Q.   No, you haven't said that yet.

12   A.   That's all I can recall at the moment.

13   Q.   And was this list written down anywhere or just in your

14   head?

15   A.   Just in my head.

16   Q.   All right.  So let's go through a few of those names.

17        Why is Target 1 on the list?

18   A.   Because she's a pedo-activist.

19   Q.   And by "pedo-activist" -- is that what you testified about

20   earlier, about the schools being turned into pedophile

21   molestation factories?  Is that what you're referring to?

22   A.   Yeah.  I'd actually add more.  It's not just that she's a

23   pedo-activist.  It's that she wants to turn all the schools

24   into pedophile molestation factories.  I mean, if she was just

25   a pedo-activist, I probably wouldn't have targeted her for just

1    that.

2    **Q.**   So I'm going to show you another unredacted exhibit.  I

3    think the monitors are still off.

4              **THE COURT:**  Are they still off?

5              **MS. CHUANG:**  Thank you.

6    **BY MS. CHUANG:**

7    **Q.**   So I'm going to show you Exhibit -- what's in evidence as

8    Exhibit 500.  Do you see that on your screen?

9    **A.**   Yes.

10   **Q.**   Is this a screenshot of your website?

11   **A.**   Yes.

12   **Q.**   All right.  So this is page 20 that we're looking at.

13        About two-thirds of the way down, do you see a post with

14   Target 1's name?

15   **A.**   Yes.

16   **Q.**   And when was the date of that post?  It's sort of small.

17   **A.**   September 16th, 2022.

18   **Q.**   2022.  So how much time elapsed between when you posted

19   that and when you went to the Pelosis' house?

20   **A.**   I believe about a month and a half.

21   **Q.**   And does this post reference anything that Target 1 has

22   written?

23   **A.**   So in the post, I embedded James Lindsay's podcast about

24   her, and I made commentary along with time stamps that I'm

25   commentating upon.

1  Q.   So we'll stay on this page.  A few entries above that, do

2  you see a post that says "groomer schools"?

3  A.   Yes.

4          MS. CHUANG:  If we could please blow that up.

5  BY MS. CHUANG:

6  Q.   So what date was this post that we're looking at?

7  A.   Same day.

8  Q.   And what does the phrase "groomer schools" mean to you?

9  A.   Same general thing as what I understand ███████ wrote

10 about in her academic paper she published that James Lindsay

11 was talking about: queering the students, pushing

12 transgenderism to confuse children about their identities to

13 make them more vulnerable to abuse and Marxist indoctrination.

14 Q.   We're going to turn to page 24.  And do you see -- wait.

15 Hang on.

16      Do you see a post on this page that says:  Franklin Credit

17 Union Coverup"?

18 A.   Yes.

19 Q.   Do you see that there now?

20 A.   Yes.

21 Q.   What's -- what is the Franklin Credit Union coverup?

22 A.   So there's a documentary called "Why Johnny Can't Come

23 Home."  And a mother had her son -- she had her son kidnapped

24 for, like, child abuse reasons --

25 Q.   If you need to take a minute, go ahead.

1   **A.**   And she never gave up on -- and so there were politicians

2   that were using children for sexual abuse and kompromat.   And

3   this actually involved a very prominent Republican, and it also

4   connected into her son being kidnapped.   There were witnesses

5   who were willing to testify to it, but they were basically

6   persecuted by the Government instead of the people involved,

7   and the Government covered it up.

8   **Q.**   Why is there a picture of pizza in the picture with this

9   post?

10   **A.**   To avoid, like, copyright things, I was using AI-generated

11   images from, I think, Midi-something.   I can't remember the

12   name.   And pizza is supposed to have some child abuse

13   connotations, so I used AI-generated images with pizza because

14   those reasons.

15   **Q.**   Does pizza have child abuse connotations because of

16   something called "Pizzagate"?

17   **A.**   Pizzagate is about it containing child abuse connotations.

18   **Q.**   If we could go to page 25.   About halfway down the page,

19   do you see a post that says, "Mainstream Media Cop Pushing

20   Propaganda"?

21   **A.**   Yes.

22   **Q.**   What did you mean by that?

23        **THE COURT:**   Is this still --

24        **MS. CHUANG:**   Oh, I guess we can turn the monitors back

25   on.

DEPAPE - DIRECT / CHUANG

1     THE COURT:  Yes.

2     THE WITNESS:  So on -- that one's specifically about

3  ivermectin.  The mainstream media would push lies that

4  ivermectin was, like, poisoning people and stuff.  And then

5  afterwards, people would do more research and find out that

6  what they published was a lie.  Like, they contacted the

7  hospitals and found out that the story that was published

8  wasn't true.

9  BY MS. CHUANG:

10  Q.  And then, finally, on the same page, do you see several

11  posts that say "Fall of the Cabal" as part of the title?

12  A.  Yes.

13     MS. CHUANG:  Could we just blow one of those up.

14  BY MS. CHUANG:

15  Q.  So what is that -- what are those about?  What cabal are

16  these posts talking about?

17  A.  That references a documentary that is embedded in the

18  pages, probably.  It's a very long, information-packed

19  documentary.  I can't remember the specifics, but if I

20  remember, they talk about, like, secret societies that are

21  running our society.  And they may talk about their connections

22  to the Jesuits and stuff.

23  Q.  Okay.  So is the cabal related to the ruling class that

24  you talked about before?

25  A.  Yes.

1      **MS. CHUANG:**  Okay.  So we can take this exhibit down

2  now.  Thank you.

3  **BY MS. CHUANG:**

4  **Q.**   Going back to your list, Mr. DePape, why was Tom Hanks on

5  the list?

6  **A.**   So there's a number of accusations around Tom Hanks.

7  There is an actor named Isaac Kappy who blew the whistle on,

8  I believe, 30 Hollywood pedophiles.  The only one I'm aware of

9  is Tom Hanks.  After this, Isaac Kappy died under suspicious

10  circumstances.

11      The witnesses at the scene say that he committed suicide,

12  but a lot of people believe that he was killed and made to look

13  like a suicide.  And basically, there -- he went off on

14  overpass and, I believe, was hit by a car, and there was two

15  people at the scene who said that they were trying to stop him

16  from committing suicide.  But it's reasonable to believe that

17  they were the ones who were murdering him.

18      And the day before he died like this, he produced a video

19  saying he's not suicidal.  He's scared for his life.

20  **Q.**   Take a moment.  Take a few deep breaths if you need to.

21  **A.**   So of the 30 people that he identified, it appears as if

22  Tom Hanks fled the country immediately after his death.  So

23  people suspect that he might have been the one who ordered the

24  hit on Kappy.  Hollywood kind of freaked out after this, when

25  Tom Hanks fled the country.

1        And, like, Ben Stiller produced a video that may have been

2   a coded message.  He was talking about chainsaw art, and this

3   could be construed as, like, a veiled threat, or he may just

4   like chainsaw art.

5        And there's a video that Isaac Kappy released -- or Isaac

6   Kappy said that he had a dead switch if he dies, which is

7   information that will be released if he gets killed.  So

8   there's a video that leaked out that people believe is his

9   deadman switch, but aren't certain.

10       And it shows a bunch of five-year-olds -- not dressed

11   illegally, but I would say inappropriately.  And they're

12   pouring water, and it appears to be, like, a -- kind of like a

13   temple or something.  It appears pretty inappropriate, but not

14   necessarily illegal.

15       And people -- using the architecture, people found where

16   that is, and it's a resort in Turkey.  And there's pictures of

17   Tom Hanks posing with that resort on the cover of a magazine.

18   So he seems to have some connection to it, although I don't

19   know how much he necessarily knows about what goes on there.

20       And there are -- there's a 14-year-old who came forward

21   claiming that her father sold her to Tom Hanks for sex.

22   Q.   Did you think that this was true about Tom Hanks, that he

23   was a pedophile?

24   A.   None of the evidence is conclusive.  But it was worth

25   finding out more, which is why I wanted to visit him.  And I

1  figured that he might be able to blow the whistle on other

2  Hollywood pedophiles.

3  Q.   Did you look up Tom Hanks' address as well?

4  A.   Yes.

5        MS. CHUANG:  So I think we can go with redacted

6  version is fine, of Exhibit 293.  If we could blow up search

7  history again.

8       Thank you.

9  BY MS. CHUANG:

10 Q.   Okay.  Mr. DePape, I'm showing you, again, Exhibit 293.

11 So under search history, do you see a Beverly Hills address

12 that's partially redacted?

13 A.   Yes.

14 Q.   Was -- is that address what you believe to be Tom Hanks'

15 address?

16 A.   Yeah, I think so.  He might be in Pacifica, but --

17 Q.   Did you find addresses for him in the LA area?

18 A.   Yes.

19        MS. CHUANG:  You can take that down, please.

20       Thank you.

21 BY MS. CHUANG:

22 Q.   Okay.  So moving on.  Adam Schiff, who is he?

23 A.   A congressman or senator.

24 Q.   Do you know which one?

25 A.   Can I go back to the previous question?

1    **Q.**    Sure.

2    **A.**    So I believe I wasn't able to find Tom Hanks through

3    Spokeo.  I found him through other means.

4    **Q.**    Okay.

5    **A.**    So the Spokeo search records aren't necessarily what I

6    found as his address.

7    **Q.**    Thank you for the clarification.

8         So Adam Schiff, do you know if he's a congressman or a

9    senator?

10   **A.**    I can't remember for certain.

11   **Q.**    Okay.  And why was he on your list?

12   **A.**    So he had a speech -- I think it was in Congress, but I'm

13   not 100 percent certain -- where he told bald-faced lies to the

14   American people.

15        And I don't know if I watched the speech, but it became

16   like a culturally significant event because afterwards -- so

17   like half the country believed what he had to say because

18   they're so propagandized.  And what he was saying was a lie,

19   and half the country realizes it was a lie.  So to excuse the

20   fact that he blatantly told such blatant lies on the floor of

21   Congress, he excused it as a joke.

22   **Q.**    Were you aware of other allegations against Adam Schiff?

23   **A.**    Yes.  So he took a very prominent place because of his

24   lies, and I just randomly happened across an accusation

25   involving him that -- I don't know if this accusation is true

1   or has any merit, but it was a claim, something along the lines

2   of a child was trafficked to him, and I believe they died of an

3   overdose.

4        And Anthony Bourdain lived in the same apartment and

5   witnessed something about this; and for that, Adam Schiff had

6   him killed.  I didn't have time to research this a lot, so I

7   don't know if Anthony Bourdain is dead.  He might still be

8   alive.  I don't know what manner he died to say that it was

9   suspicious.

10        Through my research, trying to find Adam Schiff's address,

11  I can't confirm that he did, in fact, live at that building he

12  was alleged to have lived at in this allegation.  I did not

13  take the time to find out if Anthony Bourdain ever lived there

14  or if there -- they lived there at the same time.

15        The main thing that I got from this was like -- like, it

16  was basically an allegation that there's kompromat on him, and

17  it's like -- it suddenly made sense why he was telling such

18  bold-faced lies on the floor of Congress to the American

19  public.

20        And then there was -- before I left, I tried to look into

21  it a little bit more.  I just did, like, pre-cursory searches,

22  and it brought up more allegations that people had made

23  allegations against Adam Schiff of sexual abuse involving

24  minors and that he had paid off the witnesses.

25        And then I found pictures of him in front of a -- like, a

DEPAPE - DIRECT / CHUANG

1  Haitian orphanage.  And Haitian orphanages are like a front --
2  not all, but many are a front for child trafficking.  Like
3  the -- you guys have heard about Pizzagate and how, like, the
4  Clintons are, like, supposed to be trafficking children in a
5  pizza parlor?  That's a straw man argument.
6       A straw man argument is when you, like, instead of
7  presenting the real argument, you present a weakened argument.
8  So the argument against the Clintons is that a woman -- I can't
9  remember her name at the moment -- got caught trafficking
10  children out of Haiti.  And when she did, she called the
11  Clintons, and they used their political influence to help her
12  at her trial and get her a reduced sentence or something.
13      And then I found out later that apparently Bill Clinton
14  went down, and he was possibly picking the children out at the
15  orphanage before she tried to kidnap them.
16  Q.   All right.  Did you look up Mr. Schiff's address as well?
17  A.   Yes.
18  Q.   Do you remember what city that was in?
19  A.   I found one in LA, and then I found another, maybe in MD.
20  I can't remember for certain, but it was like --
21  Q.   By "MD," do you mean the -- oh, sorry.
22       By "MD," do you mean the state of Maryland?
23  A.   Maybe.  If that's what MD is -- which led me to believe he
24  might have moved.
25  Q.   So let's talk about Hunter Biden.  Why was he on your

1  list?

2  **A.**    I fucking love Hunter Biden.  So he's, like, so blatantly

3  corrupt.  Like, he doesn't even try to hide the nepotism.

4       It's, like, while they were trying to impeach Trump for,

5  like, investigating the corruption.  It's, like, the FBI had

6  the evidence of the corruption.  And when it finally got

7  exposed to the public so they couldn't cover it up anymore,

8  instead of investigating it, the FBI was covering up the

9  corruption.  And when it still got leaked out because of people

10  who care about their democracy, it was covered up by the

11  propaganda industrial complex instead until they could finish

12  stealing the election.

13       And there's e-mails on there where they're discussing

14  basically laundering Joe Biden's influence-peddling through his

15  son.  And what I mean by that is instead of paying Joe Biden

16  for voting their way, they pay his son to get him to vote how

17  they want to him.  That's influence-peddling, and they're

18  laundering it through his son.

19       And there's e-mails with this, but instead of referencing

20  Joe Biden directly, they use acronyms.  And there are witnesses

21  who are recipients to these e-mails who have confirmed that

22  they are, in fact, referring to Joe Biden.  And this is being

23  covered up by the propaganda industrial complex.

24       And I figured -- so Hunter -- something like 400 -- over

25  400 charges were sent before Congress against -- multiple

DEPAPE - DIRECT / CHUANG

1  charges to charge Hunter Biden with.  Not -- yeah, Hunter

2  Biden.  And so I figured that they're more likely to throw him

3  under the bus to try and deflect criticism from Joe Biden

4  because they want to cover up Joe Biden's corruption.

5      So I wanted to get him to expose the corruption against

6  his father.  And then once his father's corruption is exposed,

7  like, he can freely pardon him.  Because pardoning him is

8  blatant corruption, but once the corruption's exposed, there's

9  nothing stopping them.

10     So I figured if I could get there, I could get Joe to

11 basically pardon all of these criminals.  And the reason I

12 wanted to do that, like, that was the grand end of my plan --

13 was a pardon for all these criminals for all their criminal

14 conduct.

15     And when I told the officer this in our interview, she was

16 like -- she was surprised that my plan was to get them a

17 pardon.  And it's like, the reason why is that it's just

18 easier -- you know, trying to convict all these people.

19 They'll burn our country to the fucking ground before any of

20 them will face a day in court or in jail.  So it's like giving

21 them a pardon so that we can move forward as a country.  It's

22 just easier.

23 Q.   Take a minute if you need.

24                     (Pause in proceedings.)

25 \\\

**BY MS. CHUANG:**

**Q.**   Is Hunter Biden part of the ruling class that you were talking about before?

**A.**   I would probably say, yes.

**Q.**   All right.  So let's move on to Soros.  By "Soros," do you mean George Soros?

**A.**   Yes.

**Q.**   Who is he?

**A.**   I believe he's a hedge fund manager.  He has destroyed several currencies by doing speculation.  He does this to enrich himself.  He also uses his money to influence politics behind the scene.  He funds grassroots movements to push his policies.  I believe he's fomented revolutions in several countries, including Ukraine.

**Q.**   Does he hold any position in government that you're aware of?

**A.**   Not that I'm aware of.

**Q.**   Is he part of the ruling class?

**A.**   Oh, for sure.

**Q.**   All right.  Now let's talk about Gavin Newsom.  Why was Gavin Newsom on the list?

**A.**   So they -- they're trampling your rights, like the Second Amendment.  And it's gotten so commonplace that you guys don't even notice it anymore.  So somebody who's trampling Second Amendment rights needed to make the list, and I just

1    happened to see that he signed a bill regarding guns, and so he

2    was close, so he made the list.

3    Q.   Was Paul Pelosi on your list?

4    A.   No.

5    Q.   Was Nancy Pelosi on your list?

6    A.   Yes.

7    Q.   Okay.  So we'll come back to why she was on your list in a

8    little bit.

9         For now, who was on the top of your list?

10   A.   Hunter Biden was, I would say, the top of the list.

11   Q.   Between Target 1 and Nancy Pelosi, who was higher on the

12   list?

13   A.   Target 1 for sure.  Nancy was just like lying to the

14   public about Russiagate and basically pushing a biased line for

15   the Democratic party, whereas Target 1 wanted to turn all our

16   schools into pedophile molestation factories.  That's the big

17   discrepancy there.

18   Q.   I'm going to bring you back to the night of October 27th,

19   2022.  When you went to the Pelosi house that night, where did

20   you come from?

21   A.   My place in Richmond.

22   Q.   What did you bring with you?

23   A.   A whole bunch of supplies that I thought I might need.

24   Q.   Did you see earlier in the trial when the Government went

25   through all the things you brought with you?

1  A.   Yes.

2  Q.   Why so many supplies, why bring so many supplies?

3  A.   Because I expected this would be an extended trip because

4  I would probably need to travel across the country.

5  Q.   Was the Pelosi house just planned to be one of many stops?

6  A.   Yes.  It was just close proximity.

7  Q.   Where else did you plan to go after the Pelosi house?

8  A.   I was originally planning to go to Target 1, Nancy, and

9  then Gavin.  But because of proximity -- but because it seemed

10  to be too hard to gain entry to Target 1, I went to Nancy's and

11  I thought, you know, I could wing it on the fly and maybe lure

12  Target 1 over to Nancy's and then head to Gavin.

13

14  Q.   All right.  So let's talk about what happened when you got

15  to the house that night.

16       How did you get in?

17  A.   Breaking through a window or door or glass door.

18  Q.   What did you use to do that?

19  A.   Hammer.

20  Q.   Was this -- that a regular hammer or sledgehammer?

21  A.   Just a regular hammer.

22  Q.   Did you also have a sledgehammer with you?

23  A.   Yes.

24  Q.   But that's not what you used to break in; right?

25  A.   No.

DEPAPE - DIRECT / CHUANG

1   **Q.**   Okay.  After you got into the house, where did you leave

2   your stuff?

3   **A.**   Outside.

4   **Q.**   And what did you do next?

5   **A.**   Started looking for the occupants.  I think I went to -- I

6   went past the stairs and looked into some room.  I can't

7   remember what it was.  And then I went upstairs.

8   **Q.**   All right.  And when you went upstairs, did you find

9   someone?

10   **A.**   Yes.  I was looking along -- I was starting to worry that,

11   like, nobody was home, and he actually -- he kind of like woke

12   up and startled me.

13   **Q.**   Who do you mean by -- when you say "he"?

14   **A.**   Paul.

15   **Q.**   Paul Pelosi?

16   **A.**   Yes.

17   **Q.**   So when he woke up and startled you, what did you say to

18   each other?

19   **A.**   He was kind of like surprised.  I asked him if Nancy

20   Pelosi is here.

21   He said:  She's not here.

22   I probably asked:  Where is she?

23   He's like:  In Washington, D.C.

24   We started talking about, like, when did she leave.  I

25   think he mentioned when she left, like, a little bit prior.

1      And I, like, asked:  When is she going to be back?

2      And he's like:  I think about the weekend.

3      And then he asked like:  What's this about?

4      And I was like:  I want to talk to her.

5      And he's like:  Talk to her about what?

6      And he's like -- I think I said something about, like, the

7   corruption in DC, and he appeared to agree with, like, the

8   problem with corruption in DC, and he appeared to be genuinely

9   remorseful about the corruption in DC.

10      Then he started, like, asking like:  How can we resolve

11   this?  Like -- or like:  What are we going to do now?

12      And I was like:  I don't know.  And I was like:  Maybe

13   I'll wait for her.  And because at this point I was still

14   hoping to go forward with this portion of the plan.

15      And we went back and forth, him kind of like asking like:

16   What should we do now?

17      And he was kind of sitting on the edge of the bed, and he

18   was, like, small, kind of like small like he was intimidated.

19      And I suggested:  Why don't I, like, restrain you so that

20   I can go to sleep, and we'll figure it out in the morning?

21      And at this point, like, there was a pile of pillows in

22   front of a window, and I, like, dropped the hammer on it and

23   reached into my pocket to pull up the restraints.  And at this

24   point, he walked away.  And as I was coming in, there was like

25   a little room, and it was very dark and there was a window in

DEPAPE - DIRECT / CHUANG

1  front of it, and I couldn't tell what it was.

2      And I realized he was heading towards it, and I didn't

3  know what it was, so I was worried, like, he's heading towards

4  something and I don't know what this is.  So I pursued him.  He

5  got into the elevator, and he was turning towards the phone.

6      And I inserted myself into the elevator with him so that

7  if he -- I believe I only inserted myself about halfway into it

8  because it was crowded.  But it's like, if he was going

9  anywhere in the elevator, I was definitely going with him.

10      And I turned to him, and I asked him -- I was like:  Do

11  you really want to try this?

12      And he was, I believe, shorter than me, and he kind of

13  like looked up at me, and he was like:  You're a big guy.  No.

14      And then he, like, got out of the elevator, and there was

15  like an alarm pad, like, for setting the burglar alarm, and he

16  kind of like ran his fingers down it as he was walking past.

17  And then he walked through the bedroom, went through the

18  bedroom --

19  Q.   Mr. DePape, I'm going to stop you right there so I can go

20  back and talk in a little more detail about certain parts of

21  that.  Okay?

22  A.   Okay.

23  Q.   So let's go back to when you first found out that

24  Ms. Pelosi was not there.

25      What was going through your head when you found out that

1   she wasn't there?

2   **A.**   I was kind of like surprised and confused, like, what to

3   do next.

4   **Q.**   Had it crossed your mind before that she may not be there?

5   **A.**   No.

6   **Q.**   And then you mentioned that Mr. Pelosi went to the

7   elevator?

8   **A.**   Yes.

9   **Q.**   And that you -- did you follow him to the elevator?

10  **A.**   Yes.

11  **Q.**   Did you try to grab him to stop him from going to the

12  elevator?

13  **A.**   No.

