**Volume 5**

**Pages 880 - 965**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )   NO. CR 22-00426-JSC
                                 )
DAVID WAYNE DEPAPE,              )
                                 )
            Defendant.           )
_____  )
```

San Francisco, California
Wednesday, November 15, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

             ISMAIL J. RAMSEY
             United States Attorney
             450 Golden Gate Avenue
             San Francisco, California 94102
    **BY:  LAURA E. VARTAIN
             HELEN L. GILBERT
             ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

             JODI H. LINKER
             Federal Public Defender
             450 Golden Gate Avenue
             San Francisco, California 94102
    **BY:  JODI H. LINKER
             ANGELA CHUANG
             TODD M. BORDEN
             ASSISTANT FEDERAL PUBLIC DEFENDERS**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

Also present:          Maddi Wachs, Paralegal
                       Special Agent Stephanie Minor
                       Sheree Cruz-Laucirica, Paralegal
                       Catherine Goulet, Defense Investigator

<u>**I N D E X**</u>

Wednesday, November 15, 2023 - Volume 5

|                                              | <u>PAGE</u> | <u>VOL.</u> |
|----------------------------------------------|------|------|
| Jury Instructions                            | 889  | 5    |
| Closing Argument by Ms. Gilbert              | 897  | 5    |
| Closing Argument by Ms. Chuang               | 927  | 5    |
| Rebuttal Closing Argument by Ms. Gilbert     | 952  | 5    |
| Final Jury Instructions                      | 959  | 5    |

1   <u>**Wednesday - November 15, 2023**</u>                                  <u>**8:20 a.m.**</u>

2                          <u>P R O C E E D I N G S</u>

3                              ---o0o---

4       (Proceedings were heard out of the presence of the jury.)

5           **THE COURT:**  Good morning.  Before we begin, one of my

6   externs rode up in an elevator, and a juror got in and there

7   were some other people in there.  I believe this was

8   inadvertent.  But the people who were behind the juror, so

9   wouldn't have necessarily known it was the juror, were speaking

10  about the case and the juror was in there.  We believe it is

11  Juror Number 3.

12      So I have my extern here, and we can go ahead and she can

13  say what she heard, and then if you want, we can then speak to

14  the juror in my chambers.  We'll have the court reporter move

15  so we can put it on the record.

16      So, Ms. Turner, do you want to -- you can come -- you

17  don't have to go under oath, but you can just come sit in the

18  witness stand and tell us what you heard.

19          **MS. TURNER:**  I was in the elevator from the first

20  floor to the 17th floor, and there was -- I was in the back

21  corner and then an individual -- two individuals came in, and

22  they were in the other corner of the elevator.  The juror

23  stepped in and turned around, and he was facing the doors, and

24  they were discussing the case.

25      And I believe they talked about how it wasn't possible for

1  the defendant to have gone after Pelosi because he was

2  attempting to go to Target 1's house.  And then one individual

3  said, "Well, what's Target 1's name" -- "of course, he was

4  trying to go to her house," and then asked what the name was.

5  The other person said what the name was and then they talked

6  about Googling it to make sure what the name was.

7        And then I got off at the 17th floor, so I don't know what

8  was said between the 17th and the 19th floor.

9            **THE COURT:**  So would you like -- we'll question the

10  juror back in chambers?

11            **MS. LINKER:**  Yes, Your Honor.

12            **MS. CHUANG:**  Yes, Your Honor.

13            **THE COURT:**  So before we do that, because the court

14  reporter's going to have to move, were there any

15  modifications -- or requested modifications to the jury

16  instruction or the verdict form?

17            **MS. GILBERT:**  No, Your Honor.

18            **MS. CHUANG:**  Not from us, Your Honor.

19        But we do have one just brief matter; we'd like to renew

20  our Rule 29 motion for the same reasons as before.

21            **THE COURT:**  Okay.  All right.

22        Overruled, or denied, whatever it is I'm supposed to say.

23  Okay.

24        All right.  Ms. Ekhaus, we'll go back to chambers, then.

25  \\\

**PROCEEDINGS**

```
 1        (A sidebar discussion was held in chambers as follows:)

 2        THE COURT:  Okay.  We're on the record.

 3     One of my staff members was in an elevator this morning

 4  when you got in, and you faced back.  And there were some

 5  people behind you that she then heard talking about the case.

 6  And so we wanted to explore because, you know, as I ask every

 7  morning "What have you been exposed to," what you heard or what

 8  do you remember hearing?

 9        JUROR NUMBER 3:  From the elevator?

10        THE COURT:  Yes.

11        JUROR NUMBER 3:  So I didn't hear much.  The only

12  thing they said was that they -- they knew what Target 1's name

13  is.  That was -- wasn't really a secret.  They heard it

14  somewhere.  And that's -- probably the only thing I heard.

15        THE COURT:  That's all you remember hearing?

16        JUROR NUMBER 3:  Mm-hmm.

17        THE COURT:  Do you have any questions?

18        MS. VARTAIN:  No.

19        MS. CHUANG:  No.

20        THE COURT:  Do you think you could put that out of

21  your mind and decide the case, as I will instruct you, solely

22  on the evidence that was presented here in court?

