1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  HELEN L. GILBERT (NYBN 4736336)
   LAURA VARTAIN HORN (CABN 258485)
5  Assistant United States Attorney

6        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
7        Telephone: (415) 436-7200
         FAX: (415) 436-7234
8        Helen.Gilbert@usdoj.gov
         Laura.Vartain@usdoj.gov
9
   Attorneys for United States of America
10

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                 SAN FRANCISCO DIVISION

14
   UNITED STATES OF AMERICA,          )   **CASE NO. 3:22-CR-426-JSC**
15                                     )
            Plaintiff,                 )   **UNITED STATES'**
16                                     )   **SENTENCING MEMORANDUM**
        v.                             )
17                                     )   Court: Hon. Jacqueline Scott Corley, Courtroom 8
   DAVID WAYNE DEPAPE,                 )   Sentencing Date:     May 17, 2024
18                                     )   Sentencing Time:     10:00 a.m.
            Defendant                  )
19  _____)

20

21

22

23

24

25

26

27

28

1

**<u>TABLE OF CONTENTS</u>**

2   INTRODUCTION ........................................................................................................................1

3   OVERVIEW OF OFFENSE CONDUCT ...............................................................................1

4   I.        The Verdict ......................................................................................................................1

5   II.       The Crime ........................................................................................................................2

6   III.      Defendant's Continued Failure to Accept Responsibility ....................................3

7   DISCUSSION .............................................................................................................................6

8   I.        Discussion of Objections to the PSR ........................................................................6

9              A.       Official Victim Enhancement .......................................................................6

10             B.       Acceptance of responsibility ........................................................................7

11             C.       Terrorism enhancement .................................................................................9

12  II.       Sentencing Recommendation and Factors ...........................................................12

13             A.       The Government's Recommendation .......................................................12

14             B.       Section 3553(a) factors .................................................................................13

15  CONCLUSION ........................................................................................................................16

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

*Hammoud v. United States*,
   483 Fed. Appx. 865 (4th Cir. 2012) ................................................................................ 12

*United States v. Ashqar*,
   582 F.3d 819 (7th Cir. 2009) ......................................................................................... 10

*United States v. Awan*,
   607 F.3d 306 (2d Cir. 2010) .......................................................................................... 11

*United States v. Cottrell*,
   312 Fed. App'x 979 (9th Cir. 2009) .............................................................................. 10

*United States v. Graham*,
   275 F.3d 490 (6th Cir. 2001) ......................................................................................... 11

*United States v. Hale*,
   448 F.3d 971 (7th Cir. 2005) ........................................................................... 11, 15, 16

*United States v. Hammoud*,
   381 F.3d 316 (4th Cir. 2004) ......................................................................................... 12

*United States v. Innie*,
   7 F.3d 840 (9th Cir. 1993) .............................................................................................. 7

*United States v. Joey*,
   845 F.3d 1291 (9th Cir. 2017) .................................................................................. 11, 12

*United States v. Mandhai*,
   375 F.3d 1243 (11th Cir. 2004) ..................................................................................... 11

*United States v. McKinney*,
   15 F.3d 849 (9th Cir. 1994) ............................................................................................ 7

*United States v. McKittrick*,
   142 F.3d 1170 (9th Cir. 1998) ..................................................................................... 8, 9

*United States v. Meskini*,
   319 F.3d 88 (2d Cir. 2003) ............................................................................................ 11

*United States v. Smith*,
   719 F.3d 1120 (9th Cir. 2013) ....................................................................................... 12

*United States v. Tuan Ngoc Luong*,
   965 F.3d 973 (9th Cir. 2020) ...................................................................................... 7, 8

*United States v. Williams*,
   14 F.3d 30 (9th Cir. 1994) ............................................................................................. 11

1

**Statutes**

2

18 U.S.C. § 351(c) ................................................................................................ 9

3

18 U.S.C. § 844(i) ............................................................................................... 10

4

18 U.S.C. § 2332b(g)(5) ....................................................................................... 9

5

18 U.S.C. § 2332b(g)(5)(B) ............................................................................... 10

6

18 U.S.C. § 3553(a) ............................................................................................ 13

7

18 U.S.C. §§ 1201(a)(5) ..................................................................................... 10

8

**Rules**

9

Section 3A1.4(a) ................................................................................................... 9

10

Section 3A1.4(b) ................................................................................................... 9

11

U.S.S.G. § 3A1.4 ....................................................................................... 1, 2, 9, 10

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

On November 16, 2023, defendant David DePape was found guilty by a jury of both counts of the Indictment, charging him with attempting to kidnap Member and Speaker of the United States House of Representatives Nancy Pelosi on account of the performance of her official duties and assault of Speaker Pelosi's husband Paul Pelosi with the intent to impede, intimidate, or interfere with Speaker Pelosi while engaged in her official duties or with intent to retaliate against Speaker Pelosi on account of the performance of her official duties.  PSR ¶ 3; Dkt. 180 (verdict form).

U.S. Probation has recommended that defendant is a Total Offense Level 42 and is in Criminal History Category I, resulting in a Guidelines range of 360 months to life imprisonment.  Probation recommends a variance below the low end of this range, to 300 months of imprisonment, followed by 5 years of supervised release.

