JODI LINKER, Bar Number 230273
Federal Public Defender
Northern District of California
ANGELA CHUANG, Bar Number 313445
Assistant Federal Public Defenders
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:        Angela_Chuang@fd.org

Counsel for Defendant DePape

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 22–426 JSC |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| DAVID WAYNE DEPAPE, | **Court:**          Courtroom 8, 19th  Floor |
| Defendant. | **Hearing Date:**   May 17, 2024 |
| | **Hearing Time:**   10:00 a.m. |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................................... i

INTRODUCTION .................................................................................................................... 1

ARGUMENT ............................................................................................................................ 1

    I.      Mr. DePape's Objections To The PSR ..................................................................... 1

            A.      Mr. DePape Should Receive A Two-Level Reduction In The Offense Level For Acceptance Of Responsibility Under U.S.S.G. § 3E1.1(a) .................................. 1

    II.     A Sentence of 168 Months (14 Years) Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of §3553(a) .............................................. 3

            A.      The nature and circumstances of the offense ........................................ 4

            B.      Mr. DePape's history and characteristics ........................................... 5

            C.      The need to avoid unwarranted sentencing disparities ....................... 13

    III.    The Court Should Order That Mr. DePape's Federal Sentence Run Concurrently With Any Future State Sentence In His Pending State Case And Reduce The Federal Sentence By The Time He Has Spent In Presentence Custody .................................... 20

            A.      This Court has the authority to order a federal sentence to run concurrently with a state sentence that has yet to be imposed ......................................... 20

            B.      If this Court stays silent on whether the federal sentence should be concurrent with a future state sentence, the sentences will run consecutively ..................... 20

            C.      The Court should order that Mr. DePape's sentence run concurrently with any future state sentence in his pending state case to avoid precluding concurrent sentences .................................................................................................. 21

            D.      The Court should reduce Mr. DePape's federal sentence by 18 months and 20 days to account for the time that he has spent in presentence custody .............. 22

CONCLUSION .......................................................................................................................... 23

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**

3

*Gall v. United States,*

4
    558 U.S. 38 (2007) ........................................................................................... 4

5

*Kimbrough v. United States,*
    128 S. Ct. 558 (2007) ...................................................................................... 3

6

7

*Rita v. United States,*
    551 U.S. 338 (2007) ........................................................................................ 4

8

9

*Setser v. United States,*
    566 U.S 231 (2012) ................................................................................. 20, 22

10

*Taylor v. Reno,*

11
    164 F.3d 440 (9th Cir. 1998) ......................................................................... 21

12

*United States v. Booker,*
    543 U.S. 220 (2005) ..................................................................................... 3, 4

13

*United States v. Broussard,*

14
    987 F.2d 215 (5th Cir. 1993) ........................................................................... 2

15

*United States v. Carty,*

16
    520 F.3d 984 (9th Cir. 2008) ........................................................................... 3

17

*United States v. Fells,*
    78 F.3d 168 (5th Cir. 1996) ............................................................................. 2

18

19

*United States v. Luong,*
    965 F.3d 973 (9th Cir. 2020) ........................................................................... 2

20

*United States v. McKittrick,*

21
    142 F.3d 1170 (9th Cir. 1998) ......................................................................... 2

22

*United States v. Robinson,*
    942 F.3d 767 (7th Cir. 2019) ........................................................................... 2

23

24

*United States v. Rojas-Flores,*
    384 F.3d 775 (9th Cir. 2004) ........................................................................... 2

25

26

27

28

**Federal Statutes**

18 U.S.C. § 231 ................................................................................................. 14, 15, 16

18 U.S.C. § 372 ................................................................................................. 14, 15, 16

18 U.S.C. § 1361 ............................................................................................... 14, 15, 16

18 U.S.C. § 1512 ............................................................................................... 14, 15, 16

18 U.S.C. § 2384 ............................................................................................... 14, 15, 16

18 U.S.C. § 3553 ............................................................................................... 1, 3, 4, 23

18 U.S.C. § 3584 ............................................................................................................ 20

18 U.S.C. § 3585 ............................................................................................................ 22

18 U.S.C. § 3621 ............................................................................................................ 22

**United States Sentencing Guidelines**

U.S.S.G. § 3E1.1 .......................................................................................................... 1, 2

U.S.S.G. § 5G1.3 ............................................................................................... 20, 22, 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Mr. DePape comes before this Court following conviction at trial in November 2023. The crimes he committed in this matter and determination of the appropriate sentence must be viewed through a lens that takes into consideration the unique history and surrounding circumstances that ultimately led to his actions. His entire adult life was indelibly shaped and distorted by an abusive, long-term relationship with a partner who exploited his innate vulnerabilities and immersed him in a world of extreme beliefs where reality is not reality. Her influence began at a formative and critical period in his life and extended far beyond the end of their relationship leaving him completely unmoored in the years leading up to the offense, when he was further radicalized through his obsessive consumption of media amplifying extreme beliefs.

In light of this context, Mr. DePape respectfully requests that the Court impose a sentence of 168 months. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

**ARGUMENT**

**I.    Mr. DePape's Objections To The PSR**

As noted in the addendum to the Presentence Report ("PSR"), there remain several unresolved objections to the Offense Level calculation. *See* PSR Addendum ¶¶ 5–12. Mr. DePape maintains Objections Two and Three (opposing victim-related adjustments), and Objection Four (opposing an upward departure under § 3A1.4) for the reasons laid out in the PSR. *Id.* ¶¶ 7, 9, 11. He supplements Objection Number One below.

**A.    Mr. DePape Should Receive A Two-Level Reduction In The Offense Level For Acceptance Of Responsibility Under U.S.S.G. § 3E1.1(a)**

Mr. DePape acknowledges that he is not eligible for a third acceptance of responsibility point under U.S.S.G. § 3E1.1(b), but maintains that he should receive a two-level reduction for acceptance of responsibility pursuant to § 3E1.1(a).

Conviction at trial does not always preclude a defendant from an Offense Level reduction for acceptance of responsibility. In "rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even if he exercises his constitutional right to a trial." U.S.S.G. § 3E1.1 n.2. One such situation is where "a defendant goes to trial to assert… issues that do not relate

to factual guilt," such as "a challenge to the applicability of a statute to his conduct." *Id.* The Ninth

Circuit has held that a defendant who does not contest factual guilt but presents a legal defense at trial

contesting the applicability of a federal statute to his conduct is not precluded from receiving an

adjustment for acceptance of responsibility. *See United States v. Luong*, 965 F.3d 973, 992 (9th Cir.