14  **Q.**   Did you try to hit him to stop him from going to the

15  elevator?

16  **A.**   No.  I wasn't trying to hurt him.

17  **Q.**   I'm sorry.  I didn't hear that part.

18  **A.**   No.  I wasn't trying to hurt him.

19  **Q.**   And then after he went to the elevator, I think you just

20  testified that he went back towards the bedroom; is that right?

21  **A.**   Yes.

22  **Q.**   Okay.  So did you follow him?

23  **A.**   Yes.

24  **Q.**   And at this point, did you grab him to try to hold him

25  back?

1    A.    No.

2    Q.    Did you try to hit him to stop him from moving around?

3    A.    No.  I wasn't trying to hurt him.

4    Q.    All right.  And then what happened next; where did he go

5    next?

6    A.    He went into the bathroom and picked up a phone, and he

7    was kind of like switching -- swishing through the menus as I

8    arrived in the bathroom.

9          He said to me:  Perhaps we can call someone to resolve

10   this.

11         And I was like:  No, I don't think so.

12         And then he quickly dialed 9-1-1.

13   Q.    When he was calling 9-1-1, did you try to take the phone

14   out of his hands?

15   A.    No.

16   Q.    Did you try to hit him at that point to stop him from

17   calling 9-1-1?

18   A.    No.  I wasn't trying to hurt him.

19   Q.    And when he was on the phone with 9-1-1, did you give the

20   operator your name?

21   A.    Yes.  Yes.

22   Q.    Why did you give your name?

23   A.    I didn't want this to escalate into something where he

24   would get hurt, and so I was trying to get him off the phone so

25   I could explain that to him.  And I didn't want to -- like,

 1 | when he first called, he kind of like started the phone call

 2 | with, like, oh, I think this is a mistake.  Kind of like he was

 3 | leaving the possibility open that he wouldn't bring the police

 4 | there.

 5 | And so I was hoping that that would be the outcome so it

 6 | wouldn't escalate into something he would get hurt.  And so I

 7 | didn't want to raise the alarm because I didn't want to

 8 | escalate into something that he would get hurt, and I wanted to

 9 | get him off the phone so I could explain to him and we can find

10 | a different way of resolving this.

11 | **Q.**   After he hung up the phone, did you take his phone?

12 | **A.**   So he hung up the phone.  He went into the bedroom.  He

13 | kind of like plopped down on the corner -- he threw it onto the

14 | bed, and he kind of like plopped down onto the corner of the

15 | bed.  And he was kind of almost gleeful.  Like happy with what

16 | he just accomplished.

17 | And -- and I said, like:  Like, you know they're coming

18 | now.  And kind of like:  Like, we got to fix this.

19 | And he's like:  Oh, no.  They didn't take the call

20 | seriously.

21 | And I'm, like:  No.  No way that they didn't get the

22 | message from that.  Like, they're definitely coming.

23 | And then -- then I tell them:  Like, like I have other --

24 | I have other targets.

25 | Because at this point I'm thinking, like:  Nancy's a wash.

1   And another thing is, like, before I suggested going to sleep,

2   he was telling me about how Nancy has, like, a guard, like

3   I guess it's Capitol Police.  And like, you know, when she

4   comes back, they'll be here and stuff.

5        And so at this point, that's kind of more registered.  I'm

6   like:  Yeah.  Probably better if I'm not here when she gets

7   back.

8        So I'm thinking this is a wash.

9        So I tell him, like:  I have other targets.

10       And it's, like:  If you stop me, I'll go through you.

11       It's, like:  I don't want to hurt you, but it's, like, I

12   don't want you to get in the way, either.

13       And I don't recall ever taking the phone.  I was actually

14   surprised to see when it came out of my pocket in the videos.

15  **Q.**   So did you ever say to Paul that you could take -- that

16   you would take him out?

17  **A.**   No.  I said I would go through him.

18  **Q.**   What's the difference between those two?

19  **A.**   Go through is, like -- it's, like, the choice is on your

20   end.  It's, like, you're getting in the way, whereas if you're

21   going to take someone out, it's them getting hurt is

22   predetermined.

23       It's like -- like -- like how I wanted to, like, talk to

24   Nancy.  And if she lied, I would break her kneecap.  It's,

25   like, the choice is on her, you know, rather than me

1   predetermined hurting her.  You know, she has an option of

2   doing something where she won't be hurt.  There's -- there's an

3   alternate path to resolution that doesn't involve violence.

4   **Q.**   Okay.  So at some point, did you and Mr. Pelosi go

5   downstairs?

6   **A.**   Yes.  I can't remember exactly what he said.  I think he

7   said something about, like, maybe getting my bags or something.

8   He was the one who suggested it.  And I went along with it.  At

9   this point, like, because he called the cops, he was the only

10  one who could basically un-call them.

11       And it's like at the beginning of the 9-1-1 call, he,

12  like, was, like, saying, like, oh, maybe this was a mistake.

13  Like, kind of like suggesting that he could take this back.

14  And so I was hoping that he would take it back so that we could

15  resolve it in a way that didn't result in violence.

16  **Q.**   Okay.  So after he suggested going downstairs, did the two

17  of you go downstairs?

18  **A.**   Yes.

19  **Q.**   Who was leading the way?

20  **A.**   I believe Paul was.

21  **Q.**   And when you went downstairs, where did you go?

22  **A.**   When we got downstairs, I believe we got to, I guess it's

23  called, the family room where the door is broken, and we

24  started talking about how the door is broken and, like, how

25  tough the glass was and surprised that it didn't trip a burglar

DEPAPE - DIRECT / CHUANG

1   alarm and stuff like that.

2   **Q.**   At some point, did you squeeze his shoulder?

3   **A.**   Yeah.  While we were talking, like, we kind of had a

4   pretty good rapport going.  He was a very amiable gentleman,

5   and I just gave him a squeeze on the shoulder just to be

6   reassuring.

7   **Q.**   Up until the point where you squeezed his shoulder, had

8   you made any physical contact with him before that?

9   **A.**   I don't recall ever touching him before that.

10  **Q.**   Why not?

11  **A.**   Because the idea of restraining him or anything never

12  really occurred to me, other than, like, tying him up so I

13  could go to sleep.  And I kind of like -- we had a pretty good

14  rapport going, and I kind of trusted him.

15  **Q.**   So after the two of you went to look at the broken window,

16  what happened next?

17  **A.**   So I -- there's a door, and above it there's like a dome

18  shaped window or kind of arched.  I guess, arched is a better

19  word.

20      And I saw a flashing light of a police car through it, and

21  I'm, like -- I told him -- I'm like:  The police are here.

22      And he was, like, denying it.  He was saying:  Oh, no.

23  That's not the police.

24      And I'm like:  No.  That's definitely the police.

25      And so then he was like -- like, he was -- like, conceded

1    that.  He was, like:  Okay.  Well, we just won't answer the

2    door, and they'll go away.

3    Q.  And what did he do next?

4    A.  He went over towards the door.

5    Q.  Did you follow him?

6    A.  Yes.

7    Q.  Did you try to grab him to stop him from getting to the

8    door?

9    A.  No.

10   Q.  Did you hit him to try to stop him from getting to the

11   door?

12   A.  No.  I wasn't trying to hurt him.

13   Q.  Okay.  And when he got to the door, did he open it?

14   A.  Yes.

15   Q.  Once he opened the door, what did you see?

16   A.  Two police officers.

17   Q.  And what did Paul do right after opening the door?

18   A.  He opened the door and turned and grabbed the hammer, and

19   as he did, he kind of had an expression on his face.  Like, he

20   was uncertain how I would react to that.

21   Q.  Were you surprised when Mr. Pelosi grabbed the hammer?

22   A.  Yes.

23   Q.  Up until that point, had he tried to grab it at all?

24   A.  No.

25   Q.  Up until that point, had he tried to fight you at all?

DEPAPE - DIRECT / CHUANG

1  A.   No.

2  Q.   So what did you do in that moment when the cops are at the

3  door and Mr. Pelosi surprised you by grabbing the hammer?

4  A.   I reacted and tried to swing at him, and I had to pull the

5  hammer away from him first.

6  Q.   Did you hit him in the head?

7  A.   Yes.

8  Q.   How many times did you hit him?

9  A.   I recall hitting him once.  The medical report appears

10 that he was probably hit more.  But my recollection is only

11 one.

12 Q.   Up until that moment that you hit him, had you planned to

13 hurt him at all?

14 A.   No.

15 Q.   So why did you hit him in that moment?

16 A.   I reacted because my plan was basically ruined.

17 Q.   By plan, do you mean the getting to the rest of your

18 targets?

19 A.   Yes.  And securing a pardon for all of them and basically

20 stopping the corruption and the -- unifying the country,

21 you know.

22 Q.   Did you hit Paul because of anything that his wife had

23 done in Congress?

24 A.   No.

25 Q.   Did you hit Paul because of anything to do with his wife

1   at all?

2   A.   No.

3   Q.   Now, when you went to the house that night, did you plan

4   to hurt Mr. Pelosi?

5   A.   No.

6   Q.   So now, during this trial, you've heard and seen evidence

7   about Mr. Pelosi's injuries.  Do you remember that?

8   A.   Yes.

9   Q.   Did you feel bad afterwards that you had hurt him so

10  badly?

11  A.   Yes.  When he was, like, on the ground breathing, I was,

12  like, really scared for his life.  And later in the hospital,

13  like, you know, I felt ready bad for him because we kind of

14  had, like, a really good rapport, and things were going pretty

15  good until, like, the very last second.  And hearing the

16  medical examiner's report was really chilling.  Yeah.

17        And I actually thought he was probably dead until, like, I

18  heard the charges against me and saw that it was attempted

19  murder.

20  Q.   If he were here, would you apologize to him?

21  A.   Yes.  He was never my target, and I'm sorry that he got

22  hurt.

23  Q.   After you hit Mr. Pelosi, what happened next?

24  A.   I was tackled by police officers.

25  Q.   And did you sustain any injuries?

1  **A.**    The force of the tackle dislocated my shoulder, and I

2  received injuries on my arm requiring like five stitches,

3  similar to the injuries that Paul received on his arms and

4  wrist.  Mine weren't as severe as his, though.

5  **Q.**    Were you in pain from those injuries?

6  **A.**    The -- I couldn't feel the -- the one on my wrist, the

7  pain from the dislocation was so great that the -- I believe

8  the natural painkillers my body was releasing numbed out the

9  pain from the other injury.

10  **Q.**    So after you were tackled, did the police take you to the

11  hospital?

12  **A.**    Yes.

13  **Q.**    And were you treated there?

14  **A.**    Yes.

15  **Q.**    Do you remember speaking with Sergeant Hurley at the

16  hospital?

17  **A.**    Yes.

18  **Q.**    How much pain were you in when you were speaking to her?

19  **A.**    I was in extreme pain, for, I believe, three hours.  They

20  didn't give me any painkillers until, like, the -- right before

21  they performed -- put my arm back in.  My arm was dislocated

22  that entire time.  And then they basically put my arm back in,

23  and she came into the interview room and started interviewing

24  me right away.

25      By that point, they had given me some painkillers.  I was

DEPAPE - DIRECT / CHUANG

1  probably still in pain, but it was a lot better because once

2  your arm goes back in, a lot of the pain goes away.

3  Q.   And by the time you were talking to her, when was the last

4  time you had slept before that?

5  A.   The previous night.  I was pretty tired.  I don't do well

6  without enough sleep.

7  Q.   So between whatever pain you still felt and being tired,

8  how clear was your mind when you were talking to her?

9  A.   Relatively clear, but not -- not peak performance.

10 Q.   Did you talk to Sergeant Hurley about the targets on your

11 list?

12 A.   Yes.

13 Q.   Did you talk to her about Target 1?

14 A.   Yes.

15 Q.   Did you talk to her about Tom Hanks?

16 A.   Yes.

17 Q.   Did you talk to her about Gavin Newsom?

18 A.   Yes.

19 Q.   And Hunter Biden?

20 A.   Yes.

21 Q.   And Mike Pence?

22 A.   Yes.

23 Q.   All right.  So let's go back to Nancy Pelosi now.

24 A.   Okay.

25 Q.   If Nancy Pelosi had been in the house that night, what

1   were you planning to use her to do?

2   **A.**   I was planning to use her to lure out Target 1, and I

3   wanted to use her to basically expose the truth.  I wanted to

4   basically ask her a question about Russiagate, and I wanted to

5   film it and post it online.

6        Now, it's -- I -- I kind of expected her to, like, go

7   along with me to, like, tell me what I want to hear, and then

8   it's basically claim that she only said that because she was

9   under duress and basically deny it afterwards.

10        But I wasn't worried about that because the grand plan was

11   to expose everything at the end with Hunter Biden.  So if she

12   only told the truth because she was threatened and lied about

13   it later, the more she lies, the more she's just exposing

14   herself as a liar, you know.

15   **Q.**   All right.  So let's take that one piece at a time?

16   **A.**   Okay.

17   **Q.**   So you first mentioned that you wanted to use Nancy Pelosi

18   to lure Target 1 to you.

19   **A.**   Yes.

20   **Q.**   Are you aware of any relationship between Nancy Pelosi and

21   Target 1?

22   **A.**   No.

23   **Q.**   So in your plan, how did you envision using Nancy Pelosi

24   to get Target 1 to you?

25   **A.**   I figured that Target 1 would know of Nancy Pelosi and be

1   attracted to her celebrity and position of power.

2   Q.   Were you planning to have Nancy Pelosi call Target 1?

3   A.   Yes.

4   Q.   Is that why you wrote Target 1's phone number on that

5   paper in your pocket?

6   A.   Yes.

7   Q.   Right.  So you also mentioned that you wanted to take a

8   video where you're questioning Nancy Pelosi?

9   A.   Yes.

10  Q.   What were you going to record that with?

11  A.   I was planning to wear the unicorn costume and record it

12  with the body cams that I brought.

13  Q.   Did you plan to tie Nancy Pelosi up during this video?

14  A.   No.

15  Q.   If she told you the truth, what would you have done?

16  A.   Let her go.

17  Q.   And if she didn't tell you the truth, what would you have

18  done?

19  A.   I was going to break her kneecap.

20  Q.   Did you see now-Lieutenant Hurley testify earlier in this

21  trial?

22  A.   Yes.

23  Q.   Did you hear, when she was on the stand, when the

24  Government played parts of your interview with her?

25  A.   Yes.

DEPAPE - DIRECT / CHUANG

1   Q.   So that part of the interview when you say that Nancy

2   Pelosi would wheel into Congress in a wheelchair, did you mean

3   that you personally would wheel her in?

4   A.   No.

5   Q.   And when you said that her wheeling into Congress would

6   make others realize there's a consequence for being evil, what

7   did you mean by that?

8   A.   Being corrupt and engaging in criminal activities.

9   Q.   Okay.  Was that specifically directed at people in

10  Congress?

11  A.   It was directed at corrupt politicians who are breaking

12  the law and doing things that are outside their duties of

13  office.

14  Q.   Does it go beyond politicians to others in the rulings

15  class?

16  A.   Um, yeah.

17  Q.   Were you trying to influence how she voted on any laws?

18  A.   No.

19  Q.   Now, did you hear Mr. Pelosi's testimony yesterday?

20  A.   Yes.

21  Q.   And did you hear when he testified that you said to him,

22  while you were in the house, that his wife was the leader of

23  the pack?

24  A.   Yeah.  So Russiagate originated with Hillary Clinton, but

25  after the election, she kind of became the most prominent

1  person who was appearing in the media and lying about it.

2  Hillary kind of disappeared off the scene.

3  Q.   So when you said "leader of the pack," what did you mean,

4  leader of what pack?

5  A.   The people who were lying about Russiagate.

6  Q.   Would that be people like the DNC?

7  A.   Yes.

8  Q.   Did you also hear, during this trial, a recording of part

9  of a call that you made to a reporter?

10  A.   Yes.

11  Q.   Did you make that call in January?

12  A.   Yes.

13  Q.   Did you hear the part of the call where you talked about

14  killing the tree of liberty?

15  A.   Yes.

16  Q.   Who is killing the tree of liberty?

17  A.   The ruling class, the cabal.  The people who control us,

18  run the media.

19  Q.   And did you hear the part of the call where you're talking

20  about tyranny?

21  A.   Yes.

22  Q.   Who's engaged in tyranny?

23  A.   The cabal and the ruling class.

24  Q.   And did you hear yourself mention patriots in the call?

25  A.   Yes.

DEPAPE - DIRECT / CHUANG

1    Q.   Who are patriots?

2    A.   People who care about the truth and this country.  Like,

3    even though Jimmy Dore is on the opposite end of the political

4    spectrum from me, I consider him a patriot because he cares

5    about the truth.

6    Q.   Now, having listened, again, to this call that you made

7    10 months ago, what do you make it of now?

8    A.   A little immature.  Didn't really do a good job of trying

9    to explain what I was trying to express.  And it's like I was

10   kind of upset about how, like, they're basically trampling my

11   freedom of speech and, like, freedom of the press by removing

12   my website so people can't hear what I have to say.

13        And I actually talk about that in the interview.  That's

14   the part that they, like, won't let you guys hear.  I was

15   talking about how, like, fascism is when the ruling class is

16   split between, like, government power and private industry.

17   And using private industry to trample my rights rather than

18   using the Government is basically fascism, and that's kind of

19   what I was upset about.  And I explained that in the second

20   half -- or in the part that they're omitting from the

21   interview.

22   Q.   During this trial, did you also see part of

23   Officer Najarro's body cam footage where you were being treated

24   by medics and talking about why you were there?

25   A.   Yeah.  I don't recall it too well, but.

DEPAPE - DIRECT / CHUANG

1  **Q.**   Do you remember part of the footage where you talk about

2  lies coming out of Washington, D.C.?

3  **A.**   Yes.

4  **Q.**   What did you mean by lies coming out of Washington, D.C.?

5  What or who were you referring to?

6  **A.**   Washington, D.C., just refers to a seat of power that

7  relates to the ruling class.

8  **Q.**   Okay.  Were you specifically referring to halls of

9  Congress when you made that statement?

10  **A.**   No.

11  **Q.**   Were you specifically referring to government officials

12  doing their jobs when you made that statement?

13  **A.**   No.

14  **Q.**   And why do you care so much about what's happening in the

15  US when you're Canadian?

16  **A.**   Because this is my home.

17  **Q.**   So I believe you testified earlier that you wanted to --

18  you wanted to see if Nancy Pelosi would tell you the truth

19  about Russiagate; is that right?

20  **A.**   Yes.

21  **Q.**   What do you -- so who did Russiagate originate with?

22  **A.**   Hillary Clinton on behalf of the DNC.

23  **Q.**   And what is Russiagate?

24  **A.**   It's a smear trying to delegitimize Trump based on

25  innuendo fabricated during the 2016 election to benefit the

DEPAPE - DIRECT / CHUANG

1   Democrats in their attempt to get elected.

2   Q.   And what role did Nancy Pelosi play in that, from your

3   point of view?

4   A.   After the election, she made a lot of media appearances

5   basically pushing the lie as if it was true.

6   Q.   Pushing lies about a rival campaign?

7   A.   Yes.

8   Q.   Was Nancy Pelosi on your target list because of any bills

9   that she sponsored in Congress?

10  A.   I don't keep track of what bills she sponsors.

11  Q.   Was she on your list because of how she voted on any

12  legislation?

13  A.   I don't know how she votes on any legislation.  Like, the

14  only thing I can think of was, like, the Green New Deal, and

15  that's where, like, AOC kind of put the Democrats over the

16  barrel by forcing them to vote on her little communist

17  manifesto, green communist manifesto.  But, I mean, that was

18  kind of just joke politics.  I mean, it didn't go anywhere.

19  Q.   Was the Green New Deal the reason why Nancy Pelosi was on

20  your list?

21  A.   Not at all.  I mean, it was amusing.

22  Q.   Was Nancy Pelosi on your list because of any speeches that

23  she gave on the floor of the House of Representatives?

24  A.   No.

25  Q.   Was she on your list because of anything she did in the

1   House?

2   **A.**   No.

3   **Q.**   Was she on your list because of anything she did as part

4   of a congressional committee?

5   **A.**   No.

6   **Q.**   Was she on your list because of anything she said or did

7   while meeting with her constituents?

8   **A.**   No.

9   **Q.**   Was she on your list because she helped get federal grants

10   for someplace in her congressional district?

11   **A.**   No.

12   **Q.**   So when you say that the role she played was appearing in

13   media and lying in the media, on whose behalf was she lying?

14   **A.**   The Democratic Party.

15   **Q.**   Okay.  So I'll just ask you directly now.  Did you attempt

16   to kidnap Nancy Pelosi because of anything she did as a member

17   of Congress?

18   **A.**   No.

19   **Q.**   Did you --

20   **A.**   Because of lies she was telling on behalf of the Democrat

21   Party.

22   **Q.**   Did you hit Paul Pelosi with a hammer to retaliate against

23   his wife for anything she did as a member of Congress?

24   **A.**   No.

25         **MS. CHUANG:**  No further questions.

 1          THE COURT:  Are you ready?

 2          MS. VARTAIN:  I am ready, Your Honor, though it would

 3  be helpful to take a break.  I'm happy to start.

 4          THE COURT:  Why don't we just take a ten-minute break

 5  right now, and then we'll start with the cross.

 6          MS. VARTAIN:  Thank you, Your Honor.

 7                    (The jury leaves the courtroom.)

 8                    (Recess taken at 10:23 a.m.)

 9                    (Proceedings resumed at 10:33 a.m.)

10      (Proceedings were heard out of the presence of the jury.)

11          THE COURT:  Can we go back on the record for a minute.

12  I was just speaking to the marshal about just sitting in a

13  chair there.  Whenever I've had a defendant testify, there's

14  always been a marshal there.

15          MS. CHUANG:  That's fine.

16          THE COURT:  Okay.  All right.

17      Because I seem to have the cases where they testify.

18                    (The jury enters the courtroom.)

19      (Proceedings were heard in the presence of the jury.)

20          THE COURT:  All right.  Thank you, members of the

21  jury.