23        JUROR NUMBER 3:  Yes.

24        THE COURT:  Do you have any doubt at all about your

25  ability to be fair and impartial?
```

1      **JUROR NUMBER 3:**  No doubts.

2      **THE COURT:**  Okay.  All right.  Great.  Thank you,

3  Mr. Suarez.

4      **JUROR NUMBER 3:**  Thank you.

5           (Juror Number 3 leaves chambers.)

6      **THE COURT:**  Does anybody want to excuse him?

7      **MS. VARTAIN:**  No.

8      **MS. CHUANG:**  No.  No.

9      **MS. LINKER:**  No.  I am wondering if we should ask -- I

10  don't know about the elevators -- there are just so many people

11  in the building right now.

12      **THE COURT:**  Well, it was Ms. Taub; right?  It was her,

13  who's having her moment in the sun.  And she was speaking to

14  her sons.  Same person who handed the card, of course, to

15  Ms. Ekhaus.  So, I think if they go home today, then before

16  they leave, I'll probably -- I'll ask Ada to bring them in so I

17  can just remind them if they get in the elevator and they hear

18  someone start talking about the case, they should raise their

19  hand and say:  I'm a juror.  Please be quiet.

20      **MS. VARTAIN:**  I think that would be great.

21      **MS. CHUANG:**  Yes.  Yes.

22      **MS. VARTAIN:**  And maybe not to --

23      **THE COURT:**  Sorry.  I'll do it today.  When we're

24  done, because they may go -- well, we did order lunch for them.

25  But in the -- still, nonetheless, they may wander out into the

1    public hallways or even in the hallways here.

2          MS. VARTAIN:  I think, Your Honor, if you made that

3    same direction, but wherever they are because I think that

4    would obviate some of our concerns about coming in and out of

5    the building too.

6          THE COURT:  Okay.  I'll do that.

7          MS. LINKER:  I also wonder -- I'm ruminating here for

8    a second -- is it appropriate for the Court to give that same

9    caution to members of the public and to say "It's very

10   important, since we all share this space, that you not attempt

11   to discuss anything with jurors or talk about the case in their

12   presence"?

13         THE COURT:  Yeah.  I mean, I do think it was

14   inadvertent.  I mean, I don't doubt that they -- she would do

15   it intentionally, but what Ms. Turner said was he got in and

16   turned this way, so it's quite possible that she didn't know

17   that he was there.  If I thought it was intentional, I might

18   boot her from the courthouse.

19         But, no, I don't think there's anything wrong with that.

20   And maybe, when I go -- before we start and I bring the jury

21   in, I will -- if you like, I will say that to the audience.

22         MS. VARTAIN:  I think that's fine.

23         MS. CHUANG:  Yeah.

24         THE COURT:  I'm sure Mr. Suarez is relieved about

25   that.

1          **MS. CHUANG:**  Like being called into the principal's

2   office.

3          **MS. VARTAIN:**  It's a nice-looking office.

4          **THE COURT:**  Thank you so much, Ruth.

5                  (End chambers conference.)

6      (The following proceedings were heard in open court:)

7      (Proceedings were heard out of the presence of the jury.)

8          **THE COURT:**  Okay.  The jury is all here.  Before we

9   bring them in, I just do want to remind the members of the

10  public and urge you to be cautious about discussing the case.

11  The jurors do have to come in through the public -- they do

12  come in through the elevator, and you may not always be aware

13  that they're there.  And if you speak about the case, you are

14  jeopardizing these proceedings and the fairness of the

15  proceedings.  So I urge you to please be aware of that and, if

16  possible, just don't discuss the case when you are in those

17  public places.

18      Okay.  So the jurors are here.  We'll bring the jury in.

19                  (Pause in proceedings.)

20              (The jury enters the courtroom.)

21      (Proceedings were heard in the presence of the jury.)

22          **THE COURT:**  Good morning, members of the jury.  Thank

23  you as always for being so prompt.  And as I always ask, have

24  any of you been exposed, even accidentally, to any information

25  about this case on the radio, in an elevator, or any of that

1   since you left yesterday?

2   (No response.)

3   **THE COURT:**  Okay.  Great.  All right.

4   So now what we're going to do is I'm going to give you the

5   jury instructions, read them to you, and then we will proceed

6   with the closing arguments.

7   **JURY INSTRUCTIONS**

8   **THE COURT:**  Now that you have heard all the evidence,

9   it is my duty to instruct you on the law that applies to this

10  case.

11  A copy of these instructions will be available in the jury

12  room for you to consult.

13  It is your duty to weigh and evaluate all of the evidence

14  in the case, and in that process, to decide the facts.  It is

15  also your duty to apply the law, as I give it to you, to the

16  facts as you find them, whether you agree with the law or not.

17  You must decide the case solely on the evidence and the

18  law.  You will recall that you took an oath promising to do so

19  at the beginning of the case.

20  You should also not be influenced by any person's race,

21  color, religious beliefs, national ancestry, sexual

22  orientation, gender identity, gender, or economic

23  circumstances.

24  Also, do not allow yourself to be influenced by personal

25  likes or dislikes, sympathy, prejudice, fear, public opinion,

1    or biases, including unconscious biases.

2         Unconscious biases are stereotypes, attitudes, or

3    preferences that people may consciously reject but may be

4    expressed without conscious awareness, control, or intention.

5         You must follow all of these instructions and not single

6    out some and ignore others.  They are all important.  Please do

7    not read into these instructions, or into anything I may have

8    said or done during the trial, as any suggestion as to what

9    your verdict should be.  That is a matter that is entirely up

10   to you.

11        The indictment is not evidence.  The defendant has pleaded

12   not guilty to the charges.  The defendant is presumed to be

13   innocent unless and until the Government proves the defendant

14   guilty beyond a reasonable doubt.

15        In addition, the defendant does not have to testify or

16   present any evidence.  The defendant does not have to prove

17   innocent -- innocence.  The Government has the burden of

18   proving every element of the charges beyond a reasonable doubt.

19        Proof beyond reasonable doubt is proof that leaves you

20   firmly convinced the defendant is guilty.  It is not required

21   that the Government prove guilt beyond all possible doubt.

22        A reasonable doubt is a doubt based upon reason and common

23   sense and is not based purely on speculation.  It may arise

24   from a careful and impartial consideration of all the evidence

25   or from lack of evidence.

If, after careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.

On the other hand, if, after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

The evidence you are to consider in deciding what the facts are consist of, first, the sworn testimony of any witness; second, the exhibits that are received into evidence; and third, any facts to which the parties have agreed.

In reaching your verdict, you may consider only the testimony and exhibits received in evidence.  The following things are not evidence, and you may not consider them in deciding what the facts are.

Questions, statements, objections, and arguments by the lawyers are not evidence.  The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence.

Similarly, what the lawyers have said in their opening statements, will say in their closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence.

1    If the facts as you remember them differ from the way the

2    lawyers state them, your memory of them controls.

3    Any testimony that I've excluded, stricken, or instructed

4    you to disregard is not evidence.  And anything you may have

5    seen or heard when the court was not in session is not

6    evidence.  You are to decide the case solely on the evidence

7    received here, in here.

8    Evidence may be direct or circumstantial.  Direct evidence

9    is direct proof of a fact, such as testimony by a witness about

10   what that witness personally saw or heard or did.

11   Circumstantial evidence is indirect evidence, that is, it

12   is proof of one or more facts from which one can find another

13   fact.

14   By way of example:  If you wake up in the morning and see

15   that the sidewalk is wet, you may find from that fact that it

16   rained during the night; however, other evidence, such as a

17   turned on garden hose, may provide an explanation for the water

18   on the sidewalk; therefore, before you decide that a fact has

19   been proven by circumstantial evidence, you must consider all

20   the evidence in light of reason, experience, and common sense.

21   You are to consider both direct and circumstantial

22   evidence.  Either can be used to prove any fact.  The law makes

23   no distinction between the weight to be given to either direct

24   or circumstantial evidence.  It is for you to decide how much

25   weight to give to any evidence.

1    In deciding the facts in this case, you may have to decide

2 which testimony to believe and which testimony not to believe.

3 You may believe everything a witness says or part of it or none

4 of it.

5    In considering the testimony of any witness, you may take

6 into account, first, the witness's opportunity and ability to

7 see or hear or know the things testified to; second, the

8 witness's memory; third, the witness's manner while testifying;

9 fourth, the witness's interest in the outcome of the case, if

10 any; fifth, the witness's bias or prejudice, if any; sixth,

11 whether other evidence contradicted the witness's testimony;

12 seventh, the reasonableness of the witness's testimony in light

13 of all the evidence; and, eighth, any other factors that bear

14 on believability.

15    Sometimes a witness may say something that is not

16 consistent with something else they said.  Sometimes different

17 witnesses will give different versions of what happened.

18    People often forget things or make mistakes in what they

19 remember.  Also, two people may see the same event but remember

20 it differently.

21    You may consider these differences but do not decide that

22 testimony is untrue just because it differs from other

23 testimony.

24    However, if you decide that a witness has deliberately

25 testified untruthfully about something important, you may

choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are and how much weight you think their testimony deserves.

The defendant has testified; you should treat this testimony just as you would the testimony of any other witness.

You've also heard testimony that the defendant made statements.  It is for you to decide whether the defendant made the statements and, if so, how much weight to give them.

In making those decisions, you should consider all the evidence about the statements, including the circumstance under which the defendant may have made them.

The parties have agreed to certain facts that have been stated to you; those facts are now conclusively established.

And certain charts and summaries have been admitted into evidence.  Charts and summaries are only as good as the underlying supporting material; you should, therefore, give

them only such weight as you think the underlying material deserves.

A separate crime is charged against the defendant in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on the other count.

The defendant is charged, in Count 1 of the indictment, with attempting to kidnap a federal officer, in violation of Section 1201(a)(5) and (d) of Title 18 of the United States Code.

For the defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant intended to seize, confine, kidnap, abduct, or carry away and hold a federal officer against her will on account of the performance of her official duties. And, second, the defendant did something that was a substantial step toward committing the crime.

A federal officer is any officer or employee of the United States or of any agency in any branch of the United States government, including any member of the uniformed services.

A substantial step is conduct that strongly corroborated the defendant's intent to commit the crime.

To constitute a substantial step, a defendant's act or actions must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances.  Mere

1   preparation is not a substantial step toward committing the

2   crime.

3         Jurors do not need to agree unanimously as to which

4   particular act or actions constituted a substantial step toward

5   commission of a crime.

6         The defendant is charged, in Count 2 of the indictment,

7   with assault on a member of the immediate family of a federal

8   official, in violation of Section 115(a)(1)(A) of Title 18 of

9   the Code.

10        For the defendant to be found guilty of that charge, the

11   Government must prove each of the following elements beyond a

12   reasonable doubt:

13        First, the defendant forcibly assaulted a member of the

14   immediate family of a United States official.

15        Second, the defendant did so with intent to impede,

16   intimidate, or interfere with the federal official while

17   engaged in the performance of her official duties or with

18   intent to retaliate against the federal official on account of

19   the performance of her official duties.

20        And, third, the defendant used a dangerous weapon during

21   and in relation to the offense.

22        There is a forcible assault when one person intentionally

23   strikes another.

24        A United States official means the president, president

25   elect, vice president, vice president elect, a member of

 1  Congress, a member elect of Congress, a member of the executive

 2  branch who is the head of a department listed in 5

 3  U.S.C. Section 101, or the director of the Central Intelligence

 4  Agency.

 5       A hammer is a dangerous weapon if it is used in a way that

 6  is capable of causing death or serious bodily injury.

 7       When you begin your deliberations, elect one member of the

 8  jury as your foreperson who will preside over the deliberations

 9  and speak for you here in court.

10       And, actually, I'm going to give you the rest of these

11  instructions after we hear the closing arguments.

12       So is the Government prepared to begin?

13            MS. GILBERT:  Yes, Your Honor.

14                    **CLOSING ARGUMENT**

15       **MS. GILBERT:**  I am not going to replay the video of

16  the assault for you all today, but I want to talk about this

17  moment.

18       What happens in less than a second after this image is the

19  key moment in this case.

20       This is the moment where Paul Pelosi ends up attacked in

21  the dead of night, in his own home, lying on the floor in a

22  pool of his own blood.

23       The evidence has shown that Mr. Pelosi was here, in this

24  next moment, laying on the floor, only because his wife had an

25  important job.  She was the speaker of the U.S. House of

 1   Representatives.  She was the head of the Democratic Party in

 2   the House.  That was her job.

 3       And because of her job, the defendant targeted her.

 4       He researched her.  He researched her family.  He found

 5   where she lived.  And he smashed his way into her home, fully

 6   equipped to, in his own words, "hold her hostage, break her

 7   kneecaps, and have her wheeled out onto the floor of Congress."

 8       The defendant came to the Pelosis' home that night, in the

 9   early hours of October 28th of 2022, intending to commit

10   violence.  But instead of Speaker Pelosi, the defendant found

11   her husband, Paul Pelosi.

12       Speaker Pelosi and the Capitol Police that protect her

13   around the clock weren't there.  The defendant soon realized

14   that she wasn't home.

15       Did he leave?  No.  Why didn't he leave?

16       Because -- and these are his own words.  He was there for

17   the fight.  "If you stop me from going after evil, you will

18   take the punishment instead."

19       And Mr. Pelosi did take the defendant's punishment, the

20   punishment the defendant had planned for Speaker Pelosi.

21       The defendant inflicted this punishment using the same

22   hammer that he had brought to break Speaker Pelosi's kneecaps.

23       I will first walk you through the elements of the two

24   counts that have been charged here, which the Court just

25   instructed you on:  The attempted kidnapping of Speaker Nancy

1   Pelosi and the assault of Paul Pelosi.

2        We'll go through them, and we'll go through the steps that

3   the defendant took before this moment, the aftermath of the

4   attack, and the things the defendant said about it, which all

5   prove beyond a reasonable doubt that the Government has met its

6   burden here.

7        First, a few ground rules.  Nothing I say or the Defense

8   says is evidence, but I will be giving you a source for the

9   information we talk about.  So you'll see here, in the

10  bottom-right corner, that will be the number of the exhibit

11  that's shown on the screen.  And if I discuss someone's

12  testimony, I'll tell you who I believe said it.

13       But if you recall the testimony differently, your memory