As set out below, the United States agrees in significant part with the Probation Office's guidelines calculation; however, the Probation Office did not apply the terrorism enhancement of U.S.S.G. § 3A1.4.  For the reasons discussed below, that enhancement applies to defendant's conduct, resulting in a Total Offense Level of 52 and Criminal History Category VI.  As a result, the appropriate Guidelines range is life.  The statutory maximum penalties are 20 years on Count 1 and 30 years on Count 2.  The government recommends that the Court impose a sentence at the statutory maximum for both counts, with a period of ten years to run consecutive and the remainder to run concurrent to each other.  As a result, the government recommends that the Court impose a sentence of 40 years.

## OVERVIEW OF OFFENSE CONDUCT

Having presided over the trial, the Court is familiar with the facts, which are generally not in dispute.  Accordingly, the government summarizes those that are key to the sentencing enhancements at issue.

## I.    The Verdict

Defendant was convicted of attempting to kidnap then-Speaker of the U.S. House of Representatives Nancy Pelosi and of violently assaulting her husband, Paul Pelosi, both on account of the performance of Speaker Pelosi's official duties.  PSR ¶ 3.

## II.     The Crime

1

2          On October 28, 2022, around 2 a.m., the defendant broke into the Pelosi's home.  PSR ¶ 8.  He

3    planned to hold Speaker Emerita Pelosi hostage and break her kneecaps if she lied to him.  PSR ¶ 7, 15.

4    The defendant had started gathering the supplies he brought to aid in this attack in July 2022, and had

5    begun researching Speaker Pelosi, her family, and her address on October 19, 2022.  PSR ¶ 12.

6          Speaker Emerita Pelosi was not home.  Instead, the defendant found Mr. Pelosi, who he

7    repeatedly threatened to tie up and "take out."  PSR ¶¶ 9-10.  He also told Mr. Pelosi that Speaker

8    Emerita Pelosi was "the leader of the pack" and that the defendant "had to take her out."  *Id*.  Mr. Pelosi

9    was able to call 911 for help.  PSR ¶ 9.  When the police arrived, Mr. Pelosi opened the door and the

10   defendant, who was standing next to him holding a hammer, violently struck Mr. Pelosi three times

11   (twice on the head) before the police were able to subdue him.  PSR ¶ 10.  As a result of the defendant's

12   violent assault, Mr. Pelosi was unconscious for a few minutes in a pool of his own blood. PSR ¶ 10.

13         After his arrest, the defendant made several statements.  PSR ¶ 13-16.  When describing to

14   Sergeant Hurley why he would have broken "Nancy's" kneecaps if she lied (which he expected she

15   would do), the defendant said:

16              What would have been the mission? She would have got a broken knee,
               and she would have realized that her endless fucking lies and corruption
17              had a price. And then every time she goes into Congress, every other
               fucking corrupt piece of shit in there is going to see her wheeling in in a
18              wheelchair, and their going to realize that there is a fucking consequence
               for being the most evil fucking people on the plan.
19

20   Tr. Ex. 5.

21         Medical examination at the hospital identified that Mr. Pelosi suffered two skull fractures that

22   had to be repaired in emergency surgery, along with a wound to his arm and to his hand, which were

23   also treated in surgery by specialized surgeons.  PSR ¶ 11.  At trial, the neurosurgeon who performed the

24   surgeries testified that one of the skull fractures narrowly missed a vein that if lacerated would have

25   caused life-threatening blood loss.  PSR ¶ 11.

26         Mr. Pelosi spent 6 days in the hospital and as of the trial, had still not fully recovered from his

27   injuries.  PSR ¶ 11.

28         Mr. Pelosi testified about the physical and emotional injuries and rehabilitation over the past

USA's SENTENCING MEMORANDUM
3:22-CR-426-JSC                    2

1   year.  Mr. Pelosi explained the physical recovery to his body over the past year, including explaining

2   that since his release from the hospital,

> 3   they had – they had people come out to take care of me at the house, both
> on his medication and on physical therapy and so forth. And I'm still
> 4   doing physical therapy a couple of days a week at a facility and doing the
> exercises every day of balance and getting my walking back and that sort
> 5   of thing.

6       Vol. 3 at 665:22-666:2.

7   Mr. Pelosi further testified that he experiences pain from the head wounds:

> 8   it's a lot less now. I would – I would – I was constantly getting headaches
> and dizziness when I would stand. It would – pain would start in the back
> 9   of my neck and then I knew – back of my skull and I knew – back of my
> skull and I knew – and I knew I was going to get dizzy and I knew I was
> 10  going to – so I would immediately sit down. I do a lot of sitting. But – and
> – and I had to take naps. I couldn't get through the day very well. Now,
> 11  here we are a year later. They told me it would take a least a year. And so
> now, I still get a little lightheaded sometimes. And I get some headaches,
> 12  not as much. And I – I don't have to nap as much.