2020) ("Here, Luong admitted factual guilt, but proceeded to trial to assert that his offense conduct

did not fall within the scope of the Hobbs Act's jurisdictional nexus. Challenging the federal

government's jurisdiction to prosecute the alleged offense conduct is not inconsistent with

contrition."); *see also United States v. Rojas-Flores*, 384 F.3d 775, 780–81 (9th Cir. 2004) (holding

that defendant was entitled to reduction for acceptance of responsibility where defendant did not

dispute that he possessed a weapon but only contested whether the definition of "weapon" in the

charged statute covered what he possessed).[1] Similarly, the Ninth Circuit has also found that

challenging an intent element—but not contesting conduct—does not disqualify a defendant from

receiving a reduction for acceptance of responsibility. *United States v. McKittrick*, 142 F.3d 1170,

1178, 1178 (9th Cir. 1998) ("McKittrick's was such a trial [described in Application Note Two] - he

contended that the regulations were invalid or inapplicable and that they required a level of intent he

did not possess. Therefore, McKittrick was eligible for a section 3E1.1 reduction.").

Here, Mr. DePape has never contested factual guilt for the conduct in the case. To the contrary,

beginning at his arrest and consistently since then, including in an interview with the police shortly

after his arrest and in his trial testimony, he has always truthfully and openly admitted his criminal

conduct in breaking into the Pelosi's home in an attempt to find Ms. Pelosi and assaulting Mr. Pelosi

with a hammer. The only element he contested at trial was the intent element required by the two

federal statutes charged in this matter, arguing that these specific statutes did not apply to his

admitted conduct. He did not contest the *actus reus* of the charged offenses. The Probation Officer's

---

[1] Other Circuits have held similarly. *See, e.g.*, *United States v. Robinson*, 942 F.3d 767, 771 (7th Cir. 2019) (citing cases and noting "a district court may deny a reduction if a defendant 'falsely denies, or frivolously contests' the court's factual findings. Legal arguments are not a valid basis for denying a reduction.") (emphasis in original); *United States v. Broussard*, 987 F.2d 215, 224 (5th Cir. 1993) (agreeing that defendant who had challenged the applicability of the statute to the facts, but had not challenged factual guilt, had accepted responsibility for his conduct); *United States v. Fells*, 78 F.3d 168, 171 (5th Cir. 1996) (defendant challenging whether underlying facts constituted "possession in and affecting interstate commerce" under the statute fell within the Application Note Two exception).

response to Objection Number One points to Mr. DePape's January 2023 phone call to a KTVU reporter, but that should not be a reason to deny him a reduction for acceptance of responsibility. That phone call occurred early in the case, a mere three months after the offense. In most federal criminal cases, defendants have not pleaded guilty that early on and many do not admit factual guilt until much more time has passed, but still routinely receive reductions for acceptance of responsibility. Mr. DePape, on the other hand, has always admitted his factual guilt and did not deny his criminal conduct in that call. Furthermore, he has since shown clear remorse for his actions, as demonstrated by his trial testimony, during which he explained that he felt "really scared for [Mr. Pelosi's] life," "felt ready [sic] bad for him," and expressed a desire to apologize for what he had done. Tr. 750:6–750:22. He should receive a two-level reduction for his early and consistent acceptance of responsibility for his conduct.

## II.   A Sentence of 168 Months (14 Years) Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)

In sentencing Mr. DePape, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also directs the Court to consider additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing Guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

Under *Booker*, the sentencing court must impose the lowest reasonable sentence that fulfills the goals of Congress, unencumbered by offense levels, criminal history, or the availability of authorized downward departures. While the Court may apply a presumption of reasonableness to sentences within the applicable Guidelines range, the district court "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007). Nor is it required to use a formulaic approach yielding a mathematical justification of non-Guidelines sentences. *See Gall v. United States*, 558 U.S. 38, 49 (2007). Rather, it must exercise "reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors." *Rita*, 551 U.S. at 358.

Mr. DePape agrees that his Criminal History Category ("CHC") is I based on zero criminal history points. *See* PSR ¶ 54. He disputes the PSR's calculation of a final offense level of 42, as discussed above and in the PSR Addendum. *See* PSR Addendum ¶¶ 5–12. The PSR's resulting advisory Guidelines range is 360 months–life. *Id.* ¶ 87. If the Court gives Mr. DePape a two-level reduction for acceptance of responsibility, but applies the victim-related enhancements, the final offense level would be 40 and the resulting advisory Guidelines range would be 292–365 months. If the Court sustains all of Mr. DePape's objections, the final offense level would be 34 and the resulting advisory Guidelines range would be 151–188 months.

## A.     The nature and circumstances of the offense

Following a trial in November, Mr. DePape was convicted of one count of Attempted Kidnapping of a Federal Officer or Employee and one count of Assault on the Immediate Family Member of a Federal Official.

After presiding over this matter through pre-trial litigation, a jury trial, and post-trial motions, the Court is already familiar with the charges and background of this case. To summarize briefly, Mr. DePape broke into the Pelosis' house early in the morning on October 28, 2022. PSR ¶ 8. He was looking for then-Speaker Nancy Pelosi, who he planned to question on video about lies that she had told. *See id.* ¶ 15. He later told police that if she had lied, he would have broken her kneecaps. *Id.* At the time he broke into the house, unbeknownst to him, Ms. Pelosi was not home. *Id.* ¶ 9. Mr. DePape found her husband, Paul Pelosi, sleeping in the bedroom. *Id.* After Mr. Pelosi woke up and told Mr.

1  DePape that his wife was not home, Mr. Pelosi called 911. *Id.* When the SFPD arrived at the house,

2  Mr. Pelosi opened the door with his other hand on a hammer that Mr. DePape had brought with him

3  and had used to break into the house. *Id.* ¶ 10. Immediately thereafter, Mr. DePape hit Mr. Pelosi on

4  the head with the hammer. *Id.* The police then tackled and arrested Mr. DePape. *Id.*

5      Mr. DePape has always acknowledged, including at trial, that he committed serious crimes that

6  night. In particular, what he did to Mr. Pelosi was inexcusable but not what Mr. DePape had set out to

7  do. Hurting Mr. Pelosi in any way, let alone as seriously as he did, was not part of his plan and not

8  what he intended. Mr. DePape has openly expressed remorse and continues to feel great remorse

9  about the injuries and other harms he inflicted on Mr. Pelosi, who was not one of his targets. Mr.

10  DePape's actions that night were part of a larger, ill-conceived plan that he had developed to confront

11  those who he viewed as promoters and participants in an elite cabal of corrupt individuals, many of

12  whom he believed engaged in or played a pivotal role in covering up child sexual abuse and other

13  crimes. *See id.* ¶ 17. There is no doubt that his beliefs, as extreme and bizarre as they may appear to

14  those who do not share them, were deeply held and drove him to engage in criminal conduct that

15  anyone who knew him before would describe as completely out of character.