22      Does the Government have any cross-examination?

23          MS. VARTAIN:  Thank you, Your Honor.

24                        **CROSS-EXAMINATION**

25  \\\

DEPAPE - CROSS / VARTAIN

1    BY MS. VARTAIN:

2    Q.   You agree that you broke into the Pelosis' home on

3    October 28th, 2022; right?

4    A.   Yes.

5    Q.   And you agree that before October 28th, 2022, you used

6    Firefox on your home computer to search for Nancy Pelosi?

7    A.   Yes.

8    Q.   I'd like to --

9         MS. VARTAIN:  Ms. Wachs, would you please pull up

10   Exhibit 274, starting at page 6.  And, actually, if you could

11   pull up just at the very top to indicate which record we're

12   looking at.

13   BY MS. VARTAIN:

14   Q.   Do you see that this is the Firefox web history?

15   A.   Yes.

16        MS. VARTAIN:  And, Ms. Wachs, if you would, please,

17   pull up Record 13.

18        One moment.

19   BY MS. VARTAIN:

20   Q.   You agree that you searched on your home computer, using

21   Spokeo, for Nancy Pelosi; is that right?

22   A.   Yes.

23        MS. VARTAIN:  Ms. Wachs, Record 14, please.

24   BY MS. VARTAIN:

25   Q.   You agree that on October 19th, 2022, you conducted a

DEPAPE - CROSS / VARTAIN

1  Spokeo search, also for Nancy Pelosi?

2  **A.**   Yes.

3  **Q.**   On October -- on October 19th, same day, you conducted

4  another search, using Firefox, for Nancy Pelosi phone number,

5  e-mail, and address; is that correct?

6  **A.**   Yes.

7       **MS. VARTAIN:**  Ms. Wachs, if you would, please, go to

8  Record 17.

9  **BY MS. VARTAIN:**

10 **Q.**   On the same day, you agree that you searched Wikipedia for

11 Nancy Pelosi?

12 **A.**   Yes.

13      **MS. VARTAIN:**  Record 19, please.

14 **BY MS. VARTAIN:**

15 **Q.**   On the same day, you searched Wikipedia, again, for Nancy

16 Pelosi; is that correct?

17 **A.**   Yes.

18      **MS. VARTAIN:**  Record 20, please, Ms. Wachs.

19 **BY MS. VARTAIN:**

20 **Q.**   On the same day, you also queried and found a website,

21 "Nancy Pelosi's home vandalized with pig's head, fake blood" by

22 ABC27; is that correct?

23 **A.**   Yes.

24      **MS. VARTAIN:**  Record 21, please.

25 \\\

DEPAPE - CROSS / VARTAIN

BY MS. VARTAIN:

Q.   You conducted another Google -- you conducted a Google search for "Pelosi pig blood"; is that correct?

A.   Yes.

MS. VARTAIN:   Record 22, please.

BY MS. VARTAIN:

Q.   Are we looking at, here, also one of your web searches for "Pelosi pig blood"?

A.   Yes.   Looks like that.

MS. VARTAIN:   Record 23, please.

BY MS. VARTAIN:

Q.   Did you watch a video -- you also watched a video on the same day, "YouTuber live streams himself defecating in the driveway of Nancy Pelosi's San Francisco home"; is that right?

A.   I don't believe I watched the YouTube.   But I believe I visited that page.   That's Daily Mail, not YouTube.

It's an article about a video.   I don't recall watching the actual video itself.

MS. VARTAIN:   Record 25, please.

BY MS. VARTAIN:

Q.   You made a purchase.   In fact, you purchased a subscription to Spokeo, correct, to have bigger access to Spokeo's search features; is that correct?

A.   Yes.

MS. VARTAIN:   Record 26, please.

DEPAPE - CROSS / VARTAIN

1  BY MS. VARTAIN:

2  Q.   And you used Spokeo to search for Nancy Pelosi?

3  A.   Yes.

4        MS. VARTAIN:  Record 27, please.

5  BY MS. VARTAIN:

6  Q.   You also used the Internet, specifically, Firefox, to

7  search for "Nancy Pelosi house Broadway San Francisco"; is that

8  correct?

9  A.   Yes.

10       MS. VARTAIN:  Record 28, please.

11 BY MS. VARTAIN:

12 Q.   And you got information from the Internet about Nancy

13 Pelosi's home address; is that correct?

14 A.   Yes.  I believe this might be where I first found her

15 house address for certain.

16 Q.   In addition to searching on Firefox on your home computer,

17 you also used the Google browser to search; is that correct?

18 A.   Possibly.  I don't recall which process I used, but

19 probably.

20       MS. VARTAIN:  Ms. Wachs, would we please look at

21 Exhibit 277 and, specifically, if you could start on page 14,

22 please.

23 BY MS. VARTAIN:

24 Q.   On October 19th, 2022, you searched Nancy Pelosi's age; is

25 that right?

DEPAPE - CROSS / VARTAIN

1  **A.**   Appears so, yes.

2          **MS. VARTAIN:**  And if we could go to page 15, please,

3  and Record 37.

4  **BY MS. VARTAIN:**

5  **Q.**   You also searched on your home computer for information

6  about Nancy Pelosi family; is that correct?

7  **A.**   Yes.

8          **MS. VARTAIN:**  Record 38, please.

9  **BY MS. VARTAIN:**

10 **Q.**   And you did search for "Pelosi pig blood"; is that

11 correct?

12 **A.**   Yes.  These may actually be image searches.

13 **Q.**   Meaning that you looked for images of the Pelosis' home

14 with the pig head and blood?

15 **A.**   Yes.  And possibly the family as well.

16         **MS. VARTAIN:**  If we could look at Record 65 on the

17 bottom of page 23, please.

18 **BY MS. VARTAIN:**

19 **Q.**   You continued to search for information about Nancy

20 Pelosi's home on Broadway in San Francisco; is that correct?

21 **A.**   Yes.

22 **Q.**   You agree that you had a folder on your desktop for Nancy

23 Pelosi; is that correct?

24 **A.**   Yes.

25 **Q.**   And that was within a larger folder, "Favorite

**DEPAPE - CROSS / VARTAIN**

1  Politicians"; correct?

2  **A.**   Yes.

3  **Q.**   I think you just said that you conducted some image

4  searches on the Internet for "Pelosi pig blood home"; is that

5  correct?

6  **A.**   I can't recall which of those are image searches, but

7  I believe a bunch of them were image searches.

8  **Q.**   You did, in fact, save images of the Pelosis' home with a

9  pig's head and fake blood onto your desktop; correct?

10  **A.**   Yes.

11        **MS. VARTAIN:**  Ms. Wachs, could we please look at

12  Exhibit 281.

13  **BY MS. VARTAIN:**

14  **Q.**   You agree that this is an image you saved into your Pelosi

15  folder on your desktop; correct?

16  **A.**   Yes.

17        **MS. VARTAIN:**  Exhibit 282, please.

18  **BY MS. VARTAIN:**

19  **Q.**   You agree that this is another image you saved onto your

20  desktop, Pelosis' home; is that right?

21  **A.**   Yes.

22  **Q.**   Is this the defecating YouTuber?

23  **A.**   I believe so.

24        **MS. VARTAIN:**  Exhibit 284, please.

25  \\\

DEPAPE - CROSS / VARTAIN

```
 1  BY MS. VARTAIN:
 2  Q.   This is the Pelosis' home that you broke into and
 3  assaulted Mr. Pelosi in on October 28th, 2022; is that correct?
 4  A.   Yes.
 5  Q.   And you saved a picture of the home on your computer;
 6  correct?
 7  A.   Yes.
 8       MS. VARTAIN:  Exhibit 285, please.
 9  BY MS. VARTAIN:
10  Q.   This is an image of the Pelosis' home with the fake pig's
11  blood in front of it; is that correct?
12  A.   Yes.
13  Q.   And you saved this to your home computer?
14  A.   Yes.
15       MS. VARTAIN:  Exhibit 286, please.
16  BY MS. VARTAIN:
17  Q.   You agree that this is another image of the Pelosis' home
18  that you saved onto your home computer?
19  A.   Yes.
20       MS. VARTAIN:  Exhibit 287, please.
21  BY MS. VARTAIN:
22  Q.   You agree that this is an image of Nancy Pelosi on your
23  home computer; is that right?
24  A.   Yes.
25  Q.   And also images of her home as well; correct?
```

DEPAPE - CROSS / VARTAIN

1   A.   Yes.

2        MS. VARTAIN:  Exhibit 288, please.

3   BY MS. VARTAIN:

4   Q.   Another one of the images you saved to your laptop of the

5   Pelosi to your computer -- of the Pelosis' home?

6   A.   Yes.

7        MS. VARTAIN:  Exhibit 290, please.

8   BY MS. VARTAIN:

9   Q.   This is, again, another image that you saved to your

10  computer; is that correct?

11  A.   Yes.

12  Q.   You testified that you purchased a subscription to Spokeo,

13  and you used that to search information about your targets; is

14  that correct?

15  A.   Yes.

16       MS. VARTAIN:  Ms. Wachs, would you please pull up

17  Exhibit 293, page 2.

18  BY MS. VARTAIN:

19  Q.   Do you see information -- you searched for information on

20  Nancy Pelosi; is that -- using Spokeo -- correct?

21  A.   Yes.

22       MS. VARTAIN:  Take that down, please, Ms. Wachs.

23  Thank you.

24  BY MS. VARTAIN:

25  Q.   When you broke into the Pelosis' home on October 28th,

**DEPAPE - CROSS / VARTAIN**

1  2022, you knew that you might be committing violence against

2  Nancy Pelosi while you were there; correct?

3  **A.**  It wasn't my intention, but it was a possibility, yes.

4  **Q.**  Yes.

5      And you came with items that you would need for your plan;

6  is that correct?

7  **A.**  Yes.

8  **Q.**  And you used Exhibit 160, the hammer, to break into the

9  home; correct?

10  **A.**  Yes.

11  **Q.**  You brought this rope with you as well?

12  **A.**  Yes.

13  **Q.**  You brought the duct tape as well?

14  **A.**  Yes.  I believe I left that in the backpack.

15  **Q.**  You were prepared to hold Nancy Pelosi hostage; correct?

16  **A.**  I said that when I was, like, very tired and --

17  **Q.**  I asked you a yes-or-no question.

18      Can you give me a yes-or-no answer?

19  **A.**  And the question again.

20  **Q.**  You -- I asked you if you were prepared to hold Nancy

21  Pelosi hostage.

22  **A.**  I would say, no, that's a mischaracterization.

23  **Q.**  You agree that you told Lieutenant Hurley that you were --

24  would hold Nancy Pelosi hostage; correct?

25  **A.**  Yes.  I said that to her.

**DEPAPE - CROSS / VARTAIN**

1  Q.   You knew that it was a possibility that you would need to

2  break Speaker Pelosi's kneecaps; correct?

3  A.   Yes.

4  Q.   And you had two hammers with you -- one hammer and one

5  sledgehammer with you; correct?

6  A.   In my belongings, but not on me at -- during the break-in.

7  Q.   You had this hammer on you when you were in -- on -- in

8  the third floor, in the Pelosis' bedroom; correct?

9  A.   Yes.

10 Q.   And you had the sledgehammer in your backpack on the back

11 porch; correct?

12 A.   Yes.

13 Q.   You agree that you were -- you knew that Nancy Pelosi

14 worked in Washington; correct?

15 A.   Yes.

16 Q.   And you said:  Of all the people in Washington fucking

17 lying, I'm just amazed that she has to be like the leader --

18 sorry -- the fucking leader of the pack; right?

19 A.   That's a quote from the Hurley thing.  I believe I said

20 that, yes.

21 Q.   And it's also true that you said:  The evil shit that is

22 coming out of Washington has gone too far; correct?

23 A.   Yes.

24 Q.   You knew that Nancy Pelosi worked in Congress; right?

25 A.   Yes.

**DEPAPE - CROSS / VARTAIN**

1          **MS. VARTAIN:**  Ms. Wachs, could we please look at

2    Exhibit 274, Record 18, page 8.

3    **BY MS. VARTAIN:**

4    **Q.**   You looked at Congresswoman Nancy Pelosi's biography; is

5    that correct?

6    **A.**   Yes.

7    **Q.**   And you also told Lieutenant Hurley that you wanted to

8    break Nancy Pelosi's kneecaps so that when she goes into

9    Congress, every other fucking corrupt piece of shit in there is

10   going to see her wheeling in a wheelchair; isn't that right?

11   **A.**   Yes.

12   **Q.**   And in this way, you could teach them all a lesson that

13   they're going to realize that there is a fucking consequence

14   for being the most evil fucking people on the planet; is that

15   correct?

16   **A.**   Yes.

17   **Q.**   You've also said:  The evil shit that is coming out of

18   Washington is going too far; right?

19   **A.**   Yes.

20   **Q.**   In your view, the Democratic Party has been on a fucking

21   record-breaking crime spree for four years; isn't that right?

22   **A.**   Yes.  I would say it's longer now.

23   **Q.**   It was correct as of October of 2022; correct?

24   **A.**   Yes, yes.

25   **Q.**   You know that Speaker -- then-Speaker Pelosi,

**DEPAPE - CROSS / VARTAIN**

1   now-Speaker Emerita is a Democrat; correct?

2   **A.**   Yes.

3   **Q.**   And in your testimony on direct exam, you testified that

4   Nancy Pelosi was lying on behalf of the Democratic party; is

5   that correct?

6   **A.**   Yes.

7   **Q.**   You also testified that you told -- talked to Mr. Pelosi

8   about the corruption in DC; correct?

9   **A.**   Yes.  In general terms.

10  **Q.**   When you assaulted Mr. Pelosi, you agree that you were in

11  his home; correct?

12  **A.**   Correct.

13  **Q.**   You were not at Tom Hanks' home?

14  **A.**   No.

15  **Q.**   You were not at Target 1's home?

16  **A.**   No.

17  **Q.**   You were not at George Soros' home?

18  **A.**   No.

19  **Q.**   You were not at Hunter Biden's home?

20  **A.**   No.

21  **Q.**   And you were not at Adam Schiff's home?

22  **A.**   No.

23  **Q.**   You know that Adam Schiff also works in Congress; correct?

24  **A.**   I'm not certain which house he's in, but I know he's a

25  politician.

DEPAPE - CROSS / VARTAIN

1    Q.    When you were with Mr. Pelosi, you -- you didn't let him

2    leave in the elevator; correct?

3    A.    I got into the elevator, so if he left in it, he would

4    have to bring me with him.

5    Q.    You didn't let him get away without you; fair to say?

6    A.    Yes.  I followed him where he went.

7    Q.    And when Mr. Pelosi called 9-1-1, you didn't take that

8    opportunity to leave; correct?

9    A.    No.

10   Q.    Even though you knew where the stairs were; correct?

11   A.    Yes.

12   Q.    Even though you knew where the elevator was; correct?

13   A.    Yes.

14   Q.    You didn't choose to leave at that moment; correct?

15   A.    No.

16   Q.    When -- I think you testified on direct exam that

17   Mr. Pelosi told you that his wife had guards, maybe the Capitol

18   Police; is that right?

19   A.    Yes.

20   Q.    Even when you learned that, you didn't leave at that point

21   in time; correct?

22   A.    No.  I didn't feel that I would be able to get away.

23   You know, once I -- once the window was cracked, it's like

24   there was no turning back.

25   Q.    You did not leave at any point in time after Mr. Pelosi

**DEPAPE - CROSS / VARTAIN**

1  called 9-1-1 and before the police arrived; correct?

2  **A.**   Yes.

3  **Q.**   When the police were at the door, you did not surrender;

4  correct?

5  **A.**   Yes; correct.

6  **Q.**   You agree that you warned Mr. Pelosi before the police

7  arrived; right?

8  **A.**   Yes.

9  **Q.**   You said:  If you are going to stop me, you will take the

10  punishment instead.  Is that right?

11  **A.**   No.  I believe that's not what I said to Paul.  That's an

12  explanation that I gave to, I believe, Hurley.

13      What I believe I said to Paul was:  I'll go through you.

14  But that was an explanation of what I meant by it.  I don't

15  recall explaining it that well to Paul.

16  **Q.**   Your explanation of it, though, is that Mr. Pelosi would

17  take the punishment instead; correct?

18  **A.**   Yes.

19  **Q.**   And you agree that you also told Lieutenant Hurley -- I'm

20  sorry.  Strike that.

21      You agree that you threatened Mr. Pelosi while you were in

22  his home; correct?

23  **A.**   Yes.

24  **Q.**   You agree that you hit Mr. Pelosi with full force;

25  correct?

DEPAPE - CROSS / VARTAIN

1  **A.**   Yes.

2  **Q.**   You agree that you hit Mr. Pelosi with full force using

3  this hammer; correct?

4  **A.**   Yes.

5  **Q.**   You watched the slow-motion video in court yesterday?

6  **A.**   I did.

7  **Q.**   You saw that you hit Mr. Pelosi more than one time with

8  the hammer?

9  **A.**   My recollection is that I hit him once.  I was surprised

10 to find out that I hit him more.

11      The first indication was when I heard about the medical

12 reports in the discovery.  And when I watched the slow-motion

13 video, I don't actually see myself striking him more than once.

14 I see motions of my elbow that suggests I made more than one

15 swing.  But what actually happens is blocked by my body, so I

16 can't say for certain, but it seems reasonable that there was

17 more than one swing.

18 **Q.**   And you agree that any swings you took were using full

19 force using this hammer?

20 **A.**   I don't know --

21 **Q.**   Let me ask that differently.  I'm going to withdraw the

22 question.

23      Do you agree that the swing you remember taking was using

24 full force using this hammer?

25 **A.**   Yes.

**DEPAPE - CROSS / VARTAIN**

1  Q.   You agree that you knew exactly what you were doing;

2  right?

3  A.   Yes.

4  Q.   You also told the paramedics that you don't have any

5  depression, bipolar, schizophrenia, or anything like that;

6  right?

7  A.   I don't recall telling them that, but, yes, I would agree

8  that that's true.

9  Q.   Months after you hit Mr. Pelosi with full force, you

10  called KTVU; right?

11  A.   Yes.

12  Q.   And you were delivering a message for America; is that

13  correct?

14  A.   Yes.

15  Q.   You wanted everyone to know that you wished you'd gotten

16  more of them, didn't you?

17  A.   That comment was kind of sarcastic.  The apology that

18  preceded it was overlong on purpose.

19  Q.   You said that you wished you had gotten more of them when

20  you called KTVU; isn't that correct?

21  A.   Yes.

22  Q.   When you said that, you agree that the body cam footage

23  had been released; correct?

24  A.   Yes.

25  Q.   In fact, you called KTVU on that day because the body

**PROCEEDINGS**

1   camera footage had been released; correct?

2   **A.**   Yes.

3   **Q.**   You agree that that footage shows you assaulting

4   Mr. Pelosi with this hammer?

5   **A.**   Yes.

6                          (Conferring.)

7          **MS. VARTAIN:**  No further questions.

8          **THE COURT:**  Any redirect?

9          **MS. CHUANG:**  No redirect.

10         **THE COURT:**  All right.  Mr. DePape, you may step down.

11                      (Witness excused.)

12         **THE COURT:**  Is the Defense ready to call your next

13  witness?

14         **MS. LINKER:**  Yes.  We call Target 1, Your Honor.

15      (Target 1 steps forward to be sworn.)

16                     (Pause in proceedings.)

17         **THE COURT:**  You can come right -- and sit right here.

18  Good morning.

19         **THE CLERK:**  Can you raise your right hand?

20         **THE WITNESS:**  Do I sit or stand?

21         **THE CLERK:**  Whatever you want to do.

22                       **<u>TARGET 1</u>**,

23  called as a witness for the Defendant, having been duly sworn,

24  testified as follows:

25         **THE WITNESS:**  I do.

1      **THE CLERK:**  Thank you.  You may be seated.

2                       <u>**DIRECT EXAMINATION**</u>

3  BY MS. LINKER:

4  **Q.**   Do you support sexual abuse of children?

5  **A.**   Absolutely not.

6  **Q.**   Are there people who equate LGBTQ politics, people, and

7  scholarship with grooming children for sexual abuse?

8  **A.**   So I understand from what's in the press.

9  **Q.**   Have your writings been construed by some to claim that

10  you support child sex abuse?

11  **A.**   Yes, somewhat.

12  **Q.**   Do you live in fear that you would be publicly associated

13  with child sexual abuse?

14  **A.**   Yes.

15  **Q.**   Were you subpoenaed here today?

16  **A.**   I was.

17  **Q.**   Do you want to be here?

18  **A.**   No.

19  **Q.**   What do you do for work?

20  **A.**   I'm a college professor.

21  **Q.**   You're a professor of what?

22  **A.**   Anthropology and women's and gender studies.

23  **Q.**   And where are you a professor?

24  **A.**   University of Michigan.

25  **Q.**   How long have you been a professor at the University of

**TARGET 1 - DIRECT / LINKER**

1   Michigan?

2   **A.**   About 20 years.

3   **Q.**   What is your area of study?

4   **A.**   Anthropology, mostly urban anthropology.

5   **Q.**   And can you be a little more specific?

6   **A.**   I study the process -- urban processes that tend to

7   distribute LGBTQ populations in the city.  I particularly study

8   South of Market here in San Francisco.

9   **Q.**   And LGBTQ, just so we're clear, what does that stand for?

10  **A.**   I'm sorry.  I didn't quite hear.

11  **Q.**   LGBTQ, what does that stand --

12  **A.**   Oh, it's the acronym.  Lesbian, gay, bisexual,

13  transgender, queer.

14  **Q.**   And you do work in feminist theory and queer studies?

15  **A.**   I do.

16  **Q.**   What topics have you written on?

17  **A.**   I have written on gender stratification.  I've written on

18  urban processes.  I've written on the theories and conceptual

19  frameworks for thinking about sexuality.  I've written on gay

20  communities in San Francisco, particularly South of Market.

21  I've written quite a lot, actually.

22  **Q.**   Have you written on pornography and feminism?

23  **A.**   I have.

24  **Q.**   Have you written on sex education?

25  **A.**   On sex education, to a degree, yes.

**TARGET 1 - DIRECT / LINKER**

1  Q.   Have you written on age of consent laws?

2  A.   Yes, somewhat.

3  Q.   What courses do you teach at the University of Michigan?

4  A.   I teach a course on the history of marital institutions.

5  I teach a course called "Sex and the City."  I teach a course

6  on the history of sexological theory.  I teach a course called

7  "Sex Panics."  I teach a course on the feminist sex wars.  I

8  have taught courses on just general social theory, feminist

9  theory.  I have taught a course on the history of women at

10 Michigan.

11 Q.   You have a Wikipedia page?

12 A.   Yes, I do.

13 Q.   Have you reviewed that?

14 A.   No.  I avoid it, actually, because Wikipedia is a -- just

15 has a lot of errors, and you're not supposed to edit your own

16 pages.