14  controls, not mine.  If I say anything differently, and I'll

15  try not to, than what the judge just instructed you, defer to

16  the judge and the instructions you'll have with you.

17       What I show you here, you can't take back with you, so if

18  you want to take notes, you're welcome to, but you'll have all

19  of the exhibits.

20       Count 1 is the attempted kidnapping of Speaker Nancy

21  Pelosi.  The first element is that the defendant intended to

22  seize, confine, kidnap, abduct, or carry away and hold a

23  federal officer against her will on account of the performance

24  of her official duties.

25       And I'll stop before we turn to the second element because

1   a federal officer, which I've highlighted, has a specific

2   definition:  Any officer or employee of the United States or of

3   any agency in any branch of the United States government.

4        This is Exhibit 297.  Special Agent Minor testified about

5   this document, which is the official list of members of the

6   House of Representatives for the 117th Congress, which, as

7   Special Agent Minor said, covered the period of October 28th of

8   2022.

9        Nancy Pelosi is on this list.  She was officially the

10  representative for the 12th District of California, in

11  San Francisco.

12       We have met that element already.

13       The second element of the attempted kidnapping charge is

14  that the defendant did something that was a substantial step

15  towards committing the crime.

16       And I've highlighted "substantial step" because, as

17  the Court just instructed you, there are two additional

18  instructions about what that means.

19       First, the definition:  A substantial step is conduct

20  that's strongly corroborated the defendant's intent to commit

21  the crime.  To constitute a substantial step, a defendant's act

22  or actions must unequivocally demonstrate that the crime will

23  take place unless interrupted by independent circumstances.

24  Mere preparation is not a substantial step towards committing

25  the crime.

1       The second part of this, as the Court just instructed you,

2   jurors, you do not need to agree unanimously as to which

3   particular acts or actions constituted the substantial step

4   towards the commission of a crime.

5       I want to take one second and show you what I expect will

6   be the verdict form you take back with you because it's a

7   little bit different for the first count and the second count.

8       This is what the verdict form should look like for the

9   first count.  The jury will have to decide whether the

10  defendant is guilty or not guilty.  And you circle one.

11      Let's move to Count 2, which is the assault of Paul

12  Pelosi.

13      The first element includes two defined terms, which are

14  both highlighted here by me in yellow.

15      First, the defendant forcibly assaulted a member of the

16  immediate family of a United States official.  Forcible assault

17  is defined as when one person intentionally strikes another.

18      We believe we've met that element through the video of the

19  assault you've watched a number of times here.

20      United States official has a slightly different meaning

21  than it did in the first statute, in the first count.  Here, it

22  means a member of Congress.

23      Document 297 establishes that she's -- Speaker Pelosi is

24  on the list as a member of Congress.

25      And this element also talks about -- that the assault is

1   on a member of the immediate family of the United States

2   official.  And if you recall, Paul Pelosi testified that his

3   wife is now speaker emerita, was then-Speaker Nancy Pelosi.

4   That is a member.  He is a member of her immediate family.

5        The second element of Count 2 is that the defendant did so

6   with intent to impede, intimidate, or interfere with the

7   federal official while engaged in the performance of her

8   official duties or with intent to retaliate against the federal

9   official on account of the performance of her official duties.

10        And here's where I'll stop before going to the third

11   element.  And I want to show you the verdict form that I expect

12   you'll see for Count 2.

13        This is the first you see; it starts with 2A:  We the jury

14   find the defendant as charged in Count 2 of the indictment --

15   and you circle not guilty or guilty.

16        If you find the defendant guilty of those two elements of

17   Count 2, then you turn to Count 3 -- excuse me -- Element 3,

18   which states that the defendant used a dangerous weapon during

19   and in relation to the offense.

20        Dangerous weapon is defined.  That's why it's highlighted.

21   A hammer is a dangerous weapon if it is used in a way that is

22   capable of causing death or serious bodily injury.

23        And this is what the second part of your verdict form I

24   expect will look like, which says:  Please answer the following

25   question only if you found the defendant guilty of Count 2,

 1  otherwise leave it blank.  And it says:  Having found the

 2  defendant guilty of the offense charged in Count 2, do you

 3  unanimously find beyond a reasonable doubt that the defendant

 4  used a dangerous weapon during and in relation to the assault

 5  charged in Count 2.  And you circle no or yes.

 6      I'd finally like to just touch on reasonable doubt, which

 7  the Court just instructed you on.

 8      What does that mean?  Proof beyond a reasonable doubt is

 9  proof that leaves you firmly convinced the defendant is guilty.

10  It is not required that the Government prove guilt beyond all

11  possible doubt.

12      A reasonable doubt is a doubt based upon reason and common

13  sense and is not based purely on speculation.  It may arise

14  from a careful and impartial consideration of all the evidence

15  or from lack of evidence.

16      I'd like to start at the beginning of the story, with the

17  defendant's preparation for what took place on October 28th of

18  2022.

19      Three months before the assault, the defendant starts

20  gearing up.  This is Exhibit 295, and it shows the items that

21  the defendant ordered from Amazon, the items that Special Agent

22  Minor testified were the items -- same type of items that the

23  San Francisco Police Department later found in the backpacks he

24  brought to the Pelosis' home.

25      You'll see here, he started ordering the -- one of the two

 1   body-worn cameras he had on July 4th of 2022; you see the

 2   100-liter camping/hiking backpack that was, as Agent Minor

 3   testified, the big backpack he had on his back.  And he orders

 4   items that we eventually see he carries into the Pelosis' home

 5   through mid-September of 2022.

 6        We jump forward to eight days before the attack.  The

 7   defendant starts visiting websites about Nancy Pelosi.  One of

 8   the first sites he visits is her biography on house.gov, her

 9   official page for Congresswoman Nancy Pelosi.  They're all on

10   the 19th of October.

11        And the defendant testified he knew she was a member of

12   Congress.

13        He visits Nancy Pelosi's Wikipedia page twice.  He visits

14   a Wikimapia page specifically for her home in San Francisco.

15   He starts looking at articles reporting information not just

16   about Nancy Pelosi but about her home specifically.

17        So he looks at an article about how her home was

18   vandalized with pig's -- a pig's head and fake blood.  And on

19   the same day, he looks at an article about a YouTuber who live

20   streams himself defecating in the driveway of Nancy Pelosi's

21   San Francisco home.

22        He then starts to do some Google searches.  He searches

23   Nancy Pelosi age.  He searches Nancy Pelosi family.  Nancy

24   Pelosi house, Broadway, San Francisco.  Pelosi pig blood.  He

25   searches Pelosi pig blood a number of times.

1      You'll see these are records from Exhibit 277, and each

2  record is a separate visit, a separate search here, so I've

3  pulled up for you Record 38.  Records 38 to 64, 66 to 68 are

4  all searches for Pelosi pig blood.

5      He bookmarks a Spokeo page for Nancy Pelosi,

6  San Francisco, California.  And you all heard someone from

7  Spokeo, Mr. Matthes, testify about what Spokeo is; it's a

8  website to look up information about someone, aggregated

9  information.

10      He does additional Spokeo searches for Nancy Pelosi.

11      I'm showing you three records here, but Exhibit 274 shows

12  a number of searches by the defendant, using Spokeo,

13  specifically for Nancy Pelosi.

14      Then, on the same day, he starts saving information about

15  Nancy Pelosi on his computer, and he puts it all in a special

16  folder.  This is the file path of the folder, which you heard

17  both forensic examiner Wing Ng testify about and Special Agent

18  Stephanie Minor.

19      The file path is users, David, desktop, stuff, favorite

20  politicians.  And within that favorite politicians' folder is

21  his folder for Pelosi.

22      And let's look at what he starts to save in that folder.

23  This is all still eight days before the assault.

24      He saves a number of images, as Special Agent Minor

25  testified.  The Pelosis' home.  This is a single image with a

1  number of images embedded in it.  Nancy Pelosi.  Her home and

2  her home being vandalized with the pig's head and fake blood.

3       He saves this photograph of the YouTuber, according to

4  Special Agent Minor.  Another photo of the Pelosis' home.

5  Another photo believed to be of the Pelosis' home.  Another

6  photo of the pig's blood incident.

7       He saves two image files that Jason Matthes from Spokeo

8  said look a whole lot like what a Spokeo limited search would

9  be, where Spokeo will blur out some information because they

10  want you to buy their subscription and get -- and have to pay

11  for it, but they're showing you what they have about someone.

12       The defendant saves this in his Pelosi folder.  And look

13  at it, it's Broadway Street, where we now know the Pelosis'

14  live, most recent address for Nancy.

15       This is another image saved in that same folder by the

16  defendant.  And Mr. Matthes testified this also looks like a

17  limited Spokeo search, here with, it looks like, additional

18  information about Nancy P. Pelosi.

19       The defendant also created and saved, on the same day,

20  October 19th, this text document where he's collecting some

21  information about Nancy Pelosi.

22       And at this point, he has her address, he knows her

23  husband's name, and he's included information about her

24  children and her grandchildren.

25       This is Exhibit 291.  And the metadata about this file,

1    about when it was created and modified, that's Exhibit 292.

2        Five days before the assault, he buys that Spokeo

3    subscription, spends about $35.  And on that same day, right at

4    the bottom there, he searches for Nancy P. Pelosi,

5    San Francisco, California.

6        Two days before the assault, Special Agent Minor testified

7    that they found a receipt showing $7,000 of cash being

8    withdrawn on October 25th, two days before the defendant left

9    his house to travel to the Pelosis'.  He also testified there

10   was no indication anyone else lived there.

11       This photo is Exhibit 250.  And that receipt is one of the

12   pieces of physical evidence, Exhibit 268.  If you recall,

13   San Francisco police found over $9,000 in cash in the big

14   backpack defendant brought with him to the Pelosis' that night.

15       One day before he leaves his house to go to the Pelosis',

16   he conducts a Google Map search of their address.  And if you

17   recall, in Exhibit 276, there were a number of records for this

18   address where the center of the map kept moving, showing that

19   he is looking at that map and moving that map.

20       Talking about the action defendant now starts to take.  He

21   packs his bags.  I'm not going to go through all the physical

22   evidence again, but let's talk about what he puts in these

23   bags, with these items that he has been ordering since July.

24       He brings things he can use to tie up Nancy Pelosi and

25   hold her hostage.  He brings weapons, two hammers, the one you

1  see him break into their house with and a sledgehammer.

2      He brings restraints.  He brings rope.  He brings multiple

3  bags of zip-ties.  You see him with two in the house, and there

4  are three more in his backpack.

5      He brings duct tape, brings gloves.  He also brings items

6  showing that he was planning to stay there or he was planning

7  to run, but he was not going home.  He brings what appear to be

8  most of his identification:  His birth certificate, his social

9  security card, his passport, two driver's licenses, his debit

10  cards, over $9,000 in cash.  He brings a sleeping bag, shown in

11  this picture.  He brings clothes.  He brings a toothbrush.  He

12  brings floss.

13      He has multiple electronic devices in these bags.  He has

14  his cell phone.  He has two body-worn cameras with manuals.  He

15  has a laptop.  He has a tablet.  He has hard drives.  He brings

16  nonperishable food and drink:  Beef sticks, goji berries, those

17  drink mixes.

18      And he brings things to pass the time.  He brings a book;

19  his Nintendo Switch, his video game console.

20      This is a still from Exhibit 11, which we played, showing

21  the defendant calmly travel on an over three-hour journey from

22  the BART Station closest to his home, the El Cerrito Plaza

23  BART, that's where this image is from, to the Pelosi' home.

24      So he starts in El Cerrito Plaza.  It shows him going to

25  MacArthur; it shows him going to Civic Center, where he gets

 1    off BART.

 2        You should review Exhibit 11, but it shows the defendant

 3    patiently waiting for each train, serenely sitting on BART.

 4    He's not checking his phone.  He's not reading a book.  He's

 5    just calmly sitting there.

 6        And you see him walking slowly and deliberately throughout

 7    this video and especially as he walks up the stairs carrying

 8    all of his things out of the Civic Center BART Station.

 9        This is another still frame from that same exhibit, which

10    also shows the Muni bus that the defendant took from the Van

11    Ness Avenue and McAllister Street bus stop all the way up to

12    North Point and Van Ness.

13        This shows the defendant getting off that bus at about

14    12:45 a.m. on October 28th of 2022.

15        He shows up at the Pelosis' home, which is captured on the

16    Capitol Police surveillance footage, over an hour later.

17    Presumably he walks that distance.  Special Agent Minor said it

18    would be reasonable for it to take that long.

19        And the defendant later tells Lieutenant Hurley he's

20    tired; he had to carry that heavy backpack.  I think he says:

21    Fucking heavy backpack.

22        Then we turn to Exhibit 14, which, if you recall, is a

23    summary exhibit showing the cameras that captured the defendant

24    casing the Pelosis' home.  That's him walking up the sidewalk

25    right before 2:00 a.m. on October 28th of 2022.

1          He takes his time.  He walks around the house.  He later

2     tells Lieutenant Hurley he's looking for the best place to

3     break in.  And you can see, from Exhibit 14, that he spends

4     about 10 minutes doing this.  He leaves his bags at one point.

5     He's looking around.  You see him pop his head up in the

6     security camera footage, pop back down.  Then he breaks into

7     their house.

8          This is a clip from Exhibit 15.  And you've seen this clip

9     as part of that summary exhibit, but I'm showing it to you now

10     in Exhibit 15 so you can see the details a little bit more.

11          This is the defendant; he's in the back patio area of the

12     Pelosis' home.  And let's see what he does.

13                    (Video played but not reported.)

14          **MS. GILBERT:**  So he's looking through his big

15     backpack.  He pulls out an item and another item.  You can see

16     it's the rope.  You can compare it to the physical exhibit.

17     And there he is; he's got the hammer in his hand.  He tucks the

18     rope and the zip-ties into his pocket.

19                    (Video played but not reported.)

20          **MS. GILBERT:**  There he is going into the smaller

21     backpack.

22                    (Video played but not reported.)

23          **MS. GILBERT:**  He takes out his -- what appear to be

24     new gloves, rips off the label, sticks it back in the bag --

25     where San Francisco police later find it -- puts on a glove.

1              (Video played but not reported.)

2         **MS. GILBERT:**  Throws the second glove back down.

3    Again, found later by the San Francisco police.

4         He starts hammering and destroying their glass door.

5         This is a substantial step towards attempting to kidnap

6    Nancy Pelosi.  Putting the rope and zip-ties in his pocket is a

7    substantial step.  Casing their house is a substantial step.

8    Shattering the glass of their back door is a substantial step.

9    Entering their home is a substantial step.  Holding the hammer

10   and the restraints.

11        I want to pause for a minute right here.  It is now about

12   2:00 in the morning on October 28th.  Let's go back a few hours

13   to what Mr. Pelosi was doing that night.

14        He testified that he got home around 10:00 p.m.  He was 82