13  Vol. 3 at 669-21.

14       About his emotional state, Mr. Pelosi testified:

> 15  I have not discussed this incident with anybody. I haven't seen any of the
> news. I haven't listened to any of the tapes. And I've encouraged my
> 16  family not to either because I think it's too traumatic for my family. So I
> just have tried to put it out of my mind, and it wasn't until, well, my two
> 17  meetings with you and your associates yesterday and one a couple of
> weeks ago, when you were asking me some of these questions, that I even
> 18  – I'm trying to come back – I'm just trying – I made the best effort I
> possibly can not to relive this.

19

20  Vol. 3 at 664:9-22.

21  **III.    Defendant's Continued Failure to Accept Responsibility**

22       The defendant to date has failed to accept responsibility for his crimes.  PSR ¶ 48.  After his

23  arrest, the defendant gave several statements to law enforcement, and never expressed remorse.  To the

24  contrary, in the body camera videos of the post-arrest statements from outside the Pelosi's home, the

25  defendant told paramedics and police officers that there was no denying the conduct given that the cops

26  watched him do it.  PSR ¶ 16.  The defendant seemed proud of what he had accomplished.  Hours later,

27  when interviewed by Sergeant Hurley, the defendant also expressed no remorse about nearly killing Mr.

28  Pelosi, and instead explained the other targets that he had not been able to reach.  PSR ¶ 16.

1    On January 27, 2023, the same day that the state court proceedings released the San Francisco

2  Police Department's body camera footage, the defendant called KTVU to release a public statement.

3  The jury heard the recording, in which the defendant said:

> Now that you all have seen the body cam footage, I have an important
> message for everyone in America: You're welcome…The tree of liberty
> isn't dying. It's been killed, systematically and deliberately. The people
> killing it have names and addresses. So I got their names and addresses so
> I could pay them a little visit and have a heart-to-heart chat about their bad
> behavior. The tree of liberty needs watering. We need men of valor.
> Patriots went and put their own lives on the line to stand in opposition to
> tyranny. I would also like to apologize. I want to apologize to everyone. I
> messed up. What I did was really bad. I'm so sorry I didn't get more of
> them. It's my own fault. No one else is to blame. I should have come
> better prepared.

10  PSR. ¶ 18.

11    At no point in his testimony did the defendant express remorse for either the attempted

12  kidnapping or the assault—although he did say that he thought he had killed Mr. Pelosi.  In fact, on

13  direct examination, the defendant blamed Mr. Pelosi for making the "choice on [his] end" that led to the

14  defendant having to "go through him."

> Q: So did you ever say to Paul that you could take – that you would take
> him out?
>
> A: No. I said I would go through him.
>
> Q: What's the difference between those two?
>
> A: Go through is, like – it's, like, the choice is on your end. It's, like,
> you're getting in the way, whereas if you're going to take someone out,
> it's them getting hurt is predetermined. It's like – like – how I wanted to,
> like talk to Nancy. And if she lied, I would break her kneecap. It's like, the
> choice is on her, you know, rather than me predetermined hurting her. You
> know, she has an option of doing something where she won't be hurt.
> There's – there's an alternative path to resolution that doesn't involve
> violence.

23  Tr. Vol. 4. 745:15-746:3.

24    On direct, defendant was asked "did you feel bad *afterwards* that you had hurt him so badly." *Id.*

25  at 750:9-19 (emphasis added). The defendant did not testify that he regretted his actions:

> A: Yes. When he was, like, on the ground breathing, I was, like, really
> scared for his life. And later in the hospital like, you know, I felt ready
> [sic] bad for him because we kind of had, like, a really good rapport, and
> things were going pretty good until, like, the very last second. And hearing
> the medica examiner's report was really chilling. Yeah. And I actually
> thought he was probably dead until, like, I heard the charges against me

1          saw that it was attempted murder.

2                    Q: If he were here, would you apologize to him?

3                    A: Yes. He was never my target, and I'm sorry that he got hurt.

4     *Id.* at 750:11-22.

5          From custody, the defendant called KTVU to release a public statement on the day that the state

6     court released portions of the body worn camera footage showing the assault:

7                    Now that you all have seen the body cam footage, I have an important
                     message for everyone in America: You're welcome. The tree of liberty
8                    isn't dying. It's been killed, systematically and deliberately. The people
                     killing it have names and addresses. So I got their names and addresses so
9                    I could pay them a little visit and have a heart-to-heart chat about their bad
                     behavior. The tree of liberty needs watering. We need men of valor.
10                   Patriots went and put their own lives on the line to stand in opposition to
                     tyranny. I would also like to apologize. I want to apologize to everyone. I
11                   messed up. What I did was really bad. I'm so sorry I didn't get more of
                     them. It's my own fault. No one else is to blame. I should have come
12                   better prepared.

13    PSR ¶ 18.

14         On the stand, the defendant had the opportunity to explain what he meant:

15                   Q: Now, having listened, again, to this call that you made 10 months ago,
16                   what do you make of it now?

17                   A: A little immature. Didn't really do a good job of trying to explain what
                     I was trying to express. And it's like I was kind of upset about how, like,
18                   they're basically trampling my freedom of speech and, like, freedom of
                     the press by removing my website so people can't hear what I have to say.
19                   And I actually talk about it in the interview. That's the part that they, like,
                     won't let you guys hear. I was talking about how, like, fascism is when the
20                   ruling class is split between, like, government power and private industry.
                     And using private industry to trample my rights rather than using the
21                   Government is basically fascism, and that's kind of what I was upset
                     about. And I explained that in the second half – or in the part their
22                   omitting from the interview.