16      **B.    Mr. DePape's history and characteristics**

17      How Mr. DePape became so embroiled in the beliefs that led to his destructive behavior—

18  beliefs that many view as conspiracy theories—is crucial to understanding how Mr. DePape came to

19  do what he did that night. Like anyone else, who he is as a person stems from a unique combination

20  of nature and nurture. In his case, his innate characteristics (including neurodiversity and previously

21  undiagnosed mental health issues) made him particularly susceptible to manipulation and to unusual

22  beliefs. When combined with external factors in his life, including the insidious influence of an

23  abusive, controlling partner who filled his head with conspiracy theories and engineered his

24  estrangement from his family for most of his adult life, followed by his obsessive consumption of

25  right-wing media that amplified similar theories demonizing the people who ended up on his target

26  list, it created a perfect storm, all of which provides valuable insight on how he ended up here as well

27  as a potential way forward.

28      Mr. DePape's beliefs did not come out of nowhere. His development of those beliefs must be

1   understood in context, that context being the reality that similar beliefs have taken root and have

2   flourished amongst large swaths of the American public for the better part of the last decade. Defense

3   counsel submits in conjunction with this memorandum an expert report explaining that larger context

4   and analyzing Mr. DePape's particular psychological profile in relation thereto. *See* Declaration of

5   Angela Chuang in Support of Defendant's Sentencing Memorandum ("Chuang Decl."), Ex. A

6   (Expert Report). The authors, Drs. Mia Bloom and Sophia Moskalenko, are widely-recognized

7   experts in extremism and radicalization who have extensively studied the proliferation of QAnon and

8   related conspiracy theories. A baseline QAnon belief is that "there is a secret cabal of child-abusing

9   pedophiles who control the world," including "'deep state' Democratic saboteurs (which includes the

10  Hollywood elites) who worship Satan and traffic children for torture with the goal of harvesting the

11  children's blood . . . ." *Id.* at 2. This cabal included celebrities like Tom Hanks, who was one of Mr.

12  DePape's targets based on his belief that Mr. Hanks is one of many Hollywood pedophiles who has

13  sexually trafficked young girls. *See id.* ("Many of these QAnon celebrities were on Mr. DePape's list

14  of individuals he wanted to expose for wrongdoing."). There is a striking similarity between the

15  spread of QAnon beliefs and the Satanic panic in the 1980's and 1990's, which convinced countless

16  people of the veracity of completely unfounded allegations of ritualistic and Satanic child sexual

17  abuse. QAnon beliefs have spread exponentially, particularly since they have been amplified and

18  promoted by Republican leaders and right-wing figures. *See id.* at 2 ( "[T]he QAnon conspiracy has

19  been especially appealing to Republicans, and their 'ideology' has been used to mobilize its adherents

20  around political figures such as their savior, Donald Trump."). Trump, for his part, has signaled his

21  support for QAnon, which would only further entrench his followers' beliefs in its theories,

22  considering how much of a public platform he has and his deification in QAnon ideology. *See id.* at 4

23  (describing how Trump posted images of himself wearing a Q lapel pin, shared a "Q drop"[2] with

24  millions of followers, and posted memes "substantiat[ing] the idea that he was a martyr fighting

25  criminals, psychopaths, and the deep state"). Mr. DePape's beliefs, as extreme as they may be, are

26

27  _____

28  [2] "Q drops" consist of cryptic messages posted on online forums by an anonymous person or group
    calling themselves "Q" that often are framed as riddles that followers are then challenged to decipher
    to reveal "the truth."

shared by tens of millions of Americans; polls suggest that "around 30 million American adults believe that there is a deep state of pedophile vampires who stole the election from Trump." *Id.*

Critically, in the months leading up to the offense charged here, Q re-emerged after a two-year hiatus in which there had been no Q drops, leading many to view it as "a sign that former president Trump was still pulling the strings behind the scenes and that his war against the Deep State was ongoing." *Id.* at 6. This Q drop included messages asking, "Are you ready to serve your country again"? and "Remember your oath." *Id.* The timing of Q's re-emergence into the public sphere coincides with when Mr. DePape began planning and preparing for his plan to confront the elite cabal of pedophiles and expose corrupt members of the deep state—precisely the types of evils that QAnon urges its followers to combat.[3]

Significantly, though perhaps unsurprisingly, there exists a strong correlation between belief in QAnon theories and mental health issues. *Id.* ("Research has shown that an overwhelming proportion of QAnon followers suffer from mental health problems . . . . It is highly likely that psychological pain makes people especially vulnerable to QAnon's content, which often speaks to fears, anxieties, and anger . . . . It is also likely that prolonged exposure to QAnon content exacerbates or even triggers mental illness. Watching video after video about horrific sexual and physical abuse of minors can have a detrimental effect on anyone's mental health."). Mr. DePape is but one example of this confluence between QAnon beliefs and mental health. Previously, he had never received any form of mental health treatment or diagnosis. He has now been diagnosed with ████████████████████ ████████████████████████████████, both of which he unknowingly was likely dealing with for most of his life. *Id.* at 14.

From a young age, Mr. DePape has felt uncomfortable in social situations, struggled with social situations, and has experienced difficulties developing relationships. *Id.* at 10. This trend continued into his adult life up until the time of the offense, as was apparent to the few people he interacted with at that point. *See* Chuang Decl., Ex. B (Letters of Support, Peter Luft Letter) ("We wondered if David's criminal action was at least partly the result of childhood trauma, his likely being on the

---

[3] QAnon adherents rarely self-identify as such, and Mr. DePape is no different. But his beliefs are consistent with QAnon theories.

1   autistic spectrum, and his (then) solitary private life spent almost entirely on right wing social

2   media."). These limitations, as well as displays of inappropriate affect, are indicative of a "pervasive

3   social deficit consistent with ███████████████████ *Id.* at 9. Mr. DePape's discomfort with

4   social interactions is also characteristic of ██████████████, as is "cognitive or perceptual

5   distortions and eccentricities of behaviors" as well as "odd beliefs or magical thinking." *Id.* Even

6   aside from the beliefs that spurred his actions in this matter, Mr. DePape holds a number of other

7   beliefs that many would find odd, including a belief that he could be the second coming of Christ and

8   that his ex-partner has been replaced by a body double working with government agents who have

9   followed him for years.

10      An understanding of the features and presentation of Mr. DePape's neurodiversity and mental

11   health are key in this case. Mr. DePape's affect immediately following his arrest seems strangely

12   devoid of emotion and he appears fairly even-keeled despite being in an immense amount of pain

13   from a dislocated shoulder. When he called KTVU to make a statement in January 2023, the tone of

14   his voice is similarly flat. But when he testified at trial, he broke down into tears at unexpected

15   moments in floods of emotion that he himself cannot explain. In a vacuum, others may perceive

16   behavior like this to reflect a lack of remorse or as proof that he is cold and calculating, when in fact,

17   it is entirely characteristic of someone with ██████████. *See id.* at 14 (describing ████ as

18   characterized by, *inter alia*, "difficulty in understanding emotional issues, including exaggerated

19   emotional response that can appear as outbursts" and ██████ as characterized by "limited or

20   incongruous affect"). This casts Mr. DePape's unusual emotional responses in a wholly different

21   light—they are manifestations of his innate neurodiversity and should be viewed as such rather than

22   as indicators that he is remorseless and uncaring. To the contrary, as he also expressed on the stand,

23   he has a great deal of remorse for what he did to Mr. Pelosi and hopes for his well-being.