17 Q.   So have you looked and seen those errors and decided to

18 just stay away?

19 A.   I haven't looked at it lately, but when I have looked at

20 it, which was a while ago, it had a lot of mistakes.

21 Q.   Have you Googled yourself?

22 A.   Yes, occasionally.

23 Q.   What did you see when you Googled yourself?

24 A.   Well, depends on when.  But after I was subpoenaed, I did

25 Google myself and found a bunch of what appeared to be

 1  right-wing attacks on me.  I bookmarked them.  I did not read

 2  them.

 3  Q.   Do you pride yourself on taking generally counterculture

 4  views?

 5  A.   Not quite sure what you mean by that.

 6  Q.   Your writings have sparked debate; is that a fair thing to

 7  say?

 8  A.   I don't write to spark debate, but my writings have

 9  sparked debate.

10  Q.   And you like to ask questions rather than merely accept

11  cultural norms?

12  A.   I'm an anthropologist.  We do that as a matter of course

13  because we know that every culture has a set of norms and that

14  these vary quite a bit, and that gives a perspective of being

15  critical of the ones which you take for granted.

16  Q.   I'm going to switch gears.

17       Where do you live?  And I do not want you to say your

18  exact address, but where do you live?

19  A.   I live mostly in San Francisco but also in Michigan.

20  Q.   And so you have a home here in San Francisco?

21  A.   I do.

22  Q.   Does your home in San Francisco have a large brick facade?

23  A.   Yes, it does.

24  Q.   You have security there?

25  A.   Depends on what you mean by security.

**TARGET 1 - DIRECT / LINKER**

1   Q.   Do you have a camera security system?

2   A.   I have cameras, yes.

3   Q.   And it retains footage?

4   A.   For a period of time, yes.

5   Q.   Was that security installed in October of 2022?  Was it in

6   place?

7   A.   It was in place, yes.

8   Q.   Have your writings prompted debate among academics?

9   A.   Somewhat, yes.

10   Q.   Have your writings prompted debate among feminists?

11   A.   Yes.

12   Q.   Have your writings prompted debate amongst LGBTQ

13   activists?

14   A.   Somewhat.

15   Q.   Have your writings also prompted debate among certain

16   individuals online?

17   A.   I would imagine, yes, but I'm not sure what you're asking.

18   I mean, there's stuff online, but I don't always follow it.

19   Q.   You're aware there is debate online about your writings?

20   A.   Yes, yes.

21   Q.   Do you believe that is based on a fair or unfair reading

22   of your work?

23   A.   It would depend on who you were talking about, but

24   I believe there's plenty that's unfair.

25   Q.   So let's talk about some of your work.

1        You published a paper in 1984; is that right?

2   **A.**   I'm sorry?

3   **Q.**   Did you publish a paper in 1984?

4   **A.**   I did.

5   **Q.**   What was the name of that paper?

6   **A.**   "Thinking Sex."

7   **Q.**   I'm sorry.

8   **A.**   "Thinking Sex."

9   **Q.**   What is the central thesis of that paper?

10  **A.**   The central point of the paper was to take the then

11  somewhat novel approaches to the history and social science of

12  sex that had been emerging through the '60s and '70s and

13  make -- and try to put them together in a synthetic framework

14  for thinking more appropriately about the scholarship and

15  politics of sexuality.

16  **Q.**   And is that paper considered one of the founding texts of

17  gay and lesbian studies, sexuality studies and queer theory?

18          **MS. VARTAIN:**  Objection.

19          **THE WITNESS:**  Depends on who you talk to.

20          **THE COURT:**  Hold on one second.

21          **MS. VARTAIN:**  I'm going to object to this line of

22  questioning.  There's no evidence the defendant knows anything

23  about these writings.

24          **THE COURT:**  Okay.  Overruled.

25  \\\

**TARGET 1 - DIRECT / LINKER**

```
 1   BY MS. LINKER:

 2   Q.   Shall I repeat the question?

 3   A.   Yes, please.  I lost track.

 4   Q.   Is "Thinking Sex" regarded as one of the founding texts of

 5   gay and lesbian studies, sexuality studies, and queer theory?

 6   A.   That would depend on who you asked.  Some people have

 7   considered it that -- actually, I don't because I think that

 8   assumption is often based on ignorance of all the work that

 9   went before.

10   Q.   You also stated that you've written on age of consent

11   laws.

12        What are age of consent laws?

13   A.   It depends on what country, what era, and what state

14   you're in.  But, generally, age of consent -- age of consent

15   currently is mostly -- well, ages of consent for marriage,

16   which means when you can consent to a marriage.  And there's

17   age of consent for sex, which is when -- at what age you can

18   consent to sex.

19   Q.   And what aspect of that have you written on?

20   A.   Mostly, the latter.

21   Q.   Your work, "Thinking Sex," does that discuss age of

22   consent laws?

23   A.   It does.

24   Q.   In that work, do you also discuss, quote,

25   cross-generational encounters?
```

**TARGET 1 - DIRECT / LINKER**

1  A.   I did.

2  Q.   What are cross-generational encounters?

3  A.   Again, it's a large category.  It could be people who have

4  encounters across the age of consent, but it also could be

5  people just of different ages.  It could be a 50-year-old and a

6  40-year-old but just not -- doesn't have to do with age of

7  consent.

8  Q.   Generally, when you refer to cross-generational encounters

9  in your age of consent law discussions, do you mean people of

10 majority age by law with people of minority age by law?

11 A.   It's hard to remember exactly what I was talking about at

12 the time, but that is a major issue.  That's what age of

13 consent is usually about.

14 Q.   Do you have a view on the legality of cross-generational

15 encounters that you express in your work, "Thinking Sex"?

16 A.   That's too general a question to completely respond to

17 because part of what I was arguing was that there are many

18 different ways in which these things -- these kinds of

19 encounters take place and that the laws that address this tend

20 to be overbroad and sweep generally both harmful and harmless

21 behavior together as illegal.

22 Q.   So taking that, is it fair to say that one of the things

23 you wrote about in "Thinking Sex" was that age of consent laws

24 sweep in too much conduct, make it illegal?

25 A.   I don't remember exactly how I would have said it, but I

 1    think the general point that I would make, that I probably did

 2    make at the time, was that the laws were overly broad.

 3         I'll give you an example, if I may.  In Michigan, a

 4    17-year-old and a 19-year-old who had a sexual relationship,

 5    this would be completely legal.  In California, it would be a

 6    felony.  These are very inconsistent laws.

 7    **Q.**   Did the publishing of "Thinking Sex" spark debate in the

 8    academic community?

 9    **A.**   Not immediately.

10    **Q.**   At some time thereafter, did it?

11    **A.**   Somewhat.  On different topics.

12    **Q.**   Was it said that you -- by academics, that you were

13    supporting the molestation of children?

14    **A.**   Not that I'm aware of.  Nothing specific that I'm aware

15    of.

16    **Q.**   Have your writings been criticized for their discussion of

17    minors and sex in academic circles?

18    **A.**   To a degree.  Most of the criticism has been about other

19    topics.

20    **Q.**   But there has been some criticism on that topic?

21    **A.**   As far as I know, yes.

22    **Q.**   Has that debate continued for some period of time?

23    **A.**   I'm not aware of much about it.

24    **Q.**   Are you familiar with a book from 2006 entitled "The

25    Professors:  The 101 Most Dangerous Academics in America" by

**TARGET 1 - DIRECT / LINKER**

1  David Horowitz?

2  **A.**   I am.

3  **Q.**   Did you purchase that book?

4  **A.**   I did.

5  **Q.**   Were you included in that book --

6  **A.**   I was.

7  **Q.**   -- as one of the 101 most dangerous academics in America?

8  **A.**   I was.

9  **Q.**   What did you consider your entry in that book to be based

10  upon?

11  **A.**   I considered it to be based upon a very sloppy and

12  somewhat misleading account of "Thinking Sex."  That's my

13  memory of it, anyway.  I haven't read it in years.

14  **Q.**   Did you eventually publish a reflection on your "Thinking

15  Sex" work?

16  **A.**   I did.

17  **Q.**   And when was that?

18  **A.**   I'm trying to -- the article was first in a journal, and I

19  don't remember the date.  And then it was published in a book

20  in 2011.

21  **Q.**   Why did you do that?

22  **A.**   Why did I do that?

23      I was asked.  There was a conference in honor of the

24  essay, and I was asked to do a lecture, which I did.  And then

25  I was asked to write it up as an article for the journal that

1    was about the conference.  And then I did a slight revision and

2    included it in a collection of my essays.

3    **Q.**   What was the name of that article?

4    **A.**   "Blood Under the Bridge."

5    **Q.**   What did you explain about your writings on age of consent

6    laws in that article?

7    **A.**   I said that there were -- first of all, most of the

8    article was not about this.  There were about three pages of a

9    long article.

10         But I started by saying that my earlier discussions of

11   several topics had been a little sketchy, and that was

12   unfortunate.  And then I addressed a different one, and then I

13   addressed the issue of children and sex for a couple of pages.

14   **Q.**   Did you indicate in there that you thought no one -- you

15   thought no one would imagine that you supported the rape of

16   prepubescents?

17   **A.**   I certainly did say that.

18            **THE WITNESS:**  By the way, am I supposed to get some

19   water?  I don't think I got any water.

20            **THE COURT:**  Yes.

21            **THE WITNESS:**  Thank you.

22                         (Pause in proceedings.)

23   BY MS. LINKER:

24   **Q.**   Are you generally aware that you have been more recently

25   criticized in political discussions online and on social media?

1   **A.**   I'm generally aware, yes.

2   **Q.**   Have people vilified you online and in other forms of

3   social media as something they view as a threat to certain

4   values?

5   **A.**   That is my impression.

6   **Q.**   Have you been portrayed online as a supporter of the

7   molestation of children?

8   **A.**   I suspect that is the case.  I have not read or watched

9   any of the content.  And I'm not on social media at all, so I

10   have no idea what's on social media.

11   **Q.**   Why do you think that is?

12   **A.**   I think these issues have been weaponized in any number of

13   ways to -- first of all, to attack the gay movement, gay

14   individuals, LGBTQ people, certainly recently, trans folks.

15        They've been weaponized to pursue various political

16   agendas, and my sense is that the way this stuff works online

17   is that perfectly -- little bits and pieces of this and that

18   are basically cherry-picked and thrown into some master

19   narrative.  And I suspect that that is what has happened to me,

20   but I don't have direct knowledge because, frankly, I try not

21   to read any of this.

22   **Q.**   In October of last year, 2022, were you contacted by the

23   FBI?

24   **A.**   I was.

25   **Q.**   Do you remember the date?

1   **A.**   It was very late in October.   I don't remember the exact

2   date, but I think it was about the 29th or thereabouts.

3   **Q.**   What was the purpose of that contact?

4   **A.**   They were trying to --

5           **MS. VARTAIN:**  Objection.  Calls for hearsay.

6           **THE COURT:**  Sustained.

7   **BY MS. LINKER:**

8   **Q.**   Did you develop an understanding that you were on

9   Mr. DePape's target list?

10  **A.**   I was told that.

11  **Q.**   When the FBI came to talk to you on October 29th, did you

12  believe that some of your prior academic writings on pedophilia

13  in the 1980s may have been the cause?

14  **A.**   They did not come to talk to me.  This was all by

15  telephone.

16          But I speculated that, if I were on his target list, that

17  some of the misreadings of my material had perhaps contributed

18  to why I was on that list.  It was an educated guess.

19  **Q.**   Did you do anything after you learned from the FBI that

20  you were on his target list?

21  **A.**   I did a lot of things.

22  **Q.**   Tell us some of the things you did.  Did you reach out to

23  any colleagues?

24  **A.**   I reached out to colleagues.  I notified my administrators

25  at school.  I notified the security people at school.  A lot of

 1    measures were taken to try to protect me and my students and

 2    my -- and the staff and colleagues at school.  There were a lot

 3    of -- a lot that happened after that, actually.

 4    **Q.**   Do you have a colleague at Yale that sent you some

 5    information about why you may have been on his target list?

 6    **A.**   I had a colleague who contacted a colleague at Yale who

 7    had a student who sent me some links that they thought might

 8    have accounted for this.

 9    **Q.**   Do you recall seeing a link to YouTube?

10    **A.**   I think there were links either to YouTube or podcasts,

11    but I think they were YouTube.

12    **Q.**   And there was a photo of you on that?

13    **A.**   Yeah.  I think so.

14    **Q.**   There was also a link to your essay, "Thinking Sex"?

15    **A.**   That's what I recall, yes.

16    **Q.**   Is that the same photo that's on your Wikipedia page?

17    **A.**   I have no idea what photo is on my Wikipedia page, if any.

18    I didn't know there was one.

19              **MS. LINKER:**  Ms. Cruz-Laurcirica, if we could pull up

20    Exhibit --

21              **THE WITNESS:**  I'm sorry.  I didn't hear.

22              **MS. LINKER:**  I'm asking our paralegal.  I'm sorry.

23              **THE WITNESS:**  Oh.  Okay.

24              **MS. LINKER:**  If you could pull up Exhibit 500.  We

25    need to make sure the monitors are off.

**TARGET 1 - DIRECT / LINKER**

1                    (Pause in proceedings.)

2  **BY MS. LINKER:**

3  **Q.**   Exhibit 500, at page 20.

4  **A.**   What are we looking at?

5  **Q.**   We're going to blow it up.  Do you see that image there?

6  **A.**   Yes, I do.

7  **Q.**   Is that a photograph of you?

8  **A.**   It is.

9  **Q.**   Does that look similar to what you were sent by your

10  colleague?

11  **A.**   Yes.  I think so.

12          **MS. LINKER:**  You can take that down.

13  **BY MS. LINKER:**

14  **Q.**   Are you familiar with James Lindsay?

15  **A.**   No, I'm not.

16  **Q.**   He wrote a book called "Cynical Theories"?

17  **A.**   What's it called?

18  **Q.**   "Cynical Theories"?

19          **MS. VARTAIN:**  Objection.  Lacks foundation.

20          **THE COURT:**  She said -- she's just -- you can answer

21  that question.  Do you know of that book?

22          **THE WITNESS:**  I don't know of that book.  I don't know

23  what you're talking about.

24          **THE COURT:**  Next question.

25  \\\

TARGET 1 - DIRECT / LINKER

```
 1   BY MS. LINKER:
 2   Q.    Have you heard of a website or podcast called "New
 3   Discourses"?
 4   A.    No.
 5   Q.    Have you heard the term "groomer schools"?
 6   A.    What?
 7   Q.    Groomer schools?
 8   A.    Not really, no.
 9   Q.    Have you heard the term "groomer"?
10   A.    Oh, I've heard the term "groomer."
11   Q.    What's your understanding of the meaning of that term?
12   A.    Depends, again, on -- it used to be a term for adults who
13   cultivated relationships with young people in order -- well, it
14   means a lot of things, but in this context, to try to have sex
15   with them.  Groomer also mean a dog groomer.  I mean, this is a
16   term that has a lot of uses.
17         But lately it's been weaponized.  Again, this much I know
18   from just reading the press and watching TV news to apply to
19   pretty much all LGBTQ people, studies, mobilization, activism,
20   rights, politics, et cetera.
21   Q.    To be clear, you do not support child molestation?
22   A.    Absolutely not.
23   Q.    What is your view on pedophilia?
24   A.    Well, depends, again, on how you define it.  Pedophilia
25   has been a psychiatric classification for people who have an
```

```
 1   interest, usually in prepubescent children.  Lately it seems to
 2   be used as an all-purpose insult.  And also as a synonym for
 3   child molestation, which is not accurate.
 4   Q.   Prior to this case, had you ever heard of David DePape?
 5   A.   No, not until I heard about the case.
 6   Q.   Had he ever reached out to you?
 7   A.   No.
 8   Q.   Do you know anything about his belief that you are a
 9   supporter of child molestation?
10   A.   Very little.
11   Q.   Have you ever worked for the Federal Government?
12   A.   No.
13   Q.   Do you have any association with the Federal Government?
14   A.   I mean, I pay taxes.
15                         (Laughter.)
16        THE COURT:  You're just saying that because you're
17   sitting here.
18                         (Laughter.)
19   BY MS. LINKER:
20   Q.   Do you consider yourself a politician?
21   A.   No.
22   Q.   You're an anthropologist?
23   A.   I'm a scholar and an academic, an anthropologist, and I
24   have done political activism, but I -- over -- for many years,
25   feminist and otherwise.
```

```
 1   Q.   I'm going to show you --

 2   A.   But I'm not a politician.

 3   Q.   Thank you.  I'm going to show you something.

 4                   (Pause in proceedings.)

 5           MS. LINKER:  May I approach, Your Honor?

 6           THE COURT:  You may.

 7                   (Counsel approaches witness.)

 8           THE WITNESS:  What on earth is this?

 9   BY MS. LINKER:

10   Q.   I'm showing you what's been admitted in this case as

11   Exhibit 170.  Have you seen this before?

12   A.   No.

13   Q.   There are three items, do you see, listed on there?

14   A.   I do.

15   Q.   That first address at the top, do you recognize that

16   address?

17   A.   I don't.

18   Q.   And don't say out loud anything you read on that piece of

19   paper, please.

20        The second line, do you recognize that address?

21   A.   I do.

22   Q.   And what is that?

23   A.   That's my home.

24   Q.   In San Francisco?

25   A.   Correct.
```

**TARGET 1 - DIRECT / LINKER**

1   Q.   And that was your home on October 28th, 2022?

2   A.   It was.

3   Q.   That third line, again, without saying it aloud, do you

4   recognize the phone number?

5   A.   I do.

6   Q.   Is that a phone number associated with you?

7   A.   It was.  Some years ago.

8           MS. LINKER:  I can take that back.

9       May I approach, Your Honor?

10          THE COURT:  You may.

11              (Counsel approaches witness.)

12  BY MS. LINKER:

13  Q.   Do you know who Nancy Pelosi is?

14  A.   Yes.

15  Q.   Do you have any personal connection to her?

16  A.   No.  I'm a constituent.

17  Q.   Do you --

18  A.   I've never met her.

19  Q.   I'm sorry.

20  A.   I never met her.

21  Q.   You never met her.

22      Do you have a professional connection to her in any way?

23  A.   No.

24  Q.   Do you have any connection to Mr. Pelosi, Paul Pelosi?

25  A.   None.

1   Q.   You've never spoken with Nancy Pelosi one-on-one?

2   A.   No.

3   Q.   Never spoken with her on the phone?

4   A.   No.

5   Q.   If Speaker Pelosi called you, would you speak with her?

6   A.   If I thought it was a legitimate call, but these days, you

7   never know who's calling.

8   Q.   Fair enough.

9        MS. LINKER:  I have nothing further, Your Honor.

10       THE COURT:  Any questions?

11       MS. VARTAIN:  No, thank you.

12       THE COURT:  You are excused.

13       THE WITNESS:  Thank you.

14       THE COURT:  Thank you.

15   Is the Defense ready to call your next witness?

16       MS. CHUANG:  Yes.  We call Elizabeth Yates to the

17   stand.

18   (Elizabeth Yates steps forward to be sworn.)

19       THE CLERK:  Thank you.  Please raise your right hand.

20                        **ELIZABETH YATES**,

21   called as a witness for the Defendant, having been duly sworn,

22   testified as follows:

23       THE WITNESS:  Yes.

24       THE CLERK:  You can sit down, please.  State your name

25   and then spell it for the record.

1            **THE WITNESS:**  Okay.   Okay.   Elizabeth Yates,

2     E-L-I-Z-A-B-E-T-H, Y-A-T-E-S.

3                        <u>DIRECT EXAMINATION</u>

4     BY MS. CHUANG:

5     **Q.**   Good morning, Ms. Yates.

6     **A.**   Good morning.

7     **Q.**   What do you do for work?

8     **A.**   I'm retired.

9     **Q.**   Before you retired, what did you do?

10    **A.**   I was a legal assistant.

11    **Q.**   How long did you do that for?

12    **A.**   About 20 years.

13    **Q.**   And when did you retire from that?

14    **A.**   2020.

15    **Q.**   So is that about three years that you've been retired now?

16    **A.**   Yes.

17    **Q.**   Where are you from originally?

18    **A.**   California, mostly whole life, Stockton.

19    **Q.**   What city do you live in now?

20    **A.**   Richmond.

21    **Q.**   Do you know my client, David DePape?

22    **A.**   Yes.

23    **Q.**   How do you know him?

24    **A.**   David worked as an assistant with Frank Ciccarelli, who

25    built my deck long ago, and then Frank would show up in the

1  neighborhood and do jobs for people.  He was a very good

2  builder.  And he showed up one day with David as his assistant,

3  and I met him then.  I can't remember exactly the year,

4  maybe 2017.  Don't know.

5  **Q.**  So maybe roughly five or six years, would you say that

6  you've known Mr. DePape?

7  **A.**  Yeah, yeah.  But, again, I really -- I don't know for

8  sure.

9  **Q.**  At some point, did he live across the street from you?

10 **A.**  Yes.

11 **Q.**  When did he move in there?

12 **A.**  I think it was three years ago.  Two -- four years ago,

13 could be.

14 **Q.**  Can you describe what his living situation was like?

15 **A.**  He rented a room that had been a garage that had been

16 converted into an artist studio.  And then all of the art

17 things were taken out, and it was a room for David.

18 **Q.**  Was there a bathroom in that?

19 **A.**  No, huh-uh.

20 **Q.**  Where did he shower?

21 **A.**  He showered at my house.

22 **Q.**  How often would he come to your house to shower?

23 **A.**  Once a week, you know, after work.

24 **Q.**  And how did you feel about having him come into your

25 house?

**YATES - DIRECT / CHUANG**

1  A.   Fine.

2  Q.   When he was living across from you, did he -- did you ever

3  see any friends or family visiting him?

4  A.   No, huh-uh.

5  Q.   Where did he live before he moved in the garage space, if

6  you know?

7  A.   I believe that he was homeless.  He lived in Berkeley in a

8  tent, I believe, under a tree.  That's my understanding.

9  Q.   So while he was living across the street from you, how

10 frequently did the two of you interact?