15   at the time.  His wife was out of town, and he was home alone.

16   He said he didn't set the alarm.  The motion sensors would go

17   off when he was home, so he didn't set the alarm.

18        And he headed up to bed with his typical glass of ice

19   water.  He gets into his room and he puts his phone in the

20   charger in the bathroom like he always does.  He takes those

21   extra pillows on his bed, and he puts them on the floor by the

22   drapes like he always does.  And then he turns off the lights,

23   makes sure the drapes are closed, shuts both of those doors to

24   his bedroom.  He says he's asleep between about 11:30 and

25   midnight.  And that would be on October 27th of 2022.

**CLOSING ARGUMENT/ GILBERT**

1      Now, let's turn back to the defendant.  A few hours later,

2  we just see the defendant; he has just broken into their home.

3  The defendant tells Lieutenant Hurley he's roaming around the

4  house.  What is he doing?  He is looking for Nancy, holding the

5  hammer.  And he's got the rope and the zip-ties in his pocket.

6  This is another substantial step he takes to attempt to kidnap

7  Nancy Pelosi.

8      Now, I'm going to turn to a photo of the third floor of

9  the Pelosis' home, but keep in mind, this photo was taken in

10  the daylight, later that day when all of the police and FBI

11  showed up to look for evidence.  It is dark.  Picture this as a

12  dark place.

13      The defendant makes his way up to the third floor.  And

14  you heard from a number of witnesses, including Mr. Pelosi,

15  that that open door is the door to the elevator and it was

16  open, and then, right beyond that, is his bedroom.  And in this

17  picture, the door on the right is open, but both that and the

18  door on the left were closed, he said.

19      The defendant opens the door, he walks in, he wakes up

20  Mr. Pelosi.  And, again, this photo was taken later that day,

21  but it was dark.  Mr. Pelosi said it was dark.  Mr. Pelosi is

22  asleep right there in that portion of the bed.  He said he

23  sleeps on that side closest to the door.

24      Mr. Pelosi testified that the defendant was standing in

25  the doorway, only 3 to 4 feet away from him, and that he was

1  holding a hammer in one hand and restraints, cords and

2  zip-ties, in the other.

3      And the first thing that the defendant says, "Where's

4  Nancy?"  Several times, Mr. Pelosi testified.

5      Mr. Pelosi answered, "She's not here.  She's in

6  Washington."

7      Take a second.  The defendant has just spent some time, as

8  he said, roaming around the house.  He's finally found their

9  bedroom.  He does not see Nancy Pel- -- Nancy Pelosi in that

10  bedroom, and Mr. Pelosi says she's not here.

11      Does the defendant leave then?  His target is not home.

12  No, he doesn't leave.  He says, "We'll have to wait for her.

13  I'll have to tie you up and wait for her" is what Mr. Pelosi

14  says he says.

15      This is another substantial step that the defendant takes

16  to attempt to kidnap Nancy Pelosi.

17      And remember, you only need to find that he took one step,

18  and you don't have to even agree on what that step is.

19      What happens next?

20      Mr. Pelosi testifies that he tries to get up and go to the

21  elevator, but the defendant blocks him from entering the

22  elevator, to the place where Mr. Pelosi knows -- and you can

23  see it in the picture -- there's a phone in that elevator.  He

24  could use it to call for help.

25      Mr. Pelosi has clearly tried to get away from the

1    defendant.  Does the defendant leave now?  No.

2        They go back into the Pelosis' bedroom.  That's when the

3    defendant tells Mr. Pelosi that Nancy is the leader of the pack

4    and that he had to take her out and that he would wait for her.

5        That's when we start to understand why the defendant is

6    there in the first place.

7        Mr. Pelosi manages to walk around his bed to the bathroom,

8    and he calls 9-1-1.  That's where his phone was, he said,

9    that's why he did it.  He went to the bathroom; that's where

10   his phone was.

11       I'm not going to play the 9-1-1 call again, but it's

12   Exhibit 1, if anyone wants to listen to it again.

13       Where's the defendant while Mr. Pelosi is on the phone

14   with 9-1-1?  You can hear the defendant in that call.  He's

15   right there.  In fact, the defendant is standing in that

16   doorway, blocking Mr. Pelosi's only way out.

17       And you can see, from the next slide, this is Exhibit 119,

18   that is a tight space.  You heard Mr. Pelosi describe the

19   defendant as a very large man, and you can see how much larger

20   the defendant is than Mr. Pelosi from the videos of the

21   assault; they're standing right next to each other.

22       Mr. Pelosi hangs up the phone with 9-1-1, and the

23   defendant takes Mr. Pelosi's phone.

24       You can see, in Exhibit 2, that's the body-worn camera

25   surveillance footage from Officer Willmes; he was the first

1  witness in this case.  You can see him pull Mr. Pelosi's phone

2  out of the defendant's pocket right after they finally handcuff

3  the defendant.

4      At this point, Paul Pelosi has managed to call 9-1-1.

5  Does the defendant leave?  No, he does not leave.  The

6  defendant says he's tired, he has to get some sleep, and that

7  he would tie up Mr. Pelosi.

8      Now, Mr. Pelosi convinces the defendant to go downstairs.

9  He says, "You have your bags, you can tie me up down there."

10      Mr. Pelosi told you, he testified, that he thought his

11  only shot was being on the first floor when the police came.

12      And so they start walking down the stairs.  Two sets of

13  these spiral stairs, from the third floor down to the first

14  floor.

15      Where is the defendant?  He's walking right behind

16  Mr. Pelosi, and he is still holding the hammer.

17      And Mr. Pelosi testified, when Ms. Vartain asked, "What

18  were you thinking," he said, "I was hoping the police were

19  coming."

20      The defendant and Mr. Pelosi get to the bottom of the

21  stairs; they're standing in the front entrance.  And Mr. Pelosi

22  says, at that point, he can see where the defendant has broken

23  in, he sees the broken glass, and he sees the defendant's bags

24  outside through that broken glass.

25      This is a still frame taken from Exhibit 315.  It's the

1    body-worn camera of Officer Najarro, who showed up minutes

2    after the assault.

3          Again, this is light.  This is pictures taken with the

4    lights on.  But this is probably what Mr. Pelosi saw at that

5    point; he sees that gaping hole in his door.

6          Mr. Pelosi says the defendant tells him, "The police are

7    going to be here, I'll have to take you out."  Mr. Pelosi

8    testified that the defendant said "I'll take you out" numerous

9    times.

10         Did the defendant leave now?  They're downstairs.  He says

11   he thinks the police are coming.  Did he slip out the back door

12   the way he came in?  He knows this house; he has cased it.  No,

13   he does not leave.

14         And I'll just clarify, those doors, we don't know if

15   those -- those doors were not open at the time that the

16   defendant broke in.  This was taken later, after the

17   San Francisco police have already removed the defendant from

18   the Pelosis' home.

19         The police arrive.  And you saw, in the body-worn camera

20   of both Officer Willmes and Officer Cagney, they knock on the

21   door.  And Mr. Pelosi said he opened the door.

22         This is what the police saw.  Officer Willmes says "Drop

23   the hammer."  This is just a still.  Does the defendant drop

24   the hammer?  No.  Does he surrender to the police?  No.  He

25   says, "Um, nope."

1      And then he violently attacks Paul Pelosi.  The assault.

2  This is the clip we started with.  That attack happens probably

3  less than a second after this clip.

4      Right after this, the defendant strikes Paul Pelosi three

5  times.  Special Agent Minor explained how she watched this

6  video in slow motion, and we slowed it down and watched it

7  together.  This is a forcible assault.  That's one of the

8  things required for Count 2, when one person intentionally

9  strikes another.

10      The defendant describes that he used full force when he

11  hit Mr. Pelosi.  He tells Lieutenant Hurley this just hours

12  after he has assaulted Mr. Pelosi.

13              (Audio played but not reported.)

14      **MS. GILBERT:**  This is what full force looks like.

15  Officer Najarro testified that Mr. Pelosi was unconscious for

16  at least two-and-a-half minutes.  You could hear his labored

17  breathing in both Officer Willmes and Officer Najarro's

18  body-worn camera.  And Mr. Pelosi testified that the next thing

19  he knew, he was waking up in a pool of blood.

20      Talking about the aftermath of that moment, of that

21  assault -- Mr. Pelosi spent six days in the hospital, in San

22  Francisco General Hospital.  You heard Dr. Huang testify about

23  the surgery he conducted on the two skull fractures of

24  Mr. Pelosi's head.

25      You heard Dr. Huang testify that the top fracture missed a

1  vein narrowly, by 1 centimeter, that if that vein had been

2  lacerated, in his experience, that could be catastrophic.

3      But even putting the vein aside, Mr. Pelosi will have an

4  iron plate in his head for the rest of his life.

5      Still, over a year later, you saw him testify, he's

6  working on his walking.  He's still working on his balance.  He

7  still goes to physical therapy.  He still gets headaches.

8      This proves that the hammer was a dangerous weapon, that

9  it was capable of causing death or serious bodily injury.

10     Mr. Pelosi also sustained a wound to his hand and a wound

11 to his arm.

12     The same day that Mr. Pelosi was being operated on at San

13 Francisco General, San Francisco Police Department and the FBI

14 search the Pelosis' home to look for evidence of the crime.

15     And here, you've seen this, it's Exhibit 27, and the

16 little red dots each have a number and those correspond to the

17 photo -- and we'll take a look at each of these -- showing what

18 they saw when they entered the home.  That was about 1:00 p.m.

19 on the 28th of October.

20     They searched the ground floor.  This is what it looks

21 like when you walk into the foyer of the home.

22     This is the aftermath of the assault.

23     Those are the zip-ties he was holding when he struck

24 Mr. Pelosi on the head with the hammer.

25     That's Mr. Pelosi's phone.  Those are other things from

1    the defendant's pocket.

2        There's Mr. Pelosi's cup, his water cup, right there.

3        This is the couch, and there's a close-up showing the

4    hammer right behind it.  This is where Officer Cagney testified

5    he threw the hammer.  He threw the hammer once he tackled the

6    defendant so the defendant couldn't hurt anyone else.  This is

7    where they recovered the hammer.

8        Here's the sitting room with the broken glass.  And you

9    can see the bags through the glass.

10       They search the third floor.  This is what they found in

11   the bedroom.  Both of those pillows that Mr. Pelosi said he

12   stacked before he went into bed.  And that's the defendant's

13   glove and more zip-ties.  Behind those pillows was the rope.

14       These show additional substantial steps.  This proves the

15   defendant entered that room holding those zip-ties, holding the

16   rope, holding the hammer.

17       In the backyard, they found the defendant's bags and the

18   sleeping bag, which we've talked about.

19       And the point of entry.  Again, that broken glass.

20       I want to switch gears.  The what and the why.  Why did

21   the defendant come after Nancy Pelosi?  What did he plan to do

22   to her, and why did he assault Paul Pelosi?

23       First, why did the defendant target Nancy Pelosi?  Let's

24   listen to this clip from the interview that Lieutenant Hurley

25   took of the defendant hours after the assault.

1          (Audio played but not reported.)

2      **MS. GILBERT:**  You heard, at the beginning of that

3  clip, Lieutenant Hurley asks him, is there a reason?  Do you

4  feel like the Pelosis did something to you?  What does he say

5  in response?

6      He talks about Washington.  He describes Speaker Pelosi as

7  the leader of the pack.  This is what defendant is talking

8  about with Russiagate.  That's what he's describing here.  He

9  calls it a record-breaking crime spree of who?  The Democratic

10  Party.

11      He notes that Hillary didn't have a position.  Who had a

12  position?  Nancy Pelosi had a position.  She is the speaker.

13      Special Agent Littlejohn testified that when Nancy Pelosi

14  served as the speaker of the house, she was the top Democrat in

15  the House.  That was her official position, and that is why the

16  defendant went to her home.

17      This is a clip from Exhibit 4, from Officer Najarro's

18  body-worn camera.  This is literally minutes after the assault.

19  The defendant is outside of the Pelosis' home being checked out

20  by the paramedics.  And this is what he says.

21          (Audio played but not reported.)

22      **MS. GILBERT:**  Minutes after the assault, what is he

23  talking about, "the lies and the shit coming out of Washington,

24  D.C."  He says he came here to have a little chat with his

25  wife.  Why?  He told Paul Pelosi why and he told

1    Lieutenant Hurley why; she was the leader of the pack.

2        What did the defendant plan to do with her?  He told

3    then-Sergeant Hurley, now Lieutenant Hurley, he was going to

4    hold her hostage and break her kneecaps.

5                    (Audio played but not reported.)

6        **MS. GILBERT:**  "I was going to basically hold her

7    hostage."

8        This is attempted kidnapping.  He intended to seize and

9    confine her.  And he brought the tools to do it.  He brought

10   rope, he brought zip-ties, he brought duct tape.

11       He says he'd let her go if she told the truth, otherwise

12   he'd break her kneecaps.  But he's very clear here; he does not

13   think she's going to tell the truth.  "Absolutely fucking not.

14   I knew beyond a doubt she would fucking lie."

15       He planned for violence.

16       He talked more about what he was doing there and what he

17   wanted to do to Nancy Pelosi in this clip.

18                    (Audio played but not reported.)

19       **MS. GILBERT:**  He was going to break her kneecaps to

20   teach her a lesson, that her endless fucking lies and

21   corruption had a price.  That's what he says.

22       And this is key, he says, "Every time she goes into

23   Congress, every other fucking corrupt piece of shit in there is

24   going to see her wheeling in in a wheelchair; they're going to

25   realize that there is a fucking consequence for being the most

1    evil fucking people on the planet."

2        This is intent to impede, to intimidate, to interfere with

3    a federal official, Speaker Nancy Pelosi, while she is engaged

4    in the performance of her official duties.

5        This is the center of the evil and of the lies and of the

6    corruption that the defendant is talking about.  What is this?

7    He tells you, it's Congress, where Nancy Pelosi performs her

8    official duties; in fact, she is the leader of Congress.  Who

9    better to teach a lesson to than the leader of the pack?

10       The defendant uses the word "leader of the pack."  I use

11   the word "speaker."  To him, they are the same thing.  There is

12   no daylight there.

13       He intends to seize and confine Speaker Pelosi on account

14   of the performance of her official duties as the speaker.

15       Months later, in January 2023, on January 27th, Special

16   Agent Minor testifies that body-worn camera footage showing the

17   defendant assaulting Mr. Pelosi was publicly released, and it

18   was published by news media on that same day.

19       After that happened, the defendant made this call to a

20   local news reporter.  He called to give a statement that he

21   offered could be recorded.  As you listen to this, think about

22   whether he's reading a statement that he's written out already.

23   Is that what he's doing here?

24                (Audio played but not reported.)

25        MS. GILBERT:  He got their names and addresses so he

1  could pay them a visit and have a chat, which is exactly what

2  he planned to do and what he tried to do to Speaker Pelosi.

3      He doesn't say, "I'm sorry I didn't get any of them," he

4  says, "I'm sorry I didn't get more of them."  Who did he get?

5  He got Paul Pelosi.  He transferred his intent to go after

6  Nancy Pelosi to her husband, to Paul.  And he's proud of that.

7  He says "you're welcome."

8      Did the defendant know what he was doing?  Yes.  He had a

9  clean medical history.

10                 (Audio played but not reported.)

11      MS. GILBERT:  And remember, this is in the minutes

12  after the assault.  He said he hadn't taken any drugs or

13  alcohol that night, and you can see him calmly answering the

14  paramedic's questions.

15                 (Audio played but not reported.)

16      MS. GILBERT:  He told Sergeant Hurley, "I know exactly

17  what I did."

18                 (Audio played but not reported.)

19      MS. GILBERT:  Again, that was hours after the assault;

20  that's when he says that, hours later.  He says it again later,