23    Tr. Vol 4 at 757:6-21

24         The jury had the opportunity to observe the defendant. At no point in the above excerpted

25    testimony did the defendant cry.

26         In contrast, early in his testimony, the defendant was in tears about uncovering the truth about

27    the "lying about Trump" while he was watching a YouTube video. *Id*. at 716: 14-17.

28

**DISCUSSION**

**I.    Discussion of Objections to the PSR**

The parties dispute several U.S. Sentencing Guidelines enhancements, as discussed below.

**A.    Official Victim Enhancement**

Defense objections two and four to the PSR argue that the official victim enhancement of § 3A1.2(b) should not apply to either the attempted kidnapping charge or the assault charge.  The defendant's objections simply repeat his defense at trial—that he did not attempt to kidnap Speaker Emerita Pelosi or assault Mr. Pelosi on account of Speaker Pelosi's official position—which the jury rejected and which the Court should similarly reject.

The PSR properly includes the official victim enhancement in § 3A1.2(b) for both Counts 1 and 2.  Speaker Pelosi was a government officer and the defendant's attempt to kidnap her was "motivated by such status."  Indeed, the jury found beyond a reasonable doubt that the defendant attempted to kidnap Speaker Emerita Pelosi "on account of the performance of her official duties." Dkt. 175, at 15 (Final Jury Instructions).  Mr. Pelosi was a member of the immediate family of a government official and the defendant's assault of him was "motivated by such status."  The jury found beyond a reasonable doubt that the defendant assaulted Mr. Pelosi either "with intent to impede, intimidate, or interfere with [Speaker Pelosi] while engaged in the performance of her official duties, or with intent to retaliate against [Speaker Pelosi] on account of the performance of her official duties." *Id*. at 16.

The defendant's argument that he attempted to kidnap Speaker Pelosi "because the defendant wanted to use Ms. Pelosi to lure Target 1 to him and because of Ms. Pelosi's separate role as a prominent member of the Democratic political party, as well as her statements in the media about a rival political campaign" was rejected by the jury and is simply an attempt to relitigate the basis of his conviction. Dkt. 227, at 22 (Final PSR, Defense Objection Number Two).  The defendant's claim that his assault of Mr. Pelosi was motivated "by the police arriving at the front door" was similarly rejected by the jury. *Id*., at 23 (Final PSR, Defense Objection Number Three).  The evidence presented at trial established that both offenses were motivated by Speaker Pelosi's status as a government officer.  The Probation Office correctly applied the official victim enhancement to both counts.

1      **B.**    **Acceptance of responsibility**

2      After nearly killing Mr. Pelosi in his effort to also kidnap the Speaker Emerita, the defendant

3 proudly called a news reported to apologize for not getting more of "them."  The Court should decline

4 the defendant's request to find that he has accepted responsibility and is therefore entitled to a two-level

5 reduction in his offense level under U.S.S.G. § 3E1.1(a).  It is the defendant's burden to establish his

6 acceptance of responsibility.  *United States v. Innie*, 7 F.3d 840, 848 (9th Cir. 1993).  Defendant has not

7 met that burden.  PSR ¶ 24.

8      The defendant acknowledges that he is not entitled to all three points for acceptance of

9 responsibility because he went to trial but contends that he nevertheless only contested factual guilt at

10 trial and so is eligible for a two-level reduction.  *See* PSR Addendum ¶ 5.  The Probation Officer

11 concluded that it was unclear whether the defendant "has genuinely expressed contrition for his actions"

12 and correctly identified the KTVU statement as evidence that he has not.  *Id.* at 6.

13      The Guidelines reduce a defendant's guidelines offense level by two points when the defendant

14 clearly demonstrates acceptance.  U.S.S.G. § 3E1.1(a).  The Application Notes lay out non-exhaustive

15 factors that can guide the assessment of whether a defendant truly accepts responsibility.  It also

16 explains that the

17         adjustment is not intended to apply to a defendant who puts the
18         government to its burden of proof at trial by denying the essential factual
            elements of guilt, is convicted, and only then admits guilt and expresses
19         remorse. Conviction by trial, however, does not automatically preclude a
            defendant from consideration of such a reduction. In *rare* circumstances a
20         defendant may clearly demonstrate an acceptance of responsibility for his
            criminal conduct even though he exercises his constitutional right to a
21         trial. This may occur, for example, where a defendant goes to trial to assert
            and preserve issues that do not relate to his factual guilt (e.g., to make a
22         constitutional challenge to a statue or a challenge to the applicability of a
            statute to his conduct). In each such instance, however, a determination
23         that a defendant has accepted responsibility will be based primarily upon
            pre-trial statements and his conduct.