24      Another characteristic of Mr. DePape's ████ that bears upon this case is his executive

25   dysfunction. *Id.* "In short, Mr. DePape does not seem to have the capacity expected of someone his

26   age to plan actions to meet goals to anticipate contingencies, or to plan for alternative outcomes. This

27   level of executive dysfunction is consistent with a developmental disorder, ████████████

28   ████████████." *Id.* One need look no further than his ill-conceived plan to see the impact of this

1  deficiency—it not only never occurred to Mr. DePape that Ms. Pelosi may not be home, but he was

2  completely unable to adapt once he learned she was not there. When the police arrived at the door

3  and derailed his plan, he similarly was unable to adapt to that unexpected contingency and reacted by

4  doing the first thing that occurred to him, which was to lash out violently at Mr. Pelosi.

5       Ultimately, what this all means is that Mr. DePape's ███████ made him "especially

6  vulnerable to believing QAnon conspiracy theories, and to being especially psychologically affected

7  by their content." *Id.* at 15. This conclusion is supported by empirical research showing not only that

8  "people with schizotypy . . . are more likely to subscribe to conspiracy theories" but also that "the

9  graphic and disturbing nature of online content discussing these conspiracy theories, which often

10  features images and descriptions of child torture and sexual abuse, may exacerbate, or trigger mental

11  health issues." *Id.*

12       But it was not just Mr. DePape's developmental and psychological disorders that made him

13  particularly susceptible to falling down the rabbit hole that he did. His long-term relationship with his

14  ex-partner, Gypsy Taub, inflicted immeasurable harm to his mental state and what little support

15  network he had in the form of his family. Meeting her completely changed his life, and his

16  subsequent relationship with her played a definitive role in taking him down the path that eventually

17  led here. When they met, he was just 20 years old—a naive, sheltered 20-year-old at that—and

18  she was over a decade older. *See* PSR ¶ 63. In short time, she cut him off from his family, accusing

19  them of torturing and sexually abusing Mr. DePape as an infant and child as part of Satanic cult

20  rituals. *Id.* She told him that his family "was a part of a widespread phenomenon of satanic cults

21  operating all around the US and Canada"[4] and that they had not only raped him as a child, but had

22  also literally crucified him by nailing his hands and feet to a cross. Chuang Decl., Ex. A (Expert

23  Report) at 16. She wrote inflammatory letters claiming that he had suffered this abuse and also that

24  he had had sexual relations with his twin sister. PSR ¶ 63. To be absolutely clear, these claims do not

25  contain even a shred of truth. But imagine the effect it would have on someone like Mr. DePape, who

26  was already socially isolated and susceptible to manipulation, to live for years with a partner who

27

28

---

[4] These claims are eerily reminiscent of QAnon beliefs.

1   reinforced over and over the idea that his family had abused him in the most horrific ways

2   imaginable. What would that have done to his grasp on reality?

3        Ms. Taub very intentionally became Mr. DePape's entire world once she successfully cut him

4   off from his family, a separation that continued throughout nearly his entire adult life. She was

5   domineering and controlling, using him to raise their three children while she occupied her time with

6   her "activism"—namely, spreading 9/11 conspiracy theories and the like. She verbally and

7   emotionally abused Mr. DePape for the many years that they lived together; she regularly called him

8   names and screamed at him for hours on end, denigrating and humiliating him. Chuang Decl., Ex. A

9   (Expert Report) at 10. She would randomly kick him out of the house, leaving him to fend for himself

10  by living out of a car or on the streets. *Id.* Though they were not privy to the abuse and gaslighting

11  that comprised Mr. DePape's daily life for nearly two decades, Mr. DePape's family still vividly

12  remembers how Ms. Taub's vitriol drove a wedge between them and Mr. DePape. *See* Chuang Decl.,

13  Ex. B (Letters of Support, Joanne Robinson Letter) ("He was in a partner situation with Gypsy for

14  many years where he was NOT ALLOWED to make contact with his family . . . . If he did, he was

15  yelled at for hours, kicked out of the house...etc."); Ex. B (Letters of Support, Shirley Lawrence

16  Letter) ("She was about ten years older than him. And in short order decided he couldn't have any

17  more contact with our family . . . . I'm sure my son now has PTSD . . . ."); Ex. B (Letters of Support,

18  Gene DePape Letter) ("[I]n 207 I got through at Christmas time his girlfriend Gypsy answered the

19  phone and started to scream at me that I abused David both sexually and physically . . . .").[5]

20       Ms. Taub was also the person who brought Mr. DePape into the world of conspiracy theories—

21  a terrifying world in which Satanic pedophile cults have infiltrated the highest levels of political and

22  cultural institutions for decades. Indeed, her embrace of conspiracy theories is so full-fledged that she

23  has fabricated a whole alternative narrative of what happened in this case, to the point where she has

24  created websites, streaming videos, and other online content "proving" that all of the evidence in the

25  case is fake and everything was "staged in a coverup by the police of a massive child sex abuse

26

27  _____

28  [5] This controlling, malevolent behavior is unfortunately typical for Ms. Taub. As the defense
    investigation uncovered, she did the same thing to her ex-husband to whom she was briefly married
    in the early 2010's, cutting him off from his family by convincing him that his parents had raped and
    tortured him since infancy. When she first met this ex-husband, he was 19 years old and she was 40.

1    operation she believes was taking place at the Pelosi residence." Chuang Decl., Ex. A (Expert Report)

2    at 17. She introduced him to the use of psychedelic drugs, ostensibly to help uncover truths and

3    recover purported repressed memories. *See id.* In reality, hallucinogens offered her another tool with

4    which to control others.

5         After their relationship had stopped being a romantic one, aside from the times when she

6    kicked him out of the house, Mr. DePape still continued to live with Ms. Taub for years raising the

7    three children. Even when she married another man, Mr. DePape lived with them, essentially

8    functioning as a live-in babysitter. When he finally left her for good, she punished him for it by

9    cutting him off from contacting the same children whom he had raised since birth. *See* PSR ¶ 63.

10    Until recently, he had not had contact with the children for years. But Ms. Taub did not stop there;

11    she went even further by giving the children hallucinogenic drugs and convincing them that Mr.

12    DePape had sexually abused them as infants. *Id.* These demonstrably false claims were not credible

13    or true at all.[6] Nonetheless, they caused incredible damage to both Mr. DePape and the children.