11 A.   Well, I would see him, of course, every week when he

12 showered, and I saw him sometimes through the week just saying

13 hi as he's riding his bicycle home.  And then for a period of

14 time, he did work for me at my house.

15 Q.   What kind of work did he do for you?

16 A.   He worked -- he did things like put in stone pathways,

17 another kind of a pathway from the backyard to the front of the

18 house.  It's like a gravel path.  Very nice, very nicely done.

19 He could do like in four house what it would take me two weeks

20 to do.  He was fantastic.  So it was a nice working

21 relationship.

22 Q.   And during your interactions with him, would you have

23 conversations with him?

24 A.   Uh-huh, yeah.  I want to say neither one of us -- well,

25 you might not know that from me here and now -- are chatty

1  people.  We're not chatty.  So we would talk, you know, a

2  little bit, not -- not a whole lot.  Okay?

3  Q.   If you know, what did he do in his spare time when he

4  wasn't working?

5  A.   He was a video gamer.  He did video games.

6  Q.   So when you had conversations with him, what types of

7  things would you talk about?

8  A.   Oh, boy.  Sometimes we talked about current events.  We

9  talked about things of interest, I mean, I remember one time he

10 explained to me something having to do with a phenomenon in

11 physics that he could -- he could explain to me something

12 having to do with time and particles that you can -- that we

13 measure but very difficult, very small particles, you know,

14 different things, different things.

15 Q.   Did you ever have any conversations with him about

16 political things?

17 A.   You know, sometimes we would touch on it, current events

18 of the day.  After a while, it became apparent to both of us

19 that we diverged politically, and so we didn't, you know,

20 really.  We stayed away from that topic.  We talked about

21 animals a lot.  He -- yeah.

22 Q.   Did you ever talk with him about something called

23 "Pizzagate"?

24 A.   I did, yeah.  I brought that up.  I remember that, yeah.

25 Q.   How would you describe Mr. DePape's political leanings?

1  **A.**   Definitely right-wing and then moving to the right, yeah.

2  **Q.**   Do you know where he got his news and information from?

3  **A.**   Yeah.   From the Internet, from websites on the Internet,

4  yeah.

5  **Q.**   Did he ever send you links to websites?

6  **A.**   He did to talk about -- for example, we talked about that

7  guy who did -- let me just try and think of the name of -- it's

8  a Project Veritas.   It's kind of a guy who's made his

9  political -- life, you know, earns money in a right-wing kind

10 of a way, spoofing people and trying to -- on -- on the left.

11 He would consider on the left and -- and anyway, Project

12 Veritas.

13      And I remember David wanted to persuade me that:  No, the

14 guy was legit.

15      And I said:  No, the guy is not legit.

16      So that's one thing.

17 **Q.**   Did he ever talk to you about George Soros?

18 **A.**   No.   Well, actually, yes, he and I talked about George

19 Soros.   This was when we could -- we were still sort of -- it

20 was earlier in the times that we talked because we didn't

21 really understand -- we diverged so much.   Yes, he talked a

22 little bit about George Soros, and I countered his thoughts

23 about George Soros.

24 **Q.**   What did he say about George Soros that you can remember?

25 **A.**   That he was --

1            **MS. VARTAIN:**  Objection.   Objection.

2            **THE WITNESS:**  -- a very, very --

3            **THE COURT:**  Hold on one second.

4            **MS. VARTAIN:**  Calls for hearsay.

5            **MS. CHUANG:**  Not for the truth.

6            **THE COURT:**  Overruled.

7     **BY MS. CHUANG:**

8     **Q.**   Sorry.  I'll ask the question again.

9            What did he say about George Soros, if you can remember?

10    **A.**   He said that George Soros was an evil man, a very bad man,

11    who was promoting causes on the left.  He might have used the

12    word "communist" and just very, very bad man who's giving lots

13    of money to left-wing causes and for bad reasons.

14           And I countered that he was a financial guy who was

15    donating to political causes that he liked and that all of

16    those financial guys did that.  So...

17    **Q.**   From your conversations with him, how important would you

18    say the truth was to him?

19    **A.**   Oh, I think the truth was very important to David.  Very

20    important to David.

21    **Q.**   And during your interactions with him, did you ever see

22    him get angry or upset?

23    **A.**   You know, there was one time when -- and this was really

24    later on when we really stopped talking about politics.

25    Both -- both of us were, like, trying to impress the other one

1   with our political points, and we both kind of, you know, got

2   to the point where I could start yelling at you, you know, so

3   you would listen to me.  And he understood that.  He felt the

4   same way.  We both backed off.  Yeah.

5   **Q.**   When was the last time you talked to him?

6   **A.**   It would have been just maybe the week before this

7   happened.  Yeah.

8   **Q.**   And in the weeks and months leading up to when he was

9   arrested last year, did you notice any changes in him?

10  **A.**   He was more quiet.  He was more quiet.  He didn't -- he

11  didn't talk as much when he was there at my place.  He was

12  always, you know, really -- I mean, we would interact when he

13  was there.  You know, we'd talk.  How's the job?  You know,

14  he'd see my animals.  I had a rescue cat who loved him, and he

15  ran all over him, you know.

16      But then towards the end, just very brief conversations.

17  Very brief conversations, yeah.

18  **Q.**   Now, during your conversations with Mr. DePape, did he

19  ever talk to you about Nancy Pelosi?

20  **A.**   No.

21  **Q.**   Did he ever bring up anything that she did this Congress?

22  **A.**   No.

23  **Q.**   Did he ever bring up any speeches she made?

24  **A.**   No.

25  **Q.**   Or any votes that she took?

PROCEEDINGS

```
1   A.   No.

2   Q.   Did he ever talk about Nancy Pelosi at all?

3   A.   Never.

4   Q.   What about Paul Pelosi?

5   A.   No.

6   Q.   Did he ever bring up anyone in the Pelosi family?

7   A.   No.

8        MS. CHUANG:  No further questions.

9        THE COURT:  Any questions?

10       MS. VARTAIN:  No, thank you.

11       THE COURT:  Ms. Yates, you are excused.

12       THE WITNESS:  Oh, okay.

13       THE COURT:  Thank you.  Yeah.

14                (Witness excused.)

15       THE COURT:  Do you have another witness?

16       MS. CHUANG:  We do.

17       MS. LINKER:  We call Dan Bernal.

18   (Dan Bernal steps forward to be sworn.)

19       THE CLERK:  Please raise your right hand.

20                DANIEL BERNAL,

21   called as a witness for the Defendant, having been duly sworn,

22   testified as follows:

23       THE WITNESS:  I do.

24       THE CLERK:  Please have a seat.  State your name and

25   spell it for the record, please.
```

1              **THE WITNESS:**  Daniel Bernal.  Last name B, like boy,

2    E-R-N, like Nancy, A-L.

3                        <u>**DIRECT EXAMINATION**</u>

4    **BY MS. LINKER:**

5    **Q.**   Good morning, Mr. Bernal.

6    **A.**   Good morning.

7    **Q.**   What do you do for a living?

8    **A.**   I work as the chief of staff in San Francisco for

9    Congresswoman Pelosi.

10   **Q.**   Can you please describe for us generally what you do as

11   her chief of staff?

12   **A.**   Yes.  I run her San Francisco office that focuses on

13   constituent services and outreach into the community.

14   **Q.**   Are you also an adviser to her in certain areas, public

15   health?

16   **A.**   Yes.

17   **Q.**   What other areas do you help advise her on?

18   **A.**   HIV/AIDS, labor, LGBTQ+ issues.

19   **Q.**   You oversee office policies and procedures?

20   **A.**   Yes, I do.

21   **Q.**   And --

22   **A.**   In the district office.

23   **Q.**   And do you help her set goals for priorities as a member

24   of Congress?

25   **A.**   For the district, yes.

**BERNAL - DIRECT / LINKER**

1   Q.   Do you maintain relationships with her with local

2   agencies, community leaders, advocacy groups?

3   A.   Yes, I do.

4   Q.   Are you familiar with her day-to-day schedule?

5   A.   Yes.

6   Q.   Do you have full access to that schedule?

7   A.   No.

8   Q.   What parts of her schedule, if you are aware, do you not

9   see?

10  A.   I'm not aware.

11  Q.   What parts of her schedule do you see?

12  A.   Times, meetings, things like that.

13  Q.   You have the detailed information about the meetings that

14  she's going to?

15  A.   I receive them, yes.

16  Q.   And you generally know where she is during the weekdays?

17  A.   No.  Only when she's in the district.

18  Q.   And you have access to that, on your system, to look at

19  where she is?

20  A.   I have access to a schedule that's sent to me, yes.

21  Q.   Do you work in a full-time capacity for her?

22  A.   Yes.

23  Q.   How long have you worked for her?

24  A.   Nearly 22 years.

25  Q.   Do you collect a salary?

BERNAL - DIRECT / LINKER

1   **A.**   I do.

2   **Q.**   Are you a federal employee?

3   **A.**   Yes, I am.

4   **Q.**   Who does your paycheck come from?

5   **A.**   The United States House of Representatives.

6   **Q.**   About how many hours a week do you work for her?

7   **A.**   For her?

8       40 to 60.

9   **Q.**   Some weeks more?  Some weeks less?

10  **A.**   Yes.

11  **Q.**   Probably, rarely less?

12  **A.**   That's correct.

13  **Q.**   Do you get paid for overtime work?

14  **A.**   I do not.

15  **Q.**   Do you ever say something to her like:  Sorry, boss.  I

16  can't do that casework or some -- some, I'll say, casework

17  because I've worked 40 hours, and I'm done?

18  **A.**   No.

19  **Q.**   At this time --

20  **A.**   Not that I recall.

21  **Q.**   Not that you recall.

22      At the same time as being her chief of staff, have you

23  also held other jobs?

24  **A.**   Yes.

25  **Q.**   Did you work for the Independent Citizens Oversight

**BERNAL - DIRECT / LINKER**

 1  Committee of the California Institute for Regenerative

 2  Medicine?

 3  **A.**   I was appointed to that body in an uncompensated volunteer

 4  role.

 5  **Q.**   And when was that?

 6  **A.**   2019, I believe.

 7  **Q.**   Do you still serve on that body?

 8  **A.**   I do.

 9  **Q.**   And do you -- did you also work for the San Francisco

10  Health Commission?

11  **A.**   Again, a volunteer position.

12  **Q.**   And when was that?

13  **A.**   Beginning in 2019 until -- sorry.  2017 until last month.

14  **Q.**   And is it permissible that you have these multiple roles?

15  **A.**   Yes.

16  **Q.**   Who determines that?

17  **A.**   The House Ethics Council.

18  **Q.**   Prior to working for Congresswoman Pelosi, did you work at

19  the White House?

20  **A.**   I did.

21  **Q.**   When was that?

22  **A.**   That was 1995 to 1997.

23  **Q.**   Who was the president at that time?

24  **A.**   William Clinton.

25  **Q.**   What was your job there?

BERNAL - DIRECT / LINKER

```
 1   A.    I was first an intern, and then I was assistant to the
 2   political director.
 3   Q.    What did you do as the assistant to the political
 4   director?
 5            MS. VARTAIN:  Objection.  Relevance.
 6            THE COURT:  Sustained.
 7   BY MS. LINKER:
 8   Q.    Did you manage travel schedules in that -- I mean, manage
 9   schedules in that capacity?
10            MS. VARTAIN:  Objection.  Relevance.
11            THE COURT:  Sustained.
12   BY MS. LINKER:
13   Q.    As her chief of staff of over 20 years, you're generally
14   familiar with the rules of the House of Representatives?
15   A.    I am.
16   Q.    Are you generally familiar with the ethics rules?
17   A.    Generally, yes.
18   Q.    Are there rules of the House -- I think you already said
19   this -- that govern when members and staff may engage in
20   outside activities?
21   A.    Could you be more specific about outside activities?
22   Q.    Are there rules that govern when members and staff can
23   engage in campaign activities?
24   A.    Could you repeat it one more time?  I'm sorry.
25   Q.    Are there rules of ethics that govern when members and
```

1  their staff may engage in campaign activities?

2  A.   Yes.

3  Q.   And do those -- those are -- they're franking rules?  Are

4  you familiar with franking rules?

5  A.   I am.

6  Q.   Can you describe what franking is?

7  A.   As I know franking, it's about mostly sending official

8  mail with a postmark on that envelope.

9  Q.   And a member of Congress has the ability to send a piece

10 of mail without paying for it; correct?

11      The frank on the envelope, that means they don't have to

12 pay for postage?

13 A.   I mean, postage is paid, but I -- I'm not sure where it's

14 paid from.

15 Q.   But when you use your franking privileges as a staffer for

16 a member of Congress, you can only send out official mail with

17 that franked envelope; correct?

18 A.   Correct.

19 Q.   Can a staff member of the House, House of Representatives,

20 engage in campaign activity?

21 A.   Yes.

22 Q.   And obviously, a member of Congress can engage in campaign

23 activity; correct?

24 A.   Yes.

25 Q.   Members of the House, how often are they reelected?

1  A.    Every two years.

2  Q.    So are they regularly campaigning?

3  A.    What do you mean by "regularly"?

4  Q.    They have to campaign fairly often, since they're up for

5  reelection more often than, say, the president or a senator?

6  A.    They are reelected more often than a president or senator.

7  I can't speak to how often they campaign.

8  Q.    Members and their staff must do that campaign work without

9  violating the standards of conduct that apply; correct?

10  A.    Correct.  The ethics rules, yes.

11  Q.    Do those standards of conduct draw a line between campaign

12  activity and official federal duties?

13  A.    Yes.

14  Q.    Why do you believe or understand that those laws are

15  there?

16  A.    So the taxpayer dollars are not used to fund campaign

17  activity.

18  Q.    Taxpayer funds cannot be used for campaign activities;

19  correct?

20  A.    That's correct.

21  Q.    That would be improper?

22  A.    That's correct.

23  Q.    And so there's a strict line between what's done on a

24  campaign and what's done for official duties to ensure that

25  there's no improper transfer of funds?

 1    **A.**    Yes.   That's what the ethics rules do.

 2    **Q.**    And you're generally familiar with the ethics rules?

 3    **A.**    I am.

 4    **Q.**    Those ethics rules generally govern how you keep these

 5    rules separate?

 6              **MS. VARTAIN:**  Objection.   Leading.

 7    **BY MS. LINKER:**

 8    **Q.**    Do these ethics rules generally govern how you keep these

 9    rules separate?

10    **A.**    Yes.

11    **Q.**    All employees of the House, members and staff, have to

12    follow the ethics rules; correct?

13              **MS. VARTAIN:**  Objection.   Leading.

14              **THE COURT:**  Sustained.

15    **BY MS. LINKER:**

16    **Q.**    Do all members -- do all employees of the House, which is

17    members and staff, have to follow the ethics rules?

18    **A.**    Yes.

19    **Q.**    Is one of the cardinal rules that official resources of

20    the House must, as a general rule, be used for the performance

21    of official business of the House, and hence, those resources

22    may not be used for campaign or political purposes?

23    **A.**    That is my understanding of the ethics rules.

24    **Q.**    There's a basic principle -- is there a basic principle

25    that government funds should not be used to help incumbents

**BERNAL - DIRECT / LINKER**

1   gain reelection?

2   **A.**   Yes, that's my understanding.

3   **Q.**   In addition to working for Congresswoman Pelosi as her

4   chief of staff, have you ever worked for Nancy Pelosi for

5   Congress?

6   **A.**   I have.

7   **Q.**   What is -- and I put air quotes around it, I'm sorry --

8   Nancy Pelosi for Congress?

9   **A.**   It's her congressional campaign committee.

10  **Q.**   What did you do for Nancy Pelosi for Congress?

11  **A.**   I served as a consultant.

12  **Q.**   When did you do that?

13  **A.**   I believe from about 2012 until last month.

14  **Q.**   And were you also a strategic campaign consultant for her

15  PAC?

16  **A.**   No.   I was paid out of Nancy Pelosi for Congress.

17  **Q.**   Are you familiar with Nancy Pelosi's PAC?

18  **A.**   Yes.

19  **Q.**   What is the name of that PAC?

20          **MS. VARTAIN:**   Objection.   Relevance.

21          **THE COURT:**   Sustained.

22  BY MS. LINKER:

23  **Q.**   What did you do as a campaign consultant for Nancy Pelosi

24  for Congress?

25  **A.**   Would organize events, would handle campaign filings,

**BERNAL - DIRECT / LINKER**

1   things like that.

2   **Q.**   Do you help direct campaign messaging?

3   **A.**   Sometimes, as it pertained to local issues, yes.

4   **Q.**   Did you establish and manage the Vote Blue SF

5   headquarters?

6           **MS. VARTAIN:**  Objection.  Relevance.

7           **THE COURT:**  Can you show some relevance?

8           **MS. LINKER:**  Yes, Your Honor.  We're showing the

9   political duties are separate from the official duties.

10          **THE COURT:**  Well, that's your argument.  All right.

11      You can answer that question.

12          **THE WITNESS:**  Could you repeat the question, please.

13  **BY MS. LINKER:**

14  **Q.**   Of course.  Did you help establish and manage the Vote

15  Blue SF headquarters?

16  **A.**   Yes.  I helped with that.

17  **Q.**   What is the Vote Blue SF headquarters?

18  **A.**   It was a space where volunteers could come and engage in

19  volunteer campaign activity.

20  **Q.**   Campaign activity for what campaign?

21  **A.**   For Nancy Pelosi for Congress or some other campaigns as

22  well.

23  **Q.**   By "some other campaigns as well," what do you mean?

24  **A.**   Other candidates running for office.

25  **Q.**   What does Vote Blue mean?

1  **A.**    Vote Democratic.

2  **Q.**    That's to support the Democratic party?

3  **A.**    Yes.

4  **Q.**    And did you do this work on her campaigns while also

5  working as a federal employee?

6  **A.**    Yes.  But not on federal time.

7  **Q.**    So how was that permissible that you could do these dual

8  roles?

9  **A.**    I could work on campaign activity either when I was not on

10  the clock working for the Federal Government or if I was taking

11  vacation time.

12  **Q.**    Did you go to any campaign events with her?

13  **A.**    Sometimes.

14  **Q.**    Did you ever go to any personal events with Nancy Pelosi?

15  **A.**    What do you mean by "personal"?

16  **Q.**    Family celebrations, things unrelated to either her

17  political role or her official duties as a member of Congress?

18  **A.**    Yes.

19  **Q.**    Were you able to keep your role as chief of staff separate

20  from your role as her campaign consultant?

21  **A.**    Yes.  Those are the rules.

22  **Q.**    And you knew it was important to follow the rules?

23  **A.**    Yes.

24  **Q.**    Let's talk about the rules for a moment.

25        Can a member make campaign fundraising phone calls from

1   their congressional office?

2   **A.**   No.

3   **Q.**   Why not?

4   **A.**   Because that would be campaign activity in a government

5   building.

6   **Q.**   Can a member make campaign fundraising phone calls from

7   the Capitol?

8   **A.**   My understanding is no.

9   **Q.**   Why not?

10  **A.**   Because it's also a government building.

11  **Q.**   Can a member use their House of Representatives staff to

12  conduct campaign activity while they are in their office, in a

13  House office building or in the district office?

14  **A.**   No, they cannot.

15  **Q.**   And why is that?

16  **A.**   Because it would be using government resources for

17  campaign activity.

18  **Q.**   And where is Speaker Emerita Pelosi's district office?

19  **A.**   Just a few blocks from here, on 7th Street.

20  **Q.**   And is that where you work?

21  **A.**   It is.

22  **Q.**   Can you work on campaign activity from that office?

23  **A.**   No.

24  **Q.**   Can you use resources from that office to do the campaign

25  activity?

```
 1   A.   No.

 2   Q.   Does Speaker Emerita Pelosi have a separate office for her

 3   reelection campaign?

 4   A.   It's not an office per se, but, yes, there's a space.

 5   Q.   And that's the Vote Blue headquarters?

 6   A.   That's not what it's called.

 7   Q.   What is it called?

 8   A.   Team Pelosi.

 9   Q.   And where is that located?

10   A.   In the Castro neighborhood.

11   Q.   And you are no longer working for Nancy Pelosi for

12   Congress; correct?

13   A.   Correct.

14   Q.   And why is that?

15   A.   Because I've taken a new job.

16   Q.   You haven't started that new job yet?

17   A.   I have not.

18   Q.   I'm going to switch gears for a second.  You have -- you

19   have access to her schedule, as we discussed; right?

20   A.   I am able to view a schedule.

21   Q.   I'm going to show you what's been admitted as Exhibit 511.

22        MS. LINKER:  If we could pull that up.

23   BY MS. LINKER:

24   Q.   While we wait for that, did you ever go to DC with

25   Congresswoman Pelosi?
```

**BERNAL - DIRECT / LINKER**

1  A.    With her, no.

2  Q.    Were you ever in DC working on official business?

3  A.    Yes.

4  Q.    How many times do you think you've done that over your

5  20 years?

6  A.    Over 20 years, well, COVID certainly didn't do -- a dozen

7  or less.

8  Q.    If we could turn to page 2 of that schedule and look at

9  Friday, October 21st, starting at 3:45.

10       Are you familiar with how this schedule looks, except for

11  the big black boxes on it?

12  A.    I'm familiar with her schedule, yes.

13  Q.    And this looks like her schedule?

14  A.    Yes.

15  Q.    And at 3:45, what was Speaker Pelosi scheduled to be

16  doing?

17  A.    Having a phone call.

18  Q.    And where were those phones call to be happening?

19  A.    According to the document you're showing me, it's a

20  conference room at the DCCC.

21  Q.    And what is the DCCC?

22  A.    It is a Democratic Congressional Campaign Committee.

23  Q.    Is that the only political committee dedicated to electing

24  Democrats to the House of Representatives?

25  A.    I believe so.

**BERNAL - DIRECT / LINKER**

1   **Q.**   Are you familiar with the DSCC?

2   **A.**   Yes.

3   **Q.**   What is that?

4   **A.**   The Democratic Senatorial Campaign Committee.

5   **Q.**   That's the Senate arm of the same idea?

6   **A.**   Yes.

7   **Q.**   And are they both under the umbrella of the DNC?

8   **A.**   I don't know the structural relationship.

9   **Q.**   Do you know what the DNC is?

10  **A.**   I do.

11  **Q.**   Could you share with us what that is?

12  **A.**   The Democratic National Committee.