21  towards the end of her interview with him.

22                 (Audio played but not reported.)

23      MS. GILBERT:  Lieutenant Hurley testified that she

24  asked this question because she found everything he said to be

25  so jarring and disturbing.  She also said she found him to be

1    extremely coherent and calm during her approximately hour-long

2    interview with him.  Again, hours after he assaulted Paul

3    Pelosi.

4         This is the last piece:  Why did the defendant assault

5    Paul Pelosi?

6         He told Lieutenant Hurley why.

7                    (Audio played but not reported.)

8         **MS. GILBERT:**  "I am here for the fight.  If you stop

9    me from going after evil, you will take the punishment

10   instead."

11        Take a moment with that.

12        What is evil?

13        To the defendant, it's Washington, it's Congress, it's the

14   leader of the pack, it's Speaker Nancy Pelosi, the head of the

15   Democratic Party.  That is her official position.

16        Take the punishment instead, in her stead.  That is why he

17   assaulted Paul Pelosi.  The defendant inflicted the punishment

18   he meant for Nancy Pelosi; he meant for her because, as we

19   would say, she was the speaker of the House, the official top

20   Democrat.  As the defendant would say, because she was the evil

21   corrupt leader of the pack of Democrats.

22        There is no daylight between those two things.  That is

23   the same thing.  We just used different words than the

24   defendant.

25        The defendant transferred the intent he had to break Nancy

1  Pelosi's kneecaps and have her wheeled out onto the floor of
2  Congress, which was an intent to impede, intimidate, interfere
3  with her while she's engaged in the performance of her official
4  duties.
5      He transferred that to Mr. Pelosi.  And that punishment he
6  meant for Nancy Pelosi, he inflicted that on Paul.  That is
7  retaliation.  Retaliation against Speaker Pelosi on account of
8  the performance of her official duties.
9      He said something similar later, to Lieutenant Hurley, in
10 this same interview.
11              (Audio played but not reported.)
12     **MS. GILBERT:**  "If you're going to stop me, you'll take
13 the punishment instead."  If there's this great evil, and we
14 know what he means by great evil, and you're going to protect,
15 it, Mr. Pelosi, you're going to take the punishment.
16     This was the result of the defendant's actions.  This is
17 what it looked like after Mr. Pelosi took the punishment
18 instead of his wife.
19     The evidence proves beyond a reasonable doubt that the
20 defendant intended to seize and confine Speaker Pelosi on
21 account of the performance of her official duties and that he
22 took a substantial step towards committing that crime.
23     The evidence also proves beyond a reasonable doubt that
24 the defendant forcibly assaulted her husband, a member of her
25 immediate family, with the intent to impede, intimidate, and

1  interfere with Speaker Pelosi while engaged in the performance

2  of her official duties, as well as with the intent to retaliate

3  against her on account of the performance of her official

4  duties.  And the defendant used a dangerous weapon during and

5  in relation to the offense.

6      We ask you to return a verdict of guilty on both counts.

7  Thank you.

8      **THE COURT:**  Thank you.

9      Why don't we take our morning break, since we've been

10  going almost an hour and a half.  So we'll take a 15-minute

11  break.  Can't talk about the case yet, not yet, please, not

12  even with each other.

13      If you're in the hallway or bathroom, you hear someone

14  saying something, please interrupt them and tell them you can't

15  hear it.

16      Thank you.

17              (The jury leaves the courtroom.)

18      (Proceedings were heard out of the presence of the jury.)

19      **THE COURT:**  Thank you.

20              (Recess taken at 9:52 a.m.)

21          (Proceedings resumed at 10:09 a.m.)

22      **THE CLERK:**  All rise for the jury.

23              (The jury enters the courtroom.)

24      (Proceedings were heard in the presence of the jury.)

25      **THE COURT:**  Thank you, members of the jury.

1     We'll now do the defense's closing argument.

2                      **CLOSING ARGUMENT**

3          **MS. CHUANG:**  Who did it, where it happened, and what

4     weapon they used, those are the three things that you need to

5     win a game of Clue, because Clue is a whodunit.

6          But, like Ms. Linker told you at the beginning of this

7     trial, this case is not a whodunit; it's a whydunit.

8          So those three things that might be enough to win a game

9     of Clue, they're not enough here, because the why matters here.

10         The who, the what, and the where are not enough.

11         So how do you go about winning a game of Clue?  You have

12    to exclude all the other possibilities one by one until you're

13    left with the right answer.  But maybe you don't narrow it down

14    enough; at the end, you have a couple of potential options, and

15    you just go ahead and guess and you hope that you guessed

16    right.  And that might get you there in a board game; you might

17    guess right.

18         But this is where the analogy is imperfect, because we're

19    not talking about a board game here; right?  We're talking

20    about real life.

21         We're talking about a real person, Mr. DePape, who is

22    charged with two serious federal crimes.  And we're talking

23    about a real person, Paul Pelosi, who was seriously hurt and

24    traumatized by Mr. DePape.

25         The stakes are so much higher, and real life, real people

1   are so much more complicated.

2        So here in real life, in this court of law, with the

3   instructions that the judge gave you and the oath that you

4   took, the why matters.  Because we're not playing a game here.

5   Guessing doesn't cut it.  Guessing at the why, even if it's

6   your best guess, that's not enough.

7        The Government has to prove the why here beyond a

8   reasonable doubt, and they just haven't.

9        So the Government knew from the very beginning, as soon as

10  Ms. Linker opened her mouth on Thursday, that this trial was

11  going to be all about Mr. DePape's reasons for acting, whether

12  he acted on account of Nancy Pelosi's performance of her

13  official duties as a member of Congress and speaker of the

14  house.

15        They knew from the start that this was not a whodunit that

16  it was all about the why, and that we weren't going to contest

17  anything about the who, the what, the where, or even the how.

18        So they had every opportunity to question their witnesses

19  and present evidence to prove the why that they have to prove,

20  and they never did.

21        When they had the chance, when Mr. DePape was up there on

22  the stand, they never even asked him if he acted on account of

23  Nancy Pelosi's performance of her official duties.  They never

24  even asked him if he knew she was speaker of the house or if he

25  had any understanding of what members in the House of

1    Representatives actually do at work.

2        Instead, they spent their entire case proving everything

3    that was never disputed.  And then they spent 80 percent of

4    their closing argument doing the same thing just now, going

5    over facts that are not in dispute.

6        Before we really get into those details, I want to remind

7    you again of something that you've heard since the very

8    beginning, when you walked through these doors for jury

9    selection, and that's the burden of proof.

10       Because the burden of proof beyond a reasonable doubt, it

11   rests entirely with the Government, right here on this table.

12   It never moves.

13       But this case isn't about whether they've proven beyond a

14   reasonable doubt that Mr. DePape went to the Pelosis' house

15   that night and hit Mr. Pelosi on the head with a hammer.  Of

16   course he did.  He admitted that.  He admitted to doing that

17   multiple times to the police who arrested him and on the stand

18   again yesterday.  So that's not what this is about.

19       The only thing it's about is whether they have proven

20   beyond a reasonable doubt why he acted.  Proof beyond a

21   reasonable doubt is a high burden.  It means that even if you

22   think that Mr. DePape possibly did it on account of her

23   performance of official duties, you must vote not guilty.  Even

24   if you think he probably did it on account of her performance

25   of official duties, you must vote not guilty.  And even if you

1    think it's very likely he did it on account of her performance

2    of her official duties, you must vote not guilty.

3         Okay.  So let's start with Mr. DePape's targets.  Why

4    would we, the Defense, want to talk about the fact that

5    Mr. DePape had a list of additional targets, when it could make

6    him look worse?

7         And the reason we're talking so much about these other

8    targets is because that larger plan, his overarching plan,

9    that's the truth behind why Mr. DePape went to the Pelosis'

10   house that night.  That larger plan, which was driven by his

11   beliefs, gives you the true why in this case.

12        Mr. DePape didn't go to that house because he had some

13   particular fixation against only Nancy Pelosi.  He didn't go

14   there because of anything she did as part of her official

15   duties as a member of Congress or speaker of the house.  She

16   was just one part of a larger plan to root out the corruption

17   of the ruling class, the cabal, to stop the molestation of

18   children, and to expose the truth to everyone.

19        Nobody here is asking any of you to agree with all of his

20   beliefs or to support what, frankly, is not a very

21   well-thought-out plan.  We're not asking you or anyone to

22   believe that Tom Hanks raped a teenager or that Target 1 is a

23   pedo activist.  And you certainly aren't being asked to agree

24   with the awful things that Mr. DePape did to Paul Pelosi.

25        That's not what your role is here.  Your role is to look

1  at the why and to see if it fits with these two charges, and

2  that's where Mr. DePape's beliefs, as destructive, abhorrent,

3  and offensive as you may think they are, that's where they

4  matter.

5      Because the reason why Nancy Pelosi was on his list had

6  nothing to do with her performance of official duties as a

7  member of Congress or speaker of the house.  It had everything

8  to do with her prominence as the leader, the face of the

9  Democratic Party her involvement with the DNC and its

10  persecution of a rival campaign and her spreading of lies in

11  the media on behalf of a political party.

12      Mr. DePape sees her as part of this elite, corrupt cabal

13  that pulls the strings behind the scenes in the shadows; right?

14  The corrupt, elite cabal that also includes people who are not

15  in government who are wealthy and powerful, like George Soros

16  and Hunter Biden.  The corrupt, elite cabal that allows

17  children to be molested and abused with no consequences.  That

18  is what brought Mr. DePape to the Pelosi house that night, not

19  because of anything she did in Congress, not because of any

20  legislation that she passed, not because of any votes that she

21  cast or speeches that she made on the House floor.  None of

22  that was even on his radar.

23      What she did as part of her official duties was irrelevant

24  to him.  That's not what he cared about.

25      We're not saying it doesn't matter that she was a member

1    of Congress and speaker at the time; right?  That's part of

2    what generated her celebrity and how famous she is now, and

3    that's why he thought she could help him lure Target 1, because

4    of her celebrity.  But what she did in her official capacity as

5    a federal official is not what caused him to act.

6         The Government's theory is that Mr. DePape broke into the

7    speaker of the house's home and brutally assaulted her husband,

8    so that means it must have been on account of performance of

9    official duties.  It must be why.  They just assumed that was

10   it, and they didn't even look for why he did it.  They wanted

11   you to believe that this was just about Nancy Pelosi, that he

12   was singularly focused, but that's not true.

13        It may have been true of them.  Agent Minor said on the

14   stand she was only focused on one person and that was it.

15        But Mr. DePape told Lieutenant Hurley about his larger

16   plan, and he told you about it too, when he took the stand

17   yesterday.

18        But you don't have to take his word for it.  You know

19   there was a larger plan from the other evidence in this case,

20   like his computer data.

21        We know, from Ms. Ng's testimony, that the FBI tagged and

22   bookmarked what they wanted from one hard drive and then she

23   ran the reports based on that.  So you only have part of the

24   data that's on that computer, that hard drive, parts that were

25   tagged by the FBI team that, as Agent Minor said, was focused

1   on just Nancy Pelosi.

2       But even within that narrow focus, their reports turned up

3   all of his other targets; right?  You can see that Mr. DePape

4   researched a lot of other people besides Nancy Pelosi.  His

5   other targets are all over those forensic reports.

6       Just as a few examples, he looked up Tom Hanks, Tom Hanks

7   family photos, home, Target 1.  He looked up Gavin Newsom, Adam

8   Schiff, and Hunter Biden.  There's even a web history record of

9   him visiting a website titled "Tom Hanks accusations of rape

10  and the meat clock."

11      The last visited date and time on that is the same night,

12  mere hours before he went to the Pelosi house.

13      And then we have Mr. DePape's Spokeo search records.  The

14  last searches he made in Spokeo were, again, the same night,

15  mere hours before he went to the Pelosis' house.  But it wasn't

16  Nancy Pelosi that he looked up.  It was Tom Hanks and Target 1.

17      What's also crucial about these last searches is that they

18  include Target 1's San Francisco address and her 415 phone

19  number.  Where else did you see that?  On the note he had in

20  his pocket.  This is a photo of the note; you have the actual

21  physical note in evidence as Exhibit 170.

22      Three things, two of those three were about Target 1.

23      Keep that note in mind.  It's important.

24      Think about everything Mr. DePape brought with him that

25  night.  All those supplies in a huge backpack; they tell you

CLOSING ARGUMENT/ CHUANG

1  that the Pelosi house was not his only stop.  Right?  There is

2  so much stuff that he had with him that the Government has been

3  hauling it in and out of court every day of trial on a flatbed

4  cart.  You don't bring seven pairs of underwear and a huge

5  container of powdered greens and a mountain of beef jerky

6  sticks for just one stop.

7       The Government's closing argument made it seem like he was

8  preparing to camp out at the Pelosis' house, maybe stay there

9  the whole time, but that's not the -- that's not true.  He was

10  clearly packing for a longer trip; he was going to be on the

11  road, because he had a larger plan to find all the other

12  targets on his list.

13      But he never got to all the people on his list.  So let's

14  talk about what happened in the house that thwarted his plan.

15      What Mr. DePape did to Mr. Pelosi was horrible.  There is

16  no question about it.  That is not something that should ever

17  happen to anyone anywhere.

18      So it is remarkable that Mr. Pelosi regained consciousness

19  within three minutes, and it is remarkable that he was lucid

20  enough to answer questions coherently and tell medics and

21  medical staff what had happened to him.  Mr. Pelosi is a

22  remarkable human with the way he has handled this entire thing.

23      What happened to him was bad enough as it stands.  He was

24  seriously hurt, and he was traumatized by what Mr. DePape did

25  to him.  No one is saying otherwise.  It was awful and

horrible.  And thank goodness it wasn't worse.  Thank goodness

he's made so much progress in his recovery.

But the Government wants you to be appalled, so appalled

by what happened to Mr. Pelosi that it will sway how you view

this case; right?  They want you to be so affected by the

blood, the trauma, and the violence that you won't think

carefully and critically about the elements of the charges.

They thought that the horrific video, seeing him lying in a

pool of blood and hearing about how awful his injuries were

would blind you to the law that applies to this case and these

charges and to your duties as a juror.

But you can't let that happen.

Because that is exactly what you promised not to do in

jury selection and when you took your oath.

It is natural to have an emotional reaction to hearing

about and seeing someone being assaulted like that, who

experienced something as traumatic as that.  But you were

chosen for this jury because of your ability to set aside that

emotional reaction and focus on what's important in this case.

What is actually at issue here, what the Government

doesn't want you to think that hard about, because there's no

evidence to support it, is whether there's a causal connection

between what Mr. DePape did and Nancy Pelosi's performance of

her official duties.

That's a crucial element in both counts.  And remember,