24 U.S.S.G. § 3E1.1 Application Note 2 (emphasis added).

25      The cases are clear that "at bottom, the district court must determine whether a defendant

26 "manifest[ed] a genuine acceptance of responsibility for his actions."  *United States v. Tuan Ngoc*

27 *Luong*, 965 F.3d 973, 991 (9th Cir. 2020) (citing cases).  The "focus of the inquiry" is on "personal

28 contrition" rather than exercise of constitutional rights.  *United States v. McKinney*, 15 F.3d 849, 853

1  (9th Cir. 1994).

2        The defendant has not manifested personal or genuine contrition in any statement and is not

3  entitled to the reduction.  The call to KTVU alone demonstrates that he is not personally or genuinely

4  contrite.  Accordingly, the Court can decline to give the defendant credit for accepting responsibility

5  because he has never demonstrated genuine contrition, and need not reach the question of whether the

6  defendant accepted factual guilt.

7        However, the defendant's contention that he accepted factual guilt is wrong.  The Application

8  Notes states that "in rare circumstances a defendant my clearly demonstrate an acceptance of

9  responsibility for his criminal conduct even though he exercises his constitutional right."  The defendant

10 does not qualify for this rare circumstance.  At trial, the defendant asked the jury to find that he did not

11 attempt to kidnap the Speaker Emerita because of her official position or to assault her husband because

12 of it—instead, because they were part of the "cabal" of wealthy elites.  The jury rejected this argument

13 and had ample evidence straight from the defendant's own mouth to reject his explanation.  For

14 example, the defendant's stated desire to break "Nancy's" kneecaps and have her wheeled on to the

15 floor of Congress demonstrated a clear focus on her elected position—and that the defendant's

16 fundamental goal was threaten democratic institutions.  Accordingly, this case is not like the cases

17 finding that raising a jurisdictional argument while accepting factual guilt may still allow for acceptance

18 of responsibility credit where a defendant is contrite.  *See Luong*, 965 F.3d at 991 (admission of factual

19 guilt of possession of firearm while contesting the interstate nexus at trial did not disqualify a defendant

20 from the two-level).  Here, the defendant's intent cuts to the core of the factual proof in the case.  Why

21 the defendant committed these acts was precisely what was at issue and was in fact the theme of the

22 defense's arguments.  It was not akin to jurisdiction in a felon-in-possession case, in which a defendant's

23 knowledge of possessing the firearm is the required *mens rea* and is the core of factual guilt.

24       When asking the Probation Office to apply two-level reduction, the defendant pointed to *United

25 States v. McKittrick*, 142 F.3d 1170, 1178 (9th Cir. 1998), for the proposition that a defendant can

26 contest intent and still qualify for the reduction.  In *McKittrick*, the defendant asked the jury to find that

27 the statute did not apply to him because he believed that he was shooting a wild dog and not a protected

28 wolf.  As a threshold matter, *McKittrick* does not give any real guidance because the Ninth Circuit

1  remanded for findings as to why the Court rejected the request for the two-level reduction.  More

2  critically, the Court found that the jury did not decide whether to believe McKittrick's claimed lack of

3  knowledge as to whether it was a dog or a protected wolf.  *Id.*  In contrast, the jury necessarily had to

4  find the defendant's intent.  In short, this defendant contested the core factual elements of his case.

5       At bottom, this defendant has not manifested acceptance and indeed used his trial testimony to

6  blame the victims, who—in his version of the facts—"forced" the issue.  He bragged to the San

7  Francisco Police Department that his acts were caught on tape, and then later made the repugnant,

8  bragging statements to KTVU that the jury heard.  To date, the defendant has submitted no statement

9  accepting responsibility and the Court should reject his efforts to shoehorn himself into some "rare"

10 circumstance that does not apply here.

11      **C.      Terrorism enhancement**

12      The terrorism sentencing enhancement, U.S.S.G. § 3A1.4, applies here.  Section 3A1.4(a)

13 provides, as applicable, "If the offense is a felony that involved, or was intended to promote, a federal

14 crime of terrorism, increase by 12 levels . . . ."  Section 3A1.4(b) states that when this enhancement

15 applies, the defendant's criminal history category "shall be Category VI."  Application Note 1 states

16 "For purposes of this guideline, 'federal crime of terrorism' has the meaning given that term in 18

17 U.S.C. § 2332b(g)(5)."

18      18 U.S.C. § 2332b(g)(5), as applicable, defines "federal crime of terrorism" as

19           an offense that—

20                (A) is calculated to influence or affect the conduct of government by intimidation or
                 coercion, or to retaliate against government conduct; and

21                (B) is a violation of—

22                     (i) . . . subsection (a), (b), (c), or (d) of section 351 (relating to congressional, cabinet,
23                     and Supreme Court assassination and kidnaping) . . . .

24 18 U.S.C. § 351(c) states "Whoever attempts to kill or kidnap any individual designated in subsection

25 (a) of this section shall be punished by imprisonment for any term of years or for life."  Section 351(a)

26 includes "any individual who is a Member of Congress."  Therefore, a "federal crime of terrorism"

27 includes the attempted kidnapping of a Member of Congress in violation of 18 U.S.C. § 351(c) if that

28 offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or

1  to retaliate against government conduct."