14         These false allegations have a direct link to the offense in this matter. In the months leading up

15    to the offense, Mr. DePape was able to resume communications with the oldest child, and learned not

16    only that these baseless accusations had been made against him but that the children actually *believed*

17    that he had done these horrible things to them. *See* Chuang Decl., Ex. A (Expert Report) at 11. This

18    revelation absolutely devastated him, as it would anyone, and particularly because these claims

19    involved allegations of child sexual abuse—the very evil that he believed he was combatting. This

20    was the last straw for Mr. DePape that, in combination with the lack of meaning in the rest of the life,

21    drove him to his criminal conduct here. At the time, as the Court knows, he was "living in squalid

22    conditions, with no stable employment or income, with no social interactions, spending most of his

23    waking hours in online spaces that describe horrific crimes against children." *Id.* Years of Ms. Taub's

24    destabilizing influence, along with his pre-existing neurodiversity and mental health issues, primed

25    him to believe all the things he heard about during hours upon hours of consuming online media

26    amplifying conspiracy theories that demonized public figures. After learning about the false

27    ——————————————

28    [6] Mr. DePape addressed the baselessness of these claims and their surrounding circumstances in
     detail in his Motion in Limine No. 5. Dkt. No. 88 at 8–10.

allegations against him, he fell into a deep depression and experienced suicidal ideation. PSR ¶ 72.
He did not care if he lived or died; his mission was a suicide mission. It is these life circumstances at
the time that made him ripe for radicalization. "Losing one's job and one's family, and becoming
homeless and alienated results in a vulnerable psychological state which opens people to radical
ideas, to memberships in radical groups, and to radical actions. Without protective factors and
desperate for connection, attention, and meaning, people can become radicalized when they are
'unfrozen.' This was the case for Mr. DePape." *Id.* at 15.

There is no more apt way to describe Ms. Taub's manipulation and influence on Mr. DePape's
life than "insidious." The trauma he experienced during their relationship has continued to impact
him significantly in the years since. That lasting harm was readily apparent even to those who never
met Ms. Taub, such as Mr. DePape's neighbor, Elizabeth Yates. *See* Chuang Decl., Ex. B (Letters of
Support, Elizabeth Yates Letter) ("I have no doubt that he was harmed by this relationship and that it
was the ultimate in confusion for him . . . . He told me that he was 'abused' in that relationship; he
used that word . . . . The one time he showed emotion (he sobbed) was when he described her
enjoying his pain."). The impact she had on the course of Mr. DePape's life and psyche cannot be
understated. As Dr, Moskalenko concludes:[7]

> With the social and psychological limitations of ███████████, Mr.
> DePape would have been ill-equipped to question, tamper or resist Ms.
> Taub's emotional intensity or her belief system. In a way, he was a perfect
> subject for her influence and for radicalization of belief guided by the
> conspiracy theories she eschewed. The news of her leading the three
> children he raised through a "memory recovery" psychedelic trip in which
> they saw him as a sexual abuser was likely the devastating "push factor"
> that made Mr. DePape move from radical beliefs to radical action in an
> attempt at redemption. Having analyzed Mr. DePape's case materials and
> interviewed both him and Ms. Taub, it is my opinion that Mr. DePape
> would never have developed his radical beliefs that culminated in his
> radical actions without Ms. Taub's supplying the conspiratorial content to
> inspire Mr. DePape's paranoia and delusions, supplying psychotropic
> substances to entrench these beliefs, isolating him socially, filling his life
> with uncertain, precarious and often deeply hurtful emotions, including
> cutting off his contact with his children and falsely accusing him of
> molesting them. Without Ms. Taub's influence, Mr. DePape would likely
> have had a far less tumultuous, unremarkable life.

---

[7] Mr. DePape urges the Court to review this report in its entirety, as it contains much more detail and
analysis than can be covered in this memorandum.

So where does one go from here? Doubtless, the Court is concerned about whether Mr. DePape would engage in violence again, and what measures can be put into place to stabilize him and reduce his risk of recidivism. To that end, Drs. Bloom and Moskalenko make several recommendations along those lines; these recommendations include limiting exposure to further negative influences; living in a supervised communal setting to avoid isolation and social alienation; engaging in work that he finds significant and meaningful; and participating in CBT as well as programming designed "to reduce or prevent radicalization in vulnerable individuals." *Id.* at 17–18. These recommendations make good sense and would go a long way towards helping to ensure that Mr. DePape's past traumas do not drive him to the extremes that they did here.

Letters from family and friends, as well as the evidence from the 44 years of Mr. DePape's life, reveal that Mr. DePape's actions here were aberrant and will not be repeated. His beliefs may not fundamentally shift, but his compulsion to act in this moment of extreme and unusual isolation and depression will never be repeated. His expressed remorse for his actions in harming another individual is genuine and his commitment to never do anything like this again is unwavering.

### C.    The need to avoid unwarranted sentencing disparities

As there are few cases, if any, with facts and circumstances directly similar to Mr. DePape's, to fulfil the sentencing statute's dictate that this Court "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," the Court should consider the sentences that have been imposed in the January 6 insurrection cases. There, the defendants were convicted of a vast conspiracy, involving hundreds of victims, including all Members of Congress, and involving severe harm to individuals, significant damage to property, and the most direct attack on democracy as could be imagined: the violent, planned, and orchestrated infiltration of the U.S. Capitol with the stated purpose of subverting the peaceful transfer of power that is at the heart of our democracy. Certainly, Mr. DePape's solo and unsophisticated conduct involving two victims and rooted in a firm, if not accurate, goal of protecting children and democracy—while undoubtedly harmful and dangerous—is not of the same scope, degree, and severity as the January 6 insurrection. The sentence should similarly be lower than the most extreme of those cases.

According to data released by the Department of Justice, it appears that out of the hundreds of defendants sentenced in January 6 cases, ten have been convicted and sentenced for sedition (18 U.S.C. § 2384). *See* https://www.justice.gov/usao-dc/capitol-breach-cases (last visited May 10, 2024). The sentences imposed for those ten defendants range from 3 to 22 years, with an average of approximately 11.5 years.[8]

The five *most serious sentences* imposed from the January 6 insurrection were between 15 and 22 years.

- The *highest* sentence imposed to date was for Enrique Tarrio, CR 21-175 TJK, who was the "primary organizer" of the January 6 insurrection; a "pernicious and "violence-oriented" leader, who used his celebrity and charisma to influence, organize, and execute a conspiracy to "forcibly stop the peaceful democratic transfer of power." CR 21-175, Doc. 855-1. Mr. Tarrio was convicted of seditious conspiracy (18 U.S.C. § 2384), conspiracy to obstruct an official proceeding (18 U.S.C § 1512(k)), obstruction of an official proceeding (18 U.S.C. § 1512(c)(2)), conspiracy to prevent an officer from discharging any duties (18 U.S.C. § 372), civil disorder (18 U.S.C. § 231(a)(3) and destruction of property (18 U.S.C. § 1361). The government recommended a sentence of 33 years (396 months) based on a Guidelines range of 360–life; the court sentenced him to 22 years (264 months).