13  **Q.**   That's the Democratic party; correct?

14  **A.**   Yes.

15  **Q.**   Is the Democratic party a governmental organization?

16  **A.**   No.

17  **Q.**   Is the DNC a governmental organization?

18  **A.**   No.

19  **Q.**   Is the DCCC a governmental organization?

20  **A.**   No.

21  **Q.**   And when we look at her schedule on Friday, October 21st,

22  when it goes from 3:45 --

23          **MS. LINKER:**  If we could turn, Ms. Cruz-Laurcirica, to

24  the next page, all the way until 7:00 p.m.

25  \\\

BERNAL - DIRECT / LINKER

```
 1   BY MS. LINKER:
 2   Q.   -- that she spent that time at the DCCC.  That was not
 3   uncommon for her schedule; correct?
 4   A.   I'm not that familiar with her DC schedule to be able to
 5   answer that.
 6   Q.   Who on Speaker Emerita Pelosi's staff makes sure that
 7   she's not violating any ethics rules?
 8          MS. VARTAIN:  Objection.  Relevance.
 9          THE COURT:  Sustained.
10   BY MS. LINKER:
11   Q.   Can taxpayer funds be used when she, say, hosts
12   Thanksgiving at her home?
13   A.   For security, perhaps.  I would say yes.
14   Q.   To buy the turkey?
15   A.   No.
16   Q.   Can taxpayer funds be used for her hair appointments?
17   A.   Again, for the security that she receives, I think, yes.
18   Q.   But to -- actually, to pay the stylist who had cut her
19   hair?
20   A.   No.
21   Q.   Can taxpayer funds be used for that?
22   A.   No.
23   Q.   Can taxpayer funds be used to send a "Vote for Nancy"
24   mailer?
25   A.   No.
```

**BERNAL - DIRECT / LINKER**

1  Q.   Can taxpayer funds be used to help her fundraise in any

2  way for the Democratic party?

3          **MS. VARTAIN:**  Objection.  Relevance.

4          **THE COURT:**  I think that's asked and answered.  So

5  I'll sustain it on that ground.

6  **BY MS. LINKER:**

7  Q.   Can taxpayer funds be used for her to go to an Emily's

8  List event?

9          **MS. VARTAIN:**  Objection.  Relevance.

10          **THE COURT:**  No; right?

11          **THE WITNESS:**  Except for perhaps security, yes.

12          **THE COURT:**  I think we get the point.

13  **BY MS. LINKER:**

14  Q.   The point taxpayer funds cannot be used for any campaign,

15  political activity.  Is that a fair statement?

16  A.   That is a fair statement.

17  Q.   To keep things separate between her political duties and

18  her official duties, does she have two of a few things?  I'll

19  be more specific.  Does she have two websites?

20  A.   There's a congressional website, and there's also a

21  campaign website.

22  Q.   Two different websites?

23  A.   Correct.

24  Q.   I'd like to show you an exhibit.  One moment.

25                    (Pause in proceedings.)

 1   BY MS. LINKER:

 2   Q.    Are you familiar with her congressional website?

 3   A.    Yes.

 4           MS. LINKER:  May I approach, Your Honor?

 5           THE COURT:  You may.

 6                 (Counsel approaches witness.)

 7           THE WITNESS:  Thank you.

 8   BY MS. LINKER:

 9   Q.    Handing you what's been marked as Exhibit 595.

10         Can you take a look at that.

11         What is that?

12   A.    It's a printout of a website.

13   Q.    Is it a printout from Speaker Pelosi's official website?

14   A.    From what I can see here, yes.

15   Q.    Does it appear to be a fair and accurate depiction of

16   items from her website?

17   A.    Yes.

18           MS. LINKER:  I move to admit Exhibit 595.

19           MS. VARTAIN:  Objection.  The date.  It's irrelevant.

20   It's printed this year.

21           THE COURT:  It is printed this year.  Sustained.

22           MS. LINKER:  Your Honor, the relevance isn't about

23   what was on it back then.  The relevance is what is on -- she

24   has two different websites.

25           THE COURT:  So for that purpose, all right.  I'll

**BERNAL - DIRECT / LINKER**

1    allow it in.

2           (Trial Exhibit 595 received in evidence.)

3           **THE COURT:**  But then the content now is not relevant,

4    so -- she has two different websites.

5    **BY MS. LINKER:**

6    **Q.**  She has two different websites.  On her official website,

7    she can list the issues that are important to her; correct?

8    **A.**  Yes.

9    **Q.**  She has her voting record on her website?

10          **MS. VARTAIN:**  Objection.  Leading.

11          **THE COURT:**  Sustained.

12   **BY MS. LINKER:**

13   **Q.**  Does she have her voting record on her website?

14   **A.**  On the document you handed me, there are votes.

15   **Q.**  And are there issues listed on the document that I handed

16   you?

17   **A.**  Yes.  On the document you handed me.

18   **Q.**  When we were talking about some of the things that she has

19   to keep separate, does she have two separate e-mail accounts?

20   **A.**  I don't know.

21   **Q.**  When she sends out solicitations for funds for her

22   campaign, does she send it from a mail.house.gov e-mail

23   address?

24   **A.**  I don't know, but the rules wouldn't allow that.

25   **Q.**  She would send it from an @pelosiforcongress.org address?

1    **A.**    I don't know that.

2    **Q.**    Do you have, as a consultant on her campaign, an

3    @pelosiforcongress.org e-mail address?

4    **A.**    I'm no longer a consultant, but, no, I never had that.

5    **Q.**    Your e-mail address was only a mail.house.gov e-mail

6    address?

7    **A.**    That's my official government e-mail for official

8    government activity.

9    **Q.**    Does she have two phones?

10   **A.**    I don't know.

11   **Q.**    For snail mail, when it's still used, she -- we talked

12   about sends certain mail from her congressional office with

13   those franking privileges; is that right?

14   **A.**    Yes.

15   **Q.**    And she has to send her campaign mail under a different

16   set of -- a pot of money -- with a different pot of money; is

17   that correct?

18   **A.**    Yes.

19   **Q.**    Okay.  So if I understood, the Democratic party is not a

20   governmental agency; correct?

21   **A.**    Correct.

22   **Q.**    So is the Democratic party separate from a member's

23   official duties?

24   **A.**    I don't -- could you elaborate on the question?

25   **Q.**    Let me give you an example.  If Nancy Pelosi switched

1  political parties, would she remain a member of Congress?

2  **A.**   Yes.

3  **Q.**   When the people in her district here in San Francisco

4  voted her into office, did they elect her to the Democratic

5  party?

6  **A.**   No.

7  **Q.**   What did they elect her to?

8  **A.**   They elected her to the United States House of

9  Representatives.

10  **Q.**   Does a member of the House always have to vote the same as

11  other members of their party?

12  **A.**   No.

13  **Q.**   Can a member be unaffiliated with any party?

14  **A.**   I'm not aware of one that is unaffiliated.

15  **Q.**   Independents?

16  **A.**   If that can be a political party.

17  **Q.**   Independent's not necessarily a political party but what

18  we call people who are unaffiliated with the Democratic or the

19  Republican party.

20  **A.**   People can be unaffiliated, but I'm not aware of a member

21  of Congress who's unaffiliated.

22  **Q.**   Would it be fair to say that Nancy Pelosi engages in quite

23  a bit of campaign activity?

24  **A.**   What do you mean by "quite a bit"?

25  **Q.**   She spends a significant amount of her time.

1   **A.**   Again, I'm sorry.  What do you mean by "significant"?

2   **Q.**   What do you mean by "significant"?

3   **A.**   More than half.

4   **Q.**   Would it be fair to say that Nancy Pelosi, on many weeks

5   of the year, spends more than half of her time on political

6   activity?

7   **A.**   I don't know that.

8   **Q.**   She has a relatively safe seat here in San Francisco?

9   **A.**   Yes.

10  **Q.**   Does that allow her to spend a lot of her time campaigning

11  for others?

12          **MS. VARTAIN:**  Objection.  Relevance.

13          **THE COURT:**  Sustained.

14  **BY MS. LINKER:**

15  **Q.**   She has raised quite a bit of money for the Democratic

16  party; correct?

17  **A.**   What -- again, what do you mean by "quite a bit"?

18  **Q.**   Well, in 2022, in the 2022 election cycle, it was

19  estimated that she raised $310 million; is that correct?

20  **A.**   I don't know.

21  **Q.**   And during her 20 years in leadership, was it estimated,

22  by aides of hers, that she raised $1.3 billion for the

23  Democratic party?

24  **A.**   I don't know.

25  **Q.**   We talked a bit about the separation of her political or

1    campaign duties from her official duties.  I want to just

2    briefly turn to her personal duties.

3         Nancy Pelosi is also a mother?

4    A.   Yes.

5    Q.   She's a grandmother?

6    A.   Yes.

7    Q.   A wife?

8    A.   Yes.

9    Q.   She has personal friends?

10   A.   Yes.

11   Q.   She gets her hair done?

12   A.   Yes.

13   Q.   She maybe goes to the theater?

14   A.   Yes.

15   Q.   I want to go through some activities with you, and I'd

16   like you to tell me whether those are campaign or, let's call

17   them, political activities or official duties as a member of

18   Congress.  Okay?

19          MS. LINKER:  I'm going to turn this on, and hope that

20   Ruth can hear me.

21   BY MS. LINKER:

22   Q.   Can you read my scribbles?

23   A.   I can.

24   Q.   We have "political" on one side, "official" on the other.

25   A.   Yes.

**BERNAL - DIRECT / LINKER**

1   **Q.**   Vote on issues presented on the House floor.

2   **A.**   Official.

3   **Q.**   Emily's list lunch.

4   **A.**   Political.

5   **Q.**   Drafting legislation.

6   **A.**   Official.

7   **Q.**   Promoting that legislation, building coalitions, sending

8   dear colleague letters, things of that nature.

9   **A.**   Official.

10   **Q.**   I'll write "LEG" if you can see that.

11      Work with the DCCC.

12   **A.**   Political.

13   **Q.**   Fundraising.

14   **A.**   Political.

15   **Q.**   Campaigning for her own campaign.

16   **A.**   Political.

17   **Q.**   You call that "Pelosi for Congress"?

18   **A.**   Yes.

19   **Q.**   Fundraising for her PAC.

20   **A.**   Political.

21   **Q.**   What's the name of that PAC?

22   **A.**   PAC to the Future.

23   **Q.**   Campaigning for others.

24   **A.**   Political.

25   **Q.**   Speeches on the House floor.

**BERNAL - DIRECT / LINKER**

1    A.    Official.

2    Q.    Rallies for other politicians.

3    A.    Political.

4    Q.    Meetings with the California Democratic party.

5    A.    Political.

6    Q.    Committee work.

7    A.    Official.

8    Q.    Mailings.

9    A.    Could you be more specific?

10   Q.    I think you would probably say both, but I don't want to

11   put words in your mouth.

12         Some campaign mailings?

13   A.    Yes.

14   Q.    Campaign mailings are?

15   A.    Political.

16   Q.    And what about constituent letters?

17   A.    Official.

18   Q.    Opposition research.

19   A.    Opposition research on what?

20   Q.    On candidates.

21   A.    Political.

22   Q.    Can you tell us what opposition research on candidates is?

23   A.    I've never engaged in opposition research.

24   Q.    Are you familiar with that term?

25   A.    I am.

**BERNAL - DIRECT / LINKER**

1  **Q.**  And what do you understand it to mean?

2  **A.**  To conduct research on a political candidate.

3  **Q.**  GOTV.

4  **A.**  Political.

5  **Q.**  And can you tell us what GOTV is?

6  **A.**  Get out the vote.

7  **Q.**  Television ads, Internet ads, social media.

8  **A.**  Again, for what purpose?

9  **Q.**  Does Speaker Pelosi have two different social media

10  presences?

11  **A.**  Yes.

12  **Q.**  And one for her campaign?

13  **A.**  Yes.

14  **Q.**  And one for her official duties as a member?

15  **A.**  Yes.

16  **Q.**  If we could put that in both?

17  **A.**  Yes.

18  **Q.**  Her website?

19          **MS. VARTAIN:**  Objection.  Relevance.

20          **THE COURT:**  Sustained.

21      How much longer do you have?  Because it's 12:20.

22          **MS. LINKER:**  30 seconds.

23          **THE COURT:**  Okay.  Go.

24          **MS. LINKER:**  Go.  Fast.

25  \\\

1  BY MS. LINKER:

2  Q.   Work on behalf of the DNC, the Democratic National

3  Committee.

4  A.   That would be political.

5  Q.   Securing grants for her district.  Securing funding and

6  grants for people in her district.

7  A.   Official.

8  Q.   Responding to constituent requests, House tours, things of

9  that nature.

10  A.   Official.

11  Q.   "Vote Blue" work.

12  A.   Political.

13       MS. LINKER:  I have nothing further, Your Honor.

14       THE COURT:  Thank you.  Any questions?

15       MS. VARTAIN:  Yes.

16       THE COURT:  Is this our last witness?  So we're going

17  to -- members of the jury, we're going to finish up with

18  Mr. Bernal because then you will be done for the day.

19                    **CROSS-EXAMINATION**

20  BY MS. VARTAIN:

21  Q.   Good afternoon, Mr. Bernal.

22  A.   Good afternoon.

23  Q.   We haven't met, have we?

24  A.   We have not.

25  Q.   The United States Constitution established the House of

BERNAL - CROSS / VARTAIN

1   Representatives; is that correct?

2   **A.**   Yes.   In Article I.

3   **Q.**   Article I is the article concerning the legislative

4   branch; is that correct?

5   **A.**   Correct.

6   **Q.**   And the Constitution provides for elections every

7   two years.  Am I right about that?

8   **A.**   For the House of Representatives.

9   **Q.**   Thank you.

10       The Constitution requires members of the House to be

11   25 years old at the time that they're elected; is that correct?

12   **A.**   Yes.

13   **Q.**   It allows the House to choose their speaker; isn't that

14   right?

15   **A.**   Yes.

16   **Q.**   It also allows the House to choose other officers; is that

17   right?

18   **A.**   Yes.

19   **Q.**   Are the duties of a member of Congress laid out in a job

20   contract negotiated by the member and a boss?

21   **A.**   No.

22   **Q.**   Where does the salary for a member of Congress come from?

23           **MS. LINKER:**  Objection.  Relevance.

24           **THE COURT:**  Overruled.

25           **THE WITNESS:**  Taxpayer dollars.

BERNAL - CROSS / VARTAIN

**BY MS. VARTAIN:**

Q.   And do you know how the salary is set?

A.   By -- by law.

Q.   In other words, it's not a negotiation between the
member --

A.   No.

Q.   -- and the member's district?

A.   No.

Q.   When a member of Congress goes on vacation, does some
other member get elected to come in and fill that job?

A.   No.

Q.   When a member of Congress is sleeping, does that member
have someone come in and take the -- take the shift and take
over their duties?

A.   No.

Q.   Is it fair to say that a member of Congress retains the
powers and authorities of being a member of Congress 24/7?

A.   Yes.

Q.   Are there rules about how a member can be kicked out of
the House?

A.   Yes.

Q.   In other words, lose their job?

A.   Yes.

Q.   When the speaker of the House -- and here I'm asking you
specifically about Nancy Pelosi.  When she goes to sleep at

1   night, again, as the speaker, she retains the powers and

2   authorities of her office?

3   A.    Yes, she does.

4   Q.    The same true when she goes on vacation?

5   A.    Yes.

6   Q.    The speaker gets her hair done with some frequency; is

7   that correct?

8   A.    Could you explain "with some frequency"?

9   Q.    She periodically, we'll say, gets her hair done.  How is

10  that?

11  A.    Yes.

12  Q.    Okay.  And she retains the powers and authorities of her

13  office at that time?

14  A.    Yes, she does.

15  Q.    Nancy Pelosi is a member of the Democratic party; is that

16  correct?

17  A.    Yes.

18  Q.    She runs on the ballot as a Democrat?

19  A.    Yes.

20  Q.    When voters look at the ballot, they see her party

21  affiliation next to her name; is that correct?

22  A.    Yes.

23  Q.    When -- I'm going to focus on the time period of October

24  of 2022.  You worked for the speaker in her San Francisco

25  office; is that right?

**BERNAL - CROSS / VARTAIN**

1    **A.**    Correct.

2    **Q.**    And how do you distinguish that from the Washington, D.C.

3    office?

4    **A.**    The San Francisco office is focused on constituent

5    services and outreach into the community, and the Washington,

6    D.C. office is focused on legislation.

7    **Q.**    When you -- in October 2022, there were -- were there

8    times that you communicated with the speaker after hours?

9    **A.**    I don't know specifically to that period of time.

10   **Q.**    Is it -- is it common for you to communicate with the

11   speaker outside of the hours of 9:00 to 5:00?

12   **A.**    Yes.

13   **Q.**    The speaker's schedule changes; is that right?

14   **A.**    Yes.

15   **Q.**    And can I ask you, how would you -- let me ask you, how

16   would you define a classified briefing?

17   **A.**    A briefing of information that has a security -- a level

18   of security and classification, so not everyone could have

19   access to that information.

20   **Q.**    Is that the type of briefing that, in your experience, the

21   speaker received upon occasion?

22   **A.**    I haven't been there personally, but, yes.

23   **Q.**    Fair to say that when the speaker is in DC, you're more

24   focused -- you're less focused on her day-to-day schedule; does

25   that sound right?

1    **A.**    Correct.

2    **Q.**    When the speaker goes into the DCCC, does she lose her

3    powers and authorities as the speaker of the House of

4    Representatives?

5    **A.**    No.

6             **MS. VARTAIN:**  One moment.

7                              (Conferring.)

8             **MS. VARTAIN:**  Thank you.

9             **THE COURT:**  Anything further?

10            **MS. LINKER:**  One question, Your Honor.

11                   <u>REDIRECT EXAMINATION</u>

12   **BY MS. LINKER:**

13   **Q.**    Is Speaker Pelosi performing official duties when making

14   campaign calls?

15            **MS. VARTAIN:**  Objection.  "Official duties," vague.

16            **THE COURT:**  You can answer if you understand the

17   question.

18            **THE WITNESS:**  I don't.

19   **BY MS. LINKER:**

20   **Q.**    You answered several questions with the Government when

21   they asked if she was performing official duties.  Did you have

22   an understanding of official duties when you answered those

23   questions for the Government?

24            **MS. VARTAIN:**  Objection.  Misstates the testimony.  I

25   don't believe I used the term "official duties."

1          THE COURT:  You can answer if you can.

2          THE WITNESS:  Could you restate the question, please.

3    BY MS. LINKER:

4    Q.   I'm going to ask the question again and see if you

5    understand.

6    A.   Thank you.

7    Q.   Is Speaker Pelosi performing her official duties as a

8    member of Congress when making campaign calls?

9    A.   I haven't been with her when she's made campaign calls.

10   Q.   Under your understanding of the House ethics rules, would

11   it be permissible for her to be doing her official duties while

12   making campaign calls?

13   A.   My understanding of the rule is she could not be making

14   campaign calls with official resources.

15         MS. LINKER:  Thank you.

16      I have nothing further, Your Honor.

17         MS. VARTAIN:  Thank you.

18         THE COURT:  Thank you.  You are excused.

19         THE WITNESS:  Thank you, Your Honor.

20                    (Witness excused.)

21         THE COURT:  Does the Defense have any further

22   witnesses?

23         MS. CHUANG:  No, Your Honor.  The Defense rests.

24         THE COURT:  Is there any rebuttal?

25         MS. VARTAIN:  No.

1        **THE COURT:** All right.  Members of the jury, that

2    concludes the evidence in the case.  So what we're going to do,

3    you're going to be excused now.  You'll return tomorrow at

4    8:30.  I will give you orally your final jury instructions.

5    You'll have them in writing for your deliberations.  And then

6    each side will do closing arguments.

7        The Government gives a closing, the Defense, and then the

8    Government, because it is their burden, has the rebuttal, and

9    then you will begin your deliberations.

10        The schedule tomorrow will be completely up to you.  We

11    are at -- whatever the jury decides, we are at your disposal,

12    but we will begin at 8:30.

13        You still have one more afternoon/evening of your news

14    blackout.  Please do not read anything about the case or

15    discuss anything with anyone.

16        And we will see you tomorrow at 8:30.  Thank you.

17                    (The jury leaves the courtroom.)

18    (Proceedings were heard out of the presence of the jury.)

19        **THE COURT:** Oh.  Okay.  Shall we return at 2:00?  Is

20    that a good time for everyone, for the charging conference?

21        **MS. CHUANG:** Yes, Your Honor.  And we may file our

22    written request for additional jury instruction and modified

23    instructions in the meantime -- before then.

24        **THE COURT:** Please.

25        **MS. VARTAIN:** Can I just ask how much in advance?

1   Because in order for us to research and have a productive

2   charging conference, we need additions with time to do

3   research.

4          MS. CHUANG:  We just have to get back to the office

5   and do a finalizing, and then we should be able to get it in.

6   We can also -- because -- we can also send it to the

7   Government, too, in case ECF is delayed because I know that

8   happens sometimes.

9          THE COURT:  Do you think you can do it by 1:00?

10         MS. CHUANG:  Yes.

11         THE COURT:  But send it, as well, to the Government.

12         MS. CHUANG:  Yes.

13         MS. VARTAIN:  Thank you, Your Honor.

14              (Recess taken at 12:34 p.m.)

15           (Proceedings resumed at 2:34 p.m.)

16         THE CLERK:  Remain seated and come to order.

17      Court is in session.

18         THE COURT:  Okay.  Should we wait for

19   Ms. Vartain-Horn?

20         MS. GILBERT:  We could wait one minute.  We realized

21   we had forgotten to bring up your copy of the final

22   instructions from yesterday, so she went down to get a copy.

23   But we're happy to proceed, and she'll be here in just a

24   minute.  We don't want to hold up the Court.

25         THE COURT:  All right.  Let's -- let's see.  Before we

1   get to the defendant's requested modifications, are there any

2   other things with respect to the proposal?  Or that's what we

3   need to wait for Ms. Vartain Horn for?

4           MS. GILBERT:  Yes.

5           THE COURT:  Okay.  So let's skip that.  Let's go to

6   the defendant's request with respect to the assault, that the

7   indictment charged only an actual assault.  We only have -- we

8   have --

9           MS. GILBERT:  With the forcible assault portion?

10          THE COURT:  Yeah.

11          MS. GILBERT:  The Government does not object to that

12  change, so that would be on -- I'm looking at their Proposed

13  Instruction Number 14, and it would just state:  There is a

14  forcible assault when one person intentionally strikes another.