```
 1    Count 1 charges Mr. DePape with attempting to kidnap Nancy
 2    Pelosi on account of her performance of official duties.
 3    Count 2 charges him with assaulting Paul Pelosi with either the
 4    intent to impede, intimidate or interfere with Nancy Pelosi
 5    while engaged in the performance of official duties, or with
 6    intent to retaliate against her on account of the performance
 7    of her official duties.
 8         So let's talk about that.
 9         We all wear a lot of different hats in our lives; right?
10    Take me for example.  I have a work life; right?  That's
11    literally where you see me right now, in my work life as a
12    federal public defender.  I am a federal employee.  That never
13    changes, no matter what I'm doing.
14         That does not mean I am always performing my official
15    duties.  Because I also have a personal life, like when I spend
16    time with family or friends.  And at times, I have a political
17    life, like when I go to protests or I phone bank for candidates
18    that I support.
19         When I do those personal or political things, I'm not
20    performing my official duties as a federal employee, even
21    though I still am, just as a matter of fact, a federal
22    employee.
23         It's the same thing for Nancy Pelosi.
24         She has a work life, a personal life, and a political
25    life.
```

1          Yes, she was a member of Congress.  And yes, she was

2     speaker of the house at the time this happened.  That fact

3     doesn't change regardless of what she's doing.  But that

4     doesn't mean she's always performing official duties.  That's

5     consistent with what you saw in her schedule.

6          Her personal life would be things like spending

7     Thanksgiving with her family or getting her hair done.  For

8     example, on the morning of October 28th, 2022, she was

9     scheduled to have a hair appointment at 8:00 a.m.  Personal

10    life.

11         Her work life, in other words, her official duties as a

12    member of Congress or speaker of the house, would be when she

13    does things that we all think of when we think of a

14    Congressperson doing their job, like voting on a bill, giving

15    speeches on the House floor, meeting with constituents, or

16    maybe receiving briefings on governmental matters.

17         And then she has her political life.  That would be when

18    she's campaigning for herself or other Democrats, fundraising

19    for campaigns, appearing at rallies or on TV to promote the

20    Democratic Party.  And, again, you see times in her schedule

21    when she's engaging in those types of political activities.

22    There's one time when she's scheduled to be on a Zoom to help

23    Rep. Cartwright's re-election campaign.  There's another Zoom

24    where she's scheduled to appear for an event to help Susie

25    Lee's re-election campaign.  And then there's a time when she's

1  scheduled to spend three hours in the afternoon making phone

2  calls on behalf of the DCCC, the Democratic Congressional

3  Campaign Committee, not part of the Federal Government.

4       Mr. Bernal's testimony made it clear that there is a

5  strict separation between official House business and campaign

6  activities.  There is no overlap allowed, to the point that

7  members of Congress cannot even make campaign calls from inside

8  a Federal Government building.  They have to go to a separate

9  place, like the DCCC, which is housed within the DNC, the

10 Democratic National Committee.  These are places that are not

11 part of the Federal Government.

12      Political activity like this, campaigning for Democrats,

13 campaigning against Republicans, acting on behalf of a

14 political party, that is kept strictly and totally separate

15 from what members of Congress, including the speaker, do as

16 part of their official duties in the House.

17      Think of it like this:  The big circle is current events;

18 the other circles represent official duties, politics and

19 personal life.  These are three different spheres.  And, yeah,

20 they might move around and some of them might overlap at times,

21 but the important takeaway is that politics never overlaps with

22 official duties.

23      It would be a clear-cut ethical violation if they did.

24      So how do you know that Mr. DePape didn't act on account

25 of Nancy Pelosi's performance of official duties?  What you

 1   have to look at is why she was on his target list.  So let's
 2   start with his devices.
 3        You heard that the FBI collected many electronic devices
 4   and storage media belonging to Mr. DePape, seven devices alone
 5   from his stuff at the Pelosi house, even more from his home in
 6   Richmond.  There were so many that Agent Minor couldn't
 7   remember exactly how many devices there were, except that it
 8   was maybe between 10 to 15.  But in this trial, the Government
 9   only showed you some of the data from a single hard drive.
10        You heard that the FBI imaged and analyzed many of those
11   other devices looking for evidence that, as Agent Minor put it,
12   would help them determine the why -- the who, what, why, when,
13   where, and how of the criminal conduct under investigation.
14        The FBI scoured those devices.
15        And the best they could give you was a few reports from
16   one hard drive that wasn't even one of the drives that
17   Mr. DePape had on him at the house that night.
18        Those reports, what they show you, it essentially adds up
19   to four or five different ways of saying that he researched
20   Nancy Pelosi.
21        They spent pretty much their entire cross-examination of
22   Mr. DePape rehashing those same things.
23        Yes, he downloaded photos from articles online about other
24   people vandalizing her house.  That was to figure out where she
25   lived.  And, yes, he looked up her address and did some

1   background research by Googling her and looking at a Wikipedia

2   page that he clearly cut and pasted into this text document.

3       None of this is in dispute.  This is not a smoking gun.

4   It doesn't prove that Mr. DePape was interested in Nancy Pelosi

5   because of her performance of official duties.

6       If anything, it shows the opposite.  The only web history

7   record of him going to her congressional website shows him

8   looking at the biography page.  Not showing him looking at any

9   other part of that website that might actually talk about the

10  work she actually does in Congress.  There is no web or Google

11  search history of him looking up anything she did in Congress

12  because that was irrelevant to him.  He didn't care about that.

13      But what about the "Favorite Politicians" folder?  Right?

14  Well, the Government has tried to make it seem like the name of

15  the folder, "Favorite Politicians," has some significance in

16  this case.  As if that means Mr. DePape targeted Nancy Pelosi

17  based on something to do with her official duties.

18      That is just not true.  He dumped information on all sorts

19  of people in a "Favorite Politicians" folder, including Tom

20  Hanks and Target 1, both of whom, to be clear, are not

21  politicians.

22      But the Government didn't want you to see that; right?  We

23  were the ones who had to put these reports in evidence.

24      Think about this:  The FBI, like I said, scoured those

25  devices; they had a whole team searching them, and this is all

 1  they found, those reports.

 2      Don't you think if any of those devices had contained

 3  anything at all to -- showing that Mr. DePape was interested or

 4  looked up anything to do with Nancy Pelosi's work in Congress,

 5  that it would have been presented to you at this trial?  But it

 6  wasn't.

 7      Because they didn't find anything like that.  Because that

 8  is not what he cared about.

 9      Did he know that she was a member of Congress at the time?

10  Yes.

11      Did he look at the biography page of her house website?

12  Yes.

13      Again, he didn't look at any other pages that talked about

14  her actual official work because her official duties aren't why

15  he wanted to talk to her that night.

16      Think of Gavin Newsom; right?  He's another target of

17  Mr. DePape's that was on the list.  Gavin Newsom was clearly on

18  his list because of performance of his official duties, signing

19  a state law.

20      And if Nancy Pelosi was on Mr. DePape's list on account of

21  something like that, right, some law that she passed, then,

22  yes, that would clearly be on account of her performance of

23  official duties.  But that's not what the evidence has shown.

24      And the Government wants you to think that he must have

25  known about her official duties; that must be what he's

1    interested in, from looking at her Wikipedia page and the bio

2    page on a Government website.

3        But Mr. DePape doesn't trust the Government or the media.

4    Do you really think that's where his beliefs about her came

5    from, Wikipedia and government websites?  It's not.

6        He got his theories and his beliefs about Nancy Pelosi and

7    all his other targets from YouTube videos, podcasts, and

8    far-right websites that took him deep into a world where a

9    secret cabal is using everyone as puppets, schools are

10   molestation factories, and Anthony Bourdain might still be

11   alive.  That's where his information comes from.

12       Wikipedia, government websites, Spokeo, those were just

13   things he used to locate her address.  They had nothing to do

14   with his underlying beliefs about her.

15       And he did the same thing with his other targets.  The FBI

16   tagged 17 files in the category "Tom Hanks' house."  He's

17   figuring out where people live.  And the Google Maps search

18   report has Target 1's address all over it.

19       Mr. DePape has always been consistent and upfront about

20   his larger plan and how Nancy Pelosi fit into it; right?  He's

21   an open book, for better or worse.  And he told

22   Lieutenant Hurley right afterwards why Nancy Pelosi was on his

23   list.

24       We can listen to that again.

25                   (Audio played but not reported.)

1        **MS. CHUANG:**  You listened to that during the

2   Government's closing arguments too.  I want you to notice that

3   when he was asked why he did what he did, what had the Pelosis

4   done to him, one of the first things he brought up was

5   Watergate, a scandal about spying on a rival campaign.  That's

6   the parallel he drew to why Nancy Pelosi was on his list.  It

7   was about elections, it was about rival campaigns, it was about

8   politics.  And he testified to the same thing on the stand

9   yesterday.

10        Nancy Pelosi was on his list because she was appearing on

11   TV, lying on TV, from his point of view, about a rival

12   campaign.

13        It originated with Hillary Clinton and the DNC, but then

14   she stopped being the face of the party, Hillary Clinton.

15   Nancy Pelosi became the face, the leader of the Democratic

16   Party.  And he says "leader of the pack." What pack did he

17   mean?

18        So the prosecutor just got up here and said, to her,

19   leader of the pack, that means speaker of the house.  But we're

20   not here determining what the prosecutor thinks leader of the

21   pack means; right?  That's not what this case is about.  It's

22   about what Mr. DePape meant by it.

23        And he told you what he meant.  The leader of the pack

24   meant the leader of the Democratic Party, the political party,

25   not the leader of the Democrats in Congress.  He has never said

1   those words.  Those additional words, the Government is trying

2   to put those in his mouth, but he has never said them.

3       And he believes the Democratic party, a political party

4   that is not part of the government, is on a corrupt crime

5   spree, going after a rival campaign and that Nancy Pelosi was

6   the face of that, lying on TV on behalf of the Democratic

7   Party.  That is her political life.  That is not on account of

8   any of her official congressional duties.  Those are separate

9   things.

10      And that's what he meant by talking about lies and

11  corruption coming out of Washington, D.C., because much like

12  many people do, and probably many of us do, he uses Washington,

13  D.C., as a shorthand for politics as a whole; right?  It's not

14  a specific reference to the house of representatives.  And

15  Washington, D.C., is also where the DNC and the DCCC are

16  located, arms of a political party.

17      When he talked about Nancy Pelosi being wheeled into

18  Congress, he meant that it would have been a statement to other

19  corrupt members of the ruling class that there are consequences

20  for lying for a political party.  Because other members of the

21  ruling class, the cabal that he was after, some of them happen

22  to be in Congress too.  But it's really about the political

23  party; right?

24      And then at the end of their closing argument, the

25  Government said, she was the head of the Democratic Party.

1    Yes, she was.  That's not an official government position.

2        For Mr. DePape, Nancy Pelosi had other purposes -- had

3    another purpose well.  He thought that because of her

4    celebrity, how well-known she was, that he could lure Target 1

5    to him by having Nancy Pelosi call her.

6        Target 1, who, if you remember, is higher on his list

7    because he was outraged by what he believed to be pedo

8    activism, turning schools into molestation factories --

9    Target 1 who is not a government official and has no connection

10   to Nancy Pelosi's duties in Congress, whose address and phone

11   number were two of the three things that he wrote on that note

12   in his pocket.

13       So was this a logical, well-thought-out plan?  No,

14   definitely not.

15       Does it make much sense that he planned to wear an

16   inflatable unicorn costume while he recording himself asking

17   Nancy Pelosi questions to see if she would tell him the truth?

18   No, not at all.  Are his plans and beliefs jarring and

19   disturbing?  Absolutely.

20       But there's no doubt that he believes them inside and out,