2      The defendant's conviction on Count One, attempting to kidnap Speaker Pelosi on account of the

3  performance of her official duties in violation of 18 U.S.C. §§ 1201(a)(5), (d), was clearly intended to

4  promote a federal crime of terrorism, that is, attempting to kidnap a Member of Congress "to influence

5  or affect the conduct of government by intimidation or coercion, or to retaliate against government

6  conduct."  The defendant's own post-arrest statements confirm this:  he intended to kidnap Speaker

7  Pelosi because she was the "leader of the pack" and because of all of the lies coming out of Washington.

8  PSR ¶ 15.  He planned to break her kneecaps to teach her a lesson that her "endless . . . lies and

9  corruption had a price."  Trial Ex. 5.  The defendant stated that "every time [Speaker Emerita Pelosi]

10  goes into Congress every other f--ing corruption piece of s--t in there is going to see her wheeling in a

11  wheelchair, and they're going to realize that this f--cking consequence for being the most evil f--cking

12  people on the planet."  Trial Ex. 5.  This clearly evinces the defendant's intention to influence or affect

13  the conduct of government by intimidation and coercion, as well as his intention to retaliate against

14  government conduct.  Indeed, the jury's conviction on both Counts One and Two prove beyond a

15  reasonable doubt that the defendant was motivated by Speaker Emerita Pelosi's performance of her

16  official duties, and that he assaulted Mr. Pelosi intending to impede, intimidate, or interfere with

17  Speaker Emerita Pelosi's official duties, or with intent to retaliate against Speaker Emerita Pelosi on

18  account of the performance of her official duties.[1]

19      Numerous courts have held that a defendant need not be convicted of one of the enumerated

20  federal crimes of terrorism for § 3A1.4 to apply under the "intended to promote" prong of this guideline,

21  as long as the defendant intended in the substantive counts of conviction or his relevant conduct to

22  promote a federal crime of terrorism.  *See United States v. Ashqar*, 582 F.3d 819, 826 (7th Cir. 2009)

23

24      [1]  In the alternative, the Application Note 4 to U.S.S.G. § 3A1.4 provides that an upward
25  departure is warranted where "the offense was calculated to influence or affect the conduct of
   government by intimidation or coercion, or to retaliate against government conduct but the offense
26  involved, or was intended to promote, an offense other than one of the offense specifically enumerated
   in 18 U.S.C. § 2332b(g)(5)(B)."  To the extent that the Court does not apply the terrorism enhancement,
27  it should apply an upward departure under this provision.  *See United States v. Cottrell*, 312 Fed. App'x
   979 (9th Cir. 2009) (upholding upward adjustment pursuant to this note because defendant's criminal
28  acts, arson and conspiracy to commit arson in violation of 18 U.S.C. § 844(i), (n), were intended to
   intimidate or coerce the public).

USA's SENTENCING MEMORANDUM
3:22-CR-426-JSC                    10

1  (applying enhancement to conviction for obstruction of justice and criminal contempt); *United States v.*

2  *Hale*, 448 F.3d 971, 988 (7th Cir. 2005) ("That Hale did not commit a federal crime of terrorism is

3  irrelevant; the district court found that the purpose of his soliciting [a cooperating witness to kill a

4  possible witness against Hale] was to promote a federal crime of terrorism—the murder of a federal

5  officer or employee."); *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) (holding that

6  "intended to promote" means that the enhancement applies if the goal or purpose was to bring or help

7  bring into being a federal crime of terrorism); *United States v. Graham*, 275 F.3d 490, 524-19 (6th Cir.

8  2001) (enhancement applied to 18 U.S.C. § 371 conspiracy charge); *see also United States v. Awan*, 607

9  F.3d 306, 314 (2d Cir. 2010) (holding that "intended to promote" prong applies where defendant's

10  offense was "intended to encourage, further, or bring about a federal crime of terrorism" even if crime of

11  conviction is not a federal crime of terrorism).  Defendant intended to promote a federal crime of

12  terrorism and therefore, the terrorism enhancement should apply here.

13  　　Applying the terrorism enhancement in § 3A1.4 along with the official victim enhancement in

14  § 3A1.2 is not impermissible double counting, as the defendant claims in their fourth objection to the

15  PSR.  The Ninth Circuit instructs "that a court must generally apply all applicable Guidelines provisions,

16  regardless whether the same act triggers multiple provisions."  *United States v. Joey*, 845 F.3d 1291,

17  1295 (9th Cir. 2017).  That Court has "routinely upheld the cumulative application of Guidelines

18  provisions over claims of 'impermissible double counting' so long as the application was consistent with

19  the relevant Guidelines instructions."  *Id*.  Indeed, the Court emphasized that "the Sentencing

20  Commission expressly indicates when Guidelines provisions are not to be applied cumulatively" and if

21  they do not so indicate, there is no impermissible double counting.  *Id*.[2]

22  　　Other courts have held that applying the terrorism enhancement to offense levels for specific

23  terrorism charges is not impermissible double counting.  *See United States v. Meskini*, 319 F.3d 88, 91-

24

25  　　[2]  Moreover, to the extent that the defendant argues that certain Guidelines enhancements should
not apply because they overlap with the elements of the counts of conviction, the Ninth Circuit states

26  that it has "never held that a district court erred in applying an otherwise relevant Guidelines provision
merely because the same conduct triggering the Guidelines provision satisfied an element of the

27  offense."  *United States v. Joey*, 845 F.3d 1291, 1296 (9th Cir. 2017).  "[T]he proper comparison to
determine whether impermissible double-counting occurred is between the applicable guidelines

28  provisions, not between the guidelines provisions and the criminal code."  *United States v. Williams*, 14
F.3d 30, 32 (9th Cir. 1994) (internal quotation and citation omitted).