- Elmer Rhodes, CR 22-015 APM, the founder and president of the Oath Keepers, led the conspiracy "to oppose by force the lawful transfer of power," "exploited his vast public influence" and "used his talents for manipulation to goad more than twenty other American citizens into using force, intimidation, and violence to seek to impose their preferred result on a U.S. presidential election." CR 22-015 APM, Doc. 565. He was convicted of was convicted of seditious conspiracy (18 U.S.C. § 2384),  obstruction of an official proceeding

---

[8] According to data analyzed by The Washington Post, judges have gone below the guidelines in 67 percent of the January 6 sentences. *See* https://www.washingtonpost.com/dc-md-va/2024/01/05/january-6-riot-sentences/ (last visited May 10, 2024). "Of 244 felony sentencings for all charges, the average sentence has been 41 months, or about 3½ years, The [Washington] Post's data shows. For those who pleaded guilty, the average felony sentence is now about 2½ years, but those who were convicted at trial received an average of 5 years in prison." *Id.*

1    (18 U.S.C. § 1512(c)(2)), and tampering with documents or proceedings (18 U.S.C. §

2    1512(c)(1)). The government recommended a sentenced of 25 years (300 months) based on

3    a Guidelines range of 262–327 months; the court sentenced him to 18 years (216 months).

4    • Ethan Nordean, CR 21-175 TJK, embraced his role as the leader of the "rally boys," as well

5    as his "reputation for doling out physical violence." He led a group of nearly 200

6    individuals to the Capitol, tore down the fence, defied law enforcement orders, and was

7    "here to use force against the government and lead what he viewed as a second American

8    Revolution—or as Nordean would call it, "seventeen-seventy-fucking-six." *Id*. at Doc. 855-

9    2. Mr. Nordean was convicted of seditious conspiracy (18 U.S.C. § 2384), conspiracy to

10   obstruct an official proceeding (18 U.S.C § 1512(k)), obstruction of an official proceeding

11   (18 U.S.C. § 1512(c)(2)), conspiracy to prevent an officer from discharging any duties (18

12   U.S.C. § 372), civil disorder (18 U.S.C. § 231(a)(3) and destruction of property (18 U.S.C.

13   § 1361). The government recommended a sentence of 27 years (324 months) based on a

14   guideline range of 324–405 months; the court sentenced him to 18 years (216 months).

15   • Joseph Biggs, CR 21-175 TJK, "was a vocal leader and influential proponent of the group's

16   shift toward political violence" who used his military experience and expertise to direct

17   others and gain tactical advantages. *Id*. at Doc. 855-3. In the days following the events he

18   broadcast that January 6 was a "warning shot to the government" and that the founding

19   fathers were "considered terrorists." *Id*. Mr. Biggs was convicted of seditious conspiracy

20   (18 U.S.C. § 2384), conspiracy to obstruct an official proceeding (18 U.S.C § 1512(k)), and

21   obstruction of an official proceeding (18 U.S.C. § 1512(c)(2)).  The government

22   recommended a sentence of 33 years (396 months) based on a Guidelines range of 360–life;

23   the court sentenced him to 17 years (204 months).

24   • Zachary Rehl, CR 21-175 TJK, led with Briggs and Nordean a march of approximately 200

25   individuals to the Capitol, and was the key communicator to others not in the District about

26   information on the ground. *Id*. at Doc. 855-4. He not only encouraged others to engage in

27   violence, he "personally assaulted law enforcement officers with a chemical irritant spray,"

28   and then lied about it while on the stand. *Id*. He was convicted of seditious conspiracy (18

1   U.S.C. § 2384), conspiracy to obstruct an official proceeding (18 U.S.C § 1512(k)),

2   obstruction of an official proceeding (18 U.S.C. § 1512(c)(2)), conspiracy to prevent an

3   officer from discharging any duties (18 U.S.C. § 372), civil disorder (18 U.S.C. § 231(a)(3)

4   and destruction of property (18 U.S.C. § 1361). The government recommended a sentence

5   of 30 years (360 months) based on a Guidelines range of 360–life; he was sentenced to 15

6   years (180 months)

7       Notably, another defendant, Kelly Meggs, CR 22-015 APM, who "literally led a military-style

8   stack of fourteen conspirators to breach the Capitol building," was the leader of the Florida Oath

9   Keepers and used that position to convince others that they should be willing to die for this because

10  "that's what the Patriots did by the thousands" during the Revolutionary War, was sentenced to 12

11  years. He was convicted of seditious conspiracy (18 U.S.C. § 2384), conspiracy to obstruct an official

12  proceeding (18 U.S.C § 1512(k)), obstruction of an official proceeding (18 U.S.C. § 1512(c)(2)),

13  conspiracy to prevent an officer from discharging any duties (18 U.S.C. § 372), tampering with

14  documents or proceedings (18 U.S.C. § 1512(c)(1)). The government recommended a sentence of 21

15  years (252 months) based on a Guidelines range of 210–262 months; he was sentenced to 12 years.

16      The remaining four defendants who were also convicted of seditious conspiracy were sentenced

17  to 4.5 years (Roberto Minuta, CR 22-15 APM); 3.5 years (Joseph Hackett, CR 22-15 APM); and 3

18  years (Edward Vallejo and David Moerschel, CR 22-15 APM).

19      In other words, only five January 6 defendants—those with the most serious conduct—have

20  been sentenced to fifteen years or more. Those defendants were convicted of conduct that "threatened

21  the bedrock principles of our country—democracy and the rule of law;" a "vast" conspiracy that

22  "organized and directed a force of nearly 200 to attack the heart of our democracy;" and conduct that

23  "directly harmed individuals on January 6: Congress, legislators, the staffers working inside the

24  Capitol building and the hundreds of law enforcement officers from across the region valiantly trying

25  to protect the building, the people, and the constitutional process." *United States v. Tarrio*, et al, CR

26  21-175 TRK, Doc. 855. The government summarized the insurrection case as follows:

27          Having already ravaged the streets of Washington, D.C. with violence on
        two prior occasions in the fall of 2020, Tarrio, Biggs, Nordean, and Rehl
28      hand-selected "rally boys," including Pezzola, for their return on January
        6, 2021. They established a chain of command in which the directives of

leadership would be followed without question. They chose the time and place for action—leading their men to a vulnerable entrance on the west front of the Capitol when most other rally-goers were focused on then-President Donald Trump's speech almost a mile away. They arrived shortly before 1 p.m.—the appointed hour for the Certification to begin. These defendants and the men in their command saw themselves as the foot soldiers of the right—they were prepared to use, and they did use, force to stop the "traitors" from stealing the election. On May 4, 2023, twelve jurors found each defendant guilty for their calculated efforts to oppose the lawful transfer of presidential power.