15      And we do not object to that.

16          THE COURT:  All right.  I'll include that.

17      With respect to the defendant's last request, the problem

18  I find with that is it suggests an inference that what's not

19  there would be helpful to the defendant, which is exactly

20  contrary to why it's hearsay.  Mr. DePape got to testify.  He

21  got to say whatever he wanted today.  There were no objections

22  to his testimony at all.  He was allowed to say anything he

23  wanted to say.

24          MS. CHUANG:  Right.  And just a note, the basis for

25  our objection, I think the jury would be, without this

1  instruction, left wondering:  Well, the Defense pointed out

2  that there were only excerpts of an interview that were played,

3  why didn't they just put in the rest of it?

4      **THE COURT:**  Well, that is what you pointed out.  That

5  was the decision you made, to point that out.  You didn't have

6  to point it out.  And what I do instruct them is that there are

7  rules of evidence, that some things come in and some things

8  come out.

9      The problem with your instruction is that it suggests an

10 inference that what is excluded would be helpful, and I think

11 that's improper because that's why it's hearsay.

12     **MS. CHUANG:**  Right.  And I disagree about that

13 inference, Your Honor.  I think for -- to leave the jury to

14 speculate about why the Defense hasn't put something in that we

15 evidentiarily are unable to is a form of burden shifting, so

16 that's the basis for our objection.

17     **THE COURT:**  Of any case.  There's nothing here.

18     **MS. CHUANG:**  Well, I think it --

19     **THE COURT:**  That happens every case, every trial, so

20 do you have a case that says that's unlawful burden shifting.

21     **MS. CHUANG:**  No, Your Honor, but I think that is the

22 logical conclusion.

23     **THE COURT:**  Okay.  So that objection's overruled.

24     So, then, with respect to the -- with respect to the

25 charge, the 115(a), and the element "while engaged in the

1  performance of official duties," Defense says there isn't --

2  that doesn't seem to be the Government's theory?

3       **MS. GILBERT:**  Your Honor, we think that -- we have a

4  few points on this.  I think, first, we've put in definitely

5  sufficient evidence to argue that the speaker is the speaker

6  all the time, that it is a constitutional official position --

7       **THE COURT:**  Let me ask you a question.

8       **MS. VARTAIN:**  Yes, ma'am.

9       **THE COURT:**  The speaker is driving in her car, her

10 husband is sitting next to her, I or somebody -- she cuts me

11 off.  I'm enraged.  I'm enraged.  I run to the car.  I notice

12 it's the Speaker, and I punch Mr. Pelosi because I'm enraged

13 that the Speaker cut me off.

14    Are you saying that that would qualify under this "while

15 engaged in the performance of official duties"?  She's driving

16 to her -- from her daughter's house to her house after

17 Thanksgiving dinner.

18      **MS. GILBERT:**  Absolutely not, Your Honor.  We concede

19 that would be an entirely too broad ruling.  So -- and I think

20 what we were able to do over the last -- since -- you know, we

21 got this an hour-and-a-half ago, but I was able to find two

22 cases that, I think, speak to this.  I handed them to the

23 Defense as I walked in.  And I'd just like to hand them up, I

24 have them for the Court here.

25      **THE CLERK:**  Okay.  I just wanted to make sure we were

 1    on the same page there.

 2            MS. GILBERT:  Same page there.

 3        No.  I think the point is that she -- if -- the whole --

 4    this statute, I think we can all agree, is not -- does not

 5    intend to cover that kind of conduct.

 6            And I think in *Williamson*, which is the first case here,

 7    out of the DC Circuit, they get to just that point.  And this

 8    is specifically about the definition of on account of the

 9    performance of official duties.

10            So, Your Honor, this is a case that is about a similar

11    statute -- it's 18 United States Code 115(a)(1)(b) -- which

12    criminalizes threats against a federal official, quote, with

13    intent to retaliate against or interfere with them on account

14    of the performance of their official duties.

15            If you look at page 131 of this opinion, and I'm looking

16    at the --

17            THE COURT:  Stop for one second.

18            MS. GILBERT:  Of course.

19            THE COURT:  I want to make sure that you're clear.  I

20    was talking about the "while engaged in," not the "on account

21    of."

22            MS. GILBERT:  I think this language speaks to that --

23            THE COURT:  Okay.

24            MS. GILBERT:  -- and I think this opinion does, and

25    I'd like to be able to explain why.  The court says here -- and

1  I'm reading at 131, the second column, sort of in the bottom

2  middle.  (as read):

3       "The statute speaks in terms of a threat made on

4       account of the performance of official duties, not to

5       draw attention to a particular official duty but

6       instead to assure that the threat generally relates

7       to the officer's performance of official duties

8       rather than to a personal dispute having nothing to

9       do with the officer's job function.

10      "For instance, the statute would not reach a

11      threat rising from a personal dispute with a neighbor

12      who happens to be a law enforcement officer where the

13      subject of the disagreement is entirely unconnected

14      to the officer's performance of his job."

15  So I think that that is what we're talking about here.

16      I think that we need to think about the victim in this

17  case differently.  And this goes to the fact that she is the

18  speaker of the house; she is not a police officer who drives to

19  work and works a 12-hour shift and comes home.

20      Your Honor, there is, in the model instruction for

21  attempted kidnapping, which is related, I promise, to the

22  assault.  It's Model Instruction 17.6 of the Ninth Circuit jury

23  instructions.  They have a paragraph about defining official

24  duties, and they cite -- and this is in a number of places in

25  the model instructions.  We purposely didn't put this in

 1  because it doesn't fit with the constitutional role of this

 2  victim.

 3      This model instruction cites *United States versus Ornelas*,

 4  a Ninth Circuit case, where it upholds official duties

 5  instruction.   (As read):

 6          "Providing that the test for determining whether

 7      an officer is engaged in the performance of their

 8      duties is whether they're acting within the scope of

 9      his employment, that is, whether the officer's

10      actions fall within his agency's overall mission in

11      contrast to engaging in a personal frolic of his

12      own."

13      I don't think that the speaker's role is conducive to the

14  same type of analysis.  I think if -- for example, if this was

15  a crime against the president of the United States, if the

16  defendant had broken into the president's house because he was

17  upset with the corruption in Washington and attacked the

18  president's wife, I think that no one would be arguing that the

19  president wasn't performing his official duties because he was

20  sleeping.

21      And so I think that the Speaker is in a very similar place

22  here.  This isn't someone who goes on duty and off duty.  I'm

23  not driving my personal car to work and I get into an accident

24  and the question is whether I'm -- you know, while I'm

25  performing my duties, did I get into that accident?  This is an

 1   entirely different class of victim.

 2       We're not asking for any specific change to the statute.

 3   We just think that we're entitled to the ability to make this

 4   argument and defense's proposed suggestion to limit it, I

 5   think, is entirely improper and contrary to the DC Circuit

 6   opinion we provided.

 7           **THE COURT:**  Well, there's two different things.  I'm

 8   not talking about their first instruction; right?  We're

 9   talking about -- I think it's --

10           **MS. CHUANG:**  I think that's Roman numeral II.

11           **THE COURT:**  Yeah, I think it's 1201(a)(5).

12       I understand with respect to the assault.  So here's the

13   thing:  The statute defines a United States official as a

14   member elect.  So it cannot be that, to be a United States

15   official, you have to actually be engaged in those activities

16   at the time because how would it encompass a family member of a

17   member elect?

18           **MS. CHUANG:**  There are official duties that members

19   elect would be doing, such as orientation and training, before

20   they officially take office.

21           **THE COURT:**  Well, you thought of that.

22           **MS. GILBERT:**  I think, Your Honor, though -- I think

23   it -- I think there's a fair interpretation of that language

24   where the first clause is about someone coming to assault the

25   family member in order to try to stop that official from doing

1    something in the future, and the second clause is about that

2    assault being driven for punishing the official for something

3    they did in the past.

4        I think if you read the statute -- if you read "while

5    engaged in" to mean that they have to be actually engaged in

6    official duties, that's a ludicrous reading.

7            **THE COURT:**  I agree.  So I'm separating the two, the

8    kidnapping versus the assault on the family member, right,

9    because the kidnapping is of Nancy Pelosi.

10       So -- and it says -- I'm looking at -- oh, by the way,

11   shouldn't the instruction and also the verdict form refer to A5

12   rather than D?  D is the paragraph that says how much you can

13   be punished.  I don't think that's what you meant --

14           **MS. CHUANG:**  I think the D is there because it's the

15   attempt provision.

16           **MS. GILBERT:**  Yes, that's right.

17           **THE COURT:**  I guess it doesn't matter because we're

18   not going to read them.  Maybe we'll list both, A5 and D.

19       I think so.  Let me just check the code book.

20                       (Pause in proceedings.)

21           **THE COURT:**  So it says here, right, "and the person,"

22   that would be congressman, or then-Speaker Pelosi, is -- this

23   is the kidnapping one.  So the attempted kidnapping is done

24   while Speaker Pelosi is engaged in or on account of the

25   performance of official duties.

 1         And, I guess, what I'm saying is -- thinking that --

 2    right.  Am I not reading that correctly?

 3         **MS. GILBERT:**  I don't think so.  I think, Your Honor,

 4    the language is, "On account of or during the performance."

 5         **MS. CHUANG:**  That's in the model instruction.  The

 6    statute says, "while the person is engaged in."

 7         **THE COURT:**  I think that's the issue.  In the statute,

 8    it says "while the person is engaged in."  And so I'm thinking

 9    "on account of" is broader and encompasses it anyway.

10         Why -- but -- and so then in a way, it's -- I mean, it

11    does seem redundant, but...

12         It says "while the person is engaged in," and I think

13    that's -- I think that's where the Defense is saying you should

14    only instruct them "on the account of the performance of

15    official duties."  I think that language actually kind of fits

16    your theory better anyway.

17         **MS. GILBERT:**  I think that's fine, Your Honor.

18         **THE COURT:**  All right.  So that takes your Roman

19    numeral II.  We've addressed all those three.

20         **MS. CHUANG:**  And that's as to Count 1.  We have the

21    similar request as to Count 2.

22         So just to respond to what -- some of what the Government

23    was saying about that.  We believe that the clause (as read):

24              "...with intent to impede, intimidate, or

25         interfere with such official judge or law enforcement

1      officer while engaged in the performance of official.

2      duties..."

3          For the same reasons, the jury should not be instructed

4    on.

5          So I disagree with the Government that it would be

6    ludicrous.  It may just not be very common that a circumstance

7    could fall under this prong, but certainly you could see a

8    situation where someone assaults Mr. Pelosi, knowing that

9    Ms. Pelosi is on the House floor taking an important vote,

10   giving an important speech with the intent that she be

11   distracted and leave, and that would be interfering with her

12   while she is engaging in her official duties.

13          So that is what I think that prong speaks to.  And for the

14   same reasons as we think "while engaged in" should have been

15   removed from Count 1, the same reasons theory here, there's no

16   evidence that she was actually engaged in the performance of

17   duties.

18          **THE COURT:**  So your theory doesn't account -- if it

19   was she's standing next to him.  I'm going to hit him with this

20   hammer unless you promise me that you will vote not to certify

21   the election.  You'd say that doesn't fall within the statute

22   at all.  It's not -- it's not a federal crime.

23          I understand you're just saying that's the way Congress

24   wrote it, and it doesn't cover it, even though, as the

25   Government said, that would be ludicrous, wouldn't it?

1    **MS. CHUANG:**  I agree, but we're working with the

2    statutory text here.  There's a reason why "while engaged in"

3    is there.  If Congress wanted it to cover the situation that

4    the Court just said, they would never have included "while

5    engaged in."  They could have said "with intent to impede,

6    intimidate, or interfere with such official performance of

7    official duties."  That would cover that scenario.

8        **MS. GILBERT:**  Your Honor, I looked at the

9    congressional history.  I found nothing indicating that they

10   meant to limit it to instances where the official was literally

11   engaged in action at the time.

12       **MS. CHUANG:**  The language is clear in the statute.

13       **THE COURT:**  Well, I think it -- it doesn't say "at the

14   time."  There isn't a temporal thing.  I think what it does is,

15   it's limited to the interference is in the

16   engagement/performance of the official duties.

17       **MS. CHUANG:**  "While engaged in," what that means is

18   currently performing the official duties.

19       **THE COURT:**  Okay.  But it doesn't say that either.

20       **MS. CHUANG:**  No, it doesn't, but that is the most

21   synonymous common language analog.

22       **THE COURT:**  Okay.  But we don't have any case that's

23   interpreted that way, or it doesn't come up very often,

24   fortunately.

25       **MS. CHUANG:**  Right.  I think the statute is just not

 1   charged very often.  But I think the fact that the model

 2   instruction for the attempted kidnapping replaced "while

 3   engaged in" in that statute with "during," it's a similar type

 4   of idea, right, that the performance of official duties is

 5   happening when the conduct occurs.

 6          THE COURT:  Why can't it just be that the impeding,

 7   intimidating, or interference is to interfere with the person

 8   while engaged in it?  Like the interference has to be

 9   interfering while engaged -- somehow engaged in their

10   performance of official duties.

11          MS. CHUANG:  The -- it just doesn't make sense, the

12   way that it's phrased, for it to cover that.

13          Like I said, if it was intent to impede future performance

14   of official duties, there just would be no "while engaged in."

15          THE COURT:  Well, both.  It's not both.  It's not

16   limited to.  It includes current; right?  We agree with that.

17   The question is does it exclude future, which, quite honestly,

18   is the more likely thing to occur.  And I gave you an example,

19   and I appreciate your candor that it would make sense that it

20   would cover that.  Your argument is that it doesn't.

21          But you're saying Congress didn't -- you're not saying

22   that's what Congress intended.  I understand that.

23          MS. CHUANG:  I'm just saying, based on the text we

24   have, it -- that is what it covers, is current engagement in

25   performance of official duties.

1         **THE COURT:**  Well, it doesn't say "current," but...

2      All right.

3      Do you have anything further on that?

4         **MS. GILBERT:**  Your Honor, I think we should be allowed

5   to argue it to the jury.  I think it's -- no one -- I think

6   that we've put in enough evidence about her role as the

7   speaker, and I think these are arguments that the jury can

8   consider.

9         **THE COURT:**  Okay.  All right.

10      I understand the argument.  It's preserved, but I think

11  there's room to argue, but I understand.  I understand it could

12  be written better.  But it's clearly not what was intended.

13  There's just no way that's what was intended.

14      What was intended -- what was intended was to criminalize

15  violence on family members of these elected officials as a way

16  to intimidate them in their performance of their official

17  duties.  That's clearly what was intended, but I understand it

18  does have that "while engaging" language.

19      Okay.  Now, I think, with respect to the defendant's

20  request for the additional instruction, I do think that

21  something on account of the performance of official duties is

22  needed because there is -- to say that there is -- there has to

23  be a causal connection between the charged conduct and Nancy

24  Pelosi's official duties.  So there must be a causality

25  connection between the charged conduct and Nancy Pelosi's

1   actions as a member of Congress.

2      But the cases, as I've seen them, that I did my research

3   in the last hour as well, talk about its very fact-specific

4   situation.  And I -- generally my instructions don't put in

5   evidence because here, this is way too thin.  For example,

6   voting to certify the election.  You would say they would argue

7   it's official duty.

8      Voting to initiate impeachment proceedings involving --

9   out of alleged Russia things, official duties, all those are, I

10  think, somehow excluded from here.  And so I just think that's

11  too cabined, but I do think there needs to be some causal

12  connection because, as you agreed, her status as the speaker of

13  the house is of itself insufficient and, you know.

14      **MS. GILBERT:**  Well, no.  I think, Your Honor,

15  though -- I think what we will argue, though -- and I think we

16  have enough to argue this -- is the defendant intended to

17  kidnap her and ended up assaulting Mr. Pelosi because she was

18  the speaker and the head of the Democrats in the House.

19      **THE COURT:**  I don't -- that's kind of what their

20  language says, "because of."

21      **MS. GILBERT:**  I don't know that.  I think that -- I

22  mean, I think that the law is clear that where the subject of

23  the intent is entirely unconnected to their job, that's not

24  covered by the statute.  And I think --

25      **THE COURT:**  The frolic.  The personal frolic.

 1          MS. GILBERT:  The personal frolic, exactly.  Exactly.

 2    But I agree; I don't think it makes any sense to be -- and I'm

 3    assuming we'll both argue what "official" means.

 4          MS. CHUANG:  Right.  So I don't believe that arguing

 5    that he did anything because she was speaker, as a status --

 6    right? -- as that is just what she is, would be sufficient for

 7    the statute.

 8          THE COURT:  I think maybe I misspoke.  I mean, I think

 9    it could be, depending on what you mean by status of --

10          MS. CHUANG:  Right.

11          THE COURT:  -- speaker.

12          MS. CHUANG:  But the mere fact that she is speaker of

13    the house during this period of time.

14          THE COURT:  They couldn't just come up and say:  She's

15    speaker, we rest.

16          MS. GILBERT:  That would be a bad idea.

17          THE COURT:  That wouldn't be sufficient.  But there's

18    certainly lots of evidence that the conduct, as you say, was

19    motivated by -- was like how was he going to alert

20    Target Number 1?  Why would Target Number 1 answer the phone?

21    Because she was speaker of the house; right?  They might -- you

22    might say that's status, but that certainly could be sufficient

23    evidence.  So -- so the question is, what to say.

24          MS. CHUANG:  Right, Your Honor.  We would say that's

25    not sufficient because that wouldn't be doing anything on

1  account of the performance of official duties.  Again, it's the

2  performance language.  It requires an execution of an action.

3       THE COURT:  Exactly, but the cases are quite clear

4  that what is meant by performance of official duties is not

5  that she actually has to be performing them, that there must be

6  a causal connection between the charged conduct and the actions

7  as a member of Congress.

8       If someone would have -- I think that circumstance

9  absolutely would be covered.  That absolutely would be covered.

10 It's on account of the fact that she's the speaker of the

11 house.

12      Well, actually, so it's even more than as a member.  She's

13 not just a member of Congress.  She's someone who got elected

14 to be the speaker of the house.

15      MS. CHUANG:  But it's about the actions taken in that

16 role.  It's not -- just the mere role enough is not enough

17 under the statute.  It speaks about performance of official

18 duties.

19      THE COURT:  Okay.

20      MS. CHUANG:  Not official position, nothing like that.

21      THE COURT:  What case?  Because I read all the cases,

22 and that's not what they say.  What they distinguish between is

23 when you take actions against the person unrelated -- unrelated

24 to their official duties.

25      MS. CHUANG:  Well, I think even the case that the

1   Government produced, right, it's about whether it's connected

2   to the officer's performance of his job, not the officer's job,

3   period.

4        Right.  So this is -- I'm looking at 131, where the

5   Government was reading from before.

6        **THE COURT:**  How do you even separate out the

7   performance of their job?  That's sort of their argument.  Like

8   every moment she speaks as a speaker of the house is the

9   performance of her job.

10       **MS. CHUANG:**  And they can argue that specifically, but

11  saying that -- that going after her because she was speaker

12  actually doesn't get you entirely there.  That's just saying

13  because of what her status is, what her position is.

14       **THE COURT:**  Well, no, and it's -- well, we heard more

15  than just what -- her position; right?  It's what her position

16  and then what she did as speaker.

17       **MS. CHUANG:**  Right.  What she did, right, the

18  performance of official duties.

19       **THE COURT:**  You can speak as well, Ms. Linker.

20       **MS. LINKER:**  Ms. Chuang is doing a very good job.

21       **THE COURT:**  She's doing excellent.

22       **MS. CHUANG:**  The actions, the performance of

23  something.  It's not just she was in this role at this period

24  of time.  That can't be enough under the text and the statute.

25       **THE COURT:**  Well, I don't -- if he acted because she

1   was speaker of the house, if he kidnapped her -- well, let me

2   think about that.

3                    (Pause in proceedings.)

4        **THE COURT:**  The cases, none of them actually read

5   anything into performance the way you're reading it.  It's

6   true.  I would agree with you that the cases somewhat read

7   performance out.  I think it's just the way the statute was

8   written.  It's really on account of the official duties, and

9   they all -- what they say is to separate it from sort of what

10  they call the frolic -- not language I would use, right, the

11  personal frolic versus targeting a person because of their

12  official duties; right?

13       And how do you even separate out the performance of their

14  official duties?

15       **MS. CHUANG:**  It's what she is engaged in at the time;

16  right?  So if she is voting on legislation in the House, that

17  is clearly performing official duties.  If she's at

18  Thanksgiving with her family, yes, she's still speaker.  That

19  doesn't change, but she's not performing an official member of

20  Congress duty.

21       **THE COURT:**  If he came and he actually succeeded in --

22  so if she was actually there, that wouldn't fall within the

23  statute because she's -- as they said, she's sleeping?  If she

24  had been there instead of Mr. Pelosi, you're saying that

25  wouldn't fall within the statute?

 1          MS. CHUANG:  Not within this statute, not the way it's

 2   written, Your Honor.

 3          THE COURT:  I completely disagree.  I completely

 4   disagree.

 5      Look, if the Ninth Circuit disagrees with me, that's fine.

 6   And you know what, Congress will amend it the very next day

 7   because their absolute intent was to cover that.  It's not a

 8   completely useless or meaningless statute here.

 9          You know -- it's okay.  I understand, but that is -- and

10   you can't argue -- and there's no case.

11          What case would I read that actually would support that;

12   that if he was actually successful, if Nancy Pelosi had

13   actually been there, if he had actually done what he said he

14   would do, he's innocent of this charge?

15          MS. CHUANG:  Well, it would depend -- that's where the

16   "on account of" comes in, and that's where the motivation comes

17   in.  So if it was because of something --

18          THE COURT:  It says "on account of the performance."

19   We're talking about the performance.

20          MS. CHUANG:  Right.

21          THE COURT:  I'm saying she has to actively be engaged

22   in the performance --

23          MS. CHUANG:  No, no, no.  That's not what I'm saying.

24          THE COURT:  All right.

25          MS. CHUANG:  That would be "while engaged in."  What

1   I'm saying is, if -- if he went to her house at Thanksgiving

2   with her family, she's clearly not actively performing any

3   official duties at that moment.