21   through and through, with every ounce of his being and that's

22   what matters here.

23       How does Paul Pelosi fit into all of this?  Well, where he

24   comes in is with Count 2, the assault charge.  Not Count 1.

25   Count 1 charges Mr. DePape of attempted kidnapping of Nancy

1   Pelosi.  That one is all about her.

2       Mr. DePape isn't charged with attempting to kidnap Paul

3   Pelosi.  Whether or not he was going to tie him up, that's not

4   something that you're deciding here.

5       What you're deciding on Count 2 is whether Mr. DePape

6   assaulted Paul Pelosi with either the intent to impede,

7   intimidate, or interfere with Nancy Pelosi while engaged in the

8   performance of official duties or with intent to retaliate

9   against her on account of performance of official duties.

10      Well, to start off with, she clearly wasn't engaged in the

11  performance of official duties when Mr. DePape hit Mr. Pelosi

12  with that hammer.  It was the middle of the night.  She was

13  probably sleeping.  There's been no evidence to prove

14  otherwise.

15      So let's talk about intent to retaliate.  Mr. Pelosi's and

16  Mr. DePape's testimony about what happened in the house that

17  night are largely consistent; right?  There's really not much

18  of a dispute over what happened between the two of them.

19      There was roughly 20 minutes between when Mr. DePape broke

20  through the window and when the police arrived at the door.

21      During those 20 minutes, up until the police arrived,

22  Mr. DePape did not lay a hand on Mr. Pelosi except to squeeze

23  his shoulder in what he meant to be a gesture of reassurance.

24      During that time, Mr. DePape followed Mr. Pelosi around

25  the house to various places and no one was hurt.  And no doubt

1    that was largely because of Mr. Pelosi's incredible presence of

2    mind and ability to stay calm in what was unquestionably a

3    terrifying and traumatic experience for him.

4        But it was because of that calmness that Mr. Pelosi was

5    somehow able to maintain that Mr. DePape just thought things

6    were fine between them.

7        But when the police arrived, everything changed in a split

8    second.  The Government showed you a freeze frame and said this

9    is a key moment, when the police are at the door, and we agree

10   with that; it is a key moment.  Like that, everything changed.

11   And what happened next happened so quickly after Mr. Pelosi

12   opened that door.

13       It didn't unfold at a quarter speed, like the slowed down

14   video that the Government showed you.  Life doesn't happen at a

15   quarter speed.

16       In that moment, Mr. DePape realized that his plan to reach

17   his other targets had been thwarted and reacted without

18   thinking and hit Mr. Pelosi on the head.  It was a horrible,

19   awful act of violence and it was shocking, especially because

20   the 20 minutes that preceded it had not been violent.

21       If Mr. DePape's plan was to assault Mr. Pelosi for any

22   reason related to Nancy Pelosi's performance of her official

23   duties, then he would have hit him as soon as, or right after,

24   he got there.  Or right after he figured out that Nancy Pelosi

25   wasn't there.  Or he would have hit on him on the way to the

 1  elevator.  Or he would have hit him before Mr. Pelosi called
 2  9-1-1.
 3      But Mr. DePape didn't do any of that because that wasn't
 4  his intention; it wasn't part of his plan.  You know that
 5  because for 20 minutes, he did not hurt Mr. Pelosi.
 6      And 20 minutes is a really long time; right?  Think back
 7  to when, on the stand, Officer Najarro was watching some of his
 8  body cam footage for two-and-a-half minutes; that felt like an
 9  eternity, didn't it?  And 20 minutes is eight times longer than
10  that.
11      The truth is, it didn't matter who it was in that moment.
12  Didn't matter that it was Paul Pelosi.  Mr. DePape hit him in a
13  flash of desperation because his larger plan was thwarted, and
14  he wouldn't be able to get to his other targets.  That's what
15  he meant by going after evil, his other targets in the cabal.
16      And that's what Mr. DePape meant when he told
17  Lieutenant Hurley that Mr. Pelosi had to take the punishment
18  instead.  The Government has put great emphasis on that.  If he
19  meant for Mr. Pelosi to take the punishment for his wife, he
20  would have hit him earlier, once he knew she wasn't there.
21      What he really meant was that the punishment was intended
22  for his remaining targets.  That's what he meant.
23      Because by then, by the time the assault happened, he had
24  decided that getting to Nancy Pelosi was a wash.  He was moving
25  on to other targets.

 1          To be clear, this does not justify or excuse what

 2     Mr. DePape did to Mr. Pelosi.  No way.  Because what he did was

 3     horrible.  But why he hit him wasn't related to any of Nancy

 4     Pelosi's performance of official duties in Congress.

 5          At the end of all of this, if you find yourself thinking

 6     it seems like Mr. DePape was politically motivated, yes, he

 7     was, but that's not enough to prove that he's guilty of what

 8     he's charged with here.  Acting on account of politics is

 9     different and separate than acting on account of performance of

10     official duties.

11          Or if you find yourself thinking he did it because she was

12     the leader of the Democratic Party yes, he did.  He certainly

13     thought of her as the face of the Democratic Party in the

14     culture wars.  But, again, that is not enough to prove that

15     he's guilty here.  That's politics, not official duties.

16          And if you find yourself thinking, well, he must have done

17     this because she was speaker of the house, there's just no

18     evidence of that.  The Government didn't even ask him if he

19     knew she was speaker of the house rather than just a member of

20     Congress.

21          And the mere fact that she was speaker is different than

22     performing official duties in that role.  Holding office is not

23     the same as performing official duties of office.

24          The jury instructions, these charges, don't say on account

25     of official position.  They say on account of the performance

1   of official duties.  These words have meaning.  Performance

2   means action.  It is more than just a title or position.  The

3   Government has offered nothing about Nancy Pelosi's performance

4   of official duties.

5        We were the only ones who even called a witness to talk

6   about what official duties were.  The Government didn't even

7   bother to do that.

8        So this is my last chance to talk to you.  And after I sit

9   down, the Government will get back up and they get to do a

10  rebuttal, and that's because they have the burden of proof;

11  right?  We didn't have to present a defense, we didn't have to

12  call witnesses, Mr. DePape didn't have to take the stand.  We

13  have no burden.

14       But they don't get the last word in this trial, you do.

15  So because I won't get the chance to talk to you again, I'm

16  asking you to think to yourself, what would Ms. Chuang or what

17  would Ms. Linker say in response to that when you're listening

18  to their rebuttal.

19       And what I want to leave you with is this:  When it comes

20  down to it, this case is simple but not easy.  What Mr. DePape

21  did just does not fit the charges here.  The Government hasn't

22  proven the why that they need to prove for these specific

23  counts.

24       And we are asking you to do something very hard, I

25  recognize that, because Mr. DePape did horrible things; he

1   seriously hurt and traumatized Mr. Pelosi that night.  That is

2   inexcusable.  He committed serious crimes that night, there's

3   no doubt about it, he has admitted to that multiple times, but

4   he didn't commit these two crimes.

5        And you might be outraged by what he did, rightfully so.

6   But don't think of your vote as an indication that you agree

7   with his beliefs or that you condone anything he did or planned

8   to do.  That's not what this is about.  This is about whether

9   what he did was on account of Nancy Pelosi's performance of

10  official duties.

11       So you shouldn't vote to convict because you find his

12  views to be misguided, wrong, or even abhorrent.  You shouldn't

13  vote to convict out of vengeance or disdain or dislike.  You

14  shouldn't vote to convict out of frustration with how politics

15  have become weaponized.

16       This case is a sad reflection of how extreme political

17  discourse has gotten in our country.  But don't get sucked into

18  those culture wars like Mr. DePape did.  You should take the

19  high road and decide the case according to the law and

20  the Court's instructions.

21       Based on that and what's been presented here at trial and

22  what hasn't been presented, the only correct verdict is not

23  guilty, so that's what you must vote, even if every fiber of

24  your being hates the idea of having to do it, and even if every

25  fiber of your being wants to condemn and punish Mr. DePape for

1    what he did.

2          Even if every fiber of your being hates all the things

3    that he believes -- because the core truth is that he did not

4    commit these crimes.  Mr. DePape is not guilty.

5          **THE COURT:**  Thank you.

6          Ms. Gilbert.

7                      **REBUTTAL CLOSING ARGUMENT**

8          **MS. GILBERT:**  The Defense talked a lot about this

9    distinction between politics and official action.  This is a

10   made-up distinction.  The defendant made no such distinction,

11   and there's nothing in your instructions that talks about a

12   distinction between politics, whether that means Democratic

13   politics or fundraising politics, and official duties or

14   actions.  So let's look at the instruction.

15         "On account of the performance of her official duties."

16   Nowhere in there is that defined.

17         The same term is used in the second set of instructions.

18   Again, it's not defined here.  There's no reason to believe

19   that this distinction that the Defense has made up has anything

20   to do with your deliberations.

21         And here's why:  There's no evidence that the defendant

22   knew anything about Congress' internal rules about where you go

23   to mail a letter and if you need to make fundraising calls in

24   this building or that building.  There's nothing indicating he

25   had any of that in his head.  Ever.  But certainly not at the

1    time he was going to Nancy Pelosi's home and assaulting her

2    husband.

3        For him, it's all the same.  The DNC, the Democrats, it's

4    all the same thing.

5        What does he know?  He knows what he told

6    Lieutenant Hurley, that Pelosi was the leader of the pack, of

7    the lies, of the evil, of the crime spree.  He says of the

8    Democrats.  And he knows exactly what she leads.  He uses the

9    word "Congress" to Lieutenant Hurley on the day that he

10   assaults Paul Pelosi and tries to kidnap Nancy Pelosi.

11       The defendant didn't say he wanted her wheeled out with

12   those broken kneecaps to the DCCC.  He didn't say he was going

13   to wheel her out to the DNC.  Not that the defendant knows

14   that's a different building, we go there for different things.

15   No, he said Congress.  We didn't put those words in his mouth.

16   He said that on the day that he did this.

17       Now, the Defense talked a little bit about Nancy Pelosi's

18   schedule.  I'm holding that up.  It's Exhibit 511.

19       Now, there's no evidence that the defendant has ever seen

20   this, even knows it exists, had anything like this in his head.

21   No indication that he cares.  The only thing he cared about was

22   whether she was going to be home.

23       "Where is Nancy?"  But the defendant wants to show you her

24   calendar.  So let's look at the day of the assault.  What was

25   she supposed to do that day?

1      She was supposed to go to a classified briefing.  Even

2  under the Defense's narrow view of whatever the official duty

3  is, I think even they would admit a classified briefing, that's

4  official.

5      She was going to have a meeting with someone from Ukraine

6  in the Capitol building.  Again, that sounds pretty official,

7  doesn't it?  That is not a distinction that is important to

8  this case, but even if we buy into that distinction, that's

9  what she was going to do.  And the fact is that the defendant's

10  actions actually impeded her official duties that day.  Agent

11  Littlejohn told you all that everything we planned to do got

12  erased.  She didn't do anything she was going to do in DC.  She

13  immediately got on a plane and flew home to her husband.

14      I want to talk about this idea that the political party is

15  separate from official duties.  And, again, that is a false

16  distinction here.

17      Of course the defendant is targeting Speaker Pelosi

18  because of her political party.  Her official position is the

19  same thing.  She's the leader of the Democrats in the House.

20      You heard that from the Defense witness Mr. Bernal.

21      Members of Congress run officially as members of political

22  parties.  That's how our system works.  It's on our ballots.  A

23  Congressperson is a politician by definition.  That's their

24  official job.

25      That's different than me being a government employee

1    today, just like Ms. Chuang, and going home and being something

2    different.  A politician, that's their job.  Their job is

3    politics.

4         Congress is run by two parties:  The Democrats and the

5    Republicans.  They're trying to divorce anything related to

6    being a Democrat from Nancy Pelosi's official position and

7    that's just not right.

8         This is her position.  She is officially the head of the

9    Democrats in the House.

10        Why did the Defense -- why did the defendant want to

11   question her?  What did he want to ask her questions about?

12        So he called it Russiagate.  It's related to the clip that

13   we both played today that he gave to Lieutenant Hurley.  This