92 (2d Cir. 2003) (rejecting argument that the terrorism enhancement and the offense level, based on a conviction for conspiracy to provide material support to a terrorist act, together resulted in impermissible double counting because "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.  Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category."); *United States v. Hammoud*, 381 F.3d 316, 356 (4th Cir. 2004) (finding no impermissible double counting for applying terrorism enhancement to offense level under § 2M5.3, for providing material support to a foreign terrorist organization), vacated and remanded for consideration of Booker, and affirming prior guidelines calculation in *Hammoud v. United States*, 483 Fed. Appx. 865 (4th Cir. 2012).

The Guidelines do not include any language prohibiting the application of both the official victim enhancement in § 3A1.2 and the terrorism enhancement in § 3A1.4.  Under Ninth Circuit precedent, applying both provisions is not impermissible double counting.  *Joey*, 845 F.3d at 1295. Additionally, the enhancements address different conduct: targeting a government officer or their family member where the offense was motivated by the officer's status may not be for the purpose of influencing or affecting the conduct of government conduct, or retaliating against government conduct, which is addressed by the terrorism enhancement.  And not all crimes to which the terrorism enhancement applies are targeted at official victims.  As the Ninth Circuit provided in *United States v. Smith*, 719 F.3d 1120, 1125 (9th Cir. 2013), the court "may infer that two provisions do not serve unique purposes under the Guidelines, and that the Commission did not intend them to be applied cumulatively, only when the provisions are co-extensive or one provision entirely subsumes the other."  These two enhancements take account of separate offense characteristics and should therefore both be applied.

## II.      Sentencing Recommendation and Factors

### A.       The Government's Recommendation

The government recommends that the Court impose the statutory maximum sentences on each count, which is 20 years on Count 1 and 30 years on Count 2.  The statutory maximums are appropriate

1   for the reasons discussed below.  Those same factors that warrant the statutory maximums also weigh in

2   favor of the Court imposing a sentence in which 20 years of Count 2 run consecutive to the 20 years on

3   Count One.  The resulting sentence is 40 years of custody.

4         At the outset, the Guidelines speak to the question of when to run sentences concurrently or

5   consecutively on multiple counts of conviction.  U.S.S.G. § 5G1.2.  As relevant to this case, the

6   Guidelines state:

7         If the sentence imposed on the count carrying the highest statutory
          maximum is less than the total punishment, then the sentence imposed on
8         one or more of the other counts shall run consecutively, but only to the
          extent necessary to produce a combined sentence equal to the total
9         punishment. In all other respects, sentences on all counts shall run
          concurrently, except to the extent otherwise required by law.
10

11  U.S.S.G. § 5G1.2(d)

12        **B.**     **Section 3553(a) factors**

13        Balancing the 18 U.S.C. § 3553(a) factors demonstrates that the significant sentence that the

14  government recommends is warranted.  It also demonstrates that the Court should impose a period of

15  consecutive sentences.

16              **1.**      **The Nature and Circumstances of the Offense**

17        The nature and circumstances of the offense warrant statutory maximums on each count. The

18  core of both crimes—the attempted kidnapping of a public official and the assault on the family member

19  of a public official—is violence aimed at punishing the former Speaker of the House of Representatives.

20  Both crimes are an assault on our democracy and fundamental values.  The jury rejected the defendant's

21  contentions that he was motivated by something other than the Speaker Emerita's official position, but

22  even taking his own statements as true for a moment, the defendant claimed that he went to the Pelosi's

23  home to inflict violence on the Speaker Emerita.  He wanted to teach a lesson.

24        The violent lessons that the defendant wanted to teach are not permitted in this country, and the

25  sentence that this Court imposes must reflect the nature and circumstances of the offense.

26              **2.**      **History and Characteristics of the Defendant**

27        There is nothing about the history and characteristics of the defendant that warrant leniency.  The

28  defendant has admitted—indeed bragged—that he knew what he was doing when he packed his bags

USA's SENTENCING MEMORANDUM
3:22-CR-426-JSC                        13

1  and went to the Pelosi's home.

2       The government acknowledges that the defendant had difficult relationship with his biological

3  father and then with a romantic partner.  To the extent that these relationships bear on the instant

4  offense, it appears to be because of some amount of isolation.  To be sure, isolation may have led the

5  defendant to spend time on YouTube and consuming media that led him to adopt the views that

6  motivated his actions.  But the defendant's history and characteristics do not excuse the instant offense,

7  nor give a reason for leniency given the violent extremism that the defendant unleashed in October

8  2022.