The defendants and the men they recruited and led participated in every consequential breach at the Capitol on January 6. They began their assault that day at 10 a.m., when Nordean, Biggs and Rehl marched an assembled group of nearly 200 individuals away from the speeches at the Ellipse and directly to the Capitol. They arrived at the First Street gate at 12:50 p.m., and Biggs led the crowd in chants of "Whose Capitol? Our Capitol!" and "Whose house? Our house!" Within three minutes, Nordean, Biggs, Rehl, and Pezzola helped lead the charge up the first street walkway with their men throwing aside bike racks and laying waste to anything that stood in their path. As Biggs proudly declared, "we've gone through every barricade thus far." When the police attempted to reform a line, Nordean and Biggs moved to the front and again led the way. They violently tore down a black metal fence and continued their assault on the Capitol. Nearly an hour later, at approximately 1:30 p.m., when law enforcement appeared to have successfully controlled the crowd by pushing them back, the men again pushed forward. Nordean, Biggs, and Pezzola gathered at the base of the concrete stairs that led to the doors and windows of the Capitol with many of their co-conspirators and other men they had led to the Capitol. They again surged toward the Capitol and overwhelmed officers that had been battling the crowd for nearly an hour. Rehl sprayed an officer in the face. Pezzola smashed open a window, allowing the first rioters to enter the Capitol at 2:11 p.m., and Biggs entered close behind him with some of his men.

The defendants' leadership role was no accident. They viewed themselves as revolutionaries, and they believed fully in their cause. From the start of the riot, the defendants and their co-conspirators celebrated their achievement. Tarrio, who was monitoring the attack on the Capitol from afar as it unfolded, posted encouraging messages to his tens of thousands of social media followers, including the following messages: "Proud of my boys and my country," and "Don't fucking leave." Tarrio privately claimed credit for the riot at the Capitol, telling Proud Boys senior leadership, "Make no mistake . . . we did this." Biggs and Nordean posed with other Proud Boys on the west lawn of the Capitol for a celebratory video in which Biggs stated that "January 6 will be a day in infamy." Rehl made social media posts calling January 6 a "historical day," and he told his mother he was "so fucking proud" of the Proud Boys' "raid of the capitol." Pezzola, once inside the building, filmed a video of himself having a "victory smoke in the Capitol," and stating, "I knew we could take this motherfucker over if we just tried hard enough… Proud of your motherfucking boy."

The defendants' celebratory statements continued in the days that followed. On January 7, Tarrio addressed the Ministry of Self-Defense (MOSD) members, telling them he was "proud of y'all." Rehl likewise

told the MOSD members he was "proud as fuck what we accomplished yesterday." Biggs recorded a podcast-style interview in which he called January 6 a "warning shot" to the government that showed them "how weak they truly are" after being "bitch-slapped . . . on their own home turf." Biggs explained that "January 7th was warning shot to the government – look, we started this country this way and we'll fuckin' save it this way." Nordean recorded a video of himself describing an encounter with a woman at the bar; in the video he faulted the woman for not appreciating that he "was part of fucking storming the Capitol of the most powerful country in the fucking world… 1776, bitch."

Their own words leave no doubt. The defendants understood the stakes, and they embraced their role in bringing about a "revolution." They unleashed a force on the Capitol that was calculated to exert their political will on elected officials by force and to undo the results of a democratic election. The foot soldiers of the right aimed to keep their leader in power. They failed. They are not heroes; they are criminals.

Rather than an act against one Member of Congress and her husband, as in Mr. DePape's conviction[9], the January 6 defendants attacked all Members of Congress, as well as all of their staffers, visitors to the Capitol, and members of the media. Approximately 140 police officers were assaulted on January 6 at the Capitol, including about 80 from the U.S. Capitol Police and about 60 from the Metropolitan Police Department. *See* https://www.justice.gov/usao-dc/36-months-jan-6-attack-capitol-0. Moreover, while the government may dispute what brought Mr. DePape to the Pelosi home, there is no dispute that there were no official acts being conducted at that time, unlike the January 6 rioters who purposefully, deliberately, and violently invaded the Capitol for the direct purpose of stopping the peaceful transfer of power from one President to the next. Thus, while the harm to the Pelosis is awful, regrettable, and real, it is simply of a lesser scope and harm than that committed on January 6.

Mr. DePape's sentence should not be greater than the five most serious defendants convicted of a *seditious* conspiracy involving a large scale infiltration of the U.S. Capitol involving multiple assaults and immeasurable harm to those involved and the nation as whole.

Sentences in other cases involving serious crimes are also instructive as to the appropriate sentence here, as displayed in the below figures.[10] For kidnapping cases, based on data from fiscal

---

[9] Mr. DePape continues to dispute that his conduct meets the legal standard of acting on account of the performance of official duties.
[10] This data was obtained from the Sentencing Commission's Interactive Data Analyzer, which can be accessed at https://www.ussc.gov/research/interactive-data-analyzer.

years 2019–2023, the nationwide average sentence length was 186 months and the median sentence length was 144 months—not out of line with what Mr. DePape requests here. *See* Fig. 1. For murder cases, the nationwide average sentence length was 263 months and the median sentence length was 240 months. *See* Fig. 2.

### Fig. 1: Average and Median Kidnapping Sentences



Average and Median Imprisonment Length
Fiscal Year 2019,2020,2021,2022,2023

Imprisonment Length (Average Months)   Imprisonment Length (Median Months)

The figure includes the 528 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2019,2020,2021,2022,2023; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Kidnapping; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: All; Career Offender Status: All

### Fig. 2: Average and Median Murder Sentences

Average and Median Imprisonment Length
Fiscal Year 2019,2020,2021,2022,2023

Imprisonment Length (Average Months)   Imprisonment Length (Median Months)

The figure includes the 1,829 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2019,2020,2021,2022,2023; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Murder; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: All; Career Offender Status: All

When this case is viewed in light of this sentencing data, it is clear that a sentence of 168 months is appropriate here. To put it plainly, this Court should not sentence Mr. DePape to the same amount of or more prison time than what defendants in murder cases—that involved the intentional

killing of another human being—have received.

**III.    The Court Should Order That Mr. DePape's Federal Sentence Run Concurrently With Any Future State Sentence In His Pending State Case And Reduce The Federal Sentence By The Time He Has Spent In Presentence Custody**

**A.    This Court has the authority to order a federal sentence to run concurrently with a state sentence that has yet to be imposed**

As a threshold matter, it is important to note that this Court has the inherent authority to order that a federal sentence be served concurrently with or consecutive to a state sentence that has not yet been imposed. *Setser v. United States*, 566 U.S 231, 236–37 (2012) (holding that district courts' sentencing discretion extends to selecting whether the sentences they impose will run concurrently or consecutively with a state sentence that is not yet imposed, and that 18 U.S.C. § 3584 does not curtail this inherent discretion); *see* U.S.S.G. §§ 5G1.3(c), (d) (providing guidance for courts to run sentences concurrently to anticipated state or other undischarged terms of imprisonment). The *Setser* Court went on to explain that "it is always more respectful of the State's sovereignty for the district court to make its decision up front rather than for the Bureau of Prisons to make the decision *after* the state court has acted. That way, the state court has all of the information before it when it acts." *Id.* at 241.