4       If he went there because he wanted -- because of some vote

5   she had taken in the House in the past, that would fall under

6   "on account of performance of official duties."  So that would

7   fall within this statute.  I'm not saying that she has to be

8   currently performing official duties for this prong, for the

9   "on account of" prong.

10          **THE COURT:**  Okay.  All right.  But I guess we need to

11  get back to the language.

12          **MS. LINKER:**  Your Honor, if I could on those.  So

13  there's "while engaged in" and "on account of."

14      Both modify performance of official duties.

15      And so what -- I think there's some crosswise is "while

16  engaged in" would be one way to violate it, while someone is

17  actively engaged in the performance of their official duties.

18      She's out here --

19          **THE COURT:**  But what statute are we talking about,

20  because they're different?

21          **MS. CHUANG:**  I mean, both of them have the "while

22  engaged in" language.

23          **MS. LINKER:**  The model instruction changes it a little

24  bit, but they both have the "while engaged in" language.

25  That's not the circumstance here, I think we all agree.

1    **THE COURT:**  Right.  So we're actually talking about

2    the assault, and what you're saying is we can -- I can only

3    instruct on the retaliation.  Okay.  Okay.  I understand.  I

4    understand that.  I disagree, but I understand that argument.

5        **MS. LINKER:**  But I want to be clear, we're not making

6    this ludicrous argument that if it all had gone forward that --

7        **THE COURT:**  No, no.  I understand.  You were talking

8    about "while engaged" -- well --

9        **MS. LINKER:**  If the reason for doing it, the

10   motivation for doing it was on account of, on account of the

11   performance of official duties, then it's covered.

12       **THE COURT:**  Under the kidnapping?

13       **MS. LINKER:**  Yeah.  If it's on account of the

14   performance of some other duties, then it's not covered.

15       **THE COURT:**  Well, they agreed on the kidnapping, that

16   we're not instructing on the "while engaged in."  So we're in

17   agreement we're only instructing on the "on account of."

18   So now we're at the assault on a family member, and what

19   you're -- and so now we're on -- so -- and that's the

20   "intimidate and interfere with."

21   And what you're saying is, if the intent was to interfere

22   with future performance of the duties, it's not covered?

23       **MS. CHUANG:**  Yes.  With respect to that point, yes.

24       **THE COURT:**  Right.  And I think we agreed that's not

25   probably what Congress intended.

1          MS. LINKER:  Looking at the language, Your Honor, we

2     don't get to congressional intent.  The Supreme Court has been

3     clear about that --

4          THE COURT:  Yeah.  But I think it's --

5          MS. LINKER:  -- and *Kaiser* and *Stinson* and all of the

6     authority, the language is not ambiguous.  The language is

7     absolutely not ambiguous, so we don't get to any looking at the

8     legislative history or congressional intent when the language

9     is clear.

10         THE COURT:  So all we're talking about -- we're in

11    agreement on the kidnapping.  We're only talking about the

12    assault?

13         MS. GILBERT:  I'm sorry, Your Honor.  I thought we

14    were still talking about just Defendant's proposed instruction

15    on the definition of "on account of" that you've already

16    decided to included with "intent to impede, intimidate, or to

17    interfere with while engaged in."

18         THE COURT:  I did.  Are we back to that again?

19         MS. GILBERT:  I think you already ruled on that.

20         MS. CHUANG:  I think what happened is we sort of got a

21    bit sidetracked about -- talking about what exactly is enough

22    to meet the "on account of" prong.

23        And I think what the Government is saying -- and please

24    correct me if I'm -- mischaracterize it -- is that while she is

25    speaker, she is speaker 24/7, so it is always on account of --

1       **MS. GILBERT:**  No.  I think I've been clear.  We don't

2   believe that.  I think we would say, just like the DC Circuit

3   said in *Williamson*.  (as read):

4              "The key is the statute is meant to not cover

5        times where the subject of the disagreement or, in

6        this case, where the assault is entirely unconnected

7        from the officer's performance of his or, in this

8        case, her job."

9       I think that's what the case law says.  That's the Frolic

10  line of case law.

11      So I don't know -- I don't think that we need a definition

12  of performance of official duties unless it's -- essentially it

13  just -- the statute does not cover conduct that's entirely

14  unconnected to the performance of their duties.  We would be

15  comfortable with that sort of language.

16      **THE COURT:**  Okay.

17      **MS. CHUANG:**  I.

18      **THE COURT:**  Before we do that, I want to come back to

19  the assault statute.

20      And the reason that the "on account of" wouldn't work for

21  that -- because it's the "impede, intimidate, or interfere

22  with."  Well, interfere with what?  It's interfered with the

23  performance or the engaging in the performance of the official

24  duties.

25      So that's how I read it.  And I understand you read it

 1    differently.  It may be it is ambiguous.  I think there's no

 2    question what Congress intended was it to cover that situation

 3    in which somebody assaults the family member of the election --

 4    the official in order to interfere or intimidate them with

 5    respect to their future engagement of their official duties,

 6    but I understand.  It's not -- that is not a frivolous

 7    argument.

 8        All right.  So what would be the language that the

 9    Government would propose with respect to a definition?  I do

10    think we need a separate instruction on the definition of

11    "performance of official duties."

12        MS. CHUANG:  I mean, does the Government have a

13    problem with just the first sentence of our proposed

14    definition?  I know the Court was saying the additional

15    sentences may not be inclusive enough of examples, but the

16    first sentence seems to get to the general -- to the idea that

17    we're trying to get to.

18        MS. GILBERT:  I think, Your Honor, this may actually

19    tie into our proposed instruction on dual intents because I

20    think that "not for some other reason" is and "because of"

21    would potentially add greater burden to the Government that's

22    not in the statute and not in any case law I've seen.

23        I mean, unfortunately, I think the definition of

24    performance of official duties that would apply here is kind of

25    a negative definition, which is why I'm struggling with it.

 1          **THE COURT:**  Well, that's why I think the language, I

 2   think, from some of the cases, I think this 11th Circuit case

 3   recently, that there has to be a causal connection, a causal

 4   connection.  Not the only causal connection, right, but a

 5   causal connection between the charged conduct and Nancy

 6   Pelosi's actions as a member of Congress is what I wrote.

 7          **MS. CHUANG:**  Couldn't we just -- instead of including

 8   the "and not for some other reason," would the Government be

 9   okay with just ending it "as a member of Congress," period;

10   right?  I don't think -- I think that correctly states what is

11   required.

12          **THE COURT:**  The problem is if it suggests that has to

13   be only.  There could be more than one reason, and that could

14   be one of the reasons.  And so I do think there has to be a

15   causal connection.  The question is it -- you know, it would be

16   and not solely for some other reason.

17          **MS. CHUANG:**  And we would object to the dual intent

18   and mixed intent proposed instruction by the Government.  They

19   didn't give us any authority on that.  I have no idea where

20   that comes from.

21          **THE COURT:**  I was just reading the statute.

22          **MS. CHUANG:**  There's no discussion of partial intent

23   or mixed intent or some intent in the statute.

24          **THE COURT:**  Or 100 percent intent.

25          **MS. CHUANG:**  Right.  No, it doesn't say either way, so

1   I think to go further and say that there -- that some type of

2   mixed intent or dual intent would be enough is unsupported.

3           THE COURT:  Well, that's what I suggested.  I think

4   there must be a causal connection between the charged conduct

5   and Nancy Pelosi's actions as a member of Congress.  It's a

6   causal connection, sort of punts it, in a way.  But the jury

7   would have to find that there's a connection, that it was

8   caused by the performance of her official duties.

9           MS. CHUANG:  That "Mr. DePape's actions were caused by

10  her performance of official duties as a member of Congress"

11  instead of "because of"?

12          THE COURT:  "A causal connection between the charged

13  conduct and Nancy Pelosi's actions as a member of Congress."

14          MS. LINKER:  Your Honor, I think adding the dual

15  intent actually takes away from the Government's constitutional

16  burden to prove the elements of the offense beyond a reasonable

17  doubt.

18      They -- Your Honor is saying that they don't say -- it

19  doesn't say "the only," because the elements lay out what they

20  have to prove.  It doesn't say you have to prove this or

21  something else.  It says what they have to prove, and the

22  Constitution requires that they prove that beyond a reasonable

23  doubt.

24          THE COURT:  It says "on account of."  I'm trying to

25  define "on account of."  They could have said "because" and

1  they didn't say "because"; they said "on account of."  That's

2  what they've said.  And what the case law has said is that

3  they've interpreted that as a causal connection.

4        MS. CHUANG:  And the causal connection is -- because

5  of is another way to express a causal connection.

6        THE COURT:  I don't think so.  I don't think so.  I

7  think it's misleading.  I think it misstates -- it misstates

8  the law.  I don't think the statute "on account of" can be read

9  "as the only reason."  That the Government's burden is beyond a

10  reasonable doubt to prove there was only one motivation and --

11  I don't think so.  I understand, but that's not how I read it

12  or any cases that even remotely suggest that reading.

13        MS. CHUANG:  So what is the Court proposing for the

14  language for that?

15        THE COURT:  My proposal would be, I'm not wedded to do

16  it at all, is there must be a -- that to prove that

17  Mr. DePape's actions were taken on account of the performance

18  of Nancy Pelosi's official duties, there must be a causal

19  connection between, we can say, Mr. DePape's actions and Nancy

20  Pelosi's actions as a member of Congress.

21        MS. GILBERT:  Your Honor, we'd just like to add

22  "speaker," not just "member."

23        THE COURT:  Speaker.  Sure.  She was the speaker at

24  the time.

25        MS. CHUANG:  "Actions as a member of Congress"; is

1    that --

2            THE COURT:   "Actions as the speaker of the house" is

3    what --

4            MS. CHUANG:   I think we should just stick to the

5    performance -- "There must be a causal connection between

6    Mr. DePape's actions and Nancy Pelosi's performance of official

7    duties as a member of Congress and speaker of the house."

8            THE COURT:   And speaker of the house?

9            MS. CHUANG:   Yeah.

10           THE COURT:   Sure.  We can do that.

11           MS. CHUANG:   Instead of saying "actions," that just

12   adds more ambiguity.

13           THE COURT:   Official duties?

14           MS. CHUANG:   Yeah.

15           THE COURT:   So --

16           MS. GILBERT:   Would you mind reading it back?   I'm

17   sorry, Your Honor.

18           THE COURT:   "To prove that Mr. DePape's actions were

19   taken on account of the performance of Nancy Pelosi's official

20   duties, there must be a causal connection between" --

21       What did we say?

22           MS. CHUANG:   "Mr. DePape's actions."

23           THE COURT:   -- "Mr. DePape's actions and Nancy

24   Pelosi's performance of her official duties as a member of

25   Congress and the speaker of the house."

1          MS. CHUANG:  And I would just note that we -- we're

2    standing by our original request and so noting our objection as

3    to that.

4          THE COURT:  Yes, of course.

5          MS. GILBERT:  Your Honor, I just want to be clear,

6    though.  I think that -- we're concerned that the Defense is

7    going to argue to the jury that we have to prove that it was a

8    sole intent, and I don't think that's the requirement.

9      I think my -- my --

10         THE COURT:  -- requirement.

11         MS. GILBERT:  I've looked through the criminal

12   instructions for other statutes, and I have found not a single

13   statute that would require the Government to prove sole intent.

14         THE COURT:  I don't think you have to.  Causal

15   connection is not -- I need to go look.  I don't have my

16   Ninth Circuit.  But we have causation instructions all the

17   time; maybe we should import that as well.

18         MS. GILBERT:  We, of course, have managed to bring

19   down all the binders we have needed and leave up the ones we

20   didn't.

21         THE COURT:  Yeah.

22         MS. GILBERT:  Oh, we have it.

23                    (Pause in proceedings.)

24         MS. CHUANG:  Your Honor, I don't believe there's any

25   causation instruction in the criminal jury instructions.

1        THE COURT:  Well, then probably we shouldn't go there,

2   right?

3        MS. GILBERT:  Can we just say "connection" so we don't

4   have to define "causal" to the jury?

5        THE COURT:  Connection.  There must be a connection.

6        MS. CHUANG:  No, that's diluting "on account of."  And

7   if the Court's going off the 11th Circuit saying a causal

8   connection, then I say -- then that is the least -- what we

9   should stick with.

10       THE COURT:  The model jury instruction doesn't say

11  anything about it.

12       MS. LINKER:  Your Honor, in the criminal sphere, we

13  talk about intent.  Intent to cause harms.

14       And so we're trying to impose some civil framework into it

15  that doesn't exist because intent is looked at differently.

16       And so I think -- I think all of these things are diluting

17  the intent required and the causation necessary and that causal

18  relationship that Your Honor says is important.  It has to be

19  "because of."

20       And that's what causation means.  Because of.

21       And I think we're significantly -- I don't think we are --

22  I think the Court and the Government is significantly diluting

23  that requirement.

24       THE COURT:  You're saying "on account of" means only?

25  I'm trying to figure out, is that what you want to argue, that

 1    if there's mixed motives --

 2          **MS. CHUANG:**  No, what we're saying is "on account of"

 3    means "because of."

 4          **THE COURT:**  Which means what?  What do you mean by

 5    that?

 6          **MS. CHUANG:**  "Because of" doesn't mean "only"

 7    necessarily.

 8          **THE COURT:**  Maybe.

 9          **MS. LINKER:**  Your Honor could leave the language of

10    the statute and let us argue it.

11          **THE COURT:**  I think maybe that's what I'll do, just

12    not give an additional instruction.

13          **MS. GILBERT:**  I think a dual intent instruction -- as

14    long as the Defense can't argue that we have to prove a sole

15    intent, I think we should be able to argue that you can have

16    more than one intent.  The statute doesn't require a sole

17    intent.

18          **MS. CHUANG:**  And we can argue that it does require it.

19          **THE COURT:**  That's a legal question.  So, no, I decide

20    what the law is.  "On account of" does not mean sole.  "On

21    account of" does not mean sole.  I'm making that finding.  I

22    could be wrong.  If I'm wrong, fine, you have an appellate

23    issue, but it doesn't mean sole, only.

24          **MS. LINKER:**  But, Your Honor, it does mean that was

25    his intent beyond a reasonable doubt.  They have to prove that

1    that was his intent beyond a reasonable doubt.

2              THE COURT:  Yes.

3              MS. LINKER:  His intent was on account of her official

4    duties beyond a reasonable doubt.

5              THE COURT:  Yes.

6              MS. LINKER:  And that is it.  Solely.

7              THE COURT:  So -- well now you threw in "solely."

8              MS. LINKER:  Well, it's because that's what beyond a

9    reasonable doubt -- to get to beyond a reasonable doubt, you

10   can't just say it was like some side thing.  It has to be that

11   that was the intent of what he did -- was because of that.

12             THE COURT:  You're saying you can only have one

13   intent, and you can't have mixed motives?

14             MS. LINKER:  I'm saying that the Government has to

15   prove that his motive was that -- they have to prove beyond a

16   reasonable doubt that his motive was because of her official

17   duties, the performance of her official duties.

18             THE COURT:  And no other motive?

19             MS. LINKER:  They have to at least get to the point of

20   proving beyond a reasonable doubt that he acted on account of

21   the performance of her official duties.

22             THE COURT:  Yes.  But are you also saying there can't

23   be more than one "on account of"?

24             MS. LINKER:  If there was something that was more than

25   that and that was just a minor thing, then I don't think that's

1    enough.  I don't think that proves beyond a reasonable doubt

2    that that's why he acted, that had it not been for her being

3    speaker and all the other things going on that he would have

4    acted anyway.  So that's the problem with it.  They have to

5    prove beyond a reasonable doubt that that was the purpose in

6    going there.

7          MS. GILBERT:  Your Honor, I think there's -- a lot of

8    other statutes have a significant body of law about what --

9    either level of intent -- but we have found not a single one

10   that would require it to be sole intent.  So there are statutes

11   that require a substantial intent.  There are statutes that

12   require it be a motivating intent.

13         MS. CHUANG:  Your Honor, could we take a break?

14   Mr. DePape needs to use the restroom.

15         THE COURT:  Of course.

16              (Recess taken at 3:22 p.m.)

17              (Proceedings resumed at 3:26 p.m.)

18         MS. CHUANG:  Thank you, Your Honor.

19         THE COURT:  So one change I did want to make in the

20   attempted kidnapping is where we say "on account of or during".

21   Then I would add a comma, "the performance of her official

22   duties" -- because the performance of her official duties is --

23   modifies both the "on account of" or "during, comma, the

24   performance of her official duties."

25         MS. CHUANG:  I thought we were removing the "or

 1    during" --

 2            THE COURT:  Right.  Never mind.  On account of.

 3       Okay.  I think I've talked myself into not giving any

 4    further instruction, and I'll stick with the Ninth Circuit

 5    model jury instructions.  And then we'll see.  Maybe we're

 6    going to get a question from the jury, and then we can have

 7    this debate all over again.

 8       But I must tell you -- well, but the problem is "on

 9    account of."  I don't believe "on account of" means "only."

10            MS. CHUANG:  It may not, but I think it can't just be

11    a tangential motivation.  I think there has to be some level of

12    it.  So we would at least -- at the very least, primary

13    motivation is what we would say.

14            THE COURT:  Well, I don't know that it would need to

15    be primary.  So what we do in the civil context is we say it

16    has to be a moving force.  It has to be -- I mean, we could say

17    motivating factor.

18            MS. CHUANG:  We think it has to be more than that.

19            THE COURT:  Well, I know you do, but that's

20    actually -- what you were saying before was motivating.  But I

21    actually think that's what "on account of" means, is a

22    motivating factor, a moving force.  It's a moving force.

23    Actually, it's a causal connection.

24            MS. GILBERT:  If it's -- if it helps at all, we are

25    not going to argue that he had some tiny little motivation and

 1   that was sufficient.  We have no intention of arguing that the

 2   burden is that minimal for the Government.  I think the only

 3   thing we want to ensure is that the Defense cannot argue that

 4   it's his sole motivating factor.

 5        THE COURT:  I think that, if they want to argue that

 6   whatever that intent was, it wasn't enough to have caused the

 7   conduct, that's a fair argument; right?  That's a fair argument

 8   that it wasn't enough to have caused it, but -- right?  Because

 9   there has to be a causal connection.  But not that -- but they

10   can't argue that it has to be the sole motivating -- or the

11   sole reason or factor, I guess is what I would say.

12        MS. LINKER:  Understood, over our objection.

13        THE COURT:  Your objection is noted.  Preserved for

14   the record.

15     So I'm just going to leave it as it is.  And then we'll

16   see.  We'll see.  We'll see if we get any notes, and then we

17   may have to address it more fully.

18        MS. GILBERT:  Your Honor, I think we have two other

19   things.  One is another proposed instruction we submitted about

20   mental state.

21        THE COURT:  I haven't seen your submission.

22                    (Pause in proceedings.)

23        THE COURT:  Okay.

24        MS. CHUANG:  I don't think that any additional

25   instruction is needed for mental state.  We're not arguing

1    insanity.  We're not arguing diminished mental capacity.  And

2    the dual intent we already addressed.

3         **THE COURT:**  I don't think we need the dual intent.  I

4    think it will actually confuse them because they haven't --

5         **MS. GILBERT:**  I think that's fine.  I think our only

6    concern is that we discussed it at the pretrial conference.

7    The Defense has gotten very close to the line by asking a

8    number of our witnesses about whether defendant was put on

9    5150, or 800, which they know are words --

10        **THE COURT:**  I excluded both.

11        **MS. GILBERT:**  Yes, Your Honor.  Thank you.  We just

12   want to make sure we're all on the same page.

13        **THE COURT:**  I excluded both, so they actually have no

14   evidence of that, the jury, because I also instructed them not

15   no draw any inferences from questions to which objections were

16   sustained.

17        **MS. GILBERT:**  One other thing, Your Honor, we just

18   want to make sure that -- I think we -- I think the defense

19   counsel has asked a number of people about the, quote, federal

20   case, and we just want to make sure that we're all on the same

21   page, that that would be jury nullification to suggest that

22   there's another forum.

23        **THE COURT:**  Yeah, I didn't know if we needed to do an

24   instruction on that or not.  Mr. DePape testified as to

25   attempted murder charge.  There was -- you're just the federal

```
 1   agent on the federal -- you're just the agent on the federal
 2   case, implying that there is the State case.
 3       And so I didn't know if we should -- I was waiting to see
 4   if you were going to ask for an instruction that they've heard
 5   some evidence about a State case.  It's irrelevant and
 6   shouldn't be considered here.
 7           MS. GILBERT:  I think that would be appropriate or,
 8   frankly, something more strong, "You may not consider that in
 9   your deliberations."
10           MS. CHUANG:  We'd be okay with that.  I mean, we'll
11   take a look at whatever language it is, but we're generally
12   fine with that.
13           THE COURT:  Okay.  Can you just write something up and
14   submit it?
15           MS. GILBERT:  Yes, Your Honor.
16           THE COURT:  If you could do that, yeah.  Great.
17       And then should I refer, in the attempted kidnapping, to
18   E5ND?
19           MS. GILBERT:  I think so.  I just looked at the
20   statute, and I think this does makes sense, Your Honor.
21           THE COURT:  Okay.  Anything else?  Was the order of
22   the instructions okay?
23           MS. CHUANG:  Seemed fine to us.
24           THE COURT:  We'll obviously take out the instruction
25   about the defendant not testifying.
```

1        Okay.  If you could get me that and then I will send out

2   another proposed jury instructions, and then at 8:15 tomorrow,

3   we can just confirm.  And I just used your form -- verdict

4   form, but I'll file that this afternoon as well so you can look

5   at that.  And we'll confirm all that at 8:15?

6        **MS. CHUANG:**  Yes.

7        **MS. GILBERT:**  Thank you, Your Honor.

8        **MS. CHUANG:**  Thank you.

9        **THE COURT:**  And for tomorrow, as I told the jury, I

10  don't know what they'll do, but, you know, if they want to

11  stay -- I think it's supposed to be pouring, they might as well

12  stay.

13       Great.  All right.  Thank you, again, for your really

14  excellent advocacy on both sides.

15       **MS. GILBERT:**  Thank you.

16       **MS. CHUANG:**  Thank you.

17            (Proceedings adjourned at 3:33 p.m.)

18                    ---o0o---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Monday, December 18, 2023


_____

Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court