14   is all about her position in the political establishment and

15   his violent disagreement with her political positions.

16        Ask yourself this question:  Would he have gone to Nancy

17   Pelosi's home to kidnap and assault her if she had not been a

18   member of Congress and the speaker of the house?

19        Would he have gone to her house if she was a regular

20   citizen?

21        No.

22        He didn't try to kidnap and assault her because she cut in

23   front of him at Safeway.  He didn't try to kidnap and assault

24   her because she cut him off in traffic.  He wasn't casing the

25   neighborhood looking for a house to break into.  He

1   deliberately targeted her because of her job, because of her

2   role in our political system, because of her official duties.

3        How was he going to begin his attack on this political

4   establishment?  By attacking the very person he believed

5   represented it, the Democratic speaker of the house.

6        The Defense wants to read "while engaging" and we can look

7   at that in the statute.

8        They want to read "while engaging" really narrowly.  They

9   want you to think the only way that this can be violated is

10  Nancy Pelosi's got to be on the floor voting on a bill when the

11  defendant comes in and attacks her husband.

12       That is not what the instruction says.

13       **MS. CHUANG:**  Objection, misstates the law.

14       **THE COURT:**  Overruled.

15       **MS. GILBERT:**  It's whether the defendant was going

16  after her because of her position.  That would be way too

17  narrow of a reading.  It can't be that it's only criminalizing

18  activity when Nancy Pelosi is literally in her office in

19  Congress.

20       The Defense argues that the defendant attacked Mr. Pelosi.

21  It was impulsive.  It was when the cops came.  He just did it.

22       The evidence shows otherwise.

23       Mr. Pelosi testified that the whole time he was there in

24  his house with the defendant, the defendant kept saying, "I'm

25  going to take you out."

1       The defendant intended to be violent.  He went there to

2  break kneecaps.  This wasn't impulsive that he committed

3  violence.  He brought the tools to do it.  He wasn't using the

4  Pelosis' hammer; that was his hammer.

5       Mr. Pelosi testified, contrary to the Defense's

6  representation about those minutes, those long minutes that

7  Mr. Pelosi spent alone with the defendant at his house, this

8  wasn't amiable; this wasn't affectionate.  He said he was

9  threatened the entire time.

10      I want to just finish by talking for a minute about the

11 other targets.

12      I think it's clear now from the record that each of the

13 targets on the defendant's list is on there for a different

14 reason.

15      Why the defendant fixated on Target 1 and where she was on

16 his list is totally irrelevant to why he targeted Speaker Nancy

17 Pelosi.

18      He researched other people.  Of course he did.

19      But ask yourself this:  Whose house did he travel to?

20      Whose house did he break into?

21      Whose husband did he threaten?

22      And whose husband did he attack?

23      Target 1 is how we've referred to this person for the

24 purposes of this trial, but the person who actually was

25 Target 1 was Nancy Pelosi.  And if you go back and look at that

1    piece of paper in his pocket, her address is the top.  That's

2    the top address.

3        He wasn't at Tom Hanks' house.  He wasn't as Gavin

4    Newsom's house.  He didn't go to Target 1's house.  He didn't

5    go to Adam Schiff's house.  He didn't go to Hunter Biden's

6    house.

7        The Defense argues that the real reason that the defendant

8    went to the Pelosis' home was because it was a part of his

9    bigger plan against the wealthy elite and a cabal.

10       They played the same clip that we played.  When

11   Lieutenant Hurley first asked him, hours after the assault, she

12   says (as read):

13            "Is there a reason you did this?  Did you feel

14       that the Pelosi had done something to you?"

15       Listen to what he says.  He says nothing about wealthy

16   elite in that response.  He says nothing about cabal.  He uses

17   the words "Washington," "leader of the pack," "Democratic

18   Party."

19       Defense finally argues that the defendant assaulted

20   Mr. Pelosi to get to his other targets.

21       And I think we interpret his words about punishment

22   differently.

23       But keep this in mind:  If the defendant thought it was a

24   wash, he wasn't going to get Nancy Pelosi, why didn't he leave?

25   He had so many chances to leave, and he could have gone on to

1  all of his other targets.  But he didn't leave.  He stayed

2  because he had someone right in front of him.  He had the next

3  best thing.  He had her husband.

4      And the defendant could get at her by punishing him.  And

5  we know that he did that, that the punishment was from Nancy

6  Pelosi to her husband, not from the other targets, because he

7  says that later when he calls the news station, Exhibit 10.  He

8  says, "I'm so sorry I didn't get more of them."

9      He has lumped them together himself.

10     Even if you're -- even if you assume that part of the

11  reason the defendant assaults Mr. Pelosi is because he wanted

12  to go get to his other targets, there is no requirement that

13  the defendant's intent in doing so was only to impede,

14  intimidate, or interfere with Speaker Pelosi or only to

15  retaliate against Speaker Pelosi.  The defendant can have

16  multiple intents in his head at that minute and still be guilty

17  of these charges.  There's nothing in the instruction that says

18  the intent has to be exclusive.

19     For these reasons, we ask that you return guilty verdicts

20  on both counts.  Thank you.

21         **THE COURT:**  Thank you.

22              **FINAL JURY INSTRUCTIONS**

23         **THE COURT:**  Members of the jury, when you begin your

24  deliberations, elect one member of the jury as your foreperson

25  who will preside over the deliberations and speak for you here

in court.  You will then discuss the case with your fellow

jurors to reach agreement if you can do so.  You must all be

present when deliberating, so if you take a break, if someone

leaves the room, you must stop your deliberations.  Your

verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you

should do so only after you have considered all the evidence,

discussed it fully with the other jurors, and listened to the

views of your fellow jurors.  Do not be afraid to change your

opinion if the discussion persuades you that you should, but do

not come to a decision simply because other jurors think it is

right.

It is important that you attempt to reach a unanimous

verdict but, of course, only if each of you can do so after

having made your own conscientious decision.

Do not change an honest belief about the weight and effect

of the evidence simply to reach a verdict.

Perform these duties fairly and impartially.  You should

also not be influenced by any person's race, color, religious

beliefs, national ancestry, sexual orientation, gender

identity, gender, or economic circumstances.  Also do not allow

yourself to be influenced by personal likes or dislikes,

sympathy, prejudice, fear, public opinion, or biases, including

unconscious biases.  Unconscious biases are stereotypes,

attitudes, or preferences that people may consciously reject

1 but may be expressed without conscious awareness, control, or

2 intention.

3      It is your duty as jurors to consult with one another and

4 to deliberate with one another with a view towards reaching an

5 agreement if you can do so.  During your deliberations, you

6 should not hesitate to reexamine your own views and change your

7 opinion if you become persuaded that it is wrong.

8      Because you must base your verdict only on the evidence

9 received in the case and on these instructions, I remind you

10 that you must not be exposed to any other information about the

11 case or to the issues it involves.

12      And this applies to our alternates, as we may need to call

13 you back, so it's very important that you continue that cone of

14 protective silence while you're not here.

15      Do not communicate with anyone in any way, and do not let

16 anyone else communicate with you in any way about the merits of

17 the case or anything to do with it.  This restriction includes

18 discussing the case in person, in writing, by phone, computer,

19 or any other means, including e-mail, text messaging, or any

20 Internet chat room, blog, website, or other forms of social

21 media.  This restriction applies to communicating with your

22 family members, your employer, the media or press, and the

23 people involved in the trial.  If you are asked or approached

24 in any way about your jury service or anything about this case,

25 you must respond that you've been ordered not to discuss the

1   matter and to report the contact to the Court.

2       And, again, if you're with -- somewhere and you overhear

3   something, please stop the person speaking and let them know

4   you're a juror.

5       Do not read, watch, or listen to any news or media

6   accounts or commentary about the case or anything to do with

7   it, and do not do any research, such as consulting

8   dictionaries, searching the Internet, or using other reference

9   materials, and do not make any investigation or in any other

10  way try to learn about the case on your own.  The law requires

11  these restrictions to ensure the parties have a fair trial

12  based on the same evidence that each party has had an

13  opportunity to address.

14      A juror who violates these restrictions jeopardizes the

15  fairness of these proceedings, and a mistrial could result,

16  which would require the entire trial process to start over.

17      Again, if any juror is exposed to outside information,

18  please notify the Court immediately.

19      The punishment provided by law for these crimes is for the

20  Court to decide.  You may not consider punishment in deciding

21  whether the Government has proved its case against the

22  defendant beyond a reasonable doubt.

23      Whether or not there may be proceedings against the

24  defendant elsewhere is irrelevant and may not be considered.

25      A verdict form has been prepared for you.  After you have

**FINAL JURY INSTRUCTIONS**

1  reached unanimous agreement on a verdict, your foreperson

2  should complete the verdict form according to your

3  deliberations, sign and date it, and advise the clerk that you

4  are ready to return to the courtroom.

5      If it becomes necessary, during your deliberations, to

6  communicate with me, you may send a note through the clerk

7  signed by any one or more of you.

8      No member of the jury should ever attempt to communicate

9  with me except by a signed writing, and I will respond to the

10 jury concerning the case only in writing or here in open court.

11     If you send out a question, I will consult with the

12 lawyers before answering it, so it may take some time.  You may

13 continue your deliberations while waiting for an answer to any

14 question.

15     And remember that you are not to tell anyone, including

16 me, how the jury stands, numerically or otherwise, on any

17 questions submitted to you, including the question of the guilt

18 of the defendant, until after you have reached a unanimous

19 verdict or have been discharged.

20     All right.  So now Ms. Means will bring you to the jury

21 room.  She did order lunch for you.  I think she even ordered

22 it for our alternates?

23         **THE CLERK:**  No.  Because they're leaving.

24         **THE COURT:**  Oh, you didn't.  For you alternates,

25 sorry.

1       But thank you very much.  I've told you I've used two or

2   three alternates before, so it's very important that you

3   continue to keep your cell phones with you in case Ms. Means

4   needs to contact you.  And, please, no discussion of the case

5   with anyone.  But thank you so much for your service.

6       And now, for the rest of you, I've spent almost a week and

7   a half now ordering you not to discuss the case.  I am now

8   reversing myself and ordering you to discuss the evidence you

9   have seen.

10      Thank you.

11                  (The jury retired to deliberate.)

12   (Proceedings were heard out of the presence of the jury.)

13      **THE COURT:**  Okay.  So you need to, I think, confer

14   with Ms. Means about getting the evidence to the jury room, the

15   physical evidence, and I guess a laptop and all that, make sure

16   we have that.

17      Before you do that, I want to take a moment to compliment

18   and congratulate both teams here.  This was an incredibly well

19   tried case, both of you -- or all of you vigorously represented

20   your clients.  You did the whole criminal justice system, I

21   think, a great -- were a great model for it.  In particular,

22   your cooperation throughout this entire case, right, agreeing

23   to certain exhibits, stipulations while still, you know,

24   vigorously disagreeing on some things, which is perfectly

25   appropriate.

1       But what you proved, I think, to everyone is that you can

2   cooperate, you can be civil, you can present a case fairly and

3   smoothly to a jury where at the same time representing your

4   clients to the highest and greatest ability.  And that is just

5   a great lesson.  It's been an absolute privilege to preside, so

6   far, over this case.

7       And so I did want to make a note of that because it was

8   extraordinary in that sense, but I don't think -- I think your

9   clients only benefited from your cooperation.

10      All right.  Thank you, Ms. Means.  We'll be right back.

11                  (Recess taken at 11:19 a.m.)

12              (Proceedings adjourned at 3:30 p.m.)

13                          ---o0o---

14                  **CERTIFICATE OF REPORTER**

15      I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above-entitled matter.

17

18  DATE:   Tuesday, December 19, 2023

19

20

21

22  _____
      Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
23              Official Reporter, U.S. District Court

24

25