9              **3.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense,
                        Promote Respect for the Law, and to Provide Just Punishment for the**

10                      **Offense.**

11      The justification for these factors overlaps with the nature and circumstances of the offense.

12  Because of the nature and circumstances of the offense, there is a real need for the sentence to reflect the

13  seriousness of both the attempted kidnapping and the violence that the defendant contemplated there,

14  and also for the actual impact that the crimes caused.  Mr. Pelosi is a brave man who has fought hard to

15  recover his health after nearly dying at the defendant's hands.  However, it is certain that Mr. Pelosi will

16  never regain the quality of his physical or emotional life that he had prior to October 22, 2022.  The

17  impact of course, goes beyond Mr. Pelosi to his wife and to his children who live with the reality of

18  what almost happened and what did happen—and what might have happened had the hammer hit just a

19  centimeter to the side.

20      The need to promote respect for the law is particularly relevant in this case, given that the

21  defendant's October 22, 2022, actions were an attack themselves on democracy and our institutions.

22  The defendant intended to make a statement.  He came prepared with the tools he needed to broadcast

23  his hostage-taking to the world.

24              **4.      The Need to Afford Adequate Deterrence**

25      The sentence imposed must accomplish both specific and general deterrence.  As a matter of

26  specific deterrence, the defendant still seems upset that he did not unleash his plan as to Target 1 or his

27  other targets.  He wanted to get more of "them."  Of course, this overlaps with his failure to accept

28  responsibility, and it leaves the clear impression that this defendant has not been deterred, and the

1  government's recommended term will assist in specifically deterring the defendant, because he will

2  remain in custody for most of his adult life.

3          General deterrence is also critical here.  At a time when extremism has led to attacks on public

4  and elected officials, this case presents a moment to speak to others harboring ideologically motivated

5  violent dreams and plans.   This case presents strong deterrent value to say that violent ideological

6  attacks will be punished to the full extent of the law.

7                    **5.       The Need to Protect the Public**

8          Here, it is not the public that needs protecting, but the public officials.  Our public officials

9  should not live in fear of their lives, but attacks like the defendant's breed fear and dissuade people from

10  running for office or otherwise taking roles in the public sphere.  At this moment in time, this defendant

11  continues to present as a strong risk—to the Speaker Emerita and others—because of his failure to

12  accept responsibility.

13                 **6.       The Need to Avoid Unwarranted Sentencing Disparities**

14          Because the nature and circumstances of the offense were rooted in unlawful violence motivated

15  by punishment of an elected official and her spouse, thankfully there are few examples of similar

16  conduct in this district or elsewhere.  One recent example in this District is the life sentence that the

17  Honorable Yvonne Gonzalez Rogers imposed on Robert Justus, for driving the van from which co-

18  defendant Steven Carrillo fired a drive-by shot on court security officers guarding an entrance to the

19  federal courthouse in Oakland on May 29, 2020.  Dkt. 365, CR 20-265 YGR.  Carrillo and Justus were

20  adherents of the extremist "boogaloo" movement and plotted to attach the courthouse as part of their

21  anti-government ideology.  *See* Dkt. 358, CR. 20-265 YGR (Government Sentencing Memo).  Justus did

22  not pull the trigger and was given a life sentence.  Previously, Carrillo, who is subject to a life term for a

23  related murder of a sheriff's deputy shortly after his murder of the federal court officer, accepted a

24  binding plea deal to forty-one years in prison.  Dkt. 166, CR 20-265 YGR.  In accepting that plea deal,

25  the Court indicated that the life sentence on the state case was a factor in accepting the resolution.

26          In *United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2005), Matthew Hale was convicted of two

27  counts of obstructing justice and one count of soliciting a crime of violence in connection with his

28  resistance to a judgment entered against his white supremacist organization by United States District

USA's SENTENCING MEMORANDUM
3:22-CR-426-JSC                              15

1   Judge for the Northern District of Illinois Joan Lefkow and his involvement in a plot to have the judge

2   murdered.  Hale was sentenced to 40 years' imprisonment, and his conduct did not result in any actual

3   serious injury, unlike the defendant's conduct here.  *Id*. at 974.

4   **CONCLUSION**

5          The defendant planned a violent hostage-taking of the Speaker Emerita, and then nearly killed

6   her husband.  The defendant planned and unleashed violence and has stayed true to his belief that his

7   actions were necessary.  The sentencing factors compel the statutory maximums recommended here, and

8   demonstrate that the 30 years maximum on the count with the most significant statutory maximum is not

9   sufficient to meet the sentencing goals; accordingly, the government recommends that the Court impose

10  a term of 20 years on Count One (attempted kidnapping) and 30 years on Count Two (assault), with 20

11  years on Count Two to run consecutive to Count One.  The Court should also impose a term of three

12  years of supervised release on Count One and five years on Count 2, and a $100 special assessment per

13  count.

14  DATED:  May 10, 2024                                Respectfully submitted,

15                                                      ISMAIL J. RAMSEY
                                                        United States Attorney
16
                                                           /s/
17                                                      HELEN L. GILBERT
                                                        LAURA VARTAIN HORN
18                                                      Assistant United States Attorneys

19

20

21

22

23

24

25

26

27

28