**B.    If this Court stays silent on whether the federal sentence should be concurrent with a future state sentence, the sentences will run consecutively**

According to the BOP's interpretation of 18 U.S.C. § 3584(a), when a federal commitment order is silent as to whether the federal sentence should run concurrently with, or consecutive to, a future state sentence, the sentences will be run consecutively. *See* Chuang Decl., Ex. C at 1-31–1-32.[11] The BOP derives its interpretation from the provision in § 3584(a) stating that, "Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently." 18 U.S.C. § 3584(a); Chuang Decl., Ex. C at 1-31. Accordingly, the BOP will automatically run a federal sentence consecutively to a future state sentence *unless* the federal sentencing judge orders that it run concurrent—this interpretation is based on the statutory language and the legislative history of the subsection. *See* Chuang Decl., Ex. C at 1-31–1-32 ("If . . . multiple

[11] For ease of reference, this motion will use the page numbers on the upper right-hand corner of Exhibit C and the page numbers on the lower right-hand corner of Exhibit D.

terms of imprisonment are imposed at different times without the judge specifying whether they are to run concurrently or consecutively, they will run consecutively unless the statute specifies otherwise."); Chuang Decl., Ex. D at 41 ("If the federal Judgment and Commitment Order is silent and if the state authorities have primary jurisdiction over the defendant, the default by the BOP is to compute the federal sentence as consecutive with the state sentence . . .").

In Mr. DePape's case, state authorities have had primary jurisdiction over him since he was arrested by SFPD on October 28, 2022, for state charges related to the same incident as this federal matter. He has remained in state custody during the pendency of his federal proceedings, and has been produced to federal court as necessary by writ. *See* PSR at 2 (Release Status). Crucially, the state authorities never relinquished him from their custody, meaning that they have always had and still have primary jurisdiction over Mr. DePape. The fact that he was brought to this Court on a writ of *habeas corpus ad prosequendum* for his federal proceedings does not change primary jurisdiction; the federal authorities essentially "borrowed" him from state custody for the purposes of prosecuting this matter. *See, e.g.*, *Taylor v. Reno*, 164 F.3d 440, 445 (9th Cir. 1998). Therefore, because of BOP's interpretation of § 3584(a), this Court's silence at sentencing on the concurrent-vs-consecutive issue vis-à-vis a future state sentence would have the practical effect of subjecting Mr. DePape to consecutive sentences and providing him with absolutely no credit for the entire time he has already been in custody.

### C.   The Court should order that Mr. DePape's sentence run concurrently with any future state sentence in his pending state case to avoid precluding concurrent sentences

Because the state is its own sovereign, the state court judge is free to decide how a state sentence will be counted by state authorities, regardless of the federal sentence. However, because of how BOP computes the *federal* sentence, the *only way* for a federal sentence to actually run concurrently to a future state sentence when a state has primary jurisdiction is for the federal sentencing judge to clearly signal such intent by ordering concurrency. *See* Chuang Decl., Ex. C at 1-32A; Chuang Decl., Ex. D at 42 ("[S]entencing orders are not always clear, forcing the BOP to make an interpretation . . . . [D]elineation [of the federal sentencing judge's intent] would be helpful to the BOP, whose practice is to try to follow (to the extent possible) the intent of the federal sentencing

1   judge."). Essentially, if this Court orders the federal sentence to run concurrently to a future state

2   sentence, that does not guarantee that the sentences would actually be concurrent because the state

3   court judge could always decide to run the state sentence consecutively. But if the Court does *not*

4   order concurrency, that decision is taken out of the state court judge's hands and the sentences will

5   necessarily run consecutively.[12]

6        This Court should therefore order that Mr. DePape's sentence run concurrently with any future

7   state sentence yet to be imposed in his pending state matter, San Francisco County Superior Court

8   Case No. 22012966.[13] As the Court is already aware, Mr. DePape's state case and federal case both

9   involve charges arising from the *exact same incident*. Under these circumstances,  where "a state term

10  of imprisonment is anticipated to result from another offense that is relevant conduct to the instant

11  offense of conviction . . . the sentence for the instant offense shall be imposed to run concurrently to

12  the anticipated term of imprisonment." U.S.S.G. § 5G1.3(c).

13       **D.    The Court should reduce Mr. DePape's federal sentence by 18 months and 20 days
              to account for the time that he has spent in presentence custody**

14

15       BOP policy also prohibits BOP from giving a defendant prior custody credit for any time spent

16  in non-federal presentence custody if such time is later credited to a state sentence, as is the case here.

17  According to BOP's Sentence Computation Manual, "[t]ime spent in custody under a writ of habeas

18  corpus from non-federal custody will not in and of itself be considered for the purpose of crediting

19  presentence time."[14] And BOP has interpreted 18 U.S.C. § 3585(b) to prohibit them from granting

20  prior custody credit to a person in primary state custody if a subsequently-imposed state sentence

21  gives credit for that time. *See* Chuang Decl. ¶ 5. Thus, separate and aside from whether the federal

22  sentence is imposed concurrent to the future state sentence, Mr. DePape will not receive any BOP

23  credit for the 18 months and 20 days that he will have spent in presentence custody by the time of the

24  sentencing date in this matter. The Court should therefore reduce Mr. DePape's federal sentence by

26  [12] Notably, Mr. DePape objected to his federal sentencing proceeding prior to the completion of his
    state case where primary custody lies, and continues to object.

27  [13] BOP implements this concurrency by designating the state institution as a place where the federal
    sentence can be served pursuant to its authority under 18 U.S.C. § 3621(b), thus allowing the federal

28  sentence to commence while state authorities have primary jurisdiction. *See Setser*, 566 U.S. at 235.
    [14] Available at https://www.bop.gov/policy/progstat/5880_028.pdf.

the amount of presentence custody time that will not be credited by BOP—in this case, 18 months and 20 days.[15]

## CONCLUSION

For all the reasons set forth above, Mr. DePape respectfully requests that the Court sustain his objections to the PSR and impose a sentence of 168 months, adjusted for presentence custody time. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).


Dated:      May 10, 2024                              Respectfully submitted,

                                                      JODI LINKER
                                                      Federal Public Defender
                                                      Northern District of California

                                                                  /S
                                                      ANGELA CHUANG
                                                      Assistant Federal Public Defenders

---

[15] This is consistent with the Guidelines' provision directing courts to "adjust the sentence for any period of imprisonment already served . . . if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons" in situations where a defendant is already serving a state sentence for conduct related to a subsequently-sentenced federal offense. U.S.S.G. § 5G1.3(b)(1).

DEF'S SENT. MEM.
*DEPAPE*, CR 22–426 